**SAN CARLOS APACHE TRIBE**
**DEPARTMENT OF JUSTICE**
Alexander B. Ritchie, AZ Bar No. 019579
Justine Jimmie, AZ Bar No. 019148
Laurel Herrmann, AZ Bar No. 025623
Jana Sutton, AZ Bar No. 032040
Bernardo M. Velasco, AZ Bar No. 033746
P.O. Box 40
San Carlos, Arizona 85550
Tel. (928) 475-3344
alex.ritchie@scat-nsn.gov
justine.jimmie@scat-nsn.gov
laurel.herrmann@scat-nsn.gov
jana.sutton@scat-nsn.gov
bern.velasco@scat-nsn.gov
*Attorneys for the San Carlos Apache Tribe*

**THE SPARKS LAW FIRM, P.C.**
Joe P. Sparks, AZ Bar No. 002383
7503 First Street
Scottsdale, Arizona 85251
Tel. (480) 949-1339
joesparks@sparkslawaz.com
*Attorney for the San Carlos Apache Tribe*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| SAN CARLOS APACHE TRIBE, a federally recognized Indian tribe,<br><br>    *Plaintiff*<br><br>v.<br><br>UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, *et al*.,<br><br>    *Defendants*<br><br>v.<br><br>RESOLUTION COPPER MINING, LLC,<br><br>    *Intervenor-Defendant* | No. CV-21-0086-PHX-DWL<br><br>(Hon. Dominic W. Lanza)<br><br>**DECLARATION OF JAMES WELLS, PH.D., P.G.** |

James Wells, Ph.D., P.G. declares as follows:

1.     My name is James Wells of Santa Barbara, California. I have been a practicing environmental geologist for over 30 years. I am a  Professional Geologist, registered in the state of California and am the President of LEA Environmental, Inc., an environmental consulting firm.

2.     I hold a Ph.D. in Geological Sciences from the University of Washington. My Bachelor's Degree in Earth Sciences is from Dartmouth College.

3.     My *curriculum vitae*, attached as Exhibit A, describes my professional experience, which includes a variety of consulting work including site investigations and soil and groundwater remediation, groundwater hydrology, environmental forensics, and the fate and transport of contamination in soil and groundwater.  I am also on the board of the academic journal, Environmental Forensics.

4.     For the last ten years, I have advised the San Carlos Apache Tribe on environmental and water resource matters related to the proposed Resolution Copper Mine, as well as other matters. In my work as an environmental geologist, I have reviewed numerous environmental impact statements that have been prepared under the National Environmental Policy Act of 1969 ("NEPA") for mines and other mining infrastructure and am familiar with their contents and the degree of analysis that federal agencies are required to conduct.

5.     I served on the Groundwater Modeling Workgroup which advised Tonto National Forest ("TNF") on its preparation of the Draft Environmental Impact Statement (DEIS), using complex groundwater modeling methods to predict water and ecosystem

impacts from the proposed mine ("Mine") that Resolution Copper Mining, LLC ("Resolution") intends to construct beneath Oak Flat that is the subject of this lawsuit. The working group consisted of Forest Service and Resolution Copper personnel, as well as professionals from stakeholder agencies such as US Environmental Protection Agency, US Geological Survey, Arizona Game and Fish, and Arizona Department of Environmental Quality. Also, at the invitation of Tonto National Forest, I was also a member of the Resolution Copper Mine Water Resources Working Group which advised the Forest Service on its efforts to respond to public comments on the DEIS. For context, of roughly 30,000 comments submitted to the Forest Service on the DEIS during the public comment period, approximately 20% of the substantive comments related to water resources or water quality, demonstrating the public's deep concern about this issue.

6.      I reviewed the Bureau of Land Management's June 13, 2022 report prepared by Lisa Dubas, et al., *Bureau of Land Management Review of Hydrology Aspects of the Resolution Copper Project*, and agree with the conclusions stated therein, including that "hydrologic features and processes in the project area will be altered forever and, in many cases, destroyed in perpetuity" and that the FEIS is not forthright about the severity and permanence of these impacts. I also agree with the BLM authors' identification of deficiencies in the FEIS with respect to climate change, addressing indirect effects on groundwater resources in the Tribe's Cutter Basin, long term risks from the Skunk Creek tailings storage facility and its inadequate analysis of impacts to natural springs and streams.

7.      I reviewed the DEIS, and assisted the Tribe in preparing its comments on it, highlighting numerous deficiencies that I summarized in my testimony before the House Natural Resources Subcommittee on Indigenous Peoples of the United States on March 12, 2020, which I have attached as Exhibit B.

8.      Among those deficiencies, TNF failed to take a "hard look" at the Mine and ensure the scientific integrity of its evaluation of the many environmental impacts that the Mine will have including:

    a.  failure to evaluate the cumulative impacts of the Mine on Arizona's water resources, which are already experiencing shortages;

    b.  use of unreliable groundwater models that ignored long-term consequences;

    c.  inadequate analysis of impacts on groundwater-dependent ecosystems within other Forest Service lands;

    d.  failure to consider alternative to block cave mining;

    e.  inadequate mitigation measures;

    f.  failure to consider exposure of mineralized deposits in the fractured zone to atmospheric oxygen and the likelihood of acid-rock drainage; and

    g.  the failure to consider the impact of the subsidence crater on Apache Leap and its traditional cultural value.

9.      The proposed mining operation will take place at an unprecedented scale. While not a conventional open pit mine, the collapse crater will be among the largest mining pits in the world, easily visible from space, yet the DEIS did not consider

potential regional environmental impacts unique to such a massive operation. Research demonstrates that large land use changes can bring about local and regional changes to precipitation and wind patterns.[1] Such changes could negatively affect the water resources of the San Carlos Reservation and the upper Gila River watershed, yet the DEIS fails to evaluate these potential impacts.

10.      I also reviewed the Final Environmental Impact Statement ("2021 FEIS") that the United States Forest Service ("USFS") published in January 2021 and concluded that the 2021 FEIS did not resolve the above shortcomings.

11.      In August 2021, I published a report titled, The Proposed Resolution Copper Mine and Arizona's Water Future ("Report").  My Report concludes:

  a.    the Mine would consume at least 250 billion gallons of water during its production life, much of it pumped from the East Salt River Valley in the Phoenix active management area ("AMA");

  b.    the Mine would frustrate the goal of the Phoenix AMA to achieve long-term balance between groundwater withdrawals and recharge;

  c.    the Mine's groundwater use would make nearly 3,500 acres of the Superstition Vista Planning Acres unfit for development, costing the Arizona State Land Trust $536.6 million;

---

[1] Rodgers, et al., 2018, Land Cover Change, Surface Mining and Their Impacts on a Heavy Rain Event in the Appalachia, 2018, *Annals of the American Association of Geographers;* Nathian, et al., 2020, Complex Meteorology over a Complex Mining Facility: Assessment of Topography, Land Use and Grid Spacing Modifications in WRF [Weather Research and Forecasting Model], *Journal of Applied Meteorology and Climatology*; Rahmani & Fattahi, 2023, Long-Term Evaluation of Land Use/Land Cover and Hydrological Drought Patterns Alteration Consequences on River Water Quality, *Environment, Development and Sustainability.*

d.  if Resolution's water-saving measures are not as effective as claimed, the Mine's water use could be triple what Resolution forecasts, greatly exacerbating the water resource depletion;

e.  the FEIS failed to adequately account for Colorado River shortages under the Drought Contingency Plan; and

f.  Mine tailings would permanently threaten ground and surface water quality in the region.

12.    I have reviewed 16 U.S.C. 539p, which requires the Secretary of the Department of Agriculture to prepare a single environmental impact statement under NEPA for "all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."

13.    The 2021 FEIS fails to address and analyze the risks and potential environmental impacts presented by the Mine as described above..

14.    To my knowledge, USFS has not produced any reports in draft or final form for public review on these or other issues related to the Resolution Project since USFS withdrew the 2021 FEIS on March 1, 2021.

15.    In order to capably analyze any FEIS that the USFS may publish in the future, I would need at least forty-five days from the date it is provided to me to review

the document, which is customary for review of any draft EIS, so I may fully analyze the document and research issues that arise.

16.    I affirm that the foregoing is true and complete to the best of my knowledge under penalty of perjury.

_____  5/30/2025
                    James Wells        (Date)

# Exhibit A



# James T. Wells, PhD, PG
Environmental Geologist

LEA Environmental, Inc.
220 W. Gutierrez Street
Santa Barbara, CA 93101
805-880-9302
jwells@everettassociates.net

**Education**
University of Washington, Ph.D., Geological Sciences, 1990

University of Washington, M.S., Geological Sciences, 1986

Dartmouth College, B.A., Earth Sciences, 1981

**Professional Registration**
2001/California: Professional Geologist (Reg. No. 7212)

**Professional Societies**
Geological Society of America
American Ground Water Association
American Chemical Society
International Society of Environmental Forensics

Dr. Wells is an environmental geologist with over 30 years of experience in hydrogeology and geochemistry and is a Professional Geologist, licensed by the California Board for Engineers, Land Surveyors and Geologists. Dr. Wells is President of LEA Environmental, Inc., an environmental hydrogeology and remediation company. He earned his PhD in Geological Sciences from the University of Washington in 1990; Masters of Science Degree in Geological Sciences from the University of Washington in 1986; and his Bachelor's Degree in Earth Sciences from Dartmouth College in 1981.

During the course of his career, Dr. Wells has evaluated soil, soil vapor and groundwater at dozens of sites around the country. His professional work experience includes conducting subsurface investigations to define the nature and extent of contamination in soil, soil vapor and groundwater, groundwater modeling, conducting contaminant fate and transport studies, and evaluating remediation strategies. He has extensive experience in groundwater and vadose zone computer modeling, as well as in the statistical analysis of hydrogeological systems. Dr. Wells is regularly asked to serve as an expert witness in environmental lawsuits involving subsurface contamination.

Dr. Wells is a member of the Editorial Board of the journal, Environmental Forensics, a quarterly peer-reviewed scientific journal of national and international circulation. In this role, he evaluates the work of others through peer-review of manuscripts submitted for publication to the journal. He also participates in publication decisions, as well as establishing and maintaining the editorial direction of the journal. He has given technical presentation and guest lectures at scientific conferences and universities and is author and coauthor of numerous scientific publications, including the forensic review articles in Environmental Science & Technology (U.K. Edition) Special Issue dedicated to Environmental Forensics.

In 2015, Dr. Wells was appointed by the State of California Department of Toxic Substances Control and South Coast Air Quality Management District to serve as the Technical Advisor to the Exide Community Advisory Group. In this capacity, he serves as technical liaison between community stakeholders and state regulators for this project involving evaluation and cleanup of up to 10,000 homes impacted by lead emissions from a secondary lead smelter. Dr. Wells has provided expert testimony on the Exide case before a legislative hearing at the state capitol in Sacramento. He has also twice testified before the U.S. House of Representatives Natural Resource Committee on environmental matters.

LEA Environmental's billing rate for Dr. Wells is $300/hr. His hourly rate for deposition and trial testimony is $500/hr.

James T. Wells, PhD, PG
Page 2

### Employment History

LEA Environmental/L. Everett & Associates. 2010-present

Haley & Aldrich. 2006-2010

Shaw Environmental. 2005-2006

Haley & Aldrich. 2001-2005

Ogden Environmental. 2000-2001

Metcalf & Eddy. 1991-2000

### Representative Project Experience

*Applies expertise in geo-
chemistry and
hydrogeology to solve
environmental problems*

**San Roque Cleanup Fund – Groundwater Remediation, Santa Barbara, CA.**
Groundwater and soil vapor monitoring, vapor intrusion mitigation, and in-situ
groundwater remediation at a site with comingled plumes from four different dry
cleaners. Developed conceptual site model and collected corroborating data to
persuade Regional Water Quality Control Board to name additional responsible
parties.

**CA Department of Toxic Substances Control (DTSC) – Exide Technical
Advisor, Vernon, CA.** Appointed by DTSC and South Coast Air Quality
Management District to serve as the Technical Advisor to the Exide Technologies
Advisory Group. Has served since 2015 as technical liaison between community
stakeholders and state regulators for this project involving evaluation and cleanup
of up to 10,000 homes impacted by lead emissions from a secondary lead smelter.
In addition to speaking at many community meetings, Dr. Wells provided expert
testimony on the Exide case before a legislative hearing at the state capitol in
Sacramento.

**Hope Ranch Air Quality Assessment, Santa Barbara, CA.** Tested indoor and
outdoor air quality, sampled source area emissions at a unique phenomenon
involving spontaneous combustion of organic matter in marine sediments exposed
along Santa Barbara's coastal bluffs. Determined the smoldering rocks were
emitting problematic levels of benzene and other VOCs which reached nearby
homes, constituting a nuisance and a potential health risk.

**Magnolia Elementary School – Litigation Support, El Cajon, CA.** Combined
monitoring data and modeling to reconstruct historical groundwater and indoor air
impacts at an elementary school adjacent to aerospace parts manufacturer.

**SIMA Corporation – Chlorinated Solvents, Camarillo, CA.** Conducted site
characterization, subsurface remediation, regulatory negotiation for PCE in soil,
soil vapor and groundwater at this dry cleaner site, with special emphasis on the
potential for vapor intrusion into nearby commercial buildings.

**Earthjustice – Evaluation of Neighborhood Lead Impacts, City of Industry,
CA.** Worked with the nonprofit environmental law organization, Earthjustice, to
identify deficiencies in soil sampling plans and statistical analyses that were



James T. Wells, PhD, PG
Page 3

meant to measure lead impacts due to emissions from the Quemetco Secondary Lead Smelter to soil in surrounding residential neighborhoods.

**Elem Indian Colony – Mercury and Arsenic-Bearing Mine Waste, Clearlake, CA.** Served as independent technical advisor to the Elem Indian Colony regarding remediation plans for the Sulphur Bank Mercury Mine Superfund Site. Provided assistance through EPA's TASC (Technical Assistance Services for Communities) program.

**Humphrey, Farrington & McClain – Radionuclides in West Lake Landfill Superfund Site, St. Louis, MO.** Provided expert opinions on threats to human health and the environment from radioactive waste and other contaminants that had been improperly disposed of in this landfill in the early 1970s. The material consisted of uranium-ore-processing residues that had been generated in St. Louis as part of the Manhattan Project in the 1940s.

*His area of expertise includes environmental forensics and fate and transport of organic and inorganic contaminants in soil and groundwater*

**Reedley Remediation Trust – Chlorinated Solvents, Reedley, CA.** Provided site characterization and remediation planning advice for this comingled PCE groundwater plume. Also advised on the formation of a remediation trust to insure adequate resources for a long-term cleanup program.

**Isola Law Group – Rialto-Colton Superfund Site, San Bernardino County, CA.** Provided litigation support in complex, multi-party lawsuit concerning cost allocation, contaminant fate and transport and remediation technologies for large (5-mile long) perchlorate and TCE groundwater plume.

**San Carlos Apache Tribe – Technical Advice on Proposed Copper Mine, Superior, AZ.** Advised the Tribe on environmental aspects of large proposed copper mine project which the Tribe opposed. This work involved meetings and negotiations with mining company and officials of the US Forest Service regarding intergovernmental consultations and the EIS process, expert testimony in an administrative hearing, presentations at Tribal Council meetings, meetings in Washington DC with Council on Environmental Quality, EPA, USDA and Congressional staff. Testified before the U.S. House of Representatives Committee on Natural Resources.

**KB Gardena – Litigation Support & Subsurface Remediation, Gardena, CA.** Provided attorneys with technical advice and assistance with cost allocation strategy for multi-million dollar case with multiple PRPs. Conducted site remediation under existing warehouse for PCE, metals and other VOCs.

**Pacific Gas & Electric Company – Forensic Geochemistry, Chico, CA.** Analyzed high-resolution petroleum hydrocarbon data, including PIANO analysis, relative solubility and hydrocarbon weathering assessments to evaluate the theory that contamination discovered on client's property originated from off-site sources and was not due to on-site releases. PIANO analysis is a forensic technique for complex hydrocarbon mixtures using gas chromatography to speciate individual hydrocarbon compounds and group the compounds into their molecular classifications: paraffins (P), isoparaffins (I), aromatics (A), naphthalenes (N) and olefins (O).



James T. Wells, PhD, PG
Page 4

**Rand Family Trust – Petroleum Hydrocarbons, Santa Barbara, CA.**
Conducted site characterization and site remediation for a commercial site in
Santa Barbara, California that was impacted with legacy contamination from a
sawmill operation from the late 1800's. Achieved closure of this case from the
local regulatory agency.

**U.S. EPA – Del Amo and Montrose Superfund Sites, Los Angeles County,
CA.** Provided independent technical analysis and advice to community group
affected by two adjacent Superfund sites. Analysis of potential exposure scenarios
and efficacy of remediation plans from PCBs, metals and VOCs from Superfund
sites in Los Angeles under EPA's TASC program (Technical Assistance Services
for Communities).

**Terracon, Inc. – Groundwater Modeling and Litigation Support, Weld
County, CO.** Complex construction defect case involving claims of $60 million
in damage allegedly due to soil expansion caused by rising groundwater from
irrigation of nearby golf course and residential areas. Opposing experts spent two
years and $2 million on groundwater modeling which was eventually excluded
from trial after we demonstrated unreliability and lack of relevance to judge.

**Wagstaff & Cartmell – Chromium in Tannery Waste, St. Joe, MO.** Provided
litigation support for case in which tannery waste had been spread as a soil
amendment over approximately 56,000 acres of agricultural land. It had been
known that the sludge contained elevated levels of metals, including chromium. It
was apparently not known that some of the chromium was in the form of toxic
Cr(VI) which posed a serious risk to human health and the environment.

**EPA/State of Idaho – Soil Remediation Pilot Study for Metal Stabilization,
Coeur d'Alene, ID.** Conducted field pilot study on metal stabilization along the
Coeur d'Alene River. The river feeds Lake Coeur d'Alene which is highly-
impacted by the cumulative effects of 100 years of mining in the watershed and is
the primary source of drinking water for over 50,000 residents of northern Idaho.
Work was sponsored by the U.S. Environmental Protection Agency (EPA) and
State of Idaho in an effort to find a cost-effective means of addressing widespread
soil contamination along a 30 mile stretch of the Coeur d'Alene River.

**Koch Oil – Forensic Geochemistry, Oklahoma.** Conducted forensic
geochemical evaluation on naturally-occurring compounds in groundwater to
assess whether historical groundwater concentration trends constituted natural
background variability or potential releases from client's brine impoundments.

**Tri-County Public Airport – Forensic Geochemistry Herington, KS.**
Conducted oxygen, deuterium, chlorofluorocarbon (CFC), carbon isotope analysis
of groundwater and chlorinated contaminants in order of evaluate contaminant
fate and transport at a former military facility.

**Gonzalez & Robinson – Groundwater Modeling, Santa Rosa, CA.** Used
groundwater computer modeling to simulate groundwater flow in a residential
region of Sonoma County, California.



James T. Wells, PhD, PG
Page 5

**Weitz, Luxenberg – Environmental Forensics for Chlorinated Solvents, Grand Island, NE.** Conducted forensic analysis of chlorinated solvent contamination extending in groundwater over two miles under a community. The site involved multiple releases from multiple locations and complex hydrogeology and attenuation histories.

**Kimberly-Clark – Forensic Geochemistry, Ohio.** Conducted forensic geochemical analysis to demonstrate that significant component of groundwater contamination under client's site had migrated from an off-site source. Utilized compound-specific carbon isotope analysis of chlorinated compounds and daughter product abundance. This analysis was complicated by the fact that there were low levels of residual contamination from an old on-site release, which needed to be definitively differentiated from the larger off-site flux of contaminants.

**Western States Petroleum Association – Risk-Based Clean-up Studies.** Conducted a study to develop risk-based clean-up standards for crude-oil-impacted soils, including studies of the comparative environmental risks posed by crude oil, gasoline, and diesel oil in the subsurface. Applied leaking underground fuel tank evaluation methods to crude oil sites and developed cost-effective site assessment strategies.

**Tesoro Petroleum Company –MTBE Groundwater Plume, San Fernando Valley, CA.** Managed a project in Southern California to delineate and clean-up a large release of methyl tert-butyl ether (MTBE) to soil and groundwater. A particular challenge of this project was to account for the presence of multiple high-volume water supply wells near the project site, a situation involving extensive regulatory negotiation with California Regional Water Quality Control Board and Upper Los Angeles River Area Watermaster.

**Gallagher & Kennedy – Perchlorate and Chlorinated Solvents, Santa Clarita, CA.** Provided litigation support for a lawsuit involving a 996-acre brownfield site. The site, used since the 1930s for munitions manufacturing, had soil and groundwater contamination from historic releases of metals, perchlorate and chlorinated solvents. When the local municipality took 13 acres of the property by eminent domain to build a new regional highway, the property owner sued to recoup the cost of the land. The municipality estimated a cleanup cost of $220 million and, based on this, valued the land at only $142,000. With colleagues, developed a soil and groundwater remediation plan and cost estimate. Through extensive soil and groundwater data analysis and 3D modeling, we developed an alternative remediation plan that dovetailed with extensive pre-development grading and employed state-of-the-art remediation technologies for perchlorate at a cost $27 million. A jury accepted the accuracy of our remediation estimate and awarded the owner over $12 million for land value and severance damages.

**ContiGroup Companies – Groundwater Remediation, Stockton, CA.** Completed subsurface characterization and designed a remediation strategy for this grain elevator site with carbon tetrachloride and other volatile organic



James T. Wells, PhD, PG
Page 6

compounds in groundwater. Due to the complex stratigraphy and heterogeneous distribution of contaminant throughout the aquifer, an in-situ chemical treatment strategy was designed for this site coupled with an initial, short-term phase of groundwater extraction to achieve containment of the contaminant plume.

**The Boeing Company – Service Delivery Leader, California.** Served as Service Delivery Leader, responsible for coordinating quality and consistency for a project team located in six offices and providing environmental services simultaneously on up to ten large projects. Also conducted vadose zone computer modeling to evaluate clean-up standards for soil that would be protective of future groundwater quality.

**Northrop-Grumman Corporation—Remediation Planning, Hawthorne, CA.** Provided analysis of environmental data and regulatory requirements for large site with multiple occurrences of contamination in soil and groundwater. Advised client on cost-effective strategies and technologies for resolving environmental impairment.

**Tesoro Petroleum Company – Groundwater Contamination at Refinery, Kenai, AK.** Conducted a feasibility study for containment and remediation of a large plume of free phase petroleum at a refinery in Kenai, Alaska. Migration of the light non-aqueous phase liquid was influenced by complex fluvio-glacial stratigraphy and by fluctuating groundwater levels.

**Exxon Company, U.S.A. – Remediation Planning, Los Angeles, CA.** Developed remediation and regulatory strategies for the closure of a large urban oil field in California consisting of over 500 production sites over four square miles of residential and commercial districts. The proposed strategy was a risk-based approach addressing such factors as cost, schedule, future liability and land use.

**The Boeing Company - Aircraft Manufacturing Site Redevelopment Environmental Program, Long Beach, CA.** Team member for comprehensive subsurface investigation program for 343-acre former manufacturing facility. This complex project involved over 1500 soil borings, web-based data repository, risk-based formulation of clean-up standards, production of data reports specifically designed for use by potential buyers and other stakeholders and close coordination with redevelopment staff.

**Nestlé, U.S.A. –Aquifer Remediation, Palm Desert, CA.** Working with Nestlé technical staff, developed a technical strategy and gained regulatory acceptance of a passive bioremediation approach at an underground storage tank site which contained hydrocarbon contamination in groundwater in a beneficial-use aquifer.

**County of San Luis Obispo Water Supply – Nitrate in Groundwater, Los Osos, CA.** Conducted a study of nitrate contamination in shallow groundwater at Los Osos, California, a community that relies solely on groundwater for its municipal water supply. The study incorporated site-specific data on the transport and transformation of nitrogen in the subsurface to develop a nitrogen mass balance for all significant nitrate sources. This work resulted in quantitative



James T. Wells, PhD, PG
Page 7

estimates of the contribution of septic system effluent to nitrate levels in groundwater.

**U.S. Navy – Groundwater Investigations and Remediation Planning, San Diego County, CA**. Managed site investigations, feasibility studies and remediation planning at eight contaminated sites overlying the sole-source aquifer at Camp Pendleton Marine Corps Base.

**Santa Barbara Historical Society – Manufactured Gas Plant Contamination, Santa Barbara, CA.** Provided environmental consulting services, advocacy and participated in negotiations with Southern California Edison (the responsible party) on behalf a Santa Barbara nonprofit organization. This work focused on soil and groundwater investigations, remediation plans and associated risks related to soil and groundwater contamination at a former manufactured gas plant on the nonprofit's property.

**Sequoia Voting Systems – Groundwater Investigations, Exeter, CA.** Managed a project involving chlorinated compounds in groundwater and developed strategy to suspend active remediation on the grounds of natural contaminant of the chlorinated plume. Our approach was approved by the state.

**Los Angeles Metropolitan Transportation Authority – Comprehensive Environmental Services.** Project manager for comprehensive hazardous waste assessment contract with the LACMTA. For this project, we provided environmental services in support of land acquisition and construction for a light-rail commuter line in the Los Angeles area.

**State of California – Soil and Groundwater Remediation, Camarillo, CA.** Implemented an air sparging/soil vapor extraction soil and groundwater remediation system for extensive vadose zone and dissolved groundwater petroleum plumes at the future site of a Cal State University campus.

**Various Clients – Geostatistical Programs.** Developed programs for the statistical analysis of groundwater monitoring data for a mining facility, petroleum refinery, wastewater reclamation operation and a municipal waste landfill, all in Central California. Projects involved the implementation of EPA-approved statistical techniques to evaluate the differences between background and downgradient concentrations of groundwater contaminants.

### Depositions and Trial Testimony in Last Four Years

2025, Weiand Automotive Industries, Inc. et al., Delaware, Trial Testimony.

2023, Funderburk, et al., vs Johnson Controls, Inc., et al., Deposition Testimony.

2023, Taylor, et al., v. Schaeffler Group USA, Deposition Testimony.

2023, HEG Trust v. Altawood, Inc., et al., Deposition Testimony.

2023, Weiand Automotive Industries, Inc. et al., Deposition Testimony.

2023, 2022, Wright v. Unocal, et. al., Deposition Testimony (2022, 2023), Trial



James T. Wells, PhD, PG
Page 8

Testimony (2023).

2022, Lomas, et al., v. Delta Airlines, Deposition Testimony.

2022, 2021, Millman, et al., vs United Technologies Corporation, Deposition Testimony (November 2021, February 2022).

2021, 2020, Torres v. Igdaloff, Deposition Testimony (Sept 2020, June 2021).

2020, Houlihan v. UTC, et al., Deposition Testimony.

2020, Goldberg vs. Goss-Jewett, et al., Deposition Testimony (June and August).

2020, Acosta v. Shell Western E&P, et al., Trial Testimony.

2019, Strong v. Republic Services, et al., Deposition Testimony.

2019, McClurg, et al. v. Mallinckrodt, Inc., et al., Deposition Testimony.

2019. Brooks v. PB Products North America, et al., Deposition Testimony.

2018, Renzel v. Ventura, Deposition Testimony.

2018, Weiand Automotive Industries, Inc. et al., Deposition Testimony.

### Publications and Papers

Expert Witness Services for Environmental Scientists and Engineers: Professional Opportunities at The Intersection of Law and Science, in: *Applied Geology of California*, Anderson and Ferriz, eds., Chapter 29 (with Schaal, Matos and Everett).

"Emerging Trends in Environmental Forensics," presentation and paper for American Law Institute Conference on Environmental Litigation, Washington, DC, 2013.

"Tracking Chlorinated Solvents in Nature – Classic and Emerging Forensic Techniques", with I. G. Petrisor, in *Environmental Forensics*, Volume 26 in the Issues in Environmental Science and Technology series, 2008.

"Perchlorate: Is Nature the Main Manufacturer?", with I. G. Petrisor, in *Environmental Forensics*, Volume 26 in the Issues in Environmental Science and Technology series, 2008.

"Environmental Forensics," presentation to the AIHA Joint Symposium, Long Beach, California, 2004.

"A Lattice Gas Model for Heterogeneous Chemical Reactions at Mineral Surfaces and in Pore Networks," with D.R. Janecky, and B. Travis, *Physica D, vol. 47, pp. 115-123,* 1991.

"Coupled Fluid Flow and Chemical Reactions in Mid-Ocean Ridge Hydrothermal Systems: The Behavior of Silica," with M.S. Ghiorso, *Geochimica et Cosmochimica Acta, vol. 55, pp. 2467-2482,* 1991.



James T. Wells, PhD, PG
Page 9

"The Influence of Fluid Flow and Reaction Kinetics on Mass Transfer in Mid-Ocean Ridge Hydrothermal Systems." Dissertation, University of Washington, 1990.

"3-D Numerical Models for Examining Processes in Geothermal-Hydrochemical Systems," with D.R. Janecky, B.J. Travis, G. Zyvloski, N. Rosenberg. Chapman Conference on Crustal-Scale Fluid Transport, Snowbird, Utah, 1990.
"Cellular Automata Simulations of Mineral Surface Reactions," with D.R. Janecky, and B. Travis, Geological Society of America Annual Meeting, St. Louis, 1989.

"Determining Fluid Velocity of Black Smoker Jets from Digital Correlation of Video Images," with M.O. Smith, V.A. Atnipp, and R.E. McDuff, American Geophysical Union Fall Meeting, San Francisco, 1989.



# Exhibit B

**Written Testimony of James Wells, PhD, Environmental Geologist**
**L. Everett & Associates, Environmental Consultants**
Testimony before House Natural Resources Subcommittee on
Indigenous Peoples of the United States
Hearing on "The Irreparable Environmental and Cultural Impacts
of the Proposed Resolution Copper Mining Operation"
March 12, 2020

I would like to thank Chairman Grijalva, Chairman Gallego, and members of the House
Subcommittee for Indigenous Peoples of the United States for inviting me to testify at this
hearing about the proposed Resolution Copper Mine. I am a Registered Geologist and I have
been a practicing environmental geologist for nearly 30 years. My Bachelor's Degree is from
Dartmouth College and my Masters' and PhD degrees are from the University of Washington in
Seattle, all in Geological Sciences. For the last seven years, I have advised the San Carlos
Apache Tribe on environmental and water resource matters related to the proposed Resolution
Copper Mine, as well as other matters.

At the invitation of the US Forest Service, I served on the Groundwater Modeling Workgroup
which advised Tonto National Forest on its preparation of the Draft Environmental Impact
Statement (EIS), using complex groundwater modeling methods to predict water and ecosystem
impacts from the proposed mine. The working group consisted of Forest Service and Resolution
Copper personnel, as well as professionals from stakeholder agencies such as US EPA, US
Geological Survey, Arizona Game and Fish, and Arizona Department of Environmental Quality.
Also, at the invitation of Tonto National Forest, I am currently a member of the Resolution
Copper Mine Water Resources Working Group which is advising the Forest Service on its efforts
to respond to public comments on the Draft EIS. For context, of roughly 30,000 comments
submitted to the Forest Service on the Draft EIS during the public comment period,
approximately 20% of the substantive comments related to water resources or water quality,
demonstrating the public's deep concern about this issue.

The Draft EIS prepared by Tonto National Forest identifies a number of profound environmental
impacts from this project that cannot be mitigated. The scale of this project is hard to fathom and
unfortunately the Forest Service fell short of its obligation under CEQA rules to take a hard look
and ensure scientific integrity in its evaluation of these environmental impacts.

## Inadequate Evaluation of Cumulative Impacts on Water Resources in a Region Already Experiencing Shortages

Once mining commences, the formation of a subsidence crater becomes inevitable and
unstoppable. Even Resolution Copper cannot stop this process once it has begun. Further, once
the 1.8-mile wide subsidence crater forms, the Apache Leap Tuff Aquifer will be altered forever,

Written Testimony of James T. Wells, PhD, PG
Page 2 of 12

irreversibly and permanently altering the region's water resources. This is the very definition of an irreparable harm. As stated in the Draft EIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block-caving begins the Apache Leap Tuff would begin to dewater as well."[1]

The Draft EIS analysis of past, present and reasonably foreseeable future regional water impacts is inadequate, even though the Forest Service acknowledges that "groundwater demand is substantial and growing" and "total demand on the groundwater resources in the East Salt River Valley is substantial and could be greater than the estimated amount of physically available groundwater" (DEIS, p. 342). The DEIS does not take a realistic look at the consequences of Resolution's plan to pump 550,000 acre feet of water (as cited in DEIS Table 2.2-1) from the aquifer in the East Salt River Valley.

There is disagreement about the accuracy of Resolution's water use predictions, but even if we take Resolution at its word, it will use about 775,000 acre feet of water over the life of the mine, of which 70% will be pumped from a large network of new extraction wells in the East Salt River Valley. 775,000 acre feet equals 250 billion gallons of water. The mine will consume enough water to supply a city of 140,000 people every year for 50 years. This is a vast new water demand for an area of the southwest that is already experiencing water shortages.

The East Salt River Valley is part of the Phoenix Active Management Area. There are already lots of straws drawing water out of this basin. Phoenix, Scottsdale, Tempe, Mesa, Gilbert, Chandler, Apache Junction and other towns rely on groundwater from the very same basin that Resolution will be pumping from. In its latest study, the Arizona Department of Water Resources predicted demand to exceed supply into the foreseeable future for this basin and also predicted irreversible loss of aquifer capacity due to overpumping.[2] In an October 2019 study of the adjacent Pinal Active Management Area, Arizona DWR finds a future unmet demand of 8.1 million acre-feet.[3] There is simply not enough water to go around. By green-lighting this mine, we are embarking on an uncontrolled experiment on social priorities pitting Arizona's agricultural, municipal and tribal interests against those of a multinational mining company and the mining company is winning.

---

[1] Draft EIS, pp. 296-299.

[2] Arizona Department of Water Resources, 2010, Modeling Report #22, A Salt River Valley Groundwater Flow Model Application. 100-Year Predictive Scenarios Used for the Determination of Physical Availability in the Phoenix Active Management Area.

[3] Arizona Department of Water Resources, 2019 Pinal Model and 100-Year Assured Water Supply Projection Technical Memorandum.

Written Testimony of James T. Wells, PhD, PG
Page 3 of 12

Tens of thousands of people in Pinal County rely on groundwater for their water supply and already, private wells are drying up.[4] As shown on Figure 1, the Forest Service's own research shows that Arizona has experienced moisture deficits even when averaged over the last 100 years.



*Figure 1. USDA 100-year moisture index, showing much of Arizona has a moisture deficit, even when averaged over 100 years. Source, USDA, 2012, Forest Health Monitoring: National Status, Trends and Analysis.*

Colorado and other parts of the desert Southwest remain in an almost perpetual drought. Figure 2 is the Interagency Drought Monitor map showing long-term and short-term drought conditions in and around the project area and across much of the Colorado River Basin. A 2017 Report to Congress noted that the Colorado River (source of critical water supplies to Arizona via the Central Arizona Project or "CAP") has experienced lower-than-normal flows for the past 16 years, with some of the lowest annual flows in 900 years. The Report to Congress also noted that recent studies on the effects of climate change suggest that "a transition to a more arid average climate in the American West" may be under way. Likely consequences of climate change include higher temperatures in the West, higher evapotranspiration, reduced precipitation, and decreased spring runoff.[5]

The DEIS fails to evaluate "reasonably foreseeable future" Colorado River shortages and cuts, as well as the events that will be triggered under the Drought Contingency Plan once shortages occur. It also fails to look at the project's impact on regional water resources when combined with these shortages.

## Cumulative Impacts

Resolution Copper Mine will obviously require a vast amount of water in a region of the country that is already experiencing water shortages. Arizona water law grants exceptional leeway to mines, which are essentially unregulated water users. As such, Resolution Copper may be entitled to develop a virtually unlimited number of wells and pump an unlimited amount of water

---

[4] ABC15 News, Private Wells Running Dry in Pinal County, Oct. 24, 2019; https://www.abc15.com/news/region-central-southern-az/private-wells-running-dry-in-pinal-county.

[5] Congressional Research Office, November 9, 2017, Drought in the United States: Causes and Current Understanding, pp. 14-15.

Written Testimony of James T. Wells, PhD, PG
Page 4 of 12

from the East Salt River Valley. The Forest Service seems to have (incorrectly) concluded that because of this water right, it is relieved of considering impacts that would arise from the exercising of this right. This approach is not sufficient under NEPA and does not satisfy the requirement under NEPA to take a "hard look" at environmental impacts.



Figure 2. US Drought Monitor Map, accessed on 12/6/2019.

Cumulative impacts are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions."[6] One of the greatest contributions the Forest Service *could have made* to this process—but did not—would have been to conduct a thorough analysis on cumulative impacts of Resolution's plan to pump 180 billion gallons of water from the aquifer in the East Salt River Valley.

## Inadequacy and Unreliability of Groundwater Models

40 CFR §1502.24 requires that agencies ensure scientific integrity of analyses in environmental impact statements. This means that scientific analyses must be reliable. As noted in the Draft EIS,

> "The Groundwater Modeling Workgroup recognized that a fundamental limitation of the model—of any model—is *the unreliability of predictions far in the future*, and the workgroup was tasked with determining a time frame that would be reasonable to assess."[7]

The Forest Service subsequently "determined that results could be reasonably assessed up to 200 years into the future."[8] This is a problem because some hydrogeological impacts not only persist, but actually get worse in timeframes far beyond 200 years.

---

[6] 40 CFR §1508.7.

[7] Draft EIS, p. 300, emphasis added.

[8] Draft EIS, p. 300.

Written Testimony of James T. Wells, PhD, PG
Page 5 of 12

The groundwater model was actually run for 1,000 years into the future (DEIS, p. 296) although only the first 200 years are reported quantitatively in the DEIS. This long-term analysis documented that in some areas around the mine, groundwater levels will continue to decline for many hundreds of years, thus potential impacts to Groundwater-Dependent Ecosystems (GDEs) will only increase beyond the 200-year cut-off for analysis. For example, the 1,000-year hydrograph produced by Resolution's modeling consultant for Hidden Spring predicts a continuing decline in groundwater levels for almost 800 years.[9] That impacts continue (and worsen) over such vast timeframes is a testament to how large and disruptive this project truly is and how environmental impacts from this project should be measured on a geologic time scale. By limiting the period of analysis, the Forest Service discounted (and did not disclose) the worst impacts that are predicted to occur decades and even centuries later.

The Forest Service also acknowledges (see quotation above) that the best scientific tool available (three-dimensional groundwater modeling) is not up to the task of analyzing such impacts. The Forest Service did not meet its obligation under 40 CFR §1502.24 because it did not maintain scientific integrity in analyzing hydrogeological impacts beyond 200 years, even though such impacts are certain and significant.

The limitations and unreliability of the groundwater model are simply the most recent chapter in a long saga of Resolution falsely claiming that it understands the hydrogeology of the project area well enough to assess impacts due to mining. I acknowledge that Resolution has conducted substantial investigations into the hydrogeology of the project area. However, the Forest Service failed to recognize that the knowledge base was still inadequate for the purposes of the DEIS.

The hydrogeology of the project area is extremely complex, with multiple aquifers, multiple faults and variable rock types. When combined with a proposed project of such immense scale, it is a significant challenge to conduct a groundwater impact analysis and the Forest Service has not met this challenge. Starting at least as early as 2016, Resolution's consultants assured the Forest Service scientists and others that the West Boundary Fault, Concentrator Fault and other faults would limit the western aerial extent of groundwater drawdown (under Superior and farther west) from mine dewatering at Shafts 9 and 10. Resolution's own computer model later contradicted this conclusion, instead showing nearly 10 feet of drawdown as far west as the Boyce Thompson Arboretum (see Figure 4 showing substantial drawdown beyond the boundary faults surrounding the mine site). In addition, Resolution's hydrogeological studies failed to predict the inflow of 600 gallons per minute of hydrothermal groundwater (170° F) that was encountered when sinking Shaft 10.

---

[9] Groundwater Working Group Meeting Notes, Meeting #8 held on May 15, 2018.

Written Testimony of James T. Wells, PhD, PG
Page 6 of 12

Resolution's own assessment acknowledges that groundwater will be depleted by at least 10 feet (and in some places, more than 1,000 feet) over an area covering about 300 square miles. As shown on this map, this is a consequence of dewatering at the mine site as well as massive amounts of pumping that will occur in the East Salt River Valley, about 15 miles west of the mine. No one knows how long it will take for the aquifers to recover after the mine closes, but Resolution once estimated that it would take about 1,000 years.



Figure 3. Map showing predicted groundwater drawdown from mine dewatering and from the Desert Wellfield. Sources: Base Map: DEIS, Figure ES-2; Desert Wellfield drawdown contours redrawn from DEIS, Figure 3.7.1-2 (Desert Wellfield modeling analysis area and maximum modeled pumping impacts); Mine model contours redrawn from WSP, October 31, 2018, Memo: Resolution Copper Groundwater Flow Model – Predictive Results, Figure 5 (Regional Groundwater Model Predicted Drawdown-Proposed Action Post Closure (Year 200); Faults are redrawn from WSP, February 2019, Resolution Copper Groundwater Flow Report, Figure 2.1 (Regional Geology Map).

## Inadequate Analysis of Impacts on Groundwater-Dependent Ecosystems

In evaluating this project, the Forest Service has violated its own groundwater policy for Tonto National Forest. The Draft EIS acknowledges that "Between 14 and 16 GDEs, mostly sacred springs, would be anticipated to be impacted by dewatering." Use of groundwater that impacts springs and streams is contrary to Tonto National Forest's groundwater policy:

> "Groundwater shall be managed for the long-term protection and enhancement of the Forest's streams, springs and seeps, and associated riparian and aquatic ecosystems. Development and use of groundwater for consumptive purposes shall be permitted only if it can be demonstrated that such proposals will adequately protect Forest resources."[10]

One of the most important expectations of the groundwater modeling effort was to assist the Forest Service in evaluating future impacts to springs and perennial streams that support

---

[10] Martin and Loomis, Keeping Our Streams Flowing: Tonto National Forest Groundwater Policy, in: Furniss, Clifton and Ronnenberg, eds., 2007, Advancing the Fundamental Sciences: Proceedings of the Forest Service National Earth Science Conference, October 2004, PNW-GTR-689, USDA, Forest Service, Northwest Research Station.

Written Testimony of James T. Wells, PhD, PG
Page 7 of 12

groundwater-dependent ecosystems (GDEs).[11] The computer model used to evaluate this issue does not quantitatively simulate groundwater-surface water interactions: "Changes in stream flow cannot be evaluated based on the groundwater model."[12] Instead, it was decided that a finding of hydrogeological "impact" would only be identified if the model predicted at least a 10-foot drop in the groundwater elevation in the immediate vicinity of a GDE. As stated in the Draft EIS,

> "… the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict."[13]

In short, the Forest Service has acknowledged that its scientific methodology (groundwater modeling) has a limit of precision of plus or minus 10 feet. The Working Group concluded that drawdowns of less than 10 feet could still have an impact on GDEs:

> "The Groundwater Modeling Workgroup recognized that while the model may not be reliable for results less than 10 feet in magnitude, changes in aquifer water level much less than 10 feet still could have meaningful effects on GDEs, even leading to complete drying."[14]

However, due to the limitation of the model, in places where the model predicts drawdown greater than zero but less than 10 feet, the Forest Service assumed (without proof) that there are no impacts: "to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon" (Draft EIS, p. 301). The Forest Service did not scientifically conclude that 10 feet or more of groundwater drawdown is needed to cause an impact on GDEs, this was just an arbitrary number based on limitations of the method of analysis, not some scientific principle.

---

[11] BGC Environmental, November 2018, Review of Numerical Groundwater Model Construction and Approach, Section 1.1, "Issues to be Addressed by the Groundwater Model".

[12] BGC Environmental, November 2018, Review of Numerical Groundwater Model Construction and Approach, Section 4.9.2.

[13] Draft EIS, p. 301.

[14] Draft EIS, p. 301.

Written Testimony of James T. Wells, PhD, PG
Page 8 of 12



In conclusion, the Forest Service chose a methodology that is incapable of thoroughly analyzing impacts of mine dewatering and the collapse crater on GDEs. In this instance, the Forest Service is not meeting its obligation under 40 CFR §1502.24, because it is relying on a scientific method (groundwater modeling) that is not capable of predicting significant hydrogeological impacts for this complex project.

## Inadequate Consideration of Alternatives to Block Cave Mining as a Way to Avoid Permanent Water Resource Impacts

Once the 1.8-mile-wide subsidence crater forms, the Apache Leap Tuff Aquifer will be altered forever. As stated in the Draft EIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block-caving begins the Apache Leap Tuff would begin to dewater as well."[15] The Apache Leap Tuff Aquifer is a critical source of water for springs and creeks, many of them sacred. This permanent impact would not occur if alternative underground mining methods were employed, but the Forest Service did not conduct an adequate analysis of alternative mining methods (as discussed elsewhere in these comments) largely because the Forest Service accepted Resolution's assertion that any method other than block cave mining would be too expensive. The Draft EIS disclosed a number of profound impacts due to the collapse crater that cannot be mitigated, including to water resources. By failing to conduct an acceptable and competent evaluation of project alternatives that could avoid the impacts caused by the collapse zone, the Forest Service is allowing one factor (cost of mining: i.e., Resolution's profitability) to outweigh all environmental and social factors combined.

## Mitigation of Impacts to Groundwater Dependent Ecosystems

The Draft EIS concludes that the Resolution Copper Mine project will or is likely to deplete water supplies and

---

[15] Draft EIS pp. 296-299.

Written Testimony of James T. Wells, PhD, PG
Page 9 of 12

harm or destroy the streams, springs, seeps and other water features in Oak Flat, Ga'an Canyon (Devil's Canyon), Mineral Creek and Queen Creek: "Between 14 and 16 GDEs, mostly sacred springs, would be anticipated to be impacted by dewatering. Although mitigation would replace water, impacts would remain to the natural setting of these places."[16] The proposed mitigation for GDEs is inadequate. Mitigation plans are outlined in an April 2019 report.[17] This report calls for replacing water flows in springs and creeks by pumping water from nearby wells (i.e., tapping groundwater from deeper in the aquifer), storing water in tanks and piping the water to the creek or stream or by constructing various water-collecting devices such as so-called "guzzlers," surface water capture systems or even trucking water in from alternative sources. Replacing a natural system with a manufactured facsimile of the system is not the intention of mitigation under NEPA. Just as it would not be permissible to replace the real Half Dome with a very large photograph of Half Dome, it is not permissible to replace lost GDEs with artful but artificial copies of natural systems. It was not the intention of NEPA to replace nature with Disney-like imitations of nature.

The monitoring plan for GDEs is also inadequate because its discussion of triggers (i.e., occurrences or observations that would trigger mitigation activities) is vague and incomplete. The Montgomery Report[18] reveals that Resolution has built in (and the Forest Service has bought into) any number of ways to avoid actually implementing mitigation measures for GDEs. In particular, the Plan explains that Resolution will somehow differentiate the impacts from its dewatering from other variables such as "changes in weather and/or climate, impacts to the regional and/or local groundwater system from other human causes, landscape changes such as landslides and fires, natural succession of the GDE into a new presentation such as an increase in phreatophytic plants coincident with a reduction in spring flow rates, or other reasons not included in this document." Other than noting that Resolution will employ "multiple lines of evidence" there is no quantitative or qualitative discussion of how Resolution will accomplish this difficult task. Considering that all of the GDEs covered by the monitoring plan have already been identified as likely to be severely impacted by mine dewatering, this is a problematic situation and is inadequate under NEPA.

Appendix J of the Draft EIS specifies that the monitoring and mitigation plan is not intended to address water sources associated with perched shallow groundwater in alluvium or fractures. Including shallow fracture flow in this statement incorrectly excludes important and probably

---

[16] Draft EIS p. 123.

[17] Montgomery & Associates, 2019, "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells."

[18] Montgomery & Associates, 2019, "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells."

Written Testimony of James T. Wells, PhD, PG
Page 10 of 12

inevitable impacts directly related to mining. Fracture flow[19] is likely the dominant groundwater flow mechanism in the Apache Leap Tuff and this groundwater unit is the source of water discharges that support riparian zones in Ga'an Canyon (Devil's Canyon), Mineral Creek and possibly Queen Creek. The groundwater system in the Apache Leap Tuff will be profoundly and irrevocably altered by the formation of the collapse crater. The Draft EIS is incorrect in excluding shallow fracture flow from monitoring and mitigation requirements.

## Water Quality Impacts-Acid Rock Drainage

As noted in the Draft EIS, "The deposit is associated with hydrothermal alteration and includes a strong pyrite "halo" in the upper areas of the deposit, containing up to 14 percent pyrite. This mineralization has ramifications for water quality, as sulfide-bearing minerals such as pyrite have the potential to interact with oxygen and cause water quality problems (acid rock drainage)".[20] Much of the mineralized halo (i.e., rocks with abundant sulfide minerals but a lower grade of copper) will not be mined out, rather it will become a permanent part of the collapse zone.

The Draft EIS makes the unsupported assumption that the mineralized, fractured rock in the collapse zone will not be in contact with oxygen, thus will not form acid rock drainage. This is a highly optimistic conclusion that defies common sense. As the collapse zone forms, the rock will become fractured (thus increasing its hydraulic conductivity many orders of magnitude) and largely dewatered. For the purposes of groundwater modeling, Resolution assumes that the hydraulic conductivity[21] of rock in the cave zone will increase by as much as a <u>factor of a million</u>: "Maximum hydraulic conductivity values were altered by a multiplier of 1E+6 or to a hydraulic conductivity of 100 ft/day, whichever occurs first…The maximum hydraulic conductivity value of 100 ft/day was selected because it is much higher than the natural, un-altered bedrock, but higher values caused the model to become unstable."[22] This statement highlights another deficiency of the groundwater model: hydraulic conductivity of rock in the

---

[19] Groundwater flow is generally thought of as flow through porous media, that is, through the pore spaces between the grains that make up sediments and sedimentary rocks. This is considered "primary porosity." Fractures are a form of secondary porosity, created due to tectonic forces or other stresses on the rock. Large fractures can increase rates of groundwater flow very substantially compared to the generally slow flow through porous media, thus can be very important in mountainous regions with significant fracturing.

[20] Draft EIS p. 140.

[21] Hydraulic conductivity is a measure of the ease by which groundwater flows through an aquifer. This, in turn, affects the groundwater velocity through the aquifer. Solid rock has a very low hydraulic conductivity; sandstone has a higher hydraulic conductivity and very coarse grained sediments like gravels have even higher hydraulic conductivity.

[22] WSP, February 2019, Resolution Copper Groundwater Flow Report, pp. 37-38.

Written Testimony of James T. Wells, PhD, PG
Page 11 of 12

collapse zone was arbitrarily limited to 100 ft/day because the model would crash if higher (i.e., more realistic) values were used.

Atmospheric air will easily penetrate the fracture zone, supplying oxygen into a subsurface environment that has probably been devoid of oxygen for thousands if not millions of years. This assumption (no oxygen thus no acid-generating reactions in to collapse zone) is likely incorrect and likely greatly understates the impacts from acid rock drainage within the mine and in ore stockpiles.

## Water Quality Impacts-Tailings Facility

The scale of this project is hard to grasp, but the volume of tailings produced by Resolution Copper would fill the Rose Bowl to its brim, not once but nearly 1,800 times. This vast volume of waste material will permanently disturb 16,000 acres of land of which nearly 8,000 acres is Arizona State Land. The principal accomplishment of the Draft EIS seems to be to propose a new location for the mine's 1.37 billion tons of tailings, but the Draft EIS is inadequate in its assessment of impacts at this new location to surface water and groundwater quality due to seepage from the preferred tailings storage facility. Water quality impacts from the tailings is one of the most profound and concerning environmental issues for a mine of this size, yet there is virtually no defensible scientific analysis of this issue in the Draft EIS. Indeed, except for the Near West site, there is no true, data-supported, site-specific analysis of potential impacts to surface water and groundwater quality at any of the alternative tailings sites.

## Impacts to Apache Leap Special Management Area

Resolution chose to employ block cave mining (thus ensuring creation of a 1.8-mile wide subsidence crater) because that's the cheapest way to mine this deep ore body. A consequence of this mining method is that reclamation or restoration is simply impossible: maybe a sturdy fence and maybe some "no trespassing" signs.

There is a high degree of uncertainty in Resolution's subsidence predictions but we've been assured that the subsidence crater will not extend into the Apache Leap Special Management Area. True or not, we do know it will creep up the eastern slope of Apache Leap and profoundly degrade the quality of this theoretically protected place. In 75 years, if we could stand together

Written Testimony of James T. Wells, PhD, PG
Page 12 of 12

on the crest of Apache Leap, instead of the world-class view across Oak Flat, we would see a massive pit of collapsed rock, just a couple hundred meters away, devoid of life & gradually filling with toxic mine water. Imagine standing on the stairs of the US Capitol and seeing nothing but a 1,000-foot deep rocky pit, starting at the Capitol reflecting pool, swallowing not only the Smithsonian Museums and the Washington Monument, but extending all the way to the Lincoln Memorial. That's how immense this subsidence crater will be.



## Conclusions

This mining project has long-term consequences to the groundwater resources in Arizona as a whole and the Phoenix Active Management Area, in particular: in some cases, permanent consequences. Once mining commences, the formation of a subsidence crater becomes inevitable and unstoppable. The Draft EIS acknowledges that total demand for water in the East Salt River Valley is growing and could be greater than the available supply.[23] And yet, the Draft EIS does not take a realistic look at the consequences of Resolution's plan to pump 180 billion gallons of groundwater from the Desert Wellfield: a network of new extraction wells proposed for the East Salt River Valley.

Considering the effects of ongoing drought conditions and likely reductions in deliveries of Colorado River water to Arizona via the CAP, it is nearly certain that the new demand from Resolution's pumping of groundwater from the East Salt River Valley will lead to water shortages among the many users of this groundwater basin. Even more certain is the irreversibility of Resolution Copper's impacts to the Apache Leap Tuff Aquifer which will be altered forever: permanently altering the region's water resources and threatening permanent and unmitigable impacts to local streams and springs, many of which are sacred to Arizona Tribes.

---

[23] Draft EIS, p. 342.

# Exhibit C

# The Proposed
# Resolution Copper Mine and
# Arizona's Water Future

### August 2021

A report by James Wells, PhD, PG
L. Everett & Associates,
Environmental Consultants



Lake Mead on the Colorado River has dropped 130 feet in recent years and is currently at 37% capacity. In August of 2021, authorities declared a drought emergency which will cut Arizona's supply of Colorado River water by about one third, losing an amount of water that could serve nearly 1 million people.

# Executive Summary

The Resolution Copper mine would be the largest underground copper mine in the United States and consume vast amounts of groundwater, leaving less water for everyone else in Arizona during an unprecedented, climate change-fueled drought. The proposed mine would be located east of Phoenix in the Tonto National Forest, in an area known as Oak Flat. Final approval of the land transfer that would facilitate development of the mine is pending even as the drought is expected to worsen. The Colorado River is dwindling, and Lake Mead, which supplies Arizona with one-third of its water, has dropped to its lowest level since the reservoir was filled in the 1930s. Just this month, federal officials announced the first-ever official Colorado River water shortage, triggering cuts in water allocations for Arizona, Nevada, and Mexico, and pushing urban and rural water users to rely more on unsustainable groundwater pumping. Groundwater tables are dropping, aquifers are drying up, and the ground is buckling for lack of water.

Much has been written and many studies completed over the past 15 years as Rio Tinto and BHP's Resolution Copper has sought, despite federal land protections, to mine copper some 7,000 feet beneath Oak Flat. Yet there has not been a comprehensive analysis to verify how much water the Resolution Copper mine will use and the consequences of that use to the people and wildlands in the region. The Resolution Copper mine will place an enormous new water demand on an area of the southwest already experiencing severe water shortages.

Recognizing the need to aggressively manage the state's finite groundwater resources and to support a growing economy, the 1980 Arizona Groundwater Act created Active Management Areas (AMAs) to manage aquifers in areas,

including Phoenix, with heavy reliance on mined groundwater. Resolution Copper's own studies project that the mine's operations will lower the region's groundwater level by up to 1,000 feet over an area covering roughly 300 square miles.

This analysis examined new and existing data and found:

- Resolution Copper Mine would use at least 250 billion gallons of water over the life of the mine. Much of this water will be pumped from the East Salt River Valley which is part of the Phoenix AMA, about 15 miles west of the mine. If the water Resolution plans to use was stored in a tank the dimensions of a football field, such a tank would need to be 147 miles high to accommodate all the water.

- A goal of the Phoenix AMA is to achieve a long-term balance between the annual amount of groundwater withdrawn and the amount of groundwater recharged, thus avoiding depletion of the aquifer. This goal unquestionably will not be met if Resolution is allowed to pump billions of gallons from the aquifer for the next 50 years.

- Resolution Copper's groundwater use would make nearly 3,500 acres of the Superstition Vistas Planning Area unfit for development, costing Arizona's state Land Trust more than $536.6 million.

- Resolution's mine could potentially use double to triple the amount of groundwater that it claims if the promised, but unproven water-saving measures are not realized.

- The U.S. Forest Service's environmental analysis failed to adequately account for Colorado River shortages and newly announced allocation cutbacks have been triggered under the Drought

Contingency Plan. It also failed to look at the project's impact on regional water resources when combined with these shortages.

- The mine's tailings would permanently threaten groundwater and surface water quality in the region, including the Gila River. In 2015, a similar but smaller dam at a BHP project in Brazil failed, causing catastrophic damage.

Mining has been banned in Oak Flat since 1955 because of special protections put in place by the federal government. To circumvent these protections, Congress inserted language into the 2015 National Defense Authorization Act requiring the U.S. Forest Service to give Oak Flat to Rio Tinto and BHP in a land swap. Congressional action is needed to stop this mine. A bill to repeal the land swap (*Save Oak Flat Act*, HR 1884, S. 915) is pending in the U.S. House and Senate.

In addition to being protected against mining since 1955, Oak Flat is designated as a Traditional Cultural Property by the National Park Service and listed on the National Register of Historic Places. Oak Flat is also beloved by campers, climbers, hikers, and birders and is a sacred place to the Apache people.

Resolution Copper plans to use block cave mining, which would create a nearly two-mile-wide, 1,000-foot-deep subsidence crater that would swallow Oak Flat. Nothing can stop the cratering process once it has begun. Reclamation or restoration of the subsidence crater will be impossible.

Over the last 150 years, mining has brought certain benefits to Arizona but it also has serious costs. The legacy of open pits, acid mine drainage, and huge tailings dumps are obvious to anyone who has spent time in Arizona's "Copper Triangle." However, the massive water requirements of modern mines is a hidden cost that has taken on greater urgency in the 20th year of drought conditions in the desert southwest.

Arizona faces an existential water crisis that threatens livelihoods and Arizona's prosperity. This analysis shows that developing another copper mine will come at the expense of drinking water for Arizona's cities, real estate development, farming, recreation, and other industries.



## I. Introduction: Is the Proposed Resolution Copper Mine good for Arizona?

Mining is an important part of Arizona's history. Even before Arizona was a state, mining was seen as a way to bring people and prosperity to the southwest. But mines use a lot of water and the southwest is facing a severe water shortage. In modern times, with less polluting industries on the rise and the scarcity of water as a limiting resource for economic development, we need to ask: Is the proposed Resolution Copper Mine good for Arizona?

If the Resolution Copper Mine is approved, it will commandeer a vast amount of the State's water, leaving less for everyone else. Should mining be getting *more* water while other water users are forced to cut back? This is a tough and urgent question that Arizonans must face in light of impending water shortages.

*Background on the Resolution Copper Mine.* Resolution Copper is a limited liability company owned by international mining giants, Rio Tinto and BHP. Located about 60 miles east of Phoenix near the Town of Superior (see Figure

1), the Resolution Copper Mine would be the largest underground copper mine in the United States.

This is a project that–on its own–could not meet the rather low bar required for mining on federal lands. Mining on federal lands is still largely guided by the General Mining Act of 1872. This nearly 150 year old law contains substantial incentives for private companies to mine on federal lands, including charging no royalties for extracting these public resources. Thus the foreign mining companies will pay nothing for the copper they plan to remove from National Forest Service land currently owned by the American people.

The mine site is in a portion of Tonto National Forest known as Oak Flat, a starkly beautiful natural area that is loved by Arizona campers, climbers, hikers and birders, and is a sacred place (known as Chi'chil Bildagotell) to the Apache people. Oak Flat is currently off-limits to mining due to special protections put in place



*Figure 1. Location of Proposed Resolution Copper Mine and Tailings Storage Facility.*

by the federal government in 1955.[1] Special legislative action was needed to undo these protections and make this project possible. That action came in 2015 in the form of language inserted at the last minute into the National Defense Authorization Act (NDAA), which requires the Forest Service to hand over Oak Flat to Rio Tinto and BHP in a land swap. The land swap provisions obviously had nothing to do with funding the military, but by inserting the language into a "must pass" bill, it quietly became law even though the land swap regularly had been rejected in normal Congressional proceedings.

In addition to being protected against mining since 1955, Oak Flat is also designated as a Traditional Cultural Property by the National Park Service and is listed on the National Register of Historic Places, but none of that matters if the land swap goes through.

Resolution chooses to employ block cave mining at Oak Flat because that's the cheapest way to mine the deep ore body. A consequence of this mining method is a 1.8-mile wide, 1,000 foot deep subsidence crater that will swallow Oak Flat.

## II. Water Use by Resolution Copper

Resolution projects that the mine will consume enough water to supply a city of roughly 140,000 people every year for 50 years. This is a vast new water demand for an area of the southwest that is already experiencing water shortages. Resolution's water use will probably be even higher than it is disclosing. The current estimate (accepted at face value by the Forest Service) promises that this mine will use about 1/3 of the average water used (per ton of ore) by existing copper mines in the United States. This optimistic estimate is based on Resolution's assurances that it can implement significant and unproven water-saving procedures in its ore processing and tailings handling operation.

Even if one accepts Resolution's highly optimistic estimate for water usage, the mine will use about 775,000 acre-feet[2] of water—or about 250 billion gallons—over the life of the mine[3], of which approximately 70% will be pumped from a large network of new extraction wells in the East Salt River Valley about 15 miles west of the mine, closer to Phoenix and its eastern suburbs. The amount of water Resolution Copper proposes to withdrawal from the Desert Wellfield represents nearly 7 percent of the total available groundwater in the East Salt River valley subbasin.[4]

It is hard to visualize the immensity of this amount of water. A football field covers about one acre, so if the water Resolution plans to use was stored in a tank the dimensions of a football field, such a tank would need to be 775,000 feet or <u>147 miles high</u> to accommodate all the water.

Resolution's proposed Desert Wellfield is in the Phoenix Active Management Area (AMA). The state created AMAs under the landmark 1980 Groundwater Management Act to better manage aquifers in parts of Arizona that were experiencing depleted groundwater. However, Arizona water law grants exceptional leeway to mines, which are essentially unregulated water users.  That means Resolution Copper could develop an unlimited number of wells and pump an unlimited amount of water from the East Salt

---

[1] Public Land Order 1229 set aside Oak Flat and other Forest Service lands for use as campgrounds, recreation areas and for other public purposes.

[2] An acre-foot of water equals 325,850 gallons. It is the amount of water that would cover an acre of land to a depth of one foot. For comparison, an Olympic sized swimming pool holds about 2 acre-feet of water. As a rule of thumb, EPA estimates that a family of 4 uses about 1 acre-foot of water per year.

[3] Final Environmental Impact Statement (Final EIS), Appendix H, Table H-3. This is the volume of water estimated to be needed over the life of the mine for Tailings Storage Facility (TSF) Alternative 6, Skunk Camp, which is the Forest Service's preferred alternative.

[4] Final EIS, p. 418.



*Figure 2. Map showing predicted groundwater drawdown from the Desert Well Field in the East Salt River Valley and from mine dewatering.*

River Valley even as agricultural users and cities are forced to cut back. It doesn't matter that groundwater resources are already being depleted in the Phoenix AMA.

Computer modeling in the Tonto National Forest's Environmental Impact Statement (EIS) for the mining project acknowledges that cumulative effects of Resolution's pumping along with other known demands in the East Salt River Valley are likely to result in a drop in groundwater levels of approximately 450 feet in parts of the Phoenix AMA. The computer modeling did not include any of the water demands from future development in the 175,000 acre Superstition Vistas Planning Area,[5]

a sprawling exurban development expected to be home to more than 1 million people by 2060.[6]

Resolution's own assessment acknowledges that groundwater will be depleted by at least 10 feet (and in some places, more than 1,000 feet) over an area covering about 300 square miles. Such drawdown threatens to dry up existing wells and makes it more expensive for other users to pump groundwater. As shown on Figure 2, this is a consequence of dewatering at the mine site as well as pumping in the East Salt River Valley.

Resolution Copper's cumulative pumping total conflicts with the goal of the Phoenix Active Management Area to achieve "safe yield" in this groundwater basin by 2025. Safe yield

---

[5] The Superstition Vistas Planning Area consists of 275 square miles of undeveloped land east of Phoenix held in trust by the Arizona State Land Department. This land is managed for the benefit of the school children of Arizona. As noted on the State Land Department website, "State ownership of Superstition Vistas provides a unique opportunity to maximize the financial return to the education trust fund and allows for the development of a coherent vision for the area." If there is inadequate water to develop Superstition Vistas, Arizona's school children will lose the most, but the state as a whole is also a loser due to limits to growth of its economy.

[6] Superstition Vistas, Spring 2011, Final Report & Strategic Actions.

requires that the amount of groundwater pulled from aquifers must be balanced by the amount of water that is recharged, naturally or artificially, back into the AMA.

In its EIS, federal officials failed to take the "hard look" required under the National Environmental Policy Act to determine the environmental impact of the proposed mine's cumulative water usage on the Phoenix AMA. Instead, the Forest Service wrote that the state would likely give Resolution Copper a groundwater withdrawal permit because there is no authority under state law to deny it.[7] The EIS failed to consider whether enough water will be available for other water users if the copper mine becomes operational.

The EIS says "Resolution Copper's legally permitted use of water adheres to the norms and values placed on water by the State of Arizona."[8] The Forest Service is oversimplifying this complex issue: it is not adhering to the values of the State of Arizona to greenlight a project that is underlined(guaranteed to deplete scarce groundwater resources) in the East Salt River Valley.

In the 2019 draft EIS, the Forest Service acknowledged that "groundwater demand is substantial and growing" and "total demand on the groundwater resources in the East Salt River Valley is substantial and could be greater than the estimated amount of physically available groundwater"[9] These sober assessments do not appear in the final EIS.

Where will all this water go? Most of it will be used by Resolution to process the ore and transport its tailings. Most of the water will end up as part of the toxic soup in the tailings dump to be located in Dripping Springs

Wash (see Figure 1). There, what had been a resource (fresh groundwater available for Arizona's cities and farms) will be transformed into a perpetual liability--contaminated water threatening, essentially forever, groundwater and surface water quality, including even the Gila River.

## III. Long-Term Consequences For Arizona's Water Future

Recent reports and actions by local jurisdictions show that Arizona does not have enough water to accommodate the Resolution Copper mine.

In an October 2019 study of the Pinal AMA, Arizona Department of Water Resources (ADWR) identified a future unmet demand of 8.1 million acre-feet.[10] In a stark example of how scarce water supplies will affect growth and prosperity, these findings led the ADWR to stop



*Figure 3. Current drought conditions are severe in Arizona and the entire lower Colorado River Basin.*

---

[7] January 2021 EIS, p. 971.

[8] January 2021 EIS, pp. 813, 967, and Appendix R, R-285.

[9] Draft EIS, p. 342.

[10] Arizona Department of Water Resources, 2019 Pinal Model and 100-Year Assured Water Supply Projection Technical Memorandum.

approving applications for future subdivisions in Pinal County. Tens of thousands of people in Pinal County rely on groundwater for their water supply and already, private wells are drying up.[11] In its latest study, the ADWR predicted demand to exceed supply into the foreseeable future for this basin and also predicted irreversible loss of aquifer capacity due to overpumping.[12]

Arizona State University's Kyl Center for Water Policy recently warned that the state's groundwater is seriously overallocated, allowing for unsustainable pumping and failing to protect Arizona's water resources for future generations.[13] The May 2021 report, "The Myth of Safe Yield," said the problems are exacerbated by industrial users, like copper mines, that are not required to replenish the groundwater they use. Co-authored by one of the architects of the state's landmark 1980 groundwater act, the Kyl Center Report called for measures to curb the state's authority to issue new industrial groundwater use permits.

A newspaper report earlier this year aptly describes the situation: "Unlike wildfires or hurricanes, a diminishing water supply is a slow-moving, mostly invisible crisis.[14] Many outer suburbs of Phoenix rely almost exclusively on groundwater, making them extremely vulnerable to water shortages compared to other areas that may have more diversified supplies.

Colorado and other parts of the desert southwest remain in an almost perpetual drought (see Figure 3). The EIS on the Resolution Copper project failed to evaluate "reasonably foreseeable future" Colorado River shortages and cuts, as well as the events that have just been triggered for the first time under the Drought Contingency Plan[15] once the inevitable shortages occur. It also failed to look at the project's impact on regional water resources when combined with these shortages.

Scientists predict a permanent decline in water flows in the Colorado River, source of critical water supplies to Arizona via the Central Arizona Project (CAP). A 2017 Report to Congress noted that the Colorado River has experienced lower-than-normal flows for the past 16 years, with some of the lowest annual flows in 900 years. The Report to Congress also noted that "a transition to a more arid average climate in the American West" may already be under way. Likely consequences of climate change include higher temperatures in the West, higher evapotranspiration, reduced precipitation, and decreased spring runoff.[16] Researchers from the U.S. Geological Survey have determined that annual mean discharge from the Upper Colorado River Basin has been decreasing (and will

---

[11] ABC15 News, Private Wells Running Dry in Pinal County, Oct. 24, 2019; https://www.abc15.com/news/region-central-southern-az/private-wells-running-dry-in-pinal-county.

[12] Arizona Department of Water Resources, 2010, Modeling Report #22, A Salt River Valley Groundwater Flow Model Application. 100-Year Predictive Scenarios Used for the Determination of Physical Availability in the Phoenix Active Management Area.

[13] Kyl Center for Water Policy, May 2021, The Myth of Safe-Yield: Pursuing the Goal of Safe-Yield Isn't Saving our Groundwater.

[14] High Country News, June 1, 2021, "Rapid growth in Arizona's suburbs bets against an uncertain water supply.

[15] The Lower Basin Drought Contingency Plan was finalized in 2019. The DCP consists of proactive water conservation actions to be taken by water users in Arizona, California, and Nevada, and by the US Bureau of Reclamation, which are designed to leave more water in Lake Mead during severe droughts to avoid loss of power generation potential and to prevent the lake from reaching critically low levels, (Source: US Bureau of Reclamation, March 2021, Colorado River Basin, SECURE Water Act Section 9503(c) Report to Congress.

[16] Congressional Research Office, November 9, 2017, Drought in the United States: Causes and Current Understanding, pp. 14-15.

continue to decrease) at an alarming rate of 9.3% per degree Celsius of warming.[17]

Lake Mead, which supplies water to the Central Arizona Project (as well as other lower Colorado basin users) is at record low levels not observed since the construction of Hoover Dam in the 1930's (Figure 4).

Arizona receives about one third of its overall water needs from the Colorado River. Arizona has a junior water right for Colorado River supplies relative to California. The consequence of junior water rights is that shortages in the Colorado River basin from drought or climate change will disproportionately impact Arizona, and in particular its lower rights users, which include agricultural users and groundwater banking entities.

This year, Lake Mead's water level dipped below 1,075 feet (above mean sea level). This is important because according to the Drought Contingency Plan, when the Lake falls below 1,075 feet, Arizona's water deliveries from the Colorado River will be significantly curtailed, beginning with a reduction of over 500,000 acre-feet per year. Further cutbacks will occur at lower reservoir water levels. Just this month, the US Bureau of Reclamation invoked water rationing (for the first time ever) on the Lower Colorado River Basin. At first, the impacts from reduced water deliveries to Arizona from the Colorado River will mostly affect agricultural users, but this water scarcity will eventually hit urban areas as well, with water restrictions and higher prices virtually inevitable.

With CAP restrictions, farmers, cities and towns will need to pump even more groundwater to make up for the lost supply from the Colorado River. However, Arizonans already withdraw more groundwater from the major Arizona aquifers than nature can replenish. Thus Arizonans are in a situation where current users need to pump even more water from already depleted aquifers in order to survive, at the same



*Figure 4. Water Levels in Lake Mead since 1970.*

[17] Milly and Dunne, 2020, Colorado River flow dwindles as warming-driven loss of reflective snow energizes evaporation, Science, v. 367, pp. 1252-1255.

time Resolution Copper insists on pumping 250 billion gallons of water from the same aquifers.

The tough truth is that there is simply not enough water to go around in Arizona. In the Phoenix AMA, where Resolution will be pumping, there are many municipalities and commercial operations that also rely on groundwater, including Phoenix, Scottsdale, Tempe, Mesa, Gilbert, Chandler, Apache Junction and other towns.

## III. Opportunity Costs

Resolution says the mine will bring jobs and tax revenues to Arizona. This is true, although their numbers are exaggerated. As documented in this study, Resolution will also need lots of water to make good on these economic benefits. What neither Resolution Copper nor the Forest Service explain is that other uses of that same water would have even greater economic benefits than a mine and without the high environmental costs such as destruction of Oak Flat, annihilation of natural springs, acid mine drainage, 1.3 billion tons of toxic tailings burying 16,000 acres of land as a consequence of large scale mining.

What did the EIS say about opportunity costs? Nothing! According to the Forest Service, "Analysis of the economic value of the water used by Resolution Copper, the other beneficial uses to which water could be put, or extrapolation of economic harm to other entities due to Resolution Copper's legally permitted use of water, is outside the scope of analysis of this EIS."[18]

A study from Arizona State University found that the average economic benefit to Arizona from CAP water is $40,000-$50,000 per acre-foot of water.[19] At that rate, Resolution's use of about 15,000 acre feet of water each year

translates to a lost opportunity cost of more than $600 million. This is the cost of not doing other things (such as growing crops, supplying water to new homes, or supporting non-polluting commerce) with the water that Resolution will use up. For comparison, the proposed mine is projected to generate between $80 and $120 million in state and local tax revenue each year. In exchange for $600 million worth of water, Arizona citizens will get back $80-$120 million in taxes. This is not a good deal for Arizona.

Much has been made of the benefits to Superior, the town closest to the mine. The EIS determined that Superior will likely receive about $400,000 per year in tax revenues from the mine project. This would surely be a welcome financial boost, but is hardly a life-altering amount of money for a town.

The demand for copper and copper prices go through boom and bust cycles. In addition, technology and automation reduce the labor requirements of modern mines, shrinking the workforce needed to mine a given amount of copper. This instability in the copper industry discourages investment in local economies and encourages potential residents (including copper miners, themselves) to live a considerable distance from the mine and ore processing facilities. As a result copper mining towns in Arizona and across the nation are rarely prosperous.[20]

The Arizona State Land Department has determined that Resolution's groundwater withdrawals in the East Salt River Valley would cause a loss development potential for 3,440 acres of State Trust land in the Superstition Vistas Planning Area, representing a "minimum potential loss to the Trust of at least

---

[18] Final EIS, p. 813.

[19] Arizona State University, W.P. Carey School of Business, 2014, The Economic Impact of the Central Arizona Project to the State of Arizona, Authors: Tim James, Anthony Evans, Eva Madly.

[20] Power Consulting, November 2019, Deficiencies in the Socioeconomic Section of the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement.

$536,640,000 in revenue."[21] The reason for these profound losses is that other entities wishing to use groundwater in the Phoenix AMA must demonstrate a 100-year Assured Water Supply in order to secure project approval. Resolution Copper does not have to make this same showing. After Resolution takes all the groundwater it needs, there is less groundwater in storage for other potential users.

By green-lighting this mine, the people of Arizona are embarking on an uncontrolled experiment on social priorities pitting the state's agricultural, municipal, real estate and tribal interests against those of multinational mining companies and the mining companies are winning.



*Who benefits from modern mining? If there was ever any doubt, a quick comparison of downtown Superior to the gleaming headquarters buildings of BHP and Rio Tinto answers this question.*





---

[21] Arizona State Land Department, November 7, 2019 Letter to Neil Bosworth, Tonto National Forest. (Reproduced on p. R-43 of FEIS).

## IV. Other Environmental and Cultural Consequences of Resolution Copper Mine

The EIS prepared by Tonto National Forest identified a number of profound environmental impacts from this project that cannot be mitigated. The scale of this project is hard to fathom and unfortunately the Forest Service fell short of its obligation under NEPA to take a hard look and ensure scientific integrity in its evaluation of these environmental impacts.



Figure 5. Relative volumes of copper, tailings and material above ore deposit that would be disturbed due to block caving at the Resolution Mine. US Capitol is shown for scale.

Because of how the copper will be mined, the Resolution Copper mine will have greater impacts on the environment than most U.S. copper mines. As shown on Figure 5, Resolution Copper's use of block cave mining will destroy a greater amount of Arizona landscape than typical mining operations, leaving a 1.8-mile wide, 1,000-foot deep subsidence crater that would destroy the Oak Flat area.

***Land Subsidence in East Salt River Valley Due to Groundwater Pumping***. A different kind of subsidence threatens the East Salt River Valley. Land subsidence due to groundwater pumping causes a permanent reduction in the storage capacity of an aquifer. The Forest Service initially claimed it was not possible to analyze how much land subsidence the project might cause, but eventually conducted such an analysis and found that "drawdowns associated with the Desert Wellfield likely would result in subsidence of roughly 24 to 52 inches."[22] This information was not disclosed in the Draft EIS and was not subject to public review and comment. This newly quantified environmental

impact is important because even after the drawdown recovers from Resolution's pumping, that portion of the aquifer in the East Salt River Valley will never hold as much groundwater again, thus constituting an unmitigable impact. Or, as admitted by the Forest Service, "An important aspect of subsidence is that it is <u>irreversible</u>; once sediment layers collapse when dewatered, they remain collapsed even if water levels recover."[23]

Land subsidence from groundwater pumping harms public infrastructure such as roads, pipelines and utility lines, as well as harming homes and other structures.

***Loss of Sacred and Ecologically Important Springs.*** The EIS acknowledges that "Sacred springs would be <u>eradicated</u> by subsidence or construction of the tailings storage facility, and affected by groundwater drawdown."[24] In the arid southwest, springs and perennial streams are extremely rare and constitute irreplaceable

---

[22] Final EIS, p. 412.

[23] Final EIS, p. 412, emphasis added.

[24] Final EIS, p. 856, emphasis added.

(44 of 50), Page 44 of 50    Case: 25-5189, 08/16/2025, DktEntry: 12.12, Page 44 of 50





*Figure 6. Depiction of Oak Flat and Apache Leap before and after block cave mining.*

habitat. Because of impacts to springs, the proposed groundwater use by Resolution Copper Mine is contradictory to the Forest Service policy:

> "Groundwater shall be managed for the long-term protection and enhancement of the Forest's streams, springs and seeps, and associated riparian and aquatic ecosystems. Development and use of groundwater for consumptive purposes shall be permitted only if it can be demonstrated that such proposals will adequately protect Forest resources."[25]

Tonto National Forest's Draft Land Management Plan also requires that Forest activities must not negatively impact riparian areas.[26] As stated in the FEIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block caving begins the Apache Leap Tuff would begin to dewater as well."[27]

The Apache Leap Tuff Aquifer is a critical source of water for springs and creeks, many of them sacred to Western Apaches. This permanent impact would not occur if alternative underground mining methods were employed, but the Forest Service did not conduct an analysis of alternative mining methods. Instead it accepted Resolution Copper's assertion that any method other than block cave mining would be too expensive.



*Figure 7. Ga'an Canyon, near Oak Flat (also known as Devil's Canyon). This rare perennial desert stream and its ecosystem are threatened by the proposed Resolution Copper Mine.*

---

[25] Martin and Loomis, Keeping Our Streams Flowing: Tonto National Forest Groundwater Policy, in: Furniss, Clifton and Ronnenberg, eds., 2007, Advancing the Fundamental Sciences: Proceedings of the Forest Service National Earth Science Conference, October 2004, PNW-GTR-689, USDA, Forest Service, Northwest Research Station.

[26] Tonto National Forest, 2019, Draft Land Management Plan, see Section on "Riparian Areas, Seeps, Springs, Wetland and Riparian Management Zones, pp. 110-113.

[27] Final EIS, p. 369.

**Impacts from Block Cave Mining.** BHP and Rio Tinto will use block cave mining because it is the cheapest way to mine the deep Resolution ore body. Even Resolution Copper cannot stop the cratering process once it has begun. This is the very definition of an irreparable harm. Reclamation or restoration of the subsidence crater is simply impossible: just a sturdy fence and maybe some "no trespassing" signs. Once block cave mining commences, the subsidence crater becomes inevitable and unstoppable.

The EIS disclosed a number of profound impacts due to the collapse crater that cannot be mitigated, including impacts to scarce water resources. As noted by mining expert, Dr. David Chambers, if Resolution chose to use underground mining methods instead of block caving, Oak Flat could be preserved and many other environmental and social impacts would be reduced.[28] By failing to conduct an acceptable and competent evaluation of project alternatives that could avoid the impacts caused by the collapse zone, the Forest Service would allow Resolution's profitability to outweigh the project's extensive environmental, cultural and recreational costs.

**Dewatering of Groundwater Dependent Ecosystems.** The EIS concluded that the Resolution Copper Mine project will or is likely to deplete water supplies and harm or destroy the streams, springs, seeps and other water features in Oak Flat, Ga'an Canyon (see Figure 7), Mineral Creek and Queen Creek: "Dewatering or direct disturbance would impact between 18 and 20 groundwater dependent ecosystems (GDEs), mostly sacred springs. While mitigation would replace water, impacts would remain to the natural setting of these

places."[29] The proposed mitigation for GDEs is inadequate.

Mitigation plans are outlined in a September 2020 report commissioned by Resolution Copper.[30] This report calls for replacing water flows in springs and creeks by pumping water from nearby wells (i.e., tapping groundwater from deeper in the aquifer), storing water in tanks and piping the water to the creek or stream or by constructing various water-collecting devices such as so-called "guzzlers," surface water capture systems or even trucking water in from alternative sources. Replacing a natural system with a manufactured facsimile of the system is not the intention of mitigation under NEPA. Just as it would not be permissible to replace the real Half Dome with a plaster model of Half Dome, it is not permissible to replace lost GDEs with artificial copies of natural systems. It was not the intention of NEPA to replace nature with theme park-like imitations of nature.

The GDE monitoring plan to be implemented by Resolution Copper is also inadequate because its discussion of triggers (i.e., occurrences or observations that would trigger mitigation activities) is vague and incomplete. In Resolution's 2020 Mitigation Plan,[31] theydevised (and the Forest Service has bought into) ways to avoid implementing mitigation measures for these fragile ecosystems by assessing whether its groundwater pumping has caused the damage. Resolution claims it will be able to differentiate the impacts from its dewatering from other variables such as "changes in weather and/or climate, impacts to the regional and/or local groundwater system from other human causes, landscape changes such as landslides and fires, natural succession

---

[28] Chambers, October 18, 2019, Comments on the Resolution Copper Draft Environmental Impact Statement.

[29] FEIS p. 156.

[30] Montgomery & Associates, 2020, "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells."

[31] Montgomery & Associates, 2020, "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells."

of the GDE into a new presentation such as an increase in phreatophytic plants coincident with a reduction in spring flow rates, or other reasons not included in this document."

Other than noting that Resolution will employ "multiple lines of evidence" there is no quantitative or qualitative discussion of how Resolution will accomplish this difficult task. Considering that most of the GDEs covered by the monitoring plan have already been identified in the EIS as likely to be impacted by mine dewatering, Resolution's methodology for identifying impacts to GDEs is unworkable and is inadequate under NEPA.

***Acid Rock Drainage.*** As noted in the EIS, "The [copper ore] deposit is associated with hydrothermal alteration and includes a strong

pyrite "halo" in the upper areas of the deposit, containing up to 14 percent pyrite. This mineralization has ramifications for water quality, as sulfide-bearing minerals such as pyrite have the potential to interact with oxygen and cause water quality problems (acid rock drainage)."[32] Much of this pyrite halo will not be mined out; instead, it will become a permanent part of the collapse zone.

The EIS made the unsupported claim that the mineralized, fractured pyrite in the collapse zone will not be in contact with oxygen, thus it will not form acid rock drainage. This is a conclusion that defies common sense. As the collapse zone forms, the rock will be transformed into a giant rubble heap, increasing its hydraulic conductivity[33] many orders of magnitude and



*Figure 8. Aftermath of the Fundão tailings dam disaster in Brazil. This mine was a joint venture of BHP. As the dam broke, 45 million cubic meters of iron ore waste and mud covered the nearby town of Bento Rodrigues and beyond. 19 people were killed and at least 60. BHP has previously estimated that tailings would flow about 3.5 kilometers in the event of a potential dam break would flow about 3.5 kilometers. After this very real dam break, the tailings traveled over 600 km, eventually reaching the Atlantic Ocean, illustrating mining company's history of downplaying risks from their tailings dumps.*

---

[32] Final EIS, p. 173.

[33] Hydraulic conductivity is a measure of how groundwater flows through an aquifer. This, in turn, affects the groundwater velocity through the aquifer. Solid rock has a very low hydraulic conductivity; sandstone has a higher hydraulic conductivity and very coarse grained sediments like gravels have even higher hydraulic conductivity.

draining it of groundwater. For the purposes of groundwater modeling, Resolution assumed that the hydraulic conductivity of rock in the cave zone would increase by as much as a <u>factor of a million</u>: "Maximum hydraulic conductivity values were altered by a multiplier of 1E+6 or to a hydraulic conductivity of 100 ft/day, whichever occurs first…The maximum hydraulic conductivity value of 100 ft/day was selected because it is much higher than the natural, un-altered bedrock, but higher values caused the model to become unstable"[34] This statement highlights another deficiency of the groundwater model: hydraulic conductivity of rock in the collapse zone was arbitrarily limited to 100 ft/day because the model would crash if higher, more realistic values were used.

Atmospheric air will easily penetrate the dewatered fracture zone, supplying oxygen into a subsurface environment that has been devoid of oxygen for thousands if not millions of years. The assumption that no oxygen will reach rocks in the collapse zone and thus no acid-generating reactions will occur is incorrect and understates the environmental risks from acid rock drainage within the mine and in ore stockpiles. This assumption is also inconsistent with Resolution's treatment of potentially acid generating (PAG) material in the tailings. In the tailings, Resolution acknowledges that PAG needs to be submerged under a layer of water to prevent contact with oxygen and minimize acid rock drainage. However, in the collapse pit, no such protection will exist, yet Resolution somehow concludes (and the Forest Service believed it) that acid rock drainage will not occur.

***Water Quality Impacts from the Tailings Storage Facility.*** The volume of toxic mine tailings produced by Resolution Copper would fill Sun Devil Football Stadium to its brim, not once but nearly 1,800 times. This vast volume of waste material will permanently disturb 16,000 acres of land of which nearly 8,000 acres is Arizona State Land. Water quality impacts from the tailings is one of the most profound and concerning environmental issues for a mine of this size, yet there remains great uncertainty about the magnitude of water quality impacts from the tailings storage facility.

***Tailings Dam Risk of Failure.*** Tailings would be transported through about 20 miles of pipeline across sensitive habitat–including Ga'an Canyon–to the tailings dump in Dripping Springs Wash, a tributary of the Gila River. Over the life of the mine, the tailings dump would grow to cover 3,995 acres[35] of this watershed behind a three mile long, 500 foot high earthen dam–about as high as the Washington Monument–above the natural land surface.[36] Tailings dams are made from the tailings themselves and by one estimate, they fail at a rate 100 times higher than conventional dams.[37] A failure of the tailings dam would put downstream lives at risk and contaminate the Gila River.

In 2015 the Fundão tailings dam in Brazil failed, killing 19 people, contaminating hundreds of miles of the Doce River, and eventually spewing toxic waste into the Atlantic Ocean more than 400 miles downstream. That dam was much smaller than the proposed Resolution Copper dam — about 300 feet tall compared to the 500-foot dam planned by Resolution Copper. Resolution Copper's tailings facility will contain nearly 20 times greater volume than the Brazilian facility.

---

[34] WSP, February 2019, Resolution Copper Groundwater Flow Report, pp. 37-38.

[35] The direct footprint of the TSF would be 3,995 acres however, according to the FEIS, a total of 8,647 acres would be off-limits to the public due to tailings operations.

[36] FEIS, p. ES-21.

[37] Cornwall, Warren, August 2020, Catastrophic failures raise alarm about dams containing muddy mine waste, *Science*, Vol. 369, Issue 6506, pp. 906-909.

***Impacts to Apache Leap Special Management Area.*** There is a high degree of uncertainty in Resolution's subsidence predictions, but the public has been assured that the subsidence crater will not extend to the crest of Apache Leap. True or not, it is certain that the subsidence zone will creep up the eastern slope of Apache Leap and profoundly degrade the quality of this theoretically protected place. In 75 years, if we could stand together on the crest of Apache Leap, instead of the world-class view across Oak Flat, we would see a massive pit of collapsed rock, just a couple hundred meters away, devoid of life & gradually filling with toxic mine water. Imagine standing on the stairs of the US Capitol and seeing nothing but a 1,000-foot deep rocky pit, swallowing not only the Smithsonian Museums and the Washington Monument, but extending all the way to the Lincoln Memorial. That's how immense this subsidence crater will be.

***Rush to Finalize the Environmental Impact Statement.*** The Final EIS was published on January 15, 2021, in the final days of the Trump administration. The federal government later withdrew it on a temporary basis on March 1, 2021, but will re-release it later this year, setting in motion the land swap that will ensure that the mine goes forward.

The Forest Service chose to focus the EIS on evaluating different locations for the waste tailings. Considering this focus, it was surprising that the Draft EIS was issued without a competent evaluation of the geotechnical suitability and water quality impacts of Skunk Camp, the preferred Tailings Storage Facility (TSF) site. To make up for these omissions, Resolution embarked on substantial field investigations and computer modeling efforts, generating a large body of new information _after_ the Forest Service issued the DEIS. This new information consisted of at least a dozen new studies and reports totaling thousands of pages that are relevant to environmental concerns. In particular, there is substantial new groundwater modeling work to evaluate the cumulative impacts to groundwater resources in the East

Salt River Valley, site of the proposed Desert Wellfield where much of the water required by the mine would be pumped. Additionally, voluminous new studies of water quality impacts from the Skunk Camp TSF and a brand new assessment of possible surface water discharges from the mine operations under Resolution's AZDEPES permit have been prepared. All of this information was developed after publication of the DEIS, was not subject to public review or comment, and was not adequately analyzed by Tonto National Forest to determine whether this new information could impact the preferred alternatives or mitigation measures set forth by Tonto National Forest in its FEIS.

## Policy Recommendations

The proposed Resolution Copper mining project will have permanent consequences for Arizona's groundwater resources and the Phoenix AMA. By pumping billions of gallons of groundwater from the East Salt River Valley, this project would make Arizona's goal for stewardship of its scarce groundwater resources unreachable. Ongoing drought conditions and newly announced severe reductions in deliveries of Colorado River water to Arizona mean Resolution Copper's proposed groundwater pumping will exacerbate water shortages among the millions of current and future users of this groundwater basin.

In addition, the local hydrology surrounding the mine will be permanently degraded. The Apache Leap Tuff Aquifer will be destroyed by the mine's subsidence crater, forever altering the area's water resources, and eradicating regional springs, many of which are sacred to Arizona tribes. To better secure Arizona's water future, here are some recommended actions:

- The US Department of Agriculture's future EIS for this project needs a more complete analysis of the alternatives to be performed. Copper and mining is necessary, but we do not need to green-light every mining project if the cultural and environmental costs are too high, as they are for this project.

- New projects with large water demands need to be scrutinized in a new light, considering the newly announced reductions in Arizona's allotment of water from the Colorado River. Congress should pass the Save Oak Flat Act (HR 1884, S. 915) to put a pause on the Resolution Copper Mine. This would allow Arizonans time to consider the wisdom of allowing a large new water use now that we know the state is facing a time of severely reduced water supply.

- Water use by mines should be addressed in the same manner as other large users so State planners can better respond to this era of scarce water resources and protect the vitality of Arizona's economy. The Arizona State Legislature can take a big step in this direction by revoking mining industry exemptions from groundwater management laws in light of the severe drought.

**About the Author**

Dr. Wells has been a practicing environmental geologist for nearly 30 years. He is a Registered Geologist and earned a Bachelor's Degree from Dartmouth College and Masters' and PhD degrees from the University of Washington in Seattle, all in Geological Sciences. For the last seven years, he has advised the San Carlos Apache Tribe on environmental and water resource matters related to the proposed Resolution Copper Mine, as well as other matters. Dr. Wells has twice testified at Congressional Hearings in Washington, DC on environmental impacts of the Resolution Copper Mine.

At the invitation of the US Forest Service, Dr. Wells served on the Groundwater Modeling Workgroup which advised Tonto National Forest on its preparation of the Draft Environmental Impact Statement (DEIS), using complex groundwater modeling methods to predict water and ecosystem impacts from the proposed mine. The working group consisted of Forest Service and Resolution Copper personnel, as well as professionals from agencies such as US Environmental Protection Agency, US Geological Survey, Arizona Game and Fish, and Arizona Department of Environmental Quality. Also, at the invitation of Tonto National Forest, Dr. Wells was also a member of the Resolution Copper Mine Water Resources Working Group which advised the Forest Service on its efforts to respond to public comments on the DEIS.