

**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**          MB-R3-12-10          **June 2025**

# **FINAL** Environmental Impact Statement
## **Resolution Copper Project and Land Exchange**
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



79908

# Appendix R. Response to Comments Received on the DEIS

Appendix R

# Introduction

This document is a summary of public and agency comments received by the Tonto National Forest regarding the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement (DEIS), and responses to those comments prepared by the Tonto National Forest. The comment period on the DEIS lasted from August 9, 2019, to November 7, 2019, with an extended comment period for Tribes ending on December 22, 2019.

Tonto National Forest received, analyzed, and responded to over 29,000 submittals on the DEIS, as shown in table R-1. Comments include transcripts of oral comments from formal public meetings and telephone calls, letters, form letters, and petitions. These submissions were analyzed using a process called content analysis, described below.

**Table R-1. Distribution of submittals by sender type**

| Sender Type* | Submittal Count |
|---|---|
| Individual | 29,324 |
| Non-governmental organization | 80 |
| Government | 60 |
| **Total** | **29,464** |

\* Comments from individual Tribal members are included under the "individual" category, whereas comments from Tribal governments are included under the "government" category.

# Content Analysis Process

Submissions were reviewed and parsed into individual comments. These individual comments were reviewed and categorized based on topic. We compiled 5,209 individual comments, which were then categorized. The reduction from 29,464 submittals to 5,209 comments reflects that many identical or similar form letters were received. The comments and general categories are shown in table R-2.

Content analysis is a method of eliciting meanings, ideas, and other information from written text, pictures, or audio or video messages. The goals of the content analysis process are to

- ensure that every comment is considered,
- identify the concerns raised by all respondents,
- represent the breadth and depth of the public's viewpoints and concerns as fairly as possible, and
- present those concerns in a way that facilitates the U.S. Forest Service's (Forest Service's) consideration of comments.

Through the content analysis process, the content analysis team strived to identify all relevant issues, not just those represented by the majority of respondents. The breadth, depth, and rationale of each comment are especially important. In addition to capturing relevant factual input, analysts tried to capture the relative emotion and strength of public sentiment behind particular viewpoints.

The issues identified during content analysis range in nature from the strictly procedural to the technically specific. Public comment on these issues demonstrates the interest, feelings, and concerns the public has regarding the management of National Forest System (NFS) lands, the role of mining on the Tonto National Forest, the National Environmental Policy Act (NEPA) process for this project, the land exchange, and how the public and other agencies feel the Forest Service should best analyze and address the environmental, social, and economic issues presented in the DEIS.

R-1

Appendix R

**Table R-2. General categories of comments**

| General Comment Category | Number of Comments |
|---|---|
| General document comments (not specific to an individual resource section) | 193 |
| Geology, minerals, and subsidence (section 3.2) | 39 |
| Soils and vegetation (section 3.3) | 12 |
| Noise and vibration (section 3.4) | 14 |
| Transportation and access (section 3.5) | 48 |
| Air quality (section 3.6) | 69 |
| Water resources (section 3.7) | 472 |
| Wildlife (section 3.8) | 77 |
| Recreation (section 3.9) | 96 |
| Scenic resources (section 3.11) | 31 |
| Cultural resources (section 3.12) | 57 |
| Socioeconomics (section 3.13) | 138 |
| Tribal values (section 3.14) | 135 |
| Environmental justice (section 3.15) | 24 |
| Livestock grazing (section 3.16) | 20 |
| NEPA, regulatory, and procedural comments | 514 |
| Alternatives-related comments | 275 |
| Mitigation-related comments | 358 |
| Non-substantive comments of opposition or support | 2,637 |
| **Total** | **5,209** |

# Development of Comment Responses

Once parsed, analyzed, and coded, the 5,209 individual comments were further assessed in order to develop comment responses. The development of comment responses not only is intended to provide a clear reply to the issue raised by the commenter, but also serves to identify and guide any changes, modifications, or new analysis required to prepare the final EIS (FEIS). Similarly, development of comment responses could identify additional clarification or documentation that is required for the project record.

Once grouped and consolidated, we addressed the 5,209 individual comments with 460 comment responses, as shown in table R-3. These comment responses are contained in this appendix. Note that the codes are only intended as rough groupings, and since many comments cover multiple topics, the content of the response may involve other topics as well.

**Table R-3. Grouping of comment responses**

| General Response Code and Description | Number of Responses |
|---|---|
| ALT (Alternatives) | 27 |
| AMT (Alternative mining techniques) | 17 |
| AQ (Air quality) | 25 |
| CR (Cultural resources and Tribal issues) | 23 |

Appendix R

| General Response Code and Description | Number of Responses |
|---|---|
| DOC (Specific suggestions for document edits) | 1 |
| EJ (Environmental justice) | 7 |
| GS (Geology and subsidence) | 17 |
| LG (Livestock grazing) | 6 |
| MIT (Mitigation) | 30 |
| NEPA (NEPA, regulatory, land exchange, and other general topics) | 66 |
| NO (Noise) | 5 |
| NS (Non-substantive comments) | 2 |
| SO (Socioeconomics) | 18 |
| SR (Scenery and recreation) | 32 |
| TR (Transportation) | 17 |
| TS (Tailings and tailings safety) | 31 |
| WI (Wildlife) | 24 |
| WT (Water) | 112 |
| **Total** | **460** |

# Organization of this Appendix

This appendix is intended to allow the public to

- directly read comments submitted by public agencies or elected officials, in their entirety and original format;
- identify letters submitted by specific individuals or entities, identify the comments coded to each letter, and identify the responses to those comments by using an index; and
- find and read the Tonto National Forest responses to their comments.

To accomplish this the following sections are included:

- Section 1. Copies of comment letters submitted by public agencies or elected officials
- Section 2. Indices of commenter names, letter IDs, and response IDs. These are divided into three tables:
  - o Table R-4. Index of responses for letters submitted by organizations, agencies, or elected officials
  - o Table R-5. Index of responses for non-form letters
  - o Table R-6. Full text of form letters submitted and index to responses
- Section 3. Responses to comments

## How to Use this Appendix

In order to find responses to comments associated with an organization, agency, or elected official:

- Step 1. Use table R-4 in section 2 of appendix R to locate the name of the organization, agency, or elected official. These are organized alphabetically. Note the "Response-to-Comment IDs Associated with this Letter."

Appendix R

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

Optionally, for agencies and elected officials:

- Step 1. Read the original comment letter in section 1 of appendix R and note the comments that have been marked and the "Response-to-Comment IDs" associated with those comments.

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

In order to find responses to comments associated with an individual:

- Step 1. Use table R-5 in section 2 of appendix R to locate the individual's name. These are organized alphabetically by last name, using the spelling and format submitted to the Tonto National Forest. Note the "Response-to-Comment IDs Associated with this Letter."

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

In order to find responses to comments associated with a form letter:

- Step 1. Use table R-6 in section 2 of appendix R to locate the full text of the form letter. Ten form letters were submitted during the public comment period. Note the "Response-to-Comment IDs Associated with this Letter."

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

Appendix R

# Section 1. Comment Letters from Public Agencies and Elected Officials

Appendix R

*This page intentionally left blank.*

R-6

Appendix R

Letter ID: 1189
Format: Submitted by webform, 11/04/2019
Sender:
Karl Hoerig
Sender Name & Title of Person
Tribe of Arizona
Contact Info:
karl.hoerig@scat.apigov.gov
Content:

The Resolution Copper Mine project, as planned, will cause irreparable harm to the Western Apache people and to other indigenous communities with ancestral heritage in that project area. In addition to the destruction of the National Register listed Oak Flat Archaeological/Traditional Cultural Property, the current preferred alternative including the use of the block caving method of mining will destroy more than 300 archaeological sites. These sites are the testimony of Native communities' ancestors. They are infused with and make up the history and heritage of these communities. They are sacred places and are the resting places of many ancestors. They are also key parts of our stories and our nation's sacred heritage. This massive destruction of our nation's heritage is unacceptable. If this copper deposit is to be mined, it should be mined in a manner that will protect our heritage resources.

Comment ID: 11651  Response: 1152

These 7 pages represent comments submitted under comment number 2335, 151, 8030, 28330, 28339, 30028, and 30079

APACHE STRONGHOLD

Resolution EIS Comment
P.O. Box 14648
Phoenix, AZ 85543-4648

September 19, 2019

To Supervisor Bosworth:

We appreciate your attention to the public's input on the Draft Environmental Impact Statement for the Land Exchange with Resolution Copper on the Tonto National Forest (DEIS). The DEIS is flawed and incomplete. As we describe below, it fails to address impacts to Native American religion, sacred and holy sites, the extent of environmental devastation, and irreparable damage proposed by the land exchange.

In our review of the nearly 1,400 page Draft Environmental Impact Statement we have found scant analysis of the impacts to the nearby Native Americans. Where the Oak Flat DEIS also labels the social/religious experience, the DEIS fails to address the impact on current religious practice. The references consistently also significant harm to Native tones and will rock and uphill desecration of current available social science of value gathering.

• "Few areas along these are the expected significant environmental impacts and loss of the Oak Flat area, historically used by Native Americans who hold its land as sacred and uses the areas for spiritual and traditional uses. Additionally, in March 2016, the Oak Flat area was listed on the national Register of Historic Places as a traditional cultural property." (Oak Flat DEIS, pg. ES-3)

• "There is a potential for some portion of existing yet currently unidentified prehistoric and historic artifacts and resources to be disturbed or destroyed, especially within the Oak Flat subsidence area and the footprint of the tailings storage area. These losses could potentially include known burial sites within these areas." (Oak Flat DEIS, pg. ES-3)

The Tribal Values and Concerns (DEIS, 3.14) section is incomplete and demonstrates a failure of the U.S. Forest Service to do adequate consultation with affected Tribes. They report in their work already, arbitrarily, and parsimoniously affect numerous cultural artifacts; sacred groups and springs; traditional ceremonial areas; cave caring gathering locations; burial locations; and other places and experiences of high spiritual and value to which members is severed. The mine would cause permanent loss of places with community religion and cultural reverence. The lack of reference in the DEIS to the archaeological and cultural records held by the San Carlos Apache Tribe, Yavapai people, Huwalpai, and other indigenous peoples of these sites in the DEIS is inadequate.

Resolution Copper flooded the Tonto National Forest to hire "tribal members" to be preservation at the proposed action. The archeologists and tribal people who were hired have gathered increased evidence of

Comment ID: 2351  Response: CF4

Comment ID: 30079  Response: 30079

Delia Paxson, Community Chairman
District 2, Maricopa Colony
Gila River Indian Community

November 6, 2019

U.S. Department of Agriculture
Tonto National Forest

RE: Draft Environmental Impact Statement for the proposed Resolution Copper Project and Land Exchange

Dear U.S. Department of Agriculture:

The District 2 Community, also known as Maricopa Colony, hosted on the Gila River Indian Community writes this letter of support for the Avadio-Strongheld-oak-x protectotis organization in opposition of Oak Flat to Resolution Copper.

The protection of plants, historical and cultural sites must be in active consideration in the State of Arizona. Development of mining sites in our state can cause springs to dry up, wash up, pond and polluting natural resources can never be recreated in its original state, or to report inscriptions can cause permanent damage to our beautiful history. Arizona is known for its rich cultural and natural beauty and Native American history.

The United Seven Generations agrees with and supports the Avadio-Stronghold position.

Sincerely,

Delia Paxson, Community Chairman
District 2, Maricopa Colony
Gila River Indian Community

Comment ID: 3152  Response: 3151

YAVAPAI-APACHE NATION

Executive Office
Chairman Jon Huey
Vice Chairwoman Tanya Lewis
2400 West Datsi Street, Camp Verde, AZ 86322
Phone (928)567-1001   Fax (928)567-3994

November 7, 2019

Nanebah Nez-Lyndon
Tribal Relations Program Manager
Tonto National Forest, Supervisor's Office
2324 E. McDowell Rd
Phoenix, AZ 85006

RE: USFS Consultation Comments on Southeast Arizona Land Exchange and Resolution
Copper Project

Dear Ms. Nez-Lyndon:

On behalf of Yavapai-Apache Nation, I would like to thank the United States Forest Service for the consultation process on the Southeast Arizona Land Exchange and Resolution Copper Project, and ensuring inclusion of the Tribal voice.

The Yavapai-Apache Nation submitted a pre-mitigation request letter in September 2019, to mitigate and offset the impacts to the environment and cultural heritage of the Project.

It is important to note that each Tribe participating in consultation, represents itself, as we are each self-governing and sovereign governments. Our Tribe does not speak to determine the position of all Tribes.

As the comment period concludes, it is important to note that the Nation is concerned about the location of the tailings. We know that adding tailings have lasting impacts on communities and environments. We do hope that Tribes have the opportunity to continue to participate in the process of tailings location.

Sincerely,

Jon Huey
Chairman

Comment ID: 4032  Response: GR2

Comment ID: 4653  Response: GR3

R-7

# Appendix R

# Appendix R

## Apache Stronghold – Resolution EIS Comments Supporting Documents Index

### Section 1 - Tribal Resolutions and UN Declaration

### Section 2 - Committee Hearings, Testimonies and Statement

### Section 3 - Documents, News and Magazine Articles

### Section 4 - Resolution EIS Comments

R-9

Appendix R

**Emily Newell**

| | |
|---|---|
| **From:** | Donna Morey |
| **Sent:** | Wednesday, October 2, 2019 10:44 AM |
| **To:** | Emily Newell |
| **Subject:** | FW: TNF.Bosworth.DEIS.Extension.091719 |
| **Attachments:** | TNF_Bosworth_DEIS_Extension_091719.pdf |

Follow Up Flag: Follow up
Flag Status: Flagged

Should add as a comment received during the comment period.

D

From: Lyndon, Nanebah - FS <nanebah.ned.lyndon@usda.gov>
Sent: Wednesday, September 18, 2019 8:28 AM
To: Mary Rasmussen-C-FS <mary.rasmussen@usda.gov>; Hill, Kristina <kristina.hill@usda.gov>; Suzanne Griset <sgriset@soca.com>; Chris Garrett <cgarrett@soca.com>; Morgan, Esther -FS <esther.morgan@usda.gov>
Subject: FW:TNF.Bosworth.DEIS.Extension.091719

EXTERNAL: This email originated from outside SWCA. Please use caution when replying

From: Alex Ritchie [mailto:Alex.Ritchie@scat-nsn.gov]
Sent: Tuesday, September 17, 2019 2:50 PM
To: Lyndon, Nanebah - FS <nanebah.ned.lyndon@usda.gov>
Cc: Justine Jimmie <justine.jimmie@scat-nsn.gov>; Roseria Astor <roseria.astor@scat-nsn.gov>
Subject: Fwd: TNF.Bosworth.DEIS.Extension.091719
Importance: High

Noni:

See below and attached.  My assistant forgot to include you.

Alexander B. Ritchie
Attorney General
Department of Justice
San Carlos Apache Tribe
Post Office Box 40
16 San Carlos Avenue
San Carlos, Arizona, 85550
Tel. (928) 475-3344

1

Cel. (928) 200-5120
Fax. (928) 475-3348

This message contains confidential information and is intended only for
the individual(s) named as recipients. Please notify the sender immediately if you
have received this email by mistake and delete this email from your system.

Begin forwarded message:

From: Roseria Astor <roseria.astor@scat-nsn.gov>
Subject: FW: TNF.Bosworth.DEIS.Extension.091719
Date: September 17, 2019 at 2:12:31 PM MST
To: "Bosworth, Neil -FS" <nbosworth@fs.fed.us>
Cc: Kathryn Leonard <kleonard@azstateparks.gov>, "jfowler@achp.gov"
<jfowler@achp.gov>, "ASOWEB, BLM_AZ" <blm_az_asoweb@blm.gov>, Terry
Rambler <trambler@scatni.net>, Vernelda Grant <apachecrm@sbsxa.com>, Dee
Randall <DRandall@FORESTRY.SCAT-NSN.GOV>, Alex Ritchie <alex.ritchie@scat-
nsn.gov>

This email transmits the attachment of Chairman Rambler's letter regarding the Draft
Environmental Impact Statement. The original letter is being mailed certified with
tracking number 7008 1300 0000 8339 2110.

Thank you.

Roseria Astor
Legal Secretary

SAN CARLOS APACHE TRIBE
Department of Justice
P.O. Box 40
San Carlos, Arizona 85550
T: (928) 475-3344/3339
F: (928) 475-3348
E: roseria.astor@scat-nsn.gov

This electronic message contains information generated by the USDA solely for the intended recipients.
Any unauthorized interception of this message or the use or disclosure of the information it contains
may violate the law and subject the violator to civil or criminal penalties. If you believe you have
received this message in error, please notify the sender and delete this message immediately.

2



Terry Rambler
Chairman

**SAN CARLOS APACHE TRIBE**
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ◆ Fax (928) 475-2567

Tao Etpison
Vice-Chairman

September 17, 2019

*Via E-mail and U.S. Postal Service*

Neil Bosworth
Superintendent
Tonto National Forest
2324 E. McDowell Road
Phoenix, Arizona  85006
E-Mail: nbosworth@fs.fed.us

Dear Forest Supervisor Bosworth:

On behalf of the 16,800 members of the San Carlos Apache Tribe ("Tribe"), I request
that the Tonto National Forest ("TNF") issue an extension of the comment period for the Draft
Environmental Impact Statement (DEIS) for the Resolution Copper Mine project ("RCM
project") and the Southeast Arizona Land Exchange ("Land Exchange").  I further request that
TNF consult with the Tribe to arrange for at least one open meeting on the Tribe's lands in order
to encourage and optimize receipt of comments and questions from Tribal members – after all,
our Tribe's members form a significant portion of the population directly impacted by these
endeavors.

[Comment ID: 251-1  Response: NEPA25]

I am aware that on August 16th, Mary Rasmussen informed a group of stake holders and
extension of time to comment on the DEIS because you had already provided an additional 45
days beyond that required by law.  Thank you for that.  However, I am writing to you to request
that you reconsider your position due to recent developments which I believe justify a further
extension of at least another 45 days.

As you know, the Tribe has severe reservations about the Tribal Monitor Program.  We
have several concerns about the Program but a major apprehension is the Program's
impingement upon tribal sovereignty and TNF's ability to ensure that the Tribe's sovereignty is [Continued →]

Neil Bosworth
Re:  *Request for Extension of Comment Period on the DEIS for the Proposed Resolution Project*
September 17, 2019
Page 2 of 3

[Continued →]

not impaired, explicitly or implicitly.  I believe that developments in the last several weeks
provide TNF and the Tribe with an avenue to address this concern.

Specifically, on August 29, 2019, you wrote to me in response to my July 10, 2019
correspondence to you regarding the 5th draft for the Programmatic Agreement ("PA").  As you
know, among other matters, the Tribe was critical of the PA's description and use of a Tribal
Monitor Program for identification of important cultural resources.  Your August 29th letter
provided some explanation of the Tribal Monitor Program.  In your letter, you also stated I
should reach out to you with any additional requests.

I am now reaching out to you to learn more about the Tribal Monitor Program.  I request
a meeting with you in your offices for a small number of my staff together with your staff to
enlarge the Tribe's leaderships' understanding of this Program.  Any documents you would be
willing to provide me in advance of such a meeting would be greatly appreciated.

The other recent development that further justifies an extension of time to comment is
the September 6, 2019 Public Notice from the U.S. Corps of Engineers ("Corps") announcing its
review of Resolution Copper's application for a permit for a tailings storage facility ("TSF") at
Skunk Camp.  Attached for your convenience is the Public Notice.  The Public Notice indicates
that TNF, the State Historic Preservation Officer and unspecified Native American Tribes are in
consultation regarding cultural resource impacts for this TSF project.  *See* Public Notice at 3.
The notice further states that tribes have been consulted and that consultations are being led by
TNF.  *Id.*  Although not specifically stated, the implication is that the Corps has no intent to
conduct its own Section 106 analysis. [Comment ID 251-2  Response: CR13_A]

Given this last development, I would be remiss if I did not ask TNF to provide the Tribe
with all cultural resource information TNF has given to the Corps, all consultation materials
between TNF and any tribes and for any other information in TNF's possession regarding
cultural resources within the area of potential effects ("APE") for the Skunk Camp TSF.  This
information is necessary for the Tribe's ability to provide meaningful DEIS comments regarding
the Skunk Camp TSF.

The APE for the Skunk Camp has been, and as far as the Tribe is aware, still is posted for
no trespassing and is off limits for review and inspection.  For Apaches, this is not and cannot be
a "desktop" survey.  We need time to visit, learn from the representatives of the clans with
traditional ties to the Dripping Spring valley, and consider traditional knowledge in relation to
the newly unveiled plans to destroy another cherished part of our homeland.

The APE is part of the traditional territories of T'iis Tseban (Pinal Band) and Tse
Binesti'e (Aravaipa Band) Apaches driven from the Dripping Springs and Pinal Mountain areas
by military-industrial campaigns from 1859 to 1874.  Time is needed for the Apache aboriginal
landowners to re-familiarize themselves with the land and resources they were evicted from.  We
request the opportunity, for the first time in generations  to be welcomed back to the springs, [Continued →]

Appendix R

**Neil Bosworth**
*Re: Request for Extension of Comment Period on the DEIS for the Proposed Resolution Project*
September 7, 2019
Page 3 of 3

[Continued]

camp areas, and plant and mineral gathering places to assess existing conditions. We need to assess and consider connections between what we see on the land today and what we have been told by our elders. I feel this obligation to visit and inspect the area personally and spiritually. Those campaigns slaughtered almost 400 Apaches and drove my direct ancestors from their homelands to San Carlos, paving the way for the industrial mining that is now culminating in the proposed Resolution Mine.

In addition to these two recent developments, there are other reasons to provide an extension for the DEIS comment period. The DEIS is extensive, complicated, technical, and unmistakably consequential. The Tribe cannot simply suspend our duties and responsibilities relating to other issues and concerns to study and prepare comments on the DEIS. It is not reasonable or useful for TNF to require a fully informed response from the Tribe within 90 days to a massive industrial proposal involving multiple alternatives.

Comment ID: 251-3
Response: NEPA25

Our initial review makes it clear that the DEIS fails in many ways to identify and analyze many irrevocable adverse impacts to the human and biophysical environment, including land, water, air, and cultural resources upon which San Carlos Apaches and many other Native American people and communities rely. We hope TNF will continue to fill in the many gaps in the DEIS as the proposed POO continues to evolve. We particularly request TNF issuance of a DEIS supplement or amendment to address our Tribe's well-established concerns regarding the processes proposed to complete the identification of cultural resources and sacred sites and to avoid and reduce impacts to these places, objects, and traditions.

Comment ID: 251-4
Response: CR5

On behalf of the San Carlos Apache Tribe, I ask you to give these requests every favorable consideration. I look forward to your response.

Sincerely,

SAN CARLOS APACHE TRIBE

Terry Rambler
Chairman

Cc: Kathryn Leonard, Arizona State Historic Preservation Officer
John Fowler, Advisory Council on Historic Preservation Executive Director
Raymond Suazo, BLM Arizona State Director

San Carlos Apache Tribe
Tao Etpison, Vice-Chairman
San Carlos Council Members
Vanessa Grant, THPO
Dee Randall, Forest Manager, Forest Resources
A.B. Realtie, AG
Chrono



**Terry Rambler**
Chairman

**SAN CARLOS APACHE TRIBE**
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ✦ Fax (928) 475-2567

**Tao Etpison**
Vice-Chairman

November 7, 2019

*Via E-mail and U.S. Postal Service*

Michael Langley
Los Angeles District, Regulatory Division
U.S. Army Corps of Engineers
3636 N. Central Ave, Suite 900
Phoenix, AZ 85012-1939
E-Mail: ResolutionMine404Comments.SPL@usace.army.mil

Re: San Carlos Apache Tribe's Request for Government-to-Government Consultation and Comments on Resolution Copper Company's Application for Permit, Application Number SPL-2016-00547-MWL

Dear Mr. Langley:

On behalf of the nearly 16,800 members of the San Carlos Apache Tribe ("Tribe"), thank you for the opportunity to present the Tribe's initial comments regarding Resolution Copper Company's Application Number SPL-2016-00547-MWL. As you are certainly aware as the Senior Project Manager for the U.S. Army Corps of Engineers ("USACE" or "Corps"), the Tribe has opposed the development of the Resolution Copper Mine ("RCM") and the Southeast Arizona Land Exchange. Our opposition stems in large part from the certain destruction of sacred sites and places and culturally significant resources which will occur as a result of the mine's development and the exchange of federal lands controlled by the Tonto National Forest ("TNF").

Comment ID: 8030-1
Response: NS1

On July 26, 2019, I corresponded with Colonel Barta, USACE District Commander for the Los Angeles District, expressing the Tribe's concern regarding compliance issues with section 106 of the National Historic Preservation Act ("NHPA") and deficiencies with a draft Programmatic Agreement ("PA") under review by various agencies. Those issues persist today

[Continued]

---

**Michael Langley**
*Re: Resolution Copper Consultations on CWA 404*
November 7, 2019
Page 2 of 4

[Continued]

Colonel Barta kindly responded to my letter explaining that TNF was the lead agency for the preparation of an environmental impact statement under the National Environmental Policy Act (NEPA) and that jurisdictionally USACE was a cooperating agency if RCC applied for a permit to discharge dredged or fill material under section 404 of the Clean Water Act (CWA) and it was determined that in fact such a permit would be necessary. Colonel Barta also explained that the Corps had recently received RCC's application for a permit for the Skunk Camp Alternative. Colonel Barta made clear that the Corps' role in the NHPA process is limited to those areas over which your agency has jurisdiction, i.e., areas for which a section 404 permit would be required such as the tailings storage facility ("TSF") and associated pipelines. We understand this is USACE view of its limited role in this and greatly appreciate Colonel Barta's clear and succinct explanation of the Corps' position, although we do not necessarily agree.

Comment ID: 8030-4
Response: MIT27

Regretfully, the problems pertaining to meaningful government-to-government consultation with THP on any aspect of NHPA section 106 consultation about the RCM project including the Skunk Camp Alternative, have been problematic at best. Recently, the State Historic Preservation Office ("SHPO") and the Advisory Council on Historic Preservation separately warned TNF of compliance failures. TNF's responsive actions merely reaffirmed its lack of understanding of the informed consultation compliance requirements.

Comment ID: 8030-3
Response: CR8

The purpose of this letter is not to document TNF's failure to engage in consultation with the Tribe and other affected Indian tribes. Rather this letter is intended to alert USACE that, at least as to the Skunk Camp Alternative, the primary responsibility for NHPA section 106 government-to-government consultation with tribes has fallen squarely in the Corps' lap.

Comment ID: 8030-4
Response: CR13

In his August 23, 2019 correspondence, Colonel Barta wrote, "The Corps will continue to work with TNF on developing an appropriate PA for the project, as needed for our limited role, and I encourage the San Carlos Apache Tribe to stay engaged with TNF and other consulting parties to work through the issues you have identified in your letter." By this letter, I request that the Corps, as a cooperating agency, engage in government-to-government consultation regarding the Corps' permitting of the Skunk Camp Alternative and a TSF and associated pipelines to include the area of potential effects (APE). We would also encourage in our consultations that the Corps' jurisdiction be examined to determine the necessity for additional review of other aspects of the mine project.

Comment ID: 8030-5
Response: MIT27

There is no doubt that under NEPA, NHPA, the U.S. Department of Defense, American Indian and Alaska Native Policy, the USACE Tribal Policy Principles, and the various authorities cited in the letter cited above, that the Tribe has the right and the Corps has the duty to engage in government-to-government consultations. We ask that USACE engage in consultation with the Tribe in order to develop a PA which identifies, protects, and preserves the cultural, sacred, and historical assets at risk within the Corps' jurisdictional role in this project.

---

**Michael Langley**
*Re: Resolution Copper Consultations on CWA 404*
November 7, 2019
Page 3 of 4

The Tribe is also concerned about other technical aspects of RCC's application, the full panoply of which remain yet unknown to the Tribe. This is an additional basis for consultation with the Corps. In August of 2016, TNF Forest Supervisor Neil Bosworth issued a record of decision ("ROD") and finding of no significant impact ("FONSI") for a Resolution Copper Mining Plan of Operations ("MPO") for Baseline Hydrological and Geotechnical Data Gathering Activities ("Baseline Plan").

Comment ID: 8030-12
Response: ALT22

The Final Environmental Assessment for the Baseline Plan stated the purpose and need for the Baseline Plan was to provide hydrological, geochemical and geotechnical data which would be used to support the analysis of a proposed TSF. The data was deemed important to providing data TNF would need to meet the requirements of 40 CFR §1502.23, information that is "essential to a reasoned choice among alternatives." The information was necessary, according to the final EA, for the evaluation of the TSF geotechnical stability and quality issues deemed by TNF as critical to support a reasoned choice among alternative TSF sites.

A similar baseline analysis was not performed for the Skunk Camp Alternative that leads to the question of whether the information which has been provided with RCC's application provides sufficient information to make a reasoned choice among alternatives. If the Skunk Camp Alternative is an appropriate location for a TSF. After all, whatever information was derived from the Baseline Plan, it was sufficiently significant to cause RCM to abandon the site as a TSF or for TNF to reject that location.

Comment ID: 8030-4
Response: ALT22

The Corps issues permits for the discharge of dredged or fill material pursuant to section 404 of the CWA and subject to the Corps' and EPA's 404(b)(1) Guidelines ("Guidelines"). See 33 U.S.C. § 1344; 40 C.F.R. pt. 230. The Corps cannot authorize a discharge without "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the Section 404(b)(1) Guidelines." 40 C.F.R. § 230 12(a)(3)(iv); see 33 C.F.R. §§ 320.2(q) and 320.4(a)(1). The Corps' and EPA's 404(b)(1) Guidelines impose important limitations on the Corps' ability to issue a Section 404 permit. 40 C.F.R. pt. 230.

Comment ID: 8030-8
Response: MIT27

The Tribe further needs consultation to fully explore which guidelines should be applied by the Corps including whether "all appropriate steps have been taken to minimize potential adverse impacts." 40 C.F.R. § 230.10. This would include adverse impacts to cultural resources, human health and welfare, aquatic life, other water dependent wildlife, corps own diversity, recreation, geological stability and any other attributes of the human condition which may be subject to significant degradation. Id. § 230.10(c)(4)(4). The Tribe submits that the Corps has not received sufficient information from RCC to make this determination possible at this time and that the applicant should be required to submit additional information. As an example, the Tribe submits that there is a lack of information regarding the geology and the stability for any aspect of the Skunk Camp Alternative. No seismic study of the area has been performed despite the fact that a fault runs down almost the entire length of Drippings Spring Wash and the surrounding area is honeycombed with tailings sites. There is little or no information regarding springs and seeps that will be impacted the Skunk Camp Alternative even though TNF is fully

Comment ID: 8030-9
Response: ALT22

[Continued]

Appendix R

Michael Langley
*Re: Resolution Copper Consultations on CWA 404*
November 7, 2019
Page 4 of 4

aware that springs and seeps are viewed as sacred and culturally important to the Western Apache.

| | |
|---|---|
| Indeed, an examination of the Arizona Mining Reform Coalition, *et al.* comments regarding the DEIS and USACE's public notice set forth a host of reasons a 404 permit should not be issued at this time. The Tribe incorporates by reference as though fully set forth here the arguments made by the Coalition in its comments to TNF and the Corps of this date. | Comment ID: 6030-10 Response: MIT27 |
| The Tribe respectfully submits that a studied and careful inspection and analysis of the Skunk Camp Alternative is the law and is necessary for the protection of the public and the environment. The Tribe is looking forward to working with the Corps to ensure that this "Preferred" Alternative fully complies with the applicable laws and regulations. I close with an affirmation of our desire for early, direct, continuous, step-by-step and professional, government-to-government consultation with the Corps. Let us address soon how the Corps and the Tribe may engage in meaningful consultation. | Comment ID: 6030-13 Response: ALT 22 |

On behalf of the San Carlos Apache Tribe, thank you for the opportunity to offer these comments.

Sincerely,

SAN CARLOS APACHE TRIBE

*Bernadette Settle*

Terry Rambler
Chairman

Cc: Neil Bosworth, Forest Supervisor, TNF, [illegible]
Randah Langley, Tribal Relations Program Manager, TNF, [illegible]
Kathryn Leonard, Arizona State Historic Preservation Officer, [illegible]
John Fowler, Advisory Council on Historic Preservation, Executive Director, [illegible]
Col. Kirk Gibbs, Corps of Engineers
Raymond Suazo, USBLM Arizona State Director
     U.S. Bureau of Land Management
     One North Central, Suite 800
     Phoenix, Arizona 85004-4427
     E-Mail [illegible]

Roger Featherstone, Arizona Mining Reform Coalition, P.O. Box 43565, Tucson AZ 85733

San Carlos Apache Tribe
Tao Elgaren, Vice Chairman
San Carlos Council Members
Vanessa Grant, THPO
Don Randall, Forest Manager, Forest Resources
     A & B Lechuz, AG
     Cheese

---



Terry Rambler
Chairman

**SAN CARLOS APACHE TRIBE**

Tao Elgaren
Vice-Chairman

P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600  ◆  Fax (928) 475-2567

**COMMENT**
**ON**
**DRAFT ENVIRONMENTAL IMPACT STATEMENT FOR THE**
**RESOLUTION COPPER PROJECT AND LAND EXCHANGE**

December 23, 2019

On behalf of the more than 16,800 members of the San Carlos Apache Tribe (Tribe) and the San Carlos Council (Council), the Tribe's governing body, thank you for the opportunity to comment on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. Thank you also for extending the time in which the Tribe was allowed to present this comment on the DEIS.

The DEIS is required to evaluate the potential impacts associated with the Forest Service, Tonto National Forest's (Forest Service or TNF) approval of the modified General Plan of Operations (GPO) for mining of the Resolution Copper Mine (RCM) deposit and a legislatively mandated land exchange of Federal and private parcels in southeastern Arizona. In addition to analyzing the environmental impacts of the land exchange and mining operations, the Draft EIS analyzes five alternatives for a tailings storage facility (TSF), including "Alternative 6 — Skunk Camp," which is the Forest Service's preferred alternative and the site of RCM's proposed TSF.

| | |
|---|---|
| From our analysis, performed by staff and consultants that the Tribe retained for this purpose, we find that the DEIS fails to completely address the impacts or alternatives. For the following reasons, I respectfully request that the Forest Service reconsider the DEIS and work with the stakeholders in effort to either re-issue, or otherwise supplement the DEIS. | Comment ID: 30078-1 Response: H51 |

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 2 of 45

The Tribe reserves the right to supplement this Comment as part of its ongoing consultation with the Forest Service.

**I.    Introduction**

In December 2014, Congress passed the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (NDAA). Section 3003[1] of this law authorizes and directs the Secretary of Agriculture to administer an exchange which would convey 2,422 acres of Forest Service lands "in the area of the proposed mine to Resolution Copper in exchange for approximately 5,344 acres of private land on eight parcels located elsewhere in eastern Arizona."[2]

Section 3003 of the NDAA explicitly requires the Secretary of Agriculture to prepare an Environmental Impact Statement (EIS) prior to conveying the Federal land. Section 3003 also requires "[t]his EIS shall be used as the basis for all decisions under Federal law related to the proposed mine, the GPO, and any related major Federal actions, including the granting of permits, rights-of-way, or the approvals for construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."[3]

The DEIS at issue here is the Forest Service's attempted compliance with Section 3003 and other Federal laws. The DEIS acknowledged the Forest Service's responsibility under Section 3003:

> Section 3003 of the NDAA explicitly requires the Secretary of Agriculture to prepare an EIS prior to conveying the Federal land. This EIS shall be used as the basis for all decisions under Federal law related to the proposed mine, the GPO, and any related major Federal actions, including the granting of permits, rights-of-way, or the approvals for construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.
> Section 3003 of the NDAA requires this EIS to assess the effects of mining and related activities on such cultural and archaeological resources that may be located on the NFS lands conveyed to Resolution Copper, and identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any. The Secretary of Agriculture is further directed to engage in government-to-government consultation with affected Indian Tribes regarding issues of concern to the affected tribes related to the land exchange and, following such consultation, consult with Resolution Copper and seek to find

[1] *See* DEIS Appendix A.
[2] DEIS p. 3.
[3] *Id.*

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 3 of 45

mutually acceptable measures to address affected tribes' concerns and "minimize the adverse effects on the affected Indian Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper" (see 16 United States Code [U.S.C.] 539p(c)(3)).[4]

Section 3003 of the NDAA was the result of over a decade of defeats in Congress by proponents of the Land Exchange and their Congressional sponsors.[5] The successful opponents of the Land Exchange included a diverse group of Indian Tribes and organizations, environmental groups, recreational groups, academicians and religious organizations.[6] In response to these ten years of legislative defeats, the promoters of the Land Exchange added a rider, Section 3003, to the must pass 2015 NDAA appropriation bill. None of the traditional legislative safeguards, committee hearings, presentation of testimony, legislative debate and floor votes, were observed before Section 3003 was literally dropped into the NDAA. Plainly, Section 3003 had not seen the legislative light of day until it was added to the 2015 NDAA.

On March 18, 2016, Forest Service published a Notice of Intent (NOI) to prepare an EIS.[7] The Tribe filed a timely Scoping Comment with Forest Service.[8]

**II.    Oak Flat And The Area Around It**

The Federal land which is to be exchanged and the surrounding environs that make up the area of Resolution Copper mine and its various components lies approximately sixty miles east of Phoenix, Arizona.[9] The mine and its various components will have an estimated surface disturbance of over 6,900 acres or approximately 11 square miles.[10]

[4] DEIS p. 3.
[5] *See generally* Introduction, Attachment One, Land Exchange Legislative History.
[6] *See generally* Introduction, Attachment Two, Resolutions Opposing Land Exchange; Attachment Three, Correspondence Opposing Land Exchange.
[7] DEIS ES-6, ES-10. DEIS pp. 21, 715. Attachment Forest Service Notice of Intent to Prepare EIS.
[8] *See* Attachment, San Carlos Apache Tribe Scoping Comment.
[9] DEIS ES-I-3; DEIS Figure ES-1; DEIS p. 2 Figure 1.1-1.
[10] DEIS p. 3 & fn. 4. Visual, auditory and other disturbances, direct and indirect, extend the disturbances several thousand more acres.

Appendix R

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 4 of 45

### A.  Tribal Stewardship

The affected tribes are the original owners and continuing stewards of the land being proposed for industrial commodification and of the great majority of the cultural resources being proposed for destruction.

| |
|---|
| Comment ID: 30078-2 Response: CR2 |

The DEIS fails to adequately describe the human environment associated with the Oak Flat Withdrawal Area and the region surrounding it. In particular, the DEIS fails to place the human environment in its cultural and historic context.  The DEIS does not provide the cultural-historical framework needed by the Forest Service, other government agencies, and the public vital information necessary to understand the nature and magnitude of the impacts from the proposed mine and its various components to the affected tribes and their people.

The DEIS fails to adequately acknowledge and document the irrevocable damage posed by the RCM project to historical, cultural, spiritual, and emotional connections which the affected tribes will suffer. The DEIS fails to provide both the analyses of the proposed RCM project's impacts on affected tribes and the analyses of ways and means to mitigate the significant impacts.

| |
|---|
| Comment ID: 30078-3 Response: CR4 |

"Lip service" is the term that comes to mind when reading the DEIS's treatment of the RCM project's injuries to tribes.  In section ES-1.3, the DEIS briefly acknowledges the controversy surrounding the proposed destruction of the Oak Flat sacred site and National Register Historic District.  DEIS page ES-3 finds that "the expected significant environmental impacts and loss of the Oak Flat area, historically used by Native Americans who hold the land as sacred and the area for spiritual and traditional uses."[11] The DEIS also lists some of the tribes' concerns, including "access routes, air, groundwater and surface water, plant and animal life, and landscapes, as well as less tangible attributes such as sense of place; sense of historical, spiritual, and tribal identity; opportunities for solitude; and opportunities to continue traditional cultural practices and ceremonies."[12]  The DEIS recites immediate to analyze "how cumulative resource disturbance impacts tribal values and spiritual practices…. [and the] number of sacred springs or other discrete sacred sites that would be impacted, and potential effects on Native Americans from the desecration of land, springs, burials, and sacred site [and] Estimated acres of traditional resource collection areas that would be impacted."[13]  But, these paltry references do not address the depth and breadth of the irreparable harms that tribes will suffer.

Even more to the point and despite NEPA's core mandate to document the human environment, the DEIS fails disclose the unassailable truth that the land and mineral wealth

<span style="border:1px solid">Continued</span>

---

[11] DEIS p. ES-3.
[12] DEIS pp. 24-235.
[13] DEIS p. 133.

| |
|---|
| Footnotes associated with Comment ID: 30078-3 |

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 5 of 45

<span style="border:1px solid">Continued</span>

proposed for transfer to RCM belonged to the affected tribes 150 years ago, and that these resources were taken by force and with the loss of many of our ancestors. The DEIS should have referenced and discussed essential facts, including at a minimum:

| |
|---|
| Comment ID: 30078-4 Response: CR2 |

- The proposed RCM impact area was under Native American control, and later claimed by Spain and Mexico until the 1848 treaty that ended the Mexican-American War (Spicer 1962).

- In the 1852 Treaty of Santa Fe[14] that followed the end of the U.S. war with Mexico, the U.S. Government formally recognized the domain of the Western and Chiricahua Apache Nations as extending from what would become central Arizona eastward to the Rio Grande. That Treaty obliged the Apaches to live exclusively under U.S. laws and jurisdiction and obligated the U.S. to "designate, settle, and adjust [the Apaches] territorial boundaries, and … legislate and act as to secure the permanent prosperity and happiness of said Indians" (Kappler, 1904).

- Royce (1899: 922-923) on Map AZ 1, provides an authoritative depiction of the non-exclusive domain of Western and Chiricahua Apaches.[15] That map includes the RCM impact area within the Apache domain covered by the 1852 Treaty of Santa Fe.

- Despite the signed treaty and early cooperation between Apaches and the U.S. Government and the U.S. Government trust responsibilities for American Indians, various U.S. Government and Arizona Territorial Government policies and actions unlawfully abetted non-Indian encroachments onto the lands of Apaches and other Native American nations (Basso 1983; Ogle, 1970; Spicer 1962; Thrapp 1967).

- The U.S. Indian Claims Commission ("ICC") generally determined the boundaries of aboriginal lands of the affected tribes. Figure 1 below depicts the boundaries of aboriginal lands of the affected tribes.[16]

<span style="border:1px solid">Continued</span>

---

[14] *See* Attachment One, Tribal Stewardship.
[15] *See* Attachment Two, Tribal Stewardship.
[16] *See* Attachment Three, Tribal Stewardship.

| |
|---|
| Footnotes associated with Comment ID: 30078-4 |

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 6 of 45

<span style="border:1px solid">Continued</span>



*Figure 1. Boundaries of affected Tribes' Aboriginal Territories.*

- Figure 2 below is a higher resolution depiction of the aboriginal lands in the vicinity of the RCM project impact area.[17] Figure 2 establishes that the DEIS proposed RCM project would have direct, indirect, and cumulative impacts on the aboriginal lands of Arizona's Apache, Yavapai, and Pima-O'odham tribes and nations.

---

[17] *See* Attachment Four, Tribal Stewardship.

<span style="border:1px solid">Continued</span>

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 7 of 45

<span style="border:1px solid">Continued</span>



*Figure 2. Boundaries of affected Tribes' Aboriginal Territories overlapping with the RCM impact area*

- In the early 1870s, Western Apaches relinquished about millions of acres of their aboriginal lands in exchange for reduced acres on reservation lands and U.S. Government guarantees of protection and assistance (Welch, 2016, pp. 82-88). Two additional maps[18] attached to these comments depict the results of U.S. Government closures of several Apache reservations and severances of more than 2,000,000 acres from the White Mountain and San Carlos reservations from 1873-1902. These facts are specifically relevant to assessments of the human environment and tribal values and concerns for the RCM project impact area because the U.S. Government effectively donated these tracts of Apache Reservation lands to non-Apache miners, farmers, and ranchers for industrial uses. In the latter 1800s and early 1900s, and in the 2015 NDAA Section 3003, justice-driven governance was trumped by profit-driven promises by miners.

---

[18] *See* Attachments Five and Six, Tribal Stewardship.

<span style="border:1px solid">Continued</span>

Appendix R

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 8 of 45



- ICC Findings of Fact for Docket 22-D (Indian Claims Commission 1969) and Docket 22-E (Indian Claims Commission 1965) confirm the facts listed above and provide other court-confirmed facts directly relevant to understanding the historical context of the human environment of the RCM impact area.

The authoritative compendium of historical and cultural facts provided by the U.S. Smithsonian Institution is directly relevant to the human environment impacted by the RCM project. (Ortiz 1983). Nevertheless, the DEIS ignored such authority. The DEIS ignored the above-cited facts. The DEIS has not meaningfully acknowledged, much less analyzed, the human environment or the impacts of this project in these essential terms.

Based on these facts and authorities, the DEIS should have provided the historical context for documenting the proposed RCM project impact area and for analyzing and assessing those impacts on cultural resources, tribal values, and tribal communities. [the DEIS should have] embraced, and Forest Service remains legally obligated to embrace, the truth embodied in NDAA Section 3003, NHPA and NEPA. Namely, proponents of projects that propose to privatize and commodify public and former Indigenous lands and resources are obligated to compensate the public and tribal dimension through context-sensitive recognitions, descriptions, and analyses of the people and historical dynamics that have invested the impacted area with their cultural and historical significance. The respectful recognition, description, and analysis of the Apaches' cultural resources, tribal values, tribal and tribal communities meaning and value to the human environment of the Apache and other Native American peoples.

**B. Religious Significance of Chi'chil Bildagoteel**

The DEIS ignores the religious significance of Chi'chil Bildagoteel (Oak Flat) and its surrounding areas to the Tribe and Western Apaches.[17]

The Tribe has corresponded with the Forest Service and provided testimony to the U.S. Congress, regarding the preeminence of Oak Flat and its surrounding areas on our religious beliefs and values. Of all the concerns expressed by the Tribe, the impact of the proposed RCM project on the traditional religion and values of San Carlos Apache members is the most central and harmful, on a scale of cumulative effects so devastating that it cannot be completely described in English.

Despite all of the Tribe's careful, detailed documentation of the potential impacts on our people by the proposed mine project, the DEIS and, by extension, the Forest Service, have failed to sufficiently identify and discuss the profound religious significance of Oak Flat.

---
[17] It is not the Tribe's intent to ignore our fellow Native Americans by not mentioning the other tribes with ties to the area impacted by the RCM project in this section. All of the tribes have important connections to this area. The San Carlos Apache, however, can only speak to our Western Apache religious values, beliefs and not to those of other tribes.

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 10 of 45

There are many sacred and holy sites throughout our traditional lands, on and off the Reservation. These are natural places filled with power, and we go to them (or invoke them in our prayer) for a variety of reasons: for prayers and ceremonies, to get healing and ceremonial items, or for peace and personal cleansing. These places are best known by the families whose ancestors originate from the areas in which these sites are located. There are so many of these holy places that no one person knows them all. We usually best know about the sites from the area our family comes from.

* * *

Oak Flat is one of these sacred places. We call it Chich'il Bildagoteel. The ancestors of some of our Tribal members lived there, and passed their knowledge to their descendents who are alive today. The Oak Flat area and everything in it belongs to powerful Diyin who we respect. The people have always held dances and healing ceremonies, and gathered food, medicinal plants, and many other healing items there. To this day some of us go to some of the holy places within Oak Flat area for prayer and healing.[23]

The DEIS fails to provide any description of the traditional religious roles that Oak Flat and its surrounding areas has for San Carlos Apaches in everyday life. The Forest Service is well aware of the traditional religious roles and values of Oak Flat and its environs. The DEIS should include a comprehensive, detailed description of the meaning and significance that Oak Flat represents to our Tribe and Western Apaches. This would be a simple sign of respect to our people. This is particularly vital given that this mining project will result in the Oak Flat Withdrawal Area, its environment, the plants and animals, its waters, and all the sacred places within being completely destroyed by the mine's subsidence resulting from the proposed block-cave mining method. The words "harm" and "destroyed" do not describe the sheer violence that will be perpetrated by this mine.

Most tragically, the living spiritual being of Oak Flat and its attendant Ga'an and Diyin will withhold their presence and healing services to Apaches. It will prevent our access to them, and remove a part of the very heart and soul of what it is to be an Apache. These are all facts to Apaches and the impacts on Apaches, our life, our culture, our soul - all remain undescribed by the DEIS. This sexy paragraph does not even begin to provide a description of the harm that would be perpetrated.

---
[24] Id. pp. 1-2.

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 9 of 45

surrounding areas to San Carlos Apaches and our relatives within the Western Apaches. Chapters 3.12 (Cultural Resources) and 3.14 (Tribal Values and Concerns) of the DEIS offers no serious or comprehensive explanation of the integral role that Oak Flat and its surrounding areas have on our traditional religion, now and for hundreds of years in the past. Worse, the Forest Service's approach is that the proposed mine is a *fait accompli* — that nothing can or will be done to address the immediate, irreparable and incalculable harms that will be permanently perpetrated upon the Tribe's traditional religion and values. All this without regard for federal government's statutory obligations or trust responsibility to Western Apaches and our Tribe.

Leaders of our Tribe have testified before Congress to express the religious and sacred significance of Oak Flat to our people. On November 1, 2007, former Chairman Wendsler Nosie, Sr. presented testimony on H.R. 3301, the 2007 iteration of the Land Exchange Act, before the U.S. House Natural Resources Committee, Subcommittee on National Parks, Forests and Public Lands.[19] Among other things, he described Oak Flat, Apache Leap, and Devil's Canyon as holy and sacred sites for San Carlos Apaches.

For as long as may be recalled, our [Apache] People have come together here. We gather the acorns and plants that these lands provide, which we use for economics, medicinal purposes, and for other cultural reasons. We have lived throughout these lands, and the Apache People still come together at Oak Flats and Apache Leap to conduct religious ceremonies and to pray or take rest under the shade of the ancient oak trees that grow in the area. The importance of these lands has not changed. These are holy, sacred, and consecrated lands which remain central to our identity as Apache People.[20]

Our Tribe's leaders have testified before Congress on other occasions over the years always identifying the sacredness and sanctity of Oak Flat and the surrounding special places to our Western Apache People.[21] The eloquence of our Tribal Elders is poignant and is important for shedding light and understanding on the spiritual importance of places like Oak Flat.[22] The Memorandum to the Chairman, Vice-Chairman and Tribal Council on the subject of Sacred Sites in general and Oak Flat in particular signifies the singular import of sanctity and spirituality Chi'chil Bildagoteel.

---
[19] *See generally* Attachments One, Religious Significance, Testimony of Former Chairman Wendsler Nosie, Sr. presented testimony, Religious Significance, Testimony of Former Chairman Nosie Nov. 1, 2007 pp. 1-2

[20] *Id.*

[21] *See generally* Attachment Two, Religious Significance, Testimony of Former Chairman Ramon Riley Nov 29, 2009, Attachment Three, Religious Significance, Testimony of Chairman Rambler Nov. 30, 2013.

[22] *See generally* Attachment Four, Religious Significance, Elders Cultural Advisory Council's Memorandum To Chairman, Vice Chairman, Tribal Council, December 14, 2011.

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 11 of 45

**C. Elements of Apache Traditional Religion On Ga'an and Diyin[25]**

Apache religion is a highly ordered suite of patterned thoughts and actions grounded, like most of all religions, in precepts about the origin and development of the universe and the character and interrelations of objects and entities within it. (Basso 1983). The stark contrasts between Apache and Western metaphysical precepts help to explain the conflict over Chi'chil Bildagoteel (Oak Flat) and the proposed RCM project. Previous attempts on the part of US Federal and Arizona governments and industrial boosters to characterize Apaches as "primitive" and "savage" (see, for example, Legislature of the Territory of Arizona 1871) have been debunked as unprincipled racist fabrications. (see Welch 2016, 2017). In fact, despite centuries of oppression and persecution, Apaches have created and have maintained a vast and intricate mythology (Goodwin 1939), an extensive complex of elaborate and compelling prayers, chants, and rituals (Goodwin 1938; Basso 1970), a set of sophisticated theories of natural and supernatural causality (Basso 1970), and a vast and intricately named and storied landscape, one populated and animated by subtle and profound natural and supernatural entities and significances. (Basso 1996).

Traditional Apache religion makes unique and fundamental contributions to the development and sustenance of personal and collective identity and well-being. (Basso 1969, 1970, 1993). The persistent importance of traditional religious thought and practice among Apaches today and into their future as a unique Indigenous people cannot be overemphasized.

According to traditional Apache religious thought and practice, everything that exists is a manifestation of its specific form of life (*bi'hi'ho*). All plants, animals, minerals, waters, and the earth itself has *bi'hi'ho*, as do fire, wind, lightning, thunder, rainbows, and an extensive group of supernatural beings (Diyin) that are seldom seen by humans. All these forms of life are distinct and all are distinctively different from one another and from human life. All are intrinsically, though in varying degrees, "holy" or "sacred" (*godiyii*). (Goodwin 1938; Basso 1970, 1983).

Because all life forms are *godiyii* they possess their distinctive forms of sacred power (*diyi'*). Diyi' can be called upon via prayers and chants by religious practitioners who have received training and demonstrated respect for the natural world in general and the life forms possessing the required or desired *diyi'*. (Goodwin 1938; Basso 1970). Different powers are called upon for different reasons, for example, to afford protection from dangers, to heal specific illnesses, to facilitate success in particular endeavors, to celebrate female puberty, and for other purposes. (Goodwin 1938; Basso 1969, 1970, 1983).

The existence of *diyi'* is the fundamental rationale for Apache demonstrations of "respect" (*ikidoda*). Failure to display deference and *ikidoda* causes the *diyi'* to withhold benefits to supplicants. (Basso 1970, 1983). Respect may be shown through simple avoidance and mercy, by refraining from taking any life unless it is required to sustain oneself or one's kin, and by

---
[25] The Source Material for this section of the comment are in Attachment Five, Religious Significance.

---

Appendix R

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 12 of 45

←— Continued

avoidance of causing any damage to the "home" (*godil*) of the *diyi'*. For many Apaches and all practitioners of traditional Apache religion, active respect and avoidance of damage ensures stability and harmony. (Basso 1983).

Because they provide the *godil* (homes) of and for the *diyi'* (sacred power) and *Diyin* (sacred beings), certain types of places – especially mountains, springs, unique landforms, and concentrations of what Westerners call biodiversity – are closely associated with holiness, sacredness. Forms of life with homes in these places are said to "belong" to that spring, mountain, or landform. Although a particular landform may itself possess great *diyi'*, as is certainly the case with Chi'chil Bildagoteel, it is the unique combination and integration of all associated *diyi'* and *Diyin* that defines its sacred significance.

Specific places have and transcendent importance in traditional Apache religion. Apaches have, on the basis of centuries of close observations, respectful uses, and spiritual exchanges with places, developed conceptions of places, place-related powers, and place-linked sacredness. Certain places are the only available host for specific ceremonies. Certain other places provide plant, animal, water, and mineral resources required for ceremonials. Other specific places command respect because of associations with important supernatural events or processes or because they are the resting places of deceased persons. (Goodwin 1938, 1939; Basso 1983). Chi'chil Bildagoteel is a sacred place for all of these reasons, a locality of unique and uniquely profound significance. If Oak Flat is destroyed then with it will be destroyed unique, centrally important, and irreplaceable aspects of traditional Apache religion.

Among the important implications of the facts that places are endowed with specific and often unique forms of sacred significance is that different places are not interchangeable for essential purposes in traditional Apache religion. Many spiritual and ritual observances cannot occur except in designated places. Particular plants, minerals, and animals required for specific ceremonials must be collected only at certain places. Particular sacred power must be invoked with prayers and chants that mention only the names of places that provide these *diyi'* and *Diyin* with homes. Because of these proscriptions the Apache landscape resonates with profoundly moral dimensions that sacred places symbolize and embody.

In light of the foregoing, it is understandable that damage to or destruction of sacred places, especially intentional destruction in pursuit of monetary gain or personal status enhancement, is regarded as repugnant and deeply immoral. One of Keith Basso's most knowledgeable and articulate Apache consultants, Nick Thompson, made this point in clear and compelling terms:

> "If you hurt one of these holy places, it's very, very bad. You will hurt yourself and all your people if you do that. You must always show respect and take care of those holy places. Each one helps us in some way. We depend on them to help us live right, to live the way we should. So we leave them alone except when we

←— Continued

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 13 of 45

←— Continued

really need them. We pray to them to help us. If we hurt them they would stop helping us – and we would only know trouble." (Basso field notes on file, White Mountain Apache Tribe Historic Preservation Office, Whiteriver, Az.)

Jacob Henry, an enrolled member of the White Mountain Apache Tribe and a Tribal Monitor employed by the Forest Service's Tribal Monitoring Program, agreed to speak to employees of the Tribe's Department of Justice (DOJ). Mr. Henry consented to provide the DOJ with an affidavit.[34] Mr. Henry described his work with the Tribal Monitoring Program.[35] Mr. Henry stated under oath that on two specific occasions at distinct locations he "had a sensation come over me, a sensation I had felt in church" and that other persons who were present also "had a very deep, personal, powerful, spiritual connection to a presence we could not see, but could feel."[36] He described feeling overwhelmed by the presence he felt.[37] Mr. Lyndon was one of the person who also had a deep, powerful, spiritual connection and was observed by Mr. Henry as weeping on the occasion.[38]

**III. Consultation**

The Forest Service consultation processes and principles are subject to statute and regulations. Specifically, the Forest Service is required to undertake government-to-government (G2G) consultations pursuant to NEPA and its implementing regulations, under Section 3001(c)(3) NDAA, as well as by the following authorities: National Historic Preservation Act (NHPA) and its implementing regulations (36 CFR Part 800); the Forest Service Handbook 1509.13 Chapter 10, Consultation with Indian Tribes and Alaska Native Corporations; and, the U.S. Department of Agriculture's own Departmental Regulations (1340-007, Policies on American Indians and Alaska Natives, 1350-01, Tribal Consultation, and 1350-002, Tribal Consultation, Coordination and Collaboration). Furthermore, the Council on Environmental Quality (CEQ) regulations (Sections 1501.2(d)(1) and 1501.7(a)(1)) and policies require federal agencies to (1) contact Indian tribes early in the planning process and provide tribes opportunities to consult and participate in EIS preparation; (2) enable tribes to participate as cooperating agencies with federal agencies in NEPA reviews; and (3) "recognize the interrelated cultural,

[34] *See* Attachment Six, Religious Significance, Affidavit of Jacob Henry.
[35] *Id.* ¶¶ 7, 8, 12, 16 -18.
[36] *Id.* ¶¶ 20-21, 23.
[37] *Id.* ¶ 23.
[38] *Id.* ¶ 20.

Footnotes associated with Comment ID: 30078-7

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 14 of 45

social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action."[31]

The Forest Service has failed to consult with tribes in the manner prescribed by NEPA, NHPA, and NDAA Section 3003(c)(3).[32] Contrary to the assertions made by Forest Service that a three-track approach is appropriate, the consultation process required by the NDAA § 3003(c)(3) envisions an interconnected consultation process with the affected tribes. Consultation with Tribes must comply with the NHPA and NEPA. The Forest Service is required to engage in government-to-government consultation with Indian Tribes.[33]

Comment ID: 30078-8
Response: CR12_B

The Forest Service failure to consult is a matter of record, not opinion. The DEIS fails to reflect the results of previous consultations with the Tribe because it effectively has ignored virtually every concern and request conveyed in our July 2016 scoping comments. The DEIS also fails in numerous ways to support consultation efforts. The DEIS ignores the interrelations between the sociocultural and biophysical impacts of the proposed RCM. The Programmatic Agreement (PA) included in the DEIS (version 5) completely discounted and disregarded the Tribe's comments on the prior draft.

In the spring of 2016, after many months of deliberations to create a mutually acceptable memorandum of understanding between the Tribe and Forest Service to guide consultations pursuant to NDAA 3003 (c)(3) and related authorities, the Forest Service eviscerated the previously agreed upon draft MOU.

The DEIS points to the Forest Service's consultation efforts made pursuant to NHPA Section 106 as a showing that it has met its burden for consultation. Yet, this effort ignores all of the other RCM specific mandates in NDAA Section 3003(c)(3). The Forest Service has, in effect, put all its consultation "eggs" in a NHPA "basket" – an arbitrary, capricious, and poorly executed decision.

The NHPA requires federal agencies to consider the effects of their undertakings on historic properties. 36 CFR § 800.16(l) defines consultation as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the Section 106 process." NHPA's Section 106 regulations (36 CFR Part 800) require agency consultations through the multiple steps in the Section 106 process with any Indian tribe that attaches religious and cultural significance to historic properties that may be affected by the agency's undertakings. However, and as noted in ←— Continued

Comment ID: 30078-8
Response: CR8

[31] *Environmental Justice Guidance Under the National Environmental Policy Act*, p. 9 available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf, last viewed December 17, 2019.
[32] The Tribe incorporates by reference the ITAA Comment Nov. 7, 2019, pp 3, 30-34 and AMRC Comment Nov. 7, 2019, pp. 105-126.
[33] 36 C.F.R. § 219.4(a)(2).

Footnotes associated with Comment ID: 30078-8

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 15 of 45

←— Continued

our September 30, 2019 letter to Supervisor Bosworth, Forest Service has failed to follow the guidance and steps prescribed within the Section 106 consultation process. The Forest Service failed to pursue government-to-government consultations essential to the Section 106 steps and determinations, especially the consultations required to make a "reasonable and good faith effort to carry out appropriate identification efforts" to find and document historic properties[34]; to evaluate the significance and determine the eligibility of identified historic properties[35]; to assess the adverse effects of the proposed mine and land exchange on historic properties[36]; and to resolve adverse effects.[37]

Our early efforts to develop a Memoranda of Understanding specifically addressing government-to-government consultation in compliance with NDAA Section 3003(c)(3) began in March of 2016 and collapsed in January of 2017. My letter to the Forest Service of January 17, 2017, recites events and positions by Forest Service personnel which sadly foreshadowed events which are occurring today.[38] It is perhaps because the Forest Service has maintained an attitude that the Land Exchange is a foregone conclusion regardless of the recklessness of proceeding with the RCM project that such an off-hand and casual approach has been taken toward consultation with the Tribe.

The Tribe has repeatedly corresponded with the Forest Service regarding the deficiencies in the consultation process.[39] The correspondence in Attachment Two of this section reflect only a portion of the writings between us which reflect a lack of meaningful consultation. The recent special Council meeting hosted by the Tribe clearly failed to qualify as meaningful consultation.[40] The Forest Service has expressly communicated to our Tribe during the special Council meeting that the Forest Service has no intention of making authority with respect to the proposed RCM mining project, meaning that the agency cannot deny the Land Exchange as an alternative under the DEIS.[41] Several questions went unanswered during the Council meeting and Forest Service did not have the personnel who could respond to questions regarding the PA. ←— Continued

Comment ID: 30078-10
Response: CR12

[34] 36 CFR § 800.4(b).
[35] 36 CFR § 800.4(c).
[36] 36 CFR § 800.5.
[37] 36 CFR § 800.6.
[38] *See* Attachment One, Government-to-Government Consultation with Tribe.
[39] *See* Attachment Two, Government-to-Government Consultation with Tribe.
[40] *See* Attachment Three, Government-to-Government Consultation with Tribe.
[41] *Id.* p. 7.

Footnotes associated with Comment ID: 30078-10

Footnotes associated with Comment ID: 30078-10

Appendix R

←Continued

Cultural resource issues and concerns are explicitly recognized in the NDAA.[42] Our Tribe has clearly established that the Forest Service has failed to comply with the NHPA and Section 3003(c)(3)(A). The Tribe has a number of issues of concern listed in the Tribe's Scoping Statement and raised here which the Forest Service has failed to enter into any consultation regarding addressed by Section 3003(c)(3). Even if the Forest Service were capable of PA which satisfied the NHPA and its regulations, Forest Service would not have complied with its consultation obligations with tribes under the NDAA.

**IV.    The Current DEIS Stands Deficient and To Comply With NEPA, the Forest Service Must Prepare a DEIS Which Is Meaningfully Analytical and Subject To Public Review**

**A.    Introduction**

NEPA § 102(2)(C)(iii) requires that an EIS include a "detailed statement" discussing the reasonably foreseeable environmental impact both of the proposed federal action and of any feasible alternatives. The DEIS presented here does not include a "detailed statement" of reasonably foreseeable environmental impacts. 40 C.F.R. § 1502.24 requires agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." The DEIS fails in several respects.

Under NEPA, an EIS is required for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640 (9th Cir.2014). "A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987).

"In assessing the adequacy of an EIS, [the court] employ[s] a 'rule of reason' test to determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of probable environmental consequences.'" *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir.2000). "Under this standard, [the court's] task is to ensure that the [agency] took a 'hard look' at these consequences." *Id.* "The reviewing court may not 'fly-speck' an EIS ... or 'substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action.'" *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir.1988), "If the agency has taken a 'hard look' at a decision's environmental consequences, the decision must be disturbed." *Half Moon Bay*, 857 F.2d at 508 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

---

[42] NDAA Section 3003(c)(3)(A)

Footnote associated with Comment ID 30078-10

---

←Continued

RFRA's definition of "exercise of religion" was amended by the Religious Land Use and Institutionalized Persons Act (Pub. L. 106–274, 42 U.S.C. § 2000cc et seq) ("RLUIPA").[46] RLUIPA states, "[t]he term 'religious exercise' includes *any exercise of religion*, whether or not compelled by, or central to, a system of religious belief."[47] To qualify for RFRA's protection, an asserted religious belief must be sincere.[48]

The "exercise of religion" involves "not only belief and profession but the performance of (or abstention from) physical acts" that are "engaged in for religious reasons."[49] Practices that are compelled or limited by the tenets of a religious doctrine fall comfortably within RLUIPA's definition.[50] Courts have considered important writings, gathering places, and ceremonies and rituals as practices of religion for purposes of identify[ing] the exercise of religion.[51]

With respect to important writings, "most religions embrace seminal, element, fundamental, or sacred writings. These writings often include creeds, tenets, precepts, parables, commandments, prayers, scriptures, catechisms, chants, rites, or mantras."[52] As to gathering places, "many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gather places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; *and natural places, such as springs, rivers, forests, plains, or mountains*."[53] Additionally, "most religions take religion free of ceremony, ritual, liturgy, sacrament, or protocol. These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance."[54]

Continued→

---

[46] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696, 134 S. Ct. 2751, 2761 (2014) ("Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution").

[47] 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). Congress mandated that "exercise of religion" *be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g) (emphasis added).

[48] *Hobby Lobby*, 573 U.S. at 717.

[49] *Employment Division v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 1599 (1990)

[50] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710, 134 S. Ct. 2751, 2770 (2014), *Id.* Fed. 2d 615 (2014)

[51] *U.S. v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996) (discussing the factors that assist courts identify religion); *see also Africa v. Com. of Pa.*, 662 F.2d 1025 (3rd Cir. 1981)

[52] *Meyers*, 95 F.3d at 1483.

[53] *Id.* (Emphasis added)

[54] *Id.*

Footnotes associated with Comment ID 30078-11

---

Here, the Forest Service has decidedly *not* taken a "hard look" at a number of empirical and scientific analyses, monitoring and mitigation impact analyses. The Tribe will not engage in unnecessary discussion of the DEIS's failures and will instead incorporate by reference the comments of ITAA and AMRC pursuant to Section 36 C.F.R. § 218.8. The Tribe hereby expressly adopts and incorporates in full ITAA's and AMRC's Comments and Exhibits/Appendices, having submitted them by had delivery on a separate electronic media drive. Generally, the Tribe may only add a few comments made by ITAA and AMRC, and will otherwise discuss the following deficiencies of the DEIS: namely, failure to consider the application of certain laws; water quantity and quality issues; flawed water modeling; lack of alternative mining technique analysis; and inadequate subsidence analysis by the Forest Service.

**B.    Forest Service Failed to Analyze Whether the Religious Freedom Restoration Act and the American Indian Religious Freedom Act Applied**

The Forest Service has expressly communicated to the Tribe that the agency has no decision-making authority with respect to the proposed Land Exchange, meaning that the agency cannot deny the land exchange as an alternative under the DEIS. The Forest Service's reasoning is that Section 3003 of the NDAA mandates the transfer and exchange of Oak Flat to RCM within 90 days of publication of the FEIS. However, the Forest Service is not relieved of its duty to analyze whether federal laws that protect religious liberty of all Americans, including San Carlos Apaches. The Forest Service made no such analysis in the DEIS.

In 1993, Congress passed the Religious Freedom Restoration Act (Pub. L. No. 103-141, 107 Stat. 1488, 42 U.S.C. § 2000bb et. seq.) ("RFRA"), and confirmed that "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution."[43] As an agency of the United States, Forest Service is obligated to carry-out the provisions of RFRA, the RCM project will impact the exercise of San Carlos Apaches.

Under RFRA, "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of further that compelling governmental interest."[45]

Continued→

Comment ID: 30078-11

Comment ID: 30078-11   Response: GR16

---

[43] 42 U.S.C. § 2000bb(a)(1)

[44] "The term government includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2.

[45] *Id.* at § 2000bb-1(a)(1)(2).

Footnotes associated with Comment ID 30078-11

---

←Continued

The significance of Oak Flat and the documented cultural sites, songs, prayers, spiritual beings, and ceremonial sites confirms that Oak Flat holds significant religious meaning to San Carlos Apaches, thus illustrating the sincere and central religious principles of San Carlos Apaches. Such religious practices, as confirmed by the Ethno Study, has been well-documented as a practice of Apaches for hundreds of years. Today, Apache People still come together at Oak Flat and Apache Leap to conduct religious ceremonies and to pray, a ritual that stems from the ancestors of Apaches, which are holy and sacred, and remain central to the identity of Apache People. There are writings on the rocks at Oak Flat along with human remains and burials of materials and items of Apache Crown Dancers, the most powerful, spiritual protector of Apaches.

Young Apache girls who reach woman-hood go to Oak Flat to start their traditional Apache Sunrise Dance ceremony, a rite that entails the family of the young girl selecting a man and woman from the Apache community to serve as traditional god-parents to young Apache girl. This ritual entails the ceremony being performed for four-days, a number sacred to Apaches but also includes weeks of labor to put a traditional campsite together. This has been performed at Oak Flat since time immemorial. These young girls, as they progress in age and become wiser, always return to Oak Flat. That's the Apache way subject to irreparable harm that would derive, imposing severe consequences of Apache religion of Oak Flat, as a result of block-caving mining.

A government action that puts a religious practitioner to the choice of engaging in conduct that seriously violations his/her religious beliefs or facing serious consequences constitute a substantial burden for purposes of RFRA.[55] "Certain aspects of religious exercise cannot, in any way, be restricted or burdened by either federal or state legislation."[56] The freedom to hold religious beliefs and opinions is absolute.[57]

No greater burden exists than the harm that will result on Apache religion as a result of Oak Flat being destroyed due to the proposed block-cave mining method, causing Oak Flat to subside and forcing San Carlos Apaches to violate the tenets of their religion. The testimony presented by the San Carlos Apache Tribe explains the central role that Oak Flat has with the religion of San Carlos Apaches and how there is no other site that Apaches can go to practice certain ceremonies, songs, and rituals only available at Oak Flat.

When determining whether a substantial burden on the exercise of religion is in utterance of a compelling governmental interest, the court must look beyond broadly formulated interests and scrutinize the asserted harm of granting specific exceptions to particular religious

Continued→

---

[55] *Equal Employment Opportunity Commission v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 587 (6th Cir. 2018)

[56] *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146 (1961)

[57] *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903 (1940); *Reynolds v. United States*, 98 U.S. 145, 166, 25 L.Ed. 244 (1878)

Footnotes associated with Comment ID 30078-11

Appendix R

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 20 of 45


Continued

claimants.[58] RFRA contemplates a "more focused inquiry."[59] It "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.[60] This requires courts to "loo[k] beyond broadly formulated interests" and to "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants"—in other words, to look to the marginal interest.[61]

The Forest Service does not have a compelling government interest in developing and operating a copper mine. Rather the Forest Service is a facilitator following the law it is required to perform. It would be irrational to argue that the Forest Service, a federal land management agency would be compelled to develop and operate a mine which will destroy the very land it is tasked to manage.

The least restrictive means standard is exceptionally demanding, which requires the governments to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.[63] "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it."[63] This standard has no application because the Forest Service has no compelling government interest.

### C. Forest Service Must Comply with International Legal Standards

The Tribe reminds the Forest Service that it must comply with international standards with respect to evaluation the proposed mining project at Oak Flat. International law protects the right of Native American religious practitioners to maintain and practice their religious traditions in relation to sacred areas.[64] Among the principle sources of international law are treaties entered into by independent States. International treaties are part of federal law, inasmuch as the United States Constitution, Article VI, Section 2, provides that treaties made under the authority of the United States are the "supreme law of the land," and binding on the "Judges in every state."[65]

[58] *Burwell*, 573 U.S. at 726-27.

[59] *Id*

[60] *Id.*, quoting *Gonzalez v. O Centro*, 546 U.S. 418, 431 (2006).

[61] *Burwell* at 727.

[62] *Id.* at 728.

[63] *United States v. Playboy Entertain Group, Inc.*, 529 U.S. 803, 815, 120 S.Ct. 1878 (2015).

[64] The Tribe is required to advance the argument in this section if the Tribe should ever decide that it wishes to seek any form of relief in an international forum.

[65] U.S. CONST. art. VI, cl 2.

Comment ID: 30078-11

Response: CR16

Footnotes associated with Comment ID: 30078-11

Footnotes associated with Comment ID: 30078-12

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 21 of 45


Continued

Moreover, the United States Supreme Court has noted that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction."[66]

The international treaties that are particularly relevant here are the International Covenant on Civil and Political Rights[67] and the International Convention on the Elimination of All Forms of Racial Discrimination.[68] The United States ratified the Covenant in 1992[69] and the Convention two years later in 1994.

The right to practice or manifest religion or belief is protected under Article 18(1) of the International Covenant on Civil and Political Rights, which states that "[e]veryone shall have the right to freedom of thought, conscience and religion [which includes] freedom...either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching."[70] In addition, Article 27 of the Covenant, which is of relevance to indigenous peoples, gives special consideration to the rights of minorities whose cultural and religious traditions differ from those of the majority.[71] Article 27 states, "Persons belonging to minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion."[72]

Besides the Covenant, Article 5 of the International Convention on the Elimination of All Forms of Racial Discrimination provides that State parties are to "guarantee the right of everyone...to equality before the law, notably in the enjoyment of...[t]he right to freedom of thought, conscience and religion.[73] In interpreting and applying this Convention, the Committee on the Elimination of Racial Discrimination ("the Committee"), which monitors compliance with the treaty, has observed the need to take into account the particular characteristics of diverse groups in order to achieve effective equality in enjoyment of their human rights.[74] The Committee

Continued

[66] *The Paquete Habana*, 175 U.S. 677, 700 (1900).

[67] International Covenant on Civil and Political Rights, Dec. 16, 1966, S. Treaty Doc. No. 95-20, 6 I.L.M. 368 (1967) 999 U.N.T.S. 171 ("ICCPR").

[68] International Convention on the Elimination of All Forms of Racial Discrimination, Mar. 7, 1966, 660 U.N.T.S. 195 ("ICERD").

[69] Entered into force Mar. 23, 1976 and ratified by the United States Sept. 8, 1992.

[70] Article 18(1) of ICCPR.

[71] *Id.* at Article 27.

[72] *Id*

[73] Article 5 of ICERD.

[74] CERD General Recommendation 32: Special Measures, para. 8.

Footnotes associated with Comment ID: 30078-12

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 22 of 45

Continued

has noted the distinctive characteristics of indigenous peoples in particular, in light of their histories and cultures, and has called upon States to take specific measures to protect their rights, including measures to "[e]nsure that indigenous communities can exercise their rights to practise and revitalize their cultural traditions and customs."[75]

### D. The Forest Service Wrongly Analyzed a Number of Water Resource Issues.

#### 1. Water Resources Issues

The RCM DEIS provides an inadequate evaluation of cumulative impacts on water resources in a region already experiencing shortages. The Arizona Department of Water Resources modeled the Pinal County water supply over a 100-year period, and shows an 8.1 million acre foot ("af") deficit, one that does not include the RCM requirement of over 600,000 af over the 40-year life of the mine. That is enough water for 168,000 homes over 40 years. The Forest Service has not taken into account the effect of RCM's water demand on the region or the Tonto National Forest itself. In effect, once mining commences, the region's water supply will be immediately and irreparably compromised.

Comment ID: 30078-13

Response: WT4_A



Fig. 1 – RCM Pre-impacts

[75] CERD's General Recommendation, CERD C/51/Misc.13 Rev.4, para. 4(d)(e).

Footnote associated with Comment ID: 30078-12

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 23 of 45

The scale of the RCM project forms the very definition of an irreparable harm. Even Resolution Copper cannot stop this process once it is begun. Once the 1.8-mile wide collapse crater forms, the Apache Leap Tuff Aquifer, which supplies the Town of Superior and the Queen Creek community, will be altered forever, irreversibly and permanently altering the region's water resources.

Comment ID: 30078-14

Response: WT42

As stated in the DEIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block-caving begins the Apache Leap Tuff would begin to dewater as well."[76]



Fig. 2 – Impacts of RCM Operation

[76] (DEIS, at 296-299.

Appendix R

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 24 of 45

The DEIS analysis of past, present and reasonably foreseeable future regional water impacts is entirely inadequate, even though the Forest Service acknowledges that "groundwater demand is substantial and growing" and "total demand on the groundwater resources in the East Salt River Valley is substantial and could be greater than the estimated amount of physically available groundwater."[77] The DEIS does not take a realistic look at the consequences of RCM's plan to pump 180 billion gallons of water from the aquifer in the East Salt River Valley.[78]

| Comment ID: 30078-15 |
| Response: WT4 |

(Intentionally Blank)

---

[77] DEIS, at 342.

[78] 550,000 af, as cited in DEIS Table 2.2-1 for Alternative 6, equals approximately 179 billion gallons, although we note that the Mining Plan of Operations and other RCM documents referenced as much as 640,000 af over the 40-year life of the mine.

| Footnotes associated with Comment ID: 30078-15 |

---

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 25 of 45

Tens of thousands of people in Pinal County rely on groundwater for their water supply and already, private wells are drying up.[79] As shown on Figure 3, the Forest Service's own

| Comment ID: 30078-16 |
| Response: WT4 |



Fig. 3. USDA 100-year moisture index, showing much of Arizona has a moisture deficit, even when averaged over 100 years. Source: USDA, 2012, Forest Health Monitoring: National Status, Trends and

research shows that Arizona has experienced moisture deficits even when averaged over the last 100 years.

The Tribe has deep concerns about allowing Resolution Copper to overdraw groundwater resources in Pinal County. One of the only remaining groundwater resources accessible to users in Pinal County is in the Tribe's Cutter Basin. The United States has a long and troubled history of reallocating resources promised to tribes when demand is high and off-reservation supplies are low. The Tribe fears that allowing Resolution Copper to withdraw billions of gallons of groundwater will create a decades-long regional water imbalance. This imbalance, in turn, will [Continued →]

---

[79] ABC15 News, *Private Wells Running Dry in Pinal County*, Oct. 24, 2019, available at: https://www.abc15.com/news/region-central-southern-az/private-wells-running-dry-in-pinal-county.

| Footnote associated with Comment ID: 30078-16 |

---

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 26 of 45

place the Tribe's own water resources at risk due to inexorable and unmet demand and dwindling supply.

| Comment ID: 30078-17 |
| Response: WT4 |

Colorado and other parts of the desert Southwest remain in an almost perpetual drought. The Drought Monitor map for December 2019,[80] and shows the long-term and short-term drought conditions in and around the project area and across much of the Colorado River Basin.

A 2017 Report to Congress further noted that the Colorado River (the source of critical water supplies to Arizona via the Central Arizona Project or "CAP") has experienced generally lower-than-normal flows for the past 16 years, with the lowest annual flows in the last 900 years.[81] The Report to Congress also noted that recent studies on the effects of climate change suggest that "a transition to a more arid regional climate may be under way.[82] Likely consequences of climate change include higher temperatures in the West, higher evapotranspiration, reduced precipitation, and decreased spring runoff.

The DEIS further fails to evaluate "reasonably foreseeable future" Colorado River shortages and cuts, as well as the events that will be triggered under the Drought Contingency Plan once shortages occur. It also fails to look at the project's impact on regional water resources when combined with these shortages.

| Comment ID: 30078-18 |
| Response: WT4 |

Resolution Copper Mine will obviously require a vast amount of water in a region of the country that is already experiencing water shortages. Arizona water law grants exceptional leeway to mines, which are essentially unregulated water users. As such, RCM may be entitled to develop a virtually unlimited number of wells and pump an unlimited amount of water from the Desert Wellfield.

The Forest Service has incorrectly concluded that because of this water right, it is relieved of considering impacts that would arise from the exercising of this right. This approach is not sufficient under NEPA and does not satisfy the requirement under NEPA to take a "hard look" at environmental impacts:

In a cumulative impact analysis, an agency must take a "hard look" at all actions. An EA's analysis of cumulative impacts "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council*, 395 F.3d at 1028. "General [Continued →]

---

[80] Buhle, Deborah, U.S. Drought Monitor, National Drought Mitigation Center, December 3, 2019. https://droughtmonitor.unl.edu.

[81] Congressional Research Office, November 9, 2017, Drought in the United States: Causes and Current Understanding, at 14-15.

[82] *Id.*

| Footnotes associated with Comment ID: 30078-18 |

---

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 27 of 45

[← Continued] statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information about the impact cannot be provided." *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. "Some quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide."

| Comment ID: 30078-19 |
| Response: WT4_H |

*Te-Moak Tribe of Western Shoshone v. Dept. of Interior*, 608 F.3d 592, 603 (9th Cir. 2010).

Cumulative impacts are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions."[83] One of the greatest contributions the Forest Service *could have made* to this process—but did not—would have been to conduct a thorough analysis on cumulative impacts of Resolution's plan to pump 180 billion gallons of water from the aquifer in the East Salt River Valley.

**2. Improper Definition of Baseline Conditions**

In order to construct the deep mine infrastructure, RCM has been dewatering the deep aquifer by pumping groundwater from the East Plant Site since 2009. Over the last five years, the average pumping rate has been approximately 670 gallons per minute,[84] which corresponds to 326 million gallons per year, or 1,000 acre-feet per year. During peak operation of the mine, pumping would increase to 3,992 acre-feet per year (DEIS, Appendix H), or between 160,000 acre-feet over 51 years to provide access to the expanded deep mine workings.[85] Resolution's total, actual water demand is unclear (see below), but the DEIS estimates a total of 621,000 acre-feet of water over the life of the mine. Changes in the aquifer due to mine dewatering (and due to eventual block caving and land subsidence) could affect seeps, springs, flowing streams and riparian areas.[86]

| Comment ID: 30078-20 |
| Response: NEPA19 |

The analysis of impacts on water supply and groundwater dependent ecosystems ("GDEs") in the DEIS is flawed because it discounts most of the impacts of mine dewatering. Since 2009, Resolution has engaged in a large dewatering project to facilitate construction of Shaft 10 and allow future development of the deep workings for this mine. This has led to a [Continued →]

---

[83] 40 CFR §1508.7.

[84] WSP, Resolution Copper Groundwater Flow Model Report, p. 5.

[85] Westlake Resources, Resolution Copper Water Balance, Tailings Alternatives, Table 5, 2018.

[86] DEIS, at 295.

| Footnote associated with Comment ID: 30078-19 |
| Footnotes associated with Comment ID: 30078-20 |

Appendix R

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 28 of 45

 [Continued]

decline in water levels in the deep bedrock aquifer of more than 2,000 feet, as documented in nearby monitoring wells.[57]

Due in part to the fact that the pumping is being conducted locally (i.e., Resolution has a permit for this pumping, the Forest Service has classified this past and current dewatering as a baseline condition that is not considered in the DEIS toward potential environmental impacts.[58] This decision defies common sense and is improper under NEPA. The early purpose of the dewatering in question is to facilitate future mining. However, an even more egregious decision than not counting the pumping that has already taken place is the decision not to count the "baseline" pumping rate even after the mine becomes operational. During the life of the mine, all groundwater pumping that is necessary to conduct deep mining must be considered part of the project.

The decision to classify mine dewatering as a "baseline" condition is buried in the groundwater modeling technical reports. It is summarized briefly here. In support of the DEIS, two versions of the groundwater model were run. The first run was the "No Action" alternative which is a misnomer, because this scenario inexplicably incorporates components of the mining operation. In particular, the "No Action" alternative assumes that the mine would not be developed or operated but that mine dewatering would continue anyway for 51 years – the presumed life of the non-existent mine.

The second modeling run seeks to simulate the proposed action, which incorporates some additional dewatering to maintain the expanded project infrastructure and full-scale mining as well as the hydrogeological effects of the collapse crater.[59] Impacts are defined as the difference in groundwater drawdown between these two modeling scenarios.[60] However, impacts from development of the mine only count as impacts if they are greater than the baseline impacts. In other words, impacts to water supply and groundwater dependent ecosystems (GDEs) due to the substantial current dewatering program are not considered. In addition, for every year over the entire life of the mine, the current level of dewatering is subtracted from predicted future pumping, grossly under-reporting the amount of dewatering that will actually occur. This means that under the proposed action, much of the groundwater pumping at the mine location (even during mine operation) is not considered to be part of the "No Action."

There may be a logical rationale for excluding the pre-mine dewatering (we do not agree with this rationale, but there may be one) but surely, during the life of the mine, the pumping of [Continued]

---

[57] DEIS, at 312.

[58] Garrett, April 11, 2018, Process Memorandum to File, Selection of Appropriate Baseline Conditions for NEPA Analysis, at 4.

[59] DEIS, at 303.

[60] Garrett, at 5; DEIS, at 66).

Comment ID: 30078-21 Response: NEPA19

Footnotes associated with Comment ID: 30078-21

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 29 of 45

 [Continued]

thousands of acre feet of water to allow mining operations (and for no other purpose) must be considered a component of the overall project.

As shown in Figure 3, after 51 years of "No-Action," up to 500 feet of drawdown is predicted under Superior and impacts of 10 feet or more of drawdown extend over an area encompassing approximately 50 square miles. This decision explains why hydrogeological impacts of the so-called "No-Action" alternative can be quite substantial. For example, under the "No-Action" alternative, the groundwater model predicts a lowering of the water table at Ibered Spring (located on the west side of Apache Leap) by nearly 100 feet. The degree of impact will almost certainly dry out Ibered Spring, but it does not count as a project impact because of the Forest Service's improper definition of "baseline." Such effects do not count because they occur under the "No-Action" alternative even though virtually 100% of the cause of this drop in the water table is mine dewatering. Simply put, this is bad science because the "No-Action" analysis wrongly characterizes the facts of the current and prior dewatering.

The consequence of this decision is to under-report the impacts of the preferred alternative and over-report impacts from the "No-Action" alternative because it improperly assigns mining impacts (dewatering) to "No Action."

**3.  Inadequate Assessment of Water Usage**

Ever since the General Plan of Operations (GPO) was submitted in 2016, there have been contradictions about how much water the Resolution Mine says it will require in order to operate. The DEIS does nothing to resolve this confusion and—in fact—is contradictory on this topic.

In Table 2-3.1 ("Tailings Storage Facility Comparisons") the DEIS states that the preferred alternative (Skunk Camp Tailings option) will require 550,000 acre-feet of water from outside sources ("pumped from Desert Wellfield"). Similarly, Table 2.2-1 states that this is less water than would be needed for the proposed action (the Near West tailings option is listed as requiring 600,000 acre-feet over the life of the mine). The reader is then directed to Appendix H for further details of mine water Balance and use.

Contrary to Table 2-2.1, Appendix H tabulates that Skunk Camp (Alternative 6) requires more water each year than Near West (Alternative 2): 25,881 acre-feet per year during peak operations for Skunk Camp vs. 22,250 acre-feet per year for Near West (p. H-3).

In conclusion, the DEIS cannot possibly evaluate the impacts of the mine's water usage if it cannot figure out just how much water Resolution plans to use.

Comment ID: 30078-22 Response: WT3

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 30 of 45

**4.  Inadequacy and Unreliability of Groundwater Models**

40 CFR §1502.24 requires that agencies ensure scientific integrity of analyses in environmental impact statements. This means that scientific analyses must be reliable. As noted in the DEIS.

The Groundwater Modeling Workgroup recognized that a fundamental limitation of the model—of any model—is *the unreliability of predictions far in the future*, and the workgroup was tasked with determining a time frame that would be reasonable to assess.[61] (Emphasis supplied.)

The Workgroup subsequently "determined that results could be reasonably assessed up to 200 years into the future." (DEIS, p. 300). This is a problem because some hydrogeological impacts not only persist, but actually get worse in timeframes beyond 200 years.

The groundwater model is actually run for 1,000 years into the future (DEIS, p. 296) although only the first 200 years are reported quantitatively in the DEIS. This long-term analysis demonstrated that in some areas around the mine, groundwater levels will continue to decline for many hundreds of years, thus predicted impacts to GDEs will only increase beyond the 200-year cut-off for analysis. For example, the 1,000-year hydrograph produced by Resolution's modeling consultant for Hidden Spring predicts a continuing decline in groundwater levels for almost 800 years.[62] That impacts continue (and worsen) over such vast timeframes is a testament to how huge and disruptive this project truly is and how environmental impacts from this project should be measured on a geologic time scale.

By limiting the period of analysis to 200 years, the Forest Service is discounting the worst impacts that are predicted to occur in later centuries. The Forest Service also acknowledges (see quotation above) that the best scientific tool available (three-dimensional groundwater modeling) is not up to the task of analyzing such impacts. The Forest Service does not meet its obligation under 40 CFR §1502.24 because it did not maintain scientific integrity in analyzing hydrogeological impacts beyond 200 years, even though such impacts are certain and significant.

The limitations and unreliability of the groundwater model are simply the most recent chapter in a long saga of Resolution falsely claiming that it understands the hydrogeology of the project area well enough to assess impacts due to mining. Indeed, Resolution has conducted substantial investigations into the hydrogeology of the project area; however, the Forest Service has failed to recognize that the knowledge base was still inadequate for the purposes of the DEIS.

The hydrogeology of the project area is extremely complex, with multiple aquifers, multiple faults and variable rock types. When combined with a proposed project of such immense [Continued]

---

[61] DEIS, p. 300.

[62] Groundwater Working Group Meeting Notes, Meeting #4 held on May 15, 2018.

Comment ID: 30078-23 Response: WT71

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 31 of 45

[Continued]

scale, it is a significant challenge to conduct a groundwater impact analysis and the Forest Service has not met this challenge. Starting at least as early as 2016, Resolution's consultants assured the Forest Service scientists and others that the West Boundary Fault, Concentrator Fault and other faults would limit the western areal extent of groundwater drawdown (under Superior and further west) from mine dewatering at Shafts 9 and 10. Resolution's own computer model contradicted this conclusion, instead showing nearly 10 feet of drawdown as far west as the Boyce Thompson Arboretum (see Figure 5 showing substantial drawdown beyond the boundary faults surrounding the mine site). In addition, Resolution's hydrogeological studies failed to predict the inflow of 600 gallons per minute of hydrothermal groundwater (170° F) that was encountered when sinking Shaft 10.

The analysis of water resource impacts in the DEIS is a segmented environmental analysis, which is improper under NEPA. In particular, by utilizing separate computer models and non-overlapping model domains, the Forest Service incorrectly isolated its analysis of mine dewatering from its analysis of hydrogeological impacts of pumping from the Desert Wellfield. Any effects of aquifer drawdown from the Desert Wellfield are not considered in the Mine Groundwater Model and vice versa. As shown in Figure 5, drawdown from these two pumping areas almost certainly overlap, thus rendering the isolated modeling analyses incomplete and inadequate for NEPA purposes. Resolution Copper constructed the groundwater models in such a way that cumulative impacts from the two discrete pumping areas are impossible to evaluate.

In short, the assessment of water impacts in the DEIS is deficient because the field investigations and computer modeling upon which this assessment is based are still inadequate to reliably and accurately predict the long-term impacts on the vast amount of pumping Resolution must conduct at the mine site as well as in the East Salt River Valley.

(Intentionally Blank)

Comment ID: 30078-24 Response: WT69

Comment ID: 30078-25 Response: N52

---

Appendix R

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 32 of 45



Figure 5. *Map showing non-overlapping modeling domains (solid black lines) for Desert Wellfield groundwater model and Resolution Mine groundwater model. By separating the model domains, impacts from dewatering from the Desert Wellfield are not accounted for in the Mine model and impacts from mine dewatering are not accounted for in the Desert Wellfield model. As shown here, the zones of groundwater depression almost certainly overlap (dashed blue lines are hypothetical extensions of groundwater drawdown contours from the DEIS because the model domains did not extend far enough east.) Isolating the pumping areas into separate models under-estimates impacts and renders conclusions from both models unreliable. Sources: Base Map: DEIS, Figure ES-2; Desert Wellfield drawdown contours redrawn from DEIS, Figure 3.7.1-2 (Desert Wellfield modeling analysis and zone and maximum modeled pumping impacts). Mine model contours redrawn from WSP, October 31, 2018. Mine: Resolution Copper Groundwater Flow Model – Predictive Results. Figure 5 (Regional Groundwater Model Predicted Drawdown-Preferred Active Post Closure (Year 200); Faults are redrawn from WSP, February 2019, Resolution Copper Groundwater Flow Report, Figure 2.1 (Regional Geology Map).*

> Figure associated with Comment ID: 30078-23

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 33 of 45

## 5. Inadequate Analysis of Impacts on Groundwater-Dependent Ecosystems

In evaluating this project, the Forest Service has violated its own groundwater policy for Tonto National Forest. The DEIS acknowledges that "Between 14 and 16 GDEs, mostly sacred springs, would be anticipated to be impacted by dewatering." Use of groundwater that impacts springs and streams is contrary to Tonto National Forests groundwater policy:

> Groundwater shall be managed for the long-term protection and enhancement of the Forest's streams, springs and seeps, and associated riparian and aquatic ecosystems. Development and use of groundwater for consumptive purposes shall be permitted only if it can be demonstrated that such proposals will adequately protect Forest resources.[93]

One of the most important expectations of the groundwater modeling effort was to assist the Forest Service in evaluating future impacts to springs and perennial streams that support groundwater-dependent ecosystems (GDEs).[94] The computer model used to evaluate this issue does not quantitatively simulate groundwater-surface water interactions: "Changes in stream flow cannot be evaluated based on the groundwater model."[95] Instead, it was decided that a finding of hydrogeological "impact" would only be identified if the model predicted at least a 10-foot drop in groundwater elevation in the immediate vicinity of a GDE. As stated in the DEIS,

> ... the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict."[96]

In short, the Forest Service has acknowledged that its scientific methodology (groundwater modeling) has a limit of precision of plus or minus 10 feet. The Working Group concluded that drawdowns of less than 10 feet could still have an impact on GDEs:

> The Groundwater Modeling Workgroup recognized that while the model may not be reliable for results less than 10 feet in magnitude, changes in aquifer water

> Comment ID: 30078-26
> Response: WT19

> Comment ID: 30078-27
> Response: WT61

[Continued →]

[93] Martin and Loomis, Keeping Our Streams Flowing: Tonto National Forest Groundwater Policy, in Furniss, Clifton and Ronnenberg, eds., 2007, Advancing the Fundamental Sciences: Proceedings of the Forest Service National Earth Science Conference, October 2004, PNW-GTR-689. USDA, Forest Service, Northwest Research Station

[94] BGC Engineering, November 2018, Review of Numerical Groundwater Model Construction and Approach, Section 1.1, "Issues to be Addressed by the Groundwater Model."

[95] Id., Section 4.9.2

[96] DEIS, at 301.

> Footnotes associated with Comment ID: 30078-26

> Footnotes associated with Comment ID: 30078-27

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 34 of 45

[← Continued]

level much less than 10 feet still could have meaningful effects on GDEs, even leading to complete drying.[97]

Due to the limitation of the model, in places where the model predicts drawdown greater than zero but less than 10 feet, the Forest Service assumed (without proof) that there are no impacts, "to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon."[98] The Forest Service did not scientifically conclude that 10 feet or more of groundwater drawdown is needed to cause an impact on GDEs, this was just an arbitrary number based on limitations of the method of analysis, not some scientific principle.

In conclusion, the Forest Service chose a methodology that is incapable of analyzing impacts of mine dewatering and the collapse crater on GDEs. As noted in BGC's review of the groundwater model, there are two principal ways to simulate groundwater-surface water interaction in the selected modeling software (MODFLOW-SURFACT): using the drains (DRN) software package or the streamflow routing (SFR) package.[99] Resolution used the DRN approach but BGC points out that the SFR approach would have been better: "The SFR package allows for the most comprehensive modeling of groundwater-surface water interaction."[100]

In this instance, the Forest Service is not meeting its obligation under 40 CFR §1502.24, because it is relying on a scientific method (groundwater modeling) that is not capable of predicting significant hydrogeological impacts for this complex project.

## 6. Inadequate Consideration of Alternatives to Block Cave Mining as a Way to Avoid Permanent Water Resource Impacts

Once the 1.8-mile wide collapse crater forms, as a result of RCM's operations, the Apache Leap Tuff Aquifer will be altered forever. As stated in the DEIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block-caving begins the Apache Leap Tuff Aquifer would begin to dewater as well."[101] The Apache Leap Tuff Aquifer is a critical source of water for springs and creeks, many of them sacred. This permanent impact would not occur if alternative underground mining methods were employed, but the Forest Service did not conduct an adequate analysis of alternative mining methods (as discussed elsewhere in these comments)

> Comment ID: 30078-28
> Response: AMT1_B

[Continued →]

[97] Id.

[98] Id.

[99] BGC Engineering, November 2018, Review of Numerical Groundwater Model Construction and Approach, Section 4.9.

[100] BGC Engineering, Section 4.9.2.

[101] DEIS, at 296-299.

> Footnotes associated with Comment ID: 30078-28

> Footnote associated with Comment ID: 30078-28

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 35 of 45

[← Continued]

largely because the Forest Service accepted Resolution's assertion that any method other than block cave mining would be too expensive.

The DEIS anticipates a future of profound impacts due to the collapse crater that cannot be mitigated, including to water resources. By failing to conduct an acceptable and competent evaluation of project alternatives that could avoid the impacts caused by the collapse zone, the Forest Service is allowing one factor (cost of mining; i.e., Resolution's profitability) to outweigh all environmental and social factors combined.

## 7. Mitigation of Impacts to Groundwater Dependent Ecosystems

The DEIS concludes that the Resolution Copper Mine project will or is likely to deplete water supplies and harm or destroy the streams, springs, seeps and other water features in Oak Flat, Ga'an Canyon (Devil's Canyon), Mineral Creek and Queen Creek: "Between 14 and 16 GDEs, mostly sacred springs, would be anticipated to be impacted by dewatering. Although mitigation would replace water, impacts would remain to the natural setting of these places."[101]

First, the estimate of 14 to 16 GDEs is almost certainly an underestimate because springs impacted by "baseline" mine dewatering (see comment 1, above) are simply not counted. Second, the proposed mitigation for GDEs is inadequate. Mitigation plans are outlined in an April 2019 report by Montgomery & Associates entitled, "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells." This report calls for replacing water flows in springs and creeks by pumping water from nearby wells (i.e., tapping groundwater from deeper in the aquifer), storing water in tanks and piping the water to the creek or stream or by constructing various water-collecting devices such as so-called "guzzlers," surface water capture systems or even trucking water in from alternative sources. Replacing a natural system with a manufactured facsimile of the system is not the intention of mitigation under NEPA, Just as it would not be permissible to replace the real Half Dome with a very large photograph of Half Dome, it is not permissible to replace lost GDEs with artful but artificial copies of natural systems. It was not the intention of NEPA to replace nature with Disney-like imitations of nature.

Second, the monitoring plan for GDEs is also inadequate because its discussion of triggers (i.e., occurrences or observations that would trigger mitigation activities) is vague and incomplete. The Montgomery Report (Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells) reveals that Resolution has built in (and the Forest Service has bought into) any number of ways to avoid actually implementing mitigation measures for GDEs. In particular, the Plan explains that Resolution will somehow differentiate the impacts from its dewatering from other variables such as "changes in weather and/or climate, impacts to the regional and/or local groundwater system from other human causes, landscape changes such as landslides and fires, natural succession of the GDE into a new presentation such as an increase in phreatophytic plants coincident with a reduction in spring flow rates, or other reasons not

> Comment ID: 30078-29
> Response: IMT3

> Comment ID: 30078-30
> Response: IMT1

[Continued →]

[102] DEIS, at 123.

Appendix R

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 36 of 45

← Continued

included in this document." Other than noting that Resolution will employ "multiple lines of evidence" there is no quantitative or qualitative discussion of how Resolution will accomplish this difficult task. Considering that all of the GDEs covered by the monitoring plan have already been identified as likely to be severely impacted by mine dewatering, this is a problematic situation and is inadequate under NEPA.

Third, mitigation triggers are described qualitatively as a decline in groundwater elevations or a decline in stream flow but there are no quantitative triggers. This is inadequate. The DEIS should clearly delineate quantitative triggers for each GDE (i.e., groundwater decline of greater than X feet over Y monitoring events) and the DEIS must clearly explain how Resolution intends to "confirm that observed changes are caused by mine activities," and the DEIS must confirm that these methods are scientifically reliable.

> Comment ID: 3007B-31
> Response: MIT1

Finally, Appendix J of the DEIS specifies that the monitoring and mitigation plan is not intended to address water sources associated with perched shallow groundwater in alluvium or fractures. Including shallow fracture flow in this statement incorrectly excludes important and probably inevitable impacts directly related to mining. Fracture flow[145] is likely the dominant groundwater flow mechanism in the Apache Leap Tuff and this groundwater unit is the source of water discharges that support riparian zones in Ga'an Canyon (Devil's Canyon), Mineral Creek and possibly Queen Creek. The groundwater system in the Apache Leap Tuff will be profoundly and irrevocably altered by the formation of the collapse crater. The DEIS is incorrect in excluding shallow fracture flow from monitoring and mitigation requirements.

> Comment ID: 3007B-32
> Response: MIT1

## 8. Water Quality Impacts-Acid Rock Drainage

As noted in the DEIS, "The deposit is associated with hydrothermal alteration and includes a strong pyrite 'halo' in the upper areas of the deposit, containing up to 14 percent pyrite. This mineralization has ramifications for water quality, as sulfide-bearing minerals such as pyrite have the potential to interact with oxygen and cause water quality problems (acid rock drainage). (DEIS p. 140). Much of the mineralized halo (i.e., rocks with abundant sulfide minerals but a low er grade of copper) will not be mined out, rather it will become a permanent part of the collapse zone.

The DEIS makes the incredible assumption that the mineralized, fractured rock in the collapse zone will not be in contact with oxygen, thus will not form acid rock drainage. This is a highly optimistic conclusion that defies common sense. As the collapse zone forms, the rock will become fractured (thus increasing its hydraulic conductivity many orders of magnitude) and

> Continued →

[145] Groundwater that is generally thought of as flow through porous media, that is, through the pore spaces between the grains that make up sediments and sedimentary rocks. This is considered "primary porosity." Fractures are a form of secondary porosity, created due to tectonic forces or other stresses on the rock. Large fractures can increase rates of groundwater flow very substantially compared to the generally slow flow through porous media, thus can be very important in mountainous regions with significant fracturing.

> Footnote associated with Comment ID: 3007B-32

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 37 of 45

← Continued

largely dewatered. For the purposes of groundwater modeling, Resolution assumes that the hydraulic conductivity[146] of rock in the cave zone will increase by as much as a factor of a million: "Maximum hydraulic conductivity values were altered by a multiplier of 1E+6 or to a hydraulic conductivity of 100 ft/day, whichever occurs first...The maximum hydraulic conductivity value of 100 ft/day was selected because it is much higher than the natural, un-altered bedrock, but higher values caused the model to become unstable." (WSP, February 2019, Resolution Copper Groundwater Flow Report, pp. 37-38). This statement highlights another deficiency of the groundwater model: hydraulic conductivity of rock in the collapse zone was arbitrarily limited to 100 ft/day because the model would crash if higher (i.e., more realistic) values were used.

Atmospheric air will easily penetrate the fracture zone, supplying oxygen into a subsurface environment that has probably been devoid of oxygen for thousands if not millions of years. This assumption (no oxygen thus no acid-generating reactions in the collapse zone) is likely incorrect and likely greatly understates the impacts from acid rock drainage within the mine and in ore stockpiles.

> Comment ID: 3007B-33
> Response: WT49

## 9. Water Quality Impacts-Tailings Facility

The scale of this project is hard to grasp, but the volume of tailings produced by Resolution Copper would fill the Rose Bowl to its brim, not once, but nearly 1,800 times, and over an area of 6 square miles and up to 500 feet high. Imagine lower Manhattan, from the East River to the Hudson and down to the Ferry Terminal buried under 50 stories of rubble. This vast volume of waste material will permanently disturb 16,000 acres of land of which nearly 8,000 acres is Arizona State Land.

The principal accomplishment of the DEIS seems to be to propose a new location for the mine's 1.37 billion tons of tailings, but the DEIS is inadequate in its assessment of impacts as this new location to surface water and groundwater quality due to seepage from the preferred tailings storage facility.

> Comment ID: 3007B-34
> Response: WT7

Water quality impacts from the tailings is one of the most profound and concerning environmental issues for a mine of this size, yet there is virtually no defensible scientific analysis of this issue in the DEIS. For this reason alone, the DEIS should be withdrawn. Indeed, except the Near West site, there is no true, data-supported, site-specific analysis of potential impacts to surface water and groundwater quality at any of the alternative tailings sites.

[146] Hydraulic conductivity is a measure of the ease by which groundwater flows through an aquifer. This, in turn, affects the groundwater velocity through the aquifer. Solid rock has a very low hydraulic conductivity; sandstone has a higher hydraulic conductivity and very coarse grained sediments like gravels have even higher hydraulic conductivity.

> Footnote associated with Comment ID: 3007B-33

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 38 of 45

← Continued

Resolution Copper has long proposed the "Near West" location for its tailings storage facility. In support of this proposal, Resolution conducted considerable geotechnical and hydrogeologic studies at Near West. In its August 2016 "Plan of Operations for Baseline Hydrologic & Geotechnical Data Gathering," Resolution constructed 16 drill sites to accommodate a total of 16 groundwater testing and monitoring wells; completed 38 geotechnical drill holes and piezometer installations and constructed geotechnical test trenches at 32 sites in and around the Near West Site. Resolution described this work as being needed to "collect hydrologic, geotechnical and geotechnical data in order to provide baseline information on these aspects of the environment over an area being considered for a potential tailings storage site."[155] While we do not concur that Resolution's studies at Near West were sufficiently thorough, at least they conducted site-specific studies.

> Comment ID: 3007B-31
> Response: MIT1

No studies of this scale and scope have yet been completed at the Skunk Camp site. Instead, the DEIS analysis for Skunk Camp contains mere speculation and substitutes data from Near West to complete the essential hydrogeological evaluation. In the context of understanding hydrogeological impacts in Skunk Camp and comparing the alternatives tailings sites, the DEIS must provide real data for each site. At best, the current analysis provides a qualitative ranking that Skunk Camp is better than other sites because water quality impacts at Skunk Camp could be more easily controlled. This qualitative assessment is an inadequate substitute for the NEPA requirement to accurately analyze potential environmental impacts to groundwater and surface water quality.

> Comment ID: 3007B-32
> Response: WT7

## V. Conclusion

This mining project has long-term consequences to the groundwater resources in Arizona as a whole and the Phoenix Active Management Area, in particular, in some cases, permanent consequences. Once mining commences, the formation of a collapse crater becomes inevitable and unstoppable. The DEIS acknowledges that steal demand for water in the East Salt River Valley is growing and could be greater than the available supply.[159] And yet, the DEIS does not take a realistic look at the consequences of Resolution's plan to pump some 550,000 acre feet or 180 billion gallons of groundwater from the Desert Wellfield in East Salt River Valley.

> Comment ID: 3007B-36
> Response: WT4

Considering the effects of ongoing drought conditions and likely reductions in deliveries of Colorado River water to Arizona via the CAP, it is possible that impacts from Resolution's pumping in the East Salt River Valley will be irreversible. Even more certain is the inevitability of Resolution Copper's impacts to the Apache Leap Tuff Aquifer which will be altered forever: permanently altering the region's water resources and threatening permanent and unmitigable

> Continued →

[157] Resolution, August 2016, Ground Plan of Operations, Baseline Hydrologic & Geotechnical Data Gathering Activities On Tonto National Forest, at 3.

[159] DEIS, at 342.

> Footnote associated with Comment ID: 3007B-36

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 39 of 45

← Continued

impacts to local streams and springs, many of which are sacred to the Tribe. This is the very definition of an permanent, irreparable harm.

> Comment ID: 3007B-37
> Response: DOC1

## E. The Forest Service Failed to Take a "Hard Look" at Alternative Mining Techniques.

The Tribe fully adopts AMRC's Comment regarding Alternative Mining Techniques at pp. 204-211 and Dr. Chambers' Report at AMRC's Appendix A.

The Tribe would only add that Resolution Copper has limited more than just Dr. Kliche with its information regarding limited information about the tonnage of higher grade mineable ore. RCM has refused to give similar information in the appraisal context to Congress and to senior Forest Service officials. It certainly behooves RCM to low-ball the quantity and grade of ore which is mineable. And, it is a disservice to the Tribe and the public for the Forest Service to allow Oak Flat to be destroyed because the Service failed to take a "hard look" at sketchy and tenuous data relied upon by Dr. Kliche.

> Comment ID: 3007B-38
> Response: AMT1

## F. The Forest Service Failed to Adequately Analyze the Multiple Effects of Subsidence

### 1. Surface Subsidence

According to the DEIS, subsidence of the earth's surface will occur in two or more major locations. First, subsidence of the mountain formation overlying the ore body of the proposed mine will collapse into the cave-in created through the block and cave mining process during the mining process and thereafter. (Section 3.2.3.2). Second, subsidence will occur as a result of the pumping of underground water from aquifers west and northwest of the mine site to supply water for mining activity, transportation of crushed, overburdened, and mineral-laden transportation of processed ore concentrates to the processing facility, and the application of water to mitigate surface erosion of the waste deposits by wind. The removal of groundwater from these aquifers will result in a loss of vertical hydraulic support of the valley fill material overlying these aquifers and will result in surface subsidence. (Section 3.7.1).

The mountain formation in which the ore body is located east of Superior, Arizona and those mountains related to it located east of the mine site, including the Pinal Mountain range, extend south of Miami and Globe, Arizona into the San Carlos Apache Reservation on the east.

### 2. The Effects Of Subsidence On Weather Modification

The DEIS fails to discuss the weather patterns which will be affected during and after the mining process by a vertical collapse of the mountain formation overlying and surrounding the ore body. The draft fails to consider wind rose patterns which will be affected by the vertical

> Continued →

Appendix R

---

**Top-left page:**

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 40 of 45

*Continued*

collapse of the mountain unit, and the resulting alteration of the related precipitation. (3.2.2.1). The San Carlos Apache Reservation is located approximately 20 miles east of the Oak Flat site which is the site of the ore body and the central location of the collapse which will occur. That mountain formation is a weather maker for the region and a sky island within the desert. It provides a substantial influence on wind patterns and the patterns of rainfall and snowfall within the region.

Subsidence will have an effect on precipitation on the Reservation. The San Carlos Apache mineral strip and the San Carlos Cutter Basin are two locations which will be affected by any change in precipitation which will result from the collapse and subsidence of any portion of the mountain range. The San Carlos Apache mineral strip is located on the west side of the Gila River below Coolidge Dam. The Cutter Basin is located between the San Carlos River and the western San Carlos Apache Reservation boundary near Globe, AZ, approximately 20 miles east of the mine site. The water supply and recharge for the Cutter Basin is primarily from two sources: the first and greatest source is precipitation on the Pinal Mountains through the snowmelt and rainfall entering the mountain front recharge zone and moving to the northeast into the Cutter Basin. The other source of the recharge is the surface precipitation falling on the headwaters of Ranch Creek and Goods in Wash on the San Carlos Reservation and the infiltration of that surface flow into the Cutter Basin. The water in the Cutter Basin west of the San Carlos boundary is the water supply for the City of Globe, which ten municipal wells lined up running north and south along the western boundary of the San Carlos Reservation overlying the Cutter Basin. The groundwater in the Cutter Basin is also a primary source of water presently, and in the future, for the San Carlos Apache Tribe. It is high quality compared to other sources of water for both the City of Globe and the San Carlos Apache Tribe. The rights to the groundwater in the Cutter Basin and the surface water overlying the Cutter Basin within the San Carlos Apache Reservation were adjudicated in 1999 in case number W-1-4, *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source.*

Pursuant to an agreement related to that adjudication, the City of Globe may pump up to 2,500 acre-feet of water per year from the City of Globe municipal wells located on the west side of the western boundary of the San Carlos Reservation. The Tribe has the exclusive right to use both surface water and groundwater within the Reservation under the San Carlos Apache Settlement Act, Pub. L. No. 102-575, 106 Stat. 4740 (October 30, 1992) and the San Carlos Apache Tribe Water Rights Settlement Agreement dated March 30, 1999. A decrease in precipitation on that portion of the watershed which supplies the recharge of both surface and groundwater for the Cutter Basin would dramatically threaten the San Carlos Apache Tribe's vested rights to surface water and groundwater, which water rights are held in trust by the United States.[107]

*Continued*

[107] *See* Globe Equity Decree No. 59, entered June 29, 1935 and Judgment and Decree entered on December 21, 1999 in W-1-204.

Footnote associated with Comment 30078-39

| | |
|---|---|
| Comment ID: 30078-39 | Response: WT69 |

---

**Top-right page:**

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 42 of 45

*Continued*

Copper may have made to acquire the surface water rights to those springs under the statutory process for acquiring rights to surface water under prior appropriation pursuant to Arizona law. In addition, those springs contribute water to a number of tributaries to the Gila and Salt River Systems and the draft fails to discuss the impact or the right that the Forest Service or Resolution Copper could acquire to interfere with serious water rights of water holders to the Salt or Gila River in any matter whatsoever. The DEIS admits:

- Eight springs are anticipated to be impacted under the proposed action, because of the block-cave mining;

- Two springs would be directly disturbed by the subsidence area;

- Three perennial stream reaches in Devil's Canyon and Queen Creek would be impacted by reduced runoff from the subsidence area; and

- One perennial stream reach of the Gila River would be impacted by reduced runoff from the tailings facility.

The water from these springs generally provides a higher quality of water to the rivers in the region than is available from other tributary sources of the region and is closer to a neutral pH than most of the contributions to groundwater in the region. The reduction in groundwater supplies regionally from the loss of those springs would result in the loss of the springs' contributions to high quality recharge water for the groundwater in the region and a decline in water quality in the region.

| | |
|---|---|
| Comment ID: 30078-44 | Response: NEPA14 |
| Comment ID: 30078-45 | Response: WT54 |

The DEIS fails to discuss the law concerning the use of groundwater and the right to use it in Arizona. Generally, an overlying landowner may drill a well and use the water beneath the land for beneficial purposes on that land. The right to use groundwater on other than the land overlying the well is dependent upon the issuance of a permit to transfer water from wells located miles away from the point of production and is inconsistent with the general law of the State of Arizona.

No process for environmental assessment of pipelines from proposed locations of wells and the process required for permits to transfer groundwater from one location to a different location has been discussed in the DEIS. The DEIS also fails to show the use of groundwater from wells which are located in the Salt River drainage and the potential impact on the subflow and water supply of the Salt River.[124] Arizona's groundwater law is limited to percolating

| | |
|---|---|
| Comment ID: 30078-46 | Response: WT21_C |
| Comment ID: 30078-47 | Response: WT19 |

[124] *See In re General Adjudication of the Use Water in the Gila River System and Source,* 198 Ariz. 330, 9 P.3d 1060 (2000) ("Gila II"); June 30, 1994 Order filed in W1-WR Order Re: Report of the Special Master and the Arizona Department of Water Resources' Subflow Technical Report, San Pedro River Watershed and Motion for Approval of Report dated September 28, 2005 filed in case number W1-103 ("2005 Decision").

*Continued*

---

**Bottom-left page:**

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 41 of 45

*Continued*

Negative impacts to weather patterns may extend east through the Reservation into the upper Gila drainage in New Mexico. The draft fails to discuss in any matter whatsoever the potential impact on the environment, including the precipitation and wind patterns which will result from the collapse of a portion of the mountain range and its impact in all directions surrounding the collapsed mountain formation. The DEIS also fails to discuss the precipitation patterns for desert rainfall to the Gila River as a result of that collapse, the precipitation available in the terms of surface water and rainfall on the mineral strip, and the effect on the adjudicated water rights under the Globe Equity Decree.

The Globe Equity Decree adjudicates rights to the mainstream of the Gila River from ten miles east of the New Mexico boundary with the State of Arizona to near the junction of the Gila and Salt Rivers on the west side of Phoenix, Arizona. The DEIS contains no analysis of the potential changes to precipitation as it contributes to the flows of the Gila River and the storage of the waters of the Gila River, including in the San Carlos Reservoir within the San Carlos Reservation, and the flows and water available to the holders of water rights under the Globe Equity Decree.

The draft fails to analyze the impact of the subsidence on the surface and groundwater contributions to the Salt and Black Rivers to the north and east of the mine site. The northern boundary of the San Carlos Apache Reservation includes the Black and Salt River, which boundary begins east of Pinal Creek and extends east to the headwaters of the Black River to 109 degrees, 30 minutes east, roughly coinciding with the alignment of Eagle Creek on the eastern side of the Reservation.

The DEIS also fails to deal with the precipitation pattern and groundwater contribution to the San Carlos River watershed and its contribution to the water supplies of the San Carlos Apache Reservation. The San Carlos River drainage is located wholly within the San Carlos Apache Reservation and it begins on the south side of the drainage between the Black and Salt River drainage on the north and the Gila River drainage on the south. The San Carlos River drainage is dependent upon precipitation on the watershed.

3. **Impact on Regional Springs**

There are 338 springs mapped within 5 miles of the project footprint, see figure 3.8.3-1). This includes 24 springs and several stream segments that are considered to be groundwater dependent with the potential to be impacted by the project." (Section 3.8.3.2) The DEIS fails to analyze the legal right of Resolution Copper or the Forest Service to appropriate and permanently destroy the production of the 24 springs, which the draft acknowledges will be destroyed as a result of the dewatering process or subsidence. The Forest Service has failed to discuss the Forest Service's Federal Reserved water rights, and those water rights which may have been acquired by prior appropriation under state law which could be permitted by the state of Arizona under the statutory law of prior appropriation. The draft also fails to discuss any effort that Resolution

| | |
|---|---|
| Comment ID: 30078-40 | Response: WT30 |
| Comment ID: 30078-41 | Response: WT30 |
| Comment ID 30078-42 | Response: NEPA14 |
| Comment ID: 30078-43 | Response: NEPA14 |

*Continued*

---

*Forest Supervisor Bosworth and Program Manager Rasmussen*
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 43 of 45

*Continued*

groundwater unconnected to surface flow or the subflow of surface water streams. The draft fails to provide a location for the wells to be used or any analysis of the impact on surface water or subflow.

A well which intercepts any portion of its water from the subflow of a stream is subject to the law of prior appropriation under state and federal law. All of the water pumped from the well which takes any portion of its water from subflow is subject to the general subject matter jurisdiction of the State water adjudication court.[107] The test for whether the cone of depression of a well would intercept the subflow of a river is whether that well, assuming pre-development conditions and steady state pumping, would cause a reduction in subflow of 1/10 of one foot. If so, the entire production of that well is included within the subject matter jurisdiction of the adjudication court adjudicating prior appropriation water rights. (*See* 2005 Decision).

The use of a well which acquires any of its water from a surface water right subject to prior appropriation can only be acquired after 1919 by strict compliance with the statutory process set out in the Arizona Revised Statutes.[110]

There is no indication of the specific location of the proposed production wells by Resolution Copper and no analysis of whether the production of such wells would cause a drawdown of 1/10th of one foot under pre-development conditions pumped at steady state. In fact, the DEIS's analysis of the production of pumping of wells acknowledges that the data points available for analysis for a numerical model are inadequate to provide reasonably accurate scientific results accurate to a point of less than 10 vertical feet of reduction.

The fact that RCM failed to provide statistical data and data points necessary to provide a modeling result which would be capable of producing a reliable scientific prediction of a level less than a drawdown of 10 feet is indefensible and a material failure of this DEIS to properly evaluate the environmental impact of the operation of multiple wells proposed to be operated by Resolution Copper to support its mining operations, its ore processing facility, and its transportation by pipeline of processed ores and processed waste. It is also a material failure of the DEIS to properly evaluate the environmental impact of the drawdown of groundwater levels and its potential impact on water supplies and flowing streams, partially dependent upon the base-flow contribution of groundwater, which could be reduced by the operation of the production wells.

4. **Other Effects of Subsidence**

The DEIS fails to analyze the environmental impact on the vegetation dependent upon precipitation generated by the mountains which will be subject to subsidence. The impact and a *Continued*

| | |
|---|---|
| Comment ID: 30078-48 | Response: WT19 |

[107] *See Gila II*; June 30, 1994 Order filed in W1-W4 at pages 1, 62, and 63.
[110] *See* Ariz. Laws 1919, ch. 164, § 5 *et seq.*; Arizona Revised Statutes § 45-151 *et seq.*

Footnotes associated with Comment ID: 30078-43

Appendix R

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 44 of 45

[Continued] diminution of vegetation or alteration of the location of fallout could affect commercial timber and vegetation which supports grazing and wildlife on the San Carlos Reservation. Commercial timber, livestock grazing, wildlife, and fisheries management are substantial components of the economy of the San Carlos Apache Reservation.

| Comment ID: 30078-49 | Response: WT80 |

### G. The Forest Service Failed to Analyze Impacts on Other Water Resources

#### 1. Impact On The Central Arizona Project

The DEIS fails in total to evaluate the potential impact on the Central Arizona Project (CAP) canal reach from Granite Reef to the Tucson area, which overlays in part the potential subsidence zone caused by the pumping of various production and dewatering wells by Resolution Copper. A subsidence by a few inches in the gradient of the CAP canal can profoundly and adversely affect the integrity of the CAP delivery system to the Tucson and southern Pinal County area.

| Comment ID: 30078-50 | Response: WT10 |

#### 2. Impact On Groundwater Storage

The subsidence caused by groundwater pumping for production and stabilization and maintenance of waste storage sites has not been properly analyzed. The potential subsidence of those aquifers may permanently decrease the storage capacity of the groundwater aquifers and will render the potential recharge of such groundwater aquifers impossible. No analysis of those potential impacts on the future water supplies and the management of those groundwater supplies and potential recharge has been made in the DEIS.

| Comment ID: 30078-51 | Response: WT10 |

### H. The Forest Service Failed to Analyze the Impacts of Radioactive Materials And Heavy Metals

The DEIS acknowledges the existence of radioactive, toxic and hazardous materials, heavy metals and asbestos in the ore body and in overlying and surrounding geologic structures (N-3, A). It summarily deals with these radioactive, toxic and hazardous materials, heavy metals and asbestos in primarily a spreadsheet form, acknowledging the existence of a few samples in which radioactive, toxic and hazardous materials, heavy metals and asbestos were identified and reciting a degree of risk that was related to that sample concentration. (Section 3.7.1, p. 113). The spreadsheet insufficient data to quantitatively evaluate the mineralization of the ore body and the surrounding geologic structure.

The DEIS does not describe the process by which the degree of risk was evaluated or the definition of the various categories of risk, which are employed in its spreadsheet analysis. It fails to deal with the concentration of the radioactive, toxic and hazardous materials, heavy metals and asbestos in the mining process and the location of the radioactive, toxic and hazardous materials, heavy metals and asbestos into the water system and the chemical reaction of the radioactive, [Continued]

| Comment ID: 30078-52 | Response: TS24 |

---



Terry Rambler
Chairman

## SAN CARLOS APACHE TRIBE
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ✦ Fax (928) 475-2567

Tao Elgison
Vice-Chairman

December 23, 2019

Neil Bosworth
Supervisor
Tonto National Forest
U.S. Department of Agriculture
2324 E. McDowell Road
Phoenix, Arizona 85006
E-M: nbosworth@fs.fed.us

Dear Supervisor Bosworth:

On behalf of the over 16,800 members of the San Carlos Apache Tribe ("Tribe") and the San Carlos Council, as the governing body of the Tribe, this letter transmits the Tribe's comment to the Tonto National Forest ("Forest Service") on the proposed Resolution Copper Mine ("RCM") Project (the "Project") and Land Exchange Draft Environmental Impact Statement ("DEIS"). This comment supplements the Tribe's detailed scoping comments to the Forest Service for the Project submitted on July 18, 2016. In addition, the Tribe incorporates by reference comments submitted by the Arizona Mining Reform Coalition et al., submitted November 7, 2019 and July 18, 2016, and adopts and incorporates by reference the comments submitted by the Inter Tribal Association of Arizona, Inc. ("ITAA"), Earthworks and the Access Fund.

Oak Flat, known to Apaches as Chi'chil *Biłdagoteel* (pronounced Chi Chill Bilł Dah Go Tell, or "a broad flat of Emory oak trees"), is a most precious culturally and geographically defined landscape within the Tonto National Forest whose ecological integrity is vital to the continuation of Western Apache cultural practices, particularly to many members of the San Carlos Apache Tribe.

| Comment ID: 30079-1 | Response: NS2 |

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 45 of 45

[Continued]

toxic and hazardous materials, heavy metals and asbestos with the ore, waste rock, and solution in the transport pipeline of these various components and the processed ores, the various locations and the deposition and creation of waste dump sites containing the residue of those processes. It also fails to deal with the fact that radioactive materials described in the spreadsheet are currently located in consolidated hard rock, where the transmission of radioactive materials to other locations is slow to non-existent, to a situation where the hard rock will be pulverized, which will make the radioactive material readily available for chemical reaction and transportation by the water pipeline systems for processing and transporting the ore to dump sites. It also fails to recognize that once the material has been placed in the dump sites, the radioactive, toxic and hazardous materials, heavy metals and asbestos can become airborne from the surface of the dump sites and waste sites and be transported up by local air movement into populated zones. The EIS fails to consider the change in wind rose configurations related to their construction, orientation, and altitude, compared to the natural terrain.

The evaluation of the risk from exposures to radioactive, toxic and hazardous materials, heavy metals and asbestos is limited to a summary word or two including the word "risk." The DEIS fails to describe the methodology of the summary conclusion concerning risk and any method of applying the risk analysis to public health, air, or water quality. (Section 3.7.1, p. 113).

| Comment ID: 30078-53 | Response: TS24 |

The DEIS also fails to recognize that radon, once freed from the hard rock ore, can become readily transportable through the ambient air, without the aid of a particle, through humidity, and in the gaseous form. It also fails to recognize that the application of water to the surface of the waste storage sites through precipitation and sprinkling of water to reduce dust from escaping the storage sites, will cause the precipitation downward of radioactive, toxic and hazardous materials, heavy metals and asbestos materials including radon into the underground water system over time, which will cause a degradation of the local groundwater quality. No analysis of the potential airborne distribution of radioactive, toxic and hazardous materials, heavy metals and asbestos by the ambient air system or the transfer of the radioactive, toxic and hazardous materials, heavy metals and asbestos in solution resulting from the percolation and precipitation of or water applied for stabilizing the waste systems has been made in the DEIS.

| Comment ID: 30078-54 | Response: TS24 |

### CONCLUSION

The goal of NEPA is two-fold: (1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience. "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). The goals of NEPA are not satisfied by the DEIS, It is deficient on a score of matters. We would encourage the Forest Service to go back and get it right. Thank you for the opportunity to comment.

---

Neil Bosworth
*Re: RCM DEIS*
December 23, 2019
Page 2 of 5

The Southeast Arizona Land Exchange Act ("SEALECA"), a piece of federal legislation forced into the Fiscal Year 2015 National Defense Appropriations Act, as the result of back room deals subverting the will of the majority of members of Congress, transfers Oak Flat to Resolution Copper Mining, a subsidiary of BHP Billiton and Rio Tinto, foreign conglomerates.

Some may see Oak Flat a simple, but inhospitable, dry, rocky landscape. Rio Tinto and BHP Billiton see billions of dollars in profits lying beneath the surface, and others see only jobs.

Apaches see Oak Flat differently – it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where *diyi'* (sacred power) can be called upon via prayers. Oak Flat is the *gowąh* (home) of our *diyi'n*, visited by our *ga'an* (spiritual beings) who provide us with healing and spiritual services. It is also a place that speaks to the very essence of tribal culture.

| Comment ID: 30079-2 | Response: CR4 |

Covering 4,309 acres, Oak Flat lies within the traditional territory of the *T'iis Tsebán* (the "cottonwood trees gray among rocks people"), also known as the "Pinal Band" of Apaches, and is closely associated with the related *Tsé Binestł'í* (the "surrounded by rocks people"), also known as the Aravaipa Band. At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices. The ethnographic and ethnohistoric study of the area surrounding Oak Flat, conducted by Anthropological Research, LLC, at the request of the Tonto National Forest, identifies 404 traditional cultural properties of at least nine tribes with traditional ties to the area.

For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance, where we celebrate the event of a girl's maturation from puberty over four days, through dance, drumming, song and prayer, and the visitation of Crown Dancers. It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion.

Oak Flat is also a burial ground, a holy cemetery. Recently, using cadaver dogs, an effort was not done with the approval of tribes, the Forest Service found the remains of up to 100 bodies, many of whom were most likely our Apache Ancestors. The echoes of their encampments still reverberate with the outlines of wikiups, lava rock structures, metate stones for grinding foodstuffs, and other tools and artifacts. [Continued]

---

Appendix R

Neil Bosworth
Re: RCM DEIS
December 23, 2019
Page 3 of 5

←Continued  Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments.

As you have personally witnessed, it is a pristine, bucolic oasis of many varied plants and animals that depend on Oak Flat's waters. Water is very scarce in Arizona. Pinal County predicts an 8.1 million acre foot deficit in its water supply. And yet, Oak Flat is a place of water, what Apaches call tu. The water in the area plays an integral role in our traditional religion and ceremonies. Oak Flat is also full of seeps, some 46 springs, and a number of streams and ponds form an integral part of the region's weather system and the formation of ancient aquifers, like the Apache Tuff, which lies below the Town of Superior and supplies the town's municipal water system, and the Queen Creek community.

The area surrounding Superior, Arizona, as well as Oak Flat, Apache Leap and Ga'an Canyon, was also the area where mining interests and the press ignited vigilante, genocidal, militias and military campaigns between 1859 and 1874 that killed over 380 Pinal Apaches including many women and children – and resulted in the confining of survivors in a prisoner of war camp known as Old San Carlos.

For all of these reasons and factors, Oak Flat was listed in the U.S. National Register of Historic Places. Yet, if it becomes operational, the Resolution Copper Mine will swallow up and completely destroy Oak Flat in its entirety – all of the historic, cultural properties, our burial ground, our place of worship, our church, and the foundation of our traditional religious beliefs. Rio Tinto, BHP Billiton and the Forest Service each admit this wholesale destruction will occur.

Ironically, the Forest Service was established in 1905 principally to protect the region's watershed. However, the SEALECA and the 1872 Mining Act eliminates these protections. The Forest Service's Draft Environmental Impact Statement ("DEIS") blindly follows the SEALECA, and ignores other controlling statutes and regulations.

Totaling some 400 pages, that methodically details the destruction of Oak Flat and its environment, the DEIS casts the Project as a *fait accompli*, despite the certain and massive environmental catastrophes that will result once the mine becomes operational. As you know, the DEIS received 6,500 pages of analytical comments in opposition from tribes and Oak Flat supporters, including the Center for Biological Diversity, the Sierra Club, and the Arizona Mining Reform Coalition. Even though these comments point to serious, critical flaws in the DEIS, we have been advised by the Forest Service that it will not reconsider or issue a supplemental DEIS; instead, the Forest Service will only provide responses to the comments received.

Neil Bosworth
Re: RCM DEIS
December 23, 2019
Page 4 of 5

According to the DEIS, the block cave mining technique was chosen because it was the most profitable method to extract a cubic mile of copper ore body lies over 1 mile below the surface. In the process, the Oak Flat area will subside or cave-in starting in year six after the mining begins, ultimately collapsing an area approximately 2 miles in diameter of the earth's surface and swallowing and destroying Oak Flat. While the DEIS proclaims that this mining technique is the only alternative, we believe that RCM has intentionally withheld information as to the ore body's CU value, which may open up the possibility of other mining alternatives.

The mine will also consume well over 550,000 acre-feet of water, enough water to supply 168,000 homes over 40 years. This in an area already stressed by long-term drought. Worse, the water modelling employed for the DEIS's conclusions has major data gaps that do not adequately portray the impact of this mine on the region's water supply. The Forest Service does not even account for the impacts that the mine will have on the Tonto National Forest's own water supply. Nor does it take into account the Pinal County water deficit of 8.1 million acre feet 100 years from now.

| Comment ID: 30079-3 |
| Response: WT4 |

| Comment ID: 30079-4 |
| Response: WT4 |

The DEIS details how mine's waste will eventually be stockpiled over an area encompassing six square miles and 500 feet high. Imagine one-quarter of Manhattan, from Canal Street through Wall Street and down to the Staten Island Ferry buried in up to 50 stories of rubble. Just imagine the environmental disaster this stockpile of mining waste will create for the whole area, including our Reservation which stands only 14 miles away, yet the DEIS takes no issue with the stockpile and even leaves the issue for resolution at a later date.

In 40 years, when the copper will run out if RCM is allowed to mine, the quality of life, especially the elimination and pollution of scant water supplies will affect not just Apaches, but all humans that live in the surrounding areas. Once the water dries up and what remains becomes contaminated, what will prevent the people living off our Reservation to go to Congress and ask Congress for the water under the San Carlos Apache Reservation? Clearly, without question, this mine will put Apache children, grandchildren and those not born at risk. Without water, without our church, I fear for the very survival and existence of Apache life, culture and religion.

| Comment ID: 30079-5 |
| Response: CR4 |

As with the comments submitted by the ARMC and others, the Tribe's analysis of the DEIS shows that it is ill conceived, missing fundamental data, forwarding flawed analyses and methodologies, and does not meet the legal standards of other federal statutes and regulations. In addition, the Forest Service has not engaged in meaningful government-to-government consultation, as established by executive orders and statutes.

For these reasons, I respectfully request that the Forest Service reconsider the DEIS and work with the stakeholders in effort to either re-issue, or otherwise supplement the DEIS.

Neil Bosworth
Re: RCM DEIS
December 23, 2019
Page 5 of 5

As we say in our Apache language, A'hlyi'é (thank you) in advance for your attention to the Tribe's comments.

Sincerely,

SAN CARLOS APACHE TRIBE

Terry Rambler
Chairman

Enclosure

  Comment of the San Carlos Apache Tribe on the TNF RCM DEIS

Cc: Mera Dodge, Esq., Esc., FICA, meradodge@azmail.net com
    Kathya Leonard Arizona State Historic Preservation Officer  kleonard@azstateparks.gov
    Jim Keller, Advisory Council on Historic Preservation Executive Director, jfreeher@achp.gov

    San Carlos Apache Tribe
    Tao Bigman, Vice Chairman
    San Carlos Council Members
    Vernelda Grant, THPO
    Dot Randall, Forest Manager, Forest Resources
    A.B. Bischa, AG
    Others

Appendix R



**YAVAPAI-APACHE NATION**

**Executive Office**

Chairman Jon Huey

Vice Chairwoman Tanya Lewis

2400 West Datsi Street, Camp Verde, AZ 86322

Phone (928)567-1021     Fax (928)567-3994

December 13, 2019

Neil Bosworth, Supervisor
Tonto National Forest Service
2324 E. McDowell Road
Phoenix, Arizona 86006

RE: Yavapai-Apache Nation Comments on the Resolution Copper Mine EIS

Dear Supervisor Bosworth

On behalf of the Yavapai-Apache Nation, we share our concerns and recommendations regarding the Resolution Copper Mine.

**Consultation:**
The consultation with the Tonto National Forest Service and the Yavapai-Apache Nation has been fair and open. Your most recent effort was an inclusive event attended by concerned Tribes in late October 2019. The meeting was beneficial to discuss important issues and respond to them. The meeting was conducted with several Tribes who shared their perspectives; however the Nation prefers a government to government consultation as a face to face conversation between the Nation and the Tonto National Forest Service. We look forward to scheduling a consultation in the near future.

**THE TRIBAL MONITORING PROGRAM**
We support this effort as a step forward in the evolution of Cultural Resource Management (CRM). We have some concerns about how information gathered is being incorporated into the data set. We believe the monitoring program should be more fully integrated into the long-term CRM plan. This is a positive program and with further consultation with the Nation the concerns will sort out over time.

**LOCATION OF THE MINE SPOILS/TAILINGS**
Vincent Randall, the Nation's Apache Culture Director has been involved with the process of designating a tailing site since its inception, including visiting the proposed sites. The challenge has been to identify a location with minimal environmental and cultural heritage impact. Our preferred alternative is the Skunk Camp near Hayden

**CONTINUITY**
Enclosed is the Nation's letter dated October 6, 2017 for your reference regarding Apache Leap and the Resolution Copper Mine. We are fully aware of the significant ongoing cultural and environmental impacts it will

generate. It is our intention, working in conjunction with the Tonto National Forest Service, to mitigate the impacts to Shii Kee Yaa (the Apache Homeland) to the extent we can.

Thank you for your attention to this matter. Additionally, the Nation appreciates the work Nneebah Nez Lyndon has done to make the consultation process professional and comprehensive. The Nation submitted an official letter in October 2019 reflecting our participation in the process, as well as a letter requesting mitigation measures that we believe offset the cultural and environmental impact of the project. It is our hope the process continues without interruption and in respect to those Tribes who have actively participated in the process.

Cordially,

Jon Huey, Chairman

CC: Tanya Lewis, Vice Chairwoman
Vincent Randall, YAN Apache Culture Director
Scott Canty, YAN Attorney General
Chris Coder, YAN Cultural Office
Nneebah Nez Lyndon, Tonto National Forest Service

---



# City of Apache Junction

*Home of the Superstition Mountains*

October 31, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
PO BOX 34468
Phoenix, AZ 85067-4468
(sent via email comments@resolutionmineeis.us)

RE: Resolution Copper Draft Environmental Impact Statement

Mr. Bosworth,

Thank you for the opportunity for the city of Apache Junction to submit comments on the Draft Environmental Impact Statement, prior to finalization, for disclosure of impacts associated with the Resolution Copper Project and associated land exchange.

| Comment ID: 284-1 Response: NS1 |

The city of Apache Junction is in support of this project and excited at the prospect of Resolution Copper capable of producing 20% of the world's copper through the next 50 years. The 1,000 plus jobs this project is anticipated to create is important to those rural and surrounding communities. Further, this project offers great potential for other positive economic benefits to not only those surrounding and rural communities but also to the state of Arizona.

Thank you for your consideration.

Sincerely,

Jeff Serdy

Jeff Serdy
Mayor

---



October 22, 2019

Resolution Copper EIS Comments
PO Box 34468
Phoenix, AZ 85067-4468

By email: comments@resolutionmineeis.us

Re: Globe City Council Comments; Resolution Copper Draft Environmental Impact Statement

Mr. Neil Bosworth:

Thank you for the opportunity for the Globe City Council to submit comments on the Draft Environmental Impact Statement for disclosure of impacts associated with the Resolution Copper Project and associated land exchange.

The City of Globe City Council is very excited about the Resolution Copper Project in Pinal County. The City Council sees great benefit in Globe being located less than 24 miles away from the Resolution Project, that is anticipated to produce 20% of the world's copper over the next 50 years. The primary and secondary economic impacts of this project will be significant to Arizona and our region, including the creation of 1,400 direct jobs and an estimated 2,300 indirect jobs during operation.

| Comment ID: 518-1 Response: NS1 |

For these reasons, the City of Globe City Council wants to express strong support for the Resolution Copper Project, and urge the U.S. Forest Service to complete, without delay, a robust Final Environmental Impact Statement and Record of Decision. The Council should submit the following comment for your consideration:

- The City of Globe supports the relocation of the tailings facility to Skunk Camp in Gila County. We fully support the preferred tailings alternative and urge the USFS to disclose the direct and indirect employment impacts and the associated positive fiscal impacts of this facility, as it is the only portion of the operation which would have a footprint within Gila County.

| Comment ID: 518-3 Response: SO9 |

The Globe City Council would like to thank the U.S. Forest Service for giving us this opportunity to voice support and provide comments in regard to the proposed Resolution Copper Project.

If you have any further questions, please contact our City Manager, Paul Jepson at (602) 672-6924.

| Comment ID: 518-4 Response: ALT30 |

Sincerely,

Al Gameros
Mayor, City of Globe
On behalf of the Globe City Council

Appendix R



**Town of Florence**

October 22, 2019

Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

RE: Resolution Copper Project and Land Exchange Draft Environmental Impact Statement

To whom this may concern:

The Town of Florence appreciates the ability to comment on the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement. The Town has been tracking the Resolution Copper project for several years and has been in annual contact with the project team throughout the DEIS process.

Of particular interest to the Town of Florence is the location of the proposed tailings facility. The placement of 1.5 billion tons of rock crushed to a fine sand by the end of the life of the mine is concerning if located within the viewshed and upstream watershed of Florence. Florence takes great pride in not only our mountain vistas, but also our outdoor recreation opportunities, and ultimately our source of drinking water, supplied by the Gila River.

> Comment ID: S15-4
> Response: N52

Within the EIS's reasonable range of alternatives six alternative tailings sights were analyzed. For the reasons listed above, the Town of Florence is strongly opposed to the proposed Peg Leg Site (Alternative 5). Not only would this site potentially impact Florence, it would require 23-28 mile pipeline for tailing disposal which carries with it a series of environmental impacts that are both secondary and cumulative in nature.

After study of the DEIS and conversations with the Project Team, The Town of Florence prefers the Skunk Camp Site (Preferred Alternative) for the proposed tailings facility. The Skunk Camp site is located adjacent to the existing Ray Mine and is located in an area that has been impacted by and has supported industrial mining activities for over 100 years. It is also located much closer to the Resolution Copper site and its associated plant.

> Comment ID: S15-3
> Response: ALT30

Respectfully Submitted

TOWN OF Florence

By _____
Tara Walter, Mayor

---



mesa·az

October 15, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth:

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project. I hope the United States Forest Service has the resources to quickly complete the Environmental Impact Statement for this project, which I support.

> Comment ID: 267-1
> Response: N51

As an elected official in a nearby community, I am was pleased to see the economic impacts the project will have on the east valley when reviewing the DEIS. This project is vital to our national security and specifically the defense industry which operates in my community.

The only outstanding question I have is related to local transportation infrastructure. Will there be traffic impacts from people living in the east valley and commuting to work at the mine? I understand there will be several thousand construction jobs and more than 1,500 permanent jobs created by the project's development.

> Comment ID: 267-2
> Response: TR8

Thank you for your consideration of these comments and questions.

Sincerely,

Councilmember Kevin Thompson
Mesa City Council, District 6

---

**Hannah French**

| | |
|---|---|
| From: | Resolution Comments <comments@resolutionmineeis.us> |
| Sent: | Thursday, October 31, 2019 9:55 AM |
| To: | Emily Newell |
| Subject: | Fwd: DEIS Letter |
| Attachments: | Resolution Mine - Letter of Support -2019.pdf |

EXTERNAL: This email originated from outside SWCA. Please use caution when replying

---------- Forwarded message ----------
From: Karen Norris <miamiclerk@cableone.net>
Date: Wed, Oct 30, 2019 at 8:27 AM
Subject: Re: DEIS Letter
To: Bryan Sappala <Bryan.Sappala@riotinto.com>, <comments@resolutionmineeis.us>

Hi Bryan,

Here is the letter. Please let me know if you need me to mail the original anywhere. I will be out of the office the rest of the week but will be in Saturday to catch up on a few things. Thank you.

Karen Norris, C.M.C.
Town of Miami, AZ
miamiclerk@cableone.net
928-473-4403

----- Original Message -----
From: "Bryan Sappala" <Bryan.Sappala@riotinto.com>
To: "Karen Norris" <miamiclerk@cableone.net>
Sent: Tuesday, October 29, 2019 10:41:10 AM
Subject: Re: DEIS Letter

Thanks for the update!

Tell Joe hi for me.

Sent from my iPhone

> On Oct 29, 2019, at 10:36 AM, Karen Norris <miamiclerk@cableone.net> wrote:
>
> Bryan,
>
> I just talked to Joe about that this morning at our staff meeting and he said he will be working on that today. I will try and keep him on schedule to get that done today.
>

---

> Thank you.
>
> Karen Norris, C.M.C.
> Town of Miami, AZ
> miamiclerk@cableone.net
> 928-473-4403
>
> ----- Original Message -----
> From: "Bryan Sappala" <Bryan.Sappala@riotinto.com>
> To: "Karen Norris" <miamiclerk@cableone.net>
> Sent: Tuesday, October 29, 2019 10:21:48 AM
> Subject: DEIS Letter
>
> Hi Karen,
>
> Hope all is well, I just wanted to check and see if you had any more questions around the letter or submitting it.
>
> Thanks,
>
> Bryan
>
> Sent from my iPhone

Appendix R

*Copper Center of the World*

R-27

**TOWN OF MIAMI**

October 10, 2019

Re: Miami Town Council comments in response to the release of the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement

Mr. Neil Bosworth:

Thank you for the opportunity for the Miami Town Council to submit comments on the Draft Environmental Impact Statement for the disclosure of impacts associated with the Resolution Copper Project and associated land exchange.

With the addition of the preferred land swap alternative within the geographical boundaries of Gila County, we feel it is important to ensure that Resolution Copper has and will continue to create significant economic benefits to our county and as such, Gila County and the Town of Miami has a special interest in this proposal. We are a rural county with a population of 55,597, of which approximately 6.5% are unemployed and a large portion are below 200% of the federal poverty level.

**Socioeconomics**

**Water**

**Traffic**

Respectfully,

Sammy Gonzales, Vice-Mayor
Town of Miami, AZ

Comment ID: AL30 — Response:
Comment ID: ML30 — Response:
Comment ID: 3834 — Response:
Comment ID: MT1 — Response:
Comment ID: MT2 — Response:
Comment ID: SG14 — Response:

---

City of Phoenix

Re: Resolution Copper DEIS comment

Comment ID: HS1 — Response: SR08
Comment ID: 2852 — Response:
Comment ID: 2765 — Response:

---

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix, AZ 85067-4468

To whom it may concern:

Comment ID: 2837 — Response:
Comment ID: 2836 — Response:
Comment ID: 2835 — Response:
Comment ID: 5014 — Response:
Comment ID: 2834 — Response:
Comment ID: AL70 — Response:

Appendix R



**Superior Governing Board**

Arlynn Godinez

Nathan Duarte

Ignacio Magallanes

Mila Besich

Bruce Armitage

Stephen Estatine

William Duarte

Ken Major

Pamela Duarte

Maria Manoa

Bertha Mustano

Michael Diaz González

Anthony Deragian

Melissa Fever

Mitanai Genna

Valerie Kaszta Deragian

## SUPERIOR UNIFIED SCHOOL DISTRICT #15
### ONCE A PANTHER, ALWAYS A PANTHER

The Superior Unified School District Governing Board has unanimously approved the following comments concerning the Draft Environmental Impact Statement for the proposed Resolution Copper Project and Land Exchange.

The Resolution Copper Mine project is located within the District's boundaries. The DEIS states there will be an increase in revenue from property tax of the Resolution Copper Project and Land Exchange to the District. However, based on the current Arizona school funding formula, the District will not receive any additional funding. The District will require additional funding for building its infrastructure and programs due to the anticipated growth to the Town of Superior's population. The District currently has a partnership funding agreement with Resolution Copper for $1.2 million over four years. Students in Superior need increased educational opportunities that enhance the skills for the 21st Century work force, which includes those needed at the Resolution Copper Mining Project and other high-tech industries. In the long-term, this will encourage our graduates to contribute to Superior's growth, including its economy. A financial commitment from Resolution Copper is necessary for this to happen. The Governing Board will expect a new longer-term agreement or the establishment of an education foundation if the Land Exchange were approved to offset this loss of funding.

The Superior Unified School District Governing Board understands the population of the Town will increase once the mine is operational. An increase in population will require an increase for additional services such as fire, ambulance, and police. It will also call for the need for social services such as childcare, counseling, and drug rehabilitation. The Town currently is not prepared to add these additional services. Resources will be needed to provide these services in the near future.

The Superior Governing Board believes the DEIS does not address any mitigation strategies for the housing impacts. The DEIS indicates that 25% of the Resolution Copper workforce will live in Superior. This will require a substantial increase in the number of housing units. The Governing Board would like the lack of housing as well as the problems associated with it (e.g., increased crime rates and the devaluation of property) be addressed in the final EIS.

Recreation and tourism will be a major part of development in the future of Superior. The DEIS mentions that it would support the Recreational Users Group (RUG) and the surrounding trail system. It does not define what that support entails. The Superior School District would like that support to be identified and defined before the Land Exchange is approved.

Comment ID: 322-1
Response: MIT1

Comment ID: 322-2
Response: SO14

Comment ID: 322-3
Response: MIT3

Comment ID: 322-4
Response: MIT11

Superior Unified School District #15
1500 Panther Drive, Suite 101
Superior, Arizona 85173
520-689-3690 (main) 520-689-3049 (fax)
Web: www.superiorusd.org

The Superior Unified School District School Board understands there will be a possible 18% decrease in the amount of water flowing through Queen Creek. The wells and springs around the community will be negatively impacted as well. The Governing Board asks that a project from the 1999 Restoration and Management Plan for Queen Creek or an updated version be funded to prevent any water loss to these areas.

There will be a significant increase in traffic due to the influx of workers and heavy trucks traveling into Superior. This will take a heavy toll on the roads in town and will affect the wear, longevity, and safety on our school buses. The Governing Board recommends mitigation around the issues due to increased traffic.

The DEIS states that the preferred tailing site is located at Skunk Camp. The Superior Governing Board believes this site should be established as the designated tailings location in the final EIS. This site would have the least environmental impact on the community.

In closing, the Superior Unified School District Governing Board supports the Resolution Copper Project and Land Exchange. Resolution Copper has partnered with the District to provide educational support to its schools and programs for over 15 years. We believe that support should continue as long as the mine is operational. Superior is a growing community and there are many opportunities to be developed in and around town. There are also many issues that will need to be addressed before the town and the school district can plan for its future. The Superior Unified School District believes that economic mitigations are necessary for its schools, its students, and the Town of Superior to prosper as a full partner under the project.

Comment ID: 322-5
Response: MIT1

Comment ID: 322-6
Response: MIT3

Comment ID: 322-7
Response: ALT33

Sincerely,

Superior Unified School District #15 Governing Board

Arlynn Godinez, President

Jon Nathan Duarte, Clerk

Mila Besich, Member

Ignacio Magallanez, Member

Bruce Armitage, Member

Stephen Estatine, Superintendent

Superior Unified School District #15
1500 Panther Drive, Suite 101
Superior, Arizona 85173
520-689-3690 (main) 520-689-3049 (fax)
Web: www.superiorusd.org

Letter number 261 is duplicated with letter number 924

## Emily Newell



| | |
|---|---|
| From: | Resolution Comments <comments@resolutioninceis.us> |
| Sent: | Wednesday, October 16, 2019 11:01 AM |
| To: | Emily Newell |
| Subject: | Fwd: FW: Comment Letter - Town of Superior |
| Attachments: | 10 11 19 DEIS Comment Letter.pdf |

EXTERNAL: This email originated from outside SWCA. Please use caution when replying.

---------- Forwarded message ---------
From: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
Date: Fri, Oct 11, 2019 at 11:51 AM
Subject: FW: Comment Letter - Town of Superior
To: Todd Pryor <manager@superioraz.gov>
Cc: Chris Garrett <cgarrett@swca.com>, Donna Morey <dmorey@swca.com>, comments@resolutioninceis.us <comments@resolutioninceis.us>, Sando, Mark -FS <mark.sando@usda.gov>, Bosworth, Neil -FS <neil.bosworth@usda.gov>, Torres, Tom -FS <tom.torres@usda.gov>, Scaggs, John - FS <john.scaggs@usda.gov>, Quintana, Devin -FS <devin.quintana@usda.gov>, michael.w.langley@usace.army.mil <michael.w.langley@usace.army.mil>

Todd,

Thanks for sharing a copy of the formal comment letter with the EIS project team.

We appreciate the specificity and clarity of the comments expressed – and look forward to discussions with you on these topics as the impact study progresses toward finalization.

Mary C. Rasmussen, Team Leader
Resolution Copper Mine EIS
Forest Service

Tonto National Forest
p: 602-225-5268
c: 480-710-7304
mary.rasmussen@usda.gov
2324 E. McDowell Rd
Phoenix, AZ 85000
www.fs.fed.us
Caring for the land and serving people

From: Todd Pryor [mailto:manager@superioraz.gov]
Sent: Friday, October 11, 2019 11:25 AM
To: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
Subject: Comment Letter

Please find attached our final comment letter. I have submitted this through the official channels as well, but I wanted to get you a copy and thank you for your help throughout our review process.

Sincerely,

Todd Pryor

Town Manager

Town of Superior

(520) 669-5752

manager@superioraz.gov



This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the message immediately.

Appendix R



# TOWN OF SUPERIOR

Town Hall　·　199 N. Lobb Ave., PO Box 218　·　Superior, Arizona 85173
520-689-5752　·　Fax: 520-689-5822　·　TDD Relay 1-800-367-8939

Appendix R

**Emily Newell**

**From:** Resolution Comments <comments@resolutionmineeis.us>
**Sent:** Friday, September 6, 2019 11:24 AM
**To:** Emily Newell
**Subject:** Fwd: FW: Request for a Meeting with Town of Superior and Tonto National Forest
**Attachments:** Final Budget 2019 2020.pdf

EXTERNAL: This email originated from outside SWCA. Please use caution when replying

---------- Forwarded message ----------
**From:** Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
**Date:** Thu, Sep 5, 2019 at 6:20 PM
**Subject:** FW: Request for a Meeting with Town of Superior and Tonto National Forest
**To:** comments@resolutionmineeis.us <comments@resolutionmineeis.us>

**From:** Todd Pryor [mailto:manager@superioraz.gov]
**Sent:** Thursday, September 5, 2019 4:07 PM
**To:** Mila Besich <mila@superioraz.gov>; Torres, Tom -FS <tom.torres@usda.gov>
**Cc:** Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>; Boultinghouse, Veronica -FS <veronica.boultinghouse@usda.gov>
**Subject:** RE: Request for a Meeting with Town of Superior and Tonto National Forest

I noticed a fairly substantial math error in the Socioeconomic section, and I was hoping you could clarify it before I work on a comment.

On page 651, the report states that the cost of public safety in the Town of Superior will increase by 50% at full mine operations, or $375,000. The correct amount of a 50% increase based on the FY 2020 budgeted expenditures is $802,627. The $375,000 number seems to be based on the police budget alone and not police, fire, and ambulance. It also ignores the expenses of the RCM Emergency Services Contract.

This factor alone requires a re-think on the entire section, and perhaps the public safety section as well, as the revenue created by the current tax structure will not come anywhere near the projected expenses, and this needs to be reflected as a significant, neigh, huge, impact of mine operations.

→ Continued

1

Thank you. We appreciate everyone's time and attention. Looking forward to this meeting.

Thank You,

Mila Besich

Mayor

Town of Superior

C. 520-827-0676

Sent from my iPhone

On Jul 18, 2019, at 11:59 AM, Torres, Tom -FS <tom.torres@usda.gov> wrote:

> Hi Mila – We look forward to sitting down with you and others to discuss the various road access and mining issues that are important to the Town of Superior.

> Neil is aware of your request and sees this meeting as very important. He will be back in the office next Monday.

> Tom

<image001.png>  **Tom Torres**
**Deputy Forest Supervisor**
**Forest Service**

**Tonto National Forest**
p: 602-225-5375
c: 602-650-0692
tom.torres@usda.gov
www.fs.fed.us
<image002.png><image003.png><image004.png>
**Caring for the land and serving people**

3

← Continued

If the Town does not have sufficient revenue to increase our police force to meet this increase call load, the public safety of the community will suffer. The town does not have the resources to make up this shortfall in any other way.

I am working on draft comments, but this would require a re-think of many of our mitigation strategies. Can you check on this data and let me know the nature of this error so that I may correctly respond? I have attached the town budget for your consideration.

Thank you,

| | |
|---|---|
| **Comment ID:** | 250-1 |
| **Response:** | 8014 |

Todd Pryor

Town Manager

Town of Superior

(520) 689-5752

manager@superioraz.gov

**From:** Mila Besich <mila@superioraz.gov>
**Sent:** Thursday, July 18, 2019 12:55 PM
**To:** Torres, Tom -FS <tom.torres@usda.gov>
**Cc:** Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>; Todd Pryor <manager@superioraz.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>; Boultinghouse, Veronica -FS <veronica.boultinghouse@usda.gov>
**Subject:** Re: Request for a Meeting with Town of Superior and Tonto National Forest

Hi Tom,

2

**From:** Mila Besich [mailto:mila@superioraz.gov]
**Sent:** Wednesday, July 17, 2019 4:02 PM
**To:** Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>
**Cc:** Todd Pryor <manager@superioraz.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>; Boultinghouse, Veronica -FS <veronica.boultinghouse@usda.gov>; Torres, Tom -FS <tom.torres@usda.gov>
**Subject:** RE: Request for a Meeting with Town of Superior and Tonto National Forest

Mary,

Thank you for reaching out. I am going to have my assistant reach out and set a meeting up for us. We may need to look at the second week in August due to the Rural Policy Forum. We would also like for Lynne Nemeth from the Arboretum to attend.

Thanks

P 1d€:I:r/£k

Mayor

Town of Superior

P. 520-689-5752

C. 520-827-0676

Sent from Mail for Windows 10

**From:** Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
**Sent:** Wednesday, July 17, 2019 9:44:29 AM
**To:** Mila Besich <mila@superioraz.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>
**Cc:** Todd Pryor <manager@superioraz.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>; Boultinghouse, Veronica -FS <veronica.boultinghouse@usda.gov>; Torres, Tom -FS

4

Appendix R

<tom.torres@usda.gov>
Subject: RE: Request for a Meeting with Town of Superior and Tonto National Forest

Hello Mila,

Neil is away on vacation for the second half of July.

May I suggest that you contact Neil's executive assistant to schedule a meeting in early August.

Veronica has access and arranges calendars and meeting schedules for both Neil and Tom.

Veronica's contact info:

Veronica Boultinghouse, Executive Assistant

phone: 602-225-5284

email: veronica.boultinghouse@usda.gov

<image001.png> Mary C. Rasmussen, Team Leader
Resolution Copper Mine EIS
Forest Service

Tonto National Forest
p: 602-225-6246
c: 480-710-7304
mary.rasmussen@usda.gov
www.fs.fed.us
<image002.png> <image003.png> <image004.png>
Caring for the land and serving people

---

From: Mila Besich [mailto:mila@superior.gov]
Sent: Monday, July 15, 2019 3:38 PM
To: Bosworth, Neil -FS <neil.bosworth@usda.gov>; Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>
Cc: Todd Pryor <manager@superior.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>
Subject: RE: Request for a Meeting with Town of Superior and Tonto National Forest
Importance: High

Greetings Neil, Mark and Mary,

I would like to bring your attention to three critically important matters that will have a great impact on Superior, clearly necessitating a face to face meeting with you in the very near future. Please send me your best available dates the week of July 29th. Below you will find updates and concerns that the Town of Superior has in regards to these specific projects that have the potential to adversely impact Superior and the natural areas surrounding our community. I have included Lynne Nemeth, the new Executive Director for the Arboretum as we would like to include her in our discussions with the Forest Service.

Imerys-Forest Road 4: The Forest Service needs to be advised that the public meeting with Imerys on Friday, July 12 did not go well. Everyone left the meeting frustrated and angry that Imerys had no real plans on how to create access to the Arnett Canyon trail or create a new connecting route to Forest Road 4. The public, along with the Town of Superior, is concerned that this re-route will not be completed before the busy winter recreation season. The Town of Superior did record the entire meeting. Imerys responded that it could take up to three years before the Forest Service will permit a new road to make the new connection for Forest Road 4, and if accurate, this is unacceptable. We all need to come up with a solution to this problem, and quickly.

The Tonto and the Town need to have a discussion before any further meetings with Imerys are held. If Forest Road Four is not fixed, it will have a negative impact on our local economy, limit recreational access for our residents and create a variety of safety issues when people realize the road is closed and do not have the resources to turn around. The road is marked but we all know there will be those who may not heed posted signs.

Resolution Copper - Draft EIS: As the data on the Resolution Copper Draft EIS comes out, the Town is growing increasingly concerned about the projected loss of water in the Queen Creek watershed. We have asked Resolution to share their mitigation plan with us as soon as possible, however we began requesting this information in late March. We are now in mid-July and Resolution advised us that they still need another thirty days. We are concerned that the Draft EIS will come out and it will only show the loss of water and not the actual mitigations that are needed. The Town has several suggestions and ideas on how to mitigate this water loss and we would like to ensure that the Forest Service and/or SWCA are aware of our suggestions, as we cannot guarantee that our message will be carried forward by Resolution Copper or that our suggestions for mitigations will be their priorities.

---

We would like to request a meeting with either the Forest Service and/or SWCA for a briefing on the findings of the EIS as soon as it is appropriate and before further public meetings are hosted. This is important to the Town so we can appropriately communicate to our residents and also intelligently respond within the EIS Comment period.

Bronco Creek: This project will continue to be a lingering concern that will negatively affect Superior and the Arboretum. Recently, Town staff created a map that shows the plot lines and all of the Bronco Creek claims. The Town of Superior and the Arboretum are surrounded by their claims. We all understand that some of this is unlikely to happen but it still poses a huge threat to Superior and the Boyce Thompson Arboretum. Bronco Creek could essentially hold up any major development in Superior as the Land Exchange does not clarify that when the Town buys the Land Exchange - Airport Contiguous properties from the Federal Government that it will include the mineral rights. While the overall Bronco Creek drilling plan is separate from the Resolution Copper EIS it does affect the true benefits of the Land Exchange to Superior as well as the RUG plan which are mitigations for the loss of Oak Flats resulting from Resolution Copper's mine development and operations.

The Town understands that the Tonto National Forest is under great stress with limited resources and having to push through a tremendous amount of work in and around the Superior area. We appreciate the time and effort that you afford us. Please let Todd or me know of your best available dates and times for a meeting the week of July 29. The only day we can meet is July 31.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

---

Ronnie C. Martin, District I
610 E. Hwy 260, Payson, 85547
(928) 474-2029
rcmartin@gilacountyaz.gov

Tim R. Humphrey, District II
(928) 920-1251
thumphrey@gilacountyaz.gov

Woody Cline, District III
(928) 402-4726
wcline@gilacountyaz.gov

[SEAL OF GILA COUNTY]

GILA COUNTY
BOARD OF SUPERVISORS
1400 E. Ash Street
Globe, Arizona 85501

W. James Menlove,
County Manager
(928) 402-4341
jmenlove@gilacountyaz.gov

Marian Sheppard,
Clerk of the Board of Supervisors
(928) 402-4753
msheppard@gilacountyaz.gov

October 16, 2019

Mr. Neil Bosworth, Supervisor
Tonto National Forest
2324 E McDowell Road
Phoenix, AZ 85006

RE: Comments on Resolution Copper Project and Land Exchange Draft Environmental Impact Statement (DEIS)

Dear Forest Supervisor Bosworth:

The Gila County Board of Supervisors appreciates the opportunity to offer comments on the above referenced document. Although not located within the geographic boundaries of Gila County, Resolution Copper has and will continue to create economic benefit to Gila County; however, with the late inclusion of the Skunk Camp site, Alternative 6, the project now has a direct impact to Gila County residents in the Dripping Springs area.

| | Comment ID: 20824-3 Response: ALT26 |
|---|---|

**Tailings Facility Location Chapter 2**

Gila County is aware of the applicant's proposed tailing sites included in the Draft EIS, Chapter 2 and understands that the preferred Alternative 6 site is the most remote site and is the least objectionable tailings location; however, we recognize and respect the concerns of our citizens in Hayden and Winkelman. If Alternative 6 remains the preferred site in the Record of Decision Gila County encourages the USFS and Resolution Copper Company to take all measures possible to mitigate any impacts of concern to those communities.

| | Comment ID: 20824-1 Response: MT1 |
|---|---|

Gila County requests that all mitigation measures for tailings facilities afford public health and safety are met and Gila County agrees that these measures are critical to monitoring and remediating any unforeseen environmental contamination problems.

Socioeconomic: Estimated 4% reduction in property values for 31 properties in the vicinity of the tailings facility (DEIS page 665). Gila County requests that the USFS and Resolution Copper Company mitigate those reductions with the property owners.

[Continued →]

Phone (928) 425-3231      Fax (928) 425-0319      T.D.D. (928) 425-0839

Appendix R

Resolution Copper Project and Land Exchange DEIS - Comments J2

Supervisor Pete Rios
Board of Supervisors
District 1


PINAL COUNTY

If Shunk Camp remains the preferred site in the Record of Decision designed and created by the FS, Gila County requests that the FS and Res Copper ensure that all mitigation measures be in place to reduce the impacts to adjacent property owners.

Comment ID:
J20024-2
Response:
MIT1

Gila County supports any and all mitigation measures to offset the estimated $30,000 in wildlife related tourism from the loss of Oak Flat and Shunk camp (DEIS page 633).

The Gila County Board of Supervisors thanks you for the opportunity to comment and requests to be kept informed and included in the process moving forward.

Respectfully submitted,

Woody Cline
Chairman, Gila County Board of Supervisors

---

October 31, 2019

Mr. Neil Bosworth
Tonto National Forest - Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Dear Mr. Bosworth:

As Pinal County District 1 Supervisor and a native to the Hayden-Winkelman area, I am extremely familiar with copper mining and the Resolution Copper Project and Land Exchange. The majority of the project footprint including the mine and associated ancillary facilities are located within my district. Copper mining represents an important base industry for the economy in rural Pinal County and specifically the Copper Triangle communities. Please accept the following comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange.

The communication and consultation from TNF with local communities and incorporation of their feedback has improved the mine plan in important ways. This is most notable in the alternatives analysis and selection of the preferred tailings alternative called Skunk Camp, which locates a tailings facility off public lands, behind the Ray Open Pit mine and far away from local communities and popular recreational areas. The technology incorporated into this tailings storage facility will be unlike anything that currently exists in the state of Arizona. It incorporates two separate resilient and robust embankments into one impoundment and the design is aligned with the most stringent criteria consistent with best practices internationally. The ridged design features consider long-term physical stability to endure maximum floods and 10,000 year seismic events – far beyond any credible earthquake for Arizona. The approach to reclaiming the tailings at the same time as operations with vegetation types native to the local landscape is another innovative tailings management approach that has not been implemented in Arizona to date. *This approach to tailings will be a demonstration of how these facilities need to be managed in the future and I applaud the TNF for this process and outcome. However, I would like to see additional groundwater monitoring down gradient of the Skunk Camp tailings storage facility and before the confluence of the Gila River incorporated into the Final EIS.*

Comment ID:
314-1
Response:
MIT1

The socioeconomic analysis has concluded that the overall socio-economic impact of the Resolution Copper Project would result in tens of billions tax revenues and thousands of jobs with hundreds of millions in wages. These types of revenues will be vital to Pinal County and the Copper Triangle since spending by base industries, and the associated taxes, stimulate local business and construction, business services, banks and hospitals. The revenue from this mine will result in lower taxes for residents and sustained investments that strengthen the communities through strong education. *The DEIS discloses the high and low valuation of the Superior Unified School District (SUSD), both of which would be a windfall of tens of millions in taxes annually. However, the DEIS does not disclose what this would mean for the average resident of Superior in terms of lowering of their average annual taxes – please disclose this in the Final EIS along with the high and low estimate of the tax benefit directed back to the SUSD.* Please also add a statement on the benefits to the communities of Hayden and Winkelman by relocating the tailings storage facility at Skunk Camp given that some portion of the jobs would be re-allocated in this general vicinity.

Comment ID:
314-2
Response:
SO14

Comment ID:
314-3
Response:
SO10

BOARD OF SUPERVISORS
P.O. Box 827    Florence AZ 85232    T 520-866-5215    F 520-866-4527
P.O. Box 709    Maricopa Az 85138    T 520-866-5530    T 520-487-2641    F 520-866-1616
Pete Rios@pinalcountyaz.gov

---

In recognition of the need to diversify and enhance our Copper Triangle economy, I strongly support the proposed mitigations that will bring much need day time tourism to the Town of Superior and wish to see these further committed to and memorialized in the Final EIS including: RC-214 Recreational Users Group and Superior Trails Network Plan; An offset to the loss of bouldering at Oak Flat has been found called the "Inconceivables" as RC-213; A new campground near the Oak Flat campground called "Castleberry" (RC-215).

Comment ID:
314-4
Response:
MIT3

I also strongly support the conservation of the Lower San Pedro 7B parcel as described in Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 (NDAA) located near the Town of Mammoth and finalization of the compensatory mitigation plan riparian conservation, restoration and preservation projects geared towards communities located closest to the project (Queen Creek - Town of Superior; Gila River – Gila River Indian Community; Lower San Pedro in Dos Fee – Winkleman, Hayden, Kearny). Conservation of these riparian areas will also help drive diversification and protect special places for wildlife.

Comment ID:
314-5
Response:
MIT3

For these reasons, I wanted to re-iterate my support for the Resolution Copper Project, and ask that the TNF complete the Final EIS in the timeliest manner so to benefit rural Pinal County and local Copper Triangle Towns and Cities.

Sincerely,

Pete Rios
Pinal County Supervisor District 1

---

FEC's Comments on Resolution Mine Draft EIS Air Quality Section

Submitted by Feng Mao

- Draft EIS Pg. 277 AERMOD/AERMET

The 2019 NEPA Air Quality Impacts Analyses Report indicates that Resolution used AERMOD 16081 version and AERMET 16216 version for near-field analyses. It is not clear why AERMET 16216 instead of AERMET 16081 was used. Please note that the EPA released an updated AERMOD/AERMET version (dated 19191) on August 21, 2019. It is recommended to review the recent AERMOD/AERMET updates to check whether such updates will affect the modeled results or not.

Comment ID:
278-1
Response:
AQ16

- Draft EIS Pg. 277 CALPUFF

In the 2017 Appendix W final Rule, EPA removes CALPUFF as a preferred model for long-range transport assessments. It is recommended to provide justification why the use of CALPUFF is appropriate for Class I area PSD increment and AQRV analyses.

Comment ID:
278-2
Response:
AQ9

- Draft EIS Pg. 277 Years of Meteorological Data

It is recommended to delete the statement of "The dispersion models relies on 2 continuous years of meteorological data collected from the on-site monitors". While AERMOD used 2 years site-specific meteorological data, CALPUFF used 3 years of gridded data.

Comment ID:
278-3
Response:
DOC1

- Draft EIS Pg. 277 Types of Emissions Sources

The statement that the emission sources were categorized into two groups (point source and area source) is incorrect. Depending on the source release characteristics, the emission sources were characterized as point source, area source, volume source as well as line source (see NEPA Air Quality Impacts Analyses Report). For example, emissions from material transfer processes were modeled as volume source and emissions from roadways were modeled as LINE source.

Comment ID:
278-4
Response:
DOC1

- Draft EIS Pg. 281 Background Concentrations

The most recent 3 years of monitoring data show that the concentration levels in Year 2017 were higher than previous years. However, the NEPA Air Quality Impacts Analyses does not consider the 2017 monitoring data for the background concentrations determination. Would it be a concern?

Comment ID:
278-5
Response:
AQ22

- Draft Pg. 285 Table 3.6.4-1 and Pg. 289 Table 3.6.4-2

Continued

2

Appendix R

November 7, 2019

Mr. Neil Bosworth
Forest Supervisor
Tonto National Forest
2324 East McDowell Road
Phoenix, AZ 85006

Submitted electronically to www.ResolutionMineEIS.us/Comments

RE:  Draft Environmental Impact Statement for the Resolution Copper Project and
      Land Exchange

Dear Mr. Bosworth:

The Arizona Game and Fish Department (Department) has reviewed the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. The Department understands Resolution Copper Mining, LLC (Resolution Copper) has proposed to develop an underground copper mine near the town of Superior in Pinal County, Arizona on unpatented mining claims on the Tonto National Forest (Forest), along with a specified, legislatively mandated land exchange. The Project, as proposed, includes the mine site, associated infrastructure, a transportation corridor, a tailings storage facility, and access roads.

The Department understands Resolution Copper is owned by Rio Tinto and BHP Copper, Inc. As a cooperating agency, the Department has provided the Forest with technical expertise, review of draft documents, and recommended mitigation measures and conservation opportunities to support development of the DEIS.

Under Title 17 of the Arizona Revised Statutes, the Department, by and through the Arizona Game and Fish Commission (Commission), has jurisdictional authority and public trust responsibilities for the management of state fish and wildlife resources. It is the mission of the Department to conserve Arizona's diverse fish and wildlife resources, and manage for safe, compatible outdoor recreation opportunities for current and future generations. The Department recognizes the importance of projects like Resolution Copper that contribute to the state's economic development. Similarly, the Department believes that through effective planning and coordination with the Department, projects such as Resolution Copper can avoid, minimize or mitigate to the extent possible, adverse impacts on the state's fish and wildlife resources and wildlife-related recreation. For these reasons, the Department has expressed interest in all land planning initiatives that may affect the management of the state fish and wildlife resources and/or wildlife-related recreation. The Department has provided comments based on the agency's statutory authorities, public trust responsibilities, and special expertise related to wildlife resources and recreation.

*The Department respectfully requests the Forest and Resolution Copper continue collaboration on a voluntary compensatory plan, beyond what is legally mandated, to achieve a net-net loss of habitat, and seek a plan to be included in the Draft Record of Decision [Redaction, the Department requests as an Appendix of operation and maintenance endorsed to ensure a net-no-net loss of the mine to be included to implement mitigation of short-term and long-term environmental actions that may recur as a result of this project.*

For your convenience, the attached comment matrix includes the Department's recommended mitigation measures and conservation opportunities that have been submitted and discussed with Resolution Copper. The Department appreciates the Forest and Resolution Copper's willingness to develop a compensatory plan that exemplifies sustainable development and good stewardship of the state's natural resources.

The Department appreciates the opportunity to review and provide comments on the DEIS. Please contact Clay Crowder (ccrowder@azgfd.gov or 623-236-7666) directly with any questions regarding this letter.

Sincerely,

Jim Odom
Assistant Director, Wildlife Management Division

cc:  Clay Crowder, Habitat Branch Chief
     Ginger Ritter, Project Evaluation Program Supervisor
     Jay Cook, Habitat Supervisor, Region VI Area
     Kelly Wolff, Habitat, Evaluation and Lands Program Manager

Attachments:  Arizona Game and Fish Department (AGFD), 2019. AGFD 0909362 AGFD Comment Matrix on the Draft EIS for Resolution Copper Project

Literature Cited

Arizona Game and Fish Department (AGFD). 2018. Report on Species of Economic Importance, Wildlife-Related Recreation and Public Access within the Resolution Copper Mine Project Area.

AGFD. 1994. Department Operating Manual. Commission Policy A.1.9., Department Policy for Habitat Compensation Policy (J.2.)

Resolution Copper. 2016. General Plan of Operation

Rio Tinto. 2017. Our evolving approach to biodiversity

EORgfd.gov | 602.942.3000
5000 W CAREFREE HIGHWAY PHOENIX AZ 85086

DEIS for the Resolution Copper Project and Land Exchange
November 7, 2019
Page 2



The Department respectfully requests the Forest and Resolution Copper continue collaboration on a voluntary compensatory plan...

| Comment ID 11 | | Response A1073 |

2019 NEPA Air Quality Analysis Report Pgs 33-34 – Tailings Storage Facility (TSF) Wind Erosion Emissions Estimation and Modeling

It is recommended to provide clarifications for the following items:

• The wind speed dataset used (location, elevation, height of meteorological tower and the data duration).
• Justification for using a factor of 12 to convert hourly wind speed to hours in this report cited an EPA study which modeled a coal mine in Wyoming; however, a representative factor should be used from a nearby source in this report to review for the wind speed data from a nearby WEG station to select an appropriate conversion factor).
• Justification for using a control efficiency of 90% (any citation?).
• The lava elevation and release height of area source being modeled (did the modeling consider the altitude of TSF in feet of estimating IDs?).

| Comment ID 30050-11 | | Response A015 |

Draft Pg 265 Table 3.6.4-1

For 1-hr and 8-hr CO, it is not appropriate to use "3rd high over 2 years" as the modeled design concentration. The form of the NAAQS for CO is "Not to be exceeded more than once per year", which means the 2nd high (1st High) should be used to determine modeled design concentrations. (Note 2nd highest modeled CO concentration on average over 3 years?). It is recommended to determine highest, second highest concentration (HSH) over the entire receptor network for each year modeled and then select the highest concentration as the modeled design concentration (per AERMOD modeling guidance).

Readers may be confused by the background concentration for 1-hr NO₂ is around 10 ppb (10 µg/m³). It is recommended to add a footnote to clarify that a temporary varying NO₂ background profile was used for modeling.

| Comment ID 30050-14 | | Response AT73 |

The Department appreciates the collaborative process provided by the Forest and Resolution Copper, including consideration and incorporation of many of the Department's recommendations to avoid, minimize or reduce impacts to wildlife and recreational opportunities, as well as Resolution Copper's willingness to develop Best Management Practices associated with the operation and maintenance of the facility and the proposed infrastructure. (The Department appreciates the Forest's selection of Alternative 6 – Skunk Camp North Tailings Consider Option as the Preferred Alternative. The Department has concluded that compared to the other alternatives presented in the DEIS, the Preferred Alternative had fewer overall impacts to wildlife and recreational opportunities.) The Department has also identified opportunities for voluntary mitigation and conservation measures for the loss of water, fish and wildlife habitat and recreational opportunities as a result of this project.

The Department recognizes that these conservation opportunities, while not required, are recommended as a voluntary compensatory measure that supports the stated benefits and mission of Resolution Copper, the Forest, and the Department. But the Department's approach to offset loss to biodiversity are "conservation actions that are designed and implemented to address those residual impacts with a goal to achieve at least a no net loss or net gain for biodiversity" (Rio Tinto 2017). This approach is consistent with the Arizona State Wildlife Action Plan and the Department's Habitat Compensation Policy and the Department's "no net loss-no net loss of wildlife habitat" (AGFD 1994). The landscape-scale projects, to achieve at least a net-net loss for wildlife habitat (AGFD 1994), the Department has provided specific comments on the DEIS in the attached comment matrix. Additionally, the Department has also identified opportunities for voluntary mitigation and conservation for Resolution Copper for the Preferred Alternative. Please see the Department's comment on Appendix E: Mitigation and Monitoring Plan in the attached comment matrix.

R-33

Appendix R



December 12, 2019

Mr. Neil Bosworth
Forest Supervisor
Tonto National Forest
2324 East McDowell Road
Phoenix, AZ 85006

Submitted electronically to: www.ResolutionMineEIS.us/Comment.

RE: Amend AGFD Comments on Draft Environmental Impact Statement for the Resolution Copper Project and Land Exchange

Dear Mr. Bosworth:

The Arizona Game and Fish Department (Department) has reviewed our comments submitted on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange on November 7, 2019.

The Department determined that some comments were inadvertently omitted due to multiple reviewers when the comments were collated and prepared for submittal. Therefore, the Department requests that the Forest consider the attached comment matrix as the Department's official comments on the DEIS; replacing the previous comment matrix that accompanied our letter dated November 7, 2019. The attached table has all of the Department's original comments, as well those that were inadvertently omitted (highlighted blue).

The Department appreciates the opportunity to review and provide comments on the DEIS. Please contact Clay Crowder (ccrowder@azgfd.gov or 623-236-7666) directly with any questions regarding this letter.

Sincerely,

Jim deVos
Assistant Director, Wildlife Management Division

cc: Clay Crowder, Habitat Branch Chief
    Ginger Ritter, Project Evaluation Program Supervisor
    Jay Cook, Regional Supervisor, Region VI, Mesa
    Kelly Wolff, Habitat, Evaluation and Lands Program Manager

AGFD # M19-01603432

Attachments: Arizona Game and Fish Department (AGFD) 2019. M19-01603632 AGFD Revised Comment Matrix on the Draft EIS for Resolution Copper Project

azgfd.gov | 602.942.3000

5000 W. CAREFREE HIGHWAY, PHOENIX AZ 85086

GOVERNOR: DOUGLAS A DUCEY COMMISSIONERS: CHAIRMAN ERIC S SPARKS, TUCSON | KURT R DAVIS, PHOENIX
LELAND S. "BILL" BRAKE, ELGIN | JAMES E GOUGHNOUR, PAYSON | JAMES S ZIELER, ST JOHNS DIRECTOR: TY E GRAY DEPUTY DIRECTOR: JIM P DEVOS

Appendix R

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 317-305 | Buried Spring | Buried Spring has the highest riparian value, supporting a standing pool and a 500-foot riparian string of cottonwood, willow, mesquite, saltcedar, and sumac. The Proposed Action will decrease the groundwater drawdown at the spring by 30 to 50 feet. This will lead to complete loss of the riparian habitat. | Action: As Arizona Game and Fish Commission Policy 402.3, Wildlife and Wildlife Habitat Compensation, requires compensation measures to eliminate or reduce impacts to riparian habitats. AGFD requests incorporation of the proposed mitigation listed in the comment for Appendix J. | Comment ID: 30075-21 Response: MT3 |
| 320 | Table 3.7-1.3 | For the McGinnell Mine Spring, Table 3.7-1.3 indicates that 85 of 87 sensitivity runs show a drawdown greater than 10 feet in the Proposed Action alternative 200 years after the start of mining. However, the hydrograph from the sensitivity modeling results from the Groundwater Modeling Work Group indicate only 1 out of 87 runs show impacts greater than 10 feet for McGinnell Mine Spring in the Proposed Action alternative 200 years after the start of mining. | Action: The sensitivity modeling results should be verified and changed in the FEIS, if warranted. | Comment ID: 30075-22 Response: WT79 |
| | Table 3.7-1 Middle and Lower Devils Canyon | Table 3.7-1-3 states that Spring DC-6 dDW, a spring located on the wall of Middle Devil's Canyon, is predicted to experience drawdown of 10-30 feet and dry up 200 years after the start of the mine as a result of Resolution Mine's dewatering and blank-down. | Action: The modeled prediction of the mine-related loss of this spring must be reconciled with any predictive statement that the Middle Devils Canyon baseflow is not expected to experience drawdown. | Comment ID: 30075-1 Response: AT43 |
| 321 | Table 3.7-1.3 Possible drawdown impacts to GDEs. | For McGinnell Spring, the table indicates that 85 of 87 sensitivity runs show a drawdown greater than 10 feet in the Proposed Action alternative 200 years after the start of mining. However, the hydrograph from the sensitivity modeling results from the Groundwater Modeling Work Group appears to indicate that none of the runs show an impact greater than 10 feet for McGinnell Spring in the Proposed Action alternative 200 years after the start of mining. | Action: The sensitivity modeling results should be verified and changed in the FEIS, if warranted. | Comment ID: 30075-23 Response: WT79 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 303 3.7-1-3 | Middle and Lower Devils Canyon | Table 3.7-1-3 states that the predicted modeled groundwater drawdown caused by Resolution mine dewatering and the blank-down is less than 10 feet for Middle Devils Canyon. Groundwater drawdown of 10-30 feet by the Resolution Mine blank-down is predicted to result in the drying up of Spring DC-6 dDW. On September 10, 2016, WGGA presented to the Groundwater Modeling Working group a Table containing a summary of Federal Impacts to Groundwater-Dependent Ecosystems. This Table conducts that several locations, including springs, in Devil's Canyon will experience greater than 10 feet of drawdown from dewatering caused by Resolution Mine blank-down. In addition to Spring DC-6 dDW, they are: DC8 SG, DC9 2JW, DC8 1G, DC7 1G, DC6 1 MZ, DC5 1E. | Action: The Proposed Action modeling results should be re-checked for accuracy and the Table corrected, if necessary. | Comment ID: 30075-24 Response: MT82 |
| | Middle and Lower Devils Canyon | Even after 200 years, the predicted extent of the 50-foot drawdown zone will continue to increase, as groundwater continues to flow towards the collapsed block cave zone. GDEs to the south and southwest of the East Plant Site, such as Spring DC-6 dDW and Devil's Canyon, will be permanently affected. Review of Numerical Groundwater Model Construction and Approach at Section 4.17.3.3 | Action: Describe the environmental effects of continued long-term propagation of groundwater drawdown on the aquatic resources of Middle and Lower Devils Canyon. | Comment ID: 30075-2 Response: WT16 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| | Middle and Lower Devils Canyon | General Comment. Devils Canyon is to the immediate east of Oak Flat. The middle and lower reaches of Devils Canyon, from the top to the confluence with Mineral Creek (5.7 miles) have perennial streamflows, arising both from discrete springs along its walls and from groundwater inflow from the Apache Leap Tuff aquifer. DEIS, vol. 1 of 313; Review of Numerical Groundwater Model Construction and Approach (Montgomery and Associates Amec BGC Engineering, November 4, 2018). The middle and lower reaches of Devils Canyon are a Groundwater-Dependent Ecosystem (GDE), DEIS, Vol. 1 of 312 "[t]he GDE consists of a 2.3 mile long, 50-acre riparian gallery and a 0.5 mile long saturated marsh with several large perennial pools. Dominant riparian species are sycamore, cottonwood, ash, alder, and willow, and wetland species at spring locations. DEIS, Vol. 1 of 223. | Action: Water flows in the Resolution Project area this important riparian area are of great importance to AGFD. AGFD requests the following comments and actions be considered for this GDE. | Comment ID: 30075-25 Response: WT8 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 303 3.7-1-3 | Middle and Lower Devils Canyon | Given that the perennial streamflows in Devils Canyon are dependent both from springs along its walls as well as groundwater inflow along the channel bottom, what is the scientific basis for the categorical statement in vol. 1 of 323 that "[g]roundwater inflow along the main stem of Devils Canyon is not anticipated to be impacted and that statements in Table 3.7-1-3 as to the baseflow of Middle Devils Canyon, "[m]edium is possible but unlikely" and for Lower Devils Canyon, "additional drawdown due to blank-cave by an unlikely"? The MODFLOW-SURFACT model was used to model the groundwater impacts related to Resolution Mine panel caving and dewatering with loss related to ore removal. But the model's large periods studied for use at a accurately model baseflow discharge to perennial reaches of Devils Canyon, As a result, the model cannot predict changes to Devils Canyon stream flows as a result of the Resolution Mine Project. Review of Numerical Groundwater Model Construction and Approach (BGC Engineering, November 4, 2018). Given that fact, the conclusions in Table 3.7-1-3 that drawdown of the perched stream reaches in Devils Canyon are "unlikely" and "not anticipated" do not appear to be supported by data or analysis. The Groundwater Modeling Workgroup and the Tonto NF understood that predicting reductions in stream flows due to [Resolution Mine] groundwater drawdown "is the most fundamental hydrology question to be answered in the EIS". Review of Numerical Groundwater Model Construction and Approach at Section 5.7 | Action: Describe in greater detail in Vol 1, page 303 the model's limitations in predicting effects to stream reaches and affect all basis for the predictive statements in the DEIS that Devils Canyon streamflows will not be impacted. Analyses of impacts based on theoretical modeling must be supported by credible scientific evidence and data. NEPA 40 CFR 1500.2; 1502.1; 1502.22 | Comment ID: 30075-26 Response: WT81 |
| 330 Table 3.7-1-5 | Possible drawdown impacts to GDEs. | | Action: The title of this table should read "Summary of potential impacts on groundwater-dependent subsystems from surface flow losses due to subsidence from block-cave mining". | Comment ID: 30075-27 Response: DOC1 |

Appendix R







Appendix R

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 314 3.7.2.4 | Queen Creek | Exceedances of numerical or existing surface water quality standards for Queen Creek could potentially occur if permit discharges effluent limitations are exceeded. Any exceedances would further impair Queen Creek for aquatic and wildlife use. The DEIS Vol. 2 at 363 acknowledges that The Forest Service has a responsibility to analyze and disclose to the public any potential impacts on surface water and groundwater as part of the NEPA process, separate from the State permitting process. | Action: Analyze and disclose in the public any potential impacts on surface water and groundwater as part of the NEPA process, separate from the State permitting process. | Comment ID: 30075-33 Response: WT41 |
| 361 3.7.2.2 | Surface Runoff | Modeling Details - Identifies 4 water sources for block-cave area, including | Action: Add - the amount of surface water from sub-device zone | Comment ID: 30075-34 Response: DOC1 |
| 364 3.7.2.2 | Queen Creek | The DEIS states that Resolution Copper is not proposing any direct discharges to surface waters | Action: Correct this statement in light of potential ADPDES Permit AZ0020308 | Comment ID: 30075-35 Response: WT44 |
| 365 3.7.2.2 | Groundwater | 1. Groundwater inflow Apache Leap, 2.Groundwater inflow deep groundwater system 3. Blowdown water from cooling, and 4. Excess make-up water. | Action: Block-cave sump water chemistry should be remodeled to include the oxygenated surface water. | Comment ID: 30075-36 Response: WT44 |
| 365 3.7.2.2 | Impacts on Surface Runoff and Streamflow | Question for the third paragraph on p. 354. Third paragraph. What 4 assessable levels of that seepage and how is effectiveness of the existing controls is measured? | Action: Clarify what the acceptable levels of that seepage are and how is effectiveness of the existing controls is measured. | Comment ID: 30075-37 Response: DOC1 |
| 370 3.7.2.3 | Queen Creek | The DEIS states that Queen Creek has the potential to receive additional pollutants caused by the Resolution Copper Project only from runoff or seepage from tailings in Alternatives 2, 3, and 4. | Action: Correct this statement in light of potential Resolution Mine discharges to Queen Creek under ADPDES Permit AZ0020308 | Comment ID: 30075-37 Response: DOC1 Response: WT41 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 393 417 3.7.2.4 | Recycled Water and Seepage Ponds | The closure process for the slurry tailings facility under all Alternatives involves a phased process where the recycled water pool on the tailings facility, along with pumped back seepage, is allowed to evaporate. This is estimated to take five years. In the environment of the central desert southwest, open water is an important resource for wildlife, particularly for migrating passerines and waterfowl species that seek open water for resting and drinking. Migratory birds will be attracted to open water at the Resolution Mine site. The recycled water pond can be expected to rapidly after closure. As the ponded water evaporates, the water residue will become toxic to birds through exposure and ingestion. Mine tailings ponds have been documented to contain high concentrations of sulfuric acid (low pH levels) and metals. This occurred at the Arizona Mineral Mine site, where avian mortalities occurred on an intensive tailings impoundment. Phelps Dodge Corporation entered into a plea agreement with the Justice Department under the federal Migratory Bird Treaty Act, and a civil settlement agreement in the United States and the State of Arizona for natural resource damages for avian mortalities in United States of America. et al. v. Freeport-McMoran-Corporation, et al. (USDC, CV-13-0307-PCT-DGC) | Action: Resolution Mine must develop an effective bird hazing protocol to prevent avian exposure to modified and metalliferous waters. | Comment ID: 30075-39 Response: WT1 |
| 417 2.2.4-1 table | Seepage Ponds | The Table states that sluice of the tailings recycled water pond is estimated to take up to 25 years after the end of operations. Until that time, excess seepage in seepage ponds would be pumped back to the recycled water pond, and evaporation would take place on the impoundment and tailings beds face. It could take 20 years for the ponds to potentially evaporate all incoming seepage. | Action: Development and implementation of a long-term bird hazing protocol for the seepage ponds as an essential mitigation for the prevention of large-scale avian mortalities. See above Comment. | Comment ID: 30075-40 Response: WT1 |
| 421 3.7.2.2 | Bypass Seepage Mixing Models | For Shortfall Camp, one data point is insufficient to determine background water quality. | Action: More samples should be collected and the model should be run on one additional samples are collected to better depict background water quality conditions. | Comment ID: 30075-41 Response: WT7 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 400 3.7.2.2 Overall (End of Uncertainties to the Model) 3.7.2.2 Constituents of Concern | Water Quality | Queen Creek and Arnett Creek are already impaired for aquatic and wildlife use from copper during stormflow conditions. | Action: Consider reversing this discussion. For Queen Creek and Arnett Creek, since they're impaired for copper during stormflow conditions, AGFD believes that mixing of the potential pools of concern would be alleviated during stormflow conditions, not reduced via dilution. | Comment ID: 30075-42 Response: WT44 |
| 432 3.7.2.2 | Water Quality | Upper Queen Creek is currently listed as impaired for copper | Action: The text should be revised to include listing as constituent of concern. | Comment ID: 30075-43 Response: WT44 |
| 106, 400 | | The discussion of effects to riparian vegetation and species as a result of reductions of surface water and groundwater in Devil's Canyon and Queen Creek is perfunctory. | Action: Discuss and disclose the potential loss of riparian ecosystems due to a drop in groundwater tables of even less than 10 feet in the Devil's Canyon and Queen Creek watershed. | Comment ID: 30075-44 Response: WT3 |
| | Devil's Canyon Queen Creek | Groundwater and surface flow declines are adversely altering riparian ecosystems throughout the southwest, resulting in a decline of riparian trees (Populus fremont (Fremont Cottonwood) and Salix gooddingii (Gooding willow)), the study of the San Pedro River, R. Humphis and S. gooddingii were dominant over T. ramosissima (tamarisk) at sites where surface flow was present more than 76% of the time, and annual groundwater fluctuation was less than 0.5 m, and average maximum depth to ground water was less than 2.6 m. Abundance of S. gooddingii declined sharply as ground water fluctuation exceeded 0.5 m and W. fremontii declining as ground water fluctuation exceeded about 1 m. Degraded water tables lead to a severe compaction and to the more drought-tolerant tamarisk which favors wildlife habitat quality, and leads to loss of scrub-shrub, cottonwood, and mesquite bosque water in permeable for maintaining Populus-Salix forests. San Pedro River, Arizona, R. Lite, J.C. Stromberg (Arizona State University, 2005); Cottonwood and Willow Ecology Assoc. (Beauvais et al), (Arizona Game and Fish Department). | | Comment ID: 30075-7 Response: WT3 Comment ID: 30016-4 Response: WT3 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| | Middle Devil's Canyon Queen Creek Springs | The DEIS does not contain a discussion of the potential cumulative impact of climate change on surface water resources. A lower letter dated November 9, 2014 from Resolution Copper to the Forest Service references an enclosure from WSP, November 2018, entitled Resolution Copper Groundwater Flow Model - "Climate Change". The Department cannot locate the USDA Forest NF Resolution Copper Project EIS website. | Action: Develop an and implementation of the the wildwood United States is a cumulative impact on surface water resources within the Resolution Mine analysis area. | Comment ID: 30075-5 Response: AQ17 |
| | Middle Devil's Canyon Queen Creek Springs | The uncertainties concerning the extent of groundwater drawdown and its effect on riparian habitats do not reduce the Forest Service of its responsibility under NEPA to disclose the mitigation of likely impacts. South Fork Eand Council v. U.S. Department of the Interior, 588 F. 3d 718 (9th Cir. 2009). | Action: Discuss potential mitigation for losses of riparian ecosystems. | Comment ID: 30075-10 Response: WT30 |
| N5-7 3.7.3.4 | Tactic 3.7.3.5 Changes in Avg Monthly Flow | Since many of the structures are dependent on nature, the average monthly stream flow changes may not adequately demonstrate the potential reduction in flows. Water at the present in the stream is less frequently due to the a reduction of runoff making to the streams and, therefore, water will be available in smaller sections and, therefore the change structures. This may have a bigger impact to habitat and wildlife than the average flow reductions depict. | Action: Consideration should be given to reviewing the low accordingly for no potential wildlife impacts due to flow reductions. | Comment ID: 30075-44 Response: W4 |
| N5-13 3.7.3.4 | Unavoidable Adverse Effects | The section states "Alternative 5 would avoid and disclose the breed of larger adverse effects with some distance downstream below the first potential water (the Gila River). A lower effects are not anticipated from these changes due to Alternative 5's low flow fluctuation in topsoil problems with additional seepage runoff." However, on page 417 under PREDICTED REDUCTIONS IN ASSIMILATIVE CAPACITY, it says "For Alternative 6, the discharge of seepage into the Gila River uses more than 20 percent of the assimilative capacity for tailings." | Action: Clarify why this is not considered an adverse effect as AGFD believes the seepage from Alternative 6 that uses more than 20 percent of the assimilative capacity for selenium would be an adverse affect as current studies of selenium have adverse impacts to birds. | Comment ID: 30075-45 Response: WT57 |

Appendix R



Appendix R

R-39

Appendix R

Appendix R

R-41

Appendix R



Douglas A. Ducey
Governor

Arizona State Land Department

Lisa A. Atkins
State Land Commissioner

November 7, 2019

Mr. Neil Bosworth
Forest Supervisor
Tonto National Forest
PO Box 34468
Phoenix, AZ 85067-4456

RE: Resolution Copper Draft Environmental Impact Statement Comments

Dear Supervisor Bosworth,

As a cooperating agency the Arizona State Land Department (ASLD) appreciates the opportunity to submit comments for the record on the Resolution Copper Draft Environmental Impact Statement (DEIS).

The ASLD manages approximately 9.2 million acres of land throughout the State, including subsurface mineral estate. Our comments reflect ASLD's interest in the land as it is managed on behalf of the 13 state's beneficiaries to ensure that potential risks and conditions for all projects on land and resources within the Trust.

ASLD recognizes and appreciates the cultural development, financial, technological, and career opportunities that Resolution Copper brings to the State and ASLD supports the advancement of the proposed mine. ASLD does have concern regarding the possibility for the establishment of the mine, which have been expressed throughout this document and though the public process.

This comment letter constitutes the official response of ASLD and has been regulated for the funding actions it proposed concerns (including the location of the preferred alternative tailing location at Skunk Camp). It DEIS comments from Internal ASLD meetings, experts, and 3) concluding remarks.

## GENERAL COMMENTS

### SKUNK CAMP TAILINGS FACILITY – PREFERRED ALTERNATIVE

ASLD acknowledges that the Tonto National Forest (TNF) ASLD prefers Silver King as the alternative to the tailings, as it is located in federally managed land and requires significantly less water than the facilities proposed, which would require much higher volumes of water to support the tailing slurry pipeline.

ASLD also requests that TNF provide written confirmation actions deliberating approval of the pipeline corridor that is secured on State land or its beneficiaries. Receipt of this document is necessary for ASLD to begin leasing the possibility of a facility or double railroad pipe section lined with high-density polyethylene. Installing a compaction of pipeline monitoring network, and fence review of the construction and design.

## CULTURAL RESOURCES OF SKUNK CAMP

The results of cultural resources investment for all alternatives have yet not been fully reported as a cultural. The DEIS provides some preliminary numbers for the significant cultural resources that will be directly impacted based on the different alternatives. These are the cultural resources that have been recommended as eligible for listing on the Arizona and National Registers of Historic Place (AZSHRP) and those that need to register their register eligibility. Final determinations of eligibility and effect have not been completed for the Skunk Camp alternative. The Skunk Camp alternative will then likely impact significantly more cultural resources than any of the other alternatives (Table 1; Figure 1). Skunk Camp, with the South Pipeline alternative will impact 2.8 to 4.5 times more cultural resources that the other alternatives, while the South Pipeline alternative will impact 3.0-5.4 times more.



**Figure 1: Cultural Resources Directly Impacted**

## Table 1. Cultural resources directly impacted by the different alternatives

| Tailing Storage Alternatives | Cultural Resources Directly Impacted |
|---|---|
| Skunk Camp (South Pipeline Alternative) | 301 |
| Skunk Camp (North Pipeline Alternative) | 253 |
| Peg Leg West Pipeline Alternative | 75 |
| Peg Leg (East Pipeline Alternative) | 99 |
| Silver King | 60 |
| Near West (both Alternatives 2 and 3) | 56 |

## LESSER IMPACTS OF SKUNK CAMP

The Skunk Camp tailing facility generally impacts cultural resources and comprises future systems generation to the Trust. A total of three grazing leases are likely to be impacted with an estimated minimum loss of 113 animal units. Over the approximately 40-year LOM, the Trust will recognize an estimated grazing revenue loss of $369,069 in the Skunk Camp location.

Additional impacts to grazing leases downstream from the mine may include the potential loss of surface water, for which claims have been filed in the General Stream Adjudication. Loss of surface water may require lessees downstream of the mine to truck water to compensate for the shortfall.

## CONCLUDING REMARKS

ASLD appreciates the time and efforts of the collaborative TNF and SWCA teams in producing the multi-year DEIS project, and for ASLD's ability to participate as a cooperating agency on behalf of the State Land Trust and its beneficiaries.

R-43

Appendix R

Appendix R

R-44

Mr. Neil Bosworth
United States Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

Sincerely,

Lisa A. Atkins
Commissioner
Arizona State Land Department

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 29, 2019

Mr. Neil Bosworth
United States Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Respectfully,

Robert Meza
House of Representatives
Legislative District 19

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 10, 2019

Mr. Neil Bosworth
United States Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for your consideration of these comments and questions.

Sincerely,

---

Tonto National Forest
Resolution DEIS Comments
PO Box 34468
Phoenix AZ 85067-4468

October 14, 2019

Re: Resolution Copper DEIS comment

To whom it may concern:

Sincerely,

Leeann Sierra

Appendix R

## Arizona House of Representatives
### Phoenix, Arizona 85007

COMMITTEES

October 24, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Supervisor Bosworth:

On August 9th, the United States Forest Service (USFS) reached an important milestone with the release of the Draft Environmental Impact Statement (DEIS) for the Resolution Copper project. I appreciate the opportunity to comment during the review of the impacts of the Resolution Copper project on federal land. This DEIS is a great example of how the National Environmental Policy Act process can become a means that engages the community extensively and uses feedback to shape the development of a mining project.

As an elected leader that lives near this project, I have an acute interest in the impacts this project will have in supporting Arizona's economy and the conditions I represent. With the extensive support from the county, state, and federal cooperating agencies as well as Native American tribes, I am proud to say our community is shaping the outcome of the mine. Specifically, the preferred tailings site is a direct result of community and tribal input after consideration of multiple alternative sites.

The Resolution Copper mine will have a significant impact on Arizona and the United States. The DEIS confirms that this project alone will have the capacity to produce 25% of U.S. copper demand for 40 years. In the process of mining this copper, Resolution Copper will create 1,500 permanent jobs in a region that is desperately in need of economic development.

I would like the USFS to further encourage the commitment of Resolution Copper to pursue workforce development, job training, and local economic development. Developing the workforce for this side-of-mine project will be a multiple-year effort that should get underway as soon as possible. The DEIS details several key factors related to local development which highlight the need for this project. The project should continue to evolve and expand its partnership footprint with local communities to ensure both are prepared to take full advantage of the opportunities this project will bring.

Resolution Copper has shown a commitment to the local community through independent funding agreements and scholarship programs for the schools in the Copper Triangle. Additional support

---

MISTY PICHER
STATE REPRESENTATIVE

## Arizona House of Representatives
### Phoenix, Arizona 85007

COMMITTEES

October 24, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth:

I write to express my full support of the Resolution Copper project moving forward and encourage the United States Forest Service to quickly move to the Final Environmental Impact Statement under NEPA. Regarding the process to date, I have a few comments I would like the Forest Service to consider under NEPA.

| Comment ID: 30-b1 | • The approval process has been transparent and has actively sought the involvement of the community and other external stakeholders. |
|---|---|
| **Response:** HIPSD | • I strongly encourage the USFS to maintain the planned 90-day public comment period and not seek additional extensions. |
| | • The USFS should be applauded for identifying a tailings storage facility alternative that addresses the majority of public concerns. |

Thank you for your leadership and work in the development of the Final Environmental Impact Statement for the Resolution Copper Project. Completing your work is critically important to our mining sector, our local economies, our state, and our local workforce anxious to get started on this project.

Sincerely,

Representative Misty Pichon
District 1

---

from the property tax impacts will provide a school funding stream which is tied to modernization of the Superior Unified School District.

Mr. Neil Bosworth
October 24, 2019
Page 2

I appreciate the time and efforts contributed by the USFS, Resolution Copper and the public through active and meaningful participation in meetings and providing substantive comments that help shape the project. I encourage the USFS to complete the Final Environmental Impact Statement for this project as quickly as possible.

Sincerely,

DAVID L. COOK
State Representative, District 8

| Comment ID: 30-b | |
|---|---|
| **Response:** HSI | |

---

## Arizona House of Representatives
### Phoenix, Arizona 85007

COMMITTEES

October 24, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

As Chair of the Arizona House of Representatives Commerce Committee, I am always eager to learn about businesses in Arizona. Resolution Copper is a company that will stimulate our economy and businesses in Arizona. When I think about the future of our state finances, a project like this will be of utmost importance in providing the resources for a stable healthy economy in Arizona. I understand the several thousand construction jobs and more than 1,500 permanent jobs created by the project's development. I am pleased to see the economic impacts this project will have on Arizona.

| Comment ID: 30-c1 | I look forward with great anticipation to this project being up and running and the economic boost it will give to rural Arizona. Thank you for the opportunity to comment and the commendable work of the Resolution Copper Project. I hope the United States Forest Service has the resources to quickly complete the Environmental Impact Statement for this project, which I support. |
|---|---|
| **Response:** HSI | |

Hopefully the review process is quick and efficient. These are the types of projects we need in Arizona.

Thank you for your consideration of these comments.

Sincerely,

JEFF WENINGER
Arizona State Representative
Legislative District 17

JW/kbn

---

Appendix R

R-46

## Arizona House of Representatives
### Phoenix, Arizona 85007

October 15, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I was pleased to see that the United States Forest Service has completed the Draft Environmental Impact Statement for the Resolution Copper mine project in Superior, Arizona. As an elected State Legislator that represents a community in the region of the project, I appreciate the thorough and comprehensive review and analysis that has been completed of the project...

Sincerely,

Warren Petersen
Majority Leader
House of Representatives

---

## Arizona House of Representatives
### Phoenix, Arizona 85007

October 10, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I am in full support of the Resolution Copper project moving forward and...

Comment ID: 312-1
Response: 1151

Sincerely,

---

## Arizona House of Representatives
### Phoenix, Arizona 85007

October 30, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Dear Mr. Bosworth,

Comment ID: 200-1
Response: 1151

Comment ID: 200-1
Response: 1151

Sincerely,

Representative Bret Roberts
District 11

---

## Arizona House of Representatives
### Phoenix, Arizona 85007

October 30, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I write today to urge the completion of the Environmental Impact Statement (EIS) by the United Forest Service for the proposed Resolution Copper Project in Superior, Arizona.

Comment ID: 303-1
Response: 1151

Sincerely,

Rusty Bowers
Speaker of the House
Arizona's 25th Legislative District

## Appendix R

### Arizona House of Representatives
#### Phoenix, Arizona 85007

November 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-1468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

Thank you for the opportunity to comment on the Resolution Copper Land Exchange Draft Environmental Impact Statement (EIS). I commend the dedication, professionalism and due diligence with which the Tonto National Forest Service has conducted itself during this process.

As a member of the House of Federal Relations Committee, I am eager for the Resolution Copper Project to move forward. This project will benefit the local economy, ensuring growth in Arizona for future generations. I encourage the United States Forest Service to quickly complete the EIS so that the project—which has my full support.

As an advocate for economic development and education, I applaud Resolution Copper for their consideration to the community to support Apprenticeship programs and secondary educational opportunities. These efforts to develop a local tradeworkforce pipeline will benefit not only the local community but will assure the continuation of the local economy.

I hope you will agree that final approval necessary to get the economic development in our Arizona and to our state. The creation of thousands of jobs between the construction phase with the more than 1,500 positions' jobs by the project's development is paramount to the growing the local economy.

Thank you for your consideration.

Sincerely,



Representative Shawnna Bolick
Legislative District 20

Appendix R



KEVIN PAYNE
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE (602) 926-4124
TOLL FREE: 1-800-352-8404
kpayne@azleg.gov

DISTRICT 21

COMMITTEES:
PUBLIC SAFETY
Chairman
GOVERNMENT
Vice Chairman
TRANSPORTATION

## Arizona House of Representatives
Phoenix, Arizona 85007

November 6, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
PO Box 34468
Phoenix AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

> As a State Representative, I am excited and eager for the Resolution Copper Project to move forward in the process. As a small business owner, I know firsthand what a project of this scale will do to support the local economy. I am writing to encourage the United States Forest Service to quickly complete the Environmental Impact Statement for this project, which has my full support.
>
> I applaud Resolution Copper for their commitment to the community to support apprenticeship programs and secondary educational opportunities. Their efforts to develop a local Entrepreneurship and Innovation Center will ensure the local community can find pathways to participate in the development and successes of this project. Additionally, their support of the education systems to promote STEM and robotics programming will assist students in developing the interest and skills needed for the project.
>
> I look forward with great anticipation to this project being given the final approvals necessary to realize the economic development and the proceeding economic boost it will give to our local Arizona and to our state as a whole. The jobs, which will number in the thousands through the construction phase and the more than 1,500 permanent jobs created by the project's development is of critical importance to the local economy.
>
> I strongly encourage this review process to move as quickly and as efficiently as possible and to complete the Final Environmental Impact Statement without delay. These are the projects we need in Arizona.
>
> Thank you for your consideration of these comments.

Comment ID: 1307-1
Response: NS1

Thank you,

Representative Kevin Payne

---

FRANK CARROLL
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007
CAPITOL PHONE: (602) 926-5159
TOLL FREE: 1-800-352-8404
fcarroll@azleg.gov

DISTRICT 22

COMMITTEES:
RULES
Vice Chairman
GOVERNMENT
TRANSPORTATION
WAYS & MEANS



## Arizona House of Representatives
Phoenix, Arizona 85007

November 7, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
PO Box 34468
Phoenix AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

> As a State Representative, I am excited and eager for the Resolution Copper Project to move forward in the process. I am writing to encourage the United States Forest Service to quickly complete the Environmental Impact Statement for this project, which has my full support.
>
> I applaud Resolution Copper for their commitment to the community to support apprenticeship programs and secondary educational opportunities. Their efforts to develop a local Entrepreneurship and Innovation Center will ensure the local community can find pathways to participate in the development and successes of this project. Additionally, their support of the education systems to promote STEM and robotics programming will assist students in developing the interest and skills needed for the project.
>
> I look forward with great anticipation to this project being given the final approvals necessary to realize the economic development and the proceeding economic boost it will give to our local Arizona and to our state as a whole. The jobs, which will number in the thousands through the construction phase and the more than 1,500 permanent jobs created by the project's development are of critical importance to the local economy.
>
> I strongly encourage this review process to move as quickly and as efficiently as possible and to complete the Final Environmental Impact Statement without delay. These are the projects we need in Arizona.
>
> Thank you for your consideration of these comments.

Comment ID: 1427-1
Response: NS1

Sincerely,

---

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

> To whom it may concern:
>
> I would like to express my gratitude for this opportunity to provide comment on the Resolution Copper Mine and Land Exchange Draft Environmental Impact Statement. The Tonto National Forest (TNF) should be applauded for the transparent and robust manner in which you have applied NEPA throughout this process. The thorough analysis of alternatives which will decrease significantly potential environmental impacts while maintaining economic opportunities is a testament to the ability of this process to find the means to extract minerals in a responsible and sustainable manner with public interest at the forefront. Furthermore, the project and TNF should be commended for the collaborative efforts in consulting with community members, local elected officials, groups/organizations and Native American Tribes that may be potentially affected by the mine and land exchange.
>
> As an elected State Representative, I am proud to represent a diverse district that has been impacted by mining throughout many years. I believe this project is critical to reshaping how the mining industry operates in Arizona. Resolution Copper has already invested more than $50 million dollars in reclamation of the West Plant site where they did not create the environmental liabilities, and has from the beginning of this process agreed to progressive reclamation of its future operations.
>
> Additionally, Resolution Copper has expressed a willingness to work with labor organizations to ensure that the 3700 expected employees are provided with safe high paying jobs once the project becomes operational. Their apprenticeship program provides full-time employment and secondary education for participants and through their scholarship program they have awarded over $600,000 to local and Native American students. All of this illustrates the dedication they have to working with labor unions, and local communities to ensure their inclusion in the success of this project.
>
> For these reasons, and many more, including the positive economic impact to our state and the local economy I want to express my support for the project and to see it proceed.

Comment ID: 1434-1
Response: NS1

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Sincerely,

Representative Daniel Hernandez, Jr

---

Letter ID: 30073 (Page 1 of 2)
Format: Submitted by webform, 11/12/2019
Sender:
Cesar Chavez
Arizona House of Representatives
Contact Info:
cchavez@azleg.gov
Content:

November 12, 2019

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

To whom it may concern:

> I am thankful for the opportunity to provide comment on the Resolution Copper Mine and Land Exchange Draft Environmental Impact Statement. I commend the dedication and professionalism for which the Tonto National Forest (TNF) has conducted the NEPA process by transparently preparing a rigorous analysis of potential economic and environmental impacts as well as identifying alternatives to the original proposal. The project and TNF should be commended for the collaborative efforts in consulting with community members, local elected officials, groups/organizations and Native American Tribes that may be potentially affected by the mine and land exchange.
>
> As an elected State Representative, I am proud to represent many diverse economic, cultural and environmental interests across our great state. With this in mind I would like to express my support for the Resolution Copper Project and Land Exchange.
>
> One of the largest challenges that Arizona faces is funding for public education. As a state we lag behind in both funding and performance. However, Resolution Copper has taken the initiative to work with a number of rural schools to both supplement funding needs and support enhanced performance. This commitment was further solidified earlier this year when Resolution Copper agreed to a multi-year $1.2M agreement with the Superior Unified School District which is focused on providing 21st century educational tools and opportunities for local students. I am excited to see this project continue to progress and by virtue of its operations positively impact school funding across the state through increased tax revenues, most notably the anticipated $19-$30 million dollar annual mill levy.

Comment ID: 30073-1
Response: NS1

---

Appendix R

R-49

---

**Letter 258 is a duplicate of letter 923**

Arizona House of Representatives

Phoenix, Arizona 85002

August 8, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

As an elected State Representative and the Chair of the House of Representatives Appropriations Committee, I have a keen interest in the positive fiscal impacts this project will have on Arizona and on Arizona's economy as a whole. The significant capital investment and job creation the Resolution Copper Mine will create will benefit generations to come.

I strongly encourage the United State Forest Service to complete the Final Environmental Impact Statement for this project, which I support, as quickly as possible.

A project of this size and scope will have a significant and long-term impact on Arizona and its economy. The project alone will have the capacity to produce 25% of US copper demand for 40-45 years. In the process of mining this ore body, Resolution Copper will create 1,500 permanent jobs in that rural region that is desperately in need of economic development.

I would like the USFS to further encourage the commitment of Resolution Copper to continue their work to mitigate the environmental, social and economic development impacts of the project. I fully understand and support efforts to properly complete the multi-faceted and important effort that should not be hindered in any way.

The project would continue, unimpeded, to evolve and expand its partnership with local communities to assure the region and the State are prepared to take full advantage of the opportunities this project will bring.

I appreciate the thoughtfulness shown by the US Forest Service to review this project's development on federal land. It's continued development and ultimate operation is critical to the future of Arizona.

Comment ID: 934
Response: H51

Comment ID: 2052
Response: MH

---

**Letter 299 is a duplicate of letter 817**

Arizona House of Representatives

Phoenix, Arizona 85007

August 20, 2019

Resolution EIS Comments
Tonto National Forest, United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

To Whom It May Concern:

I have been following the proposed Resolution Copper Project in Superior, Arizona for many years and was pleased to see the expected draft EIS release for comment. I know this project will have a large economic impact to the district which I represent and Pinal County.

The draft EIS is a great example of how the National Assessment of how NEPA process can be done in a manner that engages the community extensively and sees feedback to shape a mining project. I have been impressed with the process in detail to properly analyze and manage this project with people in the Copper Corridor. I support this project I intend the road.

The project represents an incredible opportunity for the district to with large investment and State of Arizona. I am encouraged to see that anticipated economic benefits have been realized and that an impact of the proposed mine has been thoroughly analyzed in the draft EIS. I am especially supportive of this preferred tailings alternative and would like to see principles included in the draft camp tailings storage facility.

I appreciate you including my comments in the draft EIS process. I look forward to following this process and hope it can be resolved expeditiously.

Sincerely,

State Representative, District 8
Speaker Pro Tempore
Member - House Ways & Means Committee
Member - House Education Committee
Member - Natural Resources, Energy & Water Committee

Comment ID: 2051
Response: AT30

Comment ID: 2992
Response: MH

---

Letter ID: 3027 (Page 2 of 2)
Format: Submitted by webform, 11/12/2019
Sender:
Cesar Chavez
Arizona House of Representatives
Contact Info:
cchavez@azleg.gov
Content:

I would also like to voice my support of the preferred alternative tailings storage facility skunk camp. This location not only reduces the project's impact on public lands but also help protect local communities from undue negative socioeconomic impacts that could arise from being in close proximity a significant facility such as this.

Thank you for your consideration of these important comments during the development of the Final Environmental Impact Statement.

Sincerely,

Representative Cesar Chavez

Comment ID: 300762
Response: AT30

---

Thank you for the opportunity to provide these important comments during the development of the DEIS comment period.

Sincerely,

Regina E. Cobb
AZ State Representative
Region 4, Cobb

Appendix R

R-50

Arizona State Senate

Arizona State Senate

Arizona House of Representatives

Comment ID: 202-1
Response: 101

Comment ID: 203-1
Response: 101

Comment ID: 204-1
Response: 101

Appendix R

**SENATOR KAREN FANN**
1700 WEST WASHINGTON, SUITE 8
PHOENIX, ARIZONA 85007-2934
CAPITOL PHONE: (602) 926-5874
TOLL FREE: 1-800-352-8404
kfann@azleg.gov

COMMITTEES:
RULES
CHAIRMAN

October 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

As President of the Arizona State Senate, I want to express my support for the Resolution Copper project and for the USFS to quickly complete the Final Environmental Impact Statement and Record of Decision in favor of this project.

> Comment ID: 1049-1
> Response: NS1

In my duties as president of the Arizona State Senate, I help oversee the state budget and care for the fiscal management of the state of Arizona. A project like this will be immensely important to the healthy financial state of Arizona. Additionally, the project remains an extraordinarily important opportunity to the State of Arizona and United States of America as it provides a long-term supply of copper and potentially a number of critical minerals.

This project will help stabilize Arizona's economy throughout lean times in future years and therefore it is one of the most important projects we have before us today. I wholeheartedly support this project and look forward to the responsible mining that Resolution Copper will preform for many years to come.
I am grateful to submit comment at this point in the NEPA process for the Resolution Copper project.

Sincerely,

*Senator Karen Fann*

President Karen Fann
District 1
Arizona Senate

---

**SENATOR DAVID GOWAN**
1700 WEST WASHINGTON STATE 200
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5154
dgowan@azleg.gov

COMMITTEES:
CHAIRMAN
Natural Resources
Water and Agriculture
Federal Relations

October 16, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I am in full support of the Resolution Copper project moving forward and encourage the United States Forest Service to quickly complete the Final Environmental Impact Statement under NEPA.

I have a few comments I would like the Forest Service to consider under NEPA.

- The approval process has been transparent and has actively sought the involvement of the community and other external stakeholders.
- I strongly encourage the USFS to maintain the planned 90-day public comment period and not consider any extensions.
- The USFS should be applauded for identifying a tailings storage facility alternative that addresses the majority of public concerns.
- The economic impacts highlighted in the material illustrate the critical need to have this project up and running without delay.

Thank you for the opportunity to comment during the development of the Environmental Impact Statement for the Resolution Copper Project. Completing the Final Environmental Impact Statement is critically important to our mining sector, our local economies and our state as a whole.

Sincerely,

*David M. Gowan*

David Gowan
Arizona State Senate
Legislative District 14

> Comment ID: 1017-1
> Response: NS1

---

*Arizona State Senate*

Senator Sine Kerr
Arizona State Senate
Legislative District 13

Committees
Water & Agriculture Committee, Chair
Natural Resources & Energy, Vice Chair
Transportation & Technology
Joint Committee on Capital Review
Appropriations

October 16, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth,

As a member of the Arizona Senate, I am always eager to learn about businesses in Arizona and the positive impact they will have on our state. Resolution Copper is a company that will provide a huge economic boost to our economy and I am glad they are located in Arizona. I come from a dairy background and have traveled the state and understand that economic development in rural Arizona is important. This project would be very helpful and important for rural Arizona. Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project

> Comment ID: 1018-1
> Response: NS1

I look forward to the economic boost it will provide to Arizona, but particularly rural AZ. I am excited to see what the economic impact will be. When I think about the future of our state finances, a project like this will be important to provide the resources to have a stable healthy economy for years to come. These resources can then be poured back into our economy in other areas where they are desperately needed. I hope the review process is quick and efficient. These are the types of projects we need in Arizona.

I understand there is several thousand construction jobs and more than 1,500 permanent jobs created by the project's development.

Thank you for your consideration of these comments and questions.

Sincerely,

*Sine Kerr*

Senator Sine Kerr
Senate District 13 | Chair – Water & Agriculture Committee

---

October 18, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I write to express my support for the Resolution Copper mining project and for the USFS to quickly complete the Final Environmental Impact Statement and Record of Decision in favor of this project.

> Comment ID: 1046-1
> Response: NS1

It is evident in the draft EIS that the USFS has done a thorough and independent analysis of the project. The project is an extraordinarily important opportunity to the State of Arizona and United States of America as it provides a long-term supply of copper and potentially a number of critical minerals.

The economic development and job creation that comes with the development of a project of this scale is critical to copper triangle, the east valley and the state as a whole cannot be overlooked or undervalued in this process. An $8 billion investment and the creation of 1,500 permanent jobs would result in significant economic development, employment, and much needed revitalization of the region. Further, I was pleased to see through this process it was determined there were no anticipated negative impacts to the water supply for communities inside and outside of the region.

Thank you for the opportunity to comment at this critical point in the NEPA process for the Resolution Copper mine project. It is a project that will have a positive multi-generational impact on our state and should be approved as quickly as possible.

Sincerely,

*Eddie Farnsworth*

Senator Eddie Farnsworth, President Pro Tempore LD12.

Appendix R

**SENATOR RICK GRAY**
Majority Leader
1700 WEST WASHINGTON, SUITE 209
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5413
TOLL FREE: 1-800-352-8404
rgray@azleg.gov

DISTRICT 21

**Arizona State Senate**

**SENATE COMMITTEES**
Education
Health
& Human Services
Judiciary
Vice-Chairman
Rules
Vice-Chairman

November 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

As the Arizona Senate Majority Leader, I am grateful to businesses that want to be located in Arizona. Resolution Copper is a special business that I am glad is working responsibly and diligently on their project in Superior, AZ. This is a company that will provide a huge economic boost to our economy, and it will be especially beneficial for rural Arizona.

> Comment ID: 1145-2
> Response: NS1

I look forward to the economic boost it will provide to Arizona. I am pleased to see the economic impacts the project will have on Arizona. When I think about the future of our state finances, a project like this will be important to provide the resources to have a stable healthy economy for years to come. The resources can then be poured back into our economy in other areas where they are desperately needed. I understand there will also be several thousand construction jobs and more than 1,500 permanent jobs created by the project's development.

Putting together the state budget is always an important task, but thinking about the economic success that a project the Resolution Copper would bring to Arizona makes my job a lot easier. These are the types of projects we need in Arizona. I hope the review process is quick and efficient.

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project.

Sincerely,

Rick Gray
Senate Majority Leader

---

**Arizona State Senate**

November 6, 2019

Resolution EIS Comments
P.O. Box 34468
Phoenix, AZ 85067-4668

To Whom It May Concern:

Thank you for the opportunity to submit written comments regarding the proposed Resolution Copper Mine in Superior, Arizona. As the State Senator for Legislative District 8 which is the district in which Resolution Copper resides I have a particular interest in seeing the project and land exchange move forward. This single project will have one of the largest economic impacts to our State in the modern era, both in the construction phase and once operational. The economic and social impact to our local economies, Pinal County and the State is a game changer. And for that reason, I am in full support of Resolution Copper mining project and land exchange.

> Comment ID: 1312-1
> Response: NS1

As part of the Final Environmental Impact Statement I would like the U.S. Forest Service to more holistically describe how tax revenue from concentrate tolling will be distributed within the Arizona educational system and how property taxes for residents within Pinal County will be impacted.

> Comment ID: 1312-2
> Response: SO14

I also Understand that Resolution Copper is assisting the local government, schools, and Chambers of Commerce to prepare for a balanced economy, can you ensure that the Final Environmental Impact Statement acknowledges the opportunities which are on the brink of being realized through these efforts. These opportunities include a business incubator, increased outdoor recreation and tourism, a new hotel, and completion of a multi-generational center. Finally, it is critical that funding commitments from Resolution Copper be made clear in the Final Environmental Impact Statement such that momentum toward taking full advantage of these opportunities continues. Shared success in this project is critical to ensure the Town of Superior realizes a sustainable and vibrant economic environment.

> Comment ID: 1312-3
> Response: NS1

I appreciate your consideration of these important issues and for their inclusion in the Draft Environmental Impact Statement process. I look forward to following the progress of this important permitting process and request that the Final Environmental Impact Statement be developed without further delay.

Sincerely,

State Senator Frank Pratt

---

DAVID BRADLEY
ARIZONA STATE SENATE
1700 WEST WASHINGTON
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5262
rgray@azleg.gov

DISTRICT 10

SENATE MINORITY LEADER

October 21, 2019

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

To whom it may concern:

Thank you for the opportunity to comment on the Resolution Copper land exchange Draft Environmental Impact Statement. I commend the dedication, professionalism and due diligence with which the Tonto National Forest team has conducted itself during this process.
As an Arizona State Senator and Minority Leader in the Senate, I am proud to represent many economic, cultural and environmental interests across our great state. I am grateful that the Tonto National Forest has studied all aspects of this project, including the tribal impacts. I urge the continued consideration of tribes' interest in this process.
Education issues are at the forefront of policy discussions at the Capitol and are of critical importance to the future of our state I am very pleased to see the commitment and significant financial contributions Resolution Copper has made to the local school systems to support STEM and robotics education. Their apprenticeship program provides full-time employment and secondary education for participants as well as their scholarship program awarding over $600,000 to local and Native American students illustrates the dedication they have to working with the local community to ensure their inclusion in the success of this project.
For these reasons, and many more, including the positive economic impact to our state I am anxious to see the process continue and have the issues discussed and addressed to meet the concerns of all the interested parties.

> Comment ID: 1065-1
> Response: NS1

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Dave Bradley

David Bradley

---

**Senator Sylvia Allen**
Arizona State Senate
District 6



**Arizona State Senate**

**Committees:**
Education, Chairman
Health & Human Services
Natural Resources & Energy
Water & Agriculture

October 28, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project. It is my hope that the United States Forest Service acts quickly to complete the Environmental Impact Statement for this project, which I support wholeheartedly.

As a State Senator living in a community immediately adjacent to the project and a lifelong advocate for the wise stewardship of our State's precious natural resources, I can say without a doubt that this project has and will continue to live up to the commitments Resolution Copper has made to the community. I was pleased to see items like the economic impacts of the project detailed in the Draft EIS as I reviewed the material.

This project is vital to not only our economy but to our national security. Relying on the domestic production of copper and other crucial minerals is critically important to our military for the future of our country.

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement. It is my hope that this project will continue to move along the project timeline in the most expeditious manner. Our local communities are waiting anxiously for the jobs and economic opportunities that are so critically needed in this part of our state.

> Comment ID: 318-1
> Response: NS1

Sincerely,

Senator Sylvia Allen
Legislative District 6

1700 West Washington Street, Room 303 • Phoenix, AZ 85007 • Phone: 602-926-5409
Toll free: 1-(800) 352-8404 x65409 • Email: sallen@azleg.gov

Appendix R



DEPARTMENT OF THE ARMY
U.S. ARMY CORPS OF ENGINEERS, LOS ANGELES DISTRICT
3636 N. CENTRAL AVE, SUITE 900
PHOENIX, AZ 85012-1939

-2-

November 7, 2019

SUBJECT: Draft Environmental Impact Statement for Resolution Copper Mine (Corps file No. SPL-2016-00547)

Neil Bosworth, Forest Supervisor
Tonto National Forest
2324 East McDowell Road
Phoenix, AZ 85006

Dear Mr. Bosworth:

I am writing in regard to the recently released Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. As the public review period for the DEIS draws to a close, I wanted to provide a brief response to you and your team regarding the DEIS, particularly as it relates to the Clean Water Act Section 404 permitting process for this project.

The U.S. Army Corps of Engineers (Corps) is a cooperating agency for this project under the National Environmental Policy Act (NEPA) for development of the environmental impact statement (EIS) and will use this EIS as support a decision for issuance of a Section 404 permit. Corps staff have participated in the development of the DEIS and will continue to be a part of the NEPA process through publication of the final EIS. For this reason, we do not have any formal comments to submit on the DEIS. We will continue to remain engaged with your staff as the process progresses to share information, address issues as they come up, and refine the analysis for this project as they relate to the permitting process.

Lastly, I wanted to specifically mention my appreciation to you and your project team for the manner in which they have worked with my staff on this project. This is a very demanding and complicated project, but the process has been made less difficult by the sense of teamwork, effective communications, and offers of technical assistance conveyed by your team. We look forward to continuing our relationship with your agency.

If there is anything we can do to be of further assistance on this project, please contact me or Michael Langley, the Corps's project manager for this project.

Sincerely,

Sallie Diebolt
Chief, Arizona Branch
Regulatory Division

CC: Mary Rasmussen, TNF

---

COMMENT RESOLUTION FORM

| Reviewer/ Agency | Chapter/ Section | Page | Comment/Change | ID Team Action/ Response |
|---|---|---|---|---|
| K. Ryan/ BLM | ES-14 & 11 & 15-2 | ES-4 & 34 & 14 | Statements such as "Because Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the USACE is relying on this EIS to support a decision for issuance of a Section 404 permit" could be misconstrued that no other NEPA procedures and/or documents would be necessary.

The NDAA, at Section (c)(3)(B) states that..."the Secretary [of Agriculture] shall prepare a single environmental impact statement under [NEPA] which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations..." The NDAA goes on at Section (c)(5)(B) to state that "Nothing in this paragraph precludes the Secretary from using separate environmental review documents prepared in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or other applicable laws for exploration or other activities not involving— (i) the land exchange; or (ii) the extraction of minerals in commercial quantities by Resolution Copper on or under the Federal land"

Although it is true that, through the NDAA, Congress has directed the Secretary of Agriculture (and the Forest Service) to prepare a single EIS as the basis for decisions under Federal law, there is nothing that precludes the Secretary (of Agriculture)—or any other Federal agency—from using separate (supplementary) compliance review and procedures in accordance w/applicable laws. | Comment ID: 2016S-1 Response: 1-EPA3 |
| F. Mendoza/ BLM | ES-15 | ES-5 | Add: The EIS needed to inform decisions on the potential environmental consequences of land use authorizations across BLM lands for project features (pipelines, access roads) considered under Peg Leg Alternative. | Comment ID: 2016S-2 Response: 1-EPA3 |

---

| Reviewer/ Agency | Chapter/ Section | Page | Comment/Change | ID Team Action/ Response |
|---|---|---|---|---|
| F. Mendoza/ BLM | | ES-9 | Categories of issues don't explain what the issue is, suggest issue statements be included in this section | Response: DOC1 |
| Murray/ BLM | ES | 11 | Figure ES-2 – Figure should be modified to indicate the White Canyon Wilderness (per the AZ Desert Wilderness Act of 1990) not ACEC. | Comment ID: 2016S-4 Response: DOC1 |
| Murray/ BLM | ES | 13 | Last Sentence – should indicate amount or percentage of seepage collected, as this sentence reads now it appears that all the seepage is captured by the well field, but according to Table 3.7.1-7 more than 19,000 acre-feet are lost to the aquifer after seepage controls. | Comment ID: 2016S-5 Response: CA5 |
| K. Ryan/ BLM | ES-3.12 | ES-26 | The cultural resources analysis is flawed and, therefore, the conclusions are incorrect. The alternatives analysis is not a 1:1 comparison because most of the Alternative TBF footprints have yet to be fully inventoried. The Forest Service needs to either 1) complete the cultural resources inventories as indicated in Section 2.5 (pg 121), or 2) perform a new analysis based on known site densities (cultural resources historic properties per acre) as derived from current, valid inventory data.

The current level of inventory per Alternative must be accounted for and disclosed, regardless of the method applied. | Comment ID: 2016S-6 Response: 2016S-6 Response: DOC1 |
| F. Mendoza/ BLM | 1.5.2 | 14 | The Appleton Whittell Offered Parcel would be added to the LCNCA, not the Dripping Springs Parcel, need correction | Response: DOC1 |

Appendix R

R-54

Appendix R

Appendix R

Appendix R

Appendix R

Appendix R

Appendix R



Appendix R

**United States Department of the Interior**

OFFICE OF THE SECRETARY
Office of Environmental Policy and Compliance
333 Bush Street, Suite 515
San Francisco, California, 94104

In Reply Refer To:
100354

*Filed electronically*

Neil Bosworth
Forest Supervisor
2324 East McDowell Road
Phoenix, AZ 85006

Subject: Draft Environmental Impact Statement Resolution Copper Project and
Land Exchange, dated August 2019

Dear Mr. Bosworth:

The United States Department of the Interior (Department), through the Bureau of Reclamation (Reclamation) has reviewed the *Draft Environmental Impact Statement, Resolution Copper Project and Land Exchange, dated August 2019*. The Department notes that you are proposing to construct elements of the project in or adjacent to land withdrawn for Reclamation project purposes. The withdrawn land occurs in the Queen Creek area and along the Gila River (see attached withdrawal orders). Alternatives 2-6 of the DEIS propose to construct mine infrastructure in the existing Magma Arizona Railroad Company Corridor. As proposed, this infrastructure would be constructed across Reclamation withdrawn land set aside for the Salt River Project. Additionally, Alternative 5 (East and West options) proposes a tailings transport corridor and holding facility south of the proposed mine, near the Gila River. The proposed tailings holding facility would be located directly adjacent to the southern portion of Reclamation's withdrawn land. The proposed tailings transport corridor would cross this withdrawn land along the Gila River. Please see specific comments and documentation in the attachment and enclosures.

Reclamation requests a meeting with the Forest Service to discuss the proposed action and any potential impacts to withdrawn lands. Please contact Sean Heath with Reclamation at sheath@usbr.gov or at 623-773-6250 if you have questions regarding these comments and to

[Comment box:]
Comment ID:
1121-1

Response:
NEPA49

schedule the meeting. Please contact me at janet_whitlock@ios.doi.gov or at (415) 420-0524 with all other questions.

Sincerely,

Janet L. Whitlock
Regional Environmental Officer

Attachment
Enclosures

Cc
Sean Heath, USBR
Lisa Treichel, DOI

---

Draft Environmental Impact Statement Resolution Copper
Specific Comments from the Bureau of Reclamation, Phoenix Area Office

| Cmt # | Chapt. or | Page | Comment |
|---|---|---|---|
| 1. | 2 | 67 | Alternative 2 – Near West– Southern portion of the tailings disposal facility would overlap onto lands withdrawn for Reclamation for the Salt River Project. Mine infrastructure within the existing MARRCO corridor also would be constructed over Reclamation withdrawn land. |
| 2. | 2 | 75 | Alternative 3 – Near West Ultrathickened – See Comment #1 |
| 3. | 2 | 81 | Alternative 4 – Silver King – Tailings/MARRCO corridor overlaps Reclamation withdrawn land. |
| 4. | 2 | 88 | Alternative 5 – Peg Leg East/West – Tailings conveyance route (Both East and West Tailing Corridor Options) and MARRCO corridor overlaps Reclamation withdrawn land.<br><br>East and West tailings corridor option to southern tailings holding facility will cross land withdrawn for use by Reclamation for the Buttes Dam and Reservoir project. This withdrawn land was the subject of a letter sent in August 2017 from Reclamation (Phoenix Area Office) to the Forest Supervisor of Tonto National Forest. |
| 5. | 2 | 94 | Alternative 6 – Skunk Camp (Preferred Alternative) – Tailings conveyance route (Both East and West Tailing Corridor Options) and MARRCO corridor overlaps Reclamation withdrawn land. |

2

3

Appendix R

R-62







UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 9
75 Hawthorne Street
San Francisco, CA 94105-3901

November 1, 2019

Ms. Mary Rasmussen
United States Forest Service, Tonto National Forest
Resolution EIS Contact
Post Office Box 34468
Phoenix, AZ 85067-4468

Subject: Draft Environmental Impact Statement for the Resolution Copper Project and Land
Exchange, Pinal County, Arizona (EIS No. 20190039)

Dear Ms. Rasmussen:

The U.S. Environmental Protection Agency has reviewed the above-referenced document pursuant to
the National Environmental Policy Act (NEPA) and our independent authority under Section 309 of the
Clean Air Act. The EPA provided scoping comments on July 18, 2018 and accepted the U.S. Forest
Service's invitation to serve as a Cooperating Agency under NEPA on July 26, 2017. As a Cooperating Agency, the EPA has participated
in interagency workgroups, reviewed administrative draft documents, and provided comments on technical documents and preliminary drafts of the subject Draft EIS.

We appreciate the opportunity to review and provide recommendations on earlier draft analyses in
support of the EIS and the Clean Water Act Section 404 Permitting process. We also appreciate the
interagency workgroups hosted by Resolution Copper, with the EPA, United States Army Corps of
Engineers, and USFS to achieve the EPA comments on the Draft EIS. The EPA provided
alternatives analyses identified in early coordination. We look forward to working collaboratively to
address concerns for the Draft EIS analysis reflected in this letter and the enclosed detailed comments.

The Draft EIS evaluates the potential impacts associated with USFS approval of the modified General
Plan of Operations for mining of the Resolution Copper Mine deposit and a legislatively mandated land
exchange of Federal and private parcels in southeastern Arizona. In addition to analyzing the
environmental impacts of the land exchange and mining operations, the Draft EIS analyzes the
alternatives for a tailings storage facility (TSF), including "Alternative 6 – Skunk Camp," which is the
USFS's preferred alternative and the site of the company's proposed TSF for purposes of Clean Water
Act 404 Permitting by the USACE. As proposed, the Skunk Camp TSF would require a facility footprint
of 4,000 acres in the Dripping Spring Wash watershed and a total of 16,016 acres disturbance from
both tailings pipeline route options, including the conveyance and storage of an estimated 1.37 billion
tons of tailings material. The Draft EIS analyzes impacts to approximately 13 trout segments of jurisdictional
waters in the watershed. Approximately 14 miles of perennial streams to the Gila River. The EPA has significant concerns regarding the
USACE intends to rely on the EIS for required NEPA compliance for CWA Section 404 permitting, per

Appendix R

the legislatively mandated single environmental analysis for all federal approvals, permitting, and land exchange that are required as a part of the proposed project[1]

Comment ID: 524-1 Response: ALT22

**Information to Analyze Impacts from the USFS "preferred alternative"**

Additional baseline hydrogeologic and water quality information for the preferred alternative is needed to fully analyze and disclose the potential impacts of the proposed mining project and related conveyance and storage of approximately 1.37 billion tons of tailings. This information is critical for informing decisionmakers and the public about the potential environmental impacts of the proposed project. For the analyses in the Draft EIS, the USFS relies on assumptions that are informed by evaluation of other sites, but have not been verified for the preferred alternative. It is the EPA's understanding that much of the site-specific information needed for the preferred alternative is currently being gathered and would be analyzed for the Final EIS. Verification of assumptions presented in the Draft EIS are needed to confirm that estimated impacts are not substantively different, or greater, than currently disclosed in the Draft EIS. Recommendations for verifying and gathering baseline data are included in the enclosed detailed comments.

**Impacts to Jurisdictional Waters of the U.S. and Mitigation**

Comment ID: 524-2 Response: MIT27

The potential direct, indirect, and cumulative impacts to aquatic resources from mining operations, conveyance, and storage of tailings at the preferred site, "Skunk Camp," as well as plans for how those impacts will be mitigated, are not fully analyzed in the Draft EIS. While USFS has identified that Skunk Camp has the potential to avoid other significant impacts and catastrophic tailings failure risk associated with alternative sites in the Queen Creek watershed, the Skunk Camp site would involve direct fill of 120 acres of jurisdictional waters. Alternative sites in the Queen Creek watershed would not have any direct fill impacts to jurisdictional waters. A functional assessment of the value and potential impacts to "special aquatic sites" (40 CFR 230 – Subpart E). A functional assessment of the value of all jurisdictional waters potentially impacted by the project, as well as for the value of mitigation, is needed to show that the mitigation could offset any unavoidable impacts. Further, accurate analysis of potential impacts to water quality, based on site-specific baseline data, is needed to support a decision on a potential CWA Section 404 Permit.

**Impacts common to all action alternatives**

Regardless of action alternative selected, according to the Draft EIS, the congressionally mandated land exchange of the Oak Flat Parcel will result in permanent loss of federal protections for the National Registry of Historic Places-listed Historic District Traditional Cultural Property at Oak Flat, Chʼichʼil Biłdagoteel, and its NRHP sites and one Traditional Cultural Property. There will also be adverse effects to sacred places, springs, and loss of access to ceremonial areas and an acorn-collecting area.

Underground mining beneath Oak Flat would result in the eventual formation of a subsidence crater approximately 800–1,115 feet deep and approximately 1.8 miles in diameter that would permanently

[1] According to the National Defense Authorization Act authorizing the land exchange, "[p]rior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."

---

impact and prevent access to the NHRP District and sacred cultural areas. Significant adverse effects to these resources cannot be fully mitigated. Subsidence will also cause permanent fundamental changes to watersheds and to the underlying geology and deep groundwater regional aquifers. This will impact several groundwater-dependent ecosystems, resulting in an annual average loss of 3.5% of perennial flow at the mouth of Devil's Canyon and in Queen Creek at Whitlow Ranch Dam, as well as reductions in flow to eight springs. Combined with groundwater pumping required for mining, groundwater levels in the region are estimated to be reduced by at least 10 feet over an approximately 50 square-mile area 200 years after mining begins, with further reductions expected after that time. In the enclosed detailed comments we provide recommendations for changes to mitigation triggers in the 2019 "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells" to improve the effectiveness of mitigation plans in maintaining groundwater-dependent ecosystems.

Specific recommendations to resolve these inadequacies of the document and other concerns or recommended clarifications for the analysis that can be addressed in a Final EIS are included in EPA's Detailed Comments attached as an enclosure. EPA remains available to work with the USFS, the USACE, and the project proponent to resolve the issues that we have identified. We note that effective October 22, 2018, the EPA no longer includes ratings in our comment letters. Information about this change and the EPA's continued roles and responsibilities in the review of federal actions can be found on our website at: https://www.epa.gov/nepa/epa-review-process-under-section-309-clean-air-act. If you have any questions, please contact me at (415) 947-4161, or Hugo Hoffman, the lead reviewer for this project, at 415-972-3929 or hoffman.hugo@epa.gov.

Sincerely,

Connell Dunning, Acting Manager
Environmental Review Branch

Enclosures: EPA's Detailed Comments

cc (via email): Neil Bosworth, Forest Supervisor, Tonto National Forest
John Scaggs, Tonto National Forest
Sallie Diebolt, Army Corps of Engineers
Michael Langley, Army Corps of Engineers
Jayne Loyer, Bureau of Land Management
Jeff Humphrey, U.S. Fish and Wildlife Service
Wayne Harrison, Arizona Department of Environmental Quality, Groundwater Protection
Resi Sherrill, ADEQ, Surface Water Section
Daniel Czechlinski, ADEQ, Air Division
Michael Sundblom, Pinal County Air Quality Control District
Vincetta Kartha, Arizona Department of Water Resources
Lisa Atkins, Arizona State Land Department
Jay Cook, Arizona Game and Fish Department
William Schifferns, Arizona State Mine Inspector

3

---

**EPA DETAILED COMMENTS ON THE RESOLUTION COPPER PROJECT AND LAND EXCHANGE DRAFT ENVIRONMENTAL IMPACT STATEMENT, PINAL COUNTY, ARIZONA – NOVEMBER 1, 2019**

**Mandated "Single Environmental Impact Statement" for NEPA, Land Exchange, and Permitting**

In December 2014, Congress authorized a land exchange pending completion of the environmental impact statement (EIS), as outlined in Section 3003 of the National Defense Authorization Act (NDAA) for fiscal year 2015. The exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also the National USFS lands above the copper deposit. This collective 2,422-acre tract of land is known as the "Oak Flat Federal Parcel." According to the NDAA, "[p]rior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." The Draft EIS explains that "[b]ecause Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the USACE is relying on this EIS to support a decision for issuance of a Section 404 permit.

The USFS's "preferred alternative", Alternative 6, would involve direct fill of approximately 120 acres of largely undeveloped and high functioning waters of the U.S. The Draft EIS explains that "[w]hile most of the impacts considered under the USACE process are identical to those considered in this EIS, some impacts considered under the USACE process are specific only to that permitting process, which may have a different scope of analysis than the EIS. Because of these differences, the 404(b)(1) alternatives analysis is a document strongly related to the EIS, but also separate. Accordingly, the 404(b)(1) alternatives analysis is attached to the EIS as appendix C."

Comment ID: 524-3 Response: MIT27

Although Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the document does not contain a CWA Section 404(b)(1) alternatives analysis to support a USACE's permitting decision, nor does it include an adequate analysis of the full scope of impacts to waters of the U.S., or a compensatory mitigation plan sufficiently detailed to show how impacts to waters of U.S. could be offset. Appendix C is titled a "Practicability Analysis in Support of Clean Water Act 404(b)(1) Alternatives Analysis." A practicability analysis, by itself, is an initial step in a CWA Section 404(b)(1) Alternatives Analysis and not adequate to determine a preliminary Least Environmentally Damaging Practicable Alternative as is needed at this stage of the federal environmental analysis for the USFS's preferred alternative.

*Recommendation:* Since a single EIS must serve as the basis for all federal decision-making on the project, confirm that the EIS includes adequate information to support a decision on a CWA Section 404 Permit, including a complete 404(b)(1) Alternatives Analysis sufficient to demonstrate compliance with EPA's Guidelines administered by the USACE. Please also see EPA's November 1, 2019 comments to USACE on Public Notice (PN) 2016-00547-MWL for the proposed Resolution Copper Mine Tailings Storage Facility Project, Resolution Copper Company, Superior, Arizona.

1

---

**Inadequate Site Characterization and Water Quality Impact Predictions for the "Preferred Alternative"**

The Draft EIS presents predicted impacts to surface water and groundwater quality from tailings storage seepage based on the current level of tailings facility design and environmental baseline data; however, essential baseline hydrogeology for Alternative 6 is either substituted with data from the Near West location, inferred from desktop exercises, incomplete, or outdated. This information is needed to accurately analyze potential environmental impacts to water quality for the purposes of NEPA. The EPA understands that this baseline data is being gathered and would be used to inform reclamation and closure plans as well as to refine impact modeling for the Final EIS.

This substitution, along with missing data on potential preferential flow paths for Skunk Camp, could mean that actual impacts to groundwater and surface water quality could be substantially different than currently predicted and could result in exceedances of water quality standards. Given the differences between alternatives in topography and proximity to downstream perennial waters, the USFS concludes that potential impacts to water quality from the Skunk Camp alternative could be more easily controlled; however, this simple ranking of the available alternatives cannot substitute for a full analysis and disclosure of the potential impacts from the "preferred alternative" as these impacts could still be unacceptable and, based on an accurate analysis of impacts, design changes to mitigate impacts may need to be developed, including changes that could require more direct fill of jurisdictional waters than currently estimated.

*Recommendation:* Obtain site-specific hydrogeologic characterization for the Skunk Camp alternative and update tailings seepage modeling and related predictions for impacts to surface water and groundwater. Summarize site characterization, baseline environmental conditions, and updated site-specific environmental impact analyses and confirm that this information has been used to inform the analysis of impacts. Baseline data needed for accurate water quality impact modelling includes:

- *Hydrogeologic characterization:* major fault locations, underlying rock and soil permeability, potential preferential flowpaths (such as Dripping Spring fault, which would run roughly through the centerline of the facility and appears to extend downstream of the embankment), alluvium thickness, and verification of the assumptions about site hydrogeology in the facility design[3] and seepage estimates,[4] including the size and extent of shallow aquifer units[5] and whether groundwater at the site is connected to the Ray Mine.
- *Geologic Characterization:* lithology and mineralogy of rocks, soils, and alluvial deposits; rock unit distribution; bedrock cementation, type and degree; fracture distribution and characteristics; alteration and mineralization, including vertical and

Continued →

[3] Klohn Crippen Berger Ltd. 2018J. *Resolution Copper Project: DEIS Design for Alternative 6 – Skunk Camp. Doc. #* CCC.03.81020-EX010-0000c. Rev 1. Vancouver, Canada: Klohn Crippen Berger Ltd. August 8.
[4] Klohn Crippen Berger Ltd. 2018c. *Resolution Copper Project: DEIS Design for Alternative 6 Skunk Camp, Appendix N Seepage Estimate Amendment.* Doc. # CCC.03.81020-EX-REP-0006 Rev 2. Vancouver, Canada: Klohn Crippen Berger Ltd. January 30.
[5] Gregory, C., and T. Bayley 2018d. *TSF Alternative 6 - Skunk Camp: Life of Mine and Post Closure Seepage Transport Modeling.* Project #: 603.8501. Technical memorandum. Tucson, Arizona: Montgomery and Associates Inc. September 14.

2

Appendix R

**Comment ID: 524-4**
**Response: WT7**

lateral changes; surface-subsurface relationships; topography and slopes; soil cover (depth and type).
- *Hydrologic characterization:* background surface water hydrology and groundwater hydrogeology in the Dripping Spring Wash watershed, Upper Mineral Creek watershed, and adjacent downstream reaches of the Gila River. Assess the condition of the Dripping Springs and Seger Springs within Dripping Spring Wash, as well as their likely source.
- *Existing water quality:* baseline for surface water and groundwater in Dripping Spring Wash watershed, in surface water in the Gila River at the confluence with Dripping Spring, as well as surface water in the Upper Mineral Creek watershed and through to the confluence with Devil's Canyon. Sampling for water quality baseline conditions need to be recent and spatially representative of reaches and aquifer units that could be affected.

Additional recommendations to improve the water quality impact modelling, and suggested clarifications, are included in the section below on *Water Quality Impact Modelling*.

**Inadequate Analysis of Direct and Indirect Impacts to Waters of the U.S.**

The Draft EIS does not include a quantitative estimate of the full scope of direct, indirect, and cumulative impacts to jurisdictional waters of the U.S. for each alternative. This is critical because USFS must prepare "a single EIS under the NEPA."[3] Without analysis of the full scope of impacts to aquatic resources and jurisdictional waters, EPA believes that the EIS cannot support USACE decision-making on a CWA Section 404 Permit. A TSF at "Alternative 6 - Skunk Camp" would potentially impact an estimated 120 acres and approximately 395,215 linear feet of jurisdictional waters, but no estimate of indirect impacts is provided. Two tailings pipeline routes are considered for Alternative 6, a "north" and "south" option, but the potential impacts to jurisdictional waters from each option are not included in the Draft EIS.[4] The Draft EIS includes an estimate of 25.4 acres of wetlands potentially impacted along the USFS's preferred north pipeline option based National Wetlands Inventory information, but no discussion of their jurisdictional status or potential to contain "special aquatic sites" (40 CFR 230 – Subpart E). "Alternative 5 – Peg Leg" would have the potential to directly impact 182.5 acres and approximately 359,084 linear feet of jurisdictional waters. Based on the USACE's 2012 and 2013 jurisdictional determinations, Alternatives 2, 3, and 4 would not directly fill any jurisdictional waters. There are no jurisdictional determinations available for Alternatives 5 or 6.

*Recommendations:* In a Final EIS, or in a complete draft CWA Section 404(b)(1) Alternative Analysis attached as an appendix to the EIS, include the following information missing from the current analysis:
- Analyze and quantify direct, indirect, and cumulative impacts to linear feet and acreage of waters of the U.S., within each class of aquatic resources occurring within the footprint of each alternative, including the conveyance infrastructures. Include information on the type, function/condition of all aquatic resources at the alternative sites. Apply a consistent level of

[3] Section 3093 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015
[4] The USACE's Public Notice for the project includes an estimate of 8 acres of direct and "temporary" fill required for what appears to be the "north" pipeline option in the Draft EIS, but it is not clear how this estimate was developed or how information is included for the "south" option. In addition, there is a discrepancy in the estimates of fill for the "Skunk Camp" tailings facility between the Draft EIS and the PN. The PN estimates 124 acres of fill required for the "Skunk Camp" facility itself

3

---

**Comment ID: 524-5**
**Response: MT27**

analysis across all practicable alternatives to inform whether less environmentally damaging practicable alternatives exist.
- Describe each class of stream within the project watershed area, including information about their functional capacity for supplying, storing, and transporting water, organic matter, sediment, and nutrients. Include assessment of Aquatic Resources for each class of CWA Section 404 Permitting. The plan proposes several mitigation projects at a collection of distinct sites referred to in the Draft Plan individually as the GRIC MAR-5 Recharge Project, Lower San Pedro River Wildlife Area (ISPRWA) In-lieu Fee Project, Oberg Road Restoration Site Project, Queen Creek Project, and Arlington Wildlife Area In-lieu Fee Project. These possible projects are each in different phases of planning, pilot-testing and, in the case of In-lieu Fee (ILF) projects, review by the Inter-Agency Review Team (IRT) of which EPA is a member.
- Provide a description of the current ecological condition of each class of aquatic resource present at the potential impact sites, using aerial imagery and indicator metrics like those used in the California Rapid Assessment Method (CRAM) adapted for Arizona.
- Include detailed information about "special aquatic sites", (40 CFR 230 – Subpart E) where they are present, surveys used to confirm their absence, their connection to upstream and downstream ecosystems, and their current ecological condition.
- Additional details are in our comments to the USACE on their Public Notice for the project.

**Compensatory Mitigation for Impacts to Jurisdictional Waters**

**Comment ID: 524-6**
**Response: MT27**

The Draft EIS includes a "Draft Resolution Copper Project Clean Water Act Section 404 Conceptual Compensatory Mitigation Plan" in Appendix B, based on the assumption that the USACE would identify the Skunk Camp TSF alternative as the *Least Environmentally Damaging Practicable Alternative* for purposes of CWA Section 404 Permitting.

To determine compensatory mitigation requirements, and to determine the value of proposed mitigation elements in offsetting the aquatic resource functions lost due to Alternative 6, a scientifically valid functional assessment is needed for potentially impacted jurisdictional waters and proposed mitigation projects. The proposed mitigation in the "Draft Resolution Copper Project Clean Water Act Section 404 Conceptual Compensatory Mitigation Plan" does not provide detail on the values of aquatic resources in the context of a functional assessment that quantifies mitigation credits and debits for all impacts and potential mitigation projects. As currently proposed, ILFs and mitigation projects have not demonstrated that they would be available or could offset unavoidable impacts.

*Recommendations:* In conjunction with a complete CWA Section 404(b)(1) Alternatives Analysis identifying the *Least Environmentally Damaging Practicable Alternative*, include a revised Draft Clean Water Act Section 404 Conceptual Compensatory Mitigation Plan that demonstrates offsets for unavoidable impacts that remain after all feasible avoidance and minimization strategies are used. The EPA appreciates the commitment in the current Mitigation Plan to utilize the California Rapid Assessment Method (CRAM) to assess the functionality of ephemeral drainages based on relationships between condition and function of these streams. EPA is available to consult with the applicant and the USACE to approve final methodology and application.

4

---

**Mitigation for Impacts to Groundwater-Dependent Ecosystems**

**Comment ID: 524-7**
**Response: MIT1**

Resolution Copper's proposed monitoring and mitigation plan for impacts to seeps and springs and other groundwater-dependent ecosystems (GDEs), titled "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells,"[5] is referenced in the Draft EIS's Appendix J (Draft EIS page J-8). In Section 3 of the Plan, on monitoring, the document briefly describes the intention to deconvolute regional environmental variables (such as climate, "other human causes," fires, etc. from impacts due to mining-related groundwater drawdown. EPA acknowledges that there are numerous environmental variables in addition to mining that might decrease discharge at GDEs. It is important to note that these impacts are, by nature, cumulative. For example, impacts to a spring due, in part, to a period of drought cannot be easily separated from the incremental impact on the spring system due to groundwater drawdown. Deconvoluting the mining signal from the different stresses would need to be a highly nuanced analysis requiring much higher resolution monitoring data than currently exists. The proposed methodology would not be effective in identifying and mitigating only the incremental impact due to mining-related groundwater drawdown.

In Section 3.3 on "Mitigation Triggers," the plan states that mitigation thresholds would only be triggered based on multiple lines of evidence that impacts to GDEs are "caused by mine activities." (page 7). All the GDEs covered by the Plan have been selected because multiple lines of evidence already indicate that there is a high likelihood that dewatering will impact them (connection to bedrock source, within the 10-foot drawdown contour, etc.). Having a sophisticated signal deconvolution methodology, impacts to these GDEs should be assumed to be from mining activities. EPA is concerned that without specific upfront mitigation triggers, needed mitigation may not be initiated. Furthermore, the value of "Level 1" triggers is unclear because they appear to simply require additional monitoring and comparison with reference sites that could also be impacted since they are within the modelled 10-foot drawdown contour.

*Recommendations:* Develop quantitative trigger thresholds for mitigation actions for each GDE based on available baseline monitoring data for flow, water stage (height), and/or vegetation, as appropriate to each individual GDE. Include specific mitigation goals in reference to baseline monitored conditions and criteria by which mitigation success would be evaluated.

As explained in Appendix J, "the plan specifically notes that it is not intended to address water sources associated with perched shallow groundwater in alluvium or fractures." Conceptually, EPA agrees that it is appropriate to exclude perched shallow groundwater in alluvium; however, we do not agree that shallow groundwater associated with fractures and supported by fracture flow should be excluded from monitoring and mitigation. Fracture flow, especially in the Apache Leap tuff and Whitetail conglomerate, may be the dominant discharge mechanism and some fracture systems may be connected over large geographic areas.

[5] Montgomery and Associates Inc. 2019. *Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells*. Tucson, Arizona: Montgomery and Associates Inc. April 12 – Available at https://www.resolutionmineeis.us/sites/default/files/references/montgomery-monitoring-mitigation-plan-2019.pdf

5

---

*Recommendation:* Provide additional detail about the proposed monitoring and mitigation required for the project for regularly flowing GDEs emanating from fractures.

**Water Quality Impact Modelling**

**Comment ID: 524-8**
**Response: WT37**

The Draft EIS explains that, as modelled, groundwater and surface water quality impact predictions are based on assumption that "fractured rock in the collapsed block-cave zone does not contact oxygen and chemical weathering does not supply any chemical load to the sump water" (Draft EIS page 350), and that actual water quality constituent concentrations in the sump could be substantially higher than predicted and summarized in the Draft EIS. To illustrate the potential magnitude of difference in water quality, Table 3.7.2-1 in the Draft EIS shows predictions of block-cave mine water quality for assumptions of less oxidation (Eary 2018[6] and more oxidation (Hatch 2016[7]). The Hatch-predicted concentrations are more than double Eary-predicted concentrations for magnesium, potassium, sulfate, antimony, and thallium; and orders of magnitude greater for aluminum, beryllium, cadmium, chromium, cobalt, copper, iron, lead, manganese, mercury,[?] nickel, selenium, silver, and zinc. While EPA acknowledges that this same magnitude of difference would not be seen in final surface water and groundwater concentrations affected by tailings seepage, if actual conditions result in more oxidation in the block-cave zone and in stockpiled ore than is currently assumed for the Draft EIS, water quality standard exceedances for all action alternatives could be more numerous and significant than currently estimated.

As discussed in Hatch, for the parameters evaluated (i.e. pH, sulfate, copper, and selenium) concentrations of selenium and sulfate are sensitive to oxidation and likely cannot be mitigated by lime amendments, further underscoring the need for an accurate and reasonably conservative assessment of impacts to water quality. Eary's (2018) assumptions for oxidation appear to be based on an idealized mining process schedule that could be delayed for periods over the life of mine, resulting in greater-than-modelled oxidation. Surface water and groundwater quality impacts are likely underestimated and should be updated with a more conservative assumption about the extent of oxidation of fractured rock in the block-cave zone and in ore stockpiles at the surface.

*Recommendation:* Clarify the degree of uncertainty in assumptions about oxidation in the block-cave zone and surface ore stockpiles, including a discussion of the most reasonably conservative oxidation conditions likely to occur. Revise water quality predictions for surface water and groundwater using the more reasonably conservative oxidation assumptions for fractured block-cave rock based on Hatch (2016) or another, more realistic period of oxidation.

From a modeling perspective, the Draft EIS incorrectly evaluates flow conditions based on median flow volumes, thereby overlooking the worst potential impacts to surface water quality as well as the

[6] Eary 2018. *Block Cave Geochemical Model - 2018 Update on Calculation Approach and Results*. Technical memorandum Loveland, Colorado: Enchemica, LLC. June 26.
[7] Hatch 2016. Appendix G: *Final Draft Report: Prediction of Block Cave Water Chemistry*. In *General Plan of Operations, Resolution Copper Mining*. Scottsdale, Arizona: Hatch. January 8.
[?] Table 3.7.2-1 does not report a value for mercury concentrations under Eary conditions, but it is unclear if this was not modelled or omitted for some other reason. The value for mercury under Hatch conditions is not shaded or bolded to show exceedance of the Arizona Aquifer Water Quality Standard as it should since the reported value of 0.018 mg/L is greater than the 0.002 mg/L standard

6

Appendix R

*Recommendation:* Evaluate impacts to stream water quality based on low-flows, critical periods, and strategies for each alternative, including a discussion of the distance/time required and whether seepage management for protecting water quality.

*Post Closure Phase in Mineral Creek*

The current closure of the Alternative 6 – Shrank Camp[a] involves construction of a spillway through the saddle of between Dripping Spring Wash and Mineral Creek basins to convey runoff from about the source and feature of the Alternative to building large closure material, including geotechnical stability evaluations. Given the large magnitude of flood events, a spillway in Mineral Creek that is likely located in the valley flooding, and, according to the Draft EIS, "exhibits potential flows that support riparian galleries and aquatic habitat" (page 310), additional additional detail in the effects to surface water quality and habitat are needed

Appendix R

## Air Quality and General Southwest

**Recommendation:** To meet the goals of industry best practices for tailings safety identified in the Draft EIS, EPA recommends that BHRI reviews continue with public transparency through subsequent design, construction, operation, and closure of the selected tailings alternative.

## Status of General Mining Act Mining Claims

**Recommendation:** Provide information about local consultation between USFWS, USGS, and others that would be used to address possible mitigation measures.

## Established and Filtered Tailings Technology (Option 4) Slurry and Shrink Swamp

**Recommendation:** Include site specific environmental impact analyses based on the design of a particular alternative for Quality Risks (i.e. a BHP 1956).

## Analysis of Tailings Safety and Uncontrolled Failure Risk

**Recommendation:** Include site-specific, environmental impact analyses based on the design of a particular alternative for Quality Risks.

## Cumulative Species

**Recommendation:** Provide information about local consultation between USFWS, USGS, and others that would be used for revising and similar facilities, existing and closure.

Appendix R

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
75 HAWTHORNE STREET
SAN FRANCISCO, CALIFORNIA 94105-3901

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

AN EQUAL OPPORTUNITY EMPLOYER

Ms. Mary Rasmussen
United States Forest Service, Tonto National Forest
Resolution EIS Comment
Post Office Box 34468
Phoenix, AZ 85067-4468

---

Secretary Perdue
Department of Agriculture
Resolution EIS Comments
PO Box 34468
Phoenix, AZ 85067-4468

To Whom It May Concern:

As the representative of Arizona's 4th Congressional District, ranking member of the House Natural Resources Subcommittee on Energy and Mineral Resources and the sponsor of the Southeast **Arizona Land Exchange and Conservation Act**, I am writing to support meaningful completion of the **Final Environmental Impact Statement (FEIS) for the Resolution Copper Project.** The Tonto National Forest (TNF) has proceeded through a thorough and comprehensive analysis of potential environmental impacts in the Draft Environmental Impact Statement (DEIS) and should be prepared to quickly respond to substantive comments on issues set to the Final EIS.

Comment ID:<br>10593<br>Response:<br>HS1

As I have reviewed the Draft EIS and the NEPA process to date, the TNF has gone above and beyond what is typically required, particularly as it relates to the level of public meetings and research with other cooperating and consulting agencies. I strongly support the preferred tailings alternative...

Comment ID:<br>10592<br>Response:<br>AL30

Comment ID:<br>10574<br>Response:<br>HS1

Comment ID:<br>10593<br>Response:<br>HS2

R-67

---

**Congress of the United States**
**House of Representatives**
Washington, DC 20515–0303

October 24, 2019

U.S. Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

**Re: Resolution Copper Draft Environmental Impact Statement Comments**

...

Sincerely,
Andy Biggs
Member of Congress

Comment ID:<br>10293<br>Response:<br>HS1

Resolution is a timely fashion that our nation's ability to solicit investment and provide confidence to international companies...

1. Arizona is home to "The Five C's" which are Cattle, Citrus, Cotton, and, of course, Copper. Please incorporate the importance of Copper in Arizona's history. It has been a founding economic engine and building block to the state's economy...

2. America's national security is of utmost importance and providing for our nation's common defense is one of the responsibilities of the federal government. Copper and molybdenum are of critical importance to a national defense need for supply for major military aircraft and marine vessels. The Resolution Copper project will provide a significant and reliable source of copper and molybdenum...

Comment ID:<br>11974<br>Response:<br>NEPA34

3. The FEIS should acknowledge that the scope of the Resolution Copper mine and deposits of significant national economic importance...

Comment ID:<br>11975<br>Response:<br>SS08

EOR Vol. 2--Page 401

Appendix R

Letter 310 is a duplicate of Letter 1113

Congress of the United States
House of Representatives
Washington, DC 20515-0306

October 29, 2019

U.S. Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

United States Forest Service,

I am writing to provide comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange (Project), released on August 9, 2019. I commend the Tonto National Forest for a thorough examination of potential environmental and social impacts.

I also appreciate your efforts to consult with stakeholders. Tribes and Resolution Copper. That consultation has resulted in a better proposed Project, including the preferred alternative for the tailings storage facility, and a comprehensive National Environmental Policy Act (NEPA) document.

I support a timely completion of the land exchange, the Final Environmental Impact Statement (FEIS) and issuance of all federal approvals required for construction and operation of the Project. I previously voted for H.R. 3979, the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015. This legislation authorized the Land Exchange for this Project in Section 3003, Southeast Arizona Land Exchange and Conservation, and I look forward to seeing its implementation.

As documented in the FEIS, the Resolution Project will provide thousands of high paying jobs and support economic benefits to communities in the Copper Triangle, Maricopa County, Pinal County, Gila County, and State of Arizona of approximately $1 billion annually for decades. I am also encouraged by the ongoing constructive relationship between the Town of Superior and Resolution Copper stakeholders, and I look forward to seeing this continue.

As a co-sponsor of H.R. 2531, the National Strategic and Critical Minerals Production Act, I want to emphasize how important it is that the Project will provide substantial supplies of copper - up to 25% of U.S. copper demand for over 40 years. It will also supply other metals that are necessary for our national defense, economic growth and energy security.

Lastly, please incorporate into the FEIS further details on the importance of copper as a metal critical to our national defense, economic growth and energy security.

Thank you for the opportunity to provide comments on the Draft Environmental Impact Statement.

Sincerely,

David Schweikert
Member of Congress



---

**[Left rotated column — comment text]**

I represent Arizona's 6th Congressional District and am pleased to provide comments on the Draft Environmental Impact Statement (DEIS) for The Resolution Copper Project and Exchange.

I support both the DEIS process as it has been conducted by the Forest Service and the EIS document, which provides a thorough, professional and comprehensive description of the project and the expected environmental and social impacts. The Forest Service has dedicated a substantial effort to working with the public, Tribes, state and local agencies, Resolution Copper and other stakeholders to identify issues, gather and evaluate environmental data and consider alternative configurations for the major components of the project. I concur with the selection of a preferred location for the tailings facility at Hereford Forest System Lands. There is wide public support for that alternative location and I also support that decision.

Response ID: 325
Comment ID: 11053

---

The Resolution copper ore deposit is a world class resource. The FEIS should acknowledge that the size and scale of this deposit are important to the strategic and economic importance of the project. The Resolution ore body is one of the largest and highest-grade undeveloped copper deposits in the world and it provides a source of copper that is essential to supply our national security needs. The economic benefits disclosed in the DEIS are within any private investment in the state of Arizona today – thousands of jobs and billions in economic benefits over decades. The economic benefits disclosed in the DEIS include the purchase of goods and services being a much needed and long lasting positive economic benefits to the local Copper Triangle communities, Pinal County, Maricopa County and the state.

Comment ID: 11052          Response: ALX20
Comment ID: 11051          Response: 551

---

Late Air Force base is in my district. Copper plays a critical role in the materials needed to build military aircraft to protect our nation and the men and women who serve in our armed forces. The Resolution project would provide a secure and stable supply of copper from a source that is our national security.

During my nine years in the Arizona State Legislature, I spent time on site touring the Resolution Copper Project and working with employees and contractors. I was impressed with the extremely high level of attention and dedication demonstrated by the workforce and surrounding communities. The commitment to environmental stewardship by the company and by its employees is impressive. I appreciate a clear statement that describes the critical and strategic role copper plays in our national security.

Comment ID: 11053          Response: 551

---

[Continued]

---

**Mine Related Demand for Public Service**

The Socioeconomic section lacks a proven methodology for estimating accurate costs and benefits. As a result, the socioeconomic analysis in Section 3.13 is widely negative in tone. Please address the following:

• The analysis assumes an increase in costs of 50% a law Iron, yet the 3 arce report overlooks only a 41% increase in population. There is a rational expectation that Town costs would be highly symbolized with any potential increase in public. Revidence was presented that various estimations of fixed services, (therefore requiring some) of higher levels of maintenance.) However, the Socioeconomics section already addresses costs related to expected increases in direct maintenance and shows that new Town of Superior (Iowa) revenues will exceed these costs. Addressing street maintenance issues in those separate sections should be considered obvious. It means the reader be enable to count this impact, when in the see this you fee already been introduced through tax benefits.

Comment ID: 11151          Response: 551

---

Unfortunately, it does benefit were overshadowed in the DEIS by unsupported claims of negative impacts detailed in the text that do not necessarily align with the provided evidence. The validity of the DEIS - Transportation and Access and Socioeconomics. Please check these inconsistencies and work to address the following to the FEIS:

**Road Maintenance**

The Transportation and Access analysis is based on an analysis of the Level of Service, which is correctly an increase in traffic to the roadway, through the DEIS incorrectly assumes that it is related to congestion and not taxes to the roadway. Most five reporting shows Iowa is pretty much to be at high and the current volume of road, with their levels of maintenance." However, the Socioeconomics section already addresses costs related to expected increases in direct maintenance and shows that new Town of Superior (Iowa) revenues will exceed these costs. Addressing street maintenance issues in those separate sections should be considered obvious.

Comment ID: 11153          Response: 5014

---

**Mine Related Demand for Public Service**

The Socioeconomic section lacks a proven methodology for estimating accurate costs and benefits. As a result, the socioeconomic analysis in Section 3.13 is widely negative in tone. Please address the following:

• The analysis assumes an increase in costs of 50% a law Iron, yet the 3 arce report overlooks only a 41% increase in population. There is a rational expectation that Town costs would be highly symbolized with any potential increase in public. Revidence was presented that various estimations of fixed services (therefore requiring some) of higher levels of maintenance.) However, the DEIS showed past "Resolution Copper has entered into an agreement with the Town of Superior to provide $16.65 million to support the Town's emergency response services over the period from 2016 to 2021, beginning approximately $1.7 million each year. The average annual value of this agreement aloes in $330,000 and is much most town benefits should be considered.

Its consideration was given to the final revenue that would be created from new development for either facilitated or commercial. Yet the direct revenues of $3 for a household for each of the fixed terms, assuming the current available housing stock in Iowa. Also, previous mine opening have shown that new commercial development will be redacted from mile operations, such as commercial suppliers and hospitality.

Additionally, there is no recognition of the complete loss of opportunity and economic benefit in the discussion of the no action alternative. This needs to be included in the FEIS.

[Continued]

Comment ID: 11152          Response: 581

---

Appendix R

## Section 2. Commenter Index Tables

Appendix R

*This page intentionally left blank.*

R-70

Appendix R

**Table R-4. Index of responses for letters submitted by organizations, agencies, or elected officials**

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Access Fund | 40 | Shannon | Curt | ALT22, NEPA53, NS1, WT4 |
| Access Fund | 122 | Shannon | Curt | NS1, WT24, WT4 |
| Access Fund | 1235 | Winter | Chris | ALT22, ALT8, AMT1, MIT3, MIT7, NEPA2, NEPA53, NS2, SO6, WT24, WT4, WT6 |
| Access Fund | 1454 | Shannon | Curt | ALT22, ALT8, AMT1, MIT3, MIT7, NEPA2, NEPA53, NS2, SO6, SR13, SR13_A, SR23, SR24, SR37, WT24, WT25_A, WT4_C |
| American Exploration & Mining Association | 1396 | Compton | Mark | AMT1, CR4, EJ2, MIT13, NEPA1, NS1, SO8 |
| AMIGOS | 1313 | Hay | Sydney | NS1 |
| Ana Anu Arts | 1354 | Wyssmann | Ana Anu | NS1 |
| Apache Stronghold; San Carlos Apache Tribe | 235 | Nosie; Rambler | Terry; Wendsler | CR12, CR14, CR21, CR4, MIT11, NEPA15, NEPA30, NEPA4, NS1, NS2, WT30, WT50 |
| Archaeology Southwest | 1417 | Doelle; Welch | John; William | CR17, CR22, CR6 |
| Arizona Chamber of Commerce and Industry | 201 | Taylor | Garrick | ALT30, NS1 |
| Arizona Chamber of Commerce and Industry | 928 | Hamer | Glenn | NEPA34, NS1, SO14 |
| Arizona Department of Environmental Quality – Facilities Emissions Control | 278 | Mao | Feng | AQ13, AQ15, AQ16, AQ2, AQ9, DOC1 |
| Arizona Game and Fish Department | 30075 | Ritter | Ginger | ALT30, AQ11, DOC1, MIT1, MIT3, MIT30, MIT33, MIT34, MIT38, MIT6, MIT8, NEPA32, NEPA45, NEPA54, SO3, SR25, SR26, WI15, WI20, WI22, WI3, WT16, WT17, WT44, WT48, WT49, WT57, WT61, WT62, WT7, WT79, WT8, WT82 |
| Arizona House of Representatives | 258 | Cobb | Regina | MIT1, NS1 |
| Arizona House of Representatives | 282 | Sierra | Lorenzo | NS1 |
| Arizona House of Representatives | 285 | Meza | Robert | NS1, SO10 |
| Arizona House of Representatives | 296 | Biasiucci | Leo | NS1 |
| Arizona House of Representatives | 299 | Shope | T.J. | ALT30, NS1 |
| Arizona House of Representatives | 302 | Cook | David | NS1 |
| Arizona House of Representatives | 303 | Finchem | Mark | NEPA31 |
| Arizona House of Representatives | 305 | Weninger | Jeff | NS1 |
| Arizona House of Representatives | 308 | Petersen | Warren | NS1 |
| Arizona House of Representatives | 309 | Toma | Ben | NS1 |

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Arizona House of Representatives | 312 | Lawrence | Jay | NS1 |
| Arizona House of Representatives | 315 | Bowers | Rusty | NS1 |
| Arizona House of Representatives | 316 | Block | Shawna | NS1 |
| Arizona House of Representatives | 571 | Campbell | Noel | NS1 |
| Arizona House of Representatives | 817 | Shope | T.J. | ALT30, NS1 |
| Arizona House of Representatives | 852 | Fillmore | John | NS1 |
| Arizona House of Representatives | 907 | Fillmore; Pierce | John; Steve | NS1 |
| Arizona House of Representatives | 923 | Cobb | Regina | MIT1, NS1 |
| Arizona House of Representatives | 1281 | Hernandez | Alma | NS1, NS2, SO8 |
| Arizona House of Representatives | 1387 | Payne | Kevin | NS1 |
| Arizona House of Representatives | 1427 | Carroll | Frank | NS1 |
| Arizona House of Representatives | 1494 | Hernandez | Daniel | NS1 |
| Arizona House of Representatives | 30073 | Chavez | Cesar | ALT30, NS1 |
| Arizona House of Representatives | 297 | Kavanagh | John | NS1 |
| Arizona Mining Industry Gets Our Support (AMIGOS) | 191 | Tanner | Brett | NS1 |
| Arizona Mining Reform Coalition | 24 | Featherstone | Roger | ALT22, NEPA2, NEPA35, TS2, WT1 |
| Arizona Mining Reform Coalition | 52 | Featherstone | Roger | ALT22, WT1, WT4_L |
| Arizona Mining Reform Coalition | 53 | Featherstone | Roger | ALT22, GS8, NEPA2 |
| Arizona Mining Reform Coalition | 67 | Featherstone | Roger | ALT22, TS2, TS20, WT1 |
| Arizona Mining Reform Coalition | 104 | Featherstone | Roger | GS8, NEPA2, NEPA35, NS1, NS2, SO16 |
| Arizona Mining Reform Coalition | 178 | Featherstone | Roger | NS1, TS2 |
| Arizona Mining Reform Coalition | 230 | Featherstone | Roger | NS1, TS2 |
| Arizona Mining Reform Coalition | 279 | Featherstone | Roger | NEPA25 |
| Arizona Mining Reform Coalition | 7958 | Featherstone | Roger | CR18 |

R-72

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Arizona Mining Reform Coalition et al.* | 8032 | Featherstone et al.† | Roger | ALT11, ALT21, ALT22, ALT28, ALT5, AMT1, AMT1_A, AMT11_D, AMT1_G, AMT6, AQ11, AQ17, AQ16, AQ19, AQ20, AQ21, AQ22, AQ23, AQ24, AQ25, AQ3, AQ4, AQ4_A, AQ5, AQ6, CR16, CR17, CR2, CR20, CR22, CR4, CR5, CR6, CR8, DOC1, EJ2, EJ2_A, EJ2_B, EJ3, GS1, GS11, GS11_A, GS2, GS6, GS7, GS8, LG1, MIT1, MIT15, MIT17, MIT21, MIT22, MIT24, MIT27, MIT29, MIT3, MIT33, MIT35, MIT40, MIT5, MIT7, MIT8, NEPA1, NEPA14, NEPA17, NEPA19, NEPA2, NEPA26, NEPA3, NEPA33, NEPA35, NEPA36, NEPA43, NEPA45, NEPA50, NEPA53, NEPA54, NEPA61, NEPA62, NEPA64, NEPA66, NEPA8, NEPA9, NO1, NO3, NQ5, NS1, NS2, SO1, SO14, SQ19, SO2, SO4, SO5, SO6, SR10, SR13, SR13_A, SR17, SR19, SR23, SR24, SR5, SR7, SR9, TR1, TR13, TR14, TR17, TR18, TR20, TR21, TR6, TR7, TR8, TR9, TS1, TS16, TS19, TS2, TS20, TS20_A, TS22, TS24, TS24_A, TS24_B, TS26, TS29, TS32, WI1, WI10, WI11, WI12, WI13, WI14, WI15, WI16, WI17, WI18, WI19, WI21, WI23, WI24, WI25, WI26, WI6, WT10, WT16, WT2, WT21, WT21_A, WT21_B, WT21_D, WT24, WT26, WT35, WT36, WT37, WT39, WT4, WT4_F, WT4_I, WT41, WT42, WT45_A, WT45_C, WT45_H, WT45_I, WT45_K, WT45_N, WT45_O, WT45_P, WT45_Q, WT45_R, WT45_S, WT45_T, WT52, WT56, WT58, WT59, WT6, WT63, WT7, WT72, WT9, WT91 |
| Arizona Mining Reform Coalition et al.* | 30140 (Letter 8031 Appendix C - Maest report) | Featherstone et al.† | Roger | WT26, WT35, WT36, WT37, WT41 |
| Arizona Mining Reform Coalition et al.* | 30141 (Letter 8032 Appendix A - Chambers report) | Featherstone et al.† | Roger | AMT1, AMT1_A, GS1, GS16, MIT21, TS1 |
| Arizona Mining Reform Coalition et al.* | 30142 (Letter 8032 Appendix B2 - Emerman report) | Featherstone et al.† | Roger | WT6 |
| Arizona Mining Reform Coalition et al.* | 30143 (Letter 8032 Appendix B3 - Emerman report) | Featherstone et al.† | Roger | WT1, WT1_A, WT24, WT6 |
| Arizona Mining Reform Coalition et al.* | 30144 (Letter 8032 Appendix B4 - Emerman report) | Featherstone et al.† | Roger | GS11, NS2 |
| Arizona Mining Reform Coalition et al.* | 30145 (Letter 8032 Appendix B5 - Emerman report) | Featherstone et al.† | Roger | TS1, TS2 |

R-73

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Arizona Mining Reform Coalition et al.* | 30146 (Letter 8032 Appendix E - Prucha report) | Featherstone et al.† | Roger | WT45_A, WT45_B, WT45_C, WT45_D, WT45_E, WT45_F, WT45_G, WT45_H, WT45_I, WT45_J, WT45_K, WT45_L, WT45_M, WT45_N, WT45_O |
| Arizona Mining Reform Coalition et al.* | 30147 (Letter 8032 Appendix D - Powers report) | Featherstone et al.† | Roger | SO2, SO4, WT4, WT6 |
| Arizona Science Policy Network | 204 | Bercovici | Hannah | NS1 |
| Arizona Science Policy Network | 30122 | Bercovici | Hannah | NS1 |
| Arizona State Land Department | 562 | Atkins | Lisa | ALT30, CR5, LG3, MIT1, NEPA20, NEPA42, NS1, SO16, WT23, WT4_G |
| Arizona State Senate | 264 | Leach | Vince | NS1 |
| Arizona State Senate | 304 | Carter | Heather | NS1 |
| Arizona State Senate | 318 | Allen | Sylvia | NS1 |
| Arizona State Senate | 896 | Fann | Karen | NS1 |
| Arizona State Senate | 1017 | Gowan | David | NS1 |
| Arizona State Senate | 1018 | Kerr | Sine | NS1 |
| Arizona State Senate | 1046 | Farnsworth | Eddie | NS1 |
| Arizona State Senate | 1060 | Bradley | David | NS1 |
| Arizona State Senate | 1065 | Bradley | David | NS1 |
| Arizona State Senate | 1148 | Gray | Rick | NS1 |
| Arizona State Senate | 1312 | Pratt | Frank | NS1, SO14 |
| Arizona Trail Association | 1311 | Gaudet | Fred | ALT30, MIT1, MIT4, NS2, SR11, SR12, SR24, TR13 |
| Arizona Water Company | 555 | Haas | Andy | ALT1, ALT30, MIT1, MIT29, NEPA47, TS5, WT10, WT19, WT4, WT43, WT55, WT7, WT80 |
| Audubon Arizona | 1441 | Perillo; Supplee | Sonia; Tice | ALT22, MIT1, MIT3, MIT35, MIT8, NEPA10, NEPA65, WT1 |
| Bureau of Land Management -- Tucson Field Office | 28449 | Moore | Daniel | CR1, CR15, CR2, CR5, CR6, DOC1, EJ2, LG4, MIT1, MIT3, MIT39, MIT4, MIT7, NEPA35, NEPA43, NEPA46, NEPA52, NEPA54, NEPA60, SO10, SO3, SR13, SR16, SR24, SR30, SR31, SR32, SR33, SR34, SR36, TR11, WI7, WT32, WT33, WT4, WT7, WT81 |
| CAID Industries, Inc. | 941 | Robino | Jeff | NS1 |
| Center for Biological Diversity | 74 | Miller | Brytnee | CR4, NS1 |

R-74

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Center for Biological Diversity | 118 | Miller | Brytnee | CR4, NS1 |
| Center for Science in Public Participation | 1209 | Chambers | David | AMT1, AMT1_A, AMT1_F, MIT21, TS1 |
| City of Apache Junction | 284 | Serdy | Jeff | NS1 |
| City of Globe | 518 | Gameros | Al | ALT30, NS1, SO9 |
| Concerned Citizens and Retired Miner Coalition | 25 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 68 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 69 | Chavez | Roy | NEPA25 |
| Concerned Citizens and Retired Miner Coalition | 105 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 106 | Chavez | Roy | SO21 |
| Concerned Citizens and Retired Miner Coalition | 179 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 180 | Chavez | Roy | NEPA30, NS1 |
| Concerned Citizens and Retired Miner Coalition | 231 | Chavez | Roy | NS1, SO16 |
| County Supervisors Association of Arizona | 866 | Gallardo; McCloud; Melera; Smith; Sullivan; Whiting | Anthony; Craig; Jason; Rudy; Russell; Steve | DOC1, MIT1, MIT21, MIT3, NEPA33, NS1, NS2, SO14, SO17, TS1 |
| Department of the Interior -- Office of Environmental Policy and Compliance | 1121 | Whitlock | Janet | NEPA49 |
| Earthworks | 320 | Dronkers | Pete | ALT1, ALT13, AMT1, AMT1_G, AMT1_I |
| East Valley Beck Country Horsemen | 300 | McClintock | Stephen | ALT30, MIT1 |
| Gila County Board of Supervisors | 28824 | Cline | Woody | ALT26, MIT1 |
| Gila River Indian Community | 321 | Thomas | Derald | NS1 |
| Globe-Miami Chamber Regional Chamber of Commerce | 1516 | Holder | Tianna | NS1, SO9, TR1 |
| Government Springs Ranch, LLC | 30081 | Hoopes | John | ALT19, ALT27, CR19 |
| Great Old Broads for Wilderness | 568 | Switzer | Rosalind | ALT5, NS1, TS2 |
| Greater Florence Chamber of Commerce | 1152 | Biede | Roger | NS1, NS2 |
| Industrial Automation Services | 323 | Bauman | Terry | NS1, TS1 |
| Innovative Technologies Development Center | 1163 | Shatz | Robert | NEPA1, NS2 |
| Inter Tribal Association of Arizona | 246 | Lewis | Shan | NEPA25 |

R-75

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Inter Tribal Association of Arizona | 8031 | Lewis | Shan | ALT8, ALT9, AMT1_E, CR10, CR12_A, CR13, CR16, CR20, CR4, CR5, LG6, MIT1, MIT15, MIT18, MIT27, MIT30, NEPA1, NEPA15, NEPA16, NEPA18, NEPA19, NEPA23, NEPA24, NEPA25, NEPA26, NEPA35, NEPA41, NEPA44, NEPA45, NEPA51, NEPA54, NEPA58, NEPA59, NS1, WI15, WI6, WT1_B, WT10, WT4, WT4_F, WT44, WT45, WT63, WT7, WT8, WT83, WT9, WT90 |
| Landmark Companies | 1465 | Barney | Jason | NS1 |
| Legends of Superior Trail and Town of Superior; Superior Community Working Group; Superior Recreation User Group | 1266 | Besich; Duerr | Debra; Mila | MIT1 |
| Legends of Superior Trails | 1429 | Schenck | James | MIT1, NS1 |
| LeSueur Investments | 1204 | LeSueur | Ty | ALT30, NS1 |
| Lower San Pedro Watershed Alliance | 1186 | Else | Peter | ALT12, ALT2, ALT22, ALT23, ALT31, AQ14, DOC1, MIT1, MIT20, MIT27, MIT3, MIT8, NEPA18, NEPA3, NEPA50, NEPA52, NEPA56, NS1, SO18 |
| M3 Engineering & Technology Corporation | 1042 | Bennett | Alberto | NS1 |
| Magma Dorada LLC; JSS International Consulting | 1286 | Schenck | James | ALT30, MIT1, MIT3, NS1, SO14 |
| Maricopa Audubon Society | 154 | Horlings | Mark | WT1 |
| Maricopa Audubon Society | 224 | Horlings | Mark | WT1 |
| ME Elecmetal | 1139 | Schick | Greg | NS1 |
| Mesa Chamber of Commerce; Greater Mesa Industry & Defense Council | 1111 | Harrison | Sally | NS1, SO8 |
| Mesa Chamber of Commerce; Greater Mesa Industry & Defense Council | 1112 | Harrison | Sally | NEPA34, NS1 |
| Mesa City Council, District 6 | 267 | Thompson | Kevin | NS1, TR8 |
| Miami Town Council | 283 | Gonzales | Sammy | ALT30, MIT1, MIT3, NS1, SO14, SR28 |
| New Energy Economy | 1151 | Nanasi | Mariel | NS1, TS12 |
| Oddonetto Construction Inc. | 1300 | Oddonetto | Kimberly; Michael | ALT30, NS1 |
| Pascua Yaqui Tribe of Arizona | 1149 | Hoerig | Karl | NS2 |
| Phoenix City Council Member | 275 | Waring | Jim | NS1 |
| Pinal County | 314 | Rios | Pete | MIT1, MIT3, SO10, SO14 |
| Pinto Valley Mine | 1072 | Wickersham | Michael | NS1 |

R-76

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Public Land 4 Responsible Recreation | 778 | Hankins | Jill | NS2 |
| Queen Creek Coalition | 270 | Keedy | John | MIT1 |
| Queen Valley Golf Association | 249 | Wright | Percy | NEPA25 |
| Queen Valley Golf Association | 268 | Wright | Percy | NEPA25, WT59 |
| Saint Holdings | 1485 | Andersen | Jackob | NS1 |
| San Carlos Apache Tribe | 251 | Rambler | Terry | CR13_A, CR5, NEPA25 |
| San Carlos Apache Tribe | 8030 | Rambler | Terry | ALT22, CR13, CR8, MIT27, NS1 |
| San Carlos Apache Tribe | 30078 | Rambler | Terry | AMT1, AMT1_B, CR12_B, CR16, CR2, CR4, CR7, CR8, DOC1, MIT1, MIT3, NEPA14, NEPA19, NS1, NS2, TS24, WT10, WT19, WT21_C, WT3, WT30, WT4, WT4_A, WT4_H, WT42, WT49, WT54, WT61, WT69, WT7, WT71, WT89 |
| San Carlos Apache Tribe | 30079 | Rambler | Terry | CR4, NS2, WT4 |
| Showing Up for Racial Justice | 1236 | Cemine | Berkley | NEPA15 |
| Sierra Club | 42 | Steuter | Don | NEPA1, NEPA33, WT12 |
| Sierra Club | 124 | Steuter | Don | NEPA1, NEPA8, NS1, TS20 |
| Sierra Club â€' Grand Canyon Chapter | 182 | Bahr | Sandy | NS1, SO21 |
| Sierra Club â€' Grand Canyon Chapter | 1475 | Bahr | Sandy | NS1 |
| Signal Fire | 1258 | Pierce | Ryan | NS1 |
| Signal Fire | 1450 | Farrell-Smith | Ka'ila | CR4, NS1 |
| Southern Arizona Business Coalition | 1457 | Assenmacher | Grinnell | Bill |
| Southside Presbyterian Church | 546 | | | NS1 |
| Southside Presbyterian Church | 1205 | Lewis | Greg | NEPA39 |
| Sun City Anthem Hiking Club of Florence AZ | 1062 | WATERMAN | Greg | MIT1 |
| Superior Chamber of Commerce | 317 | Anderson | Susan | ALT30, MIT1, MIT3, NS1, SO9 |
| Superior Chamber of Commerce | 324 | Anderson | Susan | MIT1 |
| Superior Community Working Group; Superior Recreation User Group | 1389 | Duerr | Debra | DOC1, MIT1, MIT21, MIT3, MIT8, NS1, SO1, SO14, SO16, SO19, SO21, SR24, WT4 |
| Superior Retired Miners Coalition | 1140 | Munoz Sr. | Henry | NEPA46, TS24, WT4 |
| Superior Unified School District | 322 | Godinez | Arlynn | ALT30, MIT1, MIT3, SO14 |
| Superstition Area Land Trust | 319 | Goff | Charlie | ALT30, MIT1, MIT3, NS1, SR13 |

R-77

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| The Nature Conservancy | 1137 | Hill | Nicole | MIT1, MIT3 |
| The Religion and Human Rights Forum for the Preservation of Native American Sacred Sites and Rights | 248 | Boyd | Stephen | NEPA25 |
| Tonto Recreation Alliance | 1317 | Smith | Richard | MIT1 |
| Town of Florence | 515 | Walter | Tara | ALT30, NS2 |
| Town of Superior | 250 | Pryor | Todd | SO14 |
| Town of Superior | 251 | Pryor | Todd | ALT1, ALT30, MIT1, NEPA12, NS1, SO14 |
| U.S. House of Representatives | 1079 | Biggs | Andy | NS1 |
| U.S. House of Representatives | 1197 | Gosar | Paul | ALT30, NEPA34, NS1, NS2, SO8 |
| U.S. House of Representatives | 1410 | Lesko | Debbie | ALT30, NS1 |
| United Steelworkers | 266 | Conway | Thomas | NS1 |
| University of Arizona, Center for Natural Resource Users | 1122 | Eisenberg | Jeff | MIT1, MIT3, NS1, SO5 |
| U.S. Army Corps of Engineers | 28455 | Dielbolt | Sallie | – |
| US Environmental Protection Agency | 524 | Dunning | Connell | ALT1, ALT22, AQ6, DOC1, MIT1, MIT17, MIT27, MIT35, NEPA2, NEPA21, TS1, TS10, WI26, WT32, WT37, WT46, WT47, WT7, WT76, WT78, WT84, WT92 |
| US House of Representatives | 310 | Schweikert | David | NS1, SO14, TR1 |
| US House of Representatives | 1113 | Schweikert | David | NS1, SO14, TR1 |
| Wild By Nature, Inc. | 811 | Wild | Kathryn | NS1 |
| WildEarth Guardians | 1539 | Krupp | Christopher | AMT8, MIT19, MIT3, NEPA2, NEPA55, WT25 |
| Yavapai-Apache Nation | 463 | Huey | Jon | CR12, MIT3 |
| Yavapai-Apache Nation | 30080 | Huey | Jon | ALT30, CR12, CR7 |

* Full organization list: Arizona Inter-Faith Power and Light; Arizona Mining Reform Coalition; Center for Biological Diversity; Community Water Coalition of Southern Arizona; Concerned Citizens and Retired Miner Coalition; Concerned Climbers of Arizona; Earthworks; Maricopa Audubon Society; Natural Allies; Oklahoma Indigenous Theatre Company; Patagonia Area Resource Alliance; Save the Scenic Santa Ritas; Save Tonto National Forest; Sierra Club – Grand Canyon Chapter; Sky Island Alliance; Tucson Audubon Society; Valley Unitarian Universalist Congregation – Green; WildEarth Guardians

† Full list of Individuals (last name): Bahr; Bland; Chavez; Dronkers; Featherstone; Grijalva; Hartmann; Hodges; Horlings; Horning; Krieg; Lutz; Misztal; Rangel; Schwartz; Serraglio; Shafer; Whitley

R-78

Appendix R

**Table R-5. Index of responses for letters submitted by individuals**

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| (Blank) | Moa Lim | 28543 | NS1 |
|  | Anonymous | 1530 | NS1 |
| Abbott | Cathy | 7841 | NS1 |
| Abdalla | Abdulla | 1508 | CR4, LG5, NS1, TR4 |
| Abeling | Barbra | 1164 | NS1 |
| Ackerman | Frank | 5402 | NS1 |
| Ackerman | Judith | 30070 | NS1 |
| Acosta | Chris | 29455 | NS1 |
| Adams | Constance | 27013 | NS1 |
| Adams | Jess | 1186 | NS1 |
| Adams | Tulwen | 27733 | NS1 |
| Addison | Tom | 6494 | NS1 |
| Adkins | David | 5841 | NS1 |
| Aengst | Jennifer | 8282 | NS1 |
| Aex | Tim | 8283 | NS1 |
| Ages | Terry | 509 | ALT5, NEPA3, NS1 |
| Agins | Richard | 7766 | NS1 |
| Agneessen S | Rosemary | 7188 | NS1 |
| Aguirre | Mackailah | 1025 | NS1 |
| Aken | Richard Van | 5448 | MIT21 |
| Akers | Frederick | 27184 | NS1 |
| Alagamma I | Andrea | 7393 | NS1 |
| Albert | Iris | 1425 | NS1 |
| Albert | Shan | 27099 | NS1 |
| Albert-Black | Cecilia | 8147 | NS1 |
| Albright | Jon | 28265 | NS1 |
| Alcock | John | 1614 | NS1 |
| Alexakos | Irene | 27948 | NS1 |
| Alexander | Melody | 1218 | NS1 |
| Alexander | Sean | 971 | NS1 |
| Alexander | William | 29075 | NS1 |
| Alger | Rosie | 1299 | NS1 |
| Aljneibi | Naser | 1343 | MIT1, MIT4, SR21 |
| Allen | Heidi | 5528 | NS1 |
| Allen | Karen | 6779 | NS1 |
| Allen | Phillip | 29162 | NS1 |
| Allison | Breana | 28903 | NS1 |
| Alm | Magnus | 575 | NS1 |
| Alonzo | Luis | 7394 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Altherr | Forest | 6248 | NS1 |
| Altman | Andrew | 8180 | NS1 |
| Altshuler | John | 827 | NS1 |
| Alvarado | Fernando | 6403 | TS24 |
| Al-Yousef | Abdul | 1473 | MIT35, NS2, SO1 |
| Alzahrani | Rashad | 1176 | NEPA6 |
| Amrhein | Fred | 5771 | AMT1 |
| Amsden | Liz | 814 | MIT21, NS1, NS2 |
| Anaya | Zachary | 8092 | NS1 |
| Andaya | Stephanie | 6142 | NS1 |
| Andersen | Jill | 475 | NS1 |
| Andersen | Kirsten | 27121 | NS1 |
| Anderson | Alexandra | 28477 | NS1 |
| Anderson | Andrew | 1228 | NS1 |
| Anderson | Craig | 27950 | NS1 |
| Anderson | Glen | 28043 | NS1 |
| Anderson | Heather | 28108 | NS1 |
| Anderson | Ivylle | 807 | NS1 |
| Anderson | Leiann | 1229 | NS1 |
| Anderson | Mia | 28497 | WT25 |
| Anderson | Michael | 28860 | NS1 |
| Anderson | Wendi | 1332 | NS1 |
| Andersson | Rylan | 28930 | NS1, WT6_A |
| Andrew | Eidson | 960 | NS1 |
| Andrews | Jennifer | 26823 | NS1 |
| Andujo | Josh | 147 | NS1 |
| Angell | Robert | 6498 | NS1 |
| Angeloff | Linda | 6811 | NS1 |
| Anglin | Paige | 1115 | NEPA27, TS24, WI9 |
| Angus | Billy | 5461 | NS1 |
| Anonymous | Commenter1 | 35 | ALT30 |
| Anonymous | Commenter3 | 101 | NEPA35, NS1 |
| Anonymous | Commenter5 | 228 | NS1 |
| Anonymous | Anonymous | 30074 | CR4, MIT12, NS2 |
| Ansley | Celia | 6278 | NS1 |
| Anson | April | 1367 | NS1 |
| Anthony | Kendra | 28264 | NS1 |
| Apane | Irene | 28807 | NS1 |
| Apolinar | Aleena | 1038 | NS1 |
| Appel | Genevieve | 27119 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Aramburu | Alfredo | 387 | NS1 |
| Arbuckle | Nancy | 26824 | NS1 |
| Arenberg | Meg | 1324 | CR4, NS1 |
| Armentrout Jr | James | 550 | NS1, TS1 |
| Armilage | Bruce | 929 | ALT30, MIT1, MIT3, NEPA12 |
| Armstrong | William | 28639 | NS1 |
| Arndt | Laura | 2052 | NEPA40 |
| Arnold | Aimee | 1612 | NS1 |
| Arnold | William | 5549 | NS1 |
| Aroneo | Regina | 7419 | NS1 |
| Arrowsmith | Janet | 27749 | NS1 |
| Arsenault | Kyle | 28909 | NS1 |
| Arzabe | Miguel | 1352 | NS1 |
| Asch | Halee | 30126 | NS1 |
| Ashby | Lynn | 1501 | ALT22, TS1, TS2, WT1, WT8 |
| Ashley | Hannah | 28232 | NS1 |
| Ashouri | Aida | 6365 | NS1 |
| Ashton | Itzel | 1535 | EJ2 |
| Assanuvat | Sean | 421 | NS1 |
| Atkinson | Martha | 5475 | NS1 |
| Atwood | April | 27084 | NS1 |
| Auer | Brendan | 393 | NS1 |
| Auge | Benita | 27699 | NS1 |
| Austin | Tina | 1087 | NS1 |
| Av | Isaiah | 30103 | NS1 |
| Avila | Roman | 27783 | NS1 |
| Axt | Phyllis | 27003 | NS1 |
| Azbell | Daniel | 8145 | NS1 |
| B | Geeta | 5504 | NS1 |
| B | Jess | 1093 | CR4, NS1, TS24, WT4 |
| Bachhuber | Mary | 1606 | NEPA3, NS1 |
| Baden | Byron | 1358 | AMT1, GS15, GS3, NEPA27, NS1, WT4, WT68 |
| Baden | Eileen | 199 | AMT1, NEPA1, NEPA25 |
| Baden | Eileen | 1106 | NEPA25 |
| Baden | Eileen | 1360 | ALT1, AMT1, AQ11, CR4, GS13, MIT1, MIT3, NEPA1, NEPA24, NEPA27, NEPA28, NEPA35, NS1, SO14, SO21, SO6, WT4 |
| Baden | Eileen | 6820 | NEPA27 |
| Badinelli | Meghan | 1012 | NS1 |
| Bagley | Brandon | 8256 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bahti | Yuri | 6823 | NS1 |
| Bajrami | Arlinda | 1090 | CR4, NS1, WT4 |
| Baker | Kelly | 6827 | NS1 |
| Bales | Clarice | 27222 | NS1 |
| Balfe | Carolyn | 27734 | NS1 |
| Ball | Justin | 5973 | NS1 |
| Ball | Katherine | 1241 | NS1 |
| Ballard | Brian | 192 | NS1 |
| Ballard | Brian | 1284 | AQ11, WT1 |
| Ballard | Julia | 5400 | NS1 |
| Ballard | Rebecca | 1318 | NS1, NS2, WT4 |
| Balser | Austin | 6419 | ALT22, WT4_K |
| Banks | Janice | 779 | NS1 |
| Baraka | Carmen | 29707 | NS1 |
| Baranowski | Josh | 1920 | NS1 |
| Baranowski; Dailey | Eileen; Mark | 1068 | CR4, NEPA2, NS1, SO7, WT4, WT4_A, WT6 |
| Barbee | Charles | 669 | NS1, WT4, WT6 |
| Barger | Karin | 27856 | NS1 |
| Baribeau | Robert | 28649 | NS1 |
| Barney | Dakotah | 5551 | NS1 |
| Baron | Kathryn | 1192 | NEPA13, NS1 |
| Barrett | Giulio | 30117 | NS1 |
| Barrett | Sylvia | 29 | ALT16, ALT2, ALT29, EJ4, GS3, MIT21, WT12 |
| Barrett | Sylvia | 30 | MIT3 |
| Barrett | Sylvia | 169 | CR4 |
| Barrett | Sylvia | 183 | NS1, WT25 |
| Barrett | Sylvia | 236 | GS13, NS1 |
| Barrett | Sylvia | 1493 | NEPA29 |
| Barrett | Trevor | 28505 | NS1 |
| Barringer | Thaddeus | 237 | NS1 |
| Barringer | Thaddeus | 5540 | NS1 |
| Barron | Anthony | 27415 | NS1 |
| Barrow | Olivia | 28539 | NS1 |
| Barry | Chris | 28168 | NS1 |
| Barry | Wendy | 7986 | NS1 |
| Bartlett | Jeannette | 27165 | NS1 |
| Bartlett | Heather | 29142 | NS1 |
| Barton | Jennifer | 28116 | NS1 |
| Bastias | Andreas | 29349 | NS1 |
| Bate | Jo Ellen | 27381 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Baucom | Frank | 6831 | NS1 |
| Bauer | Robert | 6051 | NS1 |
| Baugher | Travis | 7970 | NS1 |
| Baus | Robert | 26858 | NS1 |
| Bauserman | Christine | 1143 | NS1 |
| Baweja | Jessica | 6469 | NS1 |
| Beagle | Bryce | 1001 | NS1 |
| Bean | Jarrett | 864 | NS1 |
| Bear | Marie | 1438 | AQ1, AQ25, AQ3, AQ5, AQ8, DOC1, MIT1, MIT24, NEPA1, SO15 |
| Beard | Molly | 6300 | NS1 |
| Beck | Robin | 29712 | NS1 |
| Becker | Robert | 28044 | NS1 |
| Beckius | John | 28157 | NS1 |
| Beene | Jane | 6836 | NS1 |
| Begley | Patrick | 5637 | NS1 |
| Beigel | Lynda | 27935 | NS1 |
| Beimborn | Curtis | 30106 | NS1 |
| Bejarano | Nick | 604 | NS1 |
| Belchamber | Patricia & Frank | 259 | ALT22, NS2, TS2, WT1 |
| Bell | Jan | 6839 | NS1 |
| Bell | Janet | 5382 | NS1 |
| Bell | Janet | 26915 | NS1 |
| Bellamy | David | 27177 | NS1 |
| Belland | Tara | 27740 | NS1 |
| Bello | D | 26940 | NS1 |
| Belshin | Bryce | 8174 | NS1 |
| Bender | Angela | 561 | NS1 |
| Bengtson | Carla | 1275 | NS1 |
| Bengtson | Nancy | 6840 | NS1 |
| Benjamin | Austin | 618 | NS1 |
| Bennett | Austin | 6188 | NS1 |
| Bennett | Erin | 6008 | NS1 |
| Bennett | Jonathan | 28561 | NS1, WT4 |
| Bercaw | John | 359 | NS1 |
| Berg | Bruce | 838 | NS1 |
| Bergman | James | 925 | NS1 |
| Beringer | Steven | 6066 | NS1 |
| Berkowitz | Henry | 5429 | NS1 |
| Berry | Michael | 957 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bertelsen | Tiffany | 28482 | NS1 |
| Berthoin | Paola | 27328 | NS1 |
| Berzonski | Edward | 30120 | NS1 |
| Bessler | Mike | 1997 | NS1 |
| Betancourt | Moises | 5519 | NS1 |
| Betts | Chloe | 6208 | NS1 |
| Betz | Catherine | 26965 | NS1 |
| Beyer | Alexander | 6155 | NS1 |
| Bia | Johnny | 1028 | NS1 |
| Bickford | Claire | 28184 | NS1 |
| Bicknell | Mary | 27436 | WT43 |
| Biggs | Patricia | 27142 | NS1 |
| Bighorse | Lian | 153 | NS1 |
| Bighorse | Lian | 214 | CR2, NS1 |
| Bighorse | Lian | 1460 | CR2 |
| Binder | Fred | 1272 | NS1 |
| Bingham | Brent | 1479 | NEPA17 |
| Binnie | Al | 28037 | NEPA2, NS1, NS2 |
| Birdsall | Kristin | 28139 | NS1 |
| Bishop | Carolyn and Walter | 26852 | NS1 |
| Bizjak | Julia | 5664 | NS1 |
| Black | Deborah | 28020 | NS1 |
| Black | Vania | 6845 | NS1 |
| Blackman | Jeffrey | 6847 | NS1 |
| Blackmon | Rachel | 29711 | NS1 |
| Blackwell | Thomas | 28176 | NS1 |
| Blair | Curt | 7456 | NS1 |
| Bland | Doug | 6915 | NS1 |
| Blank | Cody | 28529 | NS1 |
| Blindauer | Neil | 858 | MIT17 |
| Blindauer | Neil | 1128 | NS2, TS16, TS24, WT4, WT7 |
| Bloom | Diane | 1221 | NS1 |
| Blossom | Gretchen | 6197 | NS1 |
| Blow | Elaine | 27914 | NS1 |
| Bluhm | Erik | 27988 | NS1 |
| Blumer | Ruth | 884 | NS2 |
| Bocchicchio | Rocco | 28517 | NS1 |
| Bockelman | Kathryn | 746 | NS1 |
| Bodenhamer | Leah | 705 | NS1 |
| Bodenhamer | Leah | 826 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bodmer | Kacey | 6851 | NS1 |
| Boemig | Katrina | 1364 | NS1 |
| Boggess | Laura | 5867 | NS1 |
| Bogios | Constantine | 27754 | NS1 |
| Bohanon | Kelsey | 6311 | NS1 |
| Boice | Ruth | 26844 | NS1 |
| Bolduc | Daniel | 27756 | NS1 |
| Bols | Elizabeth | 27186 | NS1 |
| Bona | James | 892 | NEPA33, NS1 |
| Boone | Harper | 675 | NS1 |
| Boone | Jim | 27895 | NS1 |
| Boonstra | Michael | 1297 | NEPA39 |
| Booth | John | 28085 | NS1 |
| Borfes | Elsa | 1240 | NS1 |
| Born | Alexandra | 28536 | NS1 |
| Bottachiari | Lia | 1033 | NS1 |
| Bouchard | Dana | 471 | NS1 |
| Boudart | Piper | 28431 | NEPA3, NS1 |
| Bouldin | Bruce | 1059 | NS1 |
| Boulger | Kelsey | 30102 | NS1 |
| Boume | Haley | 28867 | NS1 |
| Bowers | Megan | 6006 | NS1 |
| Bowman | Coral | 1181 | NS1 |
| Box | Ken | 788 | NS1 |
| Boyer | Richard | 26903 | NS1 |
| Boyer Jr. | Edward | 289 | NEPA27, NS1 |
| Boyer Jr. | Edward | 290 | NS1, WT31, WT4, WT6 |
| Boyle | Dylan | 29095 | NS1 |
| Brabazon | Holly | 28188 | NS1 |
| Bracksieck | George | 29132 | NS1 |
| Bradley | Kathy | 8312 | NS1 |
| Brady | Cindy | 76 | MIT3, NS1 |
| Brainard | Mike | 6441 | NS1 |
| Brand | Jonathan | 6644 | NS1 |
| Brandt | Benjamin | 5537 | MIT3 |
| Brannon | Elizabet H | 6852 | NS1 |
| Brask | Maria | 8181 | NS1 |
| Brazitis | Peter | 27147 | MIT21 |
| Bread | Mara | 206 | NS1 |
| Brensinger | Elizabeth | 26841 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bressan | Steven | 6192 | NS1 |
| Brewer | Judy | 27361 | NS1 |
| Brewer | Landon | 1024 | NS1 |
| Brewer | Laura | 6859 | NS1 |
| Bridges | Caroline | 1912 | NS1 |
| Briggs | Jeff | 29387 | NS1 |
| Brigham | Laura | 551 | NS1 |
| Brill | Lesley | 27879 | NS1 |
| Brimberry | Patricia | 5437 | NS1 |
| Brink | Tom | 5456 | NS1 |
| Brinke | Cecelia | 1102 | NS1 |
| Briones | Tom | 6860 | NS1 |
| Brittain | Laura | 5967 | NS1 |
| Brock | Martha | 28075 | NEPA3 |
| Brockhaus | Matthew | 28995 | NS1 |
| Brockhoff | Jennie | 513 | NS1 |
| Brodersen | Tom | 7473 | NS1 |
| Brodsky | Leah | 2006 | NS1 |
| Broh | Jonah | 1519 | CR5, NEPA3 |
| Brown | David | 28021 | NS1 |
| Brown | Imogene | 136 | NS1 |
| Brown | Jon-Eric | 28677 | NS1 |
| Brown | Ken | 731 | NS1 |
| Brown | Kevin | 833 | NS1 |
| Brown | Kevin | 6861 | NS1 |
| Brown | Matonth | 163 | CR4 |
| Brown | Peter | 877 | NS1 |
| Brown | Roderick and Cynthia | 27166 | NS1 |
| Brown | Tim | 6060 | NS1 |
| Brown | Waya | 171 | NS1 |
| Brownell | Benjamin | 6101 | NS1 |
| Brown-Lopez | Gouyen | 135 | NS1 |
| Brugger | Julie | 674 | NS1 |
| Bruins | Scott | 1242 | NS1 |
| Bruno | Christina | 2043 | NS1 |
| Bruno | Steve | 7483 | NS1 |
| Bryant | Elizabeth | 5930 | NS1 |
| Bubala | Louis | 28033 | NS1 |
| Buccigross I | Gwen | 7484 | NS1 |
| Buchanan | Marlin | 696 | NS1 |

R-86

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Buck | Barbara | 7486 | NS1 |
| Buck | Sharon | 28113 | NS1 |
| Buck | Valerie | 8279 | NS1 |
| Buckingham | Kevin | 2122 | NS1 |
| Buckner | Jordan | 1924 | CR4, NS1 |
| Budan | Wanda | 28423 | NS1 |
| Budner | Brooke | 1246 | NS1 |
| Bulla | Terry | 6322 | NS1 |
| Bulla | Terry | 29370 | NS1 |
| Bundschu | Anton | 8133 | NS1 |
| Buness | Cynthia | 6870 | NS1 |
| Burch | Allen | 739 | NS1 |
| Burdorf | Rachel | 1520 | CR1, CR12, CR4, NS1 |
| Burgess | K. H. | 6872 | NS1 |
| Burgess | Martha | 1466 | NS1 |
| Burgmann | Eric | 565 | NS1 |
| Burgmeier | Rebecca | 1908 | NS1 |
| Burk | Taylor | 694 | NS1 |
| Burks | Mary | 28034 | NS1 |
| Burnett | Arthur | 686 | NS1 |
| Burnett | Chad | 28701 | NS1 |
| Burns | Jeanne | 6875 | NS1 |
| Burton | Lynnette | 27925 | NS1 |
| Butler | Bradley | 355 | NS1 |
| Butler | Carolina and Walker | 6880 | NS1 |
| Butler | Elizabeth | 1489 | ALT30, MIT1, MIT8 |
| Butler | Jeff | 5952 | NS1 |
| Byars | Katrina | 7891 | NS1 |
| Byczynski | Michael | 8184 | NS1 |
| Byerly | Steven | 819 | NS1 |
| Cabanban | Robert | 6883 | NS1 |
| Cabico | Cailin | 1990 | NS1 |
| Cabrales | Steven | 356 | ALT22, NS1, WT4, WT6 |
| Cage | Ray | 7492 | NS1 |
| Cahall | Rebecca | 30135 | NS1 |
| Cain | Barbara | 1104 | NS1 |
| Caldwell | Mary | 27739 | NS1 |
| Calem | Tenara | 1268 | NS1 |
| Call | Anson | 5892 | NS1 |
| Callaghan- Chaffee | Martha | 7493 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Callaway | Jeffery | 6400 | NS1 |
| Cambero | Angel | 947 | NS1 |
| Cameron | Roderick | 27318 | NS1 |
| Camp | Sarah | 29452 | NS1 |
| Campbell | Doug | 273 | MIT1 |
| Campbell | James | 5972 | ALT22, NS1 |
| Campbell | Kay | 28062 | NS1 |
| Campbell | Thomas | 8266 | NS1 |
| Campion | Nathaniel | 2097 | NS1 |
| Campos | Juanita | 1187 | NS1 |
| Campos | Ruben | 26 | ALT30 |
| Caracciolo | Dana | 5599 | NS1 |
| Carbone | Flavia | 1050 | NS1 |
| Carey | Jacqueline | 5616 | NS1 |
| Carloti | Julia | 6884 | NS1 |
| Carleton | Susan | 7498 | NS1 |
| Carlson | Arvid "Jack" | 958 | ALT30, NS1 |
| Carlson | Skyler | 1356 | MIT1, MIT3, MIT35, NS1, SO1, WI8 |
| Carnes | Ross | 7501 | NS1 |
| Caron | Dana | 6602 | NS1 |
| Carpegna | Allegra Di | 27987 | NS1 |
| Carpenter | Garrett | 1321 | MIT1, WT16, WT36, WT4 |
| Carpenter | Grace | 5699 | ALT22 |
| Carrao | G. S. | 6865 | NS1 |
| Carroll | Brett | 578 | NS1 |
| Carroll | Linda | 27095 | NS1 |
| Carroll | Linda Louise | 5399 | NS1 |
| Carson | Mark | 873 | NEPA33, NS1 |
| Carter | David | 30131 | NS1 |
| Carter | Debbie | 1587 | MIT21, TS2 |
| Carter | John | 336 | MIT21, TS2 |
| Carter | Marian | 26904 | NS1 |
| Carter | Marian | 1615 | NS1 |
| Carter Dulin | Kathleen | 6191 | NS1 |
| Casey | Carol | 27771 | NS1 |
| Casey | Sara | 2041 | NS1 |
| Casper | Carrie | 6660 | NS1 |
| Casper | Kathlen | 337 | NS1 |
| Casper | Peter | 301 | NS1 |
| Cassadore Sr. | Johnny | 146 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Castillo | Fred | 9 | ALT30 |
| Castillo | Jocelyn | 13 | ALT30 |
| Castillo | Weston | 977 | NS1 |
| Castleberry | Renee | 989 | NS1 |
| Casto | Greg | 5747 | ALT22, NS1 |
| Castro | Elia | 29709 | CR4 |
| Castruita | Ian | 5571 | NS1 |
| Catanese | Christina | 1525 | CR4, NS1 |
| Catt | Janice | 1333 | CR4, TS7, WT2 |
| Cattau | Christopher | 28392 | NS1 |
| Cencioso | Marilyn N | 6888 | NS1 |
| Chadwick | A | 6889 | NS1 |
| Chalepah | Kyle | 917 | CR4, MIT3 |
| Chamberlin | Ryan | 232 | NS1 |
| Chao | Dorothy | 30066 | NS1, TS1, WT4 |
| Chapin | Chris | 28607 | NS1 |
| Chapin | Radka | 6527 | NS1 |
| Charles | Nicole | 27830 | NS1 |
| Chennell | Irene | 27726 | NS1 |
| Chilcoat | Rose | 27352 | NS1 |
| Chiropolos | Jim | 29005 | NS1 |
| Chisholm | Jessica | 1463 | MIT3, TS31, WT4_D |
| Choinacky | Thomas | 1366 | NS1 |
| Choppers-Wife | Sue | 836 | NS1 |
| Choran | Chasity | 615 | ALT22, NS1 |
| Christiansen | Eric | 466 | NS1, NS2 |
| Ciano | Christina | 27366 | NS1 |
| Ciosici | Stefan | 27006 | NS1 |
| Ciprian | Esther | 28095 | NS1 |
| Clagett | Rita | 27094 | NS1 |
| Clare | Mamie | 6646 | NS1 |
| Clark | Arlyn | 830 | ALT30 |
| Clark | Don | 288 | NS1 |
| Clark | Emory | 29010 | NS1 |
| Clark | Jackie | 27175 | NS1 |
| Clark | Lucy | 27210 | NS1 |
| Clark | Morgan | 5403 | NS1 |
| Clark | Sharon | 906 | WT4 |
| Clarke | Veronica | 27790 | NS1 |
| Clarkson | Jeb | 881 | ALT30 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Clarkson | Russell | 28562 | NS1 |
| Clinton | Simon | 652 | NS1 |
| Cloud | Justin | 5912 | NS1 |
| Coady | Melis | 28801 | NS1 |
| Coates | Tim | 28327 | NS1 |
| Cobb | Maria | 1142 | NS1 |
| Cobban | Ann | 6895 | NS1 |
| Coburn | Dan | 27150 | NS1 |
| Cohan | Kathleen | 8144 | WT4 |
| Cohen | Bradley | 1249 | NS1 |
| Cohen | David | 676 | NS1 |
| Cohen | Ethan | 1008 | NEPA1, NS1 |
| Cole | Cal | 798 | NS1 |
| Cole | Jess | 6393 | NS1 |
| Cole | Ramona | 29755 | NS1 |
| Cole | Ryan | 28802 | NS1, WT25 |
| Colella | Jacob | 28316 | NS1 |
| Coleman | David | 766 | NS1 |
| Coleman | Ed | 6903 | NS1 |
| Colestock | Kailey | 409 | NS1 |
| Colter | Cindy | 478 | NS1 |
| Congdon | Sarah | 1383 | ALT22, NS1, WT4 |
| Conner | Lisa | 8167 | NS1 |
| Conner | Spencer | 8020 | NS1 |
| Conway | Katie | 931 | NS1 |
| Conway | Pamela | 832 | NS1 |
| Conway | Ryan | 253 | NS1 |
| Cook | Driz | 5493 | NS1 |
| Cook | Stephen | 1404 | ALT5, MIT1, TS24 |
| Cook | Vicki | 902 | NS1 |
| Cooper | Micah | 1032 | NS1 |
| Cooper | Paul | 27636 | NS1 |
| Coopey | Judith | 6905 | NS1 |
| Copeland | Amber | 28875 | NS1 |
| Copenagle | Lily | 5422 | NS1 |
| Copper | David | 5395 | NS1 |
| Coppinger | Josh | 6225 | NS1 |
| Corbett | Danielle | 1316 | NS1 |
| Corbin | Linda | 764 | NS1 |
| Corcoran | Tim | 1622 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Corcoran-Shannon | Alexandra | 1523 | NS1, SO19, SO6, SR13, SR13_A, SR14, SR23, SR24 |
| Cordoza | Marjory | 27803 | NS1 |
| Corley | John | 28145 | NS1 |
| Corliss | Nan | 27618 | NS1 |
| Corona | Ann M. | 1397 | NS1 |
| Corrigan | Joanna | 6911 | NS1 |
| Cote | Monique | 28169 | NS1 |
| Coughlin | Rev. J. | 26916 | NS1 |
| Cowan | Kathy | 27760 | NS1 |
| Cozine | Jeanne | 933 | NS1 |
| Crandall | Carol | 28014 | NS1, WT25 |
| Crawford | Marilyn | 7530 | NS1 |
| Crawford-Bizzell | Joshua | 5558 | NS1 |
| Crawley | Johnathon | 29183 | NS1 |
| Crea | Britt | 688 | NS1 |
| Crews | Eric | 29330 | NS1 |
| Cronin | Mikel | 29050 | NS1 |
| Cronkhite | Nicole | 728 | NS1 |
| Croom | Catherine | 27185 | NS1 |
| Crosby | Ann | 26820 | NEPA37 |
| Crossland | Anita | 28105 | NS1 |
| Crossman | John | 6923 | NS1 |
| Crown | Jessie | 6925 | NS1 |
| Cruz | Arturo | 8080 | NS1 |
| Cruz | Benjamin | 27634 | NS1 |
| Culberson | Clint | 256 | NS1 |
| Cullaz | Chris | 691 | NS1 |
| Cummings | Jackson | 28881 | NS1 |
| Cummings | Loretta | 27902 | NS1 |
| Cummings | Torreya | 1357 | NS1 |
| Cunningham | Tiffany | 415 | NS2 |
| Curley | Carrie | 75 | CR4 |
| Curley | Margie | 88 | NS1 |
| Curley | Selina | 109 | NS1 |
| Curtis | Margaret | 1320 | NS1 |
| Cusack | Patrick | 5910 | NS1 |
| Cuticello | Jill | 1459 | NS1 |
| Cutler | Patti | 850 | NS1 |
| Czachurski | John | 26956 | NS1 |
| Dacey | Kari | 1326 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Dagion | Jillian | 613 | NS1 |
| Dahlin | Camilla | 1451 | NS1 |
| Dakouzlian | Marge | 29047 | NS1 |
| Dalessio | Nicholas | 28485 | NS1 |
| Daley | Suzann | 27986 | NS1 |
| Dallari | M.Cecilia | 5457 | NS1 |
| Dallmann | Allyson | 27120 | NS1 |
| Dalpes | Bryan | 8218 | NS1 |
| Dalton-Rabago | Pamela | 1392 | ALT1, MIT1, NS1 |
| Daluz | Ze | 28074 | NS1 |
| Dancs | Kris | 668 | NS1 |
| Dantico | John | 1540 | ALT5, MIT1, MIT21, MIT27, MIT8, WT14, WT19, WT4, WT7 |
| Danz | Maria | 6436 | ALT22, NS1 |
| Dargis | Andre | 6931 | NS1 |
| Davidson | Katy | 1288 | NS1 |
| Davidson | Scott | 7957 | NS1 |
| Davies | Caroline | 935 | NS1 |
| Davies | Michael | 6438 | NS1 |
| Davis | Chandler | 27572 | NS1 |
| Davis | Jake | 1022 | NS1 |
| Davis | Jason | 8043 | NS1 |
| Davis | Karen | 5956 | NS1 |
| Davis | Keith | 714 | NS1 |
| Davis | Mark | 223 | NS1, NS2 |
| Dawood | Jonathan | 8141 | NS1 |
| Dawson | Joan | 27818 | NS1 |
| Dawud | Sumayyah | 1094 | NS1, WT1 |
| Dazey | Rachel | 1377 | NS1 |
| Deburlo | Robert | 5582 | NS1 |
| Deconcini | Dennis | 280 | NS1 |
| Dedinas | Monique | 8192 | NS1 |
| Defrain | Isaac | 28846 | NS1 |
| Delamater | Adair | 26819 | NS1 |
| Delbecq | Claire | 28645 | NS1 |
| Delgado | John | 1280 | AMT1, NS1 |
| Delo | Amy | 29241 | NS1 |
| Demaio | Teri | 26922 | NS1 |
| Demian | Dr. | 27913 | NS1 |
| Deming | Diana | 6938 | NS1 |
| Denes | Zach | 1086 | ALT5, AQ11, NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Dennis | Margaret | 27824 | NS1 |
| Denny | Rachael | 26943 | NS1 |
| Denny Ziesmer | Mary Kate | 28164 | NS1 |
| Deprez | David | 27817 | NS1 |
| Derrig | James | 6941 | NS1 |
| Deshazo | Bridget | 28175 | NS1 |
| Deshpande | Salil | 910 | AQ11, MIT17, NS1, NS2, WT1, WT24, WT26 |
| Despain | Cara | 1388 | NS1, NS2 |
| Devers | Deborah | 26909 | NS1 |
| Deweerdt | Kyle | 8212 | NS1 |
| Dewitt | Steven | 487 | NS1 |
| Deyoung | Lucas | 28471 | NS1 |
| Dial | Joe | 1212 | NS1 |
| Dianich | A. Michael | 5689 | NEPA37 |
| Dibella | Ed | 28546 | NS1 |
| Dicara | Sue | 5410 | NS1 |
| Diciccio | Sal | 307 | MIT1, NS1 |
| Diehl | Dana | 1365 | NS1 |
| Diehn | Christopher | 27181 | NS1 |
| Diller | Susan | 1202 | NS1 |
| Dillon | Joy | 27904 | NS1 |
| Dimalteo | Nick | 29148 | NS1 |
| Dischinger | Sarah | 5943 | NS1 |
| Diss | Marybeth | 27759 | NS1 |
| Dissel | Scott | 505 | NS1 |
| Distasi | Krista | 6609 | NS1 |
| Dixon | Curt | 27657 | NS1 |
| Dixon | Eva | 28439 | NS1 |
| Dixon | Marie | 27753 | NS1 |
| Dobreva | Mariyana | 27884 | NS1 |
| Dobski | Deborah | 27864 | NS1 |
| Doery | Marya | 1845 | NS1 |
| Dolan | Patricia | 27837 | NS1 |
| Dolecek | Andy | 6656 | NS1 |
| Donaghy | Howard | 2002 | NS1 |
| Donald | John | 6946 | NS1 |
| Donohoe | Colleen | 801 | NEPA30, NS1 |
| Donohoe | Colleen | 6276 | NS1 |
| Dormer | Sarah | 644 | NS1 |
| Dorn | Ryan | 8150 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Dotson | Breydan | 979 | NS1, NS2, WT4 |
| Doub | Eric | 5520 | NS1 |
| Downing | William | 1812 | NS1 |
| Dr | (Blank) | 6950 | NS1, WT4 |
| Drabik | Jennifer | 677 | NS1 |
| Drakos | Paul | 28660 | NS1 |
| Drescher | Anushka | 27180 | NS1 |
| Drubetskaya | Liliya | 1219 | NS1, WT8 |
| Dublinski | Jim | 209 | NS1, SO6, WT4 |
| Dublinski | Jim | 6181 | NS1, TS24_D |
| Dubois | Jan | 6139 | NS1 |
| Dubois | Jeffry | 27888 | NS1 |
| Dudley | Cory | 8302 | NS1 |
| Duff | Jon | 29406 | NS1 |
| Dunkle | Doug | 1273 | NS1 |
| Dunlap | Grace | 396 | NS1 |
| Dunlap | Lorraine | 6953 | NS1 |
| Dunn | Christy | 27011 | NS1 |
| Dunn | Keegan | 6482 | NS1 |
| Dunn | Valerie | 1264 | NS1 |
| Duplissis | Eve | 5431 | NS1 |
| Durfee | Alex | 2009 | NS1 |
| Dustin | Fw | 26971 | NS1 |
| Dutchoger | Tanner | 693 | NS1 |
| Dwyer | Anne | 685 | NS1 |
| Dyer | Richard | 6539 | NS1 |
| Dykers | Lawrence | 1200 | NS1, TS1 |
| Dynarski | Katherine | 6005 | NS1 |
| Earle | Nathan | 28335 | NS1 |
| Earls | Gail | 6956 | NS1 |
| Eason | Jennifer | 922 | ALT5, NS1 |
| Eckard | Chad | 531 | NS1 |
| Edelberg | Walter | 757 | NS1 |
| Eden | Cathy | 1910 | NS1 |
| Eden | Mary | 596 | NS1 |
| Edmondson | Teddy | 1919 | NS1, NS2, WT4 |
| Edwards | Angela | 29040 | NS1 |
| Edwards | Christian | 26988 | NS1 |
| Egger | Mark | 27808 | NS1 |
| Eichelberger | Jonathan | 28419 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Eiten | Zach | 648 | NS1 |
| Ela | Autumn | 1051 | NEPA36, SR2, SR35, SR36, SR4 |
| Elder | Joshua | 29158 | NS1 |
| Elkins | Scot | 8232 | NS1 |
| Ellauri | Cristian | 286 | ALT22, NEPA3, NS2, WT1, WT43 |
| Elliot | Jason | 6411 | NS1 |
| Ellis | Andrew | 736 | NS1 |
| Ellis | Andrew | 737 | NS1, WT4 |
| Ellis | Rebekah | 1329 | ALT5, MIT3, NS2, TS1, WT48 |
| Ellison | Richard | 510 | NS1 |
| England | Dennis | 5856 | NS1 |
| England | Stephen | 494 | SO1 |
| Engle | Carol | 7552 | NS1 |
| English | Amy | 7554 | NS1 |
| Engs | Bill | 27842 | NS1 |
| Enloe | Mark | 8323 | NS1 |
| Ensign | Lars | 658 | NS1 |
| Enzi | Hap | 28126 | NS1 |
| Epley | David Wilmon T | 6961 | NS1 |
| Erickson | Don | 26967 | NS1 |
| Escalet | Deborah Escalet | 27932 | NS1 |
| Espinal | Michelle | 647 | NS1 |
| Espinosa | Brittany | 5907 | NS1 |
| Eurich | Sam | 570 | NS1 |
| Evangelista | Chris | 27917 | NS1 |
| Evans | Boyd | 29060 | NS1 |
| Evans | Levi | 8239 | NS1 |
| Evans | Matthew | 28299 | NS1 |
| Evatz | Leslie | 28242 | NS1 |
| Evenson | Lynn | 27769 | NS1 |
| Eventoff | Franklin | 815 | NS1 |
| Everett | David | 1058 | MIT1 |
| Fahmy | Sam | 1841 | NS1 |
| Falcon | Jennifer | 27922 | NS1 |
| Faleq | Zakey | 29058 | NS1 |
| Fallow | David | 26958 | NS1 |
| Fancherella | Beth | 1053 | WT1 |
| Fanucchi | Joanne | 27876 | NS1 |
| Farahat | Sarah | 1222 | NS1, NS2 |
| Farrell | Courtney | 5669 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Faughn | Michael | 29140 | NS1 |
| Faulk | May | 27624 | NS1 |
| Faulkner | Madison | 1019 | NS1 |
| Feiler | Mary Anna | 27662 | NS1 |
| Feliciana | Selena | 407 | NS1 |
| Fellay | Helga | 1217 | NS1 |
| Fenderson | Ashley | 1537 | NS1 |
| Fernandez | Edgar | 1078 | NS1 |
| Ferrando | Elizabet H | 6967 | NS1 |
| Ferris | Bruce | 28866 | NS1 |
| Fiala | Ronald | 30124 | NS1 |
| Fiastro | Fred | 1169 | CR4, NS1, NS2 |
| Field | Edward | 5495 | NS1 |
| Fields | Theodore | 8028 | NS1 |
| Fiflis | Michael | 1110 | WT4 |
| Filippelli | Steven | 527 | NS1 |
| Filsinger | Erik | 876 | MIT1 |
| Finch | Larry | 29491 | NS1 |
| Fink | Hailey | 5757 | NS1 |
| Finnegan | Sean | 28641 | NS1 |
| Finnerty | Margar Et | 6973 | NS1 |
| Finsness | Paul | 26968 | NEPA2 |
| Fischer | Hans | 630 | NS1 |
| Fischer | Katrina | 635 | NS1 |
| Fischvogt | Ryan | 593 | NS1 |
| Fisher | Kristina | 27848 | WT1 |
| Fisher | Stephanie | 459 | NS1 |
| Fisher | Todd | 28592 | NS1 |
| Fishman | Jacob | 861 | MIT1 |
| Fister | Loreli | 27591 | NS1 |
| Fitchie | Denice | 1135 | NS1 |
| Fitzgerald | Sean | 29237 | NS1 |
| Flahart | Pat | 293 | NS1 |
| Flanagan | Sean | 28289 | NS1 |
| Flanagan | Todd | 6442 | NS1 |
| Flaten | Zachary | 7950 | NS1 |
| Fletcher | Carol | 27104 | NS1 |
| Flocken | Bruce | 6974 | NS1 |
| Flood | Jennifer | 26815 | NS1 |
| Flood | Tim | 1361 | MIT1, MIT21, MIT30, NEPA35, TS24 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Flores | Kimberly | 8225 | NS1 |
| Flynn | Emmet | 29505 | NS2 |
| Folsom | David | 5447 | NS1 |
| Fontana | Melanie | 6406 | NS1 |
| Ford | Garrett | 28615 | NS1 |
| Ford | Marcell A | 6979 | NS1 |
| Ford | Peggy | 28032 | NS1 |
| Forde | Daniel | 1175 | NS1 |
| Forde | Meghan | 5825 | NS1 |
| Foreman | Samuel | 28588 | NS1 |
| Forest | Amanda | 6030 | NS1 |
| Fortunato | D'Anna | 26955 | NS1 |
| Foster | Andrew | 7917 | NS1 |
| Fox | Lina | 30111 | NS1 |
| France | Glenn | 777 | NS1, WT4 |
| Frank | Dave | 771 | NS1 |
| Frank | Rachel | 27971 | NS1 |
| Franklin | Constance | 28035 | NS1 |
| Franz | Derek | 6214 | NS1 |
| Fraser | David | 1328 | NS2 |
| Fraser | Kathy | 1307 | NS1 |
| Frates | Tony | 27005 | NS1 |
| Frazier | Brent | 28572 | NS1 |
| Freeman | Beth Jane | 5454 | NS1 |
| Freeman | Beth Jane | 756 | NS1 |
| Freeman | Connie | 39 | NS1 |
| Freeman | Corrine | 4 | NS1, NS2, TS24 |
| Freeman | Corrine | 121 | NS1 |
| Freeman | Deborah | 1314 | NS1 |
| Freeman | Judy | 6959 | NS1 |
| Freeman | Nancy | 22 | AQ4, MIT1, NS2 |
| Freeman | Nancy | 23 | AMT4, NEPA13, NEPA14 |
| Freeman | Nancy | 158 | ALT6, NEPA1, NEPA13 |
| Freeman | Nancy | 162 | GS9, NS2 |
| Freeman | Nancy | 885 | NEPA10, NEPA14, NEPA68 |
| Freeman | Nancy | 1201 | GS2, GS8, GS9, MIT23 |
| Freeman | Nancy | 1469 | NS1, TS28, WT60 |
| Freeman | Nancy | 1514 | NS1 |
| Freer | Elizabet H | 6984 | NS1, WT4 |
| Freer-Parsons | Christiane | 27847 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Freiberg | Harry | 28059 | NS1 |
| Frejo | Morgun | 93 | CR4, NS1 |
| Frejo | Morgun | 156 | CR4, NS1, NS2 |
| Frejo | Morgun | 166 | CR4, NS1 |
| Frejo | Morgun | 227 | GS13, NS1, SR8 |
| French | David | 29253 | NS1 |
| Frey | Brenda | 28025 | NS1 |
| Fridena | Richard | 1173 | NS1 |
| Fridena | Richard | 1323 | NS1 |
| Friederich | Kurt | 1994 | NS1 |
| Fritz | Ian | 1057 | NS1 |
| Frost | Gail | 26992 | NS1 |
| Frye | Bob and Shelley | 1276 | ALT30, MIT21, NEPA4, NS1, NS2, SR20, WT43 |
| Fulmer | Kyle | 1873 | NS1 |
| Futrell | Sherrill | 27931 | NS1 |
| Gaarder | Kelsey | 5922 | NS1 |
| Gabel | Nancy | 27224 | NS1 |
| Gabel | Peter | 888 | CR4, NS1 |
| Gabrielson | Justin | 1453 | NS2 |
| Gadbois | Joseph | 28405 | NS1 |
| Gallagher | David | 1214 | NS1 |
| Gallego | Vanessa | 1497 | NS1 |
| Galvan | Martina | 1123 | NS1 |
| Ganahl | Amy | 5492 | NS1 |
| Ganmoryn | Croitiene | 790 | NS1 |
| Gapuz | Michael | 5566 | NS1 |
| Garai | Lonna | 205 | ALT1 |
| Garcia | Armando A. | 28542 | NS1 |
| Garcia | Deangelo | 1034 | NS1 |
| Garcia | Kimberly | 1436 | NS1 |
| Garcia | William | 28905 | ALT22 |
| Garnice | Cheryl | 6989 | NS1 |
| Garratt | Sharon | 27966 | NS1 |
| Garrido-Spencer | Sally | 1292 | NS1 |
| Gartner | Robert | 1234 | NS1 |
| Gastrich | Justin | 453 | NS1 |
| Gates | Tyler | 634 | NS1 |
| Gauba | Blaise | 29081 | NS1 |
| Gaura | Robin | 1619 | NS1 |
| Gebhard | Lisa | 672 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Gebhart | Cady | 352 | NS1 |
| Gehrels | Thomas | 28352 | NS1 |
| Geis | Tanja | 1293 | CR4, MIT35, NS2 |
| Gelczis | Lisa | 27767 | NS1 |
| Genest | Karen | 481 | NS1, WT4 |
| Gentry | Zoe | 856 | NS1 |
| George | Rusty | 6563 | NS1 |
| George | Sarah | 608 | ALT22 |
| Gerrodett E | Patricia | 6995 | NS1 |
| Gettens | Michael | 50 | NS1 |
| Gettens | Michael | 66 | ALT22, NS1, NS2, WT7 |
| Gettens | Michael | 824 | NS1, NS2 |
| Getz | Sara | 6551 | NS1 |
| Giannone | Robert | 7599 | NS1 |
| Gibbens | Paula | 812 | MIT21 |
| Gibbons | Brian | 5359 | NS1 |
| Gibbons | Connie | 7601 | NS1 |
| Gibson | George | 968 | NS1 |
| Gibson | Sara | 26999 | NS1 |
| Gibson | Zachary | 28678 | NS1 |
| Giesy | Theo | 27811 | NS1 |
| Gifford | Noah | 987 | NS1 |
| Gilbard | Alexis | 6157 | NS1 |
| Gilleran | Kari | 725 | NS1 |
| Gillespie | Fran | 891 | NS1 |
| Gillman | Andrew | 8311 | NS1 |
| Gilmore | Roland | 6546 | NS1 |
| Giordano | James | 6125 | NS1 |
| Giordano | Spencer | 557 | WT4 |
| Gist | Del | 28030 | NS1 |
| Given | Wendy | 1486 | NS1 |
| Gladieux | Stephen | 5787 | NS1 |
| Glass | Leslie | 15 | ALT22, MIT1, NS1 |
| Glass | Leslie | 64 | NEPA30, NEPA68, NS2, WT4 |
| Glass | Leslie | 65 | CR4, MIT3 |
| Glass | Leslie | 87 | CR4, NS1 |
| Glass | Leslie | 213 | NEPA30, NEPA37, NS1 |
| Glass | Leslie | 242 | CR4, NS1, NS2 |
| Glass | Leslie | 245 | NEPA30 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Glass | Leslie | 1338 | ALT22, ALT5, CR4, EJ5, EJ6, MIT7, NEPA18, NEPA29, NS2, WT4 |
| Glass | Stephen | 8015 | NS1 |
| Glassman | Lucille | 6268 | NS1 |
| Glenn | Lisa | 1278 | NEPA35, NS1 |
| Godinez | Barbara | 1224 | NS1 |
| Goldberg | Claire | 28284 | NS1 |
| Golden | Amber | 6998 | NS1 |
| Goldenberg | Suzanne | 1487 | NS1 |
| Gomez | Belinda | 7960 | NS1 |
| Gomez | Mary | 19 | ALT25, EJ2, NS2 |
| Gomez | Mary | 211 | NS1 |
| Gomez Paz | Daniela | 1362 | NS1 |
| Gonzales | Carlos | 193 | NS1 |
| Gonzales | Joe | 27671 | NS1 |
| Gonzalez | Brisa | 1248 | TS24 |
| Gonzalez | Camille | 939 | NS1 |
| Gonzalez | Debbie | 6988 | NS1 |
| Gonzalez | Gabriel | 1428 | NS1 |
| Goodwin | Laurance | 8241 | NS1 |
| Gordian | Liana | 5644 | NS1 |
| Gordin | Lawrence | 27852 | NS1 |
| Gorman | Joseph | 633 | NS1, WT4 |
| Gorton | Henry | 1439 | CR16 |
| Goseyun | Kellieann | 157 | CR4, NS1 |
| Goss | Randy | 247 | MIT1 |
| Gottfried | Susan | 27672 | NS1 |
| Gottworth | Andrew | 6564 | NS1 |
| Govedich | Penny | 7004 | NS1 |
| Gow | Alexander | 8101 | NS1 |
| Gowie | Matt | 8264 | NS1 |
| Goyette | Roland | 27794 | NS1 |
| Grace | Ashley | 934 | NS1 |
| Graetz | Jacqueline | 7943 | NS1 |
| Graffagnino | Dr. Mary Ann and Mr. Frank | 1579 | NS1 |
| Graffagnino | Dr. Mary Ann and Mr. Frank | 1626 | NS1 |
| Graham | Karen | 27056 | NS1 |
| Graham-Gardner | Rosemary | 5373 | NS1 |
| Granata | Amelia | 1965 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Grant | Andrew | 29066 | NS1 |
| Grant | Dr Jennifer | 28086 | NS1 |
| Grant | Eliesha | 1049 | NS1 |
| Grant | Vernelda | 112 | CR4, NS1 |
| Grassel | Lori | 7007 | NS1 |
| Grassi | Daniel | 27617 | NS1 |
| Gray | Carolyn | 130 | NEPA13 |
| Gray | Kathleen | 27151 | NS1 |
| Gray | Thomas | 6542 | NS1 |
| Greacen | Clary | 28138 | NS1 |
| Green | Adonna | 451 | NS1 |
| Green | Amy | 353 | NS1 |
| Greenspan | Jesse | 27836 | NS1 |
| Greenway | Lumina | 6231 | NS1 |
| Greer | Russel | 28564 | NS1 |
| Gregorio | Penny | 5721 | NS1 |
| Gregory | Eric | 7012 | NS1 |
| Gresham | George | 7015 | NS1 |
| Gresham | Margo | 465 | NS1 |
| Griesser | Scott | 6036 | NS1 |
| Griffin | Sandra and Glenn | 27045 | ALT16, SO12 |
| Griffith | E Margareta | 870 | NS1 |
| Griffith | Rosemary | 1244 | NS1 |
| Grijalva | Genesis | 27823 | NS1 |
| Grimsley | Alex | 628 | NS1 |
| Grimsrud | Dee | 27602 | NS1 |
| Grinnell | Rick | 229 | NS1 |
| Grisham | Thomas | 5924 | NS1 |
| Griswold | Gene | 1172 | NS1 |
| Grman | Mark | 29032 | NS1 |
| Groslyn | Sharyn | 27325 | NS1 |
| Gross | Cheryl | 27996 | NEPA33, TS2, WT25, WT8 |
| Gross | Cheryl A | 5474 | AMT1, NS1 |
| Grout | Jeffrey | 272 | NS1 |
| Grover | Wesley | 566 | NS1 |
| Grow | Ann | 27441 | NS1 |
| Grow-Garrett | Shannon | 5391 | NS1 |
| Guerin | Gregory | 29152 | NS1 |
| Guinn | Chris | 750 | NS1 |
| Guinn | Erica | 7022 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Gunderman | Joan | 27417 | NS1 |
| Gunn | Ashley | 1838 | NS1 |
| Gunn | David | 5 | MIT3, NEPA36 |
| Gunn | David | 521 | NEPA25 |
| Gunn | David | 1158 | ALT1, ALT22, AMT1_C, AQ1, DOC1, GS14, MIT1, MIT12, MIT23, MIT24, MIT3, MIT4, NEPA10, NEPA25, NEPA35, NEPA36, NEPA39, NEPA45, NEPA63, SO14, TR13, WT15, WT20, WT21, WT27, WT7, WT77 |
| Gunter | Jeremy | 602 | NS1 |
| Gunter | Nic | 8245 | NS1 |
| Gurney | Hugh | 27115 | NS1 |
| Gurzi | Conor | 5658 | NS1 |
| Guthrie | Linda | 27666 | NS1 |
| Gutierres | Sara | 7627 | NS1 |
| Guy | Joel | 859 | NS1 |
| Guyett | Michell E | 7628 | NS1 |
| G-Williams | Princess | 1030 | NS1 |
| H | Diana | 1461 | TR5 |
| Haddox | David | 30133 | NS1 |
| Haff | Harry | 7630 | NS1 |
| Hafner | Nancy | 27022 | NS1 |
| Hahn | Lewis | 601 | NS1 |
| Hahn | Virginia | 1198 | NS1 |
| Haldeman | Pat | 5776 | NS1 |
| Hale | Katelyn | 1513 | CR12, NS1 |
| Hall | Jacob | 612 | WT4 |
| Hall | Josephine | 27159 | NS1 |
| Hall | Linda | 1193 | NS1 |
| Hall | Rene | 27765 | NS1 |
| Hall | Ryan | 473 | NS1 |
| Hall | Shawn | 5452 | NS1 |
| Hall | Shawn | 27111 | NS1 |
| Halladay | Jason | 6281 | NS1 |
| Halligan | Michele | 27850 | NS1 |
| Halpin | Mitchell | 964 | NS1 |
| Halsey | Bill | 27822 | NS1 |
| Ham | Kyle | 6038 | NS1 |
| Hamashima | Lawrence | 2125 | NS1 |
| Hamilton | Grant | 28653 | NS1 |
| Hamilton | James | 1907 | NS1 |
| Hammer | F | 27116 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hammerle | Jim | 2117 | NS1 |
| Hamp | Charmaine | 5567 | NS1 |
| Hampton | Chance | 2129 | NS1 |
| Handwerg | Joan | 1490 | NS1 |
| Hanger | Susan | 27350 | NS1 |
| Hankins | Samantha | 6383 | NS1 |
| Hannon | Steve | 1096 | NS1 |
| Hannum | Christine | 27376 | NS1 |
| Hansen | John | 816 | ALT30 |
| Hansen | Steven | 6124 | NS1, SR22 |
| Hansis-O'Neill | Becky | 742 | ALT22, NS1 |
| Hanson | Cynthia | 28000 | NS1 |
| Harbison | Zachariah | 1015 | NS1 |
| Harders | Carl | 1081 | NS1 |
| Hardesty | Danny | 6317 | CR4 |
| Hargrove | J | 7032 | NS1 |
| Harmann | Melanie | 1442 | NS1 |
| Harmer | Jake | 6456 | NS1 |
| Harmon | Alison | 1870 | NS1, NS2 |
| Harmon | Joanna | 6152 | NS1 |
| Harmon | Lisa | 28019 | NS1 |
| Harmon | Michael | 7034 | NS1 |
| Harmon | Zachary | 851 | NEPA15, NS1 |
| Harper | Dan | 6379 | NS1 |
| Harpley | Rachel | 1335 | AQ11, TS24, WT35, WT4 |
| Harpster | Jamie | 395 | NS1 |
| Harrington | Roxy | 7036 | NS1 |
| Harris | Carolyn | 27132 | NS1 |
| Harris | Carolyn | 1500 | NS1 |
| Harris | Jerald | 1382 | NS1 |
| Harrison | David | 27995 | NEPA33, TS2, WT1, WT8 |
| Harrison | Kimberly | 30115 | NS1 |
| Harrison | Nathaniel | 641 | NS1 |
| Hart | James | 5408 | NS1 |
| Hart | Mary M | 27862 | NS1 |
| Harter | Mitchell | 360 | NS1 |
| Hartman | George | 28057 | NS1 |
| Hartman | Julia | 27156 | NS1 |
| Harts | Dwight | 28862 | NS1 |
| Hartung | Sean | 8215 | NS1 |

R-103

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hartzell | Betsy | 27667 | NS1 |
| Hartzman | Peter | 28084 | NS1 |
| Harvey | Mark Judy | 789 | NS1 |
| Harwood | Amy | 115 | NEPA30, NS1 |
| Harwood | Amy | 1480 | NS1 |
| Hassler | Andrea | 8003 | NS1 |
| Hastil | Jahn | 28340 | NS1 |
| Hastings | Logan | 29468 | NS1 |
| Hatch | Brad | 28794 | NS1 |
| Hatcher | William | 7639 | NS1 |
| Hatter | Erinn | 1341 | NS1 |
| Hatzai | Christopher | 28797 | NS1 |
| Hauck | Chad | 1000 | NS1 |
| Haughney | Sarah | 558 | NS1 |
| Havrilla | Judith | 27706 | NS1 |
| Hawes | William | 326 | NS1 |
| Hawkins | Aaliyah | 1029 | NS1 |
| Hawkins | Josh | 605 | NS1 |
| Hawley | Nicholas | 28541 | NS1 |
| Hayden | Sue | 27957 | NS1 |
| Haydon | Emily | 708 | NS1 |
| Hayenga | Beri | 8162 | NS1 |
| Hayes | Brooke | 1021 | NS1 |
| Hayes | Sara | 28120 | NS1 |
| Hayes | Tanner | 5517 | NS1 |
| Hayes | Tim | 1155 | ALT5, NEPA2, NS1 |
| Heath | Joshua | 28463 | MIT23, NEPA54 |
| Hecht | Justine | 1132 | NS1 |
| Heck | John | 997 | NS1 |
| Hedden | Chet | 27977 | NEPA33, NS1 |
| Hefton | Kris | 1144 | NS1 |
| Heirtzler | Jason | 27641 | NS1 |
| Heist | Kevin | 700 | NS1 |
| Hellauer | Tom | 28624 | NS1 |
| Heller | Carol | 1381 | TS13, WT4 |
| Heller | Carol | 1424 | AMT1, NEPA35 |
| Hemingway | Graham | 28154 | NS1 |
| Hemsoth | Jered | 6034 | NS1 |
| Henderson | Colin | 28919 | NS1 |
| Henderson | David | 1016 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hendrickson | Christopher | 1875 | NS1 |
| Hendrixson | Del | 7046 | NS1 |
| Henne | Bill | 27008 | NS1 |
| Hennessey | Kaitlyn | 29035 | NS1 |
| Henning | Elisabeth | 80 | NS1, NS2 |
| Henning | Elisabeth | 1369 | TR15 |
| Hepting | Lianna | 8117 | NS1 |
| Heritage | Jason | 28964 | NS1 |
| Hernandez | Alexia | 28466 | NS1 |
| Hernandez | Rob | 28454 | NS1 |
| Hernandez De Pena | Carlos | 938 | NS1 |
| Herrera | David | 58 | NS1, WT30 |
| Herrmann | Cody | 1066 | NS1 |
| Heston | Lark | 624 | WT4 |
| Hettinger | Joseph | 376 | CR5, NS1, WT25 |
| Hickman | Sarah | 28016 | NS1 |
| Hidalgo | Gabriela | 949 | NS1 |
| High | Fred | 7895 | NS1 |
| Hilbert | Harrison | 439 | NS1 |
| Hilf | Lawrence | 28024 | NS1 |
| Hill | Colin | 990 | NS1 |
| Hill | Donald | 28315 | NS1 |
| Hill | Melissa | 567 | NS1, WT6 |
| Hill | Sandy | 28611 | NS1 |
| Hillner | Jeremy | 2058 | NS1 |
| Hilton | Charles | 27960 | NS1 |
| Hing | Michael | 155 | NS1 |
| Hinojos | Lucinda | 216 | NS1 |
| Hinton | Rebecca | 1084 | NS1, NS2, WI1, WT1, WT7 |
| Hipshire | Mark | 28433 | NS1 |
| Hiser | Katie | 431 | NS1 |
| Hittner | Hillary | 1419 | WT1 |
| Hjelmeir | Korey | 151 | ALT5, NS1, SO21, WT1, WT6 |
| Hjelmeir | Korey | 1083 | ALT5, NS1, WT4 |
| Hjelmeir | Korey | 1468 | GS12, MIT35, NS1, NS2, SO6, TS21, WT1, WT4_E, WT6 |
| Hlodnicki | Bruce | 5349 | NS1 |
| Hobbs | Joan | 27748 | NS1 |
| Hobson | Mark | 7945 | NS1 |
| Hodge | Brendan | 719 | NS1 |
| Hodgkinson | Anne | 28049 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hodgson | Eleanor | 27421 | NS1 |
| Hoehne | Audrey | 27898 | NS1 |
| Hoffman | Cranston | 77 | NS1, WT30 |
| Hoffman | Jan | 7648 | NS1 |
| Hoffman | Karen | 844 | WT43 |
| Hoffman | Norman | 765 | NS1 |
| Hogan | Morris | 29394 | NS1 |
| Holiday | Shana | 28951 | NS1 |
| Holliday | Craig | 8289 | NS1 |
| Holmgren | Mark | 27896 | NS1 |
| Holmquist | Steve | 1524 | GS3, MIT1 |
| Holmstrom | Janet | 1233 | NS1 |
| Holsen | Jeffrey | 1103 | NS1 |
| Holtz | Michael | 1005 | NS1 |
| Honkonen | Jeffrey | 540 | NS1 |
| Honn | Mel | 7057 | NS1 |
| Hood | Mary | 26836 | NS1 |
| Hook | Wendslyn | 172 | NS1 |
| Hooke | Angel | 70 | CR4 |
| Hooke | Angel | 97 | CR4, NS1 |
| Hooley | Dan | 2018 | NS1 |
| Horn | Nancy | 1368 | WT43 |
| Horowitz | Ze'Ev | 532 | NS1 |
| Horton | Derek | 437 | CR4, NS1, WT4 |
| Horton | Janet | 1160 | NS1 |
| Horton | William | 5569 | NEPA3 |
| Hosea | Jeff | 6154 | NS1 |
| Hough | Kurtis | 1225 | NS1 |
| Howard | Rachel | 28421 | NS1 |
| Howe | Rebecca | 28015 | NS1 |
| Howington | John | 28844 | NS1 |
| Howitt | Shayna | 8002 | ALT22 |
| Hoyle | Alyssa | 30116 | NS1 |
| Hubbard | Chris | 5564 | NS1 |
| Hubbard | James | 27463 | NS1 |
| Hubbart | Lori | 1580 | NS1 |
| Huddleston | Jill | 28656 | NS1 |
| Hudson | Amanda | 5906 | NS1 |
| Hughes | Candace | 271 | NS1 |
| Hughes | Kristen | 6408 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hughes | Michael | 27792 | NS1 |
| Hughes | Sarah | 28067 | NS1 |
| Hull | Todd | 28748 | NS1 |
| Hull-Carlson | Juanita | 7059 | NS1 |
| Hultberg | Alan | 29506 | NEPA57, NS1 |
| Humphrey | Paige | 26822 | NS1 |
| Hunter | Kendra | 5433 | NS1 |
| Hunter | Mary | 1384 | NS1 |
| Hurley | Benjamin | 28957 | NS1 |
| Hurst | David | 7061 | NS1 |
| Hyatt | Nina | 28022 | NS1 |
| Hyduke | Michael | 7661 | NS1 |
| Ialeggio | Anna | 1239 | NS1 |
| Iezzi | Jeff | 585 | NS1, NS2 |
| Iglesias | Diana | 1182 | NS1 |
| Inabinet | Sam | 28007 | NS1 |
| Inouye | David | 27978 | WT4 |
| Iranitalab | Roshanak | 30121 | NS1 |
| Irons | Ellie | 1289 | CR4 |
| Irving | Melissa | 164 | CR4, NS1 |
| J | Karen | 27947 | NS1 |
| Jackson | Carolyn | 27926 | NS1 |
| Jackson | Helen | 26957 | NS1 |
| Jackson | Sharon | 7066 | NS1 |
| Jackson | Valerie | 1259 | NS1 |
| Jacob | Aaron | 1315 | NS1 |
| Jacob | Jaime | 27741 | NS1 |
| Jacobs | Diane | 1245 | NS1 |
| Jacobs | James | 430 | NS1 |
| Jacobsen | Barbara | 7067 | NS1 |
| Jacobson | Charlott E | 7666 | NS1 |
| Jacobson | Rod | 5603 | NS1 |
| Jacoby | Jesse | 27984 | NS1 |
| Jacques | Karen | 27397 | NS1 |
| Jacques | Yan | 474 | ALT22 |
| Jaeger | David | 7667 | NS1 |
| James | Gordon | 27937 | NS1 |
| James Jr. | Johanssen | 374 | NS1 |
| Jamison | George | 7896 | NS1 |
| Jamshedji | Sheriar | 29119 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Janke | Susan | 794 | NS1 |
| Jankowski | Megan | 27709 | NS1 |
| Jankowski | Rob | 7069 | NS1 |
| Jans | Peter | 786 | NS1 |
| Jansen | Scott | 347 | NS1 |
| Janzen | Gayle | 27962 | NS1 |
| Jeffrey | Anna | 1 | NS1 |
| Jeffrey | Anna | 3 | NEPA19, NS1 |
| Jeffrey | Anna | 57 | NS1, NS2 |
| Jeffrey | Anna | 71 | NEPA30, NS1 |
| Jeffrey | Anna | 98 | CR4, NS1 |
| Jeffrey | Anna | 116 | NS1 |
| Jeffrey | Anna | 188 | CR4 |
| Jenkins | Jeff | 553 | NS1 |
| Jenkins | Jess | 577 | NS1 |
| Jenkins | Rose | 27414 | NS1 |
| Jensen | Debora H | 7072 | NS1 |
| Jensen | Jennifer | 1002 | NS1, NS2 |
| Jenson | Linda | 1161 | NS1, WT4 |
| Jesik | Buster | 29156 | NS1 |
| Jiang | Isaiah | 1232 | AMT1, NS1 |
| Jimerfield | Jeff | 7074 | NS1 |
| Johns | Gavin | 8320 | WT4 |
| Johnson | Adam | 8073 | NS1 |
| Johnson | Aubrey | 128 | NS1 |
| Johnson | Audrey | 2 | NS1 |
| Johnson | Brett | 30137 | NS1 |
| Johnson | Brody | 28610 | NS1 |
| Johnson | Chris | 5923 | NS1 |
| Johnson | Dr. Alan | 749 | NS1 |
| Johnson | Evan | 29171 | NS1 |
| Johnson | Iver | 27049 | NS1 |
| Johnson | Jess | 7078 | NS1 |
| Johnson | Larry | 5416 | NS1 |
| Johnson | Margaret | 26868 | NS1 |
| Johnson | Sarah | 751 | MIT1 |
| Johnson | Sydney | 573 | NS1 |
| Johnstone | Kaitlyn | 28383 | NS1 |
| Jones | Dave | 28215 | NS1 |
| Jones | Gary | 6072 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Jones | Kalen | 452 | ALT22, NS1, WT4, WT6 |
| Jones | Kathryn | 28646 | NS1 |
| Jones | Matt | 6504 | NS1 |
| Jones | Ola Cleon | 7081 | NS1 |
| Jones | Philip | 27762 | NS1 |
| Jones | Tristan | 823 | MIT1 |
| Jordan | Andrea | 6283 | NS1 |
| Jordan | Charlton | 29331 | NS1 |
| Jordan | Dorothy | 28063 | NS1 |
| Jordan | Ellen | 609 | NS1, WT4 |
| Jorgensen | Janette | 5455 | NS1 |
| Joseph | Michael | 1009 | NS1 |
| Jurado | Terilynn | 5919 | NS1 |
| Jurczewski | Carol | 5419 | NS1 |
| Jurgens | Denise | 880 | NS1 |
| Kaczorowski | Florence | 28029 | NS1 |
| Kadrich | Peter | 7089 | NS1 |
| Kainrath | Nicholas | 706 | NS1 |
| Kame | Jaime | 493 | MIT1, NS1 |
| Kaminski | Mikayla | 27831 | NS1 |
| Kane | Jolyne | 796 | NS1 |
| Kane | Sarah | 1216 | NS1 |
| Kang | Peter | 499 | NS1 |
| Kaplan | Maya | 926 | ALT5 |
| Kardiak | Jennifer | 791 | NS1, NS2 |
| Kasten | Sayles | 1296 | CR4 |
| Katz, M.D., J.D. | Sandra | 1230 | NS1 |
| Kearney | Kris | 722 | NS1 |
| Keedy | John | 862 | MIT1, NS2 |
| Keenan | Brynn | 30129 | NS1 |
| Keiper | Erin | 27183 | NS1 |
| Keith | Kevin | 344 | NS1 |
| Kelliher | Shannon | 649 | NS1 |
| Kelly | Barbara | 26905 | NS1 |
| Kelly | Nickie | 741 | NS1 |
| Kempke | Ryan | 974 | NS1, WT4 |
| Kennedy | James | 5911 | NS1 |
| Kennedy | Randy | 6180 | NS1 |
| Kennedy | William | 940 | NS1 |
| Keppeler | Sabine | 1986 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Kerins | Mary | 28114 | NS1 |
| Kerr | Tyler | 651 | NS1 |
| Kershner | Camille | 1267 | NS1 |
| Kershner | Camille | 7094 | NS1 |
| Kessler | Anne | 26962 | NS1 |
| Kester | Christopher | 464 | NS1 |
| Keys | Catherine | 26937 | NS1 |
| Kider | David | 29088 | NS1 |
| Kiesel | Matt | 8093 | NS1 |
| Kilfmeyer | Steve | 767 | NS1 |
| Kiholm | Laura | 871 | ALT22, WT1 |
| Kilgore-Brown | Thomas | 28950 | NS1 |
| Kilpatrick | Kathleen | 5901 | NS1 |
| King | Cloud | 27074 | NS1 |
| King | Cyrina | 7098 | NS1 |
| King | Dawn | 26978 | NS1 |
| King | Mason | 6229 | NS1 |
| King | Triston | 701 | NS1 |
| Kingery | Hugh | 440 | NS1 |
| Kingsford-Smith | Steve | 6199 | NS1 |
| Kippenberger | Curt | 7991 | NS1 |
| Kirk | Steve | 30134 | NS1 |
| Kirkland | Emily | 497 | ALT5, CR4, NS1 |
| Kirkland | Emily | 1088 | NS1, NS2, WT1 |
| Kirshbaum | David | 29754 | NS1 |
| Kiss | Istvan | 1301 | ALT12, ALT3, ALT4, GS11, MIT1, MIT21, MIT8, NEPA33, SO2, SO7, TS2, TS3, WT1, WT2, WT21, WT24, WT25, WT4, WT6 |
| Kist | Rosema Ry | 7100 | NS1 |
| Kitchen | Bryan | 27915 | NS1 |
| Kitcheyan | Geraldine | 81 | CR4, NS1 |
| Kitrakis | Elyse | 6297 | NS1 |
| Kitting | Sarah | 664 | NS1 |
| Kizewski | Kurt | 28565 | NS1 |
| Kjono | Greg | 5514 | NS1 |
| Klassen | Glenn | 1147 | NS1 |
| Klein | James | 5414 | NS1 |
| Klein | James | 28090 | NS1 |
| Kleissler | Liz | 6099 | NS1 |
| Klemm | Edwina | 27168 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Klett | Lena | 1507 | NS1 |
| Klitz | Karen | 27359 | NS1 |
| Kloeppel | S. Max | 28443 | NS1 |
| Klug | Madison | 29149 | NS1 |
| Knauer | Gregor | 7103 | NS1 |
| Knebel | Kim | 7686 | NS1 |
| Knight | David | 1041 | NS1, NS2 |
| Knight | James | 28241 | NS1 |
| Knight | Jessica | 7687 | NS1, WT2 |
| Knight-Papaioannou | Khailill | 1403 | NS1 |
| Knutson | L | 760 | NS1 |
| Kobasa | Stephen V. | 26997 | NS1 |
| Kocer | Dianne | 7108 | NS1 |
| Koeck | Diana | 799 | NEPA36, NS1 |
| Koeppe | Max | 27844 | NS1 |
| Koerner | Isaac | 2070 | NS1 |
| Koerner | Michael | 327 | NS1 |
| Kohnke | Karen | 27832 | NS1 |
| Kolodner | Ashley | 1054 | NS1, WT4 |
| Kolodner | Ashley | 1394 | NS1 |
| Kolody | Kristin | 27975 | NS1 |
| Kolvites | Kathy | 28026 | NS1 |
| Kong | Lilian | 886 | NEPA18, NEPA35, NS1 |
| Koput | Elliana | 358 | NS1 |
| Kornecki | Kasia | 398 | NS1 |
| Korte | Ashley | 7689 | NS1 |
| Kosa | Kim | 758 | NS1 |
| Kosmitis | Kim | 6159 | NS1 |
| Kosowicz | Aleks | 27886 | NS1 |
| Kosten | Dylan | 399 | NS1 |
| Kovacs | Michael | 738 | NS1 |
| Kovacs | Riczi | 993 | NS1 |
| Kowalik | Jakub | 1933 | NS1, NS2 |
| Kracen | Laurel | 7114 | NS1 |
| Kraemer | Darlene | 802 | NS1 |
| Krause | Maura | 1407 | ALT32, NS1, WT25 |
| Krause | Randy | 1174 | NS1 |
| Kreider | Tawn | 27380 | NS1 |
| Kreitzberg | Bruce | 29487 | NS1 |
| Kritzman | Ellen | 27938 | NS1 |

R-111

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Krueger | Jon | 5469 | NS1 |
| Kruger | Damon | 5920 | NS1 |
| Krywult | Sebastian | 840 | NS1 |
| Kuehler | Thomas | 8149 | NS1 |
| Kuhn | Lukas | 1464 | CR4, SO16, TS28, WT4 |
| Kuhns | Randall | 27797 | NS1 |
| Kujawa | David | 367 | NS1 |
| Kulokoski | Nicholas | 5563 | NS1 |
| Kuni | Daniel | 8200 | NS1 |
| Kunitz | Isadora | 27973 | NS1 |
| Kunnecke | Mike | 781 | NS1 |
| Kunnie | Julian | 7117 | NS1 |
| Kurath | Joan | 7690 | NS1, WT7 |
| Kurick | Linda | 1238 | NS1 |
| Kurk | Katherine | 27337 | NS1 |
| Kuskey | Martha A. | 28064 | NS1 |
| Kuznetcov | Sergei | 6484 | NS1 |
| Kvaas | Robert | 27875 | NS1 |
| L. | Rebecca | 26853 | NS1 |
| Lacey | Barbara | 1223 | NS1 |
| Lacey | Jim | 325 | NS1 |
| Lacour | Nicole | 6201 | NS1 |
| Lacroix | Edward | 8272 | NS1 |
| Ladderud | Jeffrey | 657 | NS1 |
| Lagana | Jordan | 5942 | NS1, WT4 |
| Lague | Matthew | 687 | NS1 |
| Lainoff | Michael | 1476 | NS1 |
| Laiti | Jared | 27764 | NS1 |
| Lakner | Joseph | 8001 | NS1 |
| Lambert | Erik | 28745 | NS1 |
| Lambert | Justin | 29044 | NS1 |
| Lambeth | Larry | 27282 | NS1 |
| Lambrecht Se | Rudolf | 7122 | NS1 |
| Landfield | Mike | 27755 | NS1, WT8 |
| Landreth | Lucas | 999 | NS1 |
| Laney | Stephen | 6561 | NS1 |
| Lang | Robbie | 6033 | NS1 |
| Langarica | Sergio | 456 | NS1 |
| Langbeen | Maddy | 988 | NS1 |
| Lange | Karis | 834 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Langford | Jean | 27391 | NS1 |
| Langford | Kaia | 972 | NS1 |
| Lanskey | Marcus | 785 | NS1 |
| Lapen | Deanna | 574 | NS1 |
| Lara | Martin | 839 | CR4, NS1, WT43 |
| Lariviere | Ben | 28177 | NS1 |
| Larkin | Kevin | 1602 | CR5, TS7, WT1 |
| Larosa | Erin | 27859 | NS1 |
| Larsen | Josh | 28894 | NS1 |
| Larsen | Zachary | 857 | NS1 |
| Larsson | Kimberly | 7124 | NS1 |
| Laub | Jacob | 28506 | NS1 |
| Laufman | Harry | 27793 | NS1 |
| Lavallee | Jeff | 30139 | NS1 |
| Law | Eric | 6097 | NS1, WT6 |
| Law | Mary | 804 | NS1 |
| Law | Rimona | 492 | NS1 |
| Lawrence | Brian | 6467 | NS1 |
| Lawrence | Stephanie | 683 | NS1 |
| Lawson | Michael | 1035 | NS1 |
| Lazarus | Barbi | 28094 | NS1 |
| Lazzeri | Jon J. | 27273 | NS1 |
| Lazzeri | Patrizia | 28125 | NS1 |
| Leahy | Joyce | 27897 | NS1 |
| Leavell | Chuck | 27442 | NS1 |
| Lebrun | Tyler | 29117 | NS1 |
| Lee | Ryan | 1185 | NS1, WT25 |
| Lee | Virginia | 7127 | NS1 |
| Leech | John | 1207 | ALT30, ALT5, NEPA33, NS2 |
| Leff | Billie | 8168 | NS1 |
| Leger | Ariel | 383 | NS1 |
| Legrand | Richard | 1183 | NS1 |
| Legrande | Judith | 26939 | NS1 |
| Lehkamp | Justin | 432 | NS1 |
| Lehman | Rebecca | 579 | ALT22 |
| Leiser | Tzirel | 7133 | NS1 |
| Leland | Lora | 27855 | NS1 |
| Lemon | Ka | 27732 | NS1 |
| Lenchner | Essie | 8294 | NS1 |
| Leonard | Eric | 28549 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Leonard | Karson | 28545 | NS1 |
| Leonard | Shirley | 27021 | NS1 |
| Lepage | Albert | 5471 | NS1 |
| Lerch | Jean | 27515 | NS1 |
| Leslie | Darlene | 195 | NS1 |
| Lettieri | Tammy | 27118 | NS1 |
| Levi | Elena | 1370 | NS1 |
| Levine | Lisa | 49 | MIT7, WT14 |
| Levinson | Charlotte | 29708 | CR4, NS1 |
| Lewid | Mildred | 7135 | NS1 |
| Lewis | Jono | 28927 | NS1 |
| Lewis | Sherry | 28055 | NS1 |
| Lewkowitz | Micah | 28183 | NS1 |
| Lichty | Brittany | 732 | NS1 |
| Lietzke | Aryn | 1349 | AMT1, MIT9, TS1, TS1_A, WI1, WT1 |
| Lieu | Charlene | 743 | NS1 |
| Lihou | Christopher | 27014 | NS1 |
| Lincoln | Cameron | 1327 | NS1 |
| Lincoln | Jacob | 1393 | NS1 |
| Link | Kristin | 1527 | NS1 |
| Linsenberg | Richard | 7138 | NS1 |
| Lipson | Rachel | 8074 | NS1, WT4 |
| Lipstreu | David | 26970 | NS1 |
| Lisboa | Gabriela | 6222 | NS1 |
| Lish | Christopher | 1322 | ALT15, ALT22, AMT1, NEPA2, NEPA33, NS1, NS2, TS2, WT1, WT8 |
| Litchfield | Mary | 1456 | NS1 |
| Litchfield | Robert | 1462 | NS1 |
| Litwin | Iris | 6026 | NS1 |
| Livingston | Debc | 1445 | NS1 |
| Livingston | Ken and Jan | 27490 | NS1 |
| Lizama | Julia | 29299 | NS1 |
| Lloyd | David | 6587 | NS1 |
| Loba | Suntara | 29713 | NS1 |
| Loberger | Troy | 595 | WT4 |
| Lockridge | Ross | 27126 | NS1 |
| Lockwood | Victoroa | 7143 | NS1 |
| Loessberg | Casilia | 8197 | NS1 |
| Loewen | Theresa | 28659 | NS1 |
| Logan | Anthony | 72 | CR4, NS2 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Logan | Anthony | 127 | NS1 |
| Lonergan | Darragh | 1003 | NS1, SO19, SO6 |
| Long | Richard | 27908 | NS1 |
| Longman | Beth | 1199 | NS1 |
| Looijen | Autumn | 28036 | NS1 |
| Lopez | Chris | 616 | NS1 |
| Lopez | Esteban | 133 | NS1 |
| Lopez | Esteban | 200 | NS1 |
| Lopez | Isabel | 137 | NS1 |
| Lopez | John | 911 | NS1, SR20 |
| Lopez | Lozen | 161 | CR4, NS1 |
| Lopez | Maria | 27964 | NS1 |
| Lopez | Oscar | 1495 | NS1 |
| Lopez | Sinetta | 168 | CR4, NS1 |
| Lopiccolo | Barbara | 1337 | NS1 |
| Lorentson | Harold | 29333 | NS1 |
| Lorenzetti | Ole | 28394 | NS1 |
| Loughay | Bryab | 462 | NS1 |
| Louie | Avery | 28731 | NS1 |
| Louie | Tina | 56 | NS1, NS2, WT43 |
| Loveall | Jeremiah | 1534 | AQ4, MIT17, WI5 |
| Lovelace | Kristen | 28570 | NS1 |
| Lowe | Bryan | 6399 | NS1 |
| Lowe | Latherine | 2012 | NS1 |
| Lowe | Melissa | 29025 | NS1 |
| Lowther | Carolyn | 869 | NS1 |
| Luciani | Jacob | 435 | NS1 |
| Ludden | Brett | 26897 | NS1 |
| Luke | Barbara | 30127 | NS1 |
| Lull | Mark | 5468 | NS1 |
| Luna | Greg | 1253 | NS1 |
| Lundeen | William | 28508 | NS1 |
| Lundquist | Charles | 5939 | NS1 |
| Luneau | Taylor | 29157 | WT25 |
| Lunson | Tina | 28048 | NS1 |
| Lurie | Ben | 6452 | NS1 |
| Lusk | Joanne | 1099 | NS1 |
| Lyles | Thomas | 27899 | NS1 |
| Lynch | Joshua | 528 | NS1 |
| Lyons | Jim | 28226 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Lyons | Mary | 27106 | NS1 |
| M | Ejay | 7147 | NS1 |
| Macarthur | William | 5678 | NS1 |
| Macdonnell | Jo Ann | 27277 | NS1 |
| Macdougall | Galen | 5966 | NS1 |
| Macias | Michael | 51 | NS1, TS14 |
| Macias | Michael | 90 | NS1, NS2, TS24 |
| Mack | Tim | 29496 | NS1 |
| Macomson | Lena | 29448 | NS1 |
| Macphail | Elizabeth | 6490 | NS1 |
| Macpherson | Alexis | 28065 | NS1 |
| Maddock | Brad | 548 | NS1, SO6 |
| Madeson | Frances | 1063 | NS1 |
| Madigan | Nathan | 29345 | NS1 |
| Madole | Gary | 27826 | NS1 |
| Magee | Chris | 28261 | NS1 |
| Maher | Mary Ann | 7151 | NS1 |
| Mahmoud | Marwa | 2016 | NS1 |
| Maiers | Joan | 27901 | NS1 |
| Maini | Rj | 6439 | NS1 |
| Maki | Tamara | 7152 | NS1 |
| Mallea | Erin | 1531 | CR12, CR4, NEPA54, NS1, NS2 |
| Mallory | Brenda | 1262 | NS1 |
| Maloney | Patrick | 26946 | NS1 |
| Malven | Tania | 5462 | NS1 |
| Malven | Tania | 27773 | NS1 |
| Malven | Tania | 7154 | NS1 |
| Maly | Suzanne | 1505 | NEPA29, NS1 |
| Mancini | Barbara | 27360 | NS1 |
| Manes | Sharin | 7156 | NS1 |
| Manning | Brandon | 28555 | NS1 |
| Manning | Paul F | 842 | NS1 |
| Manthey | Danelle | 1386 | NS1 |
| Manuel-Navarrete | David | 1350 | CR8 |
| Marco | Preston | 1047 | NS1 |
| Mare | Renelle | 27939 | NS1 |
| Mare | Renelle | 27940 | NS1 |
| Marino | Matthew | 29258 | NS1 |
| Marks | Diane | 311 | CR4, NEPA4, NS2 |
| Markus | Jesse | 1376 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Marne | Marielle | 7158 | NS1 |
| Marshall | Allysun | 715 | NS1 |
| Marshall | Brenda | 625 | NS1 |
| Martell | Angela | 28601 | NS1 |
| Martin | Aaron | 6505 | NS1 |
| Martin | Carol and Richard | 27392 | NS1 |
| Martin | James | 905 | NS1 |
| Martin | Janet | 843 | NS1 |
| Martin | Jeff | 1070 | NS1 |
| Martin | Joy | 27167 | NS1 |
| Martin | Kirsten | 588 | NS1 |
| Martin | Marilyn | 27336 | NS1 |
| Martin | Paul | 28096 | NS1 |
| Martin | Taylor | 995 | NS1 |
| Martinez | Andrew | 1006 | NS1 |
| Martinez | Joe | 27763 | NS1 |
| Martinez | Priscilla | 5434 | NS1 |
| Martinez | Susan | 1260 | NS1 |
| Mary | David | 28579 | NS1 |
| Mason | Charlotte | 29169 | NS1 |
| Massey | Linda | 5404 | NS1 |
| Masters | Bruv | 1156 | NS1 |
| Masters | Kerry | 27669 | NS1 |
| Matejcek | Patricia | 26942 | NS1 |
| Matisse | Loralei | 703 | NS1 |
| Matousek | Tomas | 448 | NS1 |
| Matson | Erin | 638 | NS1 |
| Matsuda-Dunn | Pamela | 6164 | NS1 |
| Matter | Margaret | 1203 | NS1 |
| Mattison | Priscilla | 27129 | NS1 |
| Maue | Sarah | 6550 | NS1 |
| Maul | Myoshi | 8153 | NS1 |
| Maurer | Dorothy | 27044 | NS1 |
| Maust | Gregory | 1884 | NS1 |
| Mavilia | Tom | 29290 | NS1 |
| Maxwell | Ben | 443 | NS1 |
| May | M | 780 | MIT21 |
| May | Michele | 879 | NS1 |
| Mayer | David Mayer | 27026 | NS1 |
| Mayer | Paul | 26842 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Mayer | Susan | 26941 | NS1 |
| Mayhew | Eric | 28498 | NS1 |
| Maynard | Ben | 38 | NEPA27, TR3, WT58 |
| Maynard | Ben | 417 | NO6, NS1, TR3, WT4 |
| Maynard | Bill | 1538 | AMT1_K, GS1, NS1, TR3, WT4 |
| Maynard | Bill | 1542 | SO7 |
| Maze | Amanda | 7962 | NS1 |
| Maze | Amanda | 28199 | NS1 |
| Mazel | Molly | 6480 | NS1 |
| Mcallister | Cheryl | 901 | NS1, NS2 |
| Mcanulty | Rick | 774 | NS1 |
| Mcatlin | Barbara | 12 | NEPA48, NS2 |
| Mcbee | Nicholas | 8081 | NS1 |
| Mcblane | Michael A | 1269 | NS1 |
| Mccaffery | Chris | 2001 | NS1 |
| Mccaffrey | Emily | 6029 | NS1 |
| Mccaleb | Mac | 29110 | NS1 |
| Mccall | Kevin | 5521 | NS1 |
| Mccallum | Hannah | 28397 | NS1 |
| Mccarthy | Keri-Lynn | 28975 | NS1 |
| Mccarthy | William | 670 | NS1 |
| Mcclatchie | Michelle | 28850 | NS1 |
| Mcclay | Samantha | 29401 | NS1 |
| Mccleester | Heather | 1857 | NS1 |
| Mcclintock | Gloria | 5446 | NS1 |
| Mccloskey | Ryan | 28943 | NS1 |
| Mccormick | Carroll | 1097 | ALT1, AMT7, GS4, MIT23, NEPA10, NEPA11, NS2, SO16, SO21, SO6, SR13, TS1, TS26 |
| Mccormick | Gene | 134 | NS1 |
| Mccracken | Bill | 6424 | NS1 |
| Mccreary | Elizabeth | 1947 | NS1 |
| Mccreary | Stephanie | 411 | CR12 |
| Mccune | Letitia | 1310 | CR4, NS1, WT4 |
| Mccurry | Gordon | 27745 | NS1 |
| Mcdermott | Ann | 872 | NS1 |
| Mcdonald | Holly | 5432 | NS1 |
| Mcdonald | Holly | 27989 | NS1 |
| Mcgowan | Don | 1363 | NS1 |
| Mcgranaghan | Allie | 1308 | ALT1, AQ11, MIT3, NS1 |
| Mcgraw | Patrick | 6224 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Mcguire | James | 8251 | NS1 |
| Mcguire | Timothy | 29312 | NS1 |
| Mcintosh | Mac | 6455 | NS1 |
| Mckean | Joe | 793 | NS1 |
| Mckee | Matt | 28413 | NS1 |
| Mckee | Sarah | 5423 | NEPA38 |
| Mckee | Sarah | 27356 | NS1 |
| Mcknight | Scott | 354 | NS1 |
| Mcknight | Stanley | 6315 | NS1 |
| Mclane | Karen | 1189 | WT4 |
| Mclane | Karen | 1491 | NS1 |
| Mclaughlin | Diane | 26849 | NS1 |
| Mclaughlin | Kristin | 29139 | NS1 |
| Mclaughlin | Win | 28714 | NS1 |
| Mclean | Brian | 2051 | NS1 |
| Mclean | Powell | 2105 | NS1 |
| Mcmahan | Rick | 29338 | NS1 |
| Mcmahon | Alisa | 1117 | NS1, WT4 |
| Mcmahon | Steve | 7168 | NS1 |
| Mcnair | Linda | 27161 | NS1 |
| Mcneil | Janene | 26812 | NS1 |
| Mcswain | Susan | 27743 | NS1 |
| Mcwilliams | Cynthia | 27619 | NS1 |
| Mdanat | Morgan | 631 | NS1 |
| Medina | Kelly | 501 | NS1 |
| Medina | Laura | 212 | NS1 |
| Medlin | Zach | 733 | NS1 |
| Meeks Springan | Autumn | 7748 | NS1 |
| Meersand | Kenneth | 27105 | NS1 |
| Mehall | Luke | 6202 | NS1 |
| Mehta | Naren | 610 | NS1 |
| Meier | Lorraine | 1261 | NS1 |
| Meier | Lorraine | 7174 | NS1 |
| Meikle | Barry | 7749 | NS1 |
| Meisner | Alexander | 965 | AMT1, SR27 |
| Mendez | Laura | 26977 | NS1 |
| Mentzer | Wayne & Jerri | 254 | MIT8 |
| Mentzer | Wayne & Jerri | 867 | MIT8 |
| Merendino | Caleb | 263 | NEPA2, NEPA33, NS1, NS2, TS1, TS2, WT1 |
| Merkelbach | Joseph | 27154 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Merritt | Joyce | 7920 | NS1 |
| Mesecher | Alyssa | 620 | NS1 |
| Metcalf | Francesca | 29273 | NS1 |
| Metzger | Dwight | 126 | NEPA33, NEPA6 |
| Metzger | Dwight | 1532 | CR4, NS1 |
| Meyer | Douglas | 5421 | NS1 |
| Meyer | John | 7178 | NS1 |
| Meza | Jordyn | 1039 | NS1 |
| Michael | Sandy | 27887 | NS1 |
| Michaels | Brenda | 30132 | NS1 |
| Michaels | Mitchell | 20 | MIT1, NS1 |
| Michaels | Mitchell | 21 | MIT1, NS1 |
| Michaels | Mitchell | 91 | MIT1, NS2 |
| Michaels | Mitchell | 92 | MIT1 |
| Michalides | Joseph | 1265 | NS2 |
| Mick | David | 28935 | NS1 |
| Mickelson | Kevin | 829 | ALT30, NS1 |
| Mickowski | Patrice | 5440 | NS1 |
| Miess | Daniel | 1449 | NS1 |
| Mignella | Anthony | 28172 | NS1 |
| Mihaly | Anna | 6218 | NS1 |
| Milich | Lenard | 27137 | NS1 |
| Miller | Aaron | 7182 | NS1 |
| Miller | Elaine | 7758 | NS1 |
| Miller | Leah | 8151 | NS1 |
| Miller | Randy | 7181 | NS1 |
| Miller | Robert | 27993 | NS1, WT1 |
| Miller | Vicky | 27928 | NS1 |
| Millier | Jennifer | 680 | NS1 |
| Mills | Damon | 26845 | NS1 |
| Mills | Donna | 1282 | NS1 |
| Mills | Linda | 7185 | NS1 |
| Millsap | Curtis | 29154 | NS1 |
| Milton | Kathy | 29231 | NS1 |
| Minto | Robert | 8305 | SO2 |
| Miramon | Federico | 8 | ALT30, MIT23 |
| Miramon | Fred | 148 | MIT23 |
| Miramon | Fred | 149 | MIT1, MIT23 |
| Miritescu | Adriana | 27802 | NS1 |
| Mirkina | Olga | 5497 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Misch | Margaret | 27725 | ALT22, NS1 |
| Mischke | Erica | 1976 | NS1 |
| Mitchell | Cheryl | 27280 | NS1 |
| Mitchell | David | 28288 | NS1 |
| Mitchell | Janis | 7761 | NS1 |
| Mitchell | Phillip | 1208 | NS1 |
| Mitchell | Skye | 1287 | CR4 |
| Mitchell | Vera | 7760 | NS1 |
| Mittelmei Er | Telsa | 7762 | NS1 |
| Mittelsteadt | Scott | 1342 | AMT1, NEPA33, TS1, WT12, WT36 |
| Mkrtschjan | Jason | 5589 | NS1 |
| Mo | T | 5535 | NS1 |
| Moehlman | Bruce | 7764 | NS1 |
| Mogull | Richard | 5727 | NS1, WT4 |
| Mohr-Felsen | Ariane | 7397 | NS1 |
| Mohr-Almeida | Kathy | 210 | AQ4_B, NS1 |
| Molnar | Daniela | 1295 | NEPA33, NS1 |
| Mondragon | Norma | 7398 | NS1 |
| Monks | Gerald | 748 | NS1, SO6 |
| Monroi | Joseph | 85 | TS24 |
| Monroy | Joseph | 84 | NS1 |
| Monroy | Robert | 103 | NS1, WT7 |
| Montano | Raul | 1120 | MIT1 |
| Montano | Ysidro | 1157 | WT7 |
| Montgomery | Erica | 8249 | NS1 |
| Montgomery | Hihn | 1177 | NS1, WT10 |
| Montgomery | John | 46 | WT10 |
| Montiel | Churak | 342 | NS1 |
| Moody | Kelly | 1347 | NS1 |
| Mooney | Fjaere | 800 | NS1 |
| Moore | Chris | 534 | NS1 |
| Moore | James | 889 | AMT4 |
| Moore | Jim | 150 | AMT4 |
| Moore | Rick | 1406 | NS1, WT25 |
| Moore | Sherrie | 27923 | NS1 |
| Moran | Lauren | 1353 | CR1, CR4 |
| Moran | Mary | 1074 | NS1, WT25 |
| Moreland | Karren | 1504 | NS1, NS2, TS27 |
| Moreno | Cecilia | 837 | NS1, WT43 |
| Moreno | Paul | 6784 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Morgan | Gareth | 1941 | NS2 |
| Morgan | Nj | 27642 | NS1 |
| Morris | Alexis | 28112 | NS1 |
| Morrison | Michael | 28080 | NS1 |
| Morrissey | Sandra | 6786 | NS1 |
| Morta | Dan | 1048 | DOC1, MIT28, NEPA9, SR22 |
| Morton | Dennis | 27668 | NS1 |
| Moses | Annie | 6573 | NS1 |
| Moses | Kimberly | 27117 | NS1 |
| Moskowitz | Brad | 28553 | NS1 |
| Moss | Eric | 6203 | NS1 |
| Moss | Gilbert | 28605 | WT6 |
| Mott | Titus | 490 | NS1 |
| Mount | Patricia | 1166 | NS1, WT2 |
| Mousset-Jones | Pierre | 918 | AMT1_H, AQ26 |
| Mowers | Laralyn | 1885 | MIT3, NS1, NS2 |
| Moyles | Christopher | 572 | NS2 |
| Muckle | Stephen | 27205 | NS1 |
| Mueller | Inge | 418 | NS1 |
| Mugasis | Cathy | 1254 | NS1 |
| Muirhead | Fraser | 27149 | NS1 |
| Mulcahy | Laurie | 7193 | NS1 |
| Muller | Brian | 29361 | NS1 |
| Muller | Steve | 6088 | NS1 |
| Mullin | Brian | 8009 | NS1 |
| Mulvihill | Alex | 8224 | NS1 |
| Munn | Ralph | 28456 | NS1 |
| Munoz Sr. | Henry | 10 | AMT1, NEPA48 |
| Munoz Sr. | Henry | 44 | NEPA48, WT4 |
| Munoz Sr. | Henry | 59 | AMT1, NEPA48, WT4, WT4_G |
| Munoz Sr. | Henry | 82 | AMT1, GS10, NEPA48, WT4, WT43 |
| Munoz Sr. | Henry | 83 | WT4_B, WT4_G |
| Munson | K | 27804 | NS1 |
| Murillo | Eve | 7198 | NS1 |
| Murmi | Adam | 784 | NS1 |
| Murphy | Charlott E | 7200 | NS1 |
| Murphy | Darelan | 5594 | NS1 |
| Murphy | Donna | 27197 | NS1 |
| Murphy | Pat | 1165 | NS1 |
| Murray | Shayle | 29109 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Murrell | Susan | 1345 | NS1 |
| Musgrove | Jeanne | 5378 | NS1 |
| Mussallem | Keith | 554 | NS1 |
| Myers | David Russell | 27227 | NS1 |
| Myers | Mary | 1171 | NS1 |
| Myers | Mary | 7203 | NS1 |
| Mysak | Tara | 27658 | NS1 |
| N. | Elisabeth | 27791 | NS1 |
| Nabb | Sophia | 6275 | NS1 |
| Nagy | Karen | 27924 | NS1 |
| Nanney | Addison | 662 | NS1 |
| Naples | Jean | 5398 | NS1 |
| Naples | Jean | 28100 | NS1 |
| Necas | Al | 7206 | NS1 |
| Nedeff | Liz | 753 | NS1 |
| Nedialkov | Tzenko | 586 | NS1 |
| Neel | Margaret | 26966 | NS1 |
| Neitzke | Adam | 6478 | NS1 |
| Nelson | Adrian | 5505 | NS1 |
| Nelson | Blake | 7210 | NS1 |
| Nelson | Bryce | 5631 | NS1 |
| Nelson | Deana | 6173 | NS1 |
| Nelson | Jonathan | 996 | NS1 |
| Nelson | Margar Et | 7211 | NS1 |
| Nelson | Michael | 835 | NS1 |
| Nelson | Peter | 28961 | ALT22, NS1 |
| Nelson | Scott | 30128 | NS1 |
| Nelson | Zoey | 734 | NS1 |
| Nessel | Laurie | 1448 | AMT4, NEPA3, TS2, TS7, WT1, WT28, WT35, WT36 |
| Nevin | Ben | 6200 | NS1 |
| Newark | David | 6788 | NS1 |
| Newkirk | Staci | 1521 | CR4, NS1 |
| Nguyen | Ann | 8084 | NS1 |
| Nicholas | Ann | 26827 | NS1 |
| Nicholes | K.G.H. | 776 | AMT1 |
| Nichols | Beverly | 1226 | CR4, NEPA35, NS1 |
| Nickum | John | 6793 | NS1 |
| Nicosia | Marcella | 8022 | NS1 |
| Nieland | Thomas | 5464 | NS1 |
| Nielsen | Keeley | 569 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Niver | Amanda | 1503 | NS1 |
| Noble | John | 29390 | NS1 |
| Noedel | Sally | 244 | NS1 |
| Noel | Chelsey | 584 | NS1 |
| Nomann | Carmen | 5377 | NS1 |
| Norland | Diane | 26994 | NS1 |
| Norman | Jesse | 141 | NS1 |
| Norris | Josie | 6282 | NS1 |
| Nosie | Aleigha | 17 | NS1 |
| Nosie | Theresa | 184 | CR4 |
| Nosie | Theresa | 29655 | NS1 |
| Nosie | Vanessa | 111 | NS1 |
| Nosie | Vanessa | 185 | NS1 |
| Nosie | Vanessa | 218 | NS1 |
| Nosie | Vanessa | 240 | NS1 |
| Nosie | Vansler | 170 | NS1 |
| Nosie | Wendsler | 33 | CR14, NS1, TS24 |
| Nosie | Wendsler | 34 | NS1 |
| Nosie | Wendsler | 113 | NS1 |
| Nosie | Wendsler | 114 | NS1 |
| Nosie | Wendsler | 186 | CR4, NEPA30, NS1 |
| Nosie | Wendsler | 187 | NS1 |
| Nosie | Wendsler | 241 | CR4, NS1 |
| Novotny | Samantha | 822 | MIT1 |
| Nunn | Stephen | 7216 | NS1 |
| Nye | Christopher | 27788 | NS1 |
| Obrien | Ellen | 1247 | NS1 |
| O'Brien | Elizabeth | 5601 | NS1 |
| O'Connor | Jacqueline | 26918 | NS1 |
| O'Connor-Masse | Kate | 27912 | NS1 |
| Oddonetto | Kimberly | 86 | NS2 |
| Oder | Stephen | 7998 | NS1 |
| Oeleis | Jenny | 7976 | NS1 |
| Ogasian | Jason | 5574 | NS1 |
| Ohl | Jim | 60 | MIT1, MIT3, SO1, TS24 |
| Ohl | Jim | 61 | GS2 |
| Ojo | David | 1304 | NS1 |
| O'Kane | Connor | 5655 | NS1 |
| O'Keeffe | Sean | 775 | NS1 |
| O'Laughlin | Kirk | 1194 | NEPA21, NEPA22, NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Oliver | Eric | 5550 | NS2 |
| Olsen | Carly | 921 | ALT5 |
| Olsen | Rhesa | 7221 | NS1 |
| Olson | Carla | 7779 | NS1 |
| Olson | Erik | 679 | NS1 |
| Olson | Marie | 1305 | NS1 |
| O'Neil | Leslie | 28052 | NS1 |
| Opahle | Mikii | 27955 | NS1, WT8 |
| Opel | Markus | 28042 | NS1 |
| Ord | Katherine | 7223 | NS1 |
| O'Reilly | Patricia | 27097 | NS1 |
| Orlebeke | Michael | 626 | NS1 |
| Orndorff | John | 460 | NS1 |
| Ornstein | Edward | 1116 | NS1 |
| Orr | Lou | 26913 | NS1 |
| Ortega | Dutch | 849 | NS1 |
| Ortega | Shayna | 1150 | ALT5, CR16, NEPA13, NEPA67, NS2, WT4 |
| Ortinau | Nora | 8148 | NS1 |
| Ortiz | Erlina | 1484 | NS1 |
| Osheil | Jeffrey | 937 | NS1 |
| Oslund | Janet | 27936 | NS1 |
| Ostler | Joesef | 28135 | NS1 |
| Ostlie | Nancy | 27798 | NS1 |
| Ostrer | Allison | 27162 | NS1 |
| Ostrowski | Jack | 7227 | NS1 |
| Oswald | Fred | 7228 | NS1 |
| Otlowski | Steven | 27109 | NS1 |
| Overstreet | Cynthia | 959 | NS1 |
| Overton | Katherine | 8094 | NS1 |
| Owens | Christina | 1257 | NS1 |
| Page | Cali | 6520 | NS1 |
| Page | Edward | 29499 | NS1 |
| Paine | Bob | 8326 | NS1 |
| Paine | Jonthan | 436 | NS1 |
| Palma | Marina La | 27845 | NS1 |
| Palmer | Kaden | 5742 | NS1 |
| Palmer | Kirk | 5990 | SO6 |
| Palmer | Lynne | 1014 | NS1 |
| Palomino | Henry | 970 | NS1 |
| Panek | Jeanna | 28406 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Paney | Christiane | 6198 | NS1 |
| Pang | Selena | 30138 | NS1, WT4 |
| Panter | Rich | 5442 | NS1 |
| Paraniuk | John | 27715 | NS1 |
| Parham | Felix | 29126 | NS1 |
| Parham | Felix | 29127 | NS1 |
| Parham | Mary | 27787 | NS1 |
| Parisoe | Mary | 26839 | NS1 |
| Park | Lea | 28017 | NS1 |
| Parke-Hoffman | Will | 29309 | NS1 |
| Parker | Catharine | 1010 | NS1 |
| Parker | Greg | 5936 | NS1 |
| Parkison | Peggy | 882 | ALT30, NS1 |
| Parks | Jennifer | 29102 | NS1 |
| Parrish | Robert | 5760 | ALT22, WI25, WT1 |
| Parry | Cameron | 30123 | NS1 |
| Parsons | Alicia | 142 | NS1 |
| Parsons | Laak'Os | 144 | NS1 |
| Parsons | Orlando | 145 | NS1 |
| Parsons | Sage | 143 | NS1 |
| Pasqua | John | 5396 | NS1 |
| Patch | Joan | 30065 | CR5, NS1, WT1, WT26 |
| Patterson | Carol | 27916 | NS1, WT1 |
| Pauk | George | 1471 | CR4, NS1 |
| Paul | Joann Baker | 1544 | ALT22, ALT33, AMT1, AQ11, CR5, MIT1, MIT21, MIT9, NEPA18, NEPA41, TS29, WT12, WT24, WT26, WT4, WT8 |
| Pautman | Mike | 1957 | NS2 |
| Pavey | Steven | 217 | NS1 |
| Paxton | Harold | 287 | NS1 |
| Payne | Dustin | 8169 | NS1 |
| Payne | Jared | 6095 | NS1 |
| Peacock | Pete | 7977 | NS1 |
| Peacock | Randall | 5844 | NS1 |
| Peck | Roger | 592 | NS1 |
| Peel | Roberta | 27092 | NS1 |
| Peet | Roger | 1378 | NS1 |
| Pellerito | Elizabeth | 1124 | NS1 |
| Pemberton | Curtis | 131 | CR4, NS1 |
| Perez | Andrea | 6062 | NS1 |
| Perez | Yolanda | 7234 | NS1 |

R-126

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Perini | Julie | 1355 | NS1 |
| Perlman | Janine | 27976 | NS1 |
| Perry | Lisa | 1011 | NS1 |
| Petach | Helen | 28839 | NS1 |
| Pete | Sierra | 747 | ALT22, NS1, WT4 |
| Petefish | Ashley | 854 | ALT29, NS1 |
| Peters | Loretta | 1319 | NS1 |
| Peters | Sarah | 1379 | NS1, NS2, WT4_B |
| Petersen | Katherine | 5845 | NS1 |
| Peterson | Brenda | 27383 | NS1 |
| Peterson | Elisabeth | 5445 | NS1 |
| Peterson | Katherine | 152 | NS1 |
| Peterson | Katherine | 1477 | ALT5, CR4, NEPA30, NEPA54, TR22 |
| Peterson | Katie | 260 | NEPA30 |
| Peterson | Susan | 27906 | NS1 |
| Petrowski | Michael | 410 | WT4 |
| Petterson | Carl | 684 | NS1 |
| Pfaender | Carmela | 28195 | NS1 |
| Pfaff | Paul | 954 | NS1 |
| Pharo | Patrick | 8029 | NS1 |
| Philipee | Anna | 752 | NS1 |
| Philipps-Moses | David | 384 | NS1 |
| Phillips | Elaine | 27929 | NS1 |
| Phillips | Jared | 944 | NS1 |
| Phillips | Robert | 1211 | NS1 |
| Phillips | Stan | 8304 | NS1 |
| Phillips | Weslie | 754 | NS1 |
| Picard | Jason | 28871 | NS1 |
| Picard | June | 5472 | NS1 |
| Piccolo | Scott | 28965 | NS1 |
| Piering | Amanda | 6581 | NS1 |
| Pike | Baase | 73 | CR4, NS1 |
| Pike | Baase | 117 | NS1 |
| Pike | Baase | 129 | CR4, NS1 |
| Pike | Baase | 189 | NS1 |
| Pike | Naelyn | 94 | NS1 |
| Pike | Naelyn | 29710 | NS1 |
| Pike | Nizhoni | 100 | CR4, NS1 |
| Pikula | Sam | 893 | NS1 |
| Pinckney | Kelsey | 1077 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Pinkett | Jc | 28642 | NS1 |
| Pino | Manuel | 219 | CR16 |
| Pirmohamed | Nurbegum | 27208 | NS1 |
| Pitkapaasi | Daniel | 598 | NS1 |
| Pitman | Tera | 450 | NS1 |
| Planet | Captain | 1082 | NS1 |
| Platt | Christopher | 912 | NS1 |
| Pledger | Andrew | 580 | NS1 |
| Plenk | Bruce | 1565 | NEPA2, NS1, WT24_A |
| Plummer | Jared | 2022 | NS1 |
| Po Box 4338 | Laura | 847 | NS1 |
| Poel | James Vander | 28003 | NS1 |
| Pogue | Alexandra | 6195 | NS1 |
| Pohl | Ryan | 29009 | NS1 |
| Point | Thomas La | 27841 | NS1 |
| Polach | Scott | 1298 | NS1 |
| Polefka | Shiva | 27000 | NS1 |
| Ponce | Lydia | 27169 | NS1 |
| Poole | Gina | 27511 | NS1 |
| Pooler | Carole | 1258 | NS1 |
| Pope | Keenan | 29096 | NS1 |
| Porter | Christopher | 27872 | NS1 |
| Porter | Dr Rin | 1237 | CR7, NS1, WT43 |
| Porter-Solberg | Mary | 7805 | NS1 |
| Posey | Ariel | 8226 | NS1 |
| Post | Dianne | 7806 | NS1 |
| Potteiger | Gregory | 28948 | NS1 |
| Potteiger | Wyatt | 8227 | NS1 |
| Pottle | Judith | 7807 | NS1 |
| Potts | Randall | 27508 | NS1 |
| Potvin | Emilie | 26857 | NS1 |
| Powell | Edward | 6413 | NS1 |
| Powell | Robert | 7810 | NS1 |
| Power | Devin | 919 | NS1 |
| Powers | Christin A | 7238 | NS1 |
| Powers | John | 813 | NS1 |
| Powledge | Damien | 726 | NS1 |
| Praderio Lynn | Laura | 28507 | NS1 |
| Pravica | Sean | 502 | NS1 |
| Price | Chara | 6638 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Price | Dylan | 1975 | NS1 |
| Price | Mark | 28837 | NS1 |
| Price | Paula | 1167 | NS1 |
| Primatic | Kim | 27031 | NS1 |
| Prince | Allan | 7244 | NS1 |
| Pristelski | Jeff | 992 | NS1 |
| Proctor | Robert | 458 | NS1 |
| Proczka | John-Jozef | 8010 | NS1 |
| Pucci | Stephen | 29179 | NS1 |
| Pugsley | Debra S | 7247 | NS1 |
| Puhara | Jeff | 890 | NS1, NS2, SO21 |
| Puliselic | Christine | 1213 | NS1 |
| Punches | Vinnie | 425 | NS1 |
| Punt | Leon | 1073 | NS1 |
| Purcell | Stacey | 6350 | NS1 |
| Purdy | Jeff | 678 | NS1 |
| Pursley | Allison | 6622 | NS1 |
| Quale | Nick | 6119 | NS1 |
| Quick | Alec | 8273 | NS1 |
| Quinn | Charles and Mrs. Diana | 5370 | NS1 |
| Quinn | Neely | 787 | NS1 |
| Rafkin | Tamara | 1325 | NS1 |
| Ragan | Carolyn | 1562 | NS1 |
| Rager | Brendon | 6166 | NS1 |
| Raines | M.1. | 7251 | NS1 |
| Raitt | Jacob R. | 27422 | NS1 |
| Ralley | Phyllis | 1067 | NS1 |
| Ramaker | Julianne | 27934 | NS1 |
| Rambler | Sandra | 28 | CR12, NS1 |
| Rambler | Sandra | 54 | NS1 |
| Rambler | Sandra | 55 | CR4, CR5, NS1, NS2, TS24 |
| Rambler | Sandra | 107 | AMT1, CR4, NEPA37, NS1, NS2, WT4 |
| Rambler | Sandra | 108 | CR12, CR4, NS1, TS23 |
| Rambler | Sandra | 176 | NS1 |
| Rambler | Sandra | 181 | NS1 |
| Rambler | Sandra | 233 | CR4, CR7, WT4 |
| Ramirez | Arianna | 7964 | NS1 |
| Ramirez | Brianna | 1040 | NS1 |
| Ramirez | Steven | 1309 | AMT1, AQ4, CR4, TS24_C |
| Ramos | Miguel | 1037 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Randall | D. | 5476 | NS1 |
| Randall | Maryrose | 27663 | NS1 |
| Randall | Philip | 28865 | NS1 |
| Randolph | Adam | 1274 | CR4, NS1 |
| Rangel | Manuel | 220 | NS1 |
| Rangel | Manuel | 874 | NS1 |
| Rank | Robert | 1190 | NS1 |
| Ransom | Cat | 6302 | NS1 |
| Rasmussen | Linda | 713 | NS1 |
| Raster | Amanda | 27140 | NS1 |
| Reading | Toni | 5417 | NS1 |
| Reading | Toni | 5418 | NS1 |
| Reda | Clare | 29091 | NS1 |
| Redding | Ariane | 495 | CR4, SO6 |
| Redfield | Robert S. | 27571 | NS1 |
| Redmond | Eden | 1395 | NS1 |
| Redwine | Harriet | 27194 | NS1 |
| Reed | Sally | 1942 | NS1 |
| Rees | Sandra | 1470 | NS1 |
| Reese | Michele | 875 | NS1 |
| Reese | Will | 930 | NS1 |
| Regan | Marc | 5518 | NS1 |
| Reilly | Joe | 932 | NS1 |
| Reilly | Susan Barbara | 27920 | NS1 |
| Reily | Brian | 1481 | NEPA35 |
| Reina | Bradley | 6464 | NS1 |
| Reis | Ashley | 1391 | NS1 |
| Reiter | Margaret | 809 | NS1, NS2 |
| Remer | Seth | 29194 | NS1 |
| Renwick | Vanessa | 1512 | NS1 |
| Resendiz | Christian | 28221 | NS1 |
| Reveles | Roberto | 295 | NS1, TS1 |
| Reynolds | Jason Carl | 1179 | NS1 |
| Reynolds | Jon | 526 | NS1 |
| Reynolds | June | 1178 | NS1 |
| Reynolds | Rebecca | 27539 | NS1 |
| Reynolds | Waid | 27416 | NS1 |
| Rhodes | Renee | 1373 | NS1 |
| Ribble | Nathan | 8321 | NS1 |
| Rice | Adena | 27853 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Rice | Edward | 1420 | WT1 |
| Richards | Christopher | 27100 | NS1 |
| Richardson | Bruce | 1195 | NS1 |
| Richardson | Daniel | 292 | NS1 |
| Richardson | June | 27716 | NS1 |
| Richardson | Rebecca | 7256 | NS1 |
| Richmond | Lonna | 5465 | NS1 |
| Richt | Crystal | 7258 | NS1 |
| Rickards | Tom | 7898 | NS1 |
| Riegle | Coleman | 1952 | NS1 |
| Riffle | David | 28401 | NS1 |
| Rigney | Jane | 1220 | AMT1_G, NS1 |
| Ring | Milly | 27588 | NS1 |
| Ringgold | Bryan | 420 | NS1 |
| Ritchie | Robert | 5484 | NS1 |
| Rivera | Ryan | 994 | NS1 |
| Rivers | Karma | 853 | NS1 |
| Roach | Matthew | 7263 | NS1 |
| Roall | Richard | 7264 | NS1 |
| Roberts | Jenny | 7833 | NS1 |
| Roberts | Kathryn | 720 | NS1 |
| Roberts | Michael | 446 | NS1 |
| Roberts | Sarah | 29654 | NS1 |
| Roberts | Sarah | 30064 | ALT5, WT4 |
| Roberts | William | 762 | NS1 |
| Robertson | Annette | 27340 | NS1 |
| Robertson | Justin | 622 | NS1 |
| Robertson | Myles | 27860 | NS1 |
| Robertson | Nolan | 645 | NS1 |
| Robinett | Joseph | 7268 | NS1 |
| Robinson | Larry | 1210 | NS1, WT25 |
| Robles | Damien | 976 | NS1 |
| Rockwell | Christopher | 29475 | NS1 |
| Rodabaugh | Owen | 28963 | NS1 |
| Roder | Marc | 1401 | NS1 |
| Rodman | Emily | 6341 | NS1 |
| Rodning | Rael | 28945 | NS1 |
| Rodriguez | Danny | 29503 | NS1 |
| Rodriguez | Michael | 7270 | NS1 |
| Rodriguez | Rebeca | 28877 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Rodriguez | Ruthanne | 243 | NS1 |
| Rodriguez | Susan | 7269 | NS1 |
| Roeder | Dorothy | 7272 | NS1 |
| Roemer | Bert Von | 27874 | NS1 |
| Rogers | Arthur | 7846 | NS1 |
| Rogers | Jeremy | 28738 | NS1 |
| Rogers | Jim and Connie | 27278 | NS1 |
| Rogers | Renee | 7274 | NS1 |
| Rogers | Roz | 26990 | NS1 |
| Romano | Will | 6435 | NS1 |
| Romero | Duke | 43 | MIT30, NEPA37, NS2 |
| Romero | Duke | 125 | NEPA27, NS1 |
| Romero | Duke | 198 | NS1, TS24 |
| Rondon | Anna | 1134 | NS1 |
| Root | Margaret | 30114 | NS1 |
| Rosa | Yvette De La | 27919 | NS1 |
| Rose | Becky | 27705 | NS1 |
| Rose | Casarez | 1348 | NS1 |
| Rose | Kathryn | 27621 | NS1 |
| Rose | Susan | 28098 | NS1 |
| Rosen | Jerry | 26986 | NS1 |
| Rosen | Mike & Sally | 7281 | NS1 |
| Ross | Audrey | 1255 | NS1 |
| Ross | Jane | 28115 | NS1 |
| Rothenbery | Howard | 371 | ALT30, NS1 |
| Roush | Elizabeth | 952 | NS1 |
| Rowe | Carolyn | 281 | WT51 |
| Rowe; Rowe | Carolyn; Carolyn | 1231 | WT51 |
| Rowell | Patricia | 28103 | NS1 |
| Rowell | Patricia | 878 | NS1 |
| Rowen | James | 27945 | NS1 |
| Royall | Naomi | 29144 | NS1 |
| Royce | Jim | 6172 | NS1 |
| Rubenstein | Adrienne | 29188 | NS1 |
| Ruck | S | 1118 | TS1 |
| Rudisille | Mary | 7969 | NS1 |
| Ruiz | Gloria | 291 | ALT30, SO10, SO16, WT4 |
| Ruiz | Gloria | 30097 | ALT30, NS1 |
| Ruiz | Marcella | 18 | LG2, NS1 |
| Runneals | David | 538 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Ruopp | Kathy | 5450 | NS1 |
| Ruopp | Kathy | 28053 | NS1 |
| Russell | Suzette | 1390 | NS1 |
| Russo | Linda | 27681 | CR4, NS1, WT8 |
| Ryan | Anne | 30108 | NS1 |
| Ryan | Nancy | 27893 | NS1 |
| Sadowski | Alyssa | 963 | NS1 |
| Sadowski | Ryan | 961 | NS1 |
| Saint-Croix | Catharine | 29383 | NS1 |
| Salaam | Shalom | 1963 | NS1 |
| Salcido | Michael | 865 | NS1 |
| Saldana | Manuel | 221 | NS1 |
| Saldana | Manuel | 222 | NS1 |
| Salmony | Blake | 603 | NS1 |
| Sampson | Laura | 894 | NS1, NS2, WT4 |
| Sanchez | Michael | 639 | NS1, WT4 |
| Sand | Luke | 5618 | NS1 |
| Sandeen | Mimi | 27048 | NS1 |
| Sanderson | Melissa | 7839 | NS1 |
| Sandler | Michael | 6501 | NS1 |
| Sandok | Florence | 768 | NS1 |
| Sands | Preston | 1564 | NS1 |
| Santana | Kyra | 978 | NS1 |
| Santella | Janice | 7804 | NS1 |
| Savlove | John | 28107 | NS1 |
| Sawaya | Brianna | 1036 | NS1 |
| Sawyer | Bobby | 5974 | NS1 |
| Sawyer | Janis | 27428 | NS1 |
| Sayler | Becky | 1548 | NS1 |
| Scaltrito | Marietta | 27093 | NS1 |
| Scanlon | Peter | 973 | NS1 |
| Scarabin | James | 769 | NS1 |
| Schadel | Suzanne | 1263 | DOC1 |
| Schafer | Andrea | 6557 | NS1 |
| Schafer | Carol | 1095 | CR4, NS1 |
| Schafer | Lindsey | 28795 | NS1 |
| Schaffer | Gregory | 6131 | NS1 |
| Schalk | Kathleen | 27319 | NS1 |
| Scharf | Stuart | 26838 | NS1 |
| Schedler | Karen | 7283 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Scheel | Kurt | 7867 | NS1 |
| Schelble | Payton | 1031 | NS1 |
| Schenk | Kim | 14 | ALT1, MIT1, NS1 |
| Schepers | Danette | 1344 | ALT5, NO2, NS1, WT1 |
| Schildt | Brenda | 196 | NS1 |
| Schlossnagle | Trevor | 28942 | NS1 |
| Schmidler | Susan | 27843 | NS1 |
| Schmidt | Jacob | 28718 | NS1 |
| Schmierer | Kyle | 7869 | NS1 |
| Schmoller | Ron | 7870 | NS1 |
| Schneider | Aliza | 951 | ALT5 |
| Schneider | Carie | 1458 | CR4 |
| Schnell | Paul | 277 | NS1 |
| Schnell | Paul | 1055 | NS1 |
| Schonberg | Lisa | 1488 | NS1 |
| Schorr | Robert | 29433 | NS1 |
| Schramm | Douglas | 27007 | NS1 |
| Schroeder | Sheryl | 759 | NS1 |
| Schumacher | Mary | 30072 | NS1 |
| Schutjer | Cliff | 7285 | NS1 |
| Schwab | Mark | 549 | NS1 |
| Scott | Jonathan | 8314 | NS1 |
| Scott | Myron | 1455 | ALT5, NEPA25, NS1, NS2, WT1 |
| Scotten | Joseph | 914 | NS1 |
| Scroggins | Krisyy | 1290 | NS1 |
| Searer | Dustin | 346 | NS1 |
| Sears | Kyle | 666 | NS1 |
| Sebastian | Ted | 6068 | NS1 |
| Seeley | Megan | 29397 | NS1 |
| Segal | Adrien | 1509 | NS1 |
| Selna | Bryan | 1474 | ALT22, NS1, TS1 |
| Seltzer | Elizabeth | 797 | NS1 |
| Seubert | Joyce | 27110 | NS1 |
| Sevilla-Bazan | Todayah | 860 | NS1 |
| Shabbott | Mary | 763 | NS1 |
| Shaffer | Tria | 27427 | NS1 |
| Shaheen | William | 927 | MIT21 |
| Shane | Thomas | 28236 | NS1 |
| Shank | Ritch | 1138 | NS1 |
| Shanto | Joshua | 422 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Shapic | Alec | 416 | MIT3, NS2 |
| Shapiro | Dean | 820 | NS1 |
| Shapiro | Howard | 26980 | NS1 |
| Shapiro | Toblahs | 498 | NS1 |
| Shaplin | Adriano | 1302 | NS1 |
| Shaw | Benjamin | 28013 | NS1 |
| Shea | Erin | 1517 | NS2 |
| Shellenberger | Jessica | 1100 | CR4, NS1 |
| Shepard | David | 6161 | NS1 |
| Shepherd | Phil | 7290 | NS1 |
| Sherman | Mike and Kathy | 27288 | NS1 |
| Shiefman | Joe | 28891 | NS1 |
| Shields | Jedidiah | 5769 | NS1 |
| Shilko | Sandra | 5380 | NS1 |
| Shimeall | Nancy | 5882 | NS1 |
| Shimek | Carol | 27153 | NS1 |
| Shipley | Fernando | 95 | ALT30, NS2 |
| Shockey | Gwen | 1374 | WT4 |
| Shoemaker | Bradley | 29164 | NS1 |
| Sholette | Professor Gregory | 1372 | NS1 |
| Short | Brad | 30125 | ALT22 |
| Shoultz | Tim | 5818 | NS1 |
| Shouse | Antonia | 27894 | NS1 |
| Siebert | Danielle | 28320 | NS1 |
| Siegel | Nona & Michael | 6673 | NS1 |
| Siepka | Gene | 969 | NS1 |
| Sier | Rachel | 8087 | NS1 |
| Silbaugh | Kaitlin | 28532 | NS1 |
| Sillcox | James | 770 | NS1 |
| Sills-Trausch | Mike | 1091 | ALT22, ALT5, NS1 |
| Sills-Trausch | Patti | 1092 | ALT22, NS1, WT1 |
| Sills-Travich | Michael | 504 | ALT22, ALT5, NS1 |
| Silva | Jim | 1075 | ALT30, NEPA31, NS1, TS1 |
| Silver | L | 7298 | NS1 |
| Silver | Victoria | 27779 | NS1 |
| Simanski | Cliff | 29344 | NS1 |
| Simcox | Paul | 27770 | NS1 |
| Simmons | Eve | 27942 | NS1 |
| Simms | Christopher | 1056 | NS1 |
| Simon | Todd | 543 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Simons | Judith | 900 | ALT33, AQ11, NS1, WT4 |
| Simonton | Jonathan | 1616 | NS1 |
| Simpson | Rachel | 6186 | NS1 |
| Singer | Michael | 6675 | NS1 |
| Singh | Jaret | 542 | NS1 |
| Singler | Robert | 6676 | NS1 |
| Sirota | Joyce | 27354 | NS1 |
| Sjulstad | William | 643 | NS1 |
| Skelton | Theresa & Paul | 7301 | NS1 |
| Skidmore | Sue | 27239 | NS1 |
| Skinner | Tiffany | 29337 | NS1 |
| Skrzynski | Skz | 6680 | NS1 |
| Slay | Mark | 6102 | NS1 |
| Sloane | Gregory | 30119 | NS1 |
| Slosky | Daniel | 597 | NS1 |
| Slouka | Syd | 5863 | NS1 |
| Slovak | John | 26846 | NS1 |
| Sluski | Garrett | 1252 | NS1 |
| Sluyter | John | 868 | NS1 |
| Small | Sue | 1126 | NS1 |
| Smerlis | Judith | 1162 | NS1 |
| Smiley | Janelle | 29492 | NS1 |
| Smith | Alexandria | 665 | NS1 |
| Smith | Cameron | 512 | NS1 |
| Smith | Jaye | 28559 | NS1 |
| Smith | Joanne | 6686 | NS1 |
| Smith | John | 899 | SO1, SO3, TS1, TS24_A, WT4 |
| Smith | Kathleen | 1482 | NS1 |
| Smith | Kathy | 1536 | NS1 |
| Smith | Kira | 1227 | NS1 |
| Smith | Kurt | 6443 | NS1 |
| Smith | Kyle | 28970 | NS1 |
| Smith | Matilda | 614 | WT4 |
| Smith | Megan | 653 | NS1 |
| Smith | Patricia (Patty) | 897 | SO1, SO3, TS1, TS24, WT4 |
| Smith | Penelope | 6685 | NS1 |
| Smith | Ryan | 6535 | NS1 |
| Smith | Seth | 909 | NS1 |
| Smith | Steve | 5556 | NS1 |
| Smith | William | 667 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Smith- Hansen | Mary | 7303 | NS1 |
| Smotrich | Benjamin | 1518 | CR4, NS1 |
| Smrz | Penelope | 8083 | NS1 |
| Smuts | Barbara | 27738 | NS1 |
| Sneezy | Patricia | 167 | NS1 |
| Snyder | Brad | 28097 | NS1 |
| Snyder | Charles | 472 | NS1 |
| Sodergren | Bennett | 29056 | NS1 |
| Sohocki | Dennis | 913 | NEPA1, NS1 |
| Sohocki | Dennis | 1595 | MIT35, NEPA1 |
| Sokolov | Krum | 724 | NS1 |
| Solamito | Marilyn | 1180 | NS1, NS2, WT43 |
| Solamito | Paul | 177 | NS1 |
| Solomentsev | Michael | 6586 | NS1 |
| Soltow | Sarah | 1351 | CR4, NS1 |
| Souchuns | Charles | 8040 | NS1 |
| Soukup | Jim | 29261 | NS1 |
| Sparks | Rob | 655 | NS1 |
| Speck | Jared | 7983 | NS1 |
| Spenger | Constance | 27335 | NS1 |
| Spenser | Tim | 6545 | NS1 |
| Spidle | Chris | 119 | NEPA29, NS1 |
| Spidle | Chris | 120 | NEPA29 |
| Spidle | Chris | 175 | NEPA29 |
| Spidle | Chris | 194 | NEPA29, NS1 |
| Spidle | Chris | 262 | NEPA29 |
| Spidle | Chris | 265 | NEPA29, NS1 |
| Spidle | Chris | 274 | NEPA28 |
| Spielman | Michael | 28560 | NS1 |
| Spillane | Elizabeth | 27510 | NS1 |
| Spiro | Donald | 28159 | NS1 |
| Spitzer | Max | 5777 | NS1 |
| Spiwak-Wallin | Sandra | 27866 | NS1 |
| Spung | Sandra | 27176 | NS1 |
| Spurgeon | William | 6434 | NS1 |
| St Angelo | Lynne | 1069 | NS1 |
| St. Jean | James | 28982 | NS1 |
| Stabile | Michael | 1611 | NS1 |
| Stachecki | Julie | 27292 | NS1 |
| Staehli | Richard | 5975 | CR4, NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Stanfield | Lee | 28106 | NS1, TS2, WT1, WT8 |
| Stangle | Jeanne | 27145 | NS1 |
| Stanley | Jody | 1125 | NS1 |
| Stansfield | Jack | 5460 | NS1 |
| Stansfield | Jack | 600 | NS1 |
| Starinsky | Bob | 508 | NS1 |
| Stark | Jonathon | 28200 | NS1 |
| Stasik | Daniel | 659 | NS1 |
| States | Marcia | 5401 | NS1 |
| Steadley | Ryan | 8134 | NS1 |
| Stearnes | Chase | 438 | NS1 |
| Steck | Lee | 28501 | NS1 |
| Steckman | Laura | 6696 | NS1 |
| Steele | Donna Lee | 6697 | NS1 |
| Steffen | Matthew | 6235 | NS1, NS2 |
| Stehr | Tyler | 1452 | MIT21, TS1 |
| Stein | Cletus | 27345 | NS1 |
| Stein | Janie | 138 | NS1 |
| Steitz | Jim | 28046 | CR4, NS1 |
| Steitz | Jim | 28093 | NEPA35, NEPA37, NS1, WT1, WT8 |
| Steitz | Jim | 298 | NEPA2, NEPA37, NS1, WT1 |
| Stencel | Chelsea | 8235 | NS1 |
| Stephan | Sarah | 7941 | NS2 |
| Steuter | Don | 7308 | NEPA33 |
| Steven | Erin | 28956 | NS1 |
| Stevens | Carolyn | 27661 | NS1 |
| Stevens | Dorothea | 887 | CR4, NS1 |
| Stevens | Lisa | 27078 | NS1 |
| Stevens | Raven | 27869 | CR12 |
| Stewart | Caroline | 28671 | NS1 |
| Stewart | Kathleen | 26973 | NS1 |
| Stewart | Margar Et | 6699 | NS1 |
| Stewart | Tyee | 8105 | NS1 |
| Stilt | David | 1159 | NS1, NS2 |
| Stockburger | Paul | 1170 | NS1 |
| Stocker | Andrew | 855 | NS1 |
| Stockinger | Chris | 27255 | NS1 |
| Stockwell | Douglas | 7313 | NS1 |
| Stoecker | Evan | 661 | NS1 |
| Stollings | Luke | 6387 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Stolp-Smith | Mike | 269 | NS1 |
| Stonas | Walter | 514 | NS1 |
| Stradiotto | Becky | 1969 | NS1 |
| Stradiotto | Ronald | 28618 | NS1 |
| Stram | Veda | 26817 | NS1 |
| Stramler | Kirstie | 27905 | NS1 |
| Strauss | Susan | 27250 | NS1 |
| Strawman | Tom | 27187 | NS1 |
| Streer Seidler | Kathryn | 1168 | NS1 |
| Stridinger | Jennifer | 26944 | NS1 |
| Strieby | Collette | 1271 | NS1 |
| Strods | Ray | 28851 | NS1 |
| Stroh | Charles | 6704 | NS1 |
| Stroud-Settles | Geoffrey | 30118 | NS1 |
| Stryker | Donald | 27131 | NS1 |
| Stuart | Todd | 366 | WT4_B |
| Stuhr | Joanne | 7300 | NS1 |
| Stumpff | Linda | 27223 | NS1 |
| Suarez | Gabriels | 915 | NS1 |
| Suen | Eric | 591 | NS1 |
| Sugden | John | 5608 | NS1 |
| Sullivan | Joan Paul and Pj | 26914 | NS1 |
| Sullivan | Mike | 29286 | NS1 |
| Sundareshan; Truebe | Brian; Priya | 1499 | NEPA3, NEPA45, NEPA6, WT4_J |
| Suorsa-Johnson | Kristina | 28675 | NS1 |
| Sussman | Max | 1089 | TS24 |
| Sutherland | Catherine | 27598 | NS1 |
| Sutinen | Matt | 5598 | NS1 |
| Sutter | Gavin | 6559 | SO6 |
| Sutton | Charles | 27192 | NS1 |
| Sutton | Russ | 6707 | NS1 |
| Svyrydenko | Vladyslav | 1250 | NS1 |
| Swain | Neal | 6022 | NS1 |
| Swain | Todd | 28590 | NS1 |
| Swartz | Deborah | 26843 | NS1 |
| Sweet | Connie | 27954 | NS1 |
| Sweet | Samuel | 26871 | NS1 |
| Switlik | Mary Margaret | 792 | NS1 |
| Szablewski | Conrad | 27387 | NS1 |
| Szumel | Leo | 6567 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Taber | Rebecca | 1196 | NS1, TS30, WT2 |
| Tackett | Hannah | 7997 | NS1 |
| Taenzer | Deanne | 27758 | NS1 |
| Taishoff | Lewis | 761 | NS1 |
| Takush | Kathie | 533 | NS1, WT4 |
| Talbot | Thomas | 26935 | NS1 |
| Tall | Beverly | 27878 | NS1 |
| Tallon | Marian | 916 | NS1 |
| Tanzi | Anthony | 28173 | NS1 |
| Tapiawala | Pia | 1380 | MIT24 |
| Tarango | Andrew | 96 | NS1 |
| Tarr | Ben | 27994 | NS1 |
| Tarver | Kelsie | 8247 | NS1 |
| Tate | Alan | 28946 | NS1 |
| Tatoovich | Thomas | 1130 | MIT1, NS1 |
| Taub | Audrey | 27974 | NS1 |
| Taylor | Aaron | 6496 | NS1 |
| Taylor | Dana | 348 | NS1 |
| Taylor | Gigi | 26831 | NS1 |
| Taylor | Matt | 29046 | NS1 |
| Taylor | Peter | 5897 | NS1 |
| Tchida | Celina | 1080 | NS1 |
| Tekola | Sarra | 1359 | NS1, NS2, WT4 |
| Tenijieth | Roseanna | 1131 | NS1 |
| Terry | Susan | 28101 | NS1 |
| Terwilliger | Susan | 5453 | NS1 |
| Testerman | Dolores | 1145 | NS1 |
| Tetro | Barbara | 476 | NS1 |
| Thezan | Marcie | 28111 | NS1 |
| Thias | Nancy | 99 | NS2, TS20, TS7 |
| Thomas | Jerry | 139 | NS1 |
| Thomas | Linda | 160 | CR4 |
| Thomas | Lyn | 313 | NS1, TS1 |
| Thompson | Brett | 8237 | WT7 |
| Thompson | Christen | 1995 | NS1 |
| Thompson | Hallie | 1043 | TS26, WT43 |
| Thompson | Karissa | 803 | NS1 |
| Thompson-Glaser | Nancy | 27358 | NS1 |
| Thomsen | Arina | 29125 | NS1 |
| Thomson | Barbara | 27943 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Thorpe | James | 1215 | NS1 |
| Thrasher | Ron | 27833 | NS1 |
| Tickle | Brian | 470 | NS1 |
| Tintle | Bob | 28002 | NEPA33, NS1 |
| Tipper | Ben | 576 | NS2 |
| Tirado | Madeline | 6056 | NS1 |
| To | Pre | 981 | NS1 |
| Tobias | Thomas | 1385 | NS1 |
| Todd | Charlene | 920 | NS1 |
| Todd | Susan | 27587 | NS1 |
| Toledo | Yovonna | 173 | NS1 |
| Toole | Thomas | 525 | NS1 |
| Tooley | Elise | 26984 | NS1 |
| Tooley | Helen | 28061 | NS1 |
| Tooley | Kristin | 27891 | NS1 |
| Torii | Tomoyuki | 5393 | NS1 |
| Torrey | Wanda | 6713 | NS1 |
| Trammell | Gail | 6003 | NS1 |
| Tran | Thanhvan | 1921 | ALT5 |
| Trappman | Suzanne | 7334 | NS1 |
| Travis | Debbie | 6718 | NS1 |
| Trent | Steven | 5885 | NS1, WT6 |
| Trezise | Megan | 255 | ALT22, NS2, TS2, WT1 |
| Triana | Richard | 7335 | NS1 |
| Trinity | Kathleen | 28066 | NS1 |
| Troll | Laura | 26862 | NS1 |
| Trump | Kathleen | 6721 | NS1 |
| Trussell | Steve | 234 | NS1 |
| Trussell | Steve | 541 | CR12, MIT33, MIT7, NS1 |
| Tsoi | Michael | 735 | NS1 |
| Tuck | Judith | 6723 | NS1 |
| Tucker | James | 6515 | NS1 |
| Tucker | William | 27675 | NS1 |
| Tuell | Cyndi | 6726 | NS1 |
| Tumbusch | Andrew | 457 | NS1 |
| Turner | Erin | 132 | CR4, NEPA37, NS1, NS2, WT4 |
| Turner | Margaret | 6728 | NS1 |
| Turner | Terry | 1045 | NS1 |
| Twyman | Matthew | 6091 | NS1 |
| Uhler | Brenda | 27209 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Uhls | Marshal | 991 | NS1 |
| Underwood | Asher | 1346 | NS1 |
| Underwood | Joseph | 27892 | NS1 |
| Ursitti | Kimberly | 392 | SO16, WT4 |
| Vaaler | Jim | 37 | DOC1 |
| Vaaler | Jim | 203 | SR18 |
| Valdez | Jennifer | 6733 | NS1 |
| Valdivia | Susan | 883 | ALT5, NS1, NS2 |
| Valenta | Jamison | 29444 | NS1, WT6 |
| Valentine | Jennifer | 808 | NS1 |
| Valentine | Shane | 5877 | NS1 |
| Vallieres | Jessica | 6451 | NS1 |
| Van Der Kraan | Luca | 6244 | NS1 |
| Van Dussen | Dan | 962 | NS1 |
| Van Engel | Emily | 1492 | CR4, NS1 |
| Van Exel | Les | 2124 | NS1 |
| Van Gorp | Sandra | 1107 | AMT1_J, AMT4, MIT3, NS1, NS2, TS24, WT8_A |
| Van Sciver | Hannah | 1270 | NS1 |
| Vann | Glen | 1184 | NS1 |
| Varela | Jolie | 29380 | NS1 |
| Vasquez | Luis | 16 | ALT30, AMT1_L |
| Vasvary | Kathleen | 6738 | NS1 |
| Vazquez Gomez | Patricia | 1330 | NEPA4, NS1 |
| Vela | Teri | 1013 | NS1 |
| Venezia | Justin | 28840 | NS1 |
| Ventimiglia | Nick | 6025 | NS1 |
| Vento | Jillian | 1285 | NS1 |
| Vernon | Barbara C. Holladay | 5451 | NS1 |
| Versari | Lara | 1136 | MIT3 |
| Vershay | Anton | 727 | NS1 |
| Victor Chatlin | Leopha | 159 | CR4, NS1 |
| Vierthaler | Heidi J | 27782 | NS1 |
| Villalobos | Blanca | 1331 | NS1 |
| Villegas | Joe | 62 | CR4, GS2, GS4, NS2 |
| Villegas | Joe | 63 | WT43 |
| Villodas | Abigail | 6743 | NS1 |
| Vink | Ryan | 7894 | NS1 |
| Vitols | Inesis | 6745 | NS1 |
| Voeltz | Laurie | 1283 | NS1 |
| Volz | Dale | 123 | MIT3 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Von Ancken | Sean-Paul | 821 | NS1 |
| Von Doersten | Greg | 461 | WT4_B |
| Von Magdenko | Nadia | 29054 | NS1 |
| Votto | Nicholas | 349 | NS1 |
| Voysey | Helen | 2115 | NS1 |
| W | L | 8097 | NS1 |
| W | M | 1101 | NS1 |
| Wachtel | Jonathan | 522 | NS1 |
| Wagers | Nick | 704 | NS1 |
| Wagliardo | Nathan | 5633 | NS1 |
| Wagman | Nicole | 27838 | NS1 |
| Wagner | Betty | 190 | NS1 |
| Wagner | Norman and Dee | 27737 | NS1 |
| Wagner | Tom | 943 | MIT3, NS1, WT4 |
| Wainwright | Joel | 8082 | NS1 |
| Walbridge | John | 28583 | NS1 |
| Walden | Luke | 6519 | NS1 |
| Walker | Barbara | 1206 | CR4, NEPA33, NS1, TS30, WT25 |
| Walker | Genie | 6751 | NS1 |
| Walker | Linda | 6752 | NS1 |
| Walker | Ryan | 2044 | NS1 |
| Walker | William | 29269 | NS1 |
| Wall | Debbie | 27660 | NS1 |
| Wallace | Liz | 1064 | NS1 |
| Wallen | Rachel | 782 | NS1 |
| Walling | Robert | 6753 | NS1 |
| Walsh | Gary | 6804 | NS1 |
| Walsh | James | 202 | NEPA35 |
| Walters | Kaylin | 27164 | NS1 |
| Wang | Barb | 6807 | NS1 |
| Wang | Hannah | 469 | NS1 |
| Wannie | Evelyn | 6754 | NS1 |
| Ward | Benjamyn | 8000 | NS1, WT6 |
| Warfel | Eavan | 946 | NS1 |
| Warme | Jeanne | 28257 | NS1 |
| Warner | Benjamin | 444 | NS1 |
| Warner | Michael | 27768 | NS1 |
| Warren | Kevin | 26818 | NS1 |
| Wasker | Laura | 341 | NS1 |
| Wasp | Stephen | 506 | WT4 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Waters | Jerry | 11 | MIT1, TS7 |
| Waters | Osrville | 863 | GS1_A, TS17 |
| Watkins | Carol | 27101 | NS1 |
| Watkins | Tani | 27630 | NS1 |
| Watson | Ben | 1621 | MIT3 |
| Webb | Parker | 1938 | NS1 |
| Weber | Michael | 419 | NS1 |
| Webster | Betsy | 5405 | NS1 |
| Webster | Jeremy | 45 | ALT1, TS29 |
| Webster | Samuel | 956 | NS1 |
| Wehr | Rachel | 7972 | NS1 |
| Weigel | Kate | 29351 | NS1 |
| Weiner | Jeremy | 663 | NS1 |
| Weisser-Lee | Melinda | 6760 | ALT22, NS1 |
| Weisser-Lee | Melinda | 339 | ALT5, CR4 |
| Wellington | Mary | 6663 | NS1 |
| Weltner | Lucy | 26887 | MIT35 |
| Wende | Anthony | 845 | NS1 |
| Wernette | Tim | 7354 | NS1 |
| Werre | Silvia & Merlin | 294 | MIT8 |
| Wertz | Gina | 390 | NS1 |
| Wesley | Susan | 27073 | NS1 |
| West | Bret | 7356 | NS1 |
| Westerdale | John | 1279 | AMT1, GS13, TS1, TS15, TS24 |
| Wetherby | Aelwen | 30101 | NS1 |
| Whaley | James | 841 | NS1 |
| Wheatley | William | 5925 | NS1, SO6 |
| Whitaker | Gene | 27795 | NS1 |
| Whitaker | Tristan | 1004 | NS1 |
| White | Anne | 27694 | NS1 |
| White | Rich | 1243 | NS1 |
| White | Rose | 717 | NS1 |
| Whitney | Ellen | 6764 | NS1 |
| Whittington | Ashlee | 1020 | NS1 |
| Wight | Timothy | 238 | MIT1, NS1 |
| Wilburn | Andrew | 6401 | NS1 |
| Wilcox | Kenneth | 27679 | NS1 |
| Wildenhaus | James | 7948 | NS1 |
| Wildflower | Ivory Lynn | 6766 | NS1 |
| Wiley | Charles | 41 | AMT1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Wiley | Christopher | 560 | NS1 |
| Wiley | Dennis | 78 | AMT1 |
| Wilkin | Donovan | 27742 | NS1 |
| Willard | Mitchell | 1339 | CR4 |
| Willard | Stephanie | 1303 | NS1 |
| Williams | Karen | 28926 | NS1 |
| Williams | Kathleen | 26996 | NS1 |
| Williams | Wendy | 27921 | NS1 |
| Williamson | Alex | 29116 | ALT22 |
| Williamson | Kathleen | 27664 | NS1 |
| Williamson | Kathleen | 1108 | NS1 |
| Williamson | Kathleen | 1109 | NS1 |
| Williamson | Kelli | 6769 | NS1 |
| Willis | Fred | 773 | NS1 |
| Williams | Ann | 27580 | NS1 |
| Wilson | Ben | 6771 | NS1 |
| Wilson | Christopher | 904 | MIT1 |
| Wilson | Darrell | 1483 | NS1 |
| Wilson | Jonny | 1820 | NS1 |
| Wilson | Julien | 276 | NS1 |
| Wilson | Robert | 7370 | NS1 |
| Wimberly | Stuart | 547 | NS1 |
| Windauer | Debora H | 7372 | NS1 |
| Windauer | Debora H | 29753 | NS2 |
| Wineman | Marian | 27204 | NS1 |
| Winner | Barbara | 28087 | NS1 |
| Winner | Thomas | 27200 | NS1 |
| Winslow | Lee | 5420 | NS1 |
| Wintz | Jason | 447 | NS1 |
| Wisniewski | Brian | 1440 | NS1 |
| Witesman | Owen | 581 | NS1 |
| Wofsy | Sheila | 27190 | NS1 |
| Wofsy | Sheila | 27191 | NS1 |
| Wolf | Ann | 828 | NS1 |
| Wolf | Miranda | 564 | NS1 |
| Wolff | Pat | 5458 | NS1 |
| Wolfswinkel | Penny | 1191 | NS1 |
| Wolterman | Jimmy | 1007 | NS1 |
| Wong | Kris | 28440 | NS1 |
| Wong | Travis | 636 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Wood | Jordan | 6304 | NS1 |
| Wood | Lee | 712 | NS1 |
| Woodall | Sandra | 26814 | NS1 |
| Woodbury | Michael | 1478 | NS1 |
| Woodson | Sarah | 5743 | NS1 |
| Worden | Susan | 26954 | NS1 |
| Workman | Brandon | 29155 | NS1 |
| Worthington | E.K. | 27334 | NS1 |
| Wright | Paul | 6415 | NS1 |
| Wright | Tom | 31 | NEPA25 |
| Wright | Tom | 32 | CR23, NEPA27 |
| Wright | Tom | 110 | NEPA25, NS1 |
| Wright | Tom | 239 | NS1 |
| Wright | Tom | 1422 | CR2, MIT7, NEPA3, NEPA56, NS1 |
| Wurton | Gordon | 529 | WT4 |
| Wyciskalla | Nicholas | 28391 | NS1 |
| Yahne | Ron | 454 | NS1 |
| Yancey | Robert | 772 | NS1 |
| Yankee | Michaela | 599 | NS1 |
| Yantzer | Robert | 6776 | NS1 |
| Yarbrough | Leonard | 28347 | NS1 |
| Yazzle | Chili | 30069 | NS1 |
| Yazzie | Lyle | 1502 | NS1 |
| Yensen | Roger | 7901 | NS1 |
| Yersak | Tom | 6190 | NS1 |
| Yip | Jessica | 5783 | NS1 |
| Young | Alex | 7295 | NS1 |
| Yox | Lawrence | 27972 | NS1 |
| Yubeta-Smith | Matilda | 306 | NS1 |
| Yve | Min | 226 | NS1 |
| Zache | Zach | 6777 | NS1 |
| Zadravecz | Frank | 8201 | WT4_B |
| Zak | Casey | 28131 | NS1 |
| Zamora | Julie | 744 | NS1 |
| Zampieri | Janet | 7383 | NS1 |
| Zamudio | Barbara | 671 | NS1 |
| Zane | Jeremy | 8124 | NS1 |
| Zaneski | Eddie | 29494 | NS1 |
| Zazueta | Andrew | 1027 | NS1 |
| Zeller | Thomas | 28752 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Zeller-Av | Peyton | 6497 | NS1 |
| Zerr | Laura | 27179 | NS1 |
| Zevian | Shannin | 27807 | NS1 |
| Zhang | Wenjing | 29163 | NS1 |
| Zieber | Thomas | 1371 | AMT1 |
| Ziegler | Ann | 389 | NS1 |
| Zingg | Elizabeth | 28382 | NS1 |
| Zink | Jacqueline | 27809 | NS1 |
| Zinn | Kai | 6513 | NS1 |
| Zitzow | Kim | 1251 | NS1 |
| Zobel | Don | 6 | NS1 |
| Zobel | Don | 7 | ALT14 |
| Zobel | Don | 79 | AMT1 |
| Zobel | Don | 89 | ALT14, NS1 |
| Zobel | Don | 257 | AMT1 |
| Zsebenyi | Eric | 5937 | NS1 |
| Zurcher | Naomi | 5390 | NS1 |
| Zweig | Daniel | 28966 | NS1 |
| Zwicker | Marie Louise Morandi Long | 5428 | NS1 |

Appendix R

**Table R-6. Full text of form letters submitted and index to responses**

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| F1 | I am strongly opposed to the proposed Resolution Copper Project and Land Exchange and ask that the Forest Service not allow it to proceed as it is clearly not in the public interest. It will harm land and resources of significant spiritual and cultural value to the Apache people, severing important connections to the land and harming traditional religious practices. | ALT22, ALT5, NEPA2, NS1, TS2, WT1 |
| | In addition to the fact that this proposal would destroy these religious and spiritual values and is not in the public interest, the Draft Environmental Impact Statement (DEIS) is insufficient, incomplete, and does not reflect current conditions. The analysis of the tailings dump locations is incomplete and does not provide enough information for me to know if any of the proposed locations would be adequate for a tailings dump of such magnitude, capable of accommodating more than a billion tons of toxic waste. Several of the proposed sites were recently added and so have not had proper surveys. No cultural surveys have been completed at the Skunk Camp tailings site location, for example. Furthermore, a recent District Court ruling on the Rosemont Mine calls into question whether the Forest Service can allow tailings dumps and other facilities on public lands under the 1872 Mining Law. | |
| | It is also not clear that the proposed tailings designs in the DEIS would be legal under the U.S. Army Corps of Engineers rules. These types of tailings designs have been banned in other countries where they've failed, causing destruction and loss of life. A much more detailed and careful analysis is needed to address the disposal of billions of tons of toxic waste. | |
| | The DEIS significantly underestimates the amount of water this project would use, much less than other Arizona copper mines. It indicates it would use about 10% the amount of water other mines use, but why and how? I cannot find that information in the DEIS. Why didn't the Forest Service use a more accurate figure of 50,000-acre feet of water the mine would consume annually. The DEIS also underestimates the dewatering at Oak Flat. | |
| | The DEIS did not accurately survey, assess, and mitigate the harm to endangered and threatened species, including the Arizona hedgehog cactus, yellow-billed cuckoo, and narrow-headed garter snake. | |
| | The Forest Service must withdraw the DEIS and rewrite it to comply with the recent court decision and to provide a fuller and more accurate picture of the impacts, including the cumulative impacts. | |
| | Finally, I would like to see the Forest Service seriously consider the no action alternative, as this proposed mine is not in the public interest, will destroy a traditional cultural property and important recreational area. | |
| F2 | "I do not support this land swap and this mining operation for a multitude of reasons. Mining uses obscene amounts of water, not to mention the poisoning effect that the mining process will have on this important and sacred resource. Arizona has been experiencing a long-term drought over the last twenty-one years. More desertification brings salinization, overexploitation, and loss of biodiversity. Should we actually be dewatering the desert? Should we not be more interested in a long-term approach to land and resource management policies in an age where climate change has already modified large social patterns and mass migrations?" | ALT22, NEPA2, NS1, TS2, WT1 |
| | "My concern lies on the destruction of the environment and the contamination of not only the groundwater and aquifers, but of the air, due to the tailings facility. It lies on the loss of biodiversity, culture, and the sacred, all of which are undeniably interconnected. It lies on providing a clean space and environment for people and distinct cultures to flourish for many more generations. We should look seven generations behind us, learn from the mistakes, and consider seven generations ahead of us, to protect the future of our relatives. This mine will be in operation for around forty years, and the future that it will leave will be marred forever." | |
| | "Oak Flat is about water in a region of intense drought, its about contamination of land and water, its about biodiversity in a desert where populations of plant and animal life will dwindle, its about corruption, its about blatant lies, its about political subversion and coercion, its about disrespect of Indigenous people, its about a language (words and songs) that comes directly from these hills and these canyons, its about cultures who have participated in a traditional life since time immemorial, its about spirituality, its about medicine, its about origin, its about community, its about reclamation, its about conservation, its about the ephemeral as a perspective, and its about life." | |
| | "The DEIS is not complete and does not reflect current conditions. The DEIS does not include information allowing me to know if any of the alternative tailings dump locations are even acceptable for the dumping of more than a billion tons of toxic waste. Cultural surveys have not been done at the Skunk Camp tailings site location. And, a recent District Court ruling on the Rosemont mine project calls into question | |

R-148

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | Forest Service decisions on the use of federal public land for mining facilities. Therefore, I ask you to rewrite the DEIS to correct these deficiencies and submit it for a new comment period." | |
| | "I'm concerned this project would destroy sacred land and damage public lands that are very valuable and important to all Americans. The DEIS confirms that this project would destroy the religion of Native Americans and would destroy land and waters religions depend on. This is not acceptable." | |
| | "The DEIS underestimates the amount of water this project would use. The document says that Rio Tinto would use only 10% of the water other mines in Arizona use without outlining any new methods to achieve this unrealistic goal. I would like to know why the Forest Service did not use a more accurate figure of 50,000-acre feet of water the mine would consume annually. The DEISs modeling of dewatering at Oak Flat itself is inaccurate. The DEIS fails to prevent harm to neighboring towns and landowners." | |
| | "The DEIS did not accurately survey the harm to endangered and threatened species. Arizone hedgehog cactus, yellow-billed cuckoo, and narrow-headed garter snake surveys need to be (re)done." | |
| | "All tailings dump locations listed in this DEIS are illegal in countries such as Brazil and Chile and also could not be approved by either the Arizona Department of Environmental Quality or the US Army Corps of Engineers. The DEIS needs to be withdrawn and rewritten when the US Forest Service can show that a tailings dam site could be approved under US law." | |
| F3 | We the People of the United States of America write to you today on behalf of Oak Flat, known as the sacred place Chich'il Bildagoteel to the Apache people, as a site of great spiritual and ecological importance under threat from the foreign mining company Rio Tinto. The destruction of Oak Flat is a threat not only to the Apache, and to all Native people within this country, but also to the people of the United States of America as a whole. | NS1 |
| | Oak Flat is located in the Tonto National Forest in Arizona, about an hour east of Phoenix and about 45 minutes from the San Carlos Apache Reservation line. Although it used to be part of the reservation, the land was taken and put under the jurisdiction of the U.S. Forest Service during five separate reductions of the tribal land base. As part of the ancestral Apache territory, it continues to have significant religious, cultural, historical, and archaeological value to the San Carlos Apache Tribe and to other tribes in the region. | |
| | Oak Flat was traded to Resolution Copper Mining, a subsidiary of the foreign mining company Rio Tinto, through the addition of a last-minute rider to the National Defense Authorization Act in December 2014. The bill, which set the nations defense policy, was a must-pass item before the 113th session of Congress could close. Although attempts at the land exchange had been made before, using normal congressional procedures, they had been denied 13 separate times over the course of a decade. However, on page 1,103 of the approximately 1,700-page NDAA bill, Arizona state representatives added a provision exchanging over 2,400 acres of federal land, including Oak Flat, for around 5,300 acres of private land owned by Resolution Copper. The rider was revealed only minutes before midnight, in a manner that a New York Times op-ed referred to as sneakily anti-democratic even by congressional standards (Milet 2015). By being tacked onto the NDAA bill and sent to the Senate in a form that didnt allow for amending, the land exchange rider passed Congress on December 12th and was signed into law by President Obama on December 19th, 2014. This land exchange is an example of a small portion of government overriding the desires of the masses and exploiting legislative procedures to promote their own agenda. | |
| | Damage to or removal from these lands amounts to government interference in religion, an action that both violates the freedom of religion guaranteed by the First Amendment, and infringes on the American Indian Religious Freedom Act. Allowing the government to interfere with any religion sets a dangerous precedent. As Wendsler Nosie, former Chairman of the San Carlos Apache Tribe and spokesperson for Apache Stronghold, a nonprofit dedicated to the protection of sacred sites like Oak Flat, says, This is our church. They declared war on our religion. This is no different than being a Christian. How can anyone destroy a religious place that has significant meaning? | |
| | Because Oak Flat is located on U.S Forest Service land, which belongs to the American public, its transferal to a foreign corporation is not just a loss to the Apache people, but a theft from all citizens of the United States. It also disregards the will of previous Presidents, as the Tonto National Forest, including Oak Flat, was protected from mining by special order of both President Eisenhower and President Nixon, due to its cultural and environmental value. Aside from the sacred Apache ceremonies that are conducted there, Oak Flat is also a popular location for camping, rock climbing, and other recreational activities. | |

R-149

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | Finally, Oak Flat is as environmentally important to the human and ecological communities of Arizona as it is spiritually important to the Apache. As one of the only sites of year-round groundwater in the surrounding Sonoran Desert ecosystem, Oak Flat serves as a haven for a diverse array of species. However, the copper mine would turn this beautiful place into an industrialized mining wasteland. RCM states that it will use a method known as block cave mining to access the copper, a highly destructive and water intensive technique that involves digging underneath the ore and causing the earth to collapse under its own weight, creating a subsidence zone directly above and in the vicinity of the mine. Such a practice is projected to leave an enormous crater 2 miles wide and over 1,000 ft deep, generating up to 1.7 billion tons of waste in the process. Currently, RCM plans to dump this waste on nearby Forest Service land. The RCM General Plan of Operations states that RCM plans to put tailings behind an upstream tailings dam, the same type of dam that recently collapsed in Brazil, killing over 300 people. | |
| | Water contamination remains an issue long after copper mines have shut down. The mine would pose a threat both to water quality and to the availability of both surface and groundwater. Resolution Copper estimates that its operations would require approximately 20,000 acre-feet of water per year. Already, the amount of groundwater pumping required to drill shafts has dewatered springs in the surrounding area, springs that are vital for both local ecology and Apache ceremonies. Although RCM has promised that the economic benefits of the mine will outweigh the costs, similar promises of minings economic benefits have not been fulfilled in nearby mining towns like Superior, which has a lower median income than many of Arizonas other cities, and where nearly a fifth of the residents live in poverty. | |
| | In 2014, Carlos Apache Chairman Terry Rambler stated that Apache people have lived, prayed, and died in the Oak Flat Area since time immemorial. We are saddened that Congress, through an 11th hour rider, has ignored the will of the people. We are concerned for our children who may never see or practice their religion in their rightful place of worship. We are worried for the children of southeast Arizona who may have to find new places to live to drink clean water. And we are gravely concerned for the American voter whose voice continues to be ignored. However, the Apache people will not remain silent. We are committed to shining light on the Land Exchange and the proposed mine until we have no breath. The Save Oak Flat act has been introduced into the House of Representatives as H.R.665, and into the Senate as S.173. We ask that, regardless of partisanship or political affiliation, you take a stand on this issue and support the preservation of Oak Flat for generations yet to come. | |
| F4 | Dear Supervisor Bosworth, | ALT22, NEPA2, NS1, TS2, WT1 |
| | I am submitting comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. Thank you for the opportunity to provide public comments. The DEIS is not complete and does not reflect current conditions. The DEIS does not include information allowing me to know if any of the alternative tailings dump locations are even acceptable for the dumping of more than a billion tons of toxic waste. Cultural surveys have not been done at the Skunk Camp tailings site location. And, a recent District Court ruling on the Rosemont mine project calls into question Forest Service decisions on the use of federal public land for mining facilities. Therefore, I ask you to rewrite the DEIS to correct these deficiencies and submit it for a new comment period. I'm concerned this project would destroy sacred land and damage public lands that are very valuable and important to all Americans. The DEIS confirms that this project would destroy the religion of Native Americans and would destroy land and waters religions depend on. This is not acceptable. The DEIS underestimates the amount of water this project would use. The document says that Rio Tinto would use only 10% of the water other mines in Arizona use without outlining any new methods to achieve this unrealistic goal. I would like to know why the Forest Service did not use a more accurate figure of 50,000-acre feet of water the mine would consume annually. The DEISs modeling of dewatering at Oak Flat itself is inaccurate. The DEIS fails to prevent harm to neighboring towns and landowners. The DEIS did not accurately survey the harm to endangered and threatened species. Arizona hedgehog cactus, yellow-billed cuckoo, and narrow-headed garter snake surveys | |
| | need to be (re)done. All tailings dump locations listed in the DEIS are illegal in countries such as Brazil and Chile and also could not be approved by either the Arizona Department of Environmental Quality or the US Army Corps of Engineers. The DEIS needs to be withdrawn and rewritten when the US Forest Service can show that a tailings dam site could be approved under US law. Please add me to your mailing list and keep me informed about all actions regarding this action. | |
| | Sincerely, | |

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| F5 | Under the National Environmental Policy Act, the Forest Service must analyze the impacts of a mining project and, if ultimately approved, to select the least damaging method to achieve the purpose and need of a proposed project. But in the case of the Resolution Copper Draft Environmental Impact Statement (DEIS), the Forest Service is prioritizing one of the most damaging ways to mine. The Proposed Alternative uses panel caving mining, which will destroy most of Oak Flat, hundreds of archeological sites sacred to the Apache people, and some of the best rock climbing and bouldering in Arizona. But it doesnt have to be this way. The DEIS already makes it clear that other mining methods which would preserve the surface of Oak Flat are possible. Thats why the DEIS should have included an alternative that protects Oak Flat. Instead, the DEIS dismissed all other mining methods entirely, using basic analysis to suggest that any other method would be prohibitively expensive. Not only is this analysis lacking in its scope and short on details unique to Resolution Copper, but its also attempting to make a decision on whats in the best financial interest of Resolution Copper and its parent company Rio Tinto one of the largest mining companies in the world. The Forest Service should be protecting public lands to the extent possible, not making decisions consistent with the companys bottom line of maximizing profits. With a different underground mining technique that uses tailing backfilling, Oak Flat will be saved, far less water will be consumed, and the size of the tailings impoundment necessary will be a fraction of the size. All of these environmental savings and benefits can be achieved via a slightly different mining technique, yet the Forest Service has already dismissed these possibilities. Im asking you to include in the Final Environmental Impact Statement a preferred alternative that protects the surface of Oak Flat for current and future generations, reduces water consumption, and minimizes the size of the tailings impoundment needed.<br><br>Thank you,<br><br>Sincerely, | AMT1 |
| F6 | Thank you for the opportunity to comment on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. I'm deeply concerned about the unacceptable damage this project would do to public lands and Apache sacred sites. I urge the Tonto National Forest to reject this proposal to destroy thousands of acres with a vast block cave mine. The proposed land exchange involves trading away a very popular recreation area that was specifically withdrawn from mining to protect the surpassing cultural and recreational values of Oak Flat. The DEIS fails to either adequately assess the value of the lands to be traded away or weigh the possibility that the proposal could facilitate severe damage to other important nearby lands, such as Apache Leap. Allowing these places to be taken out of public hands and destroyed in exchange for scattered land parcels of marginal value is a bad deal for the U.S. taxpayer.<br><br>The DEIS also fails to adequately analyze the alternatives for disposing the billions of tons of toxic waste rock that will be excavated from the mine. New alternatives have recently been added to the mix that have not been thoroughly vetted in terms of their suitability as tailings sites, impacts to cultural resources, or the related damage that will be done to public and/or state lands. Absent a more thorough analysis of this critically important aspect of the mine proposal, the issuance of the DEIS is premature and fatally flawed. Moreover, it's not clear that the proposed tailings designs would even be legal under rules administered by the U.S. Army Corps of Engineers and Arizona Department of Environmental Quality. These types of tailings designs have already been banned in other countries where they've dramatically failed, causing catastrophic destruction and loss of life. Much more careful analysis is needed to address the issue of tailings and none of the tailings alternatives should be approved as proposed. The DEIS also falls short in its analysis of water use and hydrology. Estimates of the mine's water use by the mining company are vastly understated, yet accepted as fact without independent analysis. The assertion that this mine would use only 10 percent of the water that other Arizona copper mines use simply defies belief. The company's hydrological analysis has been proven to be filled with grave errors and false assumptions to this point, which destroys the credibility of their estimates and undermines the analysis of water issues in the DEIS.<br><br>Dewatering the mine at Oak Flat is quite likely to cause undue harm to the regional aquifer and nearby Ga'an Canyon, another sacred site and a critically important resource for the area's wildlife. Water taken from other locations for use by the mine is likely to harm the regional aquifer and local communities and landowners who depend on it. More work needs to be done to assess impacts to wildlife and protected species in the area, including but not limited to the Arizona hedgehog cactus, yellow-billed cuckoo and narrow-headed garter snake. The potential dewatering of Ga'an Canyon in particular could have a devastating impact on the area's web of life. Lastly, as the recent federal district court ruling against the proposed Rosemont Mine clearly establishes, for decades the U.S. Forest Service has been "misinterpreting" the General Mining Law of 1872 and "misleading the public" about the rights it conveys upon mining interests operating | ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT6 |

R-151

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | on public lands. It's not e given that the Tonto National Forest has no right to reject this mine on public lands, as the Service has claimed for so many years. It's time to begin looking at such mining proposals through a new lens, which includes elevating the value end protection of public lands and sacred sites above the imperative of company profits. Thank you again for the opportunity to comment, and please add me to the Resolution Copper EIS contact list. | |
| | Thank you for the opportunity to comment on the Resolution Copper Project and Land Exchange DEIS. | |
| | I'm deeply concerned ebout the unacceptable damage this project would do lo Apache sacred sites and public lands. I urge the Tonto NF to reject this proposal. The proposed land exchange would trade away Apache sacred sites and a very popular recreation area that were specifically withdrawn from mining to protect their surpassing cultural and recreational values. | |
| | The DEIS also fails to adequately analyze the tailings elternatives, some of which have only recently been added and not thoroughly vetted for suitability, impacts to cultural resources, or potential damage to public and/or state lands. | |
| | Much more careful analysis is needed to address the disposal of billions of tons of toxic waste none of the tailings alternatives should be approved as proposed. Resolution Copper's estimates of the mine's water use are likely vastly understated, yet accepted es fact without independent analysis, despite grave errors and false assumptions evident in the company's previous hydrological analysis. It defies belief that this mine would use only 10 percent of the water that other Arizona copper mines use. Dewatering the mine et Oak Flat is likely to harm the regional aquifer and nearby Ga'an Canyon, another sacred site and a critically important resource for wildlife. Water imported to the mine is likely to harm the regional aquifer and the local communities and landowners who depend on it. The Tonto NF should conduct a comprehensive, independent analysis of the mine's water use and potential hydrological impacts to ground and surface water in all affected areas. | |
| | A federal court ruled recently that the U.S. Forest Service has been "misinterpreting" the General Mining Law of 1872 and "misleading the public" about the rights it conveys re: mining on forest lands. The Tonto NF should consider this mining proposal through a new lens, which includes elevating the value and protection of public lands end sacred sites above the imperative of company profits. Please add me to the Resolution Copper EIS contact list. | |
| | Sincerely, | |
| F7 | Dear Supervisor Boswmth, | CR1, CR4, NS1 |
| | I am submitting comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. Thank you for the opportunity to provide public comments. | |
| | The DEIS is flawed and incomplete. | |
| | The section that discusses Tribal Values and Concerns demonstrates e failure of the U.S. Forest Service to do adequate consultation with affected Tribes. The proposed mine would directly, adversely, and permanently effect numerous cultural artifacts; sacred seeps and springs; traditional ceremonial areas; resource gathering localities; burial locations; and other places and experiences of high spiritual and other value to tribal members. | |
| | The DEIS fails to address the impact to current religious practice. It fails to address the extent of the environmental devastation end the irreparable generational harm thet will be caused to not only current but to future generations. | |
| | The mine would ceuse permanent loss of a place with enormous religious and cultural reverence. The lack of reference in the DEIS to the archeological and cultural records held by the San Carlos Apache Tribe, Yavapei people, Aravaipa, and other Indigenous peoples of these ties in the DEIS is inadequate. | |
| | Native Americans and others who hold the land as sacred end use the area for spiritual, traditional, end religious uses will be irreparably harmed and spiritually traumatized. This is not acceptable, end it is discriminatory. | |
| | I support the Tribes and congressional Leaders, Rep. Raul Grijalva, Senator Bemie Sanders and all cosponsors in requesting be held by the appropriate Congressional committees to hear this evidence of the impact to a Holy and Sacred site before the land transfer is able to move forward. | |

R-152

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | Sincerely, | |
| | Please add me to your mailing list and keep me informed about all actions regarding this action. | |
| F8 | Tonto National Forest, | NS1 |
| | I stand with the San Carlos Apache tribe in pledging support for Oak Flat. | |
| | Oak Flat in central Arizona is sacred land to the San Carlos Apache Tribe, but Congress traded it away to facilitate a huge copper mine for international mining giant Rio Tinto. The mine will destroy Oak Flat, leave behind a massive crater, and wipe out streams, springs, and wildlife. | |
| | What's happening at Oak Flat is part of a history of cultural and spiritual abuses against native people. It needs to end now. | |
| | I support bills introduced by Representative Raul Grijalva (H.R. 665) and Senator Bernie Sanders (S. 173) to repeal the provision that gave away Oak Flat. This land needs to be protected from mining and returned to the sacred site its been for thousands of years. | |
| | Signed, | |
| F9 | TO WHOM IT MAY CONCERN: | NS1 |
| | This letter serves as my opposition to the Southeastern Arizona Land Exchange which allows a foreign mining company BHP-Rio Tinto-Resolution Copper Company to destroy and desecrate holy and sacred ceremonial sites at Chi'ChilBilda'Goteel (Oak Flat) to build a mine that will also destroy our water and cause cancerous pollution. I am a member of the San Carlos Apache Tribe. | |
| | We humbly ask that Section 3003 of the National Defense Authorization Act now P.L. 113-291 be rescinded immediately. | |
| | Respectfully, | |
| F10 | Dear Neil Bosworth, | ALT22, NS1, WT4, WT6 |
| | This mining plan calls for the largest destruction of recreational climbing resources in the history of American's public lands. It is impossible to mitigate this loss and the impacts to the local economy and health and well-being of local residents who recreate at Oak Flat. This mining plan calls for the largest destruction of recreational climbing resources in the history of American's public lands. It is impossible to mitigate this loss and the impacts to the local economy and health and well-being of local residents who recreate at Oak Flat. This proposed mine will destroy the Chi'chil Bildagoteel Historic District at Oak Flat, which was placed on the National Register of Historic Places for its cultural and religious significance to the San Carlos Apache tribe. The massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more Colorado River water restrictions coming soon. The widespread dewatering this mine will cause, due to groundwater pumping in Pinal County, is unacceptable. This draft EIS is incomplete. The USFS has not conducted a geotechnical study or cultural resource survey for the tailings site that is the USFS's preferred alternative. This draft EIS is based on incorrect information. The hydrology study done by Resolution Copper was flawed, as it failed to identify the large source of 180 F water that stopped construction. The USFS should have completed an independent study in order to properly understand the hydrology in the Oak Flat area. | |
| | Thank you, | |
| | Additional comments to F10: | |
| | additionally the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | additionally this draft eis is based on incorrect information. | |
| | additionally this mining plan calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | additionally this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |

R-153

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | also the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | also this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | finally this draft eis is incomplete. | |
| | finally this mining plan calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | furthermore the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | furthermore this draft eis is based on incorrect information. | |
| | furthermore this draft eis is incomplete. | |
| | furthermore this mining plan calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | furthermore this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | in addition the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | in addition this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | it is impossible to mitigate this loss and the impacts to the local economy and health and wellbeing of local residents who recreate at oak flat. | |
| | please reconsider. | |
| | thank you. | |
| | thank you for your consideration. | |
| | thank you for your time. | |
| | the draft eis is incomplete. | |
| | the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | the usfs has not conducted a geotechnica study or cultural resource survey for the tailings site that is the usfss preferred alternative. | |
| | this draft eis is incomplete and based on incorrect information. | |
| | this mining plan also calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | this proposed mine will also destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |

R-154

Appendix R

# Section 3. Responses to Comments

R-156

*This page intentionally left blank.*

Appendix R

Appendix R

| Comment response: ALT1 Application of filtered tailings to all alternatives; movement of filter plant | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-12, 1158-11, 1158-17, 1308-4, 1360-7, 1392-7, 14-2, 205-1, 261-14, 320-8, 45-2, 524-21, 555-29

These comments ask that alternative components presented for one alternative in the DEIS be applied to other alternatives as well. The comments focus primarily on including filtered tailings in the Skunk Camp alternative (or in all alternatives) and ask that the filter plant be located either near Superior or away from the San Tan Valley for the Skunk Camp alternative.

Forest Service NEPA regulations require that an EIS develop a reasonable range of alternatives that sharply define the issues and provide a clear basis for the decision-maker's choice among available options. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action (36 Code of Federal Regulations (CFR) 220.5(e)). In making a decision under NEPA, the responsible official shall consider the alternatives analyzed in environmental documents; and then render a decision within the range of alternatives analyzed in the environmental documents (36 CFR 220.4(c)).

In addition to the required no action alternative, the DEIS presented five action alternatives. Alternative 2 is the proposed action and consists of the General Plan of Operations (GPO) that was submitted to the Forest Service by the proponent. Action alternative components, including use of filtered tailings (Alternative 4) and the relocated filter plant (Alternative 4), were identified to define or respond to specific issues. The reasons for developing each action alternative are described in the DEIS (p. 75, 81, 88, and 94).

In making the final decision, the Forest Service responsible official may mix and match components or elements of alternatives from the FEIS as long as the modifications are "encompassed within the range of alternatives analyzed" in the FEIS. Thus, the decision documented in the record of decision (ROD) can pick and choose between actions, activities, and facilities presented in the action alternatives in forming a Selected Action and the filtered tailings technology could be applied to alternative tailings sites.

As part of permitting under Section 404 of the Clean Water Act, the feasibility of applying filtered tailings to Alternative 6 was investigated (KCB Consultants Ltd. 2020f). Information was also developed concerning the movement of the filter plant to the West Plant Site (Peacey 2020a).

Since most of these comments focused on the Skunk Camp alternative (preferred alternative), it is important to note that, if Skunk Camp is ultimately picked to be the Selected Action, only those actions, activities, and facilities on NFS lands will be authorized by the ROD. The tailings facilities and plant site locations are on State and/or private lands. As stated in the DEIS, "Selection of this alternative by the Forest Supervisor would not automatically approve this alternative, since the other areas are not Federal land. Obtaining access to use ASLD-administered trust land and private land is the responsibility of the applicant" (DEIS, p. 94). The Forest Service ROD would authorize activities on NFS lands that are consistent with the Skunk Camp alternative as presented in the ROD, and the EIS analysis of various tailings methods would be available for consideration by the proponent and appropriate regulatory authorities in the permitting process.

Further assessment of whether the DEIS analysis would support application of filtered tailings to other alternatives is contained in Newell and Garrett (2018d), "Process Memorandum to File Water Resource Analysis: Assumptions, Methodology Used, Relevant Regulations, Laws, and Guidance, and Key Documents."

Appendix R

| Comment response: ALT2 Reasons for choosing Alternative 6 – Skunk Camp | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-3, 29-1

This comment questions why Alternative 6 – Skunk Camp was chosen as the preferred alternative. The primary purpose of the DEIS is to disclose impacts anticipated from all alternatives. Identifying a preferred alternative in the DEIS is desirable in order to give the public as much clarity as possible into the decision the Forest Service is inclined to make. However, identification of a preferred alternative in the DEIS is not required and does not represent a decision by the Forest Supervisor.

The actual decision by the Forest Supervisor is known as the selected action and will be identified in the ROD. The ROD will contain the rationale for why the selected action was chosen, with the Forest Supervisor weighing the advantages and disadvantages.

| Comment response: ALT3 Other alternatives to consider | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1301-23

Alternative mining methods were fully evaluated as part of the alternatives analysis and as part of responding to comments (DEIS, p. 29, and appendix F, pp. F1–F4). See also response AMT1.

Alternatives with substantially different water use were evaluated in the DEIS, with Alternative 4 using 30 percent of the water required for Alternative 2 (DEIS, p. 31, p. 336, appendix H).

Alternative tailings locations were evaluated, with four separate physical locations considered between the different action alternatives (Near West, Silver King, Peg Leg, Skunk Camp). Development of the Peg Leg and Skunk Camp alternatives was driven, in part, by the desire to minimize the population near the tailings storage facility (DEIS, pp. 88, 94).

| Comment response: ALT4 Variations of land exchange | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1301-25

This comment questions the amount of land included in the land exchange at Oak Flat (the Federal parcel) and suggests a modified acreage. The proposed land exchange, including the specific selected and offered lands, was mandated by Congress in Public Law (PL) 113-291 (the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, called the NDAA in the DEIS). The Forest Service is analyzing the impacts resulting from the land exchange as required in PL 113-291. However, the Forest Supervisor has no discretion or decision authority regarding the implementation of the land exchange (DEIS, pp. 13–14). Also see response NEPA35.

| Comment response: ALT5 Selection of no action alternative | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1083-2, 1086-4, 1091-4, 1150-4, 1155-3, 1207-3, 1329-2, 1329-6, 1338-1, 1344-1, 1404-1, 1455-7, 1477-5, 151-1, 1540-12, 1921-1, 30064-1, 339-1, 497-4, 504-3, 509-3, 568-2, 8032-25, 883-3, 921-1, 922-2, 926-1, 951-1, F1-10

These comments question whether the no action alternative was considered in the DEIS.

The no action alternative forms a benchmark against which action alternatives are compared. The no action alternative was appropriately included throughout the DEIS. The proposed action and the no action alternative are described in chapter 2 (DEIS, pp. 65–66). Impacts resulting from the no action alternative are disclosed in each resource section of chapter 3.

A separate question is whether the Forest Service has the authority to select the no action alternative. The answer to this question may vary by alternative and the regulations under which mine-related actions are approved. We have added further discussion to chapter 1 of the FEIS. See response NEPA18 for more details.

Appendix R

| **Comment response:** ALT6 Dewatering impacts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 158-3 | |

The impacts resulting from the dewatering required to construct and operate the mine are fully disclosed in section 3.7.1 (DEIS, pp. 295–345).

| **Comment response:** ALT8 Truncated NEPA process | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1235-1, 1454-1, 8031-3, 8031-5 | |

These comments express concern that the NEPA process related to the land exchange is truncated by the time frames included by Congress in PL 113-291, including (1) forgoing the objection process, (2) the objection resolution process, and (3) the ROD.

PL 113-291 specifies, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper."

The statutory language supersedes Forest Service regulations and policies with respect to the land exchange.

The Forest Service is undertaking the analysis of the impacts resulting from the land exchange as required in PL 113-291, but the Forest Supervisor has no discretion or decision authority regarding the implementation of the land exchange (DEIS, pp. 13–14). Also see response NEPA35.

Components of the ROD apart from the land exchange will processed under applicable Forest Service regulations, including a draft ROD and opportunity for objection.

| **Comment response:** ALT9 Inadequate disclosure of alternatives | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-23 | |

This comment identifies perceived inadequacies in the development and analysis of alternatives.

The comment indicates that reasons for elimination of alternatives from detailed study was not disclosed. This is an incorrect statement. Appendix F of the DEIS contains substantial information on alternatives considered but eliminated from detailed study. Further information related to the alternatives development process is found in the "Resolution Copper Project and Land Exchange Environmental Impact Statement Alternatives Evaluation Report" (Alternatives Evaluation Report) (SWCA Environmental Consultants 2017a).

The comment indicates that alternatives were not considered in detail so that reviewers may evaluate their comparative merits. This is an incorrect statement. In addition to the disclosure of impacts in each resource section in chapter 3, the comparison of all alternatives, organized by issues and sub-issues, is consolidated in appendix E of the DEIS.

The comment indicates that reasonable alternatives not within the jurisdiction of the lead agency were not considered. This is an incorrect statement. Alternatives considered within the DEIS that are not within the jurisdiction of the Forest Service include Alternative 5 (Peg Leg location, involving Bureau of Land Management (BLM) land and Arizona State Trust land), and Alternative 6 (Skunk Camp location, involving private land and Arizona State Trust land). Further alternatives not within the jurisdiction of the Forest Service that were considered but eliminated from detailed analysis include disposal of tailings in privately owned mine pits and brownfield locations, and alternative mining techniques.

The comment indicates that the no action alternative was "dismissed nearly outright in the DEIS." This is an incorrect statement. The no action was considered thoroughly for all resources. See response NEPA18.

The comment indicates that discussion of mitigation measures is inadequate. Mitigation measures were included in appendix J of the DEIS and analyzed for effectiveness under each resource in chapter 3 of the DEIS. Development of mitigation measures has continued in response to public comments and ongoing regulatory requirements. The full suite of mitigation measures is included in the FEIS (appendix J).

Appendix R

| Comment response: ALT11 Mining at other locations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-7 | |

This comment indicates that the DEIS should have examined reopening the San Manuel mine instead of mining the Resolution ore deposit as proposed.

Forest Service NEPA regulations indicate the following: "The EIS shall document the examination of reasonable alternatives to the proposed action. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action" (36 CFR 220.5(e). The purpose and need is disclosed in chapter 1 (DEIS, pp. 6–8).

The Forest Service is responding to a proposed mine plan for mining the Resolution ore deposit and to Federal legislation directing completion of a land exchange for specific lands. Mining a different deposit, in a different location, owned by a different entity, does not meet the purpose of and need for this project. We added a discussion of this alternative to appendix F of the FEIS.

| Comment response: ALT12 Backfill of old pits | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-27, 1301-26 | |

This comment suggests alternatives placing tailings in old mine pits, as well as moving the tailings to unpopulated areas.

The Forest Service considered placing tailings in old mine pits as well as other brownfields sites in the alternatives analysis but eliminated this idea from detailed analysis in the DEIS (DEIS, appendix F, pp. F4–F6).

Alternative tailings locations also were evaluated, with four separate physical locations considered among the action alternatives (Near West, Silver King, Peg Leg, Skunk Camp). Development of the Peg Leg and Skunk Camp alternatives were driven in part by the desire to minimize locating the tailings storage facility near populated areas (DEIS, pp. 88, 94).

Appendix R

| Comment response: ALT13 Backfill of old pits combined with dry-stack tailings | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
320-9

This comment suggests alternatives placing tailings in old mine pits and suggests that this possibility could be revisited with dry-stack tailings.

The Forest Service considered placing tailings in old mine pits as well as other brownfields sites in the alternatives analysis but eliminated this idea from detailed analysis in the DEIS (DEIS, appendix F, pp. F4–F6).

The Forest Service also considered dry-stack tailings in the alternatives analysis and carried this consideration forward as part of Alternative 4 – Silver King. See response ALT1 for discussion of dry-stack tailings and the potential application to other alternatives.

The suggestion to revisit mine pits or brownfields, using dry-stack tailings, is valid. However, it appears that the use of dry-stack tailings would not overcome the reasons for which old mine pits were dismissed. As discussed in the Alternatives Evaluation Report (SWCA Environmental Consultants 2017a), several sites (Ajo, Green Valley) were considered unreasonable because of distance; this factor would not change considering filtered tailings. Several sites (Copper Queen, Pinto Valley, Ray, Twin Buttes, Johnson Camp) were unavailable because of ongoing operations; this factor would not change considering filtered tailings. One group of sites (Miami) was unavailable because it is part of the Pinal Creek Water Quality Assurance Revolving Fund (State Superfund); this factor would not change considering filtered tailings.

Four locations were found to have inadequate capacity (Casa Grande, Copperstone, Tohono Cyprus, and United Verde). The tonnage of tailings material—1.37 billion tons—does not change with dry-stack tailings (DEIS, p. 48). The volume would differ somewhat when transported and placed due to the change in water content (DEIS, p. 50). After placement, water partially drains from tailings with filtered and slurry tailings become more similar over time. Regardless of variations related to water content, the combined volume of all four mine pits mentioned (167 million cubic yards) represents less than 13 percent of the volume of tailings to be disposed (1.3 billion cubic yards) (SWCA Environmental Consultants 2017a). Capacity limitations would not change substantially when considering filtered tailings instead of slurry tailings.

Two locations were found to have concerns with water quality (Carlota, San Manuel). The DEIS analysis identified that filtered tailings have substantial water quality concerns (DEIS, pp. 402–403). Water quality concerns at the Carlota and San Manuel locations would not change substantially when considering filtered tailings instead of slurry tailings.

| Comment response: ALT14 Backfill of subsidence crater | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
7-1, 89-1

These comments suggest the placement of tailings in the subsidence crater that will occur on Oak Flat.

This alternative was considered during the alternatives development process and dismissed, as disclosed in the DEIS (DEIS, appendix F, p. F-4).

Appendix R

| Comment response: ALT15<br>Alternative mining and disposal techniques | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1322-10 | |

During scoping, many comments were received indicating that selection of an alternative mining method would prevent the subsidence crater and protect the surface of Oak Flat, as suggested by the comment. Alternative mining methods were fully evaluated as part of the alternatives analysis and as part of responding to comments (DEIS, p. 29; and appendix F, pp. F1–F4). Ultimately, these techniques were considered but dismissed from detailed analysis for multiple reasons. See response AMT1.

Alternatives with substantially different water use also were evaluated in the DEIS, as suggested by the comment, with Alternative 4 using 30 percent of the water required for Alternative 2 (DEIS, p. 31, p. 336, appendix H).

Multiple tailings disposal techniques, facility types, and tailings disposal locations were evaluated in the DEIS, resulting in a range in the acreage of the tailings impoundment, as suggested by the comment. Alternatives 2 and 3 require only 40 percent of the acreage of Alternative 5. This is based on the acreage within the fence line and includes pipeline corridors.

| Comment response: ALT16<br>Lining and water treatment | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>27045-1, 29-2 | |

These comments are related to the use of liners and water treatment for the tailings storage facilities. The concept of lining the tailings storage facility was raised during scoping and played a role throughout the alternatives development process (SWCA Environmental Consultants 2017a). During this time, the concept expanded from artificial geomembrane liners to incorporate other types of low-permeability layers that would have identical functions. For the alternatives that appear in the DEIS, a wide variety of seepage-control techniques was analyzed, including the use of artificial geomembrane liners. Details are described for each alternative in chapter 2 (DEIS, pp. 47–98) and in section 3.7.2 (DEIS, pp. 381–419). More discussion on the evolution of the liner concept is contained in Newell and Garrett (2018d).

The comment notes that Alternative 4 –Silver King should be lined. Alternative 4 – Silver King is the sole alternative that does not incorporate some manner of low-permeability layer in the design. Lining Alternative 4 was specifically considered but was not feasible (see Newell and Garrett (2018d) and Klohn Crippen Berger Ltd. (2019b)).

One comment suggests the recovery of pregnant leach solution from the tailings for a duration of 100 years. This is an incorrect concept. The seepage from the tailings storage facility is not pregnant leach solution, as might be collected from a heap leach pad.

Collection of seepage would occur as long as needed to be acceptable for release to the environment without treatment, during both operations and closure; this time frame differs by alternative, as described in section 3.7.2 (DEIS, pp. 381–419).

Appendix R

| Comment response: ALT19 Pipeline relocation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30081-10

The Forest Service considered multiple tailings slurry pipeline alternatives in the DEIS for Alternatives 5 and 6. These pipeline routes have been modified in several ways between the DEIS and FEIS.

First, the Alternative 5 – West pipeline option and Alternative 6 – South pipeline option were both dropped from consideration in the FEIS. This choice was made after review of public comments and identification of which routes appeared to have greater resource impacts. A discussion of this change was added to chapter 2 of the FEIS.

Second, the Alternative 6 – North pipeline option was modified, in part based on the issues raised in this comment. The rerouted pipeline considered in the FEIS now substantially avoids perennial water and critical habitat along Mineral Creek entirely, except for a trenchless underground crossing upstream of Government Springs Ranch. The modified pipeline now crosses Devil's Canyon at a non-perennial location using an overhead span and reduces the amount of the pipeline corridor that occurs on Arizona State Trust land. A discussion of this change was added to chapter 2 of the FEIS.

| Comment response: ALT21 Power-related alternatives | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-302, 8032-65

Power for the proposed project is to be supplied by the Salt River Project (SRP). These comments, as well as comments received during scoping, suggest that alternative methods of energy production should have been considered as alternatives in the NEPA process.

The Resolution Copper Project falls within the electric service area of the SRP utility company. Under Arizona law, electric service within a service area is provided by a single entity; other service providers cannot readily enter into that area (Arizona Revised Statutes 9-516A). For this reason, the Tonto National Forest considers changes to power supply to be beyond the scope of this analysis.

However, the Tonto National Forest did assess power generation as part of the NEPA process. In response to public comments, the Tonto National Forest evaluated the overall power demands of the project to ensure proper disclosure of power demands (DEIS, p. 56; see also Garrett (2019e), "Process Memorandum to File Power Requirements"). This disclosure was updated in chapter 2 of the FEIS based on additional analysis conducted by SRP (1898 and Company 2020). See response WT24 for more detail.

As for reducing power use or using renewable energy, the Tonto National Forest pursued this as possible mitigation. An additional mitigation measure from Resolution Copper Mining LLC (Resolution Copper) committing to the use of renewable energy is discussed in appendix J of the FEIS (mitigation measure RC-AQ-01).

Appendix R

| Comment response: ALT22<br>Skunk Camp information | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1091-2, 1092-1, 1158-24, 1188-2, 1235-9, 1322-3, 1338-7, 1383-2, 1441-10, 1441-4, 1441-9, 1454-15, 1474-3, 1501-2, 15-1, 1544-11, 24-1, 255-3, 259-1, 27725-3, 286-2, 28905-1, 28961-1, 29116-1, 30125-1, 356-4, 40-2, 452-3, 474-1, 504-2, 52-1, 524-1, 53-2, 5699-1, 5747-1, 5760-3, 579-1, 5972-2, 608-1, 615-2, 6419-1, 6436-1, 66-2, 67-1, 6760-2, 742-1, 747-2, 8002-1, 8030-12, 8030-13, 8030-9, 8032-11, 8032-246, 8032-247, 871-1, F10-3, F1-3, F2-2, F4-1, F6-3

Numerous comments indicate that key information was missing from the DEIS for the preferred alternative (Alternative 6 – Skunk Camp). Many comments point specifically to the lack of geotechnical information and cultural resource information.

It is incorrect that cultural resource information was not available for the preferred alternative. The DEIS notes that while written cultural resource reports were not yet completed for Alternatives 5 and 6, preliminary survey data for the completed areas were available and formed the basis for the DEIS analysis (DEIS, p. 627). Ninety-six percent of the Skunk Camp alternative area was surveyed for cultural resources (DEIS, p. 635). All remaining surveys intended to be conducted have been completed for the FEIS.

Similarly, the same level of geotechnical information was available for Alternative 6 as for Alternatives 4 and 5. Alternatives 2 and 3 are located at the Near West location, which was the subject of intense investigation by Resolution Copper under an earlier, separate GPO. Therefore, additional geotechnical information was available for these locations.

For the EIS, the approach used when dealing with incomplete or uncertain information related to a reasonably foreseeable significant adverse effect was to make clear that such information is lacking. Obtaining that information is only considered if it is essential to a reasoned choice between alternatives and it is feasible to obtain. In this case, while detailed geotechnical information is critical to the eventual building of a tailings storage facility, it is not a key factor in making a reasoned choice among alternatives. In each case, sufficient geotechnical information was available to provide an initial design for the tailings storage facility (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d). The information in hand and disclosed in the DEIS was sufficient to understand the distinctions between the facilities. The effect of this potential uncertainty on decision making is directly discussed for one of the analyses most crucial for differentiating among alternatives, the seepage modeling (DEIS, pp. 354–357).

Other comments identify the lack of information on seeps and springs for the preferred alternative. This is an incorrect statement. This information was known (see Fleming, Shelley, et al. (2018)) and referenced in section 3.7.1 (DEIS, p. 339).

Comments identify the lack of seismic information for the preferred alternative. This is an incorrect statement. Regional seismic activity was fully analyzed in the section 3.2 (DEIS, pp. 144–145). The presence of faults within the footprint of the tailings storage facility was known (see Fleming, Shelley, et al. (2018:3 and figure 3)), and was referenced in the DEIS as part of foundation considerations (DEIS, p. 144).

Appendix R

| Comment response: ALT22 | |
|---|---|
| Skunk Camp information | Page 2 of 2 |

**Responsive to these comments:**
1091-2, 1092-1, 1158-24, 1188-2, 1235-9, 1322-3, 1338-7, 1383-2, 1441-10, 1441-4, 1441-9, 1454-15, 1474-3, 1501-2, 15-1, 1544-11, 24-1, 255-3, 259-1, 27725-3, 286-2, 28905-1, 28961-1, 29116-1, 30125-1, 356-4, 40-2, 452-3, 474-1, 504-2, 52-1, 524-1, 53-2, 5699-1, 5747-1, 5760-3, 579-1, 5972-2, 608-1, 615-2, 6419-1, 6436-1, 66-2, 67-1, 6760-2, 742-1, 747-2, 8002-1, 8030-12, 8030-13, 8030-9, 8032-11, 8032-246, 8032-247, 871-1, F10-3, F1-3, F2-2, F4-1, F6-3

We identified the Skunk Camp location as the preferred alternative and required a number of mitigation measures in the DEIS to ensure that additional information was collected prior to the FEIS to inform site-specific reclamation and closure plans (required as mitigation measure FS-226, DEIS appendix J, p. J-7), and a site-specific failure modes and effects analysis (FMEA) and refined breach analysis (required as mitigation measures FS-227 and FS-229, DEIS appendix J, p. J-19). Additional studies were conducted for the Skunk Camp location and incorporated into the FEIS:

- Site-specific soil surveys and soil testing (required as mitigation measures FS-223 and FS-224, DEIS appendix J, p. J-5). This information was incorporated into section 3.3 of the FEIS.
- Site-specific vegetation surveys (required as mitigation measure FS-225, DEIS appendix J, p. J-6). This information was incorporated into section 3.3 of the FEIS.
- Updated seismic hazard analysis specific to the Skunk Camp location (Wong et al. 2020a) and specific investigations into whether the faults within the footprint of the Skunk Camp tailings storage facility are active (Hartleb 2020; KCB Consultants Ltd. 2020e; Zellman and Cook 2020a). This information was incorporated into section 3.2 of the FEIS.
- A detailed site investigation report for the Skunk Camp location, including information on field mapping, geotechnical drilling (13 boreholes), borehole geophysical logs, hydrogeologic drilling (12 boreholes/wells), hydraulic tests, geophysics, test pits (six total), and laboratory testing for geotechnical properties. Aquifer tests also were conducted on the wells (KCB Consultants Ltd. 2019; Montgomery and Associates Inc. 2019a, 2020g). This information was incorporated into several sections of the FEIS, including 3.2, 3.7.1, 3.7.2, and 3.10.1.
- An updated seep and spring inventory was compiled (WestLand Resources Inc. and Montgomery and Associates Inc. 2020). This information was incorporated into section 3.7.1 of the FEIS.
- Refined seepage and water quality modeling was also conducted to incorporate the new information collected (KCB Consultants Ltd. 2020d; Montgomery and Associates Inc. 2020a, 2020c). This refined analysis was incorporated into section 3.7.2 of the FEIS. Note that since the January 2021 publication of the Rescinded FEIS, additional water quality modeling sensitivity runs were also conducted to respond to additional comments.
- The site-specific reclamation and closure plans required under mitigation measure FS-226 (KCB Consultants Ltd. 2020c; Tetra Tech Inc. 2020). This information was incorporated into section 3.3 of the FEIS.
- The site-specific FMEA (Gannett Fleming 2020) and breach analysis (KCB Consultants Ltd. 2020b) required under mitigation measures FS-227 and FS-229. This information was incorporated into section 3.10.1 of the FEIS.

| Comment response: ALT23 | |
|---|---|
| Dismissal of Skunk Camp alternative | Page 1 of 1 |

**Responsive to these comments:**
1188-25

The comment stating that the Skunk Camp alternative was eliminated from detailed consideration and then later selected as the preferred alternative is incorrect. The Alternative 6 – Skunk Camp tailings storage facility location was added for consideration in March 2018 following a suggestion by the BLM. The alternative was further developed from that point, but at no time was it eliminated from consideration. The evolution of the Skunk Camp location is described in the project record in "Process Memorandum to File – Evolution of Range of Alternatives Considered in Detail in DEIS, after Publication of the Alternatives Evaluation Report (Nov 2017)" (Garrett 2018c).

Appendix R

| Comment response: ALT25 Importance of Oak Flat | Page 1 of 1 |
|---|---|
| Responsive to these comments: 19-1 | |

The cultural importance of Oak Flat, its nomination to the National Register of Historic Places (NRHP) as a traditional cultural place, and potential impacts are described in section 3.14 (DEIS, pp. 662–665). Note that section 3.14 was rewritten in the FEIS in response to public comments to better communicate the impacts to Oak Flat. See response CR4 for more details.

| Comment response: ALT26 Dripping Spring Wash residents | Page 1 of 1 |
|---|---|
| Responsive to these comments: 28824-3 | |

The DEIS analyzed potential impacts to Gila County residents located along Dripping Springs Road. These included the potential for noise impacts (DEIS, pp. 233–240), traffic impacts (DEIS, pp. 266, 269), air quality impacts (DEIS, pp. 284–288; see also Newell, Garrett, et al. (2018) and Air Sciences (2019b) for tables and figures specific to Alternative 6), water quality impacts (DEIS, pp. 411–417), reductions in stormwater runoff (DEIS, pp. 443–444), recreation impacts (DEIS, pp. 507–509), and public safety impacts (DEIS, pp. 551–553).

| Comment response: ALT27 Government Springs Ranch | Page 1 of 1 |
|---|---|
| Responsive to these comments: 30081-1, 30081-2, 30081-3, 30081-4, 30081-5, 30081-6, 30081-7, 30081-8 | |

These comments largely concern impacts to Government Springs Ranch, which lies on Mineral Creek along the DEIS Alternative 6 – North pipeline option.

The Tonto National Forest modified the Alternative 6 – North pipeline option based, in part, on issues raised in comments. A discussion of this change was added to chapter 2 of the FEIS. The rerouted pipeline considered in the FEIS now:

- substantially avoids perennial water and critical habitat along Mineral Creek entirely, except for a trenchless underground crossing upstream of Government Springs Ranch;
- crosses Devil's Canyon at a non-perennial location using an overhead span; and
- reduces the amount of pipeline corridor located on Arizona State Trust land.

Government Springs Ranch lies within the Government Springs grazing allotment. Impacts to this allotment are described in section 3.16 (DEIS, pp. 699–700) and include anticipated reductions in animal unit months due to acreage loss and loss of water sources.

Burial of the pipeline is not projected to impair ranch personnel, livestock movement, or runoff to water tanks. A discussion of this potential impact was added to section 3.16 of the FEIS.

Note that Resolution Copper purchased the Government Springs Ranch property in June 2021.

| Comment response: ALT28 Seismic activity at Skunk Camp | Page 1 of 1 |
|---|---|
| Responsive to these comments: 8032-250 | |

The DEIS fully investigated the structural geological framework and potential for seismic activity for the Skunk Camp tailings storage facility location. See response ALT22 for more detailed information.

Appendix R

| Comment response: ALT29 Geophysical analysis of tailings sites | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
29-4, 854-1

Section 3.2 (DEIS, pp. 141–144) outlines specific foundation concerns related to each of the tailings storage facility sites. Analysis of regional seismic hazard also is found in this section (DEIS, pp. 144–145). For each alternative, sufficient geotechnical information was available to provide an initial design for the tailings storage facility (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d).

See response ALT22 for more details on additional investigation undertaken for the Skunk Camp tailings storage facility location and included in the FEIS.

| Comment response: ALT30 Statements of support for specific alternatives | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8-1, 9-1, 1075-3, 1197-2, 1204-2, 1207-2, 1276-7, 1286-4, 1300-2, 13-1, 1311-1, 1311-15, 1311-4, 1410-2, 1489-2, 16-1, 201-2, 26-1, 261-2, 283-1, 283-5, 291-4, 299-2, 300-1, 30073-2, 30075-11, 30080-3, 30097-2, 317-2, 319-2, 322-7, 35-1, 371-2, 515-3, 518-4, 555-12, 555-2, 555-3, 555-9, 562-3, 816-1, 817-2, 829-2, 830-1, 881-1, 882-1, 929-1, 95-1, 958-1

These comments express general support for specific alternatives.

The Forest Supervisor's decision, referred to as the selected action, will be identified in the ROD. The ROD will explain why the selected action was chosen, including a weighing by the Forest Supervisor of the advantages and disadvantages.

| Comment response: ALT31 Elimination of Upper Dripping Spring Wash tailings alternative | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-5

This comment notes that "BLM identified the Upper Dripping Springs Wash as a tailings disposal site that had been eliminated from consideration. However, no reason was given in the DEIS for its elimination as required by NEPA. Subsequently, the Tonto National Forest approved evaluation of this site in the DEIS and it became the preferred alternative under a new name: Skunk Camp. The only apparent difference between the Upper Dripping Springs Wash site and the Skunk Camp site is that the Skunk Camp site no longer occurs on the 69 acres of Bureau of Land Management lands." The comment states that this is arbitrary and capricious.

The DEIS describes the Upper Dripping Spring Wash site (appendix F, p. F-14). A more detailed discussion of the specific evolution of this alternative is found in Garrett (2018c), "Process Memorandum to File – Evolution of Range of Alternatives Considered in Detail in DEIS, after Publication of the Alternatives Evaluation Report (Nov 2017)." This process memorandum contains updated information on the alternatives development process that occurred after publication of the Alternatives Evaluation Report, including the Upper Dripping Spring Wash parcel.

The comment is correct that the Upper Dripping Spring Wash and Skunk Camp are in the same location. The conceptual footprint proposed by BLM was eliminated from detailed consideration. This footprint was refined and modified based on an actual tailings storage facility design and was carried forward in the DEIS. However, the location essentially remains the same, at the upper end of Dripping Spring Wash.

We have modified the language in appendix F of the FEIS to more accurately reflect that Skunk Camp is an evolution of the Upper Dripping Spring Wash alternative. We also noted that the location itself was not eliminated from detailed study, only the specific footprint proposed by BLM.

| Comment response: ALT32 Tailings storage locations | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1407-2

The tailings storage location varies by alternative. These were described in detail in chapter 2 and can be seen all at once in figure ES-12 of the executive summary (DEIS, p. ES-11).

Appendix R

| Comment response: ALT33<br>Renewable energy | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1544-16, 900-4 | |

These comments ask: "How much of the power that Resolution Copper would need would come from renewable energy sources? Is Rio Tinto planning on building any renewable energy facilities to power their project?"

Renewable energy facilities could be incorporated into the project in one of three ways:

  1) As part one of the project components, described in chapter 2. No renewable energy facilities were proposed as part of the mine plan.

  2) As applicant-committed environmental protection measures, described in each resource section in chapter 3. These are considered integral to the project and have a commitment from Resolution Copper. At the time of the DEIS, Resolution Copper had not brought forward or committed to any renewable energy measures.

  3) As mitigation, described in each resource section of chapter 3 and compiled into one location in appendix J. Mitigation measures are developed through the NEPA process and may be required or voluntary. At the time of the DEIS, no mitigation measures related to renewable energy were developed or included in appendix J.

Appendix J in the FEIS was updated to incorporate all mitigation developed between the DEIS and FEIS. This includes voluntary measures on behalf of Resolution Copper and mitigation measures required under the jurisdiction of the Forest Service or other agency. Resolution Copper voluntarily brought forward one renewable energy mitigation measure that was added to appendix J in the FEIS (mitigation measure RC-AQ-01).

| Comment response: AMT1<br>Alternative mining techniques | Page 1 of 6 |
| --- | --- |
| **Responsive to these comments:**<br>10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1 | |

Background on evaluation of alternative mining techniques

Numerous public comments were received that express the belief that the Forest Service should require Resolution Copper to use an alternative mining technique, other than block caving, to mine the ore deposit. As this issue was raised during scoping, it was fully evaluated during the alternatives development process. This evaluation is described in the "Alternatives Considered but Eliminated from Detailed Study" appendix of the DEIS (DEIS, appendix F, pp. F1–F4).

The premise that impacts could be avoided by different mining techniques is not incorrect. This is acknowledged in appendix F: "The proposed panel caving mining method is seen as having two major drawbacks. First, panel caving results in the creation of a subsidence area at the surface, which impacts a variety of resources. Second, because panel caving does not leave any opening or cavity belowground, there is no opportunity to backfill tailings as a potential disposal alternative. The Forest Service agreed that if an alternative mining method were found to be reasonable, it could reduce certain resource impacts, and the agency undertook an investigation into the technical and economic feasibility of using alternative mining techniques" (DEIS, appendix F, pp. F-1).

The question that we explored was not of the theoretical benefits, which were granted, but whether an alternative mining technique is at all reasonable. The most commonly cited alternative mining technique is cut-and-fill, which was used at the Magma Mine; this technique would not create surface subsidence and could allow for underground backfill of tailings.

The first evaluation of this topic was evaluated in the November 2017 Alternatives Evaluation Report (SWCA Environmental Consultants 2017a), which has similar conclusions to those in appendix F of the DEIS.

Appendix R

| Comment response: AMT1 Alternative mining techniques | Page 2 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

Our evaluation found the following:

- Block caving is a standard mining technique that is often applied to ore deposits with similar characteristics as the Resolution ore deposit.
- The ore and host rock characteristics that are typically favorable for alternative techniques like cut-and-fill differ from the characteristics of the Resolution ore deposit, and it is unlikely that any of these techniques would be chosen as a reasonable technique for a similar deposit.
- Using such techniques requires higher grades of ore in order to be feasible. An increase in the cutoff grade from 1 percent to 2 percent removes an estimated 80 percent of the tonnage of the deposit from consideration for development. Accepting this level of reduction to accommodate an alternative mining technique is not economically feasible and would not be reasonable.

We reviewed additional information purporting to demonstrate that cut-and-fill mining was economically feasible, submitted to us in December 2018 (Garrett 2019a). We concluded that the submittal contained erroneous or inappropriate assumptions, and it was not considered further.

Most comments focus on profitability and incorrectly state that the Forest Service is elevating the profitability of Resolution Copper over the protection of environmental resources. Our evaluation of alternative mining techniques does not calculate Resolution Copper's profit, nor does it use profitability in the analysis. This was summarized in the project record:

> *"The analysis provided to the Forest Service attempts to answer the question: is a different mining technique financially feasible? This is fundamentally the wrong question to be asked, and the resulting answer is not pertinent to the decision space the Forest Supervisor has for the Resolution Copper project.*
>
> *The Forest Supervisor has the authority to require changes to the mine plan of operation in order to minimize effects on National Forest System surface resources, but this authority is not absolute. When assessing how far this authority can be extended to modify a plan of operation, Forest Service mineral regulations do not rely on financial criteria. Rather than dollars or profit, the bar set for the Forest Supervisor is one of reasonableness."* (Garrett 2019a)

The reason cut-and-fill mining is not pursued as a valid mining technique is not because Resolution Copper might make less money using that technique. The reason cut-and-fill mining is not pursued as a valid mining technique is because block caving is more appropriate to this type of ore deposit and because potentially forgoing 80 percent of the ore deposit to pursue cut-and-fill mining does not pass the test for reasonableness that the Forest Service must apply.

In light of the interest in this topic, we have included a more detailed discussion in chapter 2 of the FEIS.

Appendix R

| Comment response: AMT1 Alternative mining techniques | Page 3 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

<u>DEIS comments on alternative mining techniques</u>

We received many comments regarding the application of alternative mining techniques. Several were generic in nature; the most detailed were submitted with comment letter #8032 in the form of a report by Dr. D. Chambers (appendix A of letter #8032).

The Chambers comments state, "Underground mining alternatives to block caving were eliminated from further consideration in the DEIS. These methods were eliminated from detailed consideration in the DEIS based largely on two factors, the cost of mining and the feasibility of large-scale tailings backfill."

This is an incorrect statement. The feasibility of large-scale tailings backfill was not a consideration in our evaluation of alternative mining techniques, nor is it listed as a reason these techniques were eliminated from detailed analysis in the November 2017 Alternatives Evaluation Report (SWCA Environmental Consultants 2017a) or in appendix F of the DEIS. The cost of mining was considered as part of the assessment of reasonableness in the form of the cutoff grade that would need to be targeted to employ a technique like cut-and-fill mining.

With respect to the cost of mining, there were three fundamental comments made about the Forest Service evaluation:

- Data were not available and were insufficient for the NEPA team to evaluate this issue.
- Inappropriate or outdated mining references were used.
- Incorrect ore grade terminology was used.

Our evaluation of these comments is documented in the project record (Garrett 2020i), and responses to each issue are summarized below.

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 4 of 6 |
| --- | --- |

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

Availability of Data

The Chambers comments note, "Dr Kliche had to work without any data support from Resolution Copper." This is an incorrect statement. Dr. Kliche was provided with adequate data to make a reasonable estimate of the relationship between grade and tonnage, which was the key aspect of the evaluation of reasonableness. This information, in the form of horizontal slices at 100-foot intervals from bottom to top through the Resolution Copper block model showing grade classes of the blocks, was provided when requested from Resolution Copper in March 2017 (Hart 2017). It is true that information access was not unlimited; for instance, securities regulations limit how some proprietary information can be released to the public. However, Dr. Kliche found the information provided to be sufficient for the analysis needed.

The comments also state that a specific report was unavailable ("Geologic and Mineral Resource Model – Suitability for Declaration of Mineral Resources and Support for Mine Plans to Develop a Block or Panel Cave Mine," Harry M. Parker, AMEC Foster Wheeler E&C Services Inc., March 14, 2017) (Parker 2017). This document is part of the project record, along with other supporting material for the NEPA analysis. It was not referenced in the DEIS and so was not posted to the website, but it is not proprietary and can be provided upon request. To our knowledge, these supporting materials were never requested.

Mining References

The reconvened Geology and Subsidence Workgroup compiled additional pertinent references with respect to mining techniques, in order to respond to comments that the references used by Dr. Kliche were outdated (Garrett 2020i; Garza-Cruz and Pierce 2020a). This literature review was conducted to identify classical references for mining method selection.

Itasca reviewed six classic mining references. Their conclusion is that "all of the mining method techniques arrived at similar conclusions, with block caving as the preferred mining method" (Garza-Cruz and Pierce 2020a). While block caving was identified as the clear preferred method, several other methods were identified as pertinent: top slicing, sublevel caving, and square set stoping. Top slicing and sublevel caving are both caving techniques; therefore, their use would not prevent subsidence or the impacts from subsidence.

Square set stoping is not a caving method and would allow for backfill; it therefore could offset the impacts of subsidence. Dr. Kliche evaluated this technique in the November 2017 Alternatives Evaluation Report and noted several of the downsides (SWCA Environmental Consultants 2017a):

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 5 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

- Too deep may have serious ground pressure issues
- Very expensive; high-grade ore a necessity. Need a ready source of timber. Labor intensive.

In other words, this technique is similar to other cut-and-fill techniques evaluated. It requires a higher cutoff grade of ore and therefore substantially reduces the volume of the ore deposit beyond a level considered reasonable (an 80 percent reduction in ore volume, for a shift from 1 percent to 2 percent cutoff grade).

Dr. Kliche also reviewed the per-ton mining costs in light of the comments and compiled more updated information. The Alternatives Evaluation Report cited a cost of $9.10/ton for block caving, compared with $68.03/ton for cut-and-fill (SWCA Environmental Consultants 2017a:appendix C, p. 8). The updated information compiled by Dr. Kliche indicates that block caving can run from $7.99/ton to $10.68/ton, depending on production rate and adit vs. shaft entry. This is compared with cut-and-fill mining, which can run from $62.68/ton to $140.09/ton. Dr. Kliche also compiled information from 11 currently operating mines that use stoping or cut-and-fill techniques (not block caving) and found that actual per-ton costs range from $57.51/ton to $303.97/ton.

In all cases, a review of additional references only confirms the basic conclusions of the alternatives evaluation. First, it confirms that based on industry-standard literature and approaches, block caving is the most likely technique to be selected based on the characteristics of the deposit, and cut-and-fill techniques likely would not be selected. Second, it confirms that the costs of cut-and-fill are at a minimum five times the cost of block caving. This is important not for reasons of profitability but because techniques with higher operational costs require higher grade ore, or cutoff grade. As demonstrated with data specific to the Resolution ore deposit, even a 1 percent increase in cutoff grade (from 1 percent to 2 percent) results in the loss of at least 80 percent of the deposit. This fundamental tradeoff does not meet the standard for reasonableness that the Forest Service must consider.

An additional comment states that the above assumption of an increase from 1 percent to 2 percent is not substantiated because specific cutoff grades were not calculated for individual mining techniques. We acknowledge that the numbers used represent estimates of cutoff grade for different techniques, not economic calculations. These estimates are not arbitrary, however, but are informed by specific per-ton mining costs described above. The basic understanding that higher per-ton mining costs require higher cutoff grades is not in question.

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 6 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

The comments also state, "It should be the goal of DEIS to understand the ore body holistically, so that if alternative mining techniques were hypothetically mandated, it would be possible to understand the economics behind them." Indeed, this is what we endeavored to do. Per-ton mining costs and cutoff grade were only one part of the analysis. The ore deposit was also evaluated against industry-standard practices for evaluating mining techniques, regardless of cost, and block caving was clearly the mining approach that would be considered most reasonable for the specific characteristics of the Resolution ore deposit.

Ore Grade Terminology

The Chambers comments quote several statements and claim they are inconsistent with reference to the ore deposit as "high-grade" or "low-grade." This terminology is not inconsistent but rather is a matter of context.

Dr. Kliche refers to the Resolution Copper deposit as a "relatively low grade . . . resource" (SWCA Environmental Consultants 2017a:appendix C, p. 1). This is a correct statement when made in the context of porphyry copper deposits, which are considered low grade (approximately 1 percent copper), compared with a copper-sulfide vein deposit like that mined at the Magma Mine (up to 8 percent copper).

The Chambers comments note that Dr. Kliche's use of this terminology differs from Resolution Copper's reference to the Resolution Copper deposit as "high grade." In this case, the use of the term "high grade" is in the context of a comparison with other porphyry copper deposits. Most of these deposits have less than 1 percent copper, whereas the Resolution Copper deposit has 1.54 percent copper.

More importantly, the use of terminology has no bearing on the analysis itself. These terms do not affect the quantitative estimates of grade/tonnage that Dr. Kliche relied on for the analysis of reasonableness of cut-and-fill mining.

| Comment response: AMT1_A<br>Alternative mining techniques; with addition for specific comments 8032-260, 30141-4, 1209-4 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1209-4, 30141-4, 8032-260

See response AMT1 for response to the general topic of alternative mining techniques.

These additional comments discuss the potential for portions of the ore body nearer to Apache Leap to be mined using underground mining techniques rather than block caving techniques.

It is correct that certain portions of the ore deposit would not be accessed under the current block caving operation. For instance, the panel caving as planned avoids the Oak Flat Withdrawal Area and does not extend as far west as it could, specifically in order to avoid impacts to Apache Leap.

It is not correct to assume that underground mining techniques could access these areas. As noted in the alternatives evaluation, cut-and-fill mining techniques require higher cutoff grades to be feasible. The portion of the deposit specifically near Apache Leap may not be of high enough grade to mine in this way.

Appendix R

| Comment response: AMT1_B<br>Alternative mining techniques; with addition for specific comment 30078-28 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30078-28 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment states, "The Apache Leap Tuff Aquifer is a critical source of water for springs and creeks, many of them sacred. This permanent impact would not occur if alternative underground mining methods were employed."

This is not necessarily correct. Regardless of the mining technique used, the mine infrastructure would need to be dewatered. Without block caving, the Apache Leap Tuff would not fracture and subside, thus opening a hydraulic connection between the Apache Leap Tuff aquifer and the deep groundwater system. Access to the ore body would still need to occur, and the nature of that access could result in the need to dewater Apache Leap Tuff as well. Conversely, vertical shafts could potentially be isolated from the Apache Leap Tuff aquifer. Neither outcome can be assumed without specific mine plans.

| Comment response: AMT1_C<br>Alternative mining techniques; with addition for specific comment 1158-6 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1158-6 | |

See response AMT1 for response to the general topic of alternative mining techniques.

These comments question the basis for the "reasonableness" criterion used to determine the ability to use alternative mining techniques.

This discussion is provided in Garrett (2019a): "The basic standard when considering whether an alternative mining technique could be required by the Forest Service can be generally summarized as follows:

- The requirement cannot endanger or materially interfere with mining operations;
- The requirement must be reasonable;
- The requirement may not result in operations being so unreasonably circumscribed as to amount to a prohibition;
- The requirement may not impermissibly encroach on legitimate uses incident to mining."

| Comment response: AMT1_D<br>Alternative mining techniques; with addition for specific comment 8032-206 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-206 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment raises a number of recreation impacts. These comments reiterate impacts that are disclosed in section 3.9 (DEIS, pp. 495–509).

Appendix R

| Comment response: AMT1_E | |
| :--- | :--- |
| Alternative mining techniques; with addition for specific comment 8031-38 | Page 1 of 1 |

| Responsive to these comments: |
| :--- |
| 8031-38 |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment states, "The DEIS merely states in conclusory fashion with no discussion or elaboration: 'The Forest Service assessed alternative mining techniques in an effort to prevent subsidence, but alternative methods were considered unreasonable' (p. ES-3). The DEIS further admits that alternative mining techniques were not even considered in detail and were 'dismissed from detailed analysis' (DEIS, p. 29). This is not sufficient under NEPA to support the dismissal of credible alternative mining technics that have been presented to the TNF."

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)). The full analysis of alternative mining techniques occurs elsewhere in the DEIS references (SWCA Environmental Consultants 2017a), not in the DEIS itself. However, given the interest in this topic, we have added further discussion of this topic to chapter 2 of the FEIS.

| Comment response: AMT1_F | |
| :--- | :--- |
| Alternative mining techniques; with addition for specific comment 1209-1 | Page 1 of 1 |

| Responsive to these comments: |
| :--- |
| 1209-1 |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment raises the issue of the land exchange and whether it changes the approach to alternative mining techniques.

The Forest Service approached the alternatives analysis as required under NEPA, with a full evaluation of alternatives, regardless of whether the land exchange would occur or not. The fact that the land exchange might occur did not factor in to the technical evaluation of alternative mining techniques.

| Comment response: AMT1_G | |
| :--- | :--- |
| Alternative mining techniques; with addition for specific comment 8032-229; 320-2; 1220-5 | Page 1 of 1 |

| Responsive to these comments: |
| :--- |
| 1220-5, 320-2, 8032-229 |

See response AMT1 for response to the general topic of alternative mining techniques.

These comments state, "In all materials, Dr. Kliche and the Forest Service also acknowledge that alternative mining techniques are technically feasible."

This only partially relates what is stated in the DEIS. The full quote from the DEIS is as follows: "While several underground stoping techniques could physically and technically be applied to the deposit, the ore and host rock characteristics typically favorable for these techniques differ from the characteristics of the Resolution Copper Mine deposit. While physically feasible, it is unlikely that any of these techniques would be chosen as a reasonable technique for a similar deposit" (DEIS, appendix F, p. F3).

The distinction being drawn is that just because the physical ability to build underground mine workings to access ore exists does not mean that doing so is a method that would be used by a reasonable individual.

Appendix R

| Comment response: AMT1_H<br>Alternative mining techniques; with addition for specific comment 918-1 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>918-1 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment specifically mentions sublevel stoping. Sublevel stoping was one of the alternative mining techniques specifically evaluated by the Forest Service (SWCA Environmental Consultants 2017a:appendix C, p. 3). It was also specifically evaluated after receipt of public comments on the DEIS by the Geology and Subsidence Workgroup (Garza-Cruz and Pierce 2020a). This review looked at six industry-standard mining references and applied the techniques contained therein to the selection of a mining method. Sublevel stoping was not found to be appropriate by any of the six references.

| Comment response: AMT1_I<br>Alternative mining techniques; with addition for specific comment 320-5 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>320-5 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment questions where information on the Resolution Copper ore deposit was obtained for a specific table (table 1) in the evaluation of alternative mining techniques (SWCA Environmental Consultants 2017a:appendix C, table 1).

It is not clear what version of the document the commenter is referring to. The version of the November 2017 Alternatives Evaluation Report in the project record (SWCA Environmental Consultants 2017a), as well as the standalone version of appendix C (Kliche 2017), both contain a clear reference to footnote 6, which is present at the bottom of the page: "6 Taken from 'Resolution Copper Mining, LLC - Mine Plan of Operations and Land Exchange - Follow-up Alternatives Information,' August 14, 2017; Ms. Vicky Peacey to Ms. Mary Rasmussen. Project Record #0001734" (Resolution Copper 2017a).

| Comment response: AMT1_J<br>Alternative mining techniques; with addition for specific comment 1107-1 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1107-1 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment discusses backfilling by paste tailings. This method is only feasible when underground cavities are left open after mining, as with a cut-and-fill technique. With block caving, there is no void left underground into which tailings could be placed.

| Comment response: AMT1_K<br>Alternative mining techniques; with addition for specific comment 1538-5 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1538-5 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment notes that the subsidence crater would reach a depth of 1,500 feet. This is incorrect. The DEIS states, "The primary difference in results among all the sensitivity model runs is the ultimate depth of the subsidence crater. Under the base case model, an ultimate depth of about 800 feet is anticipated. Under other sensitivity runs, the depth of the subsidence crater can vary between 800 and 1,115 feet" (DEIS, p. 151).

Appendix R

| Comment response: AMT1_L | |
|---|---|
| Alternative mining techniques; with addition for specific comment 16-2 | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 16-2 |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment references the Magma Mine and suggests that the same mining techniques (cut-and-fill) should be applied to the Resolution ore deposit. This particular statement was raised many times during scoping and public comment meetings.

The Magma Mine accessed a fundamentally different ore deposit. The Magma Mine targeted veins of material that ranged from roughly 4 to 8 percent copper. By contrast, the average grade of the Resolution ore deposit is about 1.5 percent copper.

The Magma Mine is actually a concrete example of the analysis of alternative mining techniques conducted by the Forest Service. The Forest Service concluded that alternative mining techniques like cut-and-fill could only be done at higher cutoff grades. The fact that the Magma Mine was able to use cut-and-fill with a 4 to 8 percent ore grade demonstrates this point. However, the spatial proximity of the Magma Mine to the Resolution ore deposit should not be used to conflate the properties of the ore deposits. They are fundamentally different in nature, grade, and distribution.

| Comment response: AMT4 | |
|---|---|
| In-situ leaching | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1107-6, 1448-1, 150-1, 150-2, 23-3, 889-1 |

These comments identify in-situ leaching as a preferable mining method for the Resolution ore deposit.

In-situ leaching was considered early in the alternatives development process and was not carried forward. Additional information was compiled by the Geology and Subsidence Workgroup after receipt of public comments (M3 Engineering and Technology Corporation 2020).

There are substantial concerns with technical feasibility of leaching at the depth of the Resolution ore deposit under the geothermal conditions encountered there. While technical challenges can potentially be overcome, this reportedly would be deeper than the deepest in-situ mining currently being done and would be precedent setting. The hydraulic properties of the deep groundwater system are not conducive to injection and recovery, though this could potentially be overcome with a massive hydraulic fracturing operation.

However, these technical concerns are not the fundamental issue that makes in-situ leaching unsuitable. The fundamental issue is that the mineralogy of the Resolution ore deposit is not suited to leaching. The Resolution deposit largely consists of chalcopyrite and bornite, not copper oxide ore, which is readily leachable. The estimated recovery of copper from the Resolution ore deposit would be 15 percent (M3 Engineering and Technology Corporation 2020).

In-situ leaching falls into a similar category as the other alternative mining techniques reviewed; the tradeoff with copper recovery simply does not meet the "reasonableness" standard.

Appendix R

| Comment response: AMT6 Independent assessment of ore reserves | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-231

This comment repeats scoping comments that indicate that the Forest Service has a responsibility to independently evaluate the ore reserves and the mining plan.

This type of assessment is not required under Forest Service mineral regulations 36 CFR 228 Subpart A. See response NEPA16 for discussion of the level of validation of claims and ore deposits that is required. Although the agency is authorized to determine claim validity at any time until a patent is issued, the agency is under no legal obligation to determine mining claim or mill site validity before approving a proposed plan of operations to explore for or develop minerals on lands open to the use under the mining law.

Although the ore deposit need not be evaluated, the Forest Service does have a responsibility to independently evaluate aspects of the mining plan within the context of the NEPA process. This was done. Three key parts of the mining plan were independently assessed by the Forest Service.

The first key part of the mining plan that was independently reviewed was the evaluation of alternative mining techniques to determine whether any of these techniques could be reasonably applied and prevent impacts to Oak Flat. This evaluation was undertaken, and the Forest Service reached the conclusion that other alternative mining techniques like cut-and-fill were not appropriate for the Resolution ore deposit and that applying them would not be reasonable (DEIS, appendix F, pp. F1–F4). In response to interest on the part of commenters, we have added further discussion of the evaluation of alternative mining techniques to chapter 2 of the FEIS.

The second key part of the mining plan that was independently reviewed was the largest driver of impacts—the tailings storage facility. The Forest Service assessed a wide range of tailings storage alternatives, including different types of tailings embankments, seepage control, tailings locations, and tailings dewatering. These variations in tailings storage techniques largely drove the development of the action alternatives evaluated in the DEIS.

Changing the basic processing of the ore taking place at the West Plant Site would generally not yield any environmental benefits because regardless of processing technology, tailings would still be produced and would still require management and disposal. Even so, the Forest Service also looked at a third, lesser aspect of the processing during the alternatives development process. Resolution Copper proposes to create two separate waste streams (non-potentially acid generating (NPAG) and potentially acid generating (PAG)), concentrating the pyrite minerals in the PAG waste stream. The NEPA analysis team briefly considered whole tailings during the alternatives process but found no benefit, and the approach was not carried forward.

This comment also hypothesizes problems that might occur with the block caving operation. These concerns are speculative. However, while evaluating alternative mining techniques, the Forest Service also evaluated whether the proposed block caving operation was an appropriate choice for this specific ore body. All industry guidance reviewed indicates that block caving is the most appropriate technique. See response AMT1 for more details.

Technical issues may indeed arise during implementation of the block caving technique. These are part of any mine development. See response GS8 for more discussion of real-world problems that could occur during mining.

After publication of the January 2021 Rescinded FEIS, additional legal activity has helped refine the application of the "Rosemont ruling," which concerns the use of mining claims. These recent developments are discussed in FEIS section 3.2.

Appendix R

| Comment response: AMT7<br>Use of filtered tailings to backfill the subsidence crater | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-13

This comment raises an issue specifically evaluated during alternatives development, which is the use of the subsidence crater for disposal of filtered tailings.

The rationale for dismissal of this alternative is clearly stated in appendix F of the DEIS: "The feasibility of placement of tailings in the subsidence area, either as slurry or filtered tailings, was considered during alternatives development. In this scenario, the tailings would be placed initially on undisturbed land above the mining panels in the area that would gradually become a subsidence pit. The subsidence area would then be filled with tailings as it expanded over time. This option was dismissed for safety concerns, both aboveground and belowground. In panel caving, it is paramount to control the rate of panel caving and prevent air gaps from developing above the caved zone, which can lead to potentially catastrophic air blasts. Loading of tailings above the panel cave operation could change the rock dynamics in unexpected and unknown ways. If it involves slurry, the added aspect of drainage from above further complicates mining operations. Safety hazards exist for personnel placing tailings aboveground as well, given the active subsidence and earth movement. Overall, it was determined that this option represented unreasonable safety hazards and did not conform to industry norms" (DEIS, appendix F, p. F6).

The comment characterizes this rationale as arbitrary and based on a single meeting. This is not a correct characterization. The alternatives development process took place over several years and involved professionals with experience in mining and tailings management, not just associated with Resolution Copper, but working directly for the Forest Service as part of the NEPA team. The dismissal of this alternative was made only after it was carefully considered. The documentation in the project record that specifically speaks to the issue of brownfields tailings disposal is listed in the November 2017 Alternatives Evaluation Report (SWCA Environmental Consultants 2017a:25).

Appendix R

| Comment response: AMT8<br>Requirement to evaluate alternatives under NEPA | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1539-2

This comment references Council on Environmental Quality (CEQ) regulations and guidance for implementing the NEPA process and indicates that alternative mining techniques should have been included as action alternatives.

The fundamental issue raised in this comment comes down to the assessment by the Forest Service of what is "reasonable." As noted in other comment responses (see response AMT1, for example), the assessment by the Forest Service of alternative mining techniques was based not on profitability but on reasonableness. The alternatives evaluation found that alternative mining techniques were not reasonable for this ore deposit. This assessment was based in part on industry standards and in part on the tradeoff between an alternative mining technique and the recovery of ore.

All of the industry-standard references reviewed identify block caving as a preferred method for an ore deposit with the characteristics of the Resolution deposit, whereas almost no alternative techniques like cut-and-fill were identified as reasonable for an ore deposit with the characteristics of the Resolution deposit. See response AMT1 for more details.

Regardless of this, the Forest Service also evaluated what it would mean if an alternative mining technique like cut-and-fill were used for the Resolution ore deposit. The result is a tradeoff in the amount of ore able to be recovered. This is because higher cost mining methods require higher grade ore to be feasible. The Forest Service estimated that targeting higher grade ore (a change from the 1 percent shell to the 2 percent shell) would reduce the volume of ore by 80 percent. The Forest Service did not consider this reasonable.

How did the Forest Service define "reasonable"? This discussion is contained in (Garrett 2019a:2):
"The basic standard when considering whether an alternative mining technique could be required by the Forest Service can be generally summarized as follows:
- The requirement cannot endanger or materially interfere with mining operations;
- The requirement must be reasonable;
- The requirement may not result in operations being so unreasonably circumscribed as to amount to a prohibition;
- The requirement may not impermissibly encroach on legitimate uses incident to mining."

The Forest Service has multiple mandates it must meet. The criteria above are extracted not just from mineral regulations but from multiple guidance and regulations under which the Forest Service must operate (see Garrett (2019a:attachment 3 for more details).

Under this definition, loss of 80 percent of the ore deposit was not considered reasonable.

| Comment response: AQ1<br>Air quality standards and regulatory framework | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-15, 1438-6

Section 3.6 describes the ambient air quality standards that are enforced in order to protect public health. The section also outlines the dispersion modeling analysis used to evaluate air quality impacts at the mine sites and the tailings storage facilities (DEIS, pp. 282–292). The modeling assessment includes the effect of controls, including (1) the enclosure of the ore stockpile at the concentrator; (2) control of fugitive dust emissions through applying stabilizers and water sprays; and (3) the control effectiveness of specific devices such as filters and baghouses (DEIS, pp. 283–284).

Comments note that the highest impacts are at receptors near the facility boundaries. The disclosed modeling results demonstrate that the alternatives all show compliance with applicable standards at all receptors outside the plant boundary or exclusion areas (DEIS, p. 285 [only Alternative 2 shown]; Newell, Garrett, et al. (2018) [all alternatives]). The DEIS only included results for Alternative 2 since all results were highly similar. However, we added results for all alternatives to section 3.6 in the FEIS.

Also see response AQ17 for details on modeling analyses and those impacts. See response TS24 regarding the effects on human health and risk assessment. Specifically, see "Potential impacts to mine employees" for how health impacts to employees was handled. We also added new discussion to section 3.6 with respect to potential health impacts.

These comments also state that the ore stockpile should be enclosed, not covered, as stated in the DEIS (p. 283). The ore stockpile will, in fact, be enclosed. Modeling analysis used an enclosed structure as part of estimating emissions. We revised the text in section 3.6 of the FEIS to clarify this.

Appendix R

| Comment response: AQ2 | |
|---|---|
| Air quality modeling background concentrations | Page 1 of 1 |

**Responsive to these comments:**
278-5

This comment questions the effect that 2017 monitoring data would have on the air quality modeling.

In support of evaluating air quality impacts, the dispersion modeling effort used standard modeling protocols for incorporating background concentrations. Two years of on-site data were used in developing that analysis, where only 1 year of on-site representative data is required based on U.S. Environmental Protection Agency (EPA) modeling protocols. The original modeling effort was completed prior to the finalization of the 2017 air quality data. Therefore, these data were not included.

A separate detailed review of the 2017 meteorological and air quality data (Randall and Hampson 2020a), including a recalculation of background particulate matter 10 ($PM_{10}$) and particular matter 2.5 ($PM_{2.5}$) levels, demonstrated that inclusion of those data would not lead to a material difference in air quality impacts analysis. The modeling effort, if extended through 2017, would have generated impacts in compliance with the ambient air quality standards.

| Comment response: AQ3 | |
|---|---|
| Lead analysis | Page 1 of 1 |

**Responsive to these comments:**
1438-3, 8032-159

Lead emissions were below a screening level analysis and therefore were not included in the original analysis (DEIS, p. 277) (Newell, Garrett, et al. 2018). In response to this comment, we included a formal analysis of lead emissions and impacts, compared with the National Ambient Air Quality Standards (NAAQS), in section 3.6 of the FEIS.

To do this analysis, we used a conservative approach to estimate the ambient lead concentrations to compare with the standard (0.15 micrograms per cubic meter ($\mu g/m^3$) on a 3-month average basis), which is described in Randall (2020b). Randall (2020b) provided us with a conservative estimate for the concentration of lead and other trace metals in the ore body. Lead in the ore body is 42.72 parts per million by weight (ppmw). Using a multiple of four times the projected maximum annual impact (7 $\mu g/m^3$) and the ratio of lead content, the resulting maximum impact is 0.002 $\mu g/m^3$. When added to an estimated background concentration (0.04 $\mu g/m^3$), the calculated maximum 3-month lead concentration is 0.042 $\mu g/m^3$, which is 28 percent of the ambient standard at the highest impact receptor. Impacts at other receptors would all be less than this maximum value.

Comments also note the presence of lead in soils from previous mining activities. Resolution Copper has completed cleanup and removal of impacted soils at the West Plant Site in alignment with the Arizona Department of Quality (ADEQ) and EPA cleanup recommendations. Historic soil contamination is not expected to contribute to ambient levels of metals associated with the project.

Appendix R

| Comment response: AQ4 Dust storms and extreme weather events | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1309-1, 1534-1, 22-2, 8032-232 | |

These comments concern the air quality analysis, wind speeds used, and potential impacts from dust.

We collected hourly wind speed along with $PM_{10}$ and $PM_{2.5}$ air quality data at three monitoring locations at the proposed site(s). We used recorded maximum wind speeds in modeling results to estimate impacts from these periods and included "paired in time" analyses for individual days with high winds and background concentrations in accordance with EPA modeling guidelines. In accordance with this guidance, the modeling excluded several days with high background concentrations as "exceptional events."

A formal dispersion modeling effort focused on $PM_{2.5}$, and it showed compliance with the $PM_{2.5}$ standards. Elevated PM levels during documented dust storms are captured in background $PM_{10}$. Higher wind conditions (associated with dust storms) are accounted for in fugitive dust emission estimates and meteorological data used to disperse the emissions in the model. The analysis incorporates carefully designed and engineered features to reduce emissions (including windblown dust) and impacts to air quality (DEIS, pp. 283–284). These emission reduction features comply with applicable State and local air district regulations. Estimated impacts to air quality due to emissions from all examined alternatives are demonstrated in the analysis to be below the applicable air quality standards (including the NAAQS) that were established to protect human health.

Also see response AQ17 for details on modeling analyses and those impacts. See response TS24 regarding effects on human health and risk assessment.

We added discussion of reclamation activities and ramifications for dust control and air quality to section 3.3 of the FEIS.

| Comment response: AQ4_A Dust storms and extreme weather events; with addition for specific comment 8032-169 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-169 | |

See response AQ4, which addresses the general topic of dust storms.

This comment also states that the analysis did not consider the impacts of toxic substances, the issue of aerosols, and radioactivity. See response TS24 for how impacts to human health were analyzed, including inhalation, deposition, and radioactive materials.

| Comment response: AQ4_B Dust storms and extreme weather events; with addition for specific comment 210-3 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 210-3 | |

See response AQ4, which addresses the general topic of dust storms.

This comment further discusses water scarcity. See response WT4 for more discussion of this topic.

Appendix R

| Comment response: AQ5 | |
|---|---|
| Monitoring and response requirements under air permit | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1438-9, 8032-163 |

Resolution Copper submitted applicant-committed environmental protection measures (DEIS, pp. 283–284) that demonstrate ongoing compliance with environmental standards. These measures would be enforceable by a final ROD based on the FEIS and may be included in an air quality permit to construct the facility.

The ADEQ will issue a permit. However, the permit had not been issued prior to publication of the FEIS. Permit approval will contain assurances, through monitoring or other compliance measures, that emissions from the approved project will meet the ambient air quality standards based on agency rules and evaluations. If the approved air permit and existing regulations require a reporting of any event and corrective actions necessary to correct malfunctions or exceedances, those permit requirements must be followed as stipulated.

The FEIS properly discloses impacts based on the proposed action and the mitigation or environmental protection measures that have occurred. However, the NEPA process does not require mitigation or monitoring for all impacts. Any future permitting requirements are not pertinent for the disclosure of impacts in the FEIS.

Appendix R

| Comment response: AQ6 Conformity analysis | Page 1 of 2 |
|---|---|
| **Responsive to these comments:** 524-20, 8032-153 | |

We concur with the comment that the conformity analysis contained in the DEIS was insufficient. We included a revised conformity analysis in section 3.6 of the FEIS.

The East Plant Site and the preferred alternative (Alternative 6) tailings storage facility are wholly located within the Hayden $PM_{10}$ Nonattainment Area. Major Federal actions that have direct and indirect emissions greater than the 100-ton/year threshold specified in 40 CFR 93 Part B 153(B)(1) require a conformity analysis. For these two sites, direct emissions include point and fugitive sources that contribute $PM_{10}$. As provided in Air Sciences (2019b:appendix A), the total $PM_{10}$ controlled emissions are 79.0 tons/year for the East Plant Site and 238 tons/year for the Alternative 6 tailings storage facility. The combined total exceeds the 100-ton/year threshold; thus, a conformity analysis is required.

Total potential $PM_{10}$ emissions from the filter plant and loadout facility are less than 100 tons/year. Thus, the West Pinal $PM_{10}$ Nonattainment Area does not require a conformity analysis.

There are two compliance options to demonstrate conformity: (1) the issuance of a permit under the Federal New Source Review Program, which is implemented by Pinal County Air Quality Control District (PCAQCD) or ADEQ and addresses the emission units in the proposed action or the preferred alternative; and (2) dispersion modeling that demonstrates that the proposed action or preferred alternative will not cause or contribute to an exceedance of the ambient air quality standard.

The cumulative dispersion modeling analysis (Hampson et al. 2020) used representative meteorological and background air quality data and demonstrated that the $PM_{10}$ impacts will comply with the ambient air quality standards at all receptors within the Hayden $PM_{10}$ Nonattainment Area. This modeling suffices to demonstrate conformity for these facilities.

For the purposes of the NEPA analysis, we have not relied on the future New Source Review Permitting requirement to demonstrate conformity. However, this permitting process will allow for a formal conformity review to be accepted at an appropriate time.

Part of the comment specifically addresses the silt content used in the modeling. Silt content has a direct effect on the emission of particulate matter from roadways and exposed surfaces that will handle ore or tailings storage. Additional work was conducted after the January 2021 Rescinded FEIS. We now use two separate screening analyses to assess the effects of silt content assumptions on the air quality modeling results used to demonstrate conformity.

The first screening analysis focused on how silt content assumptions could change the overall emissions amounts (in tons per year). A review of the silt content data showed that Randall and Hampson (2020b) provided the general silt content level, relying on a statewide factor for road silt content (3 percent) and an ore body analysis of 20 samples that led to an average silt content of 1.79 percent. Three percent was used throughout the fugitive dust calculations for both tailings storage facility and roadway surfaces. The comment questions the appropriateness of this 3 percent silt content, noting that EPA guidance indicates that site-specific silt content should be used where available and that if it is not available, a sector-specific silt content (found in table 13.2.2-1 of EPA's Emission Factors for Stationary Sources (AP-42) (U.S. Environmental Protection Agency 2006)) should be used.

The second screening analysis focused on how silt content assumptions could change modeled concentrations, compared with ambient air quality standards. This screening analysis used a 5.1 percent silt content for plant site roads and showed that the adjusted $PM_{10}$ impacts remain well below the ambient air quality standards. Based on this screening as well, the DEIS air quality modeling analysis demonstrates conformity to the air quality standards.

Appendix R

| Comment response: AQ6 | |
|---|---|
| Conformity analysis | Page 2 of 2 |

| Responsive to these comments: |
|---|
| 524-20, 8032-153 |

We also conducted a conservative screening process to determine the impact that silt content values other than 3 percent would have on emissions and the modeling. We used a silt content value of 17 percent for roadways (a sector-specific silt content taken from AP-42 (U.S. Environmental Protection Agency 2006)) and a silt content of 2 percent for ore/tailings silt content (a site-specific silt content obtained directly from crushed ore samples). We estimate that the hourly emission rates for $PM_{10}$ (pound per hour (lb/hour)) would decrease from 145.2 lb/hour used for the DEIS modeling, to 116.8 lb/hour for the East Plant Site and the Alternative 6 tailings storage facility, using the revised silt content values. Based on the comparison of these emission rates, the DEIS air quality modeling analysis demonstrates conformity to the air quality standards.

| Comment response: AQ8 | |
|---|---|
| Class I Areas | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1438-4 |

The impacts on Class I Areas within 100 kilometers (km) of the project sites were evaluated in accord with FLAG 2010 guidance regarding impacts on air quality related values, including visibility, regional haze, and deposition on soils and vegetation (U.S. Forest Service et al. 2010). Results for each Class I area are provided in the DEIS in section 3.6.4.2, including air quality (table 3.6.4-2), deposition (table 3.6.4-3), plume blight (table 3.6.4-4 and figure 3.6.4-3), and regional haze (table 3.6.4-5). All impacts are disclosed and are compared with significance thresholds or standards.

This comment references the maximum $PM_{10}$ and sulfur dioxide ($SO_2$) concentrations at the Superstition Wilderness area. This is an incorrect reference based on the impacts on Class II receptors in table 3.6.4-1. Impacts on Class I receptors are provided in table 3.6.4-2 and show, for example, that the maximum impact at the Superstition Wilderness Area is 4.26 $\mu g/m^3$, which is below the prevention of significant deterioration increment of 8 $\mu g/m^3$.

| Comment response: AQ9 | |
|---|---|
| Use of CALPUFF | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 278-2 |

This comment questions the use of the CALPUFF model.

CALPUFF modeling evaluates impacts on air quality related values (visibility, deposition) in accordance with guidance issued by FLAG (U.S. Forest Service et al. 2010) (see response AQ8).

We evaluated impacts on air quality concentrations in Class I areas using AERMOD modeled impacts within the 50-km grid for receptors closer than 50 km; impacts were evaluated at Class I areas beyond 50 km as the highest concentration at any 50-km receptor in the direction of the Class I Area. This approach conforms to EPA guidance for assessing impacts at those receptors.

| Comment response: AQ11 Future meteorological trends/greenhouse gas analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1086-2, 1284-2, 1308-5, 1335-4, 1335-5, 1360-10, 1544-4, 30075-9, 8032-308, 8032-64, 8032-66, 900-2, 910-6 | |

These comments concern the impacts of future meteorological trends and calculations of the project contribution to greenhouse gas emissions.

"Resolution Copper Project and Land Exchange Environmental Impact Statement: Final Summary of Issues Identified Through Scoping Process" describes the approach for assessing future meteorological trends in the DEIS (SWCA Environmental Consultants 2017b):

- Issue 8, Factors for Alternative Comparison #3: "Quantitative assessment of total mine. . . . Include tabulation of greenhouse gas emissions of CO2, CH4, and N2O." These were included in section 3.6 (DEIS, p. 279).
- Issue 8, Factors for Alternative Comparison #8: "Assessment using best available science of long-term trends in precipitation and temperature that may affect resources." This assessment is contained in resource sections where it was pertinent to ongoing trends that are part of the Affected Environment. To facilitate this, we compiled a consistent climatic trend scenario for use by all resource specialists. This compilation made use of the best available literature and analyses for anticipated climate change (Dugan 2018). Specific resource discussions of climate impacts are in sections 3.6 (Air Quality, DEIS, p. 279), 3.7.1 (Groundwater Quantity, DEIS, p. 311), and 3.7.3 (Surface Water Quantity, DEIS, pp. 426–427).

We expanded the discussion of future meteorological trends and greenhouse gas emissions in the FEIS. In addition to sections 3.6, 3.7.1, and 3.7.3, we added discussion of the effects of anticipated future meteorological trends to sections 3.3 and 3.10.2. Also, we added a comprehensive discussion of future meteorological trends to chapter 4 of the FEIS to incorporate all of the different resources in one location.

We expanded the calculations of greenhouse gas emissions to incorporate project emissions, as well as three associated types of greenhouse gas emissions: shipping of concentrate, smelting, and power generation. Note that analysis of these actions is not feasible for other resources because of the specific location and type of generation or smelting or because the specific routes of travel and processing location for concentrate are unknown and speculative. Because greenhouse gas emissions are a global phenomenon, the exact locations are not pertinent to the overall greenhouse gas emissions. We made reasonable estimates of these emissions and included them in section 3.6 of the FEIS.

| Comment response: AQ13 Modeling approach for wind speed | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 278-8 | |

It has been a common approach to use the Wyoming-derived data on a wide range of sites. A technical memorandum (Randall 2020a) that includes Lewis and Hampson (2015) provides documentation of other studies and original research that supports using this factor at sites where the countryside is undulating but slopes are not steep.

A 90 percent control effectiveness for fugitive emissions is commonly applied to water applications and surface stabilization. This control effectiveness is supported in general by EPA guidance (U.S. Environmental Protection Agency 2006).

Appendix R

| Comment response: AQ14 | |
|---|---|
| Effects of land exchange on air quality | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1188-13 |

See response NEPA50 for more discussion of the post–land exchange management of offered lands.

With regard to air quality, fundamental to the assessment of resource impacts in chapter 3 is the acknowledgment that specific management of the offered lands was not directed by Congress in Section 3003 of PL 113-291. The offered lands would be subject to management under whatever land and resource management plans are in place for BLM, Coconino National Forest, or Tonto National Forest.

Section 3.1 (DEIS, p. 189) states that a reasonably foreseeable action is one that is likely to occur in the future and does not include those that are speculative. The use of off-road vehicles on the Lower San Pedro Parcel is speculative and is therefore not reasonably foreseeable. Therefore, evaluation of the impacts on air quality from the Federal acquisition of the Lower San Pedro Parcel would be speculative.

For example, this comment notes specifically the use of off-road vehicles on this parcel. Management direction for the San Pedro River National Conservation Area specifically puts restrictions on off-road vehicle use. Similar restrictions could be placed on the Lower San Pedro Parcel (Bureau of Land Management 2019c). BLM would make this management decision after the land exchange.

| Comment response: AQ15 | |
|---|---|
| AERMOD version | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 278-1 |

Randall (2020a) reevaluated the effect of AERMOD changes from Version 16216 vs. Version 18081 and concluded that the use of the later version had no substantive effect on the determination of maximum impacts on air quality receptors. Air Sciences also conducted a test run of AERMOD Version 19191 with AERMET Version 19191 meteorological data (19191 Test Model). The test run included all alternatives at the maximum impact locations as determined by the DEIS model run. The maximum impacts from the DEIS model and the 19191 Test Model were identical.

The NEPA modeling plan was published in June 2018. Version 18081 was released in March 2018, and the DEIS was published for public comment on August 9, 2019, all before EPA's release of the updated AERMOD/AERMET 2019 version (August 21, 2019).

| Comment response: AQ16 | |
|---|---|
| Calculation of background concentrations | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 278-7 |

We concur with this comment on background carbon monoxide levels. Randall and Hampson (2020a) explored and modified this issue. We revised section 3.6 of the FEIS to incorporate this change.

Calculating the hourly nitrogen dioxide ($NO_2$) background concentration is a detailed concept/process and generally left for the reader to review in the referenced documents (Air Sciences Inc. 2018b). We added clarification to the FEIS text about the background $NO_2$ calculations.

Appendix R

| Comment response: AQ17 | |
|---|---|
| Concerns raised about AERMOD and CALPUFF application | Page 1 of 1 |

**Responsive to these comments:**
8032-162

CALPUFF modeling was used in accordance with the EPA guidelines to assess impacts on Air Quality Related Values in Class I areas. See response AQ9 for more discussion of CALPUFF. See response AQ22 for more discussion of ozone ($O_3$) modeling.

The associated air quality impact analysis draws on years of baseline data collected in accordance with Federal and State monitoring guidelines and a monitoring plan approved by the PCAQCD. The modeling approach is consistent with Federal and State modeling guidance and a modeling approach that was reviewed and approved by multiple agencies with expertise in this area (PCAQCD, ADEQ, and Forest Service). The modeling analyses presented in the DEIS are a statistically robust and conservative demonstration that ambient air quality standards are not expected to be exceeded due to emissions from the project. Impacts from urban area are accounted for in background concentrations that are added to estimated impacts at receptors in the modeling domain.

The modeling domain is appropriate for AERMOD and the size of study area is adequate (as impacts at the edge of modeling domain demonstrate). The analysis incorporates carefully designed and engineered features to reduce emissions (including windblown dust) and impacts to air quality. These emission reduction features comply with applicable State and local air district regulations. The analysis demonstrated that estimated impacts to air quality due to emissions from all examined alternatives were below the applicable air quality standards (including the NAAQS) established for the protection of human health. These features are included in the emission inventory and the DEIS as applicant-committed environmental protection measures (DEIS, pp. 283–284).

| Comment response: AQ18 | |
|---|---|
| Ultrafine particulate matter | Page 1 of 1 |

**Responsive to these comments:**
8032-55

Ultrafine particulate matter is included and directly referenced as $PM_{2.5}$. The dispersion modeling effort demonstrates compliance with ambient air quality standards, which protect human health.

We added further analysis of health risks from trace metals (as well as other pollutants) to section 3.6 of the FEIS. See response TS24 for more detail.

Appendix R

| Comment response: AQ19 Cumulative air analysis | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-151, 8032-152, 8032-171

With regard to air quality, the revised cumulative effects analysis is approached in a quantitative fashion. First, additional modeling was conducted to incorporate reasonably foreseeable emissions with enough detail to model. The DEIS included all direct and indirect emissions and impacts from the proposed action and preferred alternative. A formal cumulative air quality impact analysis was prepared (Hampson et al. 2020) that includes emissions and impacts from these reasonably foreseeable actions. Analysis results do not substantively change the effect on ambient air quality standards.

Second, there are still reasonably foreseeable actions, as identified by the Forest Service in the revised cumulative effects analysis, that were not part of this modeling effort. To quantify the cumulative effects from these projects, we estimated and compared emissions with the total emissions in the cumulative effects analysis area. Chapter 4 of the FEIS describes these approaches.

Some sources noted in comments already were incorporated into the baseline modeling as part of background concentrations if those emissions (including those from nearby urban areas) are ongoing. The AERMOD modeling analysis relies on meteorological data and background air quality data from on-site stations and evaluates impacts at a set of receptors that includes Superior, Queen Valley, and Superstition Wilderness Area. Meteorological data include winds from all directions and a wide variety of wind speeds. The size of the AERMOD modeling domain was determined in accordance with applicable State and Federal modeling guidance. It includes receptors in communities and extends 50 km from the project. Modeled impacts to air quality due to emissions from the project, plus representative background concentrations, are below the applicable ambient air quality standards.

| Comment response: AQ20 Background data from other sites | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-158

Resolution Copper conducted multiple years of baseline ambient monitoring at multiple stations across the project area. Monitoring was conducted in accordance with Quality Assurance Project Plans approved by the PCAQCD. Appropriate data quality assurance/quality control (QA/QC) procedures were applied during the monitoring program, as required in the approved Quality Assurance Project Plans. QA/QC procedures included comparison of monitored on-site data with air quality data from stations operated by other jurisdictions. PCAQCD reviewed and accepted quarterly annual reports of the baseline data. The use of other background data to represent existing conditions at distant receptors is not warranted or required under EPA guideline modeling protocols.

| Comment response: AQ21 Tailings pile emissions | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-164

With regard to implementation of dust control measures, section 3.6 (DEIS, pp. 283–284) identified applicant-committed environmental protection measures (including emission controls). The Forest Service ROD must ensure that the applicant-committed environmental protection measures listed in the FEIS, and used to evaluate impacts, are adequately specified as compliance requirements for activities under Forest Service jurisdiction. This will include any monitoring effort that is deemed necessary to demonstrate compliance. Additionally, during construction, operation, and closure, Resolution Copper will have an air quality permit and associated dust control plan issued by PCAQCD with compliance requirements for operations to ensure that the facility meets all applicable air quality standards.

Appendix R

| Comment response: AQ22 Ozone (O₃) analysis | Page 1 of 1 |
|---|---|
| Responsive to these comments: 8032-160, 8032-161 | |

Section 3.6.4.2 (DEIS, p. 288) briefly discussed photochemical formation of $O_3$ and formation of secondary $PM_{2.5}$ in the atmosphere. Reference analysis (Air Sciences Inc. 2019b) addresses these concerns using a Tier 1 threshold analysis for significant impact levels using the EPA-approved screening techniques. Results from this screening show that the volatile organic compound (VOC), nitrous oxide ($NO_x$), and $SO_2$ emissions from the proposed project would generate impacts below the significance levels. Therefore, the analysis determined that $O_3$ and secondary $PM_{2.5}$ impacts are not significant for the proposed action, and a formal modeling of $PM_{2.5}$ and $O_3$ is not required.

These comments also note impacts on human health. See response TS24 for more discussion of this concern.

| Comment response: AQ23 Impacts to Superstition Wilderness | Page 1 of 1 |
|---|---|
| Responsive to these comments: 8032-157 | |

Air quality impacts in the Superstition Wilderness Area, including impacts on vegetation and other air quality related values, are documented in section 3.6 (DEIS, p. 289, table 3.6.4-2 showing criteria pollutant concentrations at the Wilderness area; table 3.6.4-3 showing nitrogen and sulfur deposition at the Wilderness area; discussion on pp. 290–291 showing haze and visibility impacts at sites within the Wilderness area).

Follow-on monitoring of air quality conditions generally is unwarranted for predicted impacts that are well below the ambient standards. The modeled impacts in the Superstition Wilderness Area are well below the standards. The Forest Service and other Federal agencies provide monitoring for air quality conditions in Class I areas where warranted.

| Comment response: AQ24 Modeling missing for tailings facility | Page 1 of 1 |
|---|---|
| Responsive to these comments: 8032-170 | |

This comment notes that modeling is missing for alternative tailings facilities. This is incorrect, though the DEIS did not specifically summarize this information.

We conducted detailed air quality analyses for all alternative tailing storage facilities. Results presented in the DEIS indicated the impacts for Alternative 2, but these impacts were representative of all sites. "Air quality impacts were modeled for each alternative, but the results are largely the same. Maximum impacts for other alternatives would be very similar to those shown in table 3.6.4-1. Detail of the results of other alternative air quality modeling are contained in Newell et al. (2018)" (DEIS, p. 284). See table 3 in the Newell, Garrett, et al. (2018) reference document. We added this table to section 3.6 of the FEIS.

With regard to the Skunk Camp location, data for the Skunk Camp were provided in Air Sciences Inc. (2019b:table 3-17); the results are slightly higher than for Alternative 2 (1 percent for 1-hour $NO_2$, and smaller percentages for other pollutants).

We prepared a cumulative impact analysis that includes reasonably foreseeable actions for all alternatives and all criteria air pollutants. The exception was for $O_3$, which was separately determined to be below significance levels (Hampson et al. 2020). We included this impact analysis in chapter 4 of the FEIS and also summarized it in section 3.6 of the FEIS.

Appendix R

| Comment response: AQ25 | |
|---|---|
| Monsoon effects | Page 1 of 1 |

**Responsive to these comments:**
1438-10, 8032-63

Changes in rainfall patterns associated with future meteorological trends likely would not affect air quality conditions since this region historically has experienced wide ranges of daily and seasonal extremes of precipitation. Also see response AQ4 for discussion of extreme wind events and dust storms.

| Comment response: AQ26 | |
|---|---|
| Shaft exhaust noise and emissions | Page 1 of 1 |

**Responsive to these comments:**
918-2

This comment questions whether the impacts of the air emissions from the shafts at the East Plant Site were analyzed in terms of air quality and noise from fans.

The modeling used to disclose impacts in the DEIS did incorporate noise and air quality from these emissions.

The mine shaft ventilation exhaust emissions are formally addressed in the modeling report (Air Sciences Inc. 2019b:appendix A):appendix A. In that formulation, combined emissions of underground operations and sources are tabulated. The data shown in appendix A for "EP Underground Sub Total" refer to the potential controlled emissions from the mine shaft. The data include underground fugitive emissions, as well as process and combustion source emissions.

Noise modeling also included these sources: "The primary noise sources for the EPS include ventilation exhaust fans, transformers, condenser cooling towers, refrigeration plant, bulk air cooler, hoist houses, and batch plants" (Tetra Tech Inc. 2019:23).

We have added discussion of visual impacts from possible fog plumes caused by the emission of hot air from the ventilation shafts to section 3.11 of the FEIS (see response SR5).

| Comment response: CR1 | |
|---|---|
| Identified specific information missing from analysis | Page 1 of 1 |

**Responsive to these comments:**
1353-2, 1520-3, 28449-113, F7-2

These comments indicate that specific information was missing from the analysis of cultural resources or Tribal concerns in the DEIS. The Forest Service included all relevant data provided by the Tribes in the DEIS at the time of its writing (roughly July 2019). Since that time, we have reviewed and included additional relevant information provided by Tribes in section 3.14 of the FEIS.

In accordance with 36 CFR 800.2(c)(2), Tribal input through consultation was sought early and at every step of the NEPA and Section 106 processes. Since the DEIS was published, a plethora of new information has been provided to the Forest Service through Tribal consultation and Tribal Monitor reports. The reports the Tribal Monitors produced were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places. Consultation is described fully in appendix S of the FEIS. The FEIS discusses and analyzes these data, summarizing information as appropriate in accordance with CEQ guidance. Data include additional traditional cultural places and places of religious and cultural importance to Tribes, along with modern religious use of Oak Flat. Section 3.14 of the FEIS includes further detail and discussion of the overall religious significance of the project area to Tribes. See response CR4 for more discussion of this topic.

A specific comment is that "the lack of reference in the DEIS to the archeological and cultural records held by the San Carlos Apache Tribe, Yavapai people, Aravaipa, and other Indigenous peoples of these ties in the DEIS is inadequate." The Forest Service relied upon Tribes to provide information through consultation or other means. We are unaware which specific records were not provided by Tribes.

Appendix R

| Comment response: CR2<br>Information missing from analysis: cultural history | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1422-4, 1460-1, 214-2, 28449-100, 30078-2, 30078-4, 8032-131, 8032-132

These comments indicate that cultural history information is missing from the analysis.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)). We incorporated detailed background on cultural history by reference (DEIS, p. 625) and included brief summaries. We applied the same approach in the FEIS.

However, in addition to the cultural history from an academic perspective, we also received comments on the lack of a cultural history from the Tribal perspective. We have added detail about this in section 3.14 of the FEIS. See response CR4 for more discussion of this topic.

| Comment response: CR4<br>Personal statements and details of the Tribal importance of Oak Flat, and impacts to Tribes from the project | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
100-1, 100-2, 1068-5, 107-8, 108-3, 1090-3, 1093-4, 1095-2, 1100-2, 112-1, 1169-1, 118-1, 1206-6, 1226-2, 1274-1, 1287-1, 1289-1, 129-2, 1293-1, 1296-1, 1309-4, 1309-5, 1310-2, 1310-3, 131-2, 132-3, 1324-1, 1333-3, 1338-4, 1339-1, 1339-2, 1339-3, 1351-1, 1353-1, 1360-3, 1396-4, 1450-1, 1450-2, 1458-1, 1464-4, 1471-2, 1477-1, 1492-1, 1508-1, 1518-2, 1520-2, 1521-1, 1525-1, 1531-3, 1532-1, 1532-2, 156-3, 157-1, 157-2, 159-1, 160-1, 161-1, 163-1, 164-2, 166-1, 168-2, 169-1, 184-1, 184-2, 186-2, 188-1, 188-2, 1924-3, 233-2, 235-1, 235-11, 235-12, 235-13, 235-14, 235-19, 235-2, 235-3, 235-4, 235-5, 235-8, 235-9, 241-1, 242-1, 27681-1, 28046-1, 29708-2, 29709-1, 30074-1, 30078-3, 30078-6, 30078-7, 30079-2, 30079-5, 311-2, 339-2, 437-2, 495-1, 497-2, 55-4, 5975-2, 62-3, 6317-1, 65-2, 70-1, 72-2, 73-2, 74-1, 75-1, 8031-44, 8032-133, 8032-134, 8032-136, 8032-139, 8032-147, 8032-148, 8032-203, 81-1, 81-2, 81-3, 839-1, 87-1, 887-1, 888-1, 917-2, 93-2, 97-2, 97-3, 98-1, 98-2, F7-1, F7-3

The DEIS was written with the information available at the time. However, since its publication, the Forest Service has received important additional information about the role of the project area and proposed tailings storage locations in current-day Apache religion and culture, as well as similar information from other Tribes, through the Tribal Monitor surveys, government-to-government consultation, Tribal elders' and representatives' visits, and DEIS comments.

For the FEIS, we have revised section 3.14 to acknowledge and document the following:

- That the affected Tribes are the original inhabitants and continuing stewards of the land involved with the proposed mine and land exchange, disclosing that the land and mineral wealth proposed for transfer to Resolution Copper belonged to the affected Tribes 150 years ago and that these resources were taken by force and with the loss of many ancestors.

- A full depiction of the boundaries of aboriginal territories of the affected Tribes as determined by the U.S. Indian Claims Commission. These boundaries, when overlaid with the area of potential effects (APE) for the proposed project, clearly indicate the potential for direct, indirect, and cumulative impacts on aboriginal lands of Arizona's Apache, Yavapai, and Pima-O'odham Tribes and nations.

- That Apache Tribal leaders have testified before Congress over many years, consistently identifying the sacredness and sanctity of Oak Flat.

- A description of traditional Apache religious thought and practice.

- Inclusion of personal statements that describe the current religious significance and the value given to Oak Flat by the Apache people.

Appendix R

| Comment response: CR5<br>Lack of cultural resource surveys or reports | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1519-1, 1544-3, 1602-2, 251-4, 28449-101, 28449-106, 28449-108, 28449-109, 28449-114, 28449-116, 28449-24, 28449-6, 28449-99, 30065-2, 376-3, 55-6, 562-11, 8031-43, 8032-135

Consistent with 36 CFR 800.4, the Forest Service has taken the steps necessary to complete a reasonable and good-faith effort to identify the historic properties within the APE. Our efforts have included background research, consultations, sample field investigation, and pedestrian field surveys.

Our intent has been to complete pedestrian field surveys across all areas subject to project-related ground-disturbing activities (i.e., physical APE). To that end, the Forest Service directed the completion of pedestrian surveys to cover the portions of the physical APE that include the Oak Flat Federal Parcel, GPO project components (East Plant Site, West Plant Site, MARRCO corridor, and filter plant and loadout facility), and the proposed tailings locations for Alternatives 2, 3, 4, 5, and 6.

Most of the necessary surveys were conducted prior to the publication of the DEIS, as described in section 3.12 (DEIS, pp. 627–628), including the following:

- 96 percent of Alternatives 2 and 3 (DEIS, p. 631);
- 72 percent of Alternative 4 (DEIS, p. 632);
- 74 to 78 percent of Alternative 5 (depending on which pipeline route) had been surveyed (DEIS, p. 633); and
- 96 percent of the Alternative 6 – Skunk Camp (preferred alternative) and both pipeline routes (DEIS, p. 635).

We have updated section 3.12 of the FEIS to reflect the additional historic properties identified within the physical APE that were completed after publication of the DEIS.

| Comment response: CR6<br>Anglo, Hispanic history lacking; built environment lacking | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-102, 28449-9, 8032-130, 8032-137

See response CR2 for discussion of the lack of cultural history discussion in the DEIS.

Additional work was completed on the built environment (Tremblay 2020), and we added this discussion to FEIS section 3.12.

Appendix R

| Comment response: CR7 Monitoring and mitigation framework | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1237-2, 233-1, 30078-5, 30080-2

We developed mitigation for impacts to cultural and Tribal resources under two regulatory frameworks: PL 113-291, in which Congress authorized the Southeast Arizona land exchange; and the National Historic Preservation Act (NHPA).

The Forest Service, Resolution Copper, consulting Tribes, the Arizona State Historic Preservation Office (SHPO), and the Advisory Council on Historic Preservation (ACHP) collectively developed mitigations under both acts. The BLM, Arizona State Land Department (ASLD), and U.S. Army Corps of Engineers (USACE) provided additional input.

Regarding the land exchange, PL 113-291, Section 3003(c)(9)(C)(ii), requires the EIS to "identify measures that may be taken, to extent practicable, to minimize potential adverse impacts on [cultural and archaeological] resources."

The NHPA puts forth a process that identifies, assesses, and resolves adverse effects on cultural resources. Section 106 of the NHPA, along with Forest Service regulations at 36 CFR 800.6, requires the Forest Service to avoid, minimize, or mitigate adverse effects on historic properties for this entire project.

To identify historic properties, the Forest Service required pedestrian surveys of the project area for archaeological and built environment resources and Tribal Monitor surveys for resources important to Tribes. The reports the Tribal Monitors produced were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places.

The Forest Service developed a Programmatic Agreement (PA) that outlined the procedures for resolving adverse effects on historic properties identified by the above measures and defined roles and responsibilities for those participating in the agreement. Under the PA, mitigation strategies include data recovery, archaeological monitoring, funding for the continuation of a Tribal Monitoring Program, an Emory oak tree restoration project, and the establishment of heritage funds for Tribal and local community projects. The PA set up the following strategies to resolve adverse effects:

- The SHPO and Tribes reviewed and approved a historic properties treatment plan (HPTP) for the Oak Flat Federal Parcel that details data recovery of historic properties. In accordance with Stipulation IX.B.1 of the PA, the Forest Service will initiate implementation of the Oak Flat HPTP within 1 month of the PA's execution.

Appendix R

| Comment response: CR7 | |
|---|---|
| Monitoring and mitigation framework | Page 2 of 2 |

**Responsive to these comments:**
1237-2, 233-1, 30078-5, 30080-2

- In accordance with Stipulation IX.B. of the PA, we will ensure that a research design is prepared for all of the project components as described in the GPO, including the selected action. Under the umbrella of the research design, treatment plans for data recovery and other mitigations will then be prepared for each project component. Implementation of the research design and treatment plans will occur after issuance of the ROD in accordance with Stipulation IX.D of the PA.
- In accordance with Stipulation IX.C of the PA, the Forest Service shall ensure that Resolution Copper sets up multiple funding sources to fund programs for local communities and Tribes to resolve adverse effects on historic properties. These funds are set aside to partially resolve adverse effects on properties identified as being important by Tribal Monitors and Tribal representatives. The Forest Service recognizes that the Tribes assert that the adverse effects on these properties are not able to be mitigated.
- In accordance with Stipulation IX.B.3 of the PA, we will prepare and implement plans to resolve adverse visual, atmospheric, auditory, and/or cumulative effects if needed.
- In accordance with Stipulation IX.H of the PA, after we issue the ROD we will ensure that a monitoring and discovery plan is prepared and followed during construction and operation of the project.
- In accordance with Stipulation IX.I of the PA, we will develop a Native American Graves Protection and Repatriation Act plan of action for Federal lands. We also will develop an Arizona State Museum burial plan for State and private lands.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

In the Southeast Arizona Land Exchange and Conservation Act (PL 113-291, Section 3003(c)(3)(b)), Congress directed us to work with Resolution Copper to find mutually acceptable measures to address the concerns of affected Tribes and minimize the adverse effects on affected Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper. We cannot fully mitigate these types of impacts through the typical activities specified in the HPTPs. Development of these separate mitigations was a collaborative effort that took place during development of the DEIS and FEIS.

Appendix J of the FEIS incorporates mitigation measures. The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" sections within FEIS sections 3.12 and 3.14. Note that we may not be privy to some private mitigation agreements developed directly between Resolution Copper and Tribes. If these agreements exist, they were not incorporated into the FEIS.

Appendix R

| Comment response: CR8 | |
|---|---|
| Comments contain criticism or questions on the 106 process | Page 1 of 3 |

| Responsive to these comments: |
|---|
| 1350-1, 1417-1, 1417-4, 1417-5, 30078-9, 8030-3, 8032-123, 8032-124, 8032-125, 8032-127 |

Section 106 of the NHPA requires Federal agencies to consider the effects of an undertaking on historic properties. As defined by its implementing regulations (36 CFR 800), historic properties are any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the NRHP. An undertaking is a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval.

Title 36 CFR 800 sets forth the procedures to be followed during the Section 106 process: initiation of the Section 106 process, identification of historic properties, assessment of adverse effects, and resolution of adverse effects. The following summarizes each step in the process and what we have done to fulfill our responsibilities as lead Federal agency for the undertaking.

During the initiation of the Section 106 process (36 CFR 800.3), the Federal agency establishes that there is an undertaking and determines that it has the potential to affect historic properties. The agency then ascertains whether other State or Federal agencies are involved, identifies the appropriate SHPO and/or Tribal Historic Preservation Office (THPO), identifies appropriate Tribes and others consulting parties, and makes a plan for involving the public in the process.

We initiated consultation with the SHPO on March 31, 2017, with the ACHP on December 7, 2017. Initial consultation began with 11 Tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008; via a letter dated August 4, 2015, after the land exchange in 2015 was signed; and with four additional Tribes on December 3, 2018, as alternative tailings locations on BLM-managed lands were identified.

During the identification of historic properties (36 CFR 800.4), the Federal agency determines the APE in consultation with the SHPO/THPO, Tribes, and other consulting parties, identifies resources that may be historic properties within the APE to the appropriate level of effort in consultation with the SHPO/THPO, Tribes, and other consulting parties, and evaluates the historic significance of each resource through application of the NRHP criteria and determining whether a resource is eligible for the NRHP in consultation with the SHPO/THPO, Tribes, and other consulting parties.

We have continuously consulted with the SHPO, Tribes, and consulting parties regarding the APE. The APE has changed and been shaped by the input of these parties over time. The overall APE is a 6-mile buffer around the project components, except where it has been extended to the east and south up to 9 miles from the project components, as well as noncontiguous portions around the historic districts of Globe and Miami. We assert that this APE is expansive enough to account for the direct, indirect, and cumulative effects of the project.

Appendix R

| Comment response: CR8 | |
|---|---|
| Comments contain criticism or questions on the 106 process | Page 2 of 3 |

| Responsive to these comments: |
|---|
| 1350-1, 1417-1, 1417-4, 1417-5, 30078-9, 8030-3, 8032-123, 8032-124, 8032-125, 8032-127 |

For the APE for physical effects, we directed the completion of pedestrian surveys across all portions of the physical APE where project-related ground-disturbing activities might occur. Areas surveyed include the Oak Flat Federal Parcel, GPO project components (East Plant Site, West Plant Site, MARRCO corridor, and filter plant and loadout facility), and the proposed tailings locations for Alternatives 2, 3, 4, 5, and 6. Results from these cultural resource inventories have been compiled into three reports and shared with the SHPO, relevant land managing agencies, and consulting Tribes.

For the APE for auditory effects and the APE for visual effects, a Class I records search for archaeological sites and built environment resources was conducted of the entire APE. Targeted reconnaissance and windshield surveys were conducted. We sought information on places of traditional and cultural importance to Tribes through three measures: Tribal consultations, compilation of an ethnographic and ethnohistoric report, and pedestrian surveys of the APE for physical effects by Tribal Monitors. Along with agency determinations on eligibility, survey results have been or will be shared with SHPO, land managing agencies, and consulting Tribes. Please note that some reports contain sensitive information provided by the Tribes and therefore were shared in a summarized form as part of consultation.

During the assessment of adverse effects (36 CFR 800.5), the Federal agency, in consultation with the SHPO/THPO, Tribes, and other consulting parties, applies the criteria of adverse effects on the historic properties in the APE and determines whether the undertaking will result in an adverse effect on historic properties. If no adverse effects are found, then the undertaking may be implemented and the agency's Section 106 responsibilities have been fulfilled. If adverse effects on historic properties are found, the agency must consult with SHPO, Tribes, and other consulting parties to resolve the adverse effects.

In consultation with SHPO, ACHP, Tribes, and other consulting parties, we have determined that the project will have an adverse effect on historic properties. However, because of the complexity of the project, all of the effects would not be known prior to implementation of the project.

Resolution of adverse effects (36 CFR 800.6) involved the agency consulting with SHPO, Tribes, and other consulting parties to develop strategies to avoid, minimize, or mitigate adverse effects on historic properties. This is done through the development and implementation of an agreement between the Federal agency, ACHP, SHPO, and Tribes and other consulting parties. Development also included the public.

Appendix R

| Comment response: CR8 Comments contain criticism or questions on the 106 process | Page 3 of 3 |
|---|---|

**Responsive to these comments:**
1350-1, 1417-1, 1417-4, 1417-5, 30078-9, 8030-3, 8032-123, 8032-124, 8032-125, 8032-127

Considering the complexity of the project, we developed a PA to resolve adverse effects of the project in consultation with the SHPO, ACHP, Tribes, and other consulting parties. The PA outlined the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, the assessment for effects, and each party's responsibilities for resolving adverse effects from the project. Several versions of the PA were sent out for review and comment to the consulting parties, including the Tribes. Comments were received and incorporated into each new draft of the PA. In addition, the Forest Service held meetings with the Tribes to discuss the PA on October 28 and 29, 2019. The final version of the PA circulated for signature is included as appendix O of the FEIS.

We also intentionally relied on a NEPA public participation strategy to assist the Federal agencies in satisfying the public involvement requirements under Section 106, pursuant to 36 CFR 800.2(d)(3). This strategy included involving interested parties in the NEPA process, providing project information to the public, giving them opportunities to comment on the project, including Section 106 issues, through five public scoping meetings held on March 31, April 4, 5, and 6, and June 9, 2016; two alternatives workshops held on March 21 and 22, 2017; and DEIS public meetings on September 10, 12, 17, and 19 and October 8 and 10, 2019. Specific workshops to hear public comments and concerns about Section 106 compliance and the PA were held on June 13, 14, and 15, 2018. A workshop for consulting parties to discuss the PA occurred on December 11, 2019. Additionally, we received public comments through the NEPA process on the PA as presented in the DEIS.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Appendix R

| Comment response: CR10 | |
|---|---|
| Failure to comply with Forest Service regulations | Page 1 of 1 |

**Responsive to these comments:**
8031-47

This comment states that we failed to comply with appropriate regulations concerning historic preservation, including data collection, consultation, and mitigation.

Title 36 CFR 800.8(a)(3), "Inclusion of Historic Preservation Issues," states, "Agency officials should ensure that preparation of an environmental assessment (EA) and finding of no significant impact (FONSI) or an EIS and ROD includes appropriate scoping, identification, of historic properties, assessment of effects upon them, and consultation leading to resolution of adverse effects."

As stated, we must do what is "appropriate," which does not necessarily mean a full survey. In the case of the Resolution Copper Project, we have gone beyond the normal standards for information collected to inform the NEPA analysis. Most large-scale projects requiring an EIS-level analysis only gather Class I (records search) data for all alternatives. In contrast, we have gathered full Class III pedestrian survey data for all alternatives for this project.

Title 36 CFR 800.8(c) concerns use of the NEPA process for Section 106 consultation. The section concerning inventory efforts is 36 CFR 800(c)(1)(ii), which states, "Identify historic properties and assess the effects of the undertaking in such properties in a manner consistent which the standards and criteria §§ 800.4 through 800.5, provided that the scope and timing of these steps may be phased to reflect the agency official's consideration of project alternatives in the NEPA process and the effort is commensurate with the assessment of other environmental factors."

These identification efforts do not need to be completed all at once, as they can be phased. There is no requirement that 100 percent of this information he in hand for the DEIS.

The intent is for the DEIS to contain an analysis that is complete enough to draw comparisons between alternatives. However, the DEIS is a living document, intended to garner feedback on the methodologies, supporting data, and conclusions of our analysis. We assert that all survey data sufficient to support a reasonable analysis and informed decision are available for the FEIS/draft ROD.

Title 36 CFR 800.8(c)(1)(v) states that the agency must "develop in consultation with identified consulting parties alternatives and proposed measures that might avoid, minimize or mitigate any adverse effects of the undertaking on historic properties and describe them in the EA or DEIS." The level of information specific to the DEIS consists of "proposed measures," with no expectation that these would be finalized until later in the process. The PA lays out the consultation and development of mitigation.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Appendix R

| Comment response: CR12 Comments contain criticism or questions on the Tribal consultation process | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
108-2, 1513-1, 1520-1, 1531-1, 1531-4, 235-15, 27869-1, 28-2, 30080-1, 411-1, 463-2, 541-1

We have engaged in a robust program of Tribal consultation throughout the NEPA process. Several laws, regulations, and policies mandate that we consult with Tribes on projects that may be important to them. These governing documents include NEPA and Section 106 of the NHPA, Native American Graves Protection and Repatriation Act, Archaeological Resources Protection Act (ARPA), American Indian Religious Freedom Act (AIRFA), Executive Order 13007, "Indian Sacred Sites," and Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." In addition, Section 3003(c)(3) of PL 113-291 requires that the Secretary of Agriculture, through the Forest Service, engage in government-to-government consultation with affected Tribes about their concerns of the land exchange. It also requires us to consult with Resolution Copper to find measures to address the concerns of Tribes and minimize adverse effects.

We initiated consultation with 11 Tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008; for the land exchange in 2015 via a letter dated August 4, 2015; and with four additional Tribes on December 3, 2018 (due to the inclusion of the Peg Leg alternative). We continue to consult with Tribes, as evident by over 90 letters, 63 meetings, and 13 field visits. See the discussion of consultation history contained in chapter 5 of the FEIS and the full list of consultation process steps in appendix S.

| Comment response: CR12_A Comments contain criticism or questions on the Tribal consultation process; with addition for specific comment 8031-4 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8031-4

See response CR12 for response to criticisms of the Tribal consultation process.

As noted by the comment, there are additional consultation responsibilities identified in Section 3003 of PL 113-291. The comment notes, "Whether or not the TNF has fully complied with this specific and supplemental consultation requirement is not discussed in the DEIS and there is no evidence that TNF has met this statutory requirement. To the extent that the draft Programmatic Agreement is intended to address the obligations under §3003(c)(3), ITAA does not concur that consultation obligations have been met, nor are the attempts to minimize adverse effects 'mutually acceptable' as required by law."

This comment is incorrect. Additional consultation specific to developing the mitigations required under PL 113-291 has occurred. These meetings are included in the consultation history described in chapter 5 and appendix S of the FEIS. The outcomes of these discussions include some of the remedies and mitigations included in the PA developed during consultation, but note that there are other mitigations that were developed confidentially between the Forest Service, Resolution Copper, and Tribes. These confidential discussions appropriately are not included in the FEIS.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Appendix R

| Comment response: CR12_B<br>Comments contain criticism or questions on the Tribal consultation process; with addition for specific comment 30078-8; 30078-10 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30078-10, 30078-8 | |

See response CR12 for response to criticisms of the Tribal consultation process.

This comment indicates that the Forest Service has inappropriately intermingled three separate types of consultation: government-to-government Tribal consultation, consultation required under Section 106 of the NHPA, and consultation with Tribes required under Section 3003 of PL 113-291.

We agree that these are separate consultation tracks. While interrelated, they still need to be separate in order to comply with laws. Appendix S in the FEIS identifies the full list of specific meetings and correspondence that resulted from these three consultation tracks.

| Comment response: CR13<br>Comments contain criticism or questions on the Tribal consultation process, but specific to 404/USACE | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8030-4, 8031-12, 8031-13 | |

We have engaged in a robust Tribal consultation program throughout the NEPA process. Several laws, regulations, and policies mandate that we consult with Tribes on projects that may be important to them. These governing documents include NEPA and Section 106 of the NHPA, NAGPRA, ARPA, AIRFA, Executive Order 13007, "Indian Sacred Sites," and Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." In addition, Section 3003(c)(3) of PL 113-291 requires that the Secretary of Agriculture, through the Forest Service, engage in government-to-government consultation with affected Tribes about their concerns regarding the land exchange and to consult with Resolution Copper to find measures to address Tribal concerns and minimize adverse effects.

We are the lead agency for the NEPA and NHPA processes, under PL 113-291, Section 3003(c)(9)(B). For project alternatives where a Section 404 of the Clean Water Act (CWA) permit is needed, the Forest Service is the lead Federal agency for the Section 106 process and consultation under 36 CFR 800 2(a)(2) and the Forest Service acts on behalf of other Federal agencies using the Section 106 process. This includes Section 106 Tribal consultation. We will manage Tribal consultation on the Section 404 permit, along with any compensatory mitigation areas, in conjunction with the USACE.

Appendix R

| Comment response: CR13_A Criticism or questions on the Tribal consultation process, but specific to the USACE and Section 404 permit; with addition for specific comment 251-2 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 251-2 | |

See response CR13 for response to criticisms of the Tribal consultation process related to the USACE.

This comment requests "all cultural resource information TNF has given to the Corps, all consultation materials between TNF and any tribes and for any other information in TNF's possession regarding cultural resources within the area of potential effects ("APE") for the Skunk Camp TSF."

Tribes were supplied with the same information as the USACE. The Skunk Camp tailings alternative survey report was not complete when the DEIS was written, though the preliminary data were available and are referenced in section 3.12 (DEIS, pp. 635–636). When it was ready, the report was provided to the Tribes and SHPO on December 24, 2020. Any additional information provided to the USACE also was provided to the Tribes. Additionally, the reports produced by the Tribal Monitors were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places.

We also provided opportunities for representatives of all affected Tribes to visit the Skunk Camp tailings alternative. Invitations for a 2-day visit on May 6 and 7, 2019, were sent via official letter on March 11, 2019, to the 11 Tribes. The May 6 and 7 meetings were attended by representatives on one or both days from the Gila River Indian Community, Mescalero Apache Tribe, Pueblo of Zuni, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, and Yavapai-Apache Tribe. We also provided opportunities for representatives of all affected Tribes to visit the Skunk Camp tailings alternative.

| Comment response: CR14 Criticism or questions about the Tribal Monitor Program | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 235-17, 33-2 | |

The Forest Service's Tribal Monitor Program was developed because consulting Tribes asked for Tribal members to participate in the archaeological survey effort to identify important cultural resources. Tribal Monitors are not Tribal staff and cannot conduct consultation on behalf of their Tribes. Resolution Copper agreed to fund the Tribal Monitor Program to address the concerns of Tribes in compliance with PL 113-291. The reports the Tribal Monitors produced were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places.

Reports also assist the Forest Service to determine whether there are adverse effects on historic properties as mandated by Section 106, as well as adverse impacts under NEPA for resources that are not historic properties under 36 CFR 800.

| Comment response: CR15 Vegetation species of cultural importance | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 28449-115 | |

The DEIS disclosed that 49 types of plants are of special interest but only listed nine of the 49 in section 3.14.3. A comprehensive list, including those mentioned in the comments, was added to section 3.14 of the FEIS.

The Tribal Monitors have subsequently conducted surveys to identify plant species of special interest to Tribes and to record using GPS the locations of plants in specific areas; other plants that are plentiful in each survey area were not point-located. Any newly identified plant species have also been added to section 3.14 of the FEIS.

Appendix R

| Comment response: CR16 Indigenous rights, religious freedom, and international standards | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1150-2, 1439-1, 219-1, 30078-11, 30078-12, 8031-33, 8032-146

These comments question whether or how the Forest Service has complied with a number of laws and international standards concerning Indigenous rights and religious freedoms, including AIRFA and the Religious Freedom Restoration Act.

With respect to compliance with these two specific acts, see response NEPA4.

Also see response NEPA15 with respect to comments on the United Nations Declaration on the Rights of Indigenous Peoples. Other international standards raised in these comments, such as the International Covenant on Civil and Political Rights, are similar to the issues raised in response NEPA15.

These international standards are statements of goals and objectives for signatory States and are non-binding for member States. In the United States, Federal agencies are obligated to adhere to U.S. laws, regulations, and policies that protect cultural resources and the rights of Native Americans, such as the National Historic Preservation Act of 1966 (16 United States Code (U.S.C.) 470 et seq.); Archaeological and Historic Preservation Act of 1974 (16 U.S.C. 469); American Indian Religious Freedom Act of 1978 (42 U.S.C. 1996–1996a); and Native American Graves Protection and Repatriation Act of 1990 (23 U.S.C. 3001 et seq.); as well as other applicable laws, regulations, and policies. It is through these laws, regulations, and policies that progress is made toward achieving the goals and objectives in international standards to which the United States is a signatory.

In response to concerns that the DEIS did not adequately address Tribal religious impacts, section 3.14 of the FEIS was revised to more thoroughly explore these issues. See response CR4 for further detail.

Appendix R

| Comment response: CR17 Sufficiency of cultural resource information disclosed in DEIS | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1417-2, 8032-122 | |

The purpose of an EIS is to summarize and analyze information on significant issues in order to inform the public and allow agency officials to make decisions regarding a proposed project. Data are to be presented in a concise manner and in such a way that data can be easily compared across alternatives. The Forest Service approach for the EIS was that the EIS be analytic rather than encyclopedic; and that the EIS be concise and no longer than absolutely necessary to comply with NEPA and related regulations. To this end, the DEIS presented sufficient detail available at the time on the number and types of archaeological resources potentially impacted by each alternative of the proposed project for the agency official to make decisions regarding that project and for public information.

Furthermore, Section 304 of the NHPA allows Federal agencies to "withhold from disclosure to the public, information about the location, character, or ownership of a historic property if the Secretary and the Agency determine that the disclosure may –

(1) cause a significant invasion of privacy;

(2) risk harm to the historic property; or

(3) impede the use of a traditional religious site by practitioners."

Additionally, Section 9 of the ARPA (16 U.S.C. 470hh) states, "Information concerning the nature and location of any archaeological resource for which the excavation or removal requires a permit or other permission under this chapter or under any other provisions of Federal law may not be made available to the public under subchapter II of chapter 5 of title 5 or under any other provision of law unless the Federal land manager concerned determines that such disclosure would –

(1) further the purposes of this chapter or chapter 3125 of title 54, and

(2) not create a risk of harm to such resources or to the site at which such resources are located."

In general, locational information and other identifying characteristics of archaeological resources cannot be shared with the public if its release might endanger the resource. Section 9 of the ARPA applies to archaeological resources on Federal lands. If it applies, then the agency is required to withhold information if the ARPA criteria for potential harm to resources are met. Section 304 of the NHPA allows agencies to decide whether information should be withheld to protect the resource, regardless of land ownership. For the current project, the majority of the sites are on Federal land and meet the Section 9 criteria. Therefore, the law dictates that we must withhold sensitive information about those sites from the public.

In addition, many of the archaeological sites are important resources to Tribes and therefore are subject to prohibitions on disclosure, in accordance with 25 U.S.C. 3056. Graphics depicting the location of archaeological sites and detailed descriptions of sites should not be found in an EIS. These data have been shared with the staff designated by each Tribe.

In addition, agencies are limited in the amount of information they can release in a DEIS regarding the nature and characteristics of archaeological resources, which results in the use of quantified data rather than qualitative data to discuss impacts to resources.

Appendix R

| Comment response: CR18 | |
|---|---|
| Region 3 Programmatic Agreement (PA) | Page 1 of 1 |

**Responsive to these comments:**
7958-4

In accordance with WHEREAS Clause 39 of the Forest Service Region 3 Programmatic Agreement (Region 3 PA), "The FS shall seek and consider the views of the public in a manner that reflects the nature and complexity of each undertaking and its potential effects on historic properties and the likely interest of the public in the effects on historic properties. The FS shall use its procedures for public involvement under the National Environmental Policy Act (NEPA) to solicit information and concerns about historic properties from members of the public. The FS will ensure that an appropriate level of public involvement is provided, in accordance with 36 CFR 800.2(d)(3)."

In following Region 3 PA guidance, we used and coordinated the NEPA public participation efforts to assist Federal agencies in satisfying public involvement requirements under Section 106 pursuant to 36 CFR 800.2(d)(3) by involving interested parties in the NEPA process, providing project information to the public, and giving them opportunities to comment on the project, including Section 106 issues, through:

- five public scoping meetings, held on March 31, April 4, 5, and 6, and June 9, 2016;
- two alternatives workshops, held on March 21 and 22, 2017;
- DEIS public meetings, held on September 10, 12, 17, and 19 and October 8 and 10, 2019;
- workshops to hear public comments and concerns about Section 106 compliance and the project PA, held on June 13, 14, and 15, 2018; and
- workshops for consulting parties to discuss the Resolution Copper Project PA, held on December 11, 2019.

Through these avenues, the Tonto National Forest received comments through the NEPA process on the Resolution Copper Project PA as presented in the DEIS.

Stipulation II. A. of the Region 3 PA states, "The FS will ensure that environmental documents include information on historic properties that will be affected by the proposed action and alternatives, consistent with Section 304 of NHPA and Section 9 of the Archaeological Resources Protection Act (ARPA)."

Stipulation II. B. of the Region 3 PA states, "The FS shall ensure public access to findings made pursuant to this Agreement, consistent with Section 304 of NHPA and Section 9 of ARPA, and will consider comments or objections by members of the public in a timely manner."

Section 304 of the NHPA and Section 9 of the ARPA address the confidentiality of information about historic properties and/or archaeological resources. Section 9 of the ARPA applies to archaeological resources on Federal lands. If it applies, the agency is required to withhold information if the ARPA criteria are met. Section 304 of the NHPA allows agencies to decide whether information should be withheld to protect the resource, regardless of land ownership. For the current project, the majority of the sites are on Federal land and meet the Section 9 criteria.

Therefore, the law dictates that we must withhold sensitive information about those sites from the public. See response CR17 for more discussion about these restrictions.

| Comment response: CR19 | |
|---|---|
| Cultural resources along Mineral Creek | Page 1 of 1 |

**Responsive to these comments:**
30081-9

These comments concern impacts to cultural resources along Mineral Creek, which, in the DEIS, would be impacted by the pipeline and power line to the Alternative 6 tailings storage facility.

The Alternative 6 – North pipeline route was modified, in part, based on the issues raised in these comments. The rerouted pipeline considered in the FEIS now substantially avoids perennial water and critical habitat along Mineral Creek (except for a trenchless underground crossing upstream of Government Springs Ranch), crosses Devil's Canyon at a non-perennial location using an overhead span, and reduces the amount of the pipeline corridor that occurs on Arizona State Trust land. A discussion of this change was added to chapter 2 of the FEIS.

This rerouted pipeline avoids the cultural resources referred to in this comment.

Appendix R

| Comment response: CR20 Bald and golden eagles | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8031-45, 8031-66, 8032-186

Bald and golden eagles are included in the special status species analyzed in section 3.8 (DEIS, p. 454). The status of golden eagles with respect to project components is shown in table 3.8.4-2 (DEIS, p. 466), and bald eagles are discussed on p. 468 (DEIS, p. 468). Impacts to these birds along with other migratory birds are described in section 3.8 (DEIS, pp. 461–462). Further details are included in the project record (Newell 2018j).

Impacts to these two species are identified in section 3.8 of the FEIS.

| Comment response: CR21 Comments contain criticism or questions on area of potential effects (APE) | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
235-20

We developed the APE in consultation with the SHPO, Tribes, and other consulting parties. The APE for the undertaking consists of a 6-mile buffer around the Oak Flat Federal Parcel, the GPO project areas, and tailings alternatives, except where it has been extended outward to include Top-of-the-World, the historic districts in Globe and Miami, and any Section 404 of the CWA mitigation areas outside the 6-mile buffer.

This APE captures the direct, indirect, and cumulative effects of the project. The APE is broken up into "zones" to guide identification efforts and the evaluation of potential direct, indirect, and cumulative effects. The mine component footprints were buffered by 250 feet; generally, physical effects are expected to occur within the project areas and buffer. The APE for physical effects includes all areas likely to be affected by construction, operations, and reclamation activities. Auditory effects may occur within 2 miles of the combined project footprint and include effects from noise and vibration. Visual/atmospheric effects may occur within 6 miles of the project area or where it has been extended around Top-of-the-World and around the two noncontiguous historic districts in Globe and Miami. The 6-mile buffer plus the extension around Top-of-the-World and the areas around the two noncontiguous historic districts in Globe and Miami will also serve as the APE for cumulative effects. The cumulative APE encompasses most of what is known as the "Copper Triangle."

APE development was an ongoing process, with feedback from consultation with the SHPO, ACHP, Tribes, and other consulting parties. The APE was expanded several times to include new potential effects and new project areas. We are confident that the APE reflects the concerns of all the consulting parties, including the Tribes.

| Comment response: CR22 Programmatic Agreement (PA) | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1417-3, 8032-128

These comments are specific to the PA included in appendix O of the DEIS.

The version of the PA in the DEIS was the latest draft at the time of publication. The PA continued to evolve through consultation with required signatories.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Appendix R

| Comment response: CR23 | |
|---|---|
| Scoping comments on Programmatic Agreement (PA) | Page 1 of 2 |

| Responsive to these comments: |
|---|
| 32-1 |

This comment states that the PA is insufficient and refers specifically to a number of scoping comments submitted.

The version of the PA in the DEIS was the latest draft at the time of publication. The PA continued to evolve through consultation with required signatories.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

We are aware of the specific scoping comment, in the form of 13 questions, submitted by this commenter. During the NEPA process, there is no requirement that scoping comments be addressed explicitly in the DEIS. Scoping comments generate a suite of issues that then guide the analysis in the DEIS. Those issues are contained in the report titled "Final Summary of Issues Identified Through Scoping Process, November 2017" (SWCA Environmental Consultants 2017b).

Any scoping comment is traceable to the issue statements that encompass it, through the report titled "Public Concern Statements, May 2017" (U.S. Forest Service 2017h). The scoping comment in question is #26631, and the individual comments were numbered 2626 through 2638. For example, comment 2626 from scoping comment letter #26631 was as follows: "Question 1: Once the EIS is completed, the land swap has been consummated, all the permits have been issued, and mining starts in earnest - what regulatory body or bodies will ensure that any necessary mitigation, monitoring, and other NEPA-related conditions will actually be carried out?" This was assigned to Public Concern Statement MIT-4.1 (U.S. Forest Service 2017h:A-34).

Regardless of the scoping process, the commenter's specific questions largely were answered in the DEIS. These are summarized below.

Question 1 asked what agencies would oversee mitigation and monitoring. Response: This varies by alternative, and the question is answered for each mitigation/monitoring measure in appendix J. See the "Authority to Require" section for each measure.

Question 2 asked whether any mitigation/monitoring would be charged to taxpayers. Response: No; the mine bears the financial burden for mitigation/monitoring activities. We added language to appendix J of the FEIS to make this clear to the public.

Questions 3 and 4 asked what occurs in the case of bankruptcy. Response: Chapter 2 addresses financial assurances (DEIS, p. 104).

Appendix R

| Comment response: CR23 Scoping comments on Programmatic Agreement (PA) | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
32-1

Question 5 asked whether a cost/benefit analysis would be conducted. Response: No; conducting a cost/benefit analysis is not a requirement under NEPA or Forest Service regulations.

Question 6 asked who will manage mined land long term. Response: This varies by alternative. Facilities on Federal land are managed long term by the appropriate Federal agency. Facilities on private land are managed by private landowners. We added language to chapter 1 of the FEIS to make the regulatory jurisdictions for each alternative and each mine component clear to the public.

Question 7 asked the range of conditions that would be analyzed in the EIS. Response: We strove to show a range of conditions, particularly with extreme events. For instance, section 3.7.3 in the FEIS looks at effects of the project on a variety of flood conditions. Section 3.7.1 in the FEIS looks at 87 different groundwater models under a range of conditions. Section 3.2 in the FEIS looks at subsidence under a range of conditions. Section 3.10.1 looks at potential tailings failures under a range of conditions, including saturated failure and unsaturated failure.

Questions 8 and 9 asked for details on how cumulative effects and "secondary" effects would be defined. Response: There is no single answer to this question, as each resource is different. The overall approach is described in chapter 3 (DEIS, pp. 127–129) and varies resource by resource. Each resource section in chapter 3 describes the analysis area considered for direct and indirect effects. The cumulative effect analysis areas were described in (SWCA Environmental Consultants 2018a) for the DEIS but now are described and shown graphically in chapter 4 of the FEIS.

Question 10 asked about boom/bust cycles. Response: Section 3.13 addresses this subject (DEIS, p. 653).

Question 11 asked where the labor pool would be derived. Response: Section 3.13 addresses this subject (DEIS, pp. 648–650).

Question 12 asked about adverse effects on tourism, recreation, and scenic resources (among other things). Response: Section 3.13 addresses effects on the "nature-based tourism economy" (DEIS, p. 653). Section 3.9 addresses effects on recreation (DEIS, pp. 495–509). Section 3.11 addresses effects on scenic resources (DEIS, pp. 594–618).

Question 13 asked, "What effects will the proposed action have on the good faith of Arizona citizens who willingly engaged in an open, federally defined process that gave them a voice and a chance, but then had the rug pulled out from under their feet?" Response: This comment was considered non-actionable during scoping. We are responsible for ensuring that the NEPA process is conducted properly, including appropriate public outreach. The public involvement effort was conducted as required and has included public meetings and comments during scoping, during alternatives development, and after release of the DEIS.

| Comment response: DOC1 Specific wording or technical edit to be considered | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1048-1, 1048-3, 1158-10, 1158-23, 1158-44, 1158-45, 1188-12, 1188-8, 1263-1, 1389-10, 1389-11, 1389-12, 1389-5, 1389-6, 1438-7, 278-3, 278-4, 278-6, 28449-103, 28449-104, 28449-107, 28449-112, 28449-118, 28449-124, 28449-125, 28449-126, 28449-127, 28449-128, 28449-129, 28449-13, 28449-130, 28449-132, 28449-133, 28449-134, 28449-135, 28449-136, 28449-137, 28449-138, 28449-139, 28449-14, 28449-140, 28449-141, 28449-142, 28449-143, 28449-144, 28449-145, 28449-146, 28449-147, 28449-148, 28449-15, 28449-151, 28449-16, 28449-18, 28449-19, 28449-21, 28449-25, 28449-26, 28449-27, 28449-3, 28449-32, 28449-34, 28449-35, 28449-36, 28449-37, 28449-38, 28449-39, 28449-4, 28449-40, 28449-41, 28449-42, 28449-43, 28449-44, 28449-45, 28449-46, 28449-47, 28449-5, 28449-50, 28449-51, 28449-53, 28449-57, 28449-59, 28449-60, 28449-61, 28449-62, 28449-63, 28449-64, 28449-65, 28449-66, 28449-68, 28449-69, 28449-7, 28449-71, 28449-72, 28449-73, 28449-78, 28449-79, 28449-82, 28449-85, 28449-87, 28449-88, 28449-89, 28449-90, 30075-100, 30075-101, 30075-130, 30075-131, 30075-132, 30075-27, 30075-28, 30075-34, 30075-37, 30075-4, 30075-51, 30075-54, 30075-55, 30075-58, 30075-59, 30075-6, 30075-60, 30075-63, 30075-64, 30075-65, 30075-67, 30075-72, 30075-74, 30075-79, 30075-87, 30075-90, 30078-37, 37-1, 524-25, 8032-338, 866-14

We considered all suggestions for specific edits to the EIS, including punctuation, spelling, grammar, and formatting of tables and figures, and made corrections or revisions where appropriate.

Appendix R

| Comment response: EJ2<br>Overall criticisms of environmental justice analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1396-5, 1535-1, 19-5, 28449-117, 8032-140, 8032-141

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173.

These comments identify the communities of Hayden, Miami, Globe, Superior, and Winkelman, as well as eight Native American communities. All of these communities were included in the analysis area disclosed in the DEIS (see figure 3.15.2-1). With respect to these and other communities identified in comments, the methodology for identifying potentially impacted communities was disclosed in DEIS Section 3.15.2.2. The assessment of impacts to these communities, which is based on the contents of the entirety of the analysis contained in chapter 3 of the DEIS, is summarized in table 3.15.4-1.

These comments identify the need to analyze impacts on area housing. This analysis can be found in FEIS Section 3.13, Socioeconomics, subsection 3.13.4.2.

These comments identify the need to assess pressures on municipal infrastructure such as roads, schools, and medical facilities. This analysis can be found in FEIS Section 3.13, Socioeconomics, subsection 3.13.4.2, specifically "Mine-Related Demands and Costs for Public Services."

| Comment response: EJ2_A<br>Overall criticisms of environmental justice analysis; with addition for specific comment 8032-145 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-145

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

This comment raises issues related to Tribal consultation, Indigenous rights, and religious freedoms. See responses CR8, NEPA4, NEPA15, and CR16 for more discussion of these issues.

| Comment response: EJ2_B<br>Overall criticisms of environmental justice analysis; with addition for specific comment 8032-138 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-138

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

This comment includes the following statement: "These comments on the DEIS acknowledge and incorporate by reference those comments of October 25, 2019, relating to failure of the DEIS to address EJCs submitted by Professor Steven Boyd (EJ-EX-01)."

Note that these comments were not submitted to the Forest Service. The investigation into these missing comments is described in Garrett (2020l).

Appendix R

| **Comment response: EJ3**<br>Overall criticisms of the environmental justice analysis specific to public health | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-142, 8032-57 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

These comments identify a concern with public health. A public health analysis was conducted to assess potential health outcomes related to proposed mining facilities (see section 3.6 of the FEIS and also see response TS24). Analysis results indicate that emissions from the project and deposition of metals are not anticipated to exceed any thresholds that would indicate excessive cancer or non-cancer health risks.

Additionally, the comment notes the following specific resource impacts associated with the proposed mine facilities. See response EJ2 regarding analysis methodology and impact analyses. Supporting analyses can be found in the following DEIS and FEIS sections:

- Section 3.3 for plants and vegetation
- Section 3.5 for transportation
- Sections 3.7.1, 3.7.2, and 3.7.3 for waters
- Section 3.8 for general biology and wildlife
- Section 3.9 for recreation
- Section 3.12 for cultural resources
- Section 3.13 for economy, employment, and housing
- Section 3.14 for ancestral lands or traditional cultural places of Native American populations

| **Comment response: EJ4**<br>Question on pipeline impacts to Superior | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>29-3 | |

Section 3.10.1 of the DEIS analyzes the potential impacts from pipeline ruptures (pp. 546–553). This includes potential impacts resulting from ruptures of tailings slurry pipelines associated with tailings facilities (including Silver King, which is mentioned specifically), as well as concentrate pipelines that would be in the MARRCO corridor.

As stated in the DEIS (see p. 546), "In the event of a potential rupture, spill, or failure of either the concentrate pipeline or the tailings pipeline, the effects would be similar to those of a tailings storage facility failure with respect to direct damage to vegetation and potential for contamination. However, because of the ability to monitor and shut down the pipeline immediately upon identifying a problem, the impact would be much more localized, involve much smaller volumes, and would be of a shorter duration. . . . Potential for impact on groundwater quality would be relatively low, given limited release volumes and limited groundwater present in these ephemeral drainages."

| **Comment response: EJ5**<br>Missing and murdered women | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1338-2 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

Appendix R

| Comment response: EJ6 Quality of life | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1338-3

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

This comment mentions quality of life. Impacts to quality of life indicators, including baseline descriptions of the affected environment and potential impacts associated with the construction and operation of proposed mining facilities, are described in the following sections of the DEIS and FEIS:

- Section 3.4 for noise impacts
- Section 3.5 for transportation
- Section 3.6 for air quality
- Sections 3.7.1, 3.7.2, and 3.7.3 for waters
- Section 3.9 for recreation
- Section 3.11 for scenic and dark sky
- Section 3.13 for socioeconomic and municipal services

| Comment response: GS1 Pipeline failure risks, with specific reference to seismic hazards | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1538-7, 30141-7, 8032-244

These comments raise concerns over the risk and consequences of pipeline failures and the seismic analysis pertinent to the pipelines.

Analysis of the potential for pipeline failures and the consequences for pipeline failures are analyzed in section 3.10.1 (DEIS, pp. 535–554).

Studies that have been completed that are pertinent to the pipeline design and protection, including seismic hazards, include the following:

- The site-specific seismic hazard analyses for the mine site and Alternative 6 tailings storage facilities (Wong 2020)
- The pipeline management plans available before the DEIS, which includes specific analysis of potential failure modes, including geohazards and storm events (AMEC Foster Wheeler Americas Limited 2019; M3 Engineering and Technology Corporation 2019)
- A pipeline protection and integrity plan prepared in response to comments, which includes specific analysis of potential failure modes, including geohazards such as slope instability, seismic hazards, scour, and geologic subsidence (Golder Associates Inc. 2020); this plan includes specific mitigation methods to respond to these geohazards

The pipeline protection and integrity plan prepared in response to comments also includes analysis of potential failure modes other than geohazards, including mechanical failure, corrosion and erosion, operational failures, and human-caused failures. This plan includes specific mitigation methods to respond to these potential failure modes.

Appendix R

| Comment response: GS1<br>Pipeline failure risks, with specific reference to seismic hazards | Page 2 of 2 |
|---|---|
| **Responsive to these comments:**<br>1538-7, 30141-7, 8032-244 | |

Specific to seismic hazards, the pipeline protection and integrity plan looked at specific hazards such as ground movement, liquefaction, and active surface fault ruptures. No specific hazards were found to be of concern. The plan notes:

> *"Seismic events are typically not direct integrity threats to the pipelines, provided that the pipeline does not cross active faults. No records or signs of active faults have been identified along the selected pipeline alignment in the two seismic hazard evaluations completed for the area covering the pipeline and additionally, no active faults have been identified during field geotechnical investigations.*
>
> *If signs of active fault zones are identified during construction of the pipeline, the following mitigation measures may be implemented depending upon the site conditions:*
>
> - *heavy wall pipe to increase the capacity to accommodate additional stresses caused by differential movement in active fault zones*
> - *increased trench width in combination with low density fill materials to minimize the additional stresses*
> - *reduced depth of cover to minimize the additional stresses*
> - *specially designed aboveground fault crossings, if necessary."* (Golder Associates Inc. 2020:14)

| Comment response: GS1_A<br>Pipeline failure risks, with specific reference to seismic hazards; with addition for specific comment<br>863-1 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>863-1 | |

See response GS1 for response to the general topic of pipeline failures due to seismic activity.

This comment notes the design earthquake for the project is the 5,000-year return period. This is incorrect. See response TS2 for more detail.

Appendix R

| Comment response: GS2 Volcanism and seismic data sources | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1201-3, 61-1, 62-5, 8032-243

These comments concern seismic activity and volcanism.

There is no credible evidence that active volcanoes or fumaroles are present at the mine site or any of the tailings storage facilities, nor is active volcanism a general concern for this area. According to the U.S. Geological Survey (USGS) Volcano Hazards Program, the nearest volcanic fields are about 140 miles away, either to the northeast (the Red Hill-Quemado volcanic field in western New Mexico) or to the northwest (the San Francisco volcanic field around Flagstaff, Arizona). This issue is therefore not analyzed as part of the NEPA process.

With respect to seismic activity, additional investigation and updated data sources have been received since the DEIS. These include the following:

- Site-specific seismic hazard assessment for the Skunk Camp location (Wong et al. 2020a) and NEPA team review of this assessment (Zellman and Cook 2020c)
- NEPA team review of three seismic reports for the mine site (Zellman and Cook 2020b)
- NEPA team review specifically of the potential for active surface faulting at the Skunk Camp tailings storage facility (Zellman and Cook 2020a)
- Specific responses to issues raised in two reports submitted with comment letter #8032, including a report by Dr. S. Emerman (Appendix B-5 to the letter) and Dr. D. Chambers (Appendix A to the letter) (KCB Consultants Ltd. 2020g)

The comments from the Chambers report questions the data sources used for the seismic analysis, noting 2014 data from the USGS that would have postdated a 2013 seismic report. As noted in the list above, the seismic hazard studies conducted for the Skunk Camp tailings storage facility all postdate the 2014 data, and the data sources are either consistent with or more updated and recent than the sources cited in the comment.

The comments from the Chambers report also note that the EIS "must disclose the location and magnitude of the maximum credible earthquake used for the design earthquake for the tailings dam." There are two basic approaches for calculating ground motions from seismic events: a probabilistic seismic hazard assessment (PSHA), and a deterministic seismic hazard assessment (DSHA). Both methods were conducted in the 2013 report that Dr. Chambers reviewed; in addition, a more recent 2020 site-specific seismic hazard assessment was conducted for the Skunk Camp tailings location. A DSHA analyzes a specific magnitude earthquake at a specific fault. A PSHA analyzes a hypothetical seismic event of a given magnitude at a given distance. In both cases, the ground motion at the location of interest (in this case the tailings storage facility) is analyzed. The PSHA approach resulted in higher ground motion than the DSHA; therefore, the PSHA was used for the design of the tailings storage facility. Regardless of the results, the faults used for the analysis are clearly disclosed in the seismic reports.

Appendix R

| Comment response: GS3 Safety of climbing routes; induced seismicity | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1358-3, 1524-4, 29-8

The DEIS discusses the potential for the block caving operations to induce small seismic events in section 3.2 (DEIS, pp. 145–146, 155). These comments express concern that the results are not given sufficient weight, considering climbing routes in the area and the uncertainty in the analysis.

The DEIS concludes, "While mine-induced seismicity is possible, based on 100 years of worldwide observations, events greater than magnitude 5 are rare, and events of magnitude 3 or less are more common. This is observed in the most recent mine-related earthquakes in Arizona, which ranged from magnitude 2.9 to 3.1" (DEIS, p. 155).

The general effects of earthquakes of magnitude 3 (on the Richter scale) can be put into other terms, such as the Modified Mercalli scale described in section 3.2 (DEIS, p. 145). An earthquake of magnitude 3 on the Richter scale generally corresponds to a magnitude II or III on the Modified Mercalli scale. As noted in the DEIS, the effects of a magnitude III earthquake are "weak. Many people do not recognize it as an earthquake, standing vehicles may rock slightly, and vibrations are similar to the passing of a truck" (DEIS, p. 145).

As with all climbing areas, the formations in the vicinity of the project have hazards present from balancing rocks and fractured and unstable features. Rockfalls associated with these hazards happen naturally, responding to the effects of background vibrations, wind, water, and freeze/thaw cycles. Induced seismicity triggered by block caving—if it happens—appears no more likely than these natural factors to trigger specific hazards to climbers.

We have added further discussion to section 3.2 of the FEIS to put the potential hazards of induced seismicity into context.

Another comment notes that damage could occur to buildings in Superior from induced seismicity. This was analyzed in section 3.2: "Induced mine seismicity is possible, but unlikely to be of sufficient magnitude to cause structural damage" (DEIS, p. 155).

Another comment notes the horizontal and vertical displacement associated with subsidence would increase hazards, as well. See response GS14 for more details on this issue.

Appendix R

| Comment response: GS4 Uncertain information with respect to fault lines | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-9, 62-1

These comments raise concerns over uncertain information about the location and nature of the fault lines that exist in the area and state that the DEIS does not specifically note that the "uncertainty is much greater in the area near Apache Leap [Special Management Area]."

The document referenced in the comment (BGC Engineering USA Inc. 2018a) does note that the geological characterization is the most detailed near the ore body: "Therefore, the Workgroup concludes that geologic data outside of the mineralized zone, as well as for the Camp and Gant faults, is not as well represented as in the mineralized zone" BGC Engineering USA Inc. (2018a:54). The Gant Fault is indeed located on the west side of the ore body, near the Apache Leap Special Management Area (SMA). In this sense, the comment is correct that uncertainty is greater in the area near the Apache Leap SMA.

However, this uncertainty was not ignored in the DEIS analysis. The text continues, "However, conservative modeling assumptions and sensitivity analyses have been used to account for sparse data in these areas" (BGC Engineering USA Inc. 2018a:54). The results of the sensitivity analyses are discussed in section 3.2 of the DEIS:

*"The Geology and Subsidence Workgroup requested a number of sensitivity model runs as part of the evaluation of the subsidence model (BGC Engineering USA Inc. 2018a; Garza-Cruz and Pierce 2018). These model runs assess what would change if various input parameters or assumptions in the model were different, including rock mass strength, in-situ strength, fault strength, and bulked rock porosity. The size of the fracture limit under these different sensitivity runs does not differ substantially from the base case model, and while at least one sensitivity run brings it closer to the boundary of the Apache Leap SMA, it remains outside that boundary. Similarly, under all scenarios the first breakthrough of subsidence occurs in year 6 or 7 of mining, and subsidence ends very soon after ore extraction ends." (DEIS, p. 151)*

In other words, the NEPA team was cognizant of the potential for uncertainties related to faults to affect the outcomes of the model, particularly the potential impacts to Apache Leap, and devised an approach meant specifically to quantify those uncertainties. The outcome of this approach demonstrates that subsidence is not anticipated to impact the Apache Leap SMA, even considering uncertain model inputs.

| Comment response: GS6 Uncertain information | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-36

This comment states, "The DEIS Report Notes that 'There are several areas of uncertainty and some areas of sparse or low confidence data...' (Ch 3, 3.2.2.2, para. 5, bullet #4). Where are these uncertain data detailed?"

These areas of uncertain information are detailed in DEIS reference BGC Engineering USA Inc. (2018a). This memorandum documents the opinions of the Geology and Subsidence Workgroup convened by the Forest Service to assess the subsidence modeling. Much of this workgroup memorandum is devoted to identifying areas of uncertainty with the modeling. These are summarized in Section 7.0, Conclusions, and specifically in table 6, "Key input parameters impacting surface subsidence and the quality of the associated data" (BGC Engineering USA Inc. 2018a:52).

Appendix R

| Comment response: GS7 Environmental protection measures employed for Alternative 6 | Page 1 of 1 |
|---|---|

| **Responsive to these comments:** 8032-37 |
|---|

This comment asks, "Exactly what environmental protection measures and mitigation efforts would be employed?" for Alternative 6 – Skunk Camp.

There are two categories of environmental protection measures considered in the DEIS. Within each resource section in chapter 3, specific "applicant-committed environmental protection measures" are detailed. As described in chapter 2, "Applicant-committed environmental design measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. These measures would be non-discretionary as they are included in the project design, and their effects are accounted for in the analysis of environmental consequences disclosed in each resource section of chapter 3" (DEIS, p. 103). Readers should expect that any applicant-committed environmental protection measures listed in chapter 3 would be employed as described.

The second category of environmental protection measures consists of those identified as "mitigation." Chapter 3 states, "As described in chapter 2, the Forest Service is in the process of developing a comprehensive set of mitigation measures that, where practical and technically feasible to implement, would serve to avoid, minimize, rectify, reduce, or compensate for resource impacts identified during effects analyses conducted for this EIS" (DEIS, p. 129).

Unlike applicant-committed environmental protection measures, mitigation measures are not brought forward by the applicant as an integral part of the project; rather, they emerge during the NEPA process as part of the analysis.

Because mitigation measures are not an integral part of the project, the effectiveness of proposed mitigation is analyzed separately from the environmental consequences analysis for each resource assessed in chapter 3. The usefulness of the proposed mitigation is assessed separately in the "Mitigation Effectiveness" section for each resource.

All of the mitigation measures—regardless of the resource they affect—are compiled in one location in appendix J of the DEIS. Each item in appendix J clearly identifies whether that item can be required by the Forest Service or has been agreed to be implemented voluntarily by Resolution Copper. This distinction is important, because for voluntary measures, "The Forest Service and regulatory agencies have no authority, obligation, or expertise to determine or enforce compliance of the measures included in this category. They are presented here to facilitate disclosure of currently known mitigation and monitoring and their consideration in impacts analyses" (DEIS, appendix J, p. J3).

Because different alternatives have different land jurisdictions, the authority to require mitigation differs between alternatives. The Alternative 6 tailings storage facility, as noted in the comment, occurs on private land, and therefore the Forest Service may have limited jurisdiction to require mitigation. Appendix J clearly identifies the alternatives for which each mitigation measure is applicable. For example, mitigation measure "FS-01: Satellite Monitoring of Tailings Storage Facility" is shown to be applicable only to Alternatives 2, 3, 4, and 5 because of the land jurisdiction of Alternative 6: "Alternative 6: As facility would ultimately be located on private land, Forest Service would not have authority to require long-term monitoring of the tailings storage facility" (DEIS, appendix J, p. J-17).

Appendix R

| Comment response: GS8 Comments regarding Oyu Tolgoi mine | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
104-3, 1201-1, 53-3, 8032-265

These comments discuss a mine in Mongolia: "Rio Tinto is a primary partner in Oyu Tolgoi, LLC, the operator of the Oyu Tolgoi mine being developed in southern Mongolia. Underground mine operations at Oyu Tolgoi are being planned as a block cave mine. An announcement during the first half of 2019 of 'ground instability problems' at the Oyu Tolgoi site encountered during construction of the underground mine. . . . As Resolution is proposed as a block cave mine, an analysis of the implications of the Oyu Tolgoi ground instability problem should be incorporated into a revised or supplemental DEIS and FEIS for the Resolution project."

The available facts regarding the Oyu Tolgoi mine were compiled and assessed by the NEPA team (Newell 2020). This analysis concluded the following:

> *"There are no specific parallels between the Oyu Tolgoi experience and Resolution Copper. No evidence has been found through this research that the adverse geotechnical conditions that occurred at Oyu Tolgoi would repeat themselves at Resolution Copper. Nor is there any indication that such conditions if they occurred are not already considered and incorporated into the Resolution Copper development and engineering plans. Geology and geotechnical conditions are site-specific. What was experienced geologically at Oyu Tolgoi has no bearing on what would be experienced geologically at Resolution Copper."* (Newell 2020)

In addition, geotechnical challenges encountered during development of Oyu Tolgoi underground mine are related to local rock mass condition surrounding the underground development. This has no impact on predicted subsidence on ground surface, which is a function of mainly depth and shape of the ore body and the geological structures.

The analysis continues,

> *"The applicability of Oyu Tolgoi to Resolution Copper is as an example of the challenges that can occur during mine development. There is no reason to anticipate that Resolution Copper would experience the exact same challenges, but it is indeed reasonable to anticipate that Resolution Copper could experience other unspecified challenges. These could be difficulties in material or equipment supply, unanticipated geologic conditions, difficulties with ventilation, difficulties with dewatering, or an unlimited number of other challenges. Oyu Tolgoi is an example of how unanticipated real-world challenges can be met. Meeting these challenges may result in project delays, project overruns, or both. These represent business challenges and decisions for the mining company, but they have no bearing on the Forest Service decision. No part of the Forest Service decision takes Resolution Copper's profitability into account."* (Newell 2020)

Since the publication of the January 2021 Rescinded FEIS, additional news reports about Oyu Tolgoi have appeared. These are mostly related to Rio Tinto's obtaining full control over the mine and the negotiations with the Mongolian government. None of these reports suggest similarities between Resolution Copper and Oyu Tolgoi that differ from those assessed previously (Newell 2020).

| Comment response: GS9 Porous nature of Apache Leap Tuff | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1201-2, 162-1

These comments refer to the porous nature of the Apache Leap Tuff. This does not represent new information. Characterization of the Apache Leap Tuff as a permeable and productive aquifer is fundamental to the analysis in the DEIS and to the long-term predictions of impacts to groundwater levels from dewatering of the aquifer once block caving begins (DEIS, pp. 139 and 305).

Appendix R

| Comment response: GS10<br>Stated ore reserves | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>82-1 | |

This comment questions the amount of ore reserves stated by Resolution Copper. It is not clear whether the intent of the comment is to suggest that inadequate ore reserves exist or that the stated lifespan of the mine may be longer than anticipated.

Regardless, quantification, documentation, and disclosure of ore amounts are highly regulated, particularly under Canadian regulations. There are specific standards of evidence, specific definitions and terminology, and standards for responsible professionals with which to assess the ore body. Resolution Copper has adhered to these standards for disclosures of ore amounts.

There is no expectation that these numbers remain the same over time or that the understanding of the ore body would not evolve. Ore amounts change not just with further exploration and information gathered during operations but with improved technologies and the ability to profitably mine ore that was previously infeasible to mine.

| Comment response: GS11<br>Subsidence modeling, supporting information, and uncertainties | Page 1 of 3 |
| --- | --- |
| **Responsive to these comments:**<br>1301-18, 30144-2 (Emerman3), 30144-3 (Emerman3), 8032-262, 8032-263 | |

These comments are specific to the modeling of the subsidence resulting from the block caving operation, the supporting information for that modeling analysis, and the uncertainties from the analysis. Many of these comments are based on a report submitted with comment letter #8032, written by Dr. S. Emerman (Appendix B4 to letter #8032). Overall, these comments contain numerous incorrect statements and unsupportable analysis. Specific issues raised in the comments include the following:

- Lack of disclosure of supporting information
- Unreported faults
- Concerns with the subsidence monitoring plan
- Calculations of uncertainty of subsidence modeling analysis

Comments on lack of disclosure of supporting information

These comments state, "The actual data that were used in the subsidence modeling are not presented in any documents that have been provided by Rio Tinto."

This is an incorrect statement. The Forest Service convened a Geology and Subsidence Workgroup to review the subsidence modeling and supporting information, starting with the basic geological data collected at the Resolution Copper site, the interpretation of that data, and the incorporation of that information into a numerical subsidence model. The amount of information provided to the Forest Service by Resolution Copper is substantial and is detailed in the workgroup conclusion memorandum (BGC Engineering USA Inc. 2018a); see in particular the literature cited and appendix A). The primary underlying cause for these comments appears to be that many of these comments were written in March 2019, before the release of the DEIS and any supporting materials and before disclosure of the work done by the Geology and Subsidence Workgroup. Many of the comments appear to rely strictly on Resolution Copper's 2014 GPO. In fact, the subsidence analysis put forth in the 2014 GPO differs greatly in methodology from the analysis conducted to support the NEPA analysis, which was the analysis directed and reviewed by the Geology and Subsidence Workgroup.

In order to review public comments, the Geology and Subsidence Workgroup was reconvened in January 2020, and the results of this workgroup were updated. We have included a revised discussion in section 3.2 of the FEIS.

Comments on unreported faults

The Emerman comments identify two lineaments observable on aerial photographs and conclude that these represent faults not properly considered in the subsidence analysis. Comparison with the data used to develop the subsidence monitoring plan shows that these correspond to the West Boundary and Gant West Faults, both of which were known and properly considered in the subsidence modeling (Resolution Copper 2020c).

Appendix R

| Comment response: GS11 | |
|---|---|
| Subsidence modeling, supporting information, and uncertainties | Page 2 of 3 |

**Responsive to these comments:**
1301-18, 30144-2 (Emerman3), 30144-3 (Emerman3), 8032-262, 8032-263

Comments on subsidence monitoring plan

These comments state concerns about the subsidence monitoring plan, referring specifically to the subsidence monitoring plan contained in the 2014 GPO. These comments also appear to have been written prior to review of the DEIS, as this subsidence monitoring plan was not the plan disclosed as an applicant-committed environmental protection measure in section 3.2 (DEIS, p. 150). The more recent version contained substantially more detailed information than the GPO (Tshisens 2018a).

Despite the review of outdated information, the Forest Service shared some of the same concerns about the monitoring plan. This is reflected in mitigation measure FS-222 (DEIS, p. 159; appendix J, p. J-4), which states, "The subsidence monitoring plan proposed by Resolution Copper has been included in the EIS as an applicant-committed environmental protection measure, however, as subsidence has the potential to impact Tonto National Forest surface resources, the Forest Service will require that a final subsidence monitoring plan be completed and approved by the Forest Service prior to signing a decision."

After discussion as part of the reconvened Geology and Subsidence Workgroup, including review of the Emerman comments, a revised subsidence monitoring plan was submitted by Resolution Copper (Davies 2020b). The Forest Service provided additional comments, and a second revised subsidence monitoring plan was submitted (Davies 2020a). This subsidence monitoring plan has been included as a required mitigation measure in appendix J of the FEIS (measure FS-GS-01).

As part of the criticism of the subsidence monitoring plan, Emerman comments, "A comprehensive database of subsidence caused by block caving reported that unanticipated subsidence has occurred in 20 percent of block caving projects with most of the anomalies being related to geological faults." This information was reviewed by the Geology and Subsidence Workgroup and found that "the database compiles subsidence from underground hard rock mines in general and is not specific to block cave operations. Out of 36 subsidence cases reported in the database, there were 8 reported unexpected failures of which only 2 cases were related to sublevel caving operation and none from block cave or panel cave operations" (Karami and Henderson 2020).

| Comment response: GS11<br>Subsidence modeling, supporting information, and uncertainties | Page 3 of 3 |
|---|---|
| **Responsive to these comments:**<br>1301-18, 30144-2 (Emerman3), 30144-3 (Emerman3), 8032-262, 8032-263 | |

The Emerman comments also refer to several case histories of chimney failure above mining areas or collapse of the overlying rock mass above the cave. A review of those cases revealed that the main causes of those failures were local ground conditions (weak rock masses), the presence of highly altered and intensely fractured faults zones (generally absent at the Resolution Copper property), and poor mining practices. The absence of a surface monitoring program to monitor ground settlement and surface cracking further exacerbated the situation at those cases (Karami and Henderson 2020). The NEPA team further evaluated examples of successful monitoring for block caving operations and noted that lateral expansion of subsidence is primarily driven by the panels being mined and that all predictive subsidence model results for the Resolution Copper Project represent the caving when it is fully expanded to the ultimate footprint. Rapid progression within that footprint may take place but would not affect the ultimate footprint.

Calculations of subsidence uncertainty

The Emerman report makes a series of calculations attempting to describe the bounds of uncertainty of the subsidence analysis. Again, this appears to have been based solely on the information in the 2014 GPO, not the actual subsidence modeling conducted for the NEPA analysis. Through a series of mathematical steps, the report concludes that "the probability that the outer limit of the subsidence zone will extend onto Apache Leap or beyond is 5.3%."

This analysis is unsupportable. Fundamentally, the analysis is based on information not relied upon for the NEPA analysis and then extrapolates this outdated analysis using a number of erroneous assumptions. Using a similar approach, but based on the actual modeling used for the NEPA analysis, both Itasca (Resolution Copper's subsidence consultant) and the Geology and Subsidence Workgroup found that the probability that the outer limit of subsidence will extend onto Apache Leap is 0.1 percent (Garza-Cruz and Pierce 2020b; Karami and Henderson 2020).

However, the more important point that is missed by the comments is that the Geology and Subsidence Workgroup explicitly addressed the issue of uncertainty and analyzed the effect through the use of sensitivity analysis. The full range of results informed the DEIS analysis and was disclosed in the DEIS.

We have added a discussion of the uncertainty of the subsidence modeling to section 3.2 of the FEIS.

| Comment response: GS11_A<br>Subsidence modeling, supporting information, and uncertainties; with addition for specific comment 8032-264 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-264 | |

See response GS11 for response to the general topic of subsidence modeling, supporting information, and uncertainties. This comment asks a number of specific questions based on the Emerman analysis:

- Why has Rio Tinto not provided the reports on subsidence modeling from their consultants? Response: All subsidence modeling and supporting information was provided to and reviewed by the Geology and Subsidence Workgroup convened by the Forest Service to support the NEPA analysis.

- Why does Rio Tinto not recognize the pronounced lineament that connects Apache Leap with the caved rock zone as a geological fault or zone of structural weakness? Response: The two lineaments identified are faults—the Gant West and West Boundary Faults. Both were identified and incorporated properly into the subsidence modeling.

- Why does Rio Tinto believe that rapid subsidence and rockbursts cannot occur, in opposition to the block caving manual that they rely upon? Response: These concepts were incorporated into the review of the subsidence monitoring plan conducted by the reconvened Geology and Subsidence Workgroup. The subsidence monitoring plan in the FEIS represents an evolution based on review by the workgroup. The question posed in this comment is based on an outdated version of the subsidence monitoring plan, and the concepts were considered. The subsidence monitoring plan makes use of a variety of continuous monitoring techniques that would note sudden movement in almost real time and includes specific triggers for action if unanticipated movement occurs.

- Why has Rio Tinto not provided any error bounds on their predictions of the lateral extent of land subsidence? Response: The uncertainties of the subsidence analysis were explicitly analyzed during the NEPA process through the use of a number of sensitivity analyses, by changing key parameters. The entire range of results informed the DEIS analysis and was disclosed in the DEIS (DEIS, p. 151).

Appendix R

| Comment response: GS12 | |
|---|---|
| Need for analysis of subsidence impacts | Page 1 of 1 |

**Responsive to these comments:**
1468-5

This comment draws comparisons between other types of ground disturbance, such as dewatering subsidence or hydraulic fracturing, and the land subsidence to be experienced above the Resolution Copper ore body.

These comparisons are not sufficient to adequately analyze the effects of subsidence associated with block caving. The best tool for assessing the potential lateral extent of subsidence displacement is a numerical model such as that developed for the NEPA analysis. This type of model can take into account the site-specific geology, including the locations and characteristics of faults and specific rock properties, in order to assess the potential subsidence effects and the effect that uncertainty has on the outcomes. The analysis contained in the DEIS used the most appropriate tools to predict subsidence outcomes (DEIS, pp. 130–160).

| Comment response: GS13 | |
|---|---|
| Effectiveness of subsidence monitoring plan; impacts to nearby infrastructure | Page 1 of 1 |

**Responsive to these comments:**
1279-2, 1360-14, 227-1, 236-2

These comments express concern that the subsidence might affect nearby infrastructure like U.S. Route (U.S.) 60 and raise concerns about the effectiveness of the proposed subsidence monitoring to protect these areas.

We had some of the same concerns about the monitoring plan. This is reflected in mitigation measure FS-222 (DEIS, p. 159; appendix J, p. J-4), which states, "The subsidence monitoring plan proposed by Resolution Copper has been included in the EIS as an Applicant-Committed Environmental Protection Measure, however, as subsidence has the potential to impact Tonto National Forest surface resources, the Forest Service will require that a final subsidence monitoring plan be completed and approved by the Forest Service prior to signing a decision."

We reconvened the Geology and Subsidence Workgroup in January 2020 in order to address comments received on the DEIS, including a specific review and discussion of the subsidence monitoring plan. After discussion by the reconvened Geology and Subsidence Workgroup, a revised subsidence monitoring plan was submitted by Resolution Copper (Davies 2020b). We provided additional comments, and a second revised subsidence monitoring plan was submitted (Davies 2020a). This subsidence monitoring plan has been included as a required mitigation measure in appendix J of the FEIS (mitigation measure FS-GS-01).

Based on our analysis, we do not anticipate impacts to important infrastructure like U.S. 60; the monitoring is intended to ensure that real-world effects during operation match predicted outcomes. Specific attention was given to identifying triggers and tying specific actions to those triggers in order to prevent damage in the event that the NEPA analysis underestimated predicted subsidence effects.

Appendix R

| Comment response: GS14 Effects on Apache Leap | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1158-26, 1158-48

These comments express concern that vertical displacement at Apache Leap could cause instability to the geographic feature.

The issue of what types of movement or impact causes damage was specifically looked at by the Geology and Subsidence Workgroup and then reconsidered in light of comments received on the DEIS. Additional information was obtained to explore the most appropriate methods to identify and describe subsidence impacts (Karami and Henderson 2020; Pierce 2020).

Ground movement is generally defined by five different metrics:

- Vertical displacement
- Horizontal displacement
- Tilting
- Horizontal strain
- Angular distortion

Based on a review of literature and case studies, we identified appropriate metrics to describe potential damage to Apache Leap (and other sensitive areas). Vertical and horizontal displacement by themselves do not lead to damage of structures. Rather, it is horizontal strain (stretching) and angular distortion that can lead to cracks or fractures. Tilt is important for assessing the stability of tall structures, like the hoodoo formations associated with Apache Leap.

The criterion of how much horizontal strain and angular distortion it would take to damage a natural structure like Apache Leap is based on methods developed to assess structural damage to buildings. In reality, rock formations are not as sensitive as building structures, and small cracks in already fractured geological formations are unlikely to have any substantial effect. Clear thresholds have been established to identify the level of damage that would be associated with a given combination of horizontal strain and angular distortion. Within the zone of continuous subsidence, damage would be moderate to severe, which in buildings would translate to cracks on the order of 15 to 25 millimeters (mm) wide. By contrast, the combination of horizontal strain and angular distortion experienced at Apache Leap, on U.S. 60, or at Devil's Canyon would translate to negligible damage, which in buildings would translate to hairline cracks less than 0.1 mm wide.

The threshold for the level of tilt that might cause tall structures like hoodoos to topple is 7.5 degrees. The modeling results show that tilt at Apache Leap is expected to be less than 1 degree.

We added further discussion to section 3.2 of the FEIS to describe the metrics used to define damage resulting from subsidence.

| Comment response: GS15 Dewatering subsidence and block-cave subsidence | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1358-1

This comment notes that the two types of subsidence discussed in the DEIS were not evaluated cumulatively.

This is an appropriate analysis choice, and the reasons for this are described in section 3.7.1: "Two areas have the potential for land subsidence due to groundwater pumping: the area around the East Plant Site and mining panels where dewatering pumping would continue to occur, and the area around the Desert Wellfield. While small amounts of land subsidence attributable to the dewatering pumping have been observed around the East Plant Site using satellite techniques (approximately 1.5 inches, between 2011 and 2016), once mining operations begin, any land subsidence due to pumping would be subsumed by subsidence caused by the block caving (estimated to be 800 feet deep, and possibly as deep as 1,100 feet at the end of mining)" (DEIS, p. 334).

This comment also expresses concern that subsidence would not end when mining ends but would continue to occur. This question was explored by the Geology and Subsidence Workgroup before the DEIS was prepared (Morcy 2018c). Additional information was requested on this topic and can be found in (Pierce and Garza-Cruz 2018). Based on analogous mines and case studies, the Geology and Subsidence Workgroup determined that there is little likelihood of substantial residual subsidence after cessation of block caving.

Appendix R

| Comment response: GS16 Impacts from mining technique | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30141-5

This comment reiterates many of the impacts resulting from the block caving operation that are detailed in the DEIS, including impacts to cultural and Tribal values, groundwater resources, and recreation. The ultimate point made by the comment is that these impacts could be prevented by "conducting responsible mining instead of maximizing economic profit."

This is a reference to the concept that mining could or should be undertaken using an alternative mining technique. We fully vetted this issue, with the conclusion that the alternative mining techniques proposed by commenters (such as cut-and-fill) are not reasonable at this location. This conclusion is not based in any way on the amount of profit Resolution Copper would make; see response AMT1 for more details.

| Comment response: LG1 Cattle health; scope of analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-284, 8032-285, 8032-287

These comments concern perceived shortcomings in the analysis of impacts to livestock and grazing.

The DEIS addresses several of these perceived shortcomings. Comments indicate the need to expand the spatial scope of analysis. The specific metrics used to analyze livestock grazing are "the potential for acreages of grazing allotments to change, the potential for animal unit months (AUMs) to be reduced, and the potential for loss of grazing-related facilities (e.g., stock watering sources)" (DEIS, p. 687). The spatial scope is "the entirety of all allotments that overlap spatially, in full or in part, with the primary GPO-proposed mine components (East Plant Site and subsidence area, West Plant Site, MARRCO corridor, filter plant and loadout facility, Near West tailings storage facility and pipeline corridors, and transmission lines) and each alternative tailings storage facility analyzed in this EIS" (DEIS, p. 687). This spatial analysis area is where changes in identified metrics would occur and therefore is the appropriate spatial scope.

Comments indicate the need to analyze impacts to water sources. These water sources were analyzed in section 3.16 (DEIS, pp. 694–700).

Comments indicate the need to analyze impacts to cattle health due to project emissions. An analysis of potential health effects from emissions and deposition was included in section 3.6 (DEIS, p. 279). This analysis was expanded in the FEIS (see response TS24 for more detail).

Comments indicate the need to analyze socioeconomic impacts related to changes in livestock grazing. This analysis was added to section 3.13 of the FEIS.

| Comment response: LG2 Impacts to livestock water supply and range | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
18-1

This comment identifies specific concerns related to ranching water supply, water quality, and loss of range. Potential impacts to water supplies near the mine site resulting from dewatering are found in section 3.7.1 (DEIS, pp. 325–326). Additionally, specific mitigation to replace these water supplies, if needed, is discussed (DEIS, pp. 343–344). The loss of livestock water sources is found in section 3.16 (DEIS, pp. 694–700). Mitigation would replace some, but not all, impacted livestock water sources.

Potential impacts to surface water quality resulting from seepage from the tailings storage facility is discussed in section 3.10.2 (DEIS, pp. 373–419). Potential water quality changes are compared with the strictest surface water quality standards, which would encompass those established for livestock use.

Range analysis appears in section 3.16 and includes the acreage and estimated AUMs that would be lost from each allotment (DEIS, pp. 694–700).

Appendix R

---

| **Comment response: LG3** Impacts to Arizona State Trust Land grazing allottees | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
562-12

This comment concerns impacts to grazing allottees on Arizona State Trust land, including economic effects and potential loss of water sources. Potential impacts to water supplies near the mine site resulting from dewatering are found in section 3.7.1 (DEIS, pp. 325–326). Additionally, note that specific mitigation to replace these water supplies, if needed, is discussed as well (DEIS, pp. 343–344). The loss of livestock water sources is discussed in section 3.16 (DEIS, pp. 694–700). Mitigation would replace some, but not all, impacted livestock water sources.

Additional analysis of socioeconomic impacts related to changes in livestock grazing was added to section 3.13 of the FEIS.

---

| **Comment response: LG4** BLM comments specific to grazing | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
28449-119, 28449-120, 28449-121, 28449-122, 28449-123

These comments are for specific changes noted by BLM for the livestock grazing analysis. We have revised the FEIS to address all suggestions, as appropriate.

---

| **Comment response: LG5** Impacts to vegetation | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1508-3

This comment notes a number of aspects of the grazing analysis, including water sources for livestock, impacts to vegetation from tailings, and impacts to sensitive vegetation. The DEIS addresses these aspects.

Potential impacts to water supplies near the mine site resulting from dewatering are found in section 3.7.1 (DEIS, pp. 325–326). Additionally, note also that specific mitigation to replace these water supplies, if needed, is discussed as well (DEIS, pp. 343–344). The loss of livestock water sources is discussed in section 3.16 (DEIS, pp. 694–700). Mitigation would replace some, but not all, impacted livestock water sources.

Potential impacts to surface water quality resulting from seepage from the tailings storage facility are discussed in section 3.10.2 (DEIS, pp. 373–419). Potential water quality changes are compared with the strictest surface water quality standards, which would encompass those established for livestock use.

The potential for tailings revegetation of the tailings and return to long-term suitability for grazing is discussed in section 3.3 (DEIS, pp. 186–201). This includes long-term impacts to vegetation and special status plant species. This analysis was expanded in section 3.3 of the FEIS to incorporate more details on site-specific reclamation and revegetation practices.

Additional discussion of grazing impacts on native/non-native vegetation was added to section 3.16 of the FEIS.

---

| **Comment response: LG6** Baseline for livestock grazing, impacts to Oak Flat | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8031-40

This comment notes the current condition of Oak Flat (part of the Devil's Canyon grazing allotment) was not disclosed. Unlike for other allotments, no specific range health assessment was available for the Devil's Canyon allotment (DEIS, p. 690). However, additional documents were reviewed, and an updated assessment of the known range condition for the Devil's Canyon allotment was added to section 3.16 of the FEIS.

---

Appendix R

| Comment response: MIT1 Mitigation concepts or suggestions | Page 1 of 1 |
|---|---|

**Responsive to these comments:**

11-2, 1058-1, 1062-3, 1120-1, 1122-3, 1130-1, 1137-1, 1137-2, 1137-3, 1137-4, 1137-6, 1137-7, 1137-8, 1158-14, 1158-16, 1158-18, 1158-20, 1158-21, 1158-25, 1158-29, 1158-30, 1158-35, 1158-36, 1158-42, 1158-47, 1158-51, 1158-7, 1158-9, 1188-22, 1188-23, 1266-1, 1286-5, 1286-6, 1286-7, 1286-8, 1286-9, 1301-6, 1311-12, 1311-13, 1311-17, 1311-22, 1311-7, 1317-1, 1317-2, 1321-5, 1343-3, 1356-4, 1356-6, 1360-17, 1360-9, 1361-1, 1361-2, 1361-3, 1361-5, 1389-15, 1389-17, 1389-18, 1389-19, 1389-2, 1389-21, 1389-22, 1389-23, 1389-24, 1389-26, 1389-27, 1389-29, 1389-30, 1389-31, 1389-32, 1389-33, 1389-34, 1389-36, 1389-37, 1389-38, 1389-39, 1389-40, 1389-42, 1389-9, 1392-2, 1392-3, 1392-4, 1392-5, 1392-6, 1392-8, 1392-9, 1404-4, 1429-1, 1429-2, 1429-4, 14-3, 1438-5, 14-4, 1441-14, 1441-15, 1441-17, 1441-18, 1441-19, 1441-20, 1441-21, 1441-22, 1441-3, 1441-6, 1441-8, 1489-1, 1489-3, 1489-4, 149-1, 1524-1, 1524-2, 1524-3, 15-3, 1540-1, 1540-4, 1540-7, 1544-17, 20-1, 21-1, 22-1, 238-1, 247-1, 258-2, 261-10, 261-13, 261-3, 261-4, 261-6, 261-8, 261-9, 270-1, 273-1, 283-6, 28449-58, 28824-1, 28824-2, 300-2, 30075-104, 30075-111, 30075-113, 30075-114, 30075-115, 30075-117, 30075-118, 30075-119, 30075-120, 30075-123, 30075-124, 30075-125, 30075-126, 30075-127, 30075-128, 30075-133, 30075-14, 30075-39, 30075-40, 30075-46, 30075-47, 30075-49, 30075-56, 30075-70, 30075-75, 30075-77, 30075-78, 30075-80, 30075-81, 30075-82, 30075-83, 30075-84, 30075-85, 30075-86, 30075-93, 30075-98, 30075-99, 30078-30, 30078-31, 30078-32, 307-2, 314-1, 317-10, 317-11, 317-12, 317-13, 317-4, 317-5, 317-6, 317-7, 319-6, 322-1, 322-3, 322-5, 322-6, 324-1, 324-2, 324-3, 324-4, 324-5, 324-6, 324-7, 324-8, 493-1, 524-19, 524-24, 524-7, 555-22, 555-24, 555-26, 555-27, 555-6, 562-7, 562-9, 60-3, 751-1, 8031-48, 8032-144, 8032-17, 8032-18, 8032-198, 8032-204, 8032-279, 8032-283, 8032-312, 8032-317, 8032-321, 8032-322, 822-1, 823-1, 861-1, 861-2, 862-2, 866-10, 866-17, 866-8, 876-1, 904-1, 91-2, 91-3, 92-1, 923-2, 929-2, 929-3, 929-4, 929-5, 929-6, 929-7, 929-9

These comments raise specific suggestions for mitigation of impacts. The mitigation concepts contained in these comments were evaluated for implementation by the Forest Service between the DEIS and FEIS. These deliberations are documented in Garrett (2020g) and in chapter 2 and appendix J of the FEIS.

Appendix J in the FEIS summarizes all mitigations brought forward for analysis and the authority under which they would occur.

The effectiveness of the mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

| Comment response: MIT3 Support for mitigation already included in the DEIS | Page 1 of 1 |
|---|---|

**Responsive to these comments:**

5-3, 1107-7, 1122-4, 1136-1, 1137-5, 1158-22, 1158-39, 1158-40, 1158-46, 1188-26, 123-1, 1235-4, 1286-3, 1308-2, 1329-5, 1356-5, 1360-16, 1389-25, 1389-41, 1441-11, 1441-12, 1441-13, 1454-4, 1463-3, 1539-6, 1621-1, 1885-3, 283-4, 28449-20, 28449-33, 30075-102, 30075-103, 30075-105, 30075-106, 30075-107, 30075-108, 30075-109, 30075-110, 30075-112, 30075-116, 30075-121, 30075-122, 30075-129, 30075-21, 30075-30, 30075-69, 30075-71, 30075-92, 30078-29, 30-1, 314-4, 314-5, 317-9, 319-4, 319-5, 322-4, 322-8, 416-2, 463-3, 5537-1, 60-2, 65-1, 76-2, 8032-143, 8032-16, 8032-20, 8032-22, 866-7, 917-1, 929-8, 943-3

These comments generally indicate support for a mitigation concept already included in appendix J of the DEIS. The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

Appendix J of the FEIS includes most of these mitigation measures, with the exception being those measures already completed between the DEIS and FEIS.

Appendix R

| Comment response: MIT4 | |
|---|---|
| Support for mitigation not applicable for impacts under the preferred alternative | Page 1 of 1 |

**Responsive to these comments:**
1158-28, 1311-10, 1311-14, 1311-19, 1311-6, 1311-9, 1343-1, 28449-153

These comments raise specific suggestions for mitigation of impacts. However, many of these impacts are associated with specific alternatives other than the preferred alternative.

Many of the mitigation concepts raised in public comments were evaluated for implementation by the Forest Service between the DEIS and FEIS. See response MIT1. However, the mitigation suggestions raised in these comments were not evaluated in the same manner, given that the impacts would not occur if the preferred alternative were selected.

The Forest Supervisor's decision will be identified in the draft ROD. If the ROD differs from the preferred alternative and any of the mitigation suggestions are applicable to the selected action and fall within the Forest Service's jurisdiction to require them, the Forest Supervisor may add them to the ROD.

| Comment response: MIT5 | |
|---|---|
| Carpooling | Page 1 of 1 |

**Responsive to these comments:**
8032-320

This comment is based on an incorrect premise.

Carpooling was not considered a mitigation measure in the DEIS. The lone reference to carpooling in the DEIS is tied to traffic analysis and assumes that each vehicle would carry an average of 1.7 employees (DEIS, p. 260). We base this reasonable assumption on the anticipated size of the workforce and distance to the site (DEIS, p. 246).

Appendix J includes all mitigation measures considered in the DEIS. The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

| Comment response: MIT6 | |
|---|---|
| Agreements with Arizona Game and Fish Department | Page 1 of 1 |

**Responsive to these comments:**
30075-76

Resolution Copper has worked directly with the Arizona Game and Fish Department to develop a suite of mitigation measures to offset impacts to wildlife species, habitat, and related recreation. These measures were incorporated into appendix J of the FEIS (mitigation measure FS-WI-01). The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

| Comment response: MIT7 Cultural and Tribal mitigations | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1235-10, 1338-6, 1422-5, 1454-16, 28449-105, 28449-152, 49-2, 541-3, 8032-126, 8032-129

These comments point to the lack of mitigation related to the Tribal and cultural impacts disclosed in the DEIS. Mitigation for these impacts is being developed under two regulatory frameworks: the NHPA, and Section 3003 of PL 113-291, in which Congress authorized the land exchange.

The NHPA puts forth a process by which adverse effects on cultural resources are identified, assessed, and resolved. Mitigation falls under the resolution of adverse effects for the NHPA and can include data recovery for archaeological sites and intensive recordation of historic built environment resources, as well as appropriate handling of any funerary objects or human remains encountered required by law. However, measures to resolve adverse effects will include non-research-based programs as developed in consultation with Tribes and other consulting parties. Measures to resolve adverse effects under the NHPA are stipulated in the PA, which was developed by the Forest Service in consultation with the SHPO, ACHP, Tribes, and other consulting parties. In accordance with the PA, an HPTP was developed for the lands leaving Federal ownership. A separate Research Design was developed for the rest of the project area; additional HPTPs were to be developed in accordance with the Research Design for the project area components (i.e., tailings location, West Plant Site, etc.).

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Section 3003 of PL 113-291 included special conditions for developing mitigation measures to offset impacts to Tribes and Tribal members from the loss of Oak Flat. Congress dictated that the Forest Service would work with Resolution Copper to find mutually acceptable measures to address the concerns of the affected Tribes and minimize the adverse effects on the affected Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper. These types of impacts cannot be fully mitigated through the typical activities specified in the HPTPs. Development of these separate mitigation measures was a collaborative effort that took place during development of the DEIS and FEIS.

Mitigations under both acts were developed in conjunction between the Forest Service, Resolution Copper, consulting Tribes, the SHPO, and the ACHP, with additional input from the BLM, ASLD, and USACE.

These measures were incorporated into appendix J of the FEIS, and the effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" sections in sections 3.12 and 3.14 in the FEIS.

Note that we may not be privy to some private mitigation agreements developed directly between Resolution Copper and Tribes. If these agreements exist, they have not been incorporated into the FEIS.

Appendix R

| Comment response: MIT8 Authority for mitigations | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-24, 1301-22, 1389-14, 1389-16, 1441-16, 1489-5, 1540-6, 254-1, 294-1, 30075-97, 8032-15, 8032-35, 867-1

These comments indicate that more clarity is needed regarding where the mitigation identified for the project would be required and under what authority they would occur.

As discussed in appendix J of the DEIS (pp. J1–J3), several different categories of mitigation measures are incorporated into the DEIS: applicant-committed environmental protection measures, mitigation and monitoring required by the Forest Service, and mitigation and monitoring agreed to by Resolution Copper.

Applicant-committed environmental protection measures are considered an integral part of the project analyzed in the EIS and are not optional. They are part of the project analyzed by the Forest Service, and the ROD will specify that they must occur as proposed. These measures are described in detail in each resource section in chapter 3.

We are authorized to require mitigation to minimize adverse environmental effects. The breadth of this authority differs, depending on the regulations under which mine-related activities are approved. Appendix J of the FEIS discusses this in more detail.

Any mitigation and monitoring that the Forest Service requires under its authority will be identified as required in the ROD. Fully detailed implementation plans typically are developed and included in approval documents (either a final GPO or a special use permit), after the final ROD. Mitigation measures that we are authorized to require include those developed under Section 7 of the Endangered Species Act (ESA) and Section 3003 of PL 113-291.

The PA previously had been noted as providing authority for the Forest Service to require mitigation measures. The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

The USACE also is authorized to require mitigation to minimize adverse environmental impacts, derived from its regulatory role under the CWA. Appendix J of the FEIS discusses these mitigations, but requirement of these mitigations would be part of the separate USACE ROD and Section 404 permit and not part of the Forest Service ROD and approvals. More details also appear in appendix J of the FEIS.

Additionally, appendix J of the FEIS includes and describes mitigation measures that are beyond the authority of the Forest Service to require but that have been brought forward voluntarily by Resolution Copper. However, they cannot be required in the ROD and subsequent approval documents. These remain solely voluntary actions.

Additional mitigation measures would be required of Resolution Copper under a number of State permits, including an Aquifer Protection Permit, air permit, and stormwater permit. The Forest Supervisor is responsible for ensuring that the selected action would be consistent with Federal and State laws, which is discussed in the ROD. However, the Forest Supervisor would not be responsible for overseeing State permits or ensuring that any mitigation requirements associated with these permits are met. Mitigation or monitoring related to State permits is therefore not included in the FEIS.

Note that future receipt of State permits was not relied upon in the FEIS in any way to disclose impacts. Impacts related to water quality and air quality are disclosed based on the Forest Service's own analysis, regardless of future permitting actions.

Appendix R

| Comment response: MIT9<br>Water supply mitigation | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1349-5, 1544-8 | |

Groundwater extracted and used by Resolution Copper is subject to permitting under State of Arizona law, whether at the mine site or at the location of the Desert Wellfield in the East Salt River valley. Any pumping of water above and beyond that disclosed in the EIS would require appropriate authorization from the Arizona Department of Water Resources (ADWR).

| Comment response: MIT11<br>Moving Emory oak trees | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>235-16 | |

Moving Emory oak trees from Oak Flat has not been proposed as a mitigation measure. Preserving and maintaining existing oak groves separate from Oak Flat was proposed in the PA developed during consultation.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

| Comment response: MIT12<br>Preservation of Apache Leap | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1158-8, 30074-3 | |

In the NDAA, Congress directed that the Forest Service undertake the preservation and management of Apache Leap.

As discussed in chapter 1 (DEIS, p. 28), in December 2017, the Tonto National Forest finalized the environmental review process and the management plan for the Apache Leap SMA. The plan establishes a comprehensive framework for managing the Apache Leap SMA, with an emphasis on the preservation of the three primary purposes outlined in PL 113-291: preserve the natural character of Apache Leap; allow for traditional uses of the area by Native American people; and protect and conserve the cultural and archaeological resources of the area.

The plan includes a management objective to establish a closure order and complete the associated NEPA documentation to exclude overnight camping under 36 CFR Part 261, "Prohibitions."

The Forest Supervisor also determined that livestock grazing, timber production, and mining activities (location, entry, and patent) are uses of the land that are incompatible with the desired conditions and primary purposes for which the Apache Leap SMA is to be managed (U.S. Forest Service 2017e:7).

Appendix R

| Comment response: MIT13 | |
|---|---|
| Disclosure of Tribal-related mitigations | Page 1 of 1 |

**Responsive to these comments:**
1396-8

This comment recommends that all mitigation measures related to Tribal impacts be consolidated in section 3.14 of the FEIS.

We decided not to make this change to the FEIS. It is the nature of Tribal members' relationship with the land that the impacts that affect Tribal members potentially cover all resources—loss of vegetation, loss of wildlife, loss of springs, etc. Bringing these forward to section 3.14 would substantially duplicate information already available in other resource sections in chapter 3 and consolidated in appendix J of the FEIS.

Note that section 3.14 was necessarily revised in the FEIS in response to comments. See response CR4 for more details.

| Comment response: MIT15 | |
|---|---|
| Insufficient analysis of mitigation | Page 1 of 1 |

**Responsive to these comments:**
8031-75, 8032-12, 8032-13, 8032-9

The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, subsequent statutes, and Locatable Mineral Regulations (36 CFR 228 Subpart A) is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The Forest Service authority related to mitigation is limited to protection of surface resources of NFS lands (see 30 U.S.C. 612, 5 U.S.C. 551, and 36 CFR 228.1). The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B) would include terms and conditions to minimize damage to the environment, protect the public interest, and require compliance with water and air quality standards. Mitigation is integral to the scope of alternatives development (36 CFR 220.5(e)).

Development and analysis of mitigation measures has been an integral part of the NEPA process. Each of the alternatives was developed in order to specifically address certain issues or resource impacts, as described in chapter 2 (DEIS, p. 75 [Alt 3], p. 81 [Alt 4], p. 88 [Alt 5], p. 99 [Alt 6]). For example, different tailings locations were considered in alternatives development to address issues of public safety, air quality, and water quality; different tailings placement or storage techniques were considered in alternatives development to address issues of water quality and tailings stability; and different seepage collection measures were considered in alternatives development to address groundwater and surface water quality impacts. In addition, specific applicant-committed environmental protection measures were evaluated and added to the proposed action in order to further reduce environmental impacts. These are discussed in each resource section of chapter 3 as an integral part of the proposed project (see the "Summary of Applicant-Committed Environmental Protection Measures" subsection).

Each resource section of chapter 3 includes a section titled "Mitigation Effectiveness" that expressly identifies mitigation measures developed to address environmental impacts for that resource and assesses the potential effectiveness of that mitigation measure. All of the mitigation measures are compiled in appendix J of the FEIS.

In addition, mitigation measures suggested in comments on the DEIS have also been evaluated. Some have been implemented as mitigation requirements by the Forest Service, and others have been included as additional applicant-committed environmental protection measures. The process of evaluating the mitigation comments is documented in the project record (Garrett 2020g).

See response MIT8 for a discussion of which documents include requirements for mitigation and the authority for requiring those mitigations. This includes requirements for mitigation in the ROD.

| Comment response: MIT17 | |
|---|---|
| Stormwater flood events | Page 1 of 1 |

**Responsive to these comments:**
1534-3, 524-15, 8032-28, 858-1, 910-7

We have added further discussion to section 3.7.2 of the FEIS to clarify the design parameters for stormwater control facilities, including the tailings storage facility, and we have also updated the analysis of potential release of stormwater under large flood events.

Appendix R

| Comment response: MIT18 | |
| Lack of specific requirements under environmental consequences | Page 1 of 1 |

**Responsive to these comments:**
8031-30

This comment suggests shortcomings in disclosure. The first concern is a perceived lack of "meaningful consideration of energy requirements and conservation potential." The comment is not correct. The energy requirements of the project were analyzed (DEIS, p. 56; see also Garrett (2019c), "Process Memorandum to File Power Requirements"). There is little variation between alternatives, with most of the power use related to components common to all alternatives. Existing differences between tailings alternatives are described (DEIS, p. 56). Additional information has been added to Section 3.17, Required Disclosures, of the FEIS in response to this comment.

The second concern is a perceived lack of discussion of "natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures." The comment is not correct. A number of natural or depletable resources are associated with the project. The conservation potential of each of these resources, with respect to alternatives, is shown in specific sections of chapter 3. This includes mineral resources (section 3.2), soils (section 3.3), vegetation/habitat (section 3.3), water use (section 3.7.1), and wildlife (section 3.8). Appendix E outlines the conservation potential for alternatives with respect to specific metrics associated with these resources. Appendix E summarizes impacts in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. Additional information has been added to Section 3.17, Required Disclosures, of the FEIS in response to this comment.

The third concern is a perceived lack of discussion of "urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential." The comment is not correct. The differences between alternatives for historic and cultural resources is the basis for section 3.12 (DEIS, pp. 629–639). Additional discussion of potential impacts to the built environment was added to section 3.12 of the FEIS in response to comments.

See response MIT15 for a discussion of how mitigation measures were analyzed.

| Comment response: MIT19 | |
| Lack of mitigation in the DEIS | Page 1 of 1 |

**Responsive to these comments:**
1539-5

This comment indicates that mitigation was not included in the DEIS and that the effectiveness of mitigation was not considered. These are incorrect statements.

Each resource section in chapter 3 includes a section titled "Mitigation Effectiveness" that expressly identifies mitigation measures developed to address environmental impacts for that resource and assesses the potential effectiveness of that mitigation measure. Appendix J of the DEIS includes all of the mitigation measures.

The lone difference between the approach in the DEIS and FEIS is that the development of mitigation measures continued, including the assessment of all mitigation suggestions brought forward as public comments on the DEIS.

Appendix R

| Comment response: MIT20<br>Lack of mitigation in the DEIS; inability to require mitigation | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1188-20

This comment indicates that insufficient mitigation was included in the DEIS. Each resource section of chapter 3 includes a section titled "Mitigation Effectiveness" that expressly identifies mitigation measures developed to address environmental impacts for that resource and assesses the potential effectiveness of that mitigation measure. Appendix J of the DEIS includes all of the mitigation measures.

The lone difference between the approach in the DEIS and FEIS is that mitigation measures continued being developed after the DEIS, including an assessment of all mitigation suggestions brought forward as public comments. See response MIT1 for more details on mitigation brought forward between the DEIS and FEIS.

This comment expresses further concern that mitigation measures brought forward voluntarily by Resolution Copper cannot be required. This is true and is clearly disclosed in the DEIS (DEIS, appendix J, p. J-3). See response MIT8 for more discussion on mitigation authorities with respect to applicant-committed environmental protection measures and mitigation brought forward voluntarily by Resolution Copper.

| Comment response: MIT21<br>Financial assurances | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1209-6, 1276-5, 1301-20, 1301-21, 1361-4, 1389-20, 1452-3, 1540-3, 1544-12, 1587-2, 27147-1, 29-5, 30141-8, 336-2, 5448-1, 780-1, 8032-14, 8032-156, 8032-230, 8032-238, 8032-38, 8032-40, 812-1, 814-6, 866-18, 927-1

A discussion of financial assurances was included in chapters 1 and 2 (DEIS, pp. 15–20, 65, 104). These discussions were updated in the FEIS in response to comments.

| Comment response: MIT22<br>Satellite monitoring of tailings storage facilities | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-19

This comment raises concerns over satellite monitoring of tailings storage facilities, which was identified as mitigation measure FS-01 in the DEIS (DEIS, appendix J, p. J-17).

The first concern is whether satellite monitoring would be the sole monitoring technique. It would not. Satellite monitoring would supplement all other required monitoring of the tailings storage facility, including Resolution Copper's internal monitoring procedures and any monitoring procedures required under State permitting (such as the Aquifer Protection Permit). Internal tailings storage monitoring procedures are described in section 3.10.1 (DEIS, pp. 522–527 (industry best practices, including those by Rio Tinto) and pp. 536–537 (applicant-committed environmental protection measures and monitoring for specific failure modes)). Monitoring requirements under State permits would be developed as part of that permitting process but have not yet been issued.

The second concern is whether there is sufficient detail to implement this monitoring. Mitigation descriptions in the FEIS are not intended to be so detailed that they constitute full implementation plans for a given measure. Fully detailed implementation plans typically are developed and included in approval documents (either a final GPO or a special use permit), after the final ROD. Sufficient detail is developed in the FEIS to assess the effectiveness of this mitigation measure for minimizing potential impacts. This assessment is in section 3.10.1 (DEIS, pp. 556–558).

The DEIS also clearly states that this particular measure (satellite monitoring) would not be applicable to the preferred alternative (DEIS, appendix J, p. J-13).

Appendix R

| Comment response: MIT23 | |
|---|---|
| Subsidence monitoring plan | Page 1 of 1 |

**Responsive to these comments:**
8-2, 1097-11, 1158-19, 1201-4, 148-1, 149-2, 28463-2

After receipt of public comments on the DEIS, the Tonto National Forest reconvened the Geology and Subsidence Workgroup in order to assess these comments regarding the proposed subsidence monitoring plan.

These internal workgroup discussions resulted in a revised version of the subsidence monitoring plan. The revision incorporated into the FEIS was found to be acceptable by the Tonto National Forest, fulfilling mitigation measure FS-222 from the DEIS (DEIS, appendix J, p. J-4). A discussion of this process was added to section 3.2 of the FEIS. See response GS13 for more details on the evolution of the subsidence monitoring plan.

As subsidence has the potential to impact national forest surface resources, such as the adjacent Apache Leap SMA, the Forest Supervisor may require additional measures related to monitoring and mitigating subsidence in the ROD, in addition to those specified in the revised subsidence monitoring plan, if warranted.

| Comment response: MIT24 | |
|---|---|
| Air and dust mitigations | Page 1 of 1 |

**Responsive to these comments:**
1158-13, 1380-1, 1438-11, 8032-154

These comments concern perceived lack of mitigation related to air quality and fugitive dust.

There are two types of measures included in the DEIS to reduce resource impacts: (1) applicant-committed environmental protection measures and (2) mitigation measures.

Applicant-committed environmental protection measures are included in each resource section of chapter 3 (for example, see air quality, DEIS, pp. 283–284). These measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. These measures would be non-discretionary, as they are included in the project design, and their effects are accounted for in the analysis of environmental consequences disclosed in DEIS in chapter 3 (DEIS, p. 103) and in appendix J (DEIS, p. J-1).

Mitigation measures are not part of the actions proposed by Resolution Copper but are developed over the course of the NEPA analysis to avoid, minimize, rectify, reduce, or compensate for remaining impacts (DEIS, p. 100). Mitigation measures are identified for each resource, and the effectiveness of that mitigation is assessed in chapter 3 (for example, see air quality, DEIS, p. 293). Appendix J includes a compilation of mitigation measures.

With respect to air quality, numerous controls were incorporated into the project as applicant-committed environmental protection measures. These controls effectively reduce emissions to the extent that they prevent any exceedance of air quality standards at the project fence line (DEIS, pp. 284–288) or at sensitive areas beyond the fence line (DEIS, pp. 288–292). There are no mitigation measures proposed for air quality because applicant-committed environmental protection measures already accomplish the reductions needed to minimize impacts.

Comments also express concern with the impacts associated with dust mitigation, such as water use. Water needs identified for the project already incorporate water use for dust control (DEIS, pp. 59–61, and DEIS appendix H; see also WestLand Resources Inc. (2018b), showing dust management requirements as part of the water balance for tailings storage facilities).

Further discussion of the closure cover and revegetation after closure (controlling dust) was added to section 3.3 of the FEIS.

Appendix R

| Comment response: MIT27 404 Compensatory Mitigation Plan | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-21, 1540-2, 524-2, 524-3, 524-5, 524-6, 8030-10, 8030-2, 8030-5, 8030-8, 8031-15, 8031-16, 8031-17, 8031-18, 8031-19, 8031-20, 8031-21, 8031-58, 8032-334, 8032-335, 8032-336, 8032-337

These comments concern aspects of the CWA Section 404 permit.

Some comments identify a lack of details in the DEIS about compensatory mitigation for impacts to waters of the U.S. in the DEIS or suggest that the compensatory mitigation proposed is insufficient. The details included in the DEIS (appendix D) represent the draft conceptual compensatory mitigation package as it existed at the time of publication. The compensatory mitigation package will not be finalized until it has been approved by the USACE as part of the USACE's final permitting action. A habitat mitigation and monitoring plan (HMMP) will be developed by Resolution Copper that tiers from the plan provided in appendix D and provides a much greater level of detail with respect to refining mitigation requirements and specific mitigation actions to be taken, performance metrics for mitigation, long-term management of mitigation sites, etc. Implementation of the HMMP then becomes a requirement via special condition of the Section 404 Individual Permit that will be issued.

The 404 permit will not be issued until a ROD is completed by the USACE. This will occur after publication of the FEIS. The compensatory mitigation package included as appendix D in the FEIS represents an updated version that was determined to be sufficient and acceptable by the USACE but may still be modified prior to issuance of the 404 permit.

The extent of jurisdictional waters of the U.S. for which the mitigation package must compensate was determined by the USACE, including the evaluation of any special aquatic sites. The compensatory mitigation package was determined to be appropriate and sufficient to offset impacts from dredge and fill of jurisdictional waters, in accordance with USACE policy. The USACE also concluded, based on the updated plan, that adequate mitigation is available for offsetting the impacts of this project on waters of the U.S.

One comment notes that the EIS is intended to be sufficient for all Federal decisions related to the mine, including the 404 permit issuance by the USACE. The comment states that the document in appendix C (the Practicability Analysis) is not sufficient to satisfy requirements for alternatives analysis under Section 404(b)1. The full 404(b)1 alternatives analysis is attached to the FEIS as appendix C.

Other comments concern consultation under Section 7 of the ESA, Tribal consultation, or consultation under Section 106 of the NHPA. The Forest Service is the lead agency for Section 7 and Section 106 consultation. However, the USACE participates in both processes because the USACE's permitting action occurs within the larger project context for the Forest Service. The USACE conducts its own Tribal consultations. Also see response CR13.

Additional comments concern other aspects of the USACE process, including the need for a Section 401 water quality certification from the ADEQ, and a public interest review. These requirements must be completed prior to issuance of the 404 permit by the USACE. ADEQ issued the 401 water quality certification for the Resolution Copper Project on December 22, 2020.

| Comment response: MIT28 Formal wetland delineation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1048-2

Two separate regulatory requirements for wetlands are assessed in the EIS: (1) Executive Order 11990, and (2) CWA Section 404.

Executive Order 11990 requires an assessment of impacts to wetlands and floodplains. Wetlands assessed under Executive Order 11990 are based on data from the National Wetlands Inventory. As described in section 3.7.2, these are different from wetlands as defined under Section 404 of the CWA (DEIS, p. 435). Wetlands assessed under Executive Order 11990 are described in the "Impacts on Wetlands (Related to Executive Order 11990)" subsection of section 3.7.2 (DEIS, pp. 435–444).

Certain wetlands and other waters (including ephemeral drainages) may be considered under the jurisdiction of the USACE for permitting under Section 404 of the CWA. These wetlands are typically defined during a "jurisdictional delineation" completed for the agency. Resolution Copper has obtained jurisdictional delineations from the agency for all areas within the project or alternative footprints. No jurisdictional wetlands were determined to be present. Discussion of the jurisdictional delineations obtained from the USACE was added to section 3.7.2 of the FEIS.

Appendix R

| Comment response: MIT29 | |
|---|---|
| Seepage controls for Skunk Camp | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 555-14, 8032-34 |

These comments express concerns with the seepage controls associated with the Skunk Camp alternative location, particularly the potential impacts on Arizona Water Company water supplies. We have refined the analysis of seepage controls and potential water quality impacts for Alternative 6 in section 3.7.2 of the FEIS. The refined analysis indicates that no exceedances of numeric aquifer water quality standards or surface water quality standards are anticipated at the point Dripping Spring Wash enters the Gila River.

Comments also express the need for more monitoring. New monitoring wells were installed along Dripping Spring Wash by Resolution Copper and will continue to be part of the monitoring network for water quality impacts (see FEIS appendix J, mitigation measure RC-WR-03).

| Comment response: MIT30 | |
|---|---|
| Water monitoring and mitigation | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1361-6, 30075-10, 43-3, 8031-65 |

This comment indicates that inadequate monitoring and mitigation were included in the DEIS with respect to water quantity impacts.

There are two major areas where drawdown associated with project groundwater pumping would occur and have the potential to impact natural systems of water supplies: near the mine site, and near the Desert Wellfield in the East Salt River valley.

The DEIS included monitoring and mitigation for groundwater impacts near the mine site, including impacts to groundwater-dependent ecosystems (GDEs), natural systems, and water supplies. These are included in mitigation measure RC-211 (DEIS, appendix J, p. J-9), with full details contained in Montgomery and Associates (Montgomery and Associates Inc. 2019b). This mitigation measure will "ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem." Effectiveness of this mitigation measure is assessed in section 3.7.1 (DEIS, pp. 343–344). This same measure (with modifications) has been carried forward into the FEIS (appendix J, mitigation measure FS-WR-01).

The comment is correct that no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley. This groundwater pumping is subject to permitting by the ADWR. Monitoring requirements may be established during this permitting process but are not under the jurisdiction of the Forest Service and are not incorporated into either the DEIS or the FEIS. See response MIT8 for more discussion of the role of State permits in mitigation.

Note that additional water monitoring and mitigation measures were brought forward between DEIS and FEIS. These are included in appendix J and assessed in section 3.7.1.

| Comment response: MIT33 | |
|---|---|
| Reclamation and revegetation | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30075-57, 541-2, 8032-235 |

We have added further discussion concerning reclamation and closure plans, revegetation techniques, and revegetation potential to section 3.3 of the FEIS.

Appendix R

| Comment response: MIT34 Mitigation required for all project effects | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-68

A full discussion of potential mitigation measures has been incorporated into the FEIS, appendix J. See response MIT15 for more discussion of how NEPA regulations have been addressed.

The intent of the regulations and Forest Service policy is to identify a full range of relevant and reasonable mitigation measures, which is the purpose of appendix J, as well as the mitigation development actions undertaken by the Tonto National Forest (Garrett 2020g). With respect to the specific recommended mitigations associated with this comment, see response MIT6.

| Comment response: MIT35 Section 7 consultation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1293-3, 1356-1, 1441-7, 1468-6, 1473-2, 1595-2, 26887-1, 524-26, 8032-179

These comments concern consultation with the U.S. Fish and Wildlife Service (FWS) under Section 7 of the ESA. As consultation takes place on a single alternative, it necessarily takes place after a preferred alternative has been identified in the DEIS.

The Tonto National Forest initiated and completed Section 7 consultation on threatened and endangered species, and critical habitat, with FWS between the DEIS and FEIS. The outcome of the Section 7 consultation is a Biological Opinion, which is attached to the FEIS as appendix P.

| Comment response: MIT38 Request for specific document | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-96

The requested document is the DEIS reference identified as Montgomery and Associates (Montgomery and Associates Inc. 2019b) and has been available on the project website since publication of the DEIS.

| Comment response: MIT39 Mitigation codes | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-150

Clarification of the codes used in appendix J was added to the FEIS.

Appendix R

| Comment response: MIT40 Lack of details on subsidence monitoring | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-333

This comment states, "The [Apache Leap Special Management Area] document mandates, (although it is unclear of the enforcement mechanism) that seismic monitoring, fencing, and other measures must be implemented to mediate the effect of Resolution Copper's proposed project. Although impacts from the proposed project on the SMA are discussed, we could not find any discussion in the DEIS of how, when, and by whom, these measures would be implemented. As the SMA is a Connected action to this project, that information should have been included in this DEIS."

This statement is incorrect. Section 3.2 of the DEIS described subsidence monitoring as an applicant-committed environmental protection measure (DEIS, pp. 149–150). Further details are included in the project record as appendix E of the GPO (Resolution Copper 2016a) and in Tshisens (2018a).

Subsidence monitoring was also the subject of a specific mitigation measure (FS-222) required by the Forest Service between the DEIS and FEIS (DEIS, p. 159; appendix J, p. J-4). See response GS13 for more details on the evolution of the subsidence monitoring plan.

| Comment response: NEPA1 Purpose and need | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1008-2, 1163-2, 124-2, 1360-5, 1396-2, 1438-12, 158-1, 1595-1, 199-2, 42-4, 8031-34, 8032-2, 913-1

These comments suggest that the Tonto National Forest should broaden the purpose and need described in chapter 1 of the DEIS and assess alternatives consistent with a broadened purpose and need.

The Forest Service has reviewed the purpose of and need for action statement and determined that it is appropriate for this project. See the discussion of purpose and need in FEIS section 1.3.

| Comment response: NEPA2 Ramifications of the Rosemont Copper Mine decision | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
104-4, 1068-6, 1155-2, 1235-8, 1322-9, 1454-14, 1539-1, 1565-2, 24-3, 263-7, 26968-1, 28037-2, 298-4, 524-27, 53-1, 8032-4, F1-4, F1-9, F2-3, F4-2, F6-7

The Forest Service has given appropriate consideration to the pending and completed litigation involving the Rosemont Copper Mine. There are many important factors that distinguish the proposed Resolution Copper Mine from the proposed Rosemont Copper Mine, most notably the provisions of PL 113-291.

At this time, several court decisions have made use of the "Rosemont ruling," and understanding of the ruling has evolved. We have added a section to the FEIS that fully discusses how the Rosemont Copper Mine case affects each action alternative.

Appendix R

| Comment response: NEPA3 Opportunities for public comment; need for a revised DEIS | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-28, 1422-2, 1448-9, 1499-1, 1499-5, 1519-2, 1606-1, 28075-2, 28431-2, 286-4, 509-2, 5569-1, 8032-1, 8032-253

Federal regulations allow for several opportunities for public review and comment for EISs and specify minimum comment time frames.

- A minimum 45-day public comment period is required for a DEIS (36 CFR 218.25(a)(1)(ii)). The Resolution Copper Project DEIS was released for public comment over a 90-day period from August 10 through November 7, 2019 (U.S. Forest Service 2019a).
- A 45-day objection period follows the release of an FEIS and draft ROD. This allows the public to review and file objections that will be considered by the Regional Forester (36 CFR 218.22).

Each of these periods provides an opportunity for public review and comment on the DEIS, FEIS, and draft ROD, respectively.

The Resolution Copper DEIS and FEIS follow these requirements for all decisions we are authorized to make. For this project, Congress mandated that the land exchange occur at a specific time under specific conditions, as outlined in Section 3003 of PL 113-291. Thus, the land exchange is not a Forest Service decision.

The FEIS—not a revised or supplemental DEIS—is the appropriate document to prepare in response to public comments. As noted, the objection process provides another opportunity for public involvement.

| Comment response: NEPA4 American Indian Religious Freedom Act (AIRFA) | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1276-1, 1330-2, 235-24, 235-25, 235-26, 311-1

These comments focus on impacts to resources and values important to Native American Tribes, most specifically religious freedom.

The DEIS addressed Tribal concerns in the following sections: Section 3.12, Cultural Resources (DEIS, pp. 622–639); Section 3.14, Tribal Values and Concerns (DEIS, pp. 658–671); and Section 3.15, Environmental Justice (DEIS, pp. 672–686). Impacts to these resources and values clearly are described for each alternative.

The FEIS and ROD will describe the final results of consultation between the Tribes and the Forest Service. This will include mitigation and its effectiveness, as well as compliance with the AIRFA and other laws and regulations pertaining to resources and values important to Tribes.

Note that government-to-government consultation between the Forest Service and Tribes is ongoing. A full list of consultation activities as of publication of the FEIS can be found in chapter 5 and appendix S of the FEIS.

We continue to develop and evaluate measures to reduce impacts to resources and values important to the Tribes (DEIS, p. 670); those developed as of publication of the FEIS are summarized in section 3.14 and appendix J of the FEIS.

Several lawsuits were filed in January 2021, including one based on religious freedom grounds. Chapter 1 of the FEIS discusses this lawsuit and the outcomes of the lawsuit to date.

Appendix R

| Comment response: NEPA6<br>Compensation to Tribes | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1176-1, 126-2, 1499-3

There is no mechanism in Federal law or regulation that allows for provision of financial compensation for loss of Tribal, heritage, or cultural resources. Such compensation would require specific action from Congress. Rather, mitigation was developed through Section 106 consultation under the NHPA and specified in the PA and HPTP.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Beyond NHPA requirements, Section 3003 of PL 113-291 specifies that the Secretary of Agriculture shall engage in government-to-government consultation with affected Tribes. Following consultation, the Secretary shall consult with Resolution Copper and seek to find mutually acceptable measures to address the concerns of affected Tribes; and minimize adverse effects on affected Tribes from mining and related activities on the Federal land conveyed to Resolution Copper (PL 113-291, Section 3003(c)(3)). We have engaged in efforts to identify and address specific concerns of affected Tribes since August 2015.

| Comment response: NEPA8<br>Use of mining regulations (36 CFR 228A) and approval of a mine plan; or use of special use regulations (36 CFR 251) and approval of a special use permit | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
124-4, 8032-226, 8032-3, 8032-5

These comments state that the DEIS is deficient because it does not explicitly discuss permitting the mine under regulations at 36 CFR 251 (special use permit) instead of Forest Service mining regulations at 36 CFR 228 using a GPO.

The DEIS acknowledges that a Special Use Authorization may be required to authorize uses of NFS lands for specific features such as power lines, access roads, and other features (DEIS, pp. 9, 13, 15, 56).

We have included additional language in the FEIS explaining the criteria that must be considered to permit use and occupancy of NFS land. Any decision to authorize use and occupancy of NFS land will be made in the ROD, which will apply criteria from the regulations for the types of authorizations that will be issued.

| Comment response: NEPA9<br>Public interest requirement of land exchange | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1048-5, 8032-217

Through PL 113-291, Congress has enacted legislation authorizing and directing this specific land exchange. The requirements that must be met are specified in Section 3003 of PL 113-291 and addressed in the DEIS (DEIS, pp. 10–11, 30–36, and 104–105 and appendix B).

Appendix R

| Comment response: NEPA10 | |
|---|---|
| Ramifications of the withdrawal area on Oak Flat, if the land exchange does not occur | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1097-1, 1158-49, 1441-1, 885-2 |

The 760-acre "Oak Flat Picnic and Camp Ground" area was withdrawn on September 30, 1955 (Federal Register, October 1, 1955) by Public Land Order 1229, signed by Assistant Secretary of the Interior Fred Aandahl: "RESERVING LANDS WITHIN NATIONAL FORESTS FOR USE OF THE FOREST SERVICE AS CAMPGROUNDS, RECREATION AREAS AND FOR OTHER PUBLIC PURPOSES." The lands were "withdrawn . . . from all forms of appropriation under the public land laws, including the mining but not the mineral leasing laws, and reserved for use of the Forest Service, Department of Agriculture, as camp grounds, recreation areas, and for other public purposes, as indicated."

On September 20, 1971, Public Land Order 5132 modified the "Oak Flat Picnic and Camp Ground" withdrawal. Signed by Assistant Secretary of the Interior Harrison Loesch, the new order stated that the 1955 Public Land Order 1229 was "hereby modified to the extent necessary to open the following described lands to all forms of appropriation under the public land laws applicable to national forest lands, except under the U.S. mining laws . . . . [T]he lands described in paragraph 1 will be open to such forms of disposal as may by law be made of national forest lands except appropriation under the U.S. mining laws."

Public Land Order 5132 modified Public Land Order 1229 by making the 760-acre "Oak Flat Picnic and Camp Ground" area eligible for disposal by land exchange and other disposal authorities of the Forest Service.

Section 3003 of PL 113-291 defines the Oak Flat Withdrawal Area as follows: "OAK FLAT WITHDRAWAL AREA.— The term 'Oak Flat Withdrawal Area' means the approximately 760 acres of land depicted on the map entitled 'Southeast Arizona Land Exchange and Conservation Act of 2011–Oak Flat Withdrawal Area' and dated March 2011" (PL 113-291, Section 3003(b)(6)).

Section 3003 further directs that public land orders that withdraw Federal land from appropriation or disposal shall be revoked to permit disposal of the land (PL 113-291, Section 3003(i)(4)(1)).

As specified in the DEIS, there are two scenarios regarding the Oak Flat Withdrawal Area:

1. The land exchange occurs, in which the Oak Flat Withdrawal Area becomes the private holding of Resolution Copper. In that case, the area is no longer Federal property and the withdrawal is no longer applicable. The Oak Flat Withdrawal Area would be available for mining activity under the laws and regulations that govern mining on private property.

2. The land exchange for the Oak Flat Withdrawal Area is not completed and the parcel remains Federal property. In that situation, the withdrawal remains in place and mining cannot occur within the Oak Flat Withdrawal Area.

Note: Subsidence of land within the withdrawal area from mining on adjacent Federal land mining claims is unlikely to be allowable. The only authority to subside NFS land from adjacent placer or lode mining is under the Mining Law, and the Mining Law does not apply within withdrawn areas. Subsidence arguably falls under the definition of "processing" for purposes of locating a millsite claim, but millsites cannot be located within withdrawn areas. It is unlikely that other authorities pertaining to administration of NFS land would allow subsidence from adjacent mining in a withdrawn area.

Appendix R

| Comment response: NEPA11 Release of the FEIS and ROD | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-2

The NEPA process for the Resolution Copper Project is unique due to legislative direction contained in Section 3003 of PL 113-291. Thus, we must meet applicable NEPA regulations as well as the legislative requirements stipulated in Section 3003.

As this comment correctly states, Section 3003(c)(10), "Title Transfer," states, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." Under a "normal" NEPA process, we would publish an FEIS and draft ROD, go through an objection process, issue a final ROD, and then authorize the discretionary actions specified under the final ROD.

However, PL 113-291 language stipulates that the process for Resolution Copper Project will be as follows: (1) publication of the FEIS and draft ROD, (2) overlapping objection process and conveyance of all right, title, and interest of lands to be exchanged to Resolution Copper within 60 days of FEIS publication, (3) issuance of the final ROD, and (4) project authorizations. We still are responsible for properly completing the NEPA process for discretionary actions, including the objection process. However, conveyance of land interest and title is not a discretionary action on the part of the Forest Service but a legislative requirement that we are obligated to enact.

The comment also pointed out inconsistent language in a variety of documents (such as the Dear Reader letter and the website briefing and notification materials) concerning publication of the FEIS. We have reviewed those documents and made corrections or revisions where appropriate.

| Comment response: NEPA12 Mineral rights on Town of Superior exchange parcels | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
261-15, 929-11

PL 113-291 identified three parcels the United States would transfer to the Town of Superior, if requested (DEIS, p. ES-7).

These lands are currently under the administration of the Tonto National Forest as part of the NFS. Therefore, these lands are open to mineral entry under the Mining Law, and surface use and occupancy is governed by Forest Service mineral regulations (36 CFR 228A). These comments concern the effect that mining claims currently filed within these parcels will have on the ability of the Town of Superior to acquire and use these lands, as authorized by Congress.

Any surface use of the mining claims on these lands must be in accordance with Forest Service regulations. No significant disturbance of surface resources may occur without first obtaining approval of a GPO by the Tonto National Forest. Plan approval must comply with other applicable laws, including NEPA.

Mining claims do not give fee title to the land, but give the claimant the right to explore, prospect, and develop minerals. However, no property rights in the claim vest until there is a discovery of a valuable mineral deposit.

| Comment response: NEPA13 U.S. citizenship/foreign ownership | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1150-7, 1192-2, 130-1, 158-2, 23-1

Resolution Copper Mining LLC, a U.S. corporation registered in Delaware, owns the mineral claims proposed to be mined by this project. No Federal or State law precludes Resolution Copper Mining LLC from mining its deposits due to ownership or citizenship.

Appendix R

| Comment response: NEPA14 | |
|---|---|
| Winters doctrine and water rights | Page 1 of 1 |

**Responsive to these comments:**
23-2, 30078-42, 30078-43, 30078-44, 8032-340, 885-1

Section 3.7.1 of the DEIS acknowledges that potential impacts due to dewatering are anticipated for a number of springs in the project area. These impacts are anticipated at six springs under the no action alternative (DEIS, pp. 317–325) and at an additional two springs under the action alternatives (DEIS, pp. 325–334). The DEIS also acknowledges that water rights have been filed with the State of Arizona for five of these springs by the Forest Service (DEIS, pp. 332–333).

The comments suggest that impacts to such water rights, if they are necessary to fulfill the purposes for which the Tonto National Forest was reserved, are not allowable by the Forest Service.

Section 3.7.1 of the DEIS discusses the ramifications to water rights from the anticipated dewatering impacts at these springs (DEIS, p. 332) and notes that these are water rights filings only and that they have not yet been adjudicated by the State of Arizona (Superior Court) in the General Stream Adjudication of the Gila River. The DEIS concludes that while physical loss to these springs is disclosed in the DEIS, the "impact on any surface water rights from a legal or regulatory standpoint cannot yet be determined due to the ongoing adjudication."

Regardless, the DEIS clearly describes that the anticipated impacts to these water sources would not persist once mitigation is applied. The mitigation to be applied to these springs is described later in section 3.7.1 (DEIS, pp. 343–344). The five springs identified as having water rights filings by Tonto National Forest (Bitter Spring, Bored Spring, Hidden Spring, McGinnel Mine Spring, and McGinnel Spring) are specifically identified as being covered by DEIS mitigation measure RC-211. The DEIS identifies the purpose of this mitigation measure as "to ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem" (DEIS appendix J, p. J-8). The DEIS then identifies five specific techniques that could be applied to replace water in the event that the anticipated dewatering impacts are observed during monitoring.

The DEIS appropriately discloses the potential for impacts to such Tonto National Forest water rights from mining activities but also discloses Resolution Copper's commitment to prevent impacts from impinging on water uses at these springs.

| Comment response: NEPA15 | |
|---|---|
| United Nations Declaration on the Rights of Indigenous Peoples | Page 1 of 1 |

**Responsive to these comments:**
1236-1, 235-21, 8031-49, 851-4

The United Nations Declaration on the Rights of Indigenous Peoples was passed in 2007; the United States signed the declaration in 2010. The Organization of American States, including the United States, adopted an American Declaration on the Rights of Indigenous Peoples in 2016 (Organization of American States 2016).

Both the United Nations and Organization of American States declarations are statements of goals and objectives for signatory States and are non-binding on member States. In the United States, Federal agencies are required to adhere to U.S. laws, regulations, and policies that protect cultural resources and the rights of Native Americans, such as the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); Archaeological and Historic Preservation Act of 1974 (16 U.S.C. 469); American Indian Religious Freedom Act of 1978 (42 U.S.C. 1996–1996a); and Native American Graves Protection and Repatriation Act of 1990 (23 U.S.C. 3001 et seq.); as well as other applicable laws, regulations, and policies. These laws, regulations, and policies foster progress toward achieving the goals and objectives in the United Nations and Organization of American States Declarations on the Rights of Indigenous Peoples.

In response to concerns that the DEIS did not adequately address Tribal impacts, section 3.14 of the FEIS was modified to more thoroughly explore these issues and to incorporate specific comments and viewpoints from the Tribes. See response CR4 for further detail.

Appendix R

| Comment response: NEPA16 Validity of Resolution Copper mining claims | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8031-36, 8031-37, 8031-7

Issues related to validity of mining claims on NFS lands largely are dependent on the specific activity proposed on NFS lands and on which regulations allow for authorization of those activities. For the Resolution Copper Project, the specific activities proposed to occur on NFS lands differ by alternative.

For the Resolution Copper Project, the activities proposed on NFS lands can be authorized under either mining regulations at 36 CFR 228A or special use regulations at 36 CFR 251, depending on the circumstances. The regulations under which the decision would be made vary, depending on the nature of the selected action that will be identified in the ROD.

Each of the action alternatives described in the DEIS has two scenarios: (1) mining and associated activities if the land exchange occurs; and (2) mining and associated activities if the land exchange does not occur.

If the land exchange occurs, mining would occur solely on private land. Whether activities on NFS lands would be authorized by mining or special use regulations would depend on what specific actions are proposed to occur on those lands, and in some instances whether the claims underlying proposed tailings are mining or mill site claims.

If the land exchange does NOT occur, the mine would be located on both private and NFS lands, and all activities would take place under the GPO filed by Resolution Copper and 36 CFR 228A mineral regulations.

At this point, the land exchange is anticipated to occur. With the DEIS preferred alternative (Alternative 6 – Skunk Camp), assuming the land exchange occurs, both mining and tailings would ultimately be on private land, and the uses on NFS lands to be authorized under the special use regulations at 36 CFR 251 would be limited to the pipeline corridor, power line corridors, and certain mitigation and monitoring activities. No actions on NFS lands would be authorized under mining regulations at 36 CFR 228A.

If the selected action identified by the Forest Supervisor in the ROD requires that the Forest Service authorize activities on NFS land under mining regulations at 36 CFR 228A, the legal requirements for considering mine claim validity are detailed in U.S. Department of the Interior Office of Solicitor Memorandum Opinions M-37012 (dated November 14, 2005) and M-37057 (dated August 17, 2020). This legal opinion concludes that although the agency is authorized to determine claim validity at any time until a patent is issued, the agency is under no legal obligation to determine mining claim or mill site validity before approving a proposed GPO to explore for or develop minerals on lands open to operations under the Mining Law. This would be the case for Resolution Copper in the event that the land exchange did not occur.

The legal opinion also concludes that when lands are withdrawn from entry under the Mining Law, the agency must verify whether the mining claims and mill sites included in a proposed GPO are valid before approving the plan. The GPO submitted by Resolution Copper to the Tonto National Forest does not include any mining within the boundaries of any withdrawal area.

At this time, several court decisions have made use of the "Rosemont ruling," which involves the type of activities that can take place on unpatented claims and the need to validate those claims, and understanding of the ruling has evolved. We added a section to the FEIS that fully discusses how the Rosemont Copper case affects each action alternative.

| Comment response: NEPA17 Resolution mining claims on adjacent properties | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1479-1, 8032-326

As stated in the DEIS, a potential future activity must be "reasonably foreseeable." A reasonably foreseeable action is an action that is likely to occur in the future and is not simply an activity that may or may not occur at some unknown time in the future (e.g., a speculative action) (DEIS, p. 129).

It is unknown at this time whether, when, or how potential adjacent mineral deposits that are not included in the Resolution Copper GPO would be mined. There have been no proposals to mine these deposits, so future development is speculative, and they have not been included as reasonably foreseeable actions. Should proposals to mine these deposits be made in the future, those proposals would have to comply with applicable laws and regulations, such as Federal mining laws, NEPA, and Federal and State environmental laws.

Appendix R

| Comment response: NEPA18 | |
|---|---|
| No action alternative | Page 1 of 1 |

**Responsive to these comments:**
1188-1, 1338-10, 1544-1, 8031-35, 886-1

These comments question the accuracy of statements in the DEIS and related documents and claim that the Tonto Forest Supervisor cannot legally select the no action alternative.

As noted in the comments, consideration of a no action alternative is required by NEPA and its implementing regulations. We complied with this requirement by developing and analyzing a no action alternative in the DEIS.

The DEIS correctly described our authority under mining regulations at 36 CFR 228 Subpart A. The question raised by these comments is whether the proposed action and alternatives presented in the DEIS are properly authorized under Forest Service mining regulations at 36 CFR 228 Subpart A or under special use regulations at 36 CFR 251.

The authorities the Forest Service has under special use regulations differ substantially from those under the mining regulations. The alternatives presented in the DEIS differ in whether they would be permitted under the mining or special use regulations. See response NEPA8 for a more detailed discussion. We added language to chapter 1 of the FEIS to clarify the criteria that will be considered when deciding which is the appropriate permitting regulation for actions on Federal lands.

| Comment response: NEPA19 | |
|---|---|
| Appropriateness of continuing baseline pumping under the no action alternative | Page 1 of 1 |

**Responsive to these comments:**
3-1, 30078-20, 30078-21, 8031-39, 8031-41, 8031-62, 8032-23, 8032-24, 8032-69, 8032-86

These comments are concerned with the ongoing dewatering pumping being conducted by Resolution Copper, expressing the point of view that the current impacts from this dewatering should be properly analyzed in the NEPA process.

This issue was raised early in the NEPA process and thoroughly explored by the NEPA team (BGC Engineering USA Inc. 2020b; Garrett 2018d). The history of the dewatering and the impacts of that dewatering on the existing condition of the environment is explored in several places but in the most detail in chapter 3.7.1 (pp. 304–309, 312). This includes the impact this dewatering has had on groundwater levels (DEIS, p. 309) and on GDEs (DEIS, p. 312) (Garrett 2019f).

Besides describing the impact the dewatering has had on the existing environmental condition, the ongoing dewatering is evaluated in the no action alternative and the cumulative effects analysis. Among other purposes, the no action alternative acts as a baseline against which the impacts from other alternatives can be compared. A decision was required regarding whether the no action alternative should include continued dewatering or not.

None of the comments provide additional information beyond what was considered in the DEIS or suggest a basis for changing the approach. Most importantly, we believe that the approach taken ensures that no impacts have been disregarded. All future impacts resulting from the dewatering are assessed in the FEIS as part of the no action alternative and proposed action alternative, and all past impacts resulting from dewatering are assessed in the FEIS as part of the existing condition of the affected environment.

Appendix R

| Comment response: NEPA20 Effects of jurisdictional delineation on Arizona State Trust lands | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 562-6 | |

Whether any waters of the U.S. are, or are not, considered jurisdictional under the CWA is a matter of law and regulation and determined under the auspices of the USACE.

Whether a jurisdictional delineation is approved or not does not change the fundamental requirements associated with that piece of property under those laws and regulations. Any development that occurs is subject to those laws and regulations.

The effects of jurisdictional delineations on the ASLD's ability to realize the highest value for those State Trust lands located downstream, if any, are speculative and would be inappropriate for analysis.

| Comment response: NEPA21 Financial assurances for preferred alternative (Alternative 6 – Skunk Camp) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1194-2, 524-17 | |

See the response to NEPA16 concerning regulations for authorizing activities for various alternatives, scenarios, and land ownership.

Assuming that the land exchange occurs, mining for Alternative 6 – Skunk Camp (the preferred alternative) would occur solely on private land. Actions proposed for NFS lands under this alternative are limited to the pipeline corridor, power line corridors, and certain mitigation and monitoring activities that would be authorized under special use regulations at 36 CFR 251. We would not be responsible for bonding at Skunk Camp, which would be a facility located on private land. The Arizona State Mine Inspector will require a reclamation plan and financial assurance. The ADEQ will also require financial assurance as part of the Aquifer Protection Permit.

The special use permit that would authorize actions on NFS lands would require certain mitigation, which was identified and analyzed in appendix J of the FEIS. We can require a bond or other security to secure all or any of the obligations imposed by the terms of the special use permit or by any applicable law, regulation, or order (36 CFR 251.56(e)).

If the land exchange does not occur, mining for Alternative 6 – Skunk Camp would occur on both private and NFS lands. In this case, mining and associated actions on NFS lands would be authorized under Forest Service mining regulations at 36 CFR 228A. These regulations allow the Forest Service to require a bond or other financial assurance to ensure performance of payment (as necessary), reclamation, and other conditions of the contract or permit (36 CFR 228.51(a)).

| Comment response: NEPA22 Agencies and their authorities | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1194-1 | |

We clarified the discussion of authorities under which various agencies would authorize project-related actions on their lands in chapter 1 of the FEIS.

Appendix R

| Comment response: NEPA23 | |
|---|---|
| Required components of a "single EIS" | Page 1 of 1 |

**Responsive to these comments:**
8031-6

This comment focuses on the importance of the EIS addressing all Federal actions and connected actions, as required by the land exchange legislation. We acknowledged in multiple locations in the DEIS (pp. ES-4 and pp. 11, 32, and 66) that the EIS must address all Federal actions.

The comment states that the EIS must address all connected actions, specifically noting power lines and substations. The comment also asserts that "permitting decisions" are connected actions that must be analyzed in the EIS.

Infrastructure, like power lines and substations, is fully analyzed as part of the proposed project, along with all other auxiliary facilities, including pipelines, roads, and water supplies. Power lines and substations are specifically described as part of the project in chapter 2 (DEIS, pp. 56–59).

Any Federal agency making a decision related to the project is required to comply with the requirements of NEPA. The intention of the land exchange legislation at Section 3003 (c)(9)(B) is to have a single EIS provide the NEPA compliance disclosures for all Federal decisions, including the Forest Service, BLM (if needed), and USACE. The decision framework for each of these three Federal agencies is described in chapter 1 (DEIS, pp. 11–14). The NEPA process is intended to be sufficient to support these Federal decisions. We added information to chapter 1 of the FEIS to more clearly describe which components of each alternative would require Federal decisions.

The comment is incorrect when it says that State "permitting decisions" are required to be addressed in the EIS as connected actions. Rather, the purpose of the EIS is to disclose the impacts of the project on the environment. While these disclosed impacts are often the same impacts for which State permits are required, the permit decisions themselves are not part of the NEPA process.

State permitting actions are described in chapter 1 (DEIS, pp. 15–20). The relationship between these State permits and the NEPA process is described on p. 15 of the DEIS: "The EIS would not determine if a permit through another agency would be approved but would disclose impacts for resources analyzed."

With respect to other permits mentioned in the comment, the DEIS properly includes analysis of the resource impacts associated with these permits, including migratory birds (DEIS, pp. 461–462), bald eagles (DEIS, pp. 468 and 476), golden eagles (DEIS, pp. 466 and 476), threatened and endangered species (DEIS, pp. 473–476), water quality impacts (DEIS, pp. 346–422), air quality impacts (DEIS, pp. 275–294), and hazardous materials and waste (DEIS, pp. 574–584).

The comment is not correct when it says that all aspects of the project are required to be fully determined in the DEIS. This contradicts the NEPA process, during which modifications are anticipated to be made between the DEIS and FEIS in response to public comments. In addition, many of the permitting processes mentioned in the comment, including the 404 permit under the CWA, Section 7 consultation under the ESA, State of Arizona 401 water quality certification, Aquifer Protection Permit, and air permit, are specific to the alternative ultimately selected by the Forest Supervisor. Therefore, these permits may not be finalized prior to publication of the draft ROD.

| Comment response: NEPA24 | |
|---|---|
| The Skunk Camp alternative was not subject to scoping; need more public comment | Page 1 of 1 |

**Responsive to these comments:**
1360-19, 8031-31

These comments misunderstand the purpose of and legal requirements for scoping and alternatives development.

The Skunk Camp alternative was developed to respond to the issues that were raised in scoping, including public health and safety, groundwater quality, and impacts on scenic resources and recreational opportunities, and to limit the impacts on NFS surface resources (DEIS, p. 94). Development of the alternative was part of the scoping process.

Appendix R

| Comment response: NEPA25 | |
|---|---|
| Requests for extension of comment period | Page 1 of 1 |

**Responsive to these comments:**
110-1, 1106-1, 1158-1, 1455-2, 199-3, 246-1, 248-2, 249-1, 251-1, 251-3, 268-1, 279-5, 31-1, 521-1, 69-1, 8031-9

These comments generally concern aspects of the release of the DEIS to the public and specifically include requests for extensions to the public comment period.

The Forest Supervisor chose not to extend the comment period for the general public, as it already was twice as long as required by Forest Service guidance or regulation. Forest Service guidance is to "allow a minimum of 45 days for comments on a draft EIS unless a different time period is required by law or regulation" (Forest Service Handbook 1909.15, Section 24.1).

Recognizing the complexity of the Resolution Copper Project, the Forest Supervisor specified a 90-day public comment period, running from publication of the Notice of Availability in the Federal Register on August 9, 2019, through November 7, 2019.

After a specific request from the San Carlos Apache Tribe, on October 2, 2019, the Forest Supervisor extended the comment period for an additional 45 days for Tribes, through December 22, 2019 (U.S. Forest Service 2019b). With respect to comments on Tribal consultation, see response CR12.

With respect to comments on the number, format, and location of public meetings, see response NEPA30.

With respect to comments concerning the availability of the DEIS document, the document was available in electronic format on the website at the time of publication of the Notice of Availability, and hard copies were available upon request at the time of publication at various Tonto National Forest offices and the Town of Superior public library. Thumb drives containing the DEIS and all reference documents were also made available at public locations and at all public meetings. In addition, approximately 40 hard copies and thumb drives were delivered or mailed upon request in the first 2 weeks after publication of the Notice of Availability.

One comment voiced concern with the publication of the Notice of Availability in the Federal Register through the EPA weekly notice, rather than a separate Forest Service Federal Register notice. The Federal Register Notice of Availability for the Resolution Copper Project DEIS was published consistent with the "Amended Environmental Impact Statement Filing System Guidance for Implementing 40 CFR 1506.9 and 1506.10 of the Council on Environmental Quality's Regulations Implementing the National Environmental Policy Act" (Federal Register (77):51530 (2012)). Publication followed the established Forest Service process for approving Federal Register notices, which took effect in January 2017. Note that we provided details of this process to certain commenters upon request in September 2019 (Rasmussen 2019).

Appendix R

| Comment response: NEPA26 | |
|---|---|
| Logistics of website and comment acceptance | Page 1 of 1 |

**Responsive to these comments:**
8031-1, 8031-10, 8032-26

We offered a variety of methods with which to submit comments on the DEIS. These methods were identified on the project website, in the Dear Reader letter published with the DEIS, in mailers sent to the entire mailing list upon publication of the Notice of Availability in the Federal Register, in news releases from the Tonto National Forest, and in materials provided at the public meetings.

Methods for submitting comments identified to the public included the following: (1) providing comments at an open house public meeting; (2) using the online form at www.ResolutionMineEIS.us/Comment (the online form stated that it accepted attachments in Microsoft Word (.doc and .docx), rich-text format (.rtf), plaintext format (.txt), or portable document format (.pdf)); and (3) mailing written comments to the Tonto National Forest through the U.S. Postal Service. Public meetings provided attendees with further opportunities to submit comments by speaking publicly during the meeting, speaking privately to a court reporter, or submitting written comments.

We chose to use the website for acceptance of comments electronically, instead of via email. The reasons for this choice included the following: (1) both email and website were perceived to require the same level of technological skill to use; (2) webforms are commonplace and are standard methods for accepting comments; (3) both email and website have similar attachment file size limitations; (4) the webform allows for direct entry of comments into a comment database, not only increasing efficiency but minimizing the potential for mishandling of comments; (5) use of the webform provides the commenter with an individualized receipt with a tracking number, providing assurance that the comment was received; (6) use of a webform avoids possible loss of email comments by spam/filtering; (7) safety at public meetings was a paramount concern, and use of a webform allowed for real-time tracking of comments, searching for key words or threats; and (8) similar key word searches in the database can identify requests that are time sensitive, such as problems noted with the website, references, or documents, or requests for extension of the public comment period.

Comments note that attachments larger than 20 MB were required to be delivered separately and could not be delivered through the website. This would have been the case with any electronic delivery system such as email. In all cases, the Tonto National Forest accepted submittal of these files via thumb drive on a schedule convenient to the commenter. We did not reject any comments for using this delivery method or reject any comments for receipt of via this delivery method after close of the comment period.

Appendix R

| Comment response: NEPA27 | |
| --- | --- |
| Locations of postings, details of mailing list | Page 1 of 1 |

**Responsive to these comments:**
1115-1, 125-1, 1358-5, 1360-1, 289-2, 32-2, 38-1, 6820-1

These comments raise concerns about the notification process for the DEIS and the public comment meetings.

We maintain a project mailing list of interested parties, adjacent landowners, and those who have commented upon the project.

The mailing list began when the project started and we update the list regularly. It includes people interested in previous Resolution NEPA processes, commenters from the scoping period, and commenters from the DEIS comment period. The list also includes people who contacted the Tonto National Forest through webform, comment form, or direct communication and requested to be added.

As we developed alternatives that covered different geographic areas, we used the county assessor sites to add adjacent landowners to the mailing list. We used the assessor site to expand the list to include landowners up to 1 mile from each project component and in some areas up to 10 miles from the proposed project.

We use the mailing list to contact interested stakeholders and notify them of key project activities. These activities include the Notice of Availability of the DEIS and public comment meetings, scoping meetings, and the alternatives development meetings. See response NEPA30 for details about when notices such as mailed postcards or handouts or emails were distributed for the DEIS release and public meetings.

In addition to the mailing list, we used other outreach and notification means such as a Federal Register notice, social media posts, news releases, website announcements, newspaper notices (in English and Spanish), and posters physically displayed at 37 various local bulletin boards and areas in the project vicinity. We targeted communities for notification if they expressed specific concerns, including the town of Queen Valley, Superior, and Top-of-the-World; the residences along existing roads used to access project components such as residential access off Skyline Road from Quail Run Road to the filter plant and loadout facility; and residential access from Dripping Springs Road between State Route (SR) 77 and the Skunk Camp tailings storage facility.

During the San Tan Valley public meeting on September 12, 2019, local residents expressed concern that they were not aware of the project. This led us to expand our outreach and notification efforts to include landowners located farther than 1 mile from the proposed project.

The August 2019 legal notice was published in multiple local papers to achieve widespread notification. Specific to San Tan Valley residents, this included the Arizona Republic, La Voz, and the Florence Reminder and Blade Tribune.

One comment suggested that we post information to the Oak Flat campground community board, which we will consider for future notices.

The June 2019 pre-DEIS notice was sent to 17,500+ postal mail addresses and 23,000+ email addresses. The August 2019 DEIS release was sent to 15,200+ postal mail addresses (which is smaller than the June notice, as duplicates and undeliverable addresses were removed from the mailing list) and 23,000+ email addresses. The September 2019 notice of an additional public meeting was sent to 15,400+ postal addresses and 23,000+ email addresses.

Appendix R

| Comment response: NEPA28 Accessibility of DEIS and materials | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1360-2, 274-1

The comments suggest that the documents were not available to users with disabilities or speakers of different languages.

The Section 508 amendment of the Rehabilitation Act of 1973 requires that information in Federal documents be accessible to individuals with disabilities. All NEPA documents created for this project were Section 508 compliant and posted to the public website in usable ways for people with visual disabilities. The video recording of the public meeting posted to the project website included closed captioning for those with auditory disabilities. All maps and graphics were designed with color contrast in mind to make information more easily discernible.

We are not required to produce documents in languages other than English. Public notices such as the Notice of Intent, Notice of Availability, and newspaper announcements were translated into Spanish and published in the Spanish newspaper La Voz.

Disclaimers on the project website noted that "if anyone had issues with the documents to contact John Scaggs at john.scaggs@usda.gov or (602) 225-5292 if they needed additional documents or formats." No comments or requests came to our attention to translate documents into other languages, expressed problems with Section 508 compliant documents, or asked assistance with some external documents that were not Section 508 compliant but cited by a project document.

The DEIS was available by electronic download from the public website, flash drive, or printed hard copy. References cited by the DEIS also were provided for electronic download from the public website or on flash drives.

On the inside front cover of every DEIS volume (both digital and hard copy) we included the following notice:

*"In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.*

*Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

*To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.*

*USDA is an equal opportunity provider, employer and lender."*

Appendix R

| Comment response: NEPA29 Alleged conflict of interest | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
119-2, 119-3, 120-1, 1338-11, 1493-1, 1505-3, 175-1, 194-2, 262-1, 265-1, 265-3

These comments allege conflicts of interest with the third-party NEPA contractor (SWCA Environmental Consultants) selected by the Forest Service to prepare the EIS for the Resolution Copper Project.

The basis stated in the comments for the alleged conflicts of interest, specifically the relationship between Dr. Stephen W. Carothers and The Nature Conservancy and Dr. Carothers's position with SWCA Environmental Consultants, are incorrect. These claims were investigated, and the facts on these issues were documented for the Tonto National Forest in October 2019 after verbal receipt of these comments during a public meeting and were included in the project record (Garrett 2019e).

Conflict-of-interest management is a requirement of the third-party contract. These issues have been actively managed by the third-party NEPA contractor since award of the contract in 2015. A consolidated description of contracting and conflict-of-interest management activities was prepared for the Tonto National Forest and for the project record after receipt of these comments (Garrett 2019g).

We are aware that these allegations were raised with the U.S. Department of Agriculture Office of Inspector General (OIG), as noted in the comments. An OIG inspector contacted and interviewed the Tonto National Forest and SWCA Environmental Consultants. Both entities cooperated by providing all information requested.

| Comment response: NEPA30 Meeting locations | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
115-1, 1477-2, 180-2, 186-1, 213-1, 235-6, 245-3, 260-1, 64-1, 71-1, 801-1

These comments suggest that the Tonto National Forest should expand the public involvement outreach and public meetings conducted on the DEIS. We held six public meetings within local communities in the vicinity of the project during the 90-day public comment period, which ended on November 7, 2019. We conducted a seventh meeting with the San Carlos Apache Tribe during a special Tribal Council meeting on November 22, 2019, within the Tribe's extended 135-day comment period, which ended on December 22, 2019.

We notified interested stakeholders of the upcoming release of the DEIS and future public meetings by first class U.S. mail postcards (June 14, 2019) and via email to the project mailing list (June 17, 2019). The Federal Register publication of Notice of Availability of the DEIS and notification of public meetings occurred on August 9, 2019. The project website simultaneously was updated with the same information on August 9, 2019, to coincide with the Federal Register Notice. We also announced availability of the DEIS and the public meeting schedule through mailers sent via U.S. first class mail (August 12, 2019), an email to the project mailing list (August 13, 2019), 16 different Arizona newspapers (beginning on August 9, 2019, and varied publication dates over the subsequent 2 weeks based on publication schedule for each paper), and physical posting of 37 Notice Posters on local bulletin boards as well as at public meetings (September 4, 2019).

Beginning on August 9, 2019, the legal notice was published in 16 newspapers, including a Spanish translation of the notice. Newspapers included statewide and local readership areas around the project and the land exchange parcels, as follows: Arizona Capitol Times, Arizona Republic, Arizona Business Gazette, Sierra Vista Herald, Arizona Silver Belt, San Carlos Apache Moccasin, Payson Roundup, Arizona Daily Star, Florence Reminder and Blade Tribune, Coolidge Examiner, San Manuel Miner, Copper Basin News, Superior Sun, La Voz, Foothills Focus, and Arizona Daily Sun.

Six public meetings were held in September and October 2019 at locations around the project area. These locations were chosen as they mirrored locations used during the scoping period. Meetings were held mid-week during the evening hours in Superior, San Tan Valley, Kearny, Globe, Queen Valley, and Tempe. We added the Tempe meeting based on public requests for a meeting closer to central Phoenix. A seventh meeting was held at a special open meeting of the San Carlos Apache Tribal Council on November 22, 2019.

Appendix R

| Comment response: NEPA30<br>Meeting locations | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
115-1, 1477-2, 180-2, 186-1, 213-1, 235-6, 245-3, 260-1, 64-1, 71-1, 801-1

We held the Superior meeting at the Superior Junior/Senior High School on September 10, 2019, as it is close to the mine headquarters and to the West and East Plant Sites. We held the San Tan Valley meeting at Central Arizona College on September 12, 2019, to provide a venue close to the filter plant and loadout facility. We held the Kearny meeting at Ray Elementary School on September 17, 2019, to provide additional outreach to communities near two additional proposed tailings storage facility locations (Alternative 5 – Peg Leg and Alternative 6 – Skunk Camp). We held the Globe meeting at High Desert Middle School on September 19, 2019, on the east side of town, closest to the San Carlos Reservation. We held the Queen Valley meeting at the Queen Valley Recreation Hall on October 8, 2019, for residents who live downstream of the Near West Tailings Storage Facility and the MARRCO corridor. We held the Tempe meeting at the Hotel Tempe/Phoenix Airport on October 10, 2019, to enable additional Phoenix residents to participate.

Feedback from scoping meetings held in 2016 informed these locations. The Gilbert meeting location from scoping was updated to Kearny, Arizona, to better consider the additional tailings facilities described in the DEIS and because the San Tan Valley meeting covered the eastern metropolitan area. The Tempe meeting was held at a location close to freeways and the Phoenix Sky Harbor Airport. Additional public notice was given to the project mailing list by both U.S. Postal Service postcards and emails (on September 25, 2019, and September 27, 2019), press release, and website banner announcement, and with notification at the Queen Valley meeting participants (October 8, 2019).

The presentation shown at each public meeting that provided input on the project and its anticipated impacts was recorded and available on the project website for those unable to attend a meeting in person (posted on the website on September 10, 2019).

Court reporters transcribed public comments at each meeting, and we placed the transcripts for others to view on the project website (November 4, 2019).

We distributed multiple news releases and generated several social media posts about the project meetings and DEIS release and comment period (media releases on September 26, 2019, and October 22, 2019).

We received requests for a meeting in Tucson, but the Forest Supervisor determined that this would not be an appropriate use of Forest Service resources, considering the other meetings, online access to information, and distance from the project and its anticipated impacts.

| Comment response: NEPA31<br>Request for no extensions of public comment period | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1075-2, 303-1

These comments state that the comment period for the DEIS should not be extended. The Forest Supervisor chose not to extend the comment period for the general public, as it already was twice as long as required by Forest Service guidance or regulation. Forest Service guidance is to "allow a minimum of 45 days for comments on a draft EIS unless a different time period is required by law or regulation" (Forest Service Handbook 1909.15, Section 24.1).

Recognizing the complexity of the Resolution Copper Project, the Forest Supervisor specified a 90-day public comment period running from publication of the Notice of Availability in the Federal Register on August 9, 2019, through November 7, 2019.

| Comment response: NEPA32<br>Missing or incorrect reference | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-48

The comment notes that reference Newell (2018k) was not provided on the DEIS website. This is the result of a typographical error in the Literature Cited of the DEIS (p. 753), which inadvertently repeated the information for reference Newell (2018j). After this issue was noted, we made Newell (2018k) available on the website and corrected this issue in the Literature Cited section of the FEIS.

Appendix R

| Comment response: NEPA33<br>Appraisal details, including public interest and best and highest use | Page 1 of 2 |
| --- | --- |

**Responsive to these comments:**
1206-5, 1207-1, 126-1, 1295-1, 1301-24, 1322-2, 1342-3, 263-8, 27977-1, 27995-1, 27996-4, 28002-2, 42-3, 7308-1, 8032-216, 8032-218, 8032-219, 8032-220, 8032-221, 8032-222, 8032-223, 8032-225, 866-12, 873-2, 892-1, F6-2

These comments focus on a variety of perceived shortcomings of the land exchange appraisal process. They raise the following specific points: (1) question why the appraisal of lands to be exchanged has not been completed and disclosed in the DEIS; (2) make a number of claims about how the appraisal should be conducted, including determination of public interest, consideration of best and highest use, and inclusion of specific values (recreational use, Tribal values, value of copper deposits, water used by the mine, etc.); (3) question the method of appraisal to be used, which is specified in Section 3003 of PL 113-291; (4) state that the appraisal must be conducted in compliance with Federal Land Policy Management Act of 1976 (FLPMA) and NEPA; (5) claim a lack of meaningful public review of the appraisal; and (6) state that there is no disclosure of potential impacts from mining to Apache Leap and other nearby lands.

As stated in response NEPA9, this land exchange is a legislative exchange, and the requirements for conducting the exchange are specified in Section 3003 of PL 113-291. Requirements contained in other law, regulation, or policy that are not required by this legislation are not applicable to the exchange.

Section 3003 of PL 113-291 contains numerous requirements for appraisal of lands identified for exchange in this section. These legislative appraisal requirements include the following:

1. The appraisal of Federal and non-Federal lands is conducted in compliance with the requirements of 36 CFR 249.9;

2. The appraisal is prepared in accordance with nationally recognized appraisal standards, including the Uniform Appraisal Standards for Federal Land Acquisitions and the Uniform Standards of Professional Appraisal Practice (other than excluding the value of any improvements made by Resolution Copper);

3. Stipulations regarding reappraisal;

4. Requirement that the Secretary "make the appraisals of the land to be exchanged (or a summary thereof) available for public review."

5. A requirement that the appraisal "include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment;" and

6. A requirement that the value of lands to be exchanged shall be equal or equalized.

Appendix R

| Comment response: NEPA33 | |
|---|---|
| Appraisal details, including public interest and best and highest use | Page 2 of 2 |

**Responsive to these comments:**
1206-5, 1207-1, 126-1, 1295-1, 1301-24, 1322-2, 1342-3, 263-8, 27977-1, 27995-1, 27996-4, 28002-2, 42-3, 7308-1, 8032-216, 8032-218, 8032-219, 8032-220, 8032-221, 8032-222, 8032-223, 8032-225, 866-12, 873-2, 892-1, F6-2

The DEIS clearly disclosed the requirements and current state of the appraisal:

> *"The appraiser was selected and began work in 2019. The completed appraisal reports will be reviewed by a Forest Service review appraiser. The review appraiser will ensure that the appraisal follows the appraisal instructions, Uniform Standards of Professional Appraisal Practice and Uniform Appraisal Standards for Federal Land Acquisitions standards, Federal regulations, and the special requirements found in the NDAA. The review appraiser will ensure that the values concluded by the appraiser are sound and well supported.*

> *The NDAA specifies 'a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land.' The income capitalization approach is one of three commonly used approaches used for real property appraisals.*

> *The NDAA specifies that the appraisal reports (or a summary thereof) supporting the land exchange will be made available for public review prior to completion of the land exchange. The appraisal information will be made available after it is reviewed and approved by the Forest Service review appraiser."* (DEIS, pp. 35–36)

The Federal regulations for land appraisal that are required by PL 113-291 are at 36 CFR 259.9. These regulations include consideration of the best and highest uses of lands being appraised. These regulations, along with standards contained in Uniform Standards of Professional Appraisal Practice and Uniform Appraisal Standards for Federal Land Acquisitions standards, describe values and resources that are to be considered appraisal of exchange lands. As stated in both PL 113-291 and in the DEIS, the appraisal will comply with these regulations and nationally recognized appraisal standards.

The DEIS complies with NEPA requirements regarding the land exchange by describing the lands proposed for exchange and analyzing the impacts of exchanging these lands. These disclosures are contained throughout the DEIS, including in appendices B and I.

As required by PL 113-291, the final appraisal or a summary thereof will be released for public review prior to consummation of the land exchange. This release need not be part of the FEIS or draft ROD.

Impacts to nearby lands and to Apache Leap are included in the analysis of impacts throughout the sections of chapter 3 of the DEIS. There are too many instances of descriptions of potential impacts to Apache Leap and other nearby lands to identify here.

In conclusion, the land exchange appraisal will comply with a requirements stated in Section 3003 of PL 113-291 and the final report or a summary thereof will be made available for public review, as required by PL 113-291.

| Comment response: NEPA34 | |
|---|---|
| Importance of copper for defense | Page 1 of 1 |

**Responsive to these comments:**
1112-1, 1197-4, 928-2

These comments note the uses of copper and importance of copper for national strategic interests, including defense.

Uses of copper are ubiquitous and varied. Identifying specific uses of the copper to be mined by this project is speculative and beyond the scope of the analysis. The purpose and need statement in the DEIS (pp. 6–8) already notes the importance of mining to national interests, including security: "Through the Mining and Mineral Policy Act, Congress has stated that it is the continuing policy of the Federal Government, in the national interest, to foster and encourage private enterprise in the development of economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries; and the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs."

Appendix R

| Comment response: NEPA35 Forest Service decision space and framework | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
101-1, 104-2, 1158-4, 1226-3, 1278-2, 1360-18, 1361-8, 1424-1, 1481-1, 202-1, 24-5, 28093-2, 28449-1, 8031-69, 8031-8, 8032-227, 8032-339, 886-2

These comments raise a variety of concerns and questions regarding the Forest Service decision space, the framework in which decisions will be made, and related issues.

The decision framework for the Resolution Copper Project is described in the DEIS (DEIS, pp. 11–20). This section of the DEIS describes decisions that may be required by the Forest Service, BLM, and USACE, as well as various permits that would be required. The decisions to be made and the specific permits required will differ, depending on whether the requirements for the mandatory land exchange are met and which alternative is ultimately selected in the final ROD.

Another comment asks what parties will be responsible for ensuring that the required mitigation, monitoring, and other NEPA requirements will be carried out. The responsible party for ensuring NEPA compliance depends on which alternative is selected and the land ownership on which specific activities would occur. For alternatives with mine and mine-related facilities on Federal lands, the Federal agency that administers those lands would be responsible for bonding and ensuring compliance with NEPA and other requirements. For alternatives with mine and mine-related facilities on private or State lands, the Arizona State Mine Inspector would be responsible for bonding and ensuring compliance on those lands. Language will be added to the FEIS to clarify these roles and responsibilities. See response MIT31 for more detail on financial assurances.

Two comments ask why this project is being addressed at this time, given that Rio Tinto has other projects in the pipeline. Resolution Copper submitted a GPO to the Forest Service in 2013. The Forest Service has an obligation to process permit requests in a timely manner. In addition, through Section 3003 of PL 113-291, Congress directed the Forest Service to complete an EIS addressing this project.

Two comments assert that the DEIS is flawed and has failed to comply with NEPA, applicable laws, and PL 113-291. One claims the Forest Service cannot ensure that the project will comply with all applicable air, water, and other environmental standards. It is not unreasonable to presume for the purposes of the analysis that there will be compliance with statutory and regulatory requirements that are overseen and enforced by several Federal and State agencies.

One comment notes that the Oak Flat Recreation Area is used as a teaching site for Arizona State University's field biology courses and asks how the Forest Service justifies the loss of this educational land use value. We have added language to the FEIS noting this current use of the Oak Flat Recreation Area.

Another comment notes that, while PL 113-291 requires one EIS to be prepared to analyze the mineral extraction and associated activities and the land exchange, there is nothing to preclude using separate/supplementary compliance review and procedures in accordance with applicable laws. Another notes that while PL 113-291 does not permit the Forest Service to reject the land exchange, it does not change the agency's discretion to reject the GPO. PL 113-291 states that a single EIS will be prepared that "shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." If the land exchange occurs, it may be that there are no mining operations that occur on NFS land as defined under 36 CFR 228A and therefore no requirement to obtain approval of a GPO from the Forest Service.

Another comment notes that the DEIS inaccurately states that the Forest Service will no longer have jurisdiction over NFS lands impacted by the land exchange. The statement on p. 14 of the DEIS is meant to apply only to lands that will be in private ownership once the land exchange is completed. The statement is correct that the Forest Service will no longer have jurisdiction over these formerly Federal lands, which would then be in private ownership.

Lastly, one comment expressed the belief that to have this decision-making process in the hands of one person seems unwise. While there is one decision-maker for the Forest Service, there are many decisions that will be made by Federal and State agencies. Depending on which alternative is selected for implementation in the final ROD, decisions may be required by other land management or regulatory agencies (BLM, USACE, State of Arizona). The issuance of the required permits involved decisions by multiple agencies, such as ADEQ and others.

Appendix R

| Comment response: NEPA36 Legality of forest plan amendment | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
5-2, 1051-3, 1158-5, 799-1, 8032-341

These comments contend that the forest plan amendment should not occur, that the GPO should be changed to comply with the forest plan, and that the amendment would not comply with the National Forest Management Act.

The National Forest System Land Management Planning Rule (Planning Rule) (36 CFR 219) sets out the planning requirements for developing, amending, and revising land management plans (also referred to as forest plans) for units of the NFS, as required by the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (16 U.S.C. 1600 et seq.).

Identifying the need for an amendment to the forest plan is consistent with Section 219.13 of the Planning Rule. On pp. 10 and 11 of the DEIS, we disclosed that a forest plan amendment was part of the project purpose and need and that the Forest Supervisor has the discretion to determine whether and how to amend the forest plan and to determine the scope and scale of any such amendment. We further disclosed that based on a project consistency review with the existing 1985 forest plan (as amended through 2017), a few narrowly focused amendments would be needed under any alternative to reconcile the visual quality objective (VQO) and recreation opportunity spectrum (ROS) management classes for Management Areas 2F and 3I. We further disclosed in DEIS table 1.4.3-1 (p. 12) specific language for the proposed plan amendment.

After considering the options available under Section 219.15(c) of the Planning Rule, the Forest Supervisor has chosen to amend the forest plan contemporaneously with the approval of the project so that the project would be consistent with the plan, as amended. This amendment will be limited to apply only to the project or activity.

We disagree with the statement in one comment that the amendment cannot go forward because it is not supported by a legally adequate EIS. Compliance with applicable laws and regulations cannot be determined at this phase of the process. When conducting an EIS, NEPA envisions a multi-step process with several opportunities for public participation. The DEIS is only one of these steps. Scoping of the proposal prior to publication of the DEIS helps to identify issues with the proposal, which, in turn, helps identify reasonable alternatives to the proposal and social and environmental aspects that must be analyzed to determine impacts. The DEIS then presents a draft of these issues, alternatives, analysis, and impacts for public review and comment. After consideration and response to public comments on the DEIS, an FEIS is prepared that includes modifications, corrections, and additions as needed to respond to DEIS comments. The FEIS is published with a draft ROD that addresses whether the alternative proposed for authorization will comply with applicable laws and regulations. The FEIS and draft ROD then go through a Forest Service objection process. Once all objections are processed and rectified, a final ROD is published, followed by agency-specific authorizations.

Note that in December 2023 the Tonto National Forest implemented a revised forest plan. We conducted a full consistency review for the new forest plan, similar to the consistency review we conducted before for the 1985 forest plan. The results of the consistency review are documented in the FEIS and the project record, and the proposed amendment to the forest plan for the preferred alternative is fully detailed in the FEIS.

Appendix R

| Comment response: NEPA37 | |
|---|---|
| Exemption from laws | Page 1 of 1 |

**Responsive to these comments:**
107-9, 132-5, 213-2, 26820-1, 28093-3, 298-2, 43-1, 5689-1

These comments express a belief that this project is exempt from a broad swath of Federal laws, either because of foreign ownership of the proponent or because the comment purports that Forest Service believes PL 113-291 trumps other Federal environmental laws.

These comments are not correct. Section 3003 of PL 113-291 legislatively directs the land exchange to take place in compliance with specific statutory provisions and other Federal laws. The specific laws mentioned are the NHPA and NEPA. As explained in the DEIS, the Tonto National Forest Supervisor has no decision authority regarding the land exchange due to the constraints imposed by PL 113-291 (DEIS, p. 13).

All other actions proposed in the DEIS are subject to all applicable laws and regulations.

Groundwater pumping and use is regulated and permitted by the ADWR. Resolution Copper currently holds several groundwater rights: Type 2 Non-Irrigation Grandfathered Rights/Type II Mineral Extraction Rights, and a dewatering withdrawal permit. Similar rights or permits would be required for any dewatering that occurs during operations. Resolution Copper would be required to permit any wells associated with the Desert Wellfield, which would lie within the MARRCO corridor. Notices of Intent to Drill would be required for any well installation to ensure proper construction and documentation. Any further permits or rights required would depend on whether the water pumped was legally considered recharged or banked water or regular groundwater. This would be determined by the ADWR (DEIS, p. 18). The analysis of the impacts of dewatering at the mine site, analysis of pumping from the Desert Wellfield for the mine water supply, and anticipated effects from tailings seepage are disclosed in the DEIS in Chapter 3, Section 3.7.1, Groundwater Quantity and Groundwater-Dependent Ecosystems.

The determination of impacts to species listed under the ESA as threatened, endangered or candidate for listing is the responsibility of the FWS. The Forest Service has conducted formal consultation with the FWS to determine impacts to listed species from the Resolution Copper Project. The FWS has completed a Biological Opinion, which is attached as appendix P of the FEIS and is discussed in FEIS sections 1.6, 3.3, and 3.8.

Placing mine tailings on Federal lands is not illegal and may be authorized by the Forest Service, subject to compliance with applicable regulations. For the alternatives that propose to construct tailings storage facilities on NFS land, the impacts are described in each resource section of chapter 3 in the FEIS.

In terms of making a determination of legal compliance, the draft ROD specifically addresses whether the alternative proposed to be implemented will comply with applicable laws and regulations.

| Comment response: NEPA38 | |
|---|---|
| Administrative Procedures Act | Page 1 of 1 |

**Responsive to these comments:**
5423-1

The aspect of the Administrative Procedures Act that typically applies to Forest Service NEPA is as follows:

*The reviewing court shall—*

    *(1) compel agency action unlawfully withheld or unreasonably delayed; and*

    *(2) hold unlawful and set aside agency action, findings, and conclusions found to be—*

        *(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;*

        *(B) contrary to constitutional right, power, privilege, or immunity;*

        *(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;*

        *(D) without observance of procedure required by law;*

        *(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or*

        *(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.*

The Forest Service is acting in compliance with the Administrative Procedures Act and other applicable laws.

Appendix R

| Comment response: NEPA39 | |
|---|---|
| Overturning land exchange | Page 1 of 1 |

**Responsive to these comments:**
1158-12, 1205-1, 1297-1

These comments either ask for the EIS process to be put on hold pending congressional action on repealing the land exchange specified in Section 3003 of PL 113-291, or they state that the land exchange should be reversed due to the resulting environmental and cultural impacts.

Congress passed and the President signed PL 113-291 into law. It remains binding law that the Forest Service must comply with until it is changed or repealed by Congress and the President. We cannot simply ignore the direction in PL 113-291 and wait to see whether Congress will act on an introduced bill at some unknown time in the future. If Section 3003 of PL 113-291 is modified or repealed in the future, we will follow whatever applicable stipulations and requirements the new legislation or court decision contains.

| Comment response: NEPA40 | |
|---|---|
| Incorrect statement about not analyzing tailings | Page 1 of 1 |

**Responsive to these comments:**
2052-1

The comment states that tailings piles were not analyzed as a connected action. This is an incorrect statement. The tailings storage facilities are analyzed in the DEIS as part of the proposed action and action alternatives. Modification of the location of the tailings storage facility and the methods of tailings deposition formed the core of the alternatives development. Tailings storage facilities are described in detail for each alternative in chapter 2, including the tailings type, conveyance, embankment, liner, disposal method, auxiliary facilities, and reclamation and closure (DEIS, pp. 67–99). Impacts resulting from the placement of the tailings are discussed in chapter 3 for each resource under each alternative.

Appendix R

| Comment response: NEPA41 Analysis of power lines | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1544-15, 8031-71 | |

The Forest Service analyzed power lines and impacts from the power lines in the DEIS. Figure 2.2.2-15 provides an overview of the existing power lines in the project area and new power lines considered under various alternatives of the project (DEIS, p. 57).

The DEIS analysis assumed that disturbance could impact all land within the analysis corridor or project component fence line. Resolution Copper and SRP have done additional design work to narrow the amount of impacts within the corridor associated with the preferred alternative. The FEIS shows a smaller impact because the corridor was reduced in some areas from 1,000 feet wide to 75 to 500 feet wide. The greatest extent of impacts is with a 1,000-foot-wide corridor, and those impacts were disclosed in the DEIS.

Rights-of-way and easements will include the power line and associated infrastructure (e.g., substation and staging areas) and temporary construction impacts. The entire analysis corridor is considered to be affected, and we disclose the impacts of the disturbed acres. Substations built specific to this project are anticipated at the West Plant Site, East Plant Site, and tailings storage facility. These are designed to be within the project disturbance disclosed in both the DEIS and FEIS.

The DEIS disclosed that the use of applicant-committed environmental protection measures would reduce impacts on soils and vegetation in the project area.

We considered reasonably foreseeable future actions (RFFAs) such as "Superior to Silver King 115-kV Relocation Project" and "APS Herbicide Use within Authorized Powerline Rights of Way on NFS lands" in the analysis, as the projects may overlap the proposed Resolution Copper Project spatially or temporally.

The air quality analysis in section 3.6 considered the estimated emissions from construction and reclamation activities, ground disturbance, and operations and maintenance trips necessary throughout the mine life.

Vegetation impacts from the project and power lines from construction, operation and maintenance, and reclamation phases are disclosed in section 3.3, listing the impact to disturbed acres. Vegetation management will be conducted under power lines and is further described in the Biological Opinion in appendix P of the FEIS.

Section 3.8 of the DEIS considered wildlife impacts from the power line corridors. The analysis and detail provided in the Biological Opinion in appendix P of the FEIS includes noise, vibration, vegetation management, and other concerns.

Section 3.11 considers impacts from the construction and heavy machinery as well as where the lines would be visible from key observation points (KOPs) such as U.S. 60. DEIS mitigation measure FS-03 is the one scenic mitigation measure to be considered (DEIS appendix J) and has been brought forward into the FEIS (measure FS-SR-01 in FEIS appendix J).

Cultural and historical resource impacts consider the impacts from the power lines with all areas within the project considered disturbed and in need of data recovery or avoidance. Class I and III surveys have occurred on the proposed power line and project areas, as noted in section 3.12.

The power lines have also been considered in other sections such as 3.5, Transportation; 3.7, Water Resources; 3.9, Recreation; and 3.10, Public Health and Safety.

DEIS appendix B included information on the existing power lines that cross land exchange parcels.

DEIS appendix G includes an additional description of the power lines, substations, and other auxiliary facilities. See the heading titled "Electrical Substations and Power Lines," which describes the route, corridor, height of tower, and operational use of the power.

Appendix R

| Comment response: NEPA42 Clarification of Arizona State Land Department (ASLD) permitting | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
562-10

Since the DEIS, we have refined the footprint of the Alternative 6 tailings storage facility and the Alternative 6 – North pipeline/power line corridor in order to reduce potential resource impacts. This includes avoiding more Arizona State Trust land, avoiding Government Springs Ranch, and avoiding disturbance along Mineral Creek, including critical habitat for Gila chub and yellow-billed cuckoo.

We added detailed information to chapter 1 of the FEIS to more clearly describe which components of each alternative would require involvement with Federal and State agencies, including the ASLD.

Resolution Copper will be responsible for following the appropriate process for obtaining access to Arizona State Trust land for any project-related facilities.


| Comment response: NEPA43 Clarification of BLM role | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-2, 8032-228

The DEIS identified the BLM as a decision-maker in the project. Chapter 1 of the DEIS described the decision framework for BLM (p. 14). The DEIS also describes additional process steps needed to approve Alternative 5 – Peg Leg in the event that this alternative is selected by the Forest Supervisor in the final ROD. The FEIS identifies Alternative 6 – Skunk Camp as the preferred alternative.

Since the DEIS, we have refined the footprint of the Alternative 6 tailings storage facility and the Alternative 6 – North pipeline/power line corridor in order to reduce potential resource impacts. This includes avoiding more Arizona State Trust land, avoiding Government Springs Ranch, and avoiding disturbance along Mineral Creek, including critical habitat for Gila chub and yellow-billed cuckoo. In addition, Alternative 6 now completely avoids any BLM-administered land. If Alternative 6 becomes the selected action in the final ROD, BLM would not have a decision role with respect to the mine facilities. However, they would have responsibility for management of a portion of the offered lands.

Since the DEIS, we also have dropped the western pipeline alternative for Alternative 5 – Peg Leg to reduce potential resource impacts. These include avoiding Acuña cactus habitat and impacts to the Arizona National Scenic Trail.

In addition to the clarification and modifications described above, we added more detailed information in chapter 1 of the FEIS to more clearly describe which components of each alternative would require involvement with Federal and State agencies, including BLM.


| Comment response: NEPA44 Clarification of 401 water quality certification | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-11

This comment identifies the need to obtain a water quality certification from the State of Arizona, under Section 401 of the CWA, prior to issuance of the CWA Section 404 permit. Chapter 1 of the DEIS (p. 17) described the need for the issuance of the 401 water quality certification.

The comment is correct in stating that a Section 401 water quality certification is required for issuance of a 404 permit. The comment is incorrect in stating that the 401 application has not yet been submitted. A CWA Section 401 application, specific to the activities for which the 404 permit is being requested from the USACE, was submitted to ADEQ on February 13, 2020, and ADEQ issued the Section 401 water quality certification for the Resolution Copper Project on December 22, 2020. The USACE will follow the appropriate process to consider the issuance of the CWA Section 401 water quality certification in its CWA Section 404 permitting decision.

See response NEPA35 for more discussion of the role of State permits in the NEPA process and the disclosure contained in the EIS.

Appendix R

| Comment response: NEPA45<br>Complaints related to typographic errors | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-31, 1499-4, 30075-17, 30075-19, 8031-25, 8032-254

These comments identify a specific typographic error that appeared in the DEIS text. As suggested in the comments, this error occurred from the accidental pasting of unrelated text into the text of the DEIS during production. This accidental pasting of text in no way conveys a flippant attitude toward the analysis. We have fixed this error in the FEIS.

| Comment response: NEPA46<br>Need to consult with the Town of Florence | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-131

In its "Memorandum to Heads of Federal Agencies," dated January 30, 2002, the CEQ listed 12 factors for Federal agencies to consider when determining which agencies to invite as "cooperating agencies." Cooperating agencies have a responsibility to participate throughout the NEPA process by providing special expertise, providing pertinent data, participating in preparation and/or review of analyses and documents, and/or having pertinent legal jurisdiction for such things as issuing permits. We reviewed agencies and entities for cooperating agency status and extended invitations to those we felt best met the criteria and were capable of carrying out the obligations of a cooperating agency. No municipalities were identified as potential cooperating agencies.

However, the Town of Florence has had many opportunities to be involved in the NEPA process without cooperating agency status. We received a comment letter from the Town of Florence (letter 515), and those comments are being considered. In that letter, the Town noted that it has been aware of the project, was following its progress, and had been in touch with the EIS team for several years. The letter expressed a preference for the Skunk Camp alternative (preferred alternative in the DEIS) and discussed the reasons for this preference.

As a local government entity, the Town can contact us if other issues arise regarding this or other projects.

Appendix R

| Comment response: NEPA47 Request for Arizona Water Company to participate in meetings; other specific requests of Arizona Water Company | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
555-21, 555-25

This comment asks that specific analyses and data be provided to the Arizona Water Company, and that Arizona Water Company be involved in conducting certain future analyses.

1. Arizona Water Company asks for a detailed analysis of the hydrogeological and surface water runoff data after the final site selection is complete and the impact of changes in runoff on the Queen Creek and Gila River water supplies.

   An assessment of the change in volume, frequency, and magnitude of runoff from the project area, as it affects Devil's Canyon, Queen Creek, and the Gila River, was conducted. The DEIS summarized the results (p. 114). Further details are provided in section 3.7.3.4 for each alternative (DEIS, pp. 427–447).

   The "final site selection," i.e., the selected action, has not been determined and will not be determined until the FEIS and draft ROD are published. In the meantime, Alternative 6 – Skunk Camp has been identified as our preferred alternative.

2. Arizona Water Company asks for extensive geological investigation and information, regardless of which alternative is chosen.

   The DEIS presents geological information and analysis, with a summary for all alternatives on p. 107, and more details are provided in section 3.2 (DEIS, pp. 130–160).

   Numerous supporting technical documents focused on geology and related topics are available on our project website (resolutionmineeis.us) under "Related Documents" and then "Documents Cited." The comment does not specify which specific geological information and investigation is requested. The documents on the website that relate to geology are too numerous to list here.

3. Arizona Water Company asks to have further involvement in future hydrogeology and monitoring analysis.

   Arizona Water Company is not a cooperating agency for the Resolution Copper Project (see response NEPA46 regarding cooperating agency status). The scope of its involvement is the same as the general public: it can review the DEIS, FEIS, draft and final ROD and supporting information and data. Arizona Water Company can comment during public comment periods and file objections to the FEIS and draft ROD.

4. Arizona Water Company asks that we model and determine the impact on the physically available groundwater Arizona Water Company needs for assured water supply purposes.

   The DEIS addresses availability of groundwater for all alternatives. The DEIS contains a summary of impacts (DEIS, p. 112) and a more detailed discussion of current conditions and impacts (DEIS, pp. 295–345). Impacts on public groundwater supplies are specifically addressed.

5. Arizona Water Company asks that we determine potential differences in subsidence (in the East Salt River valley) and resulting damage.

   Section 3.7.1 of the DEIS (p. 334) discussed subsidence effects due to pumping at the Desert Wellfield, along with Newell and Garrett (2018d). We added further analysis of subsidence effects to section 3.7.1 of the FEIS in response to public comments.

Appendix R

| Comment response: NEPA48 USGS involvement | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 10-1, 12-5, 1140-1, 44-1, 59-1, 82-3 | |

These comments express concern that the USGS was not involved in preparing the analysis for the EIS.

The stated mission of the USGS is as follows: "The USGS serves the Nation by providing reliable scientific information to describe and understand the Earth; minimize loss of life and property from natural disasters; manage water, biological, energy, and mineral resources; and enhance and protect our quality of life." While having specialized expertise concerning analysis of technical aspects such as seismic activity, geology, and surface and groundwater hydrology and water quality, the USGS has no specific statutory role in conducting NEPA analysis. Any USGS involvement in a NEPA project is at the request of the lead agency and is discretionary on the part of the USGS.

For the Resolution Copper Project, the Forest Supervisor explored the possibility of the USGS assisting with or reviewing some aspects of the NEPA analysis (U.S. Forest Service 2017g). The USGS declined to become a cooperating agency but held open the possibility of assisting on technical issues (U.S. Geological Survey 2017a). In November 2017, the USGS identified its willingness to participate in a single task: participation in the Groundwater Modeling Workgroup, predicated on specific conditions for how USGS input could be used (U.S. Geological Survey 2017b). USGS specialists participated in four Groundwater Modeling Workgroup meetings between September 2017 and January 2018, while discussion of a full scope of work was ongoing. On January 29, 2018, we notified the USGS that we would not be requesting an interagency agreement, as the necessary time frames and costs to complete tasks identified by the USGS fell outside the scope and framework under which our EIS project team was working (Rasmussen 2018). The USGS specialists stopped their participation in the Groundwater Modeling Workgroup at that time.

| Comment response: NEPA49 Bureau of Reclamation withdrawn lands (comment from Department of the Interior) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1121-1 | |

These comments from the Department of the Interior identified an area within the Tonto National Forest that previously was withdrawn for use by SRP, potentially involving the MARRCO corridor and the tailings storage facility for Alternatives 2 and 3.

On December 19, 2019, we held a subsequent meeting with the Bureau of Reclamation to discuss the ramifications of the withdrawal, for the purposes of the NEPA process as well as the preparation of the 404(b)1 alternatives analysis for the USACE. Documentation of the withdrawal area was added to the project record, including a triparty agreement between the Tonto National Forest, SRP, and Bureau of Reclamation dating to 1979 that governs management of the withdrawn lands (Salt River Project Agricultural Improvement and Power District et al. 1979).

With respect to the NEPA process, the presence of the withdrawn lands does not invalidate consideration of Alternatives 2 and 3. CEQ guidance is that "an alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or Federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered" (CEQ 40 Most Asked Questions #2b (U.S. Fish and Wildlife Service 2020b)). A discussion of the conflict between these alternatives and the withdrawn lands was added to chapter 1 of the FEIS.

| Comment response: NEPA50 Management of land exchange offered lands after completion of exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-10, 1188-11, 1188-14, 1188-15, 1188-16, 1188-17, 1188-18, 1188-9, 8032-199 | |

These comments raise concerns about the environmental or resource effects that would occur on the offered lands after execution of the land exchange.

The effects of the land exchange have been analyzed in the DEIS. The process for the analysis is described in chapter 2 (DEIS, pp. 66–67), and the fundamental change in regulation of the selected lands moving from Federal to private ownership is described in chapter 2 (DEIS, pp. 104–105), the resource impact sections of chapter 3, and appendix I.

There are a number of specific items that the comments indicate should be analyzed for the land exchange, primarily related to wildlife and habitat impacts. Wildlife and habitat impacts from the land exchange were discussed in sections 3.3 and 3.8 of the DEIS (pp. 183, 457). These sections have been expanded in the FEIS to more directly address the items raised in the comments.

Many of the comments are specific to post–land exchange management of the 7B Ranch parcel. As with all offered lands, management of this parcel after execution of the land exchange would be subject to the management direction of the BLM. Specific mitigation suggestions regarding the 7B Ranch were raised in public comments (Garrett 2020g). The mitigation items that are being implemented are described in appendix J of the FEIS and include continued involvement of The Nature Conservancy in management of the 7B Ranch (see measure RC-SV-04).

| Comment response: NEPA51 Failure to identify least environmentally damaging practicable alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-14 | |

This comment notes that the analysis presented in the DEIS and appendix C (the practicability assessment to support the Section 404 permitting process) does not identify the least environmentally damaging practicable alternative.

The identification of the least environmentally damaging practicable alternative is associated with two separate regulations.

Under 40 CFR 230.10(a), "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." In practice, this least environmentally damaging practicable alternative determination is contained in the 404(b)1 Alternatives Analysis. The complete and approved 404(b)1 Alternatives Analysis is included as appendix C of the FEIS and identifies Alternative 6 – Skunk Camp as the least environmentally damaging practicable alternative.

The Forest Service NEPA regulations contain a similar definition of the "environmentally preferable alternative" (36 CFR 220.3), but there is no requirement that the environmentally preferable alternative be selected.

| Comment response: NEPA52 Purpose of appendix I | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-19, 28449-149 | |

These comments question the usefulness and appropriateness of appendix I of the DEIS. Appendix I is titled "Summary of Effects of the Land Exchange." The discussion related to appendix I can be found in chapter 2 (DEIS, pp. 67, 104–105).

The purpose of appendix I is summarized in chapter 2 (DEIS, p. 105).

We have added further discussion in the text of the FEIS (chapter 2, section 2.4) and in the introduction to appendix I to provide additional context for the discussion that follows. The comments also suggest adding a description of the laws shown (in column 3). We have added this discussion to appendix I as suggested.

We note also that additional discussion has been added to chapter 1 to clarify the laws and regulations that would be applicable to different project components and alternatives.

Appendix R

| Comment response: NEPA53 Analysis of power lines | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1235-7, 1454-13, 40-6, 8032-294

These comments claim that power lines were not included in the DEIS analysis. This is incorrect. The power lines were clearly described in chapter 2 (DEIS, pp. 56–59; see specifically table 2.2.2-6). Also see response NEPA41.

| Comment response: NEPA54 Cumulative effects analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1477-3, 1477-6, 1531-5, 28449-110, 28449-56, 28449-98, 28463-1, 30075-53, 8031-29, 8031-70, 8031-72, 8031-74, 8032-324, 8032-325

These comments contain criticisms of the cumulative effects analysis.

In response to comments, the cumulative impacts analysis has been expanded in the FEIS (see chapter 4).

Some comments refer specifically to water-related aspects of the cumulative effects analysis. See response WT4_F for specific discussion of the drought contingency plan and an expanded discussion of the cumulative effects on water resources.

Several comments question the framework for cumulative effects. The Forest Service maintains that the approach described in the DEIS (p. 129) is appropriate and that cumulative effects are a combination of the affected environment (representing the effects of past and present actions), environmental consequences (representing the effects of project-related actions), and analysis of effects of RFFAs. This approach remains the same in the FEIS as in the DEIS, though the cumulative effects analysis itself has been revised and given a separate chapter (chapter 4).

Comments variously suggest discussing the affected environment all in one location, instead of by resource section in chapter 3. The Forest Service followed common procedures in structuring the NEPA document, and the structure remains the same for the FEIS.

| Comment response: NEPA55 Improper analysis of ASARCO Ray Mine land exchange | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1539-4

The ASARCO Ray Mine land exchange was included in the DEIS as an RFFA. This comment indicates that the level of detail of analysis was insufficient.

The available details for the Ray Mine land exchange are found in SWCA Environmental Consultants (2018a). This document is a compilation of worksheets without page numbering (see p. 132 of the PDF file). Sources for the Ray Mine land exchange details are listed here as the final supplemental environmental impact statement (FSEIS) (Bureau of Land Management 2019b) and the FEIS (Bureau of Land Management 1999). The FSEIS is the data source that was requested for use by the commenter. Similar information can be found in SWCA Environmental Consultants (2020b).

The comment states, "Although no plan of operations has been approved for a Ray Mine expansion, FSEIS analysis offers sufficient information to discuss its cumulative impacts on the project area for the Resolution Copper proposal." Indeed, the FSEIS was the source used to identify impacted resources. As outlined in SWCA Environmental Consultants (2018a), all resources are shown to "contribute to cumulative effects" and therefore are pulled forward into the cumulative effects analysis in each resource section in chapter 3.

We are aware of a number of comments criticizing the methodologies used for the cumulative effects analysis and stating that the impacts analysis is too generic and qualitative.

We thoroughly documented the cumulative effects analysis. We acknowledge that further quantification of impacts analysis was needed. As a result, the FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes impacts from the Ray Mine land exchange.

Appendix R

| Comment response: NEPA56 Specific criticisms of the DEIS, on a variety of issues | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1422-3

This comment raises a number of specific issues that are characterized as having shortcomings. The DEIS adequately addresses all of them. The specific issues are as follows:

- Include a complete, accurate description of the proposed action. Response: Chapter 2 devotes 78 pages to describing the proposed action and action alternatives (DEIS, pp. 29–106), in addition to more detailed information in Appendix G, Further Details of East Plant Site, West Plant Site, MARRCO Corridor, and Filter Plant and Loadout Facility Infrastructure; and Appendix H, Further Details of Mine Water Balance and Use.

- Give due consideration to scoping comments. Response: During the NEPA process, there is no requirement that the DEIS explicitly and individually address scoping comments. Scoping comments generate a suite of issues that guide the analysis in the DEIS. Those issues are contained in the report titled "Final Summary of Issues Identified Through Scoping Process, November 2017" (SWCA Environmental Consultants 2017b). Any scoping comment is traceable to the issue statements that encompass it, through the report titled "Public Concern Statements, May 2017" (U.S. Forest Service 2017h).

- Evaluate a full range of alternatives, including "no action," as well as technologically feasible alternative mining techniques. Response: NEPA regulations require that an EIS develop a reasonable range of alternatives that sharply define the issues and provide a clear basis for choice between options by the decision-maker. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action (36 CFR 220.5(e)). The DEIS presents five action alternatives and the no action alternative. Alternative 2 is the proposed action and consists of the GPO that was submitted to the Forest Service by the proponent. The remaining action alternatives were developed to meet the purpose and need and sharply define the issues. For the issue of alternative mining techniques, see response AMT1.

- Document all consultations with the affected Native American communities and include a finalized PA. Response: Consultation details are included in the FEIS in chapter 5 and appendix S.

- The January 2021 Rescinded FEIS included a final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

- Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

- Greatly expand the discussion of the proposed mine's impacts on water resources, given facts about future meteorological trends, drought, diminished Colorado River flows, groundwater depletion in Pinal County, ongoing and planned population growth (e.g., the proposed city-sized "Superstition Vistas" development on State lands between Apache Junction and Florence Junction), and sustainability goals in urban, rural, and agricultural settings. Response: These details were included in the DEIS and have been expanded in the FEIS (chapter 4). See response WT4 for more details.

Appendix R

| Comment response: NEPA56 Specific criticisms of the DEIS, on a variety of issues | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
1422-3

- More fully explore the long-term socioeconomic impacts of the proposed action. Response: Additional discussion on this topic was added to section 3.13 of the FEIS.
- Discuss the post-mining requirements and costs for "in perpetuity" management of affected lands and resources. Response: These details are included in the DEIS. Section 3.7.2 discusses long-term management of water quality. Reclamation and closure plans and revegetation of disturbed areas is discussed in section 3.3 and chapter 1 (DEIS, pp. 61–65). Financial assurances are discussed in chapter 1 (DEIS, p. 65) and chapter 2 (DEIS, p. 104), as well as specifically in section 3.7.2 for each alternative with respect to water quality.
- Consider the loss of revenue and jobs from sustainable recreation, ecotourism, and heritage tourism as compared to the "boom, then bust" nature of the proposed 40-year mine. Response: Section 3.13 (DEIS, p. 653) discusses boom/bust cycles as well as impacts to nature-based tourism.
- Properly acknowledge that Oak Flat is a sacred place to the affected Native American communities and that it is still being used for religious and ceremonial activities that the spiritual leaders of the San Carlos Apache Tribe consider necessary for the survival of their culture. Response: Section 3.14 (DEIS, p. 663) explicitly acknowledges the nature of Oak Flat. See response CR4 for details on how discussion of this topic was revised in the FEIS.
- Highlight Oak Flat's historic and ongoing significance as a scenic and recreational destination, including rock-climbing competitions. Response: Section 3.9 specifically addresses recreation aspects, including climbing. Section 3.11 addresses scenic resource impacts.

| Comment response: NEPA57 Independent research by Forest Service | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
29506-2

This comment states, "I urge the USFS to conduct further, independent research (not relying on the research submitted by Resolution Copper) into the hydrological, environmental, cultural, and recreational impact of this proposed project."

CEQ's NEPA regulations expect that an applicant will submit environmental information to the agency for purposes of the NEPA analysis and direct the agency to independently evaluate the information submitted and be responsible for its accuracy. The Forest Service has complied with those requirements.

The NEPA regulations also require that agencies ensure the professional integrity, including scientific integrity, of the discussions and analyses in the EIS. The Forest Service has employed multiple measures. Those measures are described in the text of the FEIS and in summary memoranda describing the process for obtaining, reviewing, and evaluating information for key resources.

The regulations also allow for an EIS to be prepared by a third-party contractor, subject to certain disclosures and procedures. The third-party contractor (and a number of subcontractors) worked with Forest Service resource specialists to review data, conduct specialized analysis, manage the NEPA process, maintain the project record, assist in conducting public outreach, and draft the text of the NEPA documents. The actions and communication of this third-party contractor are governed by a Memorandum of Understanding, and the third-party contractor works for the Forest Service. Resolution Copper pays for the work but does not manage the work done by the third-party contractor (Garrett 2019g).

Appendix R

| **Comment response: NEPA58** Lack of analysis on a variety of resources | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-27 | |

This comment identifies a number of resources for which the comment states that direct and indirect effects were not analyzed. This is incorrect. The DEIS includes all of these analyses. Specific issues include the following:

- Raptors, eagles, and other species. See response CR20 for details.
- Effects of dewatering on local water availability. See responses WT4 and WT21 for details.
- Potential ground subsidence. See response WT10 for details.
- Tribal cultural resources and Tribal religious and traditional practices. See response CR4 for details.
- Surrounding economics of the region. Response: Section 3.13 of the DEIS analyzed a wide range of socioeconomic effects (pp. 647–656).
- Landowners and their wells. Response: Section 3.7.1 of the DEIS analyzed water supply and potential impacts on well owners (p. 333). See also response WT45, Issue #8, for why wells were not analyzed individually but by proxy wells. We also added a discussion of the financial impacts of changes to water supply to the socioeconomics section (3.13) of the FEIS.
- Long-term environmental effects. Response: DEIS analysis covered the entire mine life cycle, including construction, operation, and closure (p. 36). Postclosure conditions also were analyzed in multiple places, including long-term trends (out to 1,000 years) for groundwater impacts (DEIS section 3.7.1, pp. 317–340) and reclamation success and revegetation time frames (DEIS section 3.3, pp. 186–201). In addition, each resource section in chapter 3 included an analysis of "Short-Term Uses and Long-Term Productivity" and "Irreversible and Irretrievable Commitment of Resources." These required disclosures illuminate long-term environmental effects of the project.

| **Comment response: NEPA59** Failure to consider conflicts with plans, policies, and controls | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-28 | |

This comment states, "The DEIS failed to consider possible conflicts between the project and Federal, regional, State, and local land use plans, policies, and controls as required by 40 C.F.R. §1502.16, as evidenced in part by the failure to consider conflicts between project water usage and local, statewide, and regional drought planning measures."

The comment is not correct. These plans are identified in section 3.17.2.40 (DEIS, p. 714). Compliance with these plans is included throughout the analysis. For instance, conflicts with the "Tonto National Forest Land and Resource Management Plan" are addressed through a specific plan amendment, as described in chapter 1 (DEIS, pp. 10–11). Note that in December 2023 the Tonto National Forest implemented a revised forest plan. We conducted a full consistency review for the new forest plan, similar to the consistency review we conducted before for the 1985 forest plan. The results of the consistency review are documented in the FEIS and the project record, and the proposed amendment to the forest plan for the preferred alternative is fully detailed in the FEIS.

In response to this comment, we have added summaries to section 3.17 to consolidate any conflicts with these plans into one location.

The drought contingency plan was considered through the cumulative effects analysis; see response WT4_F for more details. Note that despite the fact that the drought contingency plan itself is not able to be analyzed (as it does not have a temporal overlap with Resolution Copper water use), the FEIS cumulative effects analysis (chapter 4) has been expanded to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

Appendix R

| Comment response: NEPA60<br>Changes to issue statements | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>28449-10, 28449-11, 28449-12, 28449-8 | |

These comments all suggest changes to Section 1.7, Issues. In general, changing this section would be inappropriate. We developed issues based on scoping, and the analysis was structured around those issues. Section 1.7 describes the road map the Tonto National Forest used to develop the EIS. Retroactively changing the issues would be inappropriate.

However, since the DEIS addresses all items noted in these comments, we have made changes to the wording in FEIS section 1.7 as deemed appropriate.

| Comment response: NEPA61<br>Connected actions | Page 1 of 2 |
| --- | --- |
| **Responsive to these comments:**<br>8032-332 | |

This comment identifies several activities that are believed to be connected actions to the project and states that they were not analyzed. The comment is not correct. All issues raised were analyzed as part of the DEIS. Specific statements include the following:

- "Thus, the fact that some of the activities will occur on private lands does not eliminate NEPA's requirement that the Forest Service analyzed the environmental impacts of those private land activities." Response: The FEIS analyzes the environmental impacts of all activities associated with the project, regardless of land ownership or agency jurisdiction. This includes analysis of the East Plant Site and the mine site itself (which would be private land after the land exchange), the West Plant Site (private land), the MARRCO corridor (a mix of NFS and private land), the filter plant and loadout facility (private land), impacts from the Desert Wellfield (pumping from private land), and the tailings storage facility (on NFS, State, and private land, depending on the alternative).
- "We have argued as far back as our Pre-Feasibility Drilling Plan comments in April of 2009 that the dewatering of shafts #9 & #10 shafts at the East Plant are Connected to the larger mine now being discussed in this DEIS." Response: Section 3.7.1 describes the impacts that have occurred and will occur from current and future dewatering associated with the proposed action. The Forest Service does not agree that the affected environment described in the NEPA analysis should be retroactively applied to a point in time before Resolution Copper began activities at the site (dewatering began in 2009). The topic of appropriate baseline conditions for the water analysis is explicitly discussed in section 3.7.1 (DEIS, pp. 299–300). As noted there, the Forest Service has designed the analysis to ensure that even though the affected environment or baseline describes conditions at present, not in 2009, the NEPA analysis also discloses any ongoing trends caused by the dewatering (which began in 2009), including impacts to GDEs. This analysis is in section 3.7.1 (DEIS, p. 312). See response NEPA19 for more details on this issue.
- "The DEIS discusses briefly the need for an additional powerline corridor paralleling the MARRCO corridor, but defers a detailed analysis that is required under both NEPA and the NDAA. Likewise other powerlines feeding power to this project are mentioned but not discussed as is any real discussion of the actual route and design of pipeline and road access corridors." Response: This is incorrect. All power lines are included as components of the proposed action. The power lines included are clearly described in chapter 2 (DEIS, pp. 56–59; see specifically table 2.2.2-6). See response NEPA41 for more detail.

Appendix R

| Comment response: NEPA61 Connected actions | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
8032-332

- "For that matter, all mitigation and monitoring plans outlined in the DEIS are connected actions with this project and should have been discussed in detail in this document no matter what the ownership of land underlying the proposed measure." Response: The Forest Service concurs, and this information is included in the DEIS. Aside from the compilation of all mitigation and monitoring measures in appendix J, the effectiveness of the mitigation, including remaining unavoidable impacts, is discussed in every resource section of chapter 3. In addition, every resource section in chapter 3 also analyzes "Impacts from Mitigation Actions" to describe how the mitigation activities themselves may adversely impact some resources while benefiting others. The distinction is drawn in appendix J regarding whether mitigation is required under the authority of the Forest Service or other agency, or is proposed by Resolution Copper and voluntary. This distinction does not change whether the mitigation measure is discussed in chapter 3; all mitigation measures are discussed for their effectiveness. The distinction is included in appendix J because there is an element of uncertainty associated with some voluntary mitigation measures, and disclosure of this uncertainty to the public is important.

| Comment response: NEPA62 Scoping comments | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-121

This comment claims that scoping comments were not addressed in the DEIS.

During the NEPA process, there is no expectation that scoping comments be addressed individually in the DEIS; rather, scoping comments generate a suite of issues that then guide the analysis in the DEIS. Those issues are contained in the report "Final Summary of Issues Identified Through Scoping Process, November 2017" (SWCA Environmental Consultants 2017b) and are summarized in section 1.7 of the DEIS (pp. 24–27). A total of 14 issues and 29 sub-issues was identified based on scoping comments. A table in appendix E identifies where each sub-issue is analyzed in the DEIS.

Any given scoping comment can also be traced to the issue statements that encompass it, through the report "Public Concern Statements, May 2017" (U.S. Forest Service 2017h).

| Comment response: NEPA63 Molybdenum processing and transport | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-3

This comment states that the FEIS should include an analysis of the molybdenum processing and the subsequent transportation of the final product.

The DEIS included this analysis. Chapter 2 of the DEIS included molybdenum processing as part of the proposed action (pp. 38, 47). This includes the intent to transport the molybdenum concentrate from the West Plant Site by truck (DEIS, p. 58).

These molybdenum trucks were included in the traffic analysis in section 3.5 (DEIS, p. 258; see also Southwest Traffic Engineering LLC (2017)).

| Comment response: NEPA64 Future meteorological trends | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-196, 8032-60, 8032-61

These comments state that future meteorological trends have not been adequately addressed in the DEIS.

The comment is not correct. The discussion of potential impacts due to future meteorological trends is included under certain resource sections in chapter 3 and has been consolidated in FEIS chapter 4.

Appendix R

| Comment response: NEPA65 | |
|---|---|
| Analysis of land exchange | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1188-29, 1188-7, 1441-5 |

These comments raise several issues regarding the analysis of the effects of the land exchange.

One concern is as follows: "This DEIS is incomplete, because it does not disclose the pre-exchange and post-exchange land management practices for the Lower San Pedro River parcel." Response: The pre-exchange conditions of the offered land parcels, including the Lower San Pedro Parcel, are summarized in chapter 2 (DEIS, p. 34) and discussed in detail in DEIS appendix B. The post-exchange management of the parcels is disclosed to the extent that it can be (DEIS, p. 14), and then in each resource section in chapter 3 (see the "Effects of the Land Exchange" subsection in each resource section). However, the specific management of the offered lands was not dictated by Congress in PL 113-291, and those lands will be subject to management under whatever land and resource management plans are in place for the BLM, Coconino National Forest, or Tonto National Forest. See response NEPA50 for further discussion of this topic, specific to the Lower San Pedro Parcel.

Another concern is as follows: "The DEIS does not provide a comprehensive analysis of the effects of the proposed land exchange." Response: The effects of the proposed land exchange are handled in multiple ways. First, as noted above, each resource section in chapter 3 includes a subsection titled "Effects of the Land Exchange," which addresses effects on a resource-by-resource basis. A larger question is how the mine itself might develop on Federal land (no land exchange occurs) instead of private land (land exchange occurs). This change in regulatory oversight is discussed in chapter 2 (DEIS, pp. 66–67, 104–105) and appendix I.

Another concern is as follows: "We do not believe the DEIS properly evaluates the second No Action alternative with no land exchange. That option would retain the Oak Flat campground and the ore body beneath it in Federal ownership and not accessible for mining. The FEIS should include this evaluation." Response: This scenario is analyzed in the DEIS. There are two aspects of this question to consider: regulatory oversight, and physical effects. The physical effects of the mine development would be the same, regardless of whether the land exchange occurs: "Physically, the panel caving proposed to take place under Oak Flat is independent of the land exchange. The deposit would be mined with fundamentally the same techniques and require fundamentally the same infrastructure, and result in the same surface subsidence, regardless of whether the surface is under Forest Service jurisdiction or is private" (DEIS, p. 105). The change in regulatory oversight caused by the land exchange (shifting from a mine on Federal land to a mine on private land) is the focus of DEIS appendix I.

| Comment response: NEPA66 | |
|---|---|
| Freedom of Information Act (FOIA) request | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 8032-224 |

This comment summarizes a Freedom of Information Act (FOIA) request made to the Forest Service's Southwestern Region (Region 3) regarding the appraisal and the response received by the submitter.

We defer to the response provided by Region 3. The FOIA request has no bearing on the NEPA analysis at this time, as the appraisal was not considered in the DEIS.

| Comment response: NEPA67 | |
|---|---|
| Congressional approval of land exchange | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1150-5 |

This comment states, "Congress approved a land exchange prior to the NEPA process which is not acceptable."

The Forest Service is directed by law to execute the land exchange and must follow the provisions in PL 113-291 (DEIS, p. 13).

Appendix R

| Comment response: NEPA68 Updated forest plan | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
64-3, 885-3

These comments concern the status of the updated forest plan. At the time of the DEIS, a revision to the 1985 "Tonto National Forest Land and Resource Management Plan" (1985 forest plan) was underway. As of the date of publication of the DEIS, the 1985 plan dictated the management direction for the Tonto National Forest, and the plan amendment considered in the DEIS is specific to the 1985 forest plan.

The revised forest plan for the Tonto National Forest was implemented in December 2023. We conducted a full consistency review of the new forest plan, similar to the consistency review we conducted before for the 1985 forest plan. The results of the consistency review are documented in the FEIS and the project record, and the proposed amendment to the forest plan for the preferred alternative is fully detailed in the FEIS.

| Comment response: NO1 Noise baseline for Skunk Camp location | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-248, 8032-277

This comment indicates that baseline noise measurements should be collected for the Skunk Camp location, rather than extrapolation based on baseline noise measurements at the Peg Leg location.

CEQ regulations in effect during the NEPA process (1502.22) address incomplete or unavailable information. Two pertinent aspects are cited in these regulations: (1) Is the information "relevant to reasonably foreseeable significant adverse impacts?" and (2) Is the information "essential to a reasoned choice among alternatives?" Baseline noise measurements for Alternative 6 – Skunk Camp are not necessary because that information does not meet either of these thresholds.

The comment misinterprets the purpose of collecting baseline noise measurements, suggesting they are required at every location where noise levels are predicted. This is not the case.

The noise analysis focuses on seven analysis areas "where there are existing and/or future land uses that are particularly sensitive to noise, known as 'noise sensitive areas'" (DEIS, p. 211). These areas are based on land uses (e.g., residential, recreation, conservation). Within each of these general areas, a single specific location known as a "sensitive receptor" was selected for predictive modeling, set at the location anticipated to experience the highest future noise.

Predictive future noise requires an assumption of baseline noise levels. Resolution Copper completed baseline noise monitoring at six locations. These sample locations were meant to represent the general noise sensitive areas and land uses so that they can be reasonably used for all identified sensitive receptors (DEIS, p. 213). The DEIS (p. 218) details each baseline noise monitoring location and the land uses each location represents. As shown in table 3.4.3-1 (DEIS, p. 220), the "measured" locations are then matched to the sensitive receptors based on land use and compared with "expected" levels at sensitive receptors in comparable land use(s). The Peg Leg monitoring location at the Peg Leg location also was used for Skunk Camp as well based on land use: "This location also serves as the source of background noise for Alternative 6, given the similar rural setting" (DEIS, pp. 218–219). This approach is identical to that taken for all other sensitive receptors shown in table 3.4.3-1. Having baseline noise measurements at each and every location where noise is modeled is not "essential to a reasoned choice among alternatives."

Predicted future noise at the Skunk Camp tailings storage facility also is not a "significant adverse impact" that would inform a choice among alternatives. As shown in figure 3.4.4-6 (DEIS, p. 240), the noise contours at the most stringent threshold applied in the DEIS (55 A-weighted decibels (dBA)) do not leave the facility boundaries except along Dripping Springs Road.

Residences along Dripping Springs Road are the sole location at which modeled noise impacts exceed any selected thresholds under normal conditions (DEIS, p. 242). Mitigation was included in the DEIS to prevent these impacts (see mitigation measure RC-218, p. 242). The FEIS identifies different mitigation that is effective at preventing noise levels from exceeding thresholds at the residences along Dripping Springs Road (see mitigation measure RC-NV-01 in section 3.4 and appendix J of the FEIS).

Appendix R

| Comment response: NO2 | |
|---|---|
| Need for analysis of rail noise | Page 1 of 1 |

**Responsive to these comments:**
1344-3

This comment indicates the concern that running the rail cars at night to avoid traffic (see DEIS, p. 261) would instead increase noise levels. The DEIS already discloses these impacts.

Noise levels associated with the rail cars were incorporated into the noise modeling: "The Filter Plant and Loadout Facility also incorporates a railway system that will tie into the existing railway located along the MARRCO corridor. The facility will be able load a maximum of two trains per day with 100 cars. This railway was entered as a railway source in the noise model and was evaluated from the Filter Plant to Magma Junction" (Tetra Tech Inc. 2019:30).

Modeling results are shown in figure 3.4.4-3 (DEIS, p. 230), as well as in Tetra Tech Inc. (2019:figure 12a, p. 43). Noise levels at four sensitive receptors were modeled in the immediate vicinity of the rail line (see DEIS figure 3.4.3-1, p. 217). The noise levels do not exceed the most stringent noise level applied in the DEIS (55 dBA).

Rail noise levels were not explicitly modeled in the DEIS for Alternative 4 – Silver King, which envisions the possibility of moving the filter plant to Superior, thus requiring rail cars to transport concentrate from Superior to Magma Junction. We have added an analysis to section 3.4 of the FEIS to discuss these impacts.

| Comment response: NO3 | |
|---|---|
| Basis for background noise measurements | Page 1 of 2 |

**Responsive to these comments:**
8032-273, 8032-274, 8032-276, 8032-278, 8032-39

This set of comments expresses general concerns over the collection and use of background noise measurements.

One comment references statements from the GPO that indicate that noise monitoring would be done during the NEPA process. This monitoring was indeed conducted and formed the basis for the DEIS analysis (see "Background Noise Measurements," DEIS, p. 213).

Other comments raise two concerns: the representativeness of the selected baseline monitoring time frames, and the potential skewing of data due to ongoing activities or other disturbances (aircraft noise is mentioned specifically). These concerns are raised because they could potentially skew the baseline data higher, therefore potentially minimizing the noise impacts caused by the mine.

The methodology used for the DEIS addresses these two concerns.

Daily/weekly variation is accounted for by the duration of monitoring: "Background noise levels are monitored for several days or weeks in order to account for variation between day and night, and weekends and weekdays" (DEIS, p. 213).

Seasonal variation also was reflected in the methodology: "Ambient sound and vibration measurements were performed from June 7 through July 2016 to represent the existing environment for the spring and summer periods when there are fewer residents and less outdoor recreation. Additional sound and vibration measurements were conducted from November 14, 2017 through January 18, 2018, to represent the existing environment for the fall and winter conditions, when there are more residents and more outdoor recreation" (Tetra Tech Inc. 2019:9). Specifically, the recreational use areas around Alternatives 2/3 – Near West were monitored during both the summer and winter periods; the results are comparable, with the summer measurements being slightly higher. The higher measurements were selected for use in the DEIS (DEIS table 3.4.3-1, p. 220).

As part of the methodology, the data were reviewed for anomalous high measurements, and these were removed: "The background noise data are then reviewed to identify any anomalies, such as fireworks, thunder, rainfall, high wind, or very close activity (like a nearby off-road vehicle). While these types of noises do occur in the analysis area, they happen infrequently or may affect the monitoring equipment more than they would a human listener. The goal of background noise measurements is to obtain a 'typical' background level, while acknowledging that occasional louder noises would also occur" (DEIS, p. 213).

Appendix R

| Comment response: NO3 | |
|---|---|
| Basis for background noise measurements | Page 2 of 2 |

**Responsive to these comments:**
8032-273, 8032-274, 8032-276, 8032-278, 8032-39

As a cross-check, baseline noise measurements were also assessed vs. expected background noise levels for different land uses and found to be similar (Tetra Tech Inc. 2019:table 11, pp. 20-21) (DEIS, pp. 213, 219–220).

Regardless of how background noise measurements are determined, the approach used to assess noise impacts in the DEIS effectively prevents background measurements from skewing modeled results. The results are assessed not only for the total modeled noise (background noise plus predicted mine noise), but also for the incremental increase over background levels. A threshold of a 15-dBA noise increase was used in the DEIS to define adverse impacts.

| Comment response: NO5 | |
|---|---|
| Noise/vibration caused by block caving | Page 1 of 1 |

**Responsive to these comments:**
8032-282

We have added further analysis to section 3.4 of the FEIS to evaluate the potential for noise or vibration caused by block caving activities.

| Comment response: NO6 | |
|---|---|
| Impacts from concentrator/dryer | Page 1 of 1 |

**Responsive to these comments:**
417-3

This comment questions whether the impacts of noise, light, and air emissions from the concentrator/dryer were assessed. From context, we believe the term "concentrator/dryer" refers to the filter plant and loadout.

Noise, air quality, and light impacts from these emissions already were incorporated into the modeling used to disclose impacts in the DEIS.

With regard to air quality, all sources of emissions associated with the filter plant and loadout were included. The exact sources of emissions are detailed in Air Sciences Inc. (2019b:appendix A, pp. 45-53). Note specifically the reference to "Copper Concentrate Loadout" on p. 51.

These sources also were included in noise modeling: "The primary noise sources for the Filter Plant and Loadout Facility include conveyors, concentrator filter plant, substation and mobile equipment" (Tetra Tech Inc. 2019:28).

Lighting effects from the filter plant also were included in the dark skies modeling. See the Dark Sky Partners LLC (2018:table 3, p. 12) reference to "Concentrate Loadout." We added more details on the impacts of lighting sources and dark skies to section 3.11 of the FEIS.

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 1 of 6 |
| --- | --- |

**Responsive to these comments:**

1-1, 2-1, 3-2, 4-1, 6-1, 1000-1, 1001-1, 1002-1, 100-3, 1003-3, 1004-1, 1005-1, 1006-1, 1007-1, 1008-1, 1009-1, 1010-1, 1011-1, 101-2, 1012-1, 1013-1, 1014-1, 1015-1, 1016-1, 1017-1, 1018-1, 1019-1, 1020-1, 1021-1, 1022-1, 1024-1, 1025-1, 1027-1, 1028-1, 1029-1, 1030-1, 103-1, 1031-1, 1032-1, 1033-1, 1034-1, 1035-1, 1036-1, 1037-1, 1038-1, 1039-1, 1040-1, 1041-1, 1042-1, 1045-1, 104-6, 1046-1, 1047-1, 1049-1, 1050-1, 105-1, 1054-2, 1055-1, 1056-1, 1057-1, 1059-1, 1060-1, 1063-1, 1064-1, 1065-1, 1066-1, 1067-1, 1068-7, 1069-1, 1070-1, 1072-1, 1073-1, 1074-2, 107-5, 1075-1, 1077-1, 1078-1, 1079-1, 1080-1, 1081-1, 1082-1, 1083-1, 1084-1, 108-5, 1086-1, 1086-3, 1087-1, 1088-3, 1090-1, 1090-4, 109-1, 1091-1, 1092-4, 1093-1, 1094-3, 1095-1, 1096-1, 1099-1, 1100-1, 1101-1, 110-2, 1102-1, 1103-4, 1104-1, 1107-2, 1107-8, 1108-1, 1109-1, 111-1, 1111-1, 1112-2, 1113-3, 1116-1, 1117-3, 112-2, 1122-1, 112-3, 1123-1, 1124-1, 1125-1, 1125-2, 1126-1, 1130-2, 113-1, 1131-1, 1132-1, 1134-1, 1135-1, 1138-1, 1139-1, 114-1, 1142-1, 1143-1, 1144-1, 1145-1, 1147-1, 1148-2, 1151-2, 115-2, 1152-2, 1155-1, 1156-1, 1159-1, 1159-5, 1160-1, 116-1, 1161-1, 1162-1, 1164-2, 1165-1, 1166-1, 1167-1, 1168-1, 1169-3, 1170-1, 117-1, 1171-1, 1172-1, 1173-1, 1174-1, 1175-1, 1177-1, 1178-1, 1179-1, 1180-1, 1180-2, 1181-1, 118-2, 1182-1, 1183-1, 1184-1, 1185-2, 1186-1, 1187-1, 1188-6, 1190-1, 119-1, 1191-1, 1192-1, 1193-1, 1194-3, 1195-1, 1196-3, 1197-1, 1198-1, 1199-1, 1200-1, 1202-1, 1203-1, 1203-2, 1204-1, 1206-1, 1208-1, 1210-1, 121-1, 1211-1, 1212-1, 1213-1, 1214-1, 1215-1, 1216-1, 1217-1, 1218-1, 1219-1, 1220-1, 122-1, 1221-1, 1222-1, 1223-1, 1224-1, 1225-1, 1226-1, 1227-1, 1228-1, 1229-1, 1230-1, 1232-2, 1233-1, 1234-1, 1237-1, 1237-4, 1238-1, 1239-1, 1240-1, 124-1, 1241-2, 1242-1, 1243-1, 1244-1, 1245-1, 1246-1, 1247-1, 1249-1, 1250-1, 1251-1, 125-2, 1252-1, 1253-1, 1254-1, 1255-1, 1256-1, 1257-1, 1258-1, 1259-1, 1260-1, 1261-1, 1262-1, 1262-2, 1264-1, 1267-1, 1268-1, 1269-1, 1270-1, 127-1, 1271-1, 1272-1, 1273-1, 1273-2, 1273-3, 1274-2, 1275-1, 1276-2, 1278-1, 1280-1, 128-1, 1281-1, 1281-5, 1282-1, 1283-1, 1285-1, 1286-1, 1288-1, 1290-1, 129-1, 1292-1, 1295-2, 1298-1, 1299-1, 1300-1, 1302-1, 1303-1, 1304-1, 1305-1, 1307-1, 1308-3, 1310-4, 1310-5, 131-1, 1312-1, 1312-2, 1313-1, 1314-1, 1315-1, 1316-1, 1316-2, 1318-5, 1318-6, 1319-1, 1320-1, 132-2, 1322-1, 1323-1, 1324-2, 1325-1, 1326-1, 1327-1, 1330-1, 133-1, 1331-1, 1332-1, 1337-1, 134-1, 1341-1, 1344-2, 1345-1, 1346-1, 1347-1, 1348-1, 135-1, 1351-2, 1352-1, 1354-1, 1355-1, 1356-7, 1357-1, 1358-6, 1359-5, 1360-4, 136-1, 1362-1, 1363-1, 1364-1, 1365-1, 1366-1, 1367-1, 1370-2, 137-1, 1372-1, 1373-1, 1376-1, 1377-1, 1378-1, 1379-2, 138-1, 1382-1, 1383-3, 1383-4, 1384-1, 1385-1, 1386-1, 1387-1, 1388-2, 1389-43, 1390-1, 139-1, 1391-1, 1392-1, 1393-1, 1394-1, 1395-1, 1396-1, 1397-1, 1401-1, 1403-1, 1406-2, 1407-3, 14-1, 1410-1, 1410-3, 141-1, 142-1, 1422-1, 1422-6, 1425-1, 1427-1, 1428-1, 1429-3, 143-1, 1436-1, 1440-1, 144-1, 1442-1, 1445-1, 1449-1, 1450-4, 145-1, 1451-1, 1455-3, 1456-2, 1457-1, 1459-1, 146-1, 1462-1, 1465-1, 1466-1, 1468-1, 1468-11, 1468-7, 1469-3, 1470-2, 147-1, 1471-1, 1471-3, 1474-1, 1475-1, 1476-1, 1478-1, 1480-1, 1482-1, 1483-1, 1484-1, 1485-1, 1486-1, 1487-1, 1488-1, 1490-1, 1490-2, 1490-3, 1491-1, 1492-2, 1494-1, 1495-1, 1497-1, 1500-1, 1502-1, 1503-1, 1504-4, 1505-1, 1507-1, 1508-4, 1509-1, 1512-1, 1513-2, 1514-1, 151-5, 1516-1, 1518-1, 15-2, 1520-4, 152-1, 1521-2, 1523-1, 1525-2, 1527-1, 1530-1, 153-1, 1531-6, 1532-3, 1536-1, 1537-1, 1538-1, 1538-6, 1548-1, 155-1, 156-1, 1562-1, 1564-1, 1565-1, 157-3, 1579-1, 1580-1, 159-2, 1606-2, 1611-1, 161-2, 1612-1, 1614-1, 1615-1, 1616-1, 1619-1, 1622-1, 1626-1, 164-1, 166-2, 167-1, 168-1, 170-2, 17-1, 171-1, 172-1, 173-1, 176-1,

Appendix R

| Comment response: NS1 | |
|---|---|
| General response for non-substantive comments | Page 2 of 6 |

**Responsive to these comments:**

177-1, 178-1, 179-1, 180-3, 181-1, 1812-1, 18-2, 1820-1, 182-1, 183-2, 1838-1, 1841-1, 1845-1, 185-1, 1857-1, 186-3, 1870-2, 187-1, 1873-1, 1875-1, 1884-1, 1884-2, 1884-3, 1885-4, 189-1, 190-1, 1907-1, 1908-1, 1910-1, 191-1, 1912-1, 1919-4, 1920-1, 192-1, 1924-1, 1924-2, 193-1, 1933-3, 1938-1, 194-1, 1942-1, 1947-1, 195-1, 1952-1, 196-1, 1963-1, 1965-1, 1969-1, 1975-1, 1976-1, 198-1, 1986-1, 1990-1, 1994-1, 1995-1, 1997-1, 200-1, 2001-1, 2001-2, 2002-1, 2006-1, 2006-2, 2009-1, 201-1, 2012-1, 2016-1, 2018-1, 20-2, 2022-1, 2041-1, 204-2, 2043-1, 2044-1, 2051-1, 2058-1, 206-1, 2070-1, 209-2, 209-4, 2097-1, 210-2, 2105-1, 211-1, 2115-1, 2117-1, 21-2, 212-1, 2122-1, 2124-1, 2125-1, 2129-1, 213-3, 214-1, 216-1, 217-1, 218-1, 220-1, 221-1, 222-1, 223-1, 226-1, 227-3, 228-1, 229-1, 229-2, 229-3, 230-1, 231-1, 232-1, 234-1, 235-7, 236-3, 237-1, 238-2, 239-1, 240-1, 241-2, 242-2, 243-1, 244-1, 25-1, 253-1, 256-1, 258-1, 261-1, 263-4, 264-1, 265-2, 266-1, 267-1, 26812-1, 26814-1, 26815-1, 26817-1, 26818-1, 26819-1, 26822-1, 26823-1, 26824-1, 26827-1, 26831-1, 26836-1, 26838-1, 26839-1, 26841-1, 26842-1, 26843-1, 26844-1, 26845-1, 26846-1, 26849-1, 26852-1, 26853-1, 26857-1, 26858-1, 26862-1, 26868-1, 26871-1, 26897-1, 26903-1, 26904-1, 26905-1, 26909-1, 269-1, 26913-1, 26914-1, 26915-1, 26916-1, 26918-1, 26922-1, 26935-1, 26937-1, 26939-1, 26940-1, 26941-1, 26942-1, 26943-1, 26944-1, 26946-1, 26954-1, 26955-1, 26956-1, 26957-1, 26958-1, 26962-1, 26965-1, 26966-1, 26967-1, 26970-1, 26971-1, 26973-1, 26977-1, 26978-1, 26980-1, 26984-1, 26986-1, 26988-1, 26990-1, 26992-1, 26994-1, 26996-1, 26997-1, 26999-1, 27000-1, 27003-1, 27005-1, 27006-1, 27007-1, 27008-1, 27011-1, 27013-1, 27014-1, 27021-1, 27022-1, 27026-1, 27031-1, 27044-1, 27048-1, 27049-1, 27056-1, 27073-1, 27074-1, 27078-1, 27084-1, 27092-1, 27093-1, 27094-1, 27095-1, 27097-1, 27099-1, 27100-1, 27101-1, 27104-1, 27105-1, 27106-1, 27109-1, 271-1, 27110-1, 27111-1, 27115-1, 27116-1, 27117-1, 27118-1, 27119-1, 27120-1, 27121-1, 27126-1, 27129-1, 27131-1, 27132-1, 27137-1, 27140-1, 27142-1, 27145-1, 27149-1, 27150-1, 27151-1, 27153-1, 27154-1, 27156-1, 27159-1, 27161-1, 27162-1, 27164-1, 27165-1, 27166-1, 27167-1, 27168-1, 27169-1, 27175-1, 27176-1, 27177-1, 27179-1, 27180-1, 27181-1, 27183-1, 27184-1, 27185-1, 27186-1, 27187-1, 27190-1, 27191-1, 27192-1, 27194-1, 27197-1, 27200-1, 27204-1, 27205-1, 27208-1, 27209-1, 272-1, 27210-1, 27222-1, 27223-1, 27224-1, 27227-1, 27239-1, 27250-1, 27255-1, 27273-1, 27277-1, 27278-1, 27278-2, 27280-1, 27282-1, 27288-1, 27292-1, 27318-1, 27319-1, 27325-1, 27328-1, 27334-1, 27335-1, 27336-1, 27337-1, 27340-1, 27345-1, 27350-1, 27352-1, 27354-1, 27356-1, 27358-1, 27359-1, 27360-1, 27361-1, 27366-1, 27376-1, 27380-1, 27381-1, 27383-1, 27387-1, 27391-1, 27392-1, 27397-1, 27414-1, 27415-1, 27416-1, 27417-1, 27421-1, 27422-1, 27427-1, 27428-1, 27441-1, 27442-1, 27463-1, 27490-1, 27508-1, 275-1, 27510-1, 27511-1, 27515-1, 27539-1, 27571-1, 27572-1, 27580-1, 27587-1, 27588-1, 27591-1, 27598-1, 27602-1, 276-1, 27617-1, 27618-1, 27619-1, 27621-1, 27624-1, 27630-1, 27634-1, 27636-1, 27641-1, 27642-1, 27657-1, 27658-1, 27660-1, 27661-1, 27662-1, 27663-1, 27664-1, 27666-1, 27667-1, 27668-1, 27669-1, 27671-1, 27672-1, 27675-1, 27679-1, 27681-2, 27694-1, 27699-1, 27705-1, 27706-1, 27709-1, 277-1, 27715-1, 27716-1, 27725-1, 27725-2, 27726-1, 27732-1, 27733-1, 27734-1, 27737-1, 27738-1, 27739-1, 27740-1, 27740-2, 27741-1, 27742-1, 27743-1, 27745-1,

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 3 of 6 |
|---|---|

**Responsive to these comments:**

27748-1, 27749-1, 27753-1, 27754-1, 27755-1, 27755-4, 27756-1, 27758-1, 27759-1, 27760-1, 27762-1, 27763-3, 27764-1, 27765-1, 27767-1, 27768-1, 27769-1, 27770-1, 27771-1, 27773-1, 27779-1, 27782-1, 27783-1, 27787-1, 27788-1, 27790-1, 27791-1, 27792-1, 27793-1, 27794-1, 27795-1, 27797-1, 27798-1, 27802-1, 27803-1, 27804-1, 27807-1, 27808-1, 27809-1, 27811-1, 27817-1, 27818-1, 27822-1, 27823-1, 27824-1, 27826-1, 27830-1, 27831-1, 27832-1, 27833-1, 27836-1, 27837-1, 27838-1, 27841-1, 27842-1, 27843-1, 27844-1, 27845-1, 27847-1, 27850-1, 27852-1, 27853-1, 27855-1, 27856-1, 27859-1, 27860-1, 27862-1, 27864-1, 27866-1, 27872-1, 27874-1, 27875-1, 27876-1, 27878-1, 27879-1, 27884-1, 27886-1, 27887-1, 27888-1, 27891-1, 27892-1, 27893-1, 27894-1, 27895-1, 27896-1, 27897-1, 27898-1, 27899-1, 27901-1, 27902-1, 27904-1, 27905-1, 27906-1, 27908-1, 27912-1, 27913-1, 27914-1, 27915-1, 27916-1, 27916-3, 27917-1, 27919-1, 27920-1, 27921-1, 27922-1, 27923-1, 27924-1, 27925-1, 27926-1, 27928-1, 27929-1, 27931-1, 27932-1, 27934-1, 27935-1, 27936-1, 27937-1, 27938-1, 27939-1, 27940-1, 27942-1, 27943-1, 27945-1, 27947-1, 27948-1, 27950-1, 27954-1, 27955-1, 27955-2, 27957-1, 27957-3, 27960-1, 27962-1, 27964-1, 27966-1, 27971-1, 27972-1, 27973-1, 27974-1, 27975-1, 27976-1, 27777-3, 27984-1, 27986-1, 27987-1, 27988-1, 27989-1, 27993-2, 27994-1, 28000-1, 28002-1, 28002-3, 28003-1, 28007-1, 280-1, 28013-1, 28014-2, 28014-3, 28015-1, 28016-1, 28017-2, 28019-1, 28020-1, 28021-1, 28022-1, 28024-1, 28025-1, 28026-1, 28029-1, 28030-1, 28032-1, 28033-1, 28034-1, 28035-1, 28036-1, 28037-1, 28042-1, 28043-1, 28044-1, 28046-2, 28048-1, 28049-1, 28052-1, 28053-1, 28055-1, 28057-1, 28059-1, 28061-1, 28062-1, 28063-1, 28064-1, 28065-1, 28066-1, 28067-1, 28074-1, 28080-1, 28084-1, 28085-1, 28086-1, 28087-1, 28090-1, 28093-1, 28093-7, 28094-1, 28095-1, 28096-1, 28097-1, 28098-1, 28-1, 28100-1, 28101-1, 28103-1, 28105-1, 28106-1, 28106-5, 28107-1, 28108-1, 28111-1, 28112-1, 28113-1, 28114-1, 28115-1, 28116-1, 28120-1, 28125-1, 28126-1, 28131-1, 28135-1, 28138-1, 28139-1, 28145-1, 28154-1, 28157-1, 28159-1, 28164-1, 28168-1, 28169-1, 28172-1, 28173-1, 28175-1, 28176-1, 28177-1, 28183-1, 28184-1, 28188-1, 28195-1, 28199-1, 28200-1, 282-1, 28215-1, 28221-1, 28226-1, 28232-1, 28236-1, 28241-1, 28242-1, 28257-1, 28261-1, 28264-1, 28265-1, 28284-1, 28288-1, 28289-1, 28299-1, 28315-1, 28316-1, 28320-1, 28327-1, 28335-1, 28340-1, 28347-1, 28352-1, 283-7, 28382-1, 28383-1, 28391-1, 28392-1, 28394-1, 28397-1, 28401-1, 28405-1, 28406-1, 284-1, 28413-1, 28419-1, 28421-1, 28423-1, 28431-1, 28433-1, 28439-1, 28440-1, 28443-1, 28454-1, 28456-1, 28456-2, 28466-1, 28471-1, 28477-1, 28482-1, 28485-1, 28498-1, 28501-1, 28505-1, 28506-1, 28507-1, 28508-1, 285-1, 28517-1, 28529-1, 28532-1, 28536-1, 28539-1, 28541-1, 28542-1, 28543-1, 28545-1, 28546-1, 28549-1, 28553-1, 28555-1, 28559-1, 28560-1, 28561-1, 28562-1, 28564-1, 28565-1, 28570-1, 28572-1, 28579-1, 28583-1, 28588-1, 28590-1, 28592-1, 28601-1, 28607-1, 28610-1, 28611-1, 28615-1, 28618-1, 28624-1, 28639-1, 28641-1, 28642-1, 28645-1, 28646-1, 28649-1, 28653-1, 28656-1, 28659-1, 28660-1, 28671-1, 28675-1, 28677-1, 28678-1, 28701-1, 287-1, 28714-1, 28718-1, 28731-1, 28738-1, 28745-1, 28748-1, 28752-1, 28794-1, 28795-1, 28797-1, 28801-1, 28802-1, 28802-3, 28807-1, 288-1, 288-2, 28837-1, 28839-1, 28840-1, 28844-1, 28846-1, 28850-1, 28851-1, 28860-1, 28862-1, 28865-1, 28866-1, 28867-1, 28871-1, 28875-1, 28877-1, 28881-1, 28891-1, 28894-1, 28903-1, 28909-1, 289-1, 28919-1, 28926-1, 28927-1, 28930-1, 28935-1, 28942-1, 28943-1, 28945-1, 28946-1, 28948-1, 28950-1,

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 4 of 6 |
| --- | --- |

**Responsive to these comments:**
28951-1, 28956-1, 28957-1, 28961-2, 28963-1, 28964-1, 28965-1, 28966-1, 28970-1, 28975-1, 28982-1, 28995-1, 29005-1, 29009-1, 29010-1, 29025-1, 29032-1, 29035-1, 290-4, 29040-1, 29044-1, 29046-1, 29047-1, 29050-1, 29054-1, 29056-1, 29058-1, 29060-1, 29066-1, 29075-1, 29081-1, 29088-1, 29091-1, 29095-1, 29096-1, 29102-1, 29109-1, 29110-1, 29117-1, 29119-1, 29125-1, 29126-1, 29127-1, 29132-1, 29139-1, 29140-1, 29142-1, 29144-1, 29148-1, 29149-1, 29152-1, 29154-1, 29155-1, 29156-1, 29158-1, 29162-1, 29163-1, 29164-1, 29164-2, 29169-1, 29171-1, 29179-1, 29183-1, 29188-1, 29194-1, 292-1, 29231-1, 29237-1, 29241-1, 29253-1, 29258-1, 29261-1, 29269-1, 29273-1, 29286-1, 29290-1, 29299-1, 29309-1, 293-1, 29312-1, 29330-1, 29331-1, 29333-1, 29337-1, 29338-1, 29344-1, 29345-1, 29349-1, 29351-1, 29361-1, 29370-1, 29380-1, 29383-1, 29387-1, 29390-1, 29394-1, 29397-1, 29401-1, 29406-1, 29433-2, 29444-1, 29444-3, 29448-1, 29452-1, 29455-1, 29468-1, 29475-1, 29487-1, 29491-1, 29492-1, 29494-1, 29496-1, 29499-1, 29503-1, 29506-1, 295-1, 296-1, 29654-1, 29655-1, 29707-1, 29708-1, 29708-3, 297-1, 29710-1, 29711-1, 29712-1, 29713-1, 29754-1, 29755-1, 298-3, 299-1, 30065-1, 30066-1, 30069-1, 30070-1, 30072-1, 30073-1, 30078-1, 30097-1, 30101-1, 30102-1, 30103-1, 30106-1, 30108-1, 301-1, 30111-1, 30114-1, 30115-1, 30116-1, 30117-1, 30118-1, 30119-1, 30120-1, 30121-1, 30122-1, 30123-1, 30124-1, 30126-1, 30127-1, 30128-1, 30129-1, 30131-1, 30132-1, 30133-1, 30134-1, 30135-2, 30137-1, 30138-2, 30139-1, 302-1, 304-1, 305-1, 306-1, 307-1, 308-1, 309-1, 310-1, 312-1, 313-1, 315-1, 316-1, 317-1, 317-3, 318-1, 319-1, 321-2, 323-2, 325-1, 326-1, 327-1, 33-1, 337-1, 34-1, 341-1, 342-1, 344-1, 346-1, 347-1, 348-1, 349-1, 352-1, 353-1, 354-1, 355-1, 356-1, 358-1, 359-1, 360-1, 367-1, 371-1, 374-1, 376-1, 383-1, 384-1, 387-1, 389-1, 390-1, 39-1, 393-1, 395-1, 396-1, 398-1, 399-1, 40-4, 407-1, 409-1, 409-2, 417-4, 418-1, 418-2, 419-1, 420-1, 421-2, 422-1, 425-2, 430-1, 431-1, 432-1, 435-1, 435-2, 436-1, 437-1, 438-1, 439-1, 440-1, 443-1, 444-1, 446-1, 447-1, 448-1, 450-1, 450-2, 451-1, 452-1, 453-1, 454-1, 456-1, 457-1, 458-1, 459-1, 460-1, 462-1, 464-1, 465-1, 465-2, 466-2, 469-1, 470-1, 471-1, 472-1, 473-1, 475-1, 475-2, 476-1, 478-1, 481-1, 481-3, 487-1, 490-1, 492-1, 493-2, 497-1, 497-3, 498-1, 499-1, 50-1, 501-1, 502-1, 504-1, 505-1, 508-1, 509-1, 510-1, 51-1, 512-1, 51-3, 513-1, 51-4, 514-1, 518-1, 522-1, 522-2, 525-1, 526-1, 527-1, 528-1, 531-1, 532-1, 533-1, 534-1, 5349-1, 5359-1, 5370-1, 5373-1, 5377-1, 5378-1, 5380-1, 538-1, 5382-1, 5390-1, 5391-1, 5393-1, 5395-1, 5396-1, 5398-1, 5399-1, 5400-1, 540-1, 5401-1, 5402-1, 5403-1, 5404-1, 5405-1, 5408-1, 5410-1, 541-4, 5414-1, 5416-1, 5417-1, 5418-1, 5419-1, 5420-1, 542-1, 5421-1, 542-2, 5422-1, 5428-1, 5429-1, 543-1, 5431-1, 5432-1, 5433-1, 5434-1, 5437-1, 54-4, 5440-1, 5442-1, 5445-1, 5446-1, 5447-1, 5450-1, 5451-1, 5452-1, 5452-2, 5453-1, 5454-1, 5455-1, 5456-1, 5457-1, 5458-1, 5460-1, 546-1, 5461-1, 5462-1, 5464-1, 5465-1, 5468-1, 5469-1, 547-1, 5471-1, 5472-1, 5474-1, 5475-1, 5476-1, 548-1, 5484-1, 549-1, 5492-1, 5493-1, 5495-1, 5497-1, 550-1, 5504-1, 5505-1, 55-1, 551-1, 5514-1, 5517-1, 5518-1, 5519-1, 5520-1, 5521-1, 5528-1, 553-1, 5535-1, 5540-1, 554-1, 5549-1, 5551-1, 5556-1, 5558-1, 5563-1, 5564-1, 5566-1, 5566-2, 5567-1, 5571-1, 5574-1, 558-1, 5582-1, 5589-1, 5594-1, 5598-1, 5599-1, 560-1, 5601-1, 5603-1, 5608-1, 561-1, 5616-1, 5618-1, 562-1, 562-2, 56-3, 5631-1, 5633-1, 5633-2, 5637-1, 564-1, 5644-1, 565-1, 5655-1, 5658-1, 566-1, 5664-1, 5669-1, 567-1, 5678-1, 568-1, 569-1, 570-1, 57-1, 571-1, 5721-1, 5727-1, 5727-3, 573-2, 574-1, 5742-1, 5743-1, 5747-2, 575-1, 5757-1, 5769-1, 577-1, 5776-1, 5777-1, 578-1, 578-2, 5783-1, 5787-1, 580-1, 581-1,

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 5 of 6 |
| --- | --- |

**Responsive to these comments:**
5818-1, 58-2, 5825-1, 584-1, 5841-1, 5844-1, 5845-1, 585-1, 5856-1, 586-1, 5863-1, 5867-1, 5877-1, 588-1, 5882-1, 5882-2, 5885-1, 5892-1, 5897-1, 5901-1, 5906-1, 5907-1, 5910-1, 591-1, 5911-1, 5912-1, 5919-1, 5920-1, 592-1, 5922-1, 5923-1, 5924-1, 5925-1, 5925-2, 5930-1, 593-1, 5936-1, 5937-1, 5939-1, 5942-1, 5942-3, 5943-1, 5943-2, 5952-1, 5952-2, 5956-1, 596-1, 5966-1, 5967-1, 597-1, 5972-1, 5973-1, 5974-1, 5975-1, 598-1, 599-1, 600-1, 600-2, 6003-1, 6005-1, 6006-1, 6008-1, 601-1, 601-2, 602-1, 6022-1, 6025-1, 6026-1, 6029-1, 6030-1, 603-1, 6033-1, 6034-1, 6036-1, 6038-1, 604-1, 605-1, 6051-1, 6056-1, 6060-1, 6062-1, 6066-1, 6068-1, 6072-1, 6088-1, 609-1, 6091-1, 6095-1, 6097-2, 6099-1, 610-1, 6101-1, 6102-1, 6119-1, 6124-2, 6125-1, 613-1, 6131-1, 6139-1, 6142-1, 615-1, 6152-1, 6154-1, 6155-1, 6157-1, 6159-1, 616-1, 6161-1, 6164-1, 6166-1, 6172-1, 6173-1, 6180-1, 618-1, 6181-1, 6186-1, 6188-1, 6190-1, 6191-1, 6192-1, 6195-1, 6197-1, 6198-1, 6199-1, 6200-1, 620-1, 6201-1, 6202-1, 6203-1, 6208-1, 6214-1, 6218-1, 622-1, 6222-1, 6224-1, 6225-1, 6229-1, 6231-1, 6235-2, 6244-1, 6248-1, 625-1, 626-1, 6268-1, 6275-1, 6275-2, 6275-3, 6275-4, 6276-1, 6278-1, 628-1, 6281-1, 6282-1, 6282-2, 6283-1, 6297-1, 6300-1, 630-1, 6302-1, 6304-1, 631-1, 6311-1, 6315-1, 6315-2, 6322-1, 633-1, 634-1, 6341-1, 634-2, 6350-1, 635-1, 636-1, 636-2, 6365-1, 6379-1, 638-1, 6383-1, 6387-1, 639-2, 6393-1, 6399-1, 6400-1, 6401-1, 6406-1, 6408-1, 641-1, 6411-1, 6413-1, 6415-1, 6415-2, 6424-1, 6424-2, 643-1, 6434-1, 6435-1, 6436-2, 6438-1, 6439-1, 644-1, 6441-1, 6442-1, 6443-1, 645-1, 6451-1, 6452-1, 6455-1, 6456-1, 6464-1, 6467-1, 6469-1, 647-1, 647-2, 6478-1, 6480-1, 648-1, 6482-1, 6484-1, 6490-1, 649-1, 6494-1, 6496-1, 6497-1, 6498-1, 6498-2, 6501-1, 6504-1, 6505-1, 651-1, 6513-1, 6515-1, 6519-1, 6520-1, 652-1, 6527-1, 653-1, 6535-1, 6539-1, 6542-1, 6545-1, 6545-2, 6546-1, 6550-1, 6550-2, 655-1, 6551-1, 6557-1, 6561-1, 6563-1, 6564-1, 6567-1, 657-1, 6573-1, 658-1, 6581-1, 6586-1, 6587-1, 6587-2, 659-1, 659-2, 6602-1, 6602-2, 6609-1, 66-1, 661-1, 662-1, 6622-1, 663-1, 6638-1, 664-1, 6644-1, 6646-1, 6646-2, 66-5, 665-1, 6656-1, 6660-1, 666-1, 6663-1, 667-1, 6673-1, 6675-1, 6676-1, 6680-1, 668-1, 6685-1, 6686-1, 669-1, 6696-1, 6697-1, 6699-1, 670-1, 6704-1, 6707-1, 671-1, 6713-1, 6718-1, 672-1, 6721-1, 6723-1, 6726-1, 6728-1, 6733-1, 6738-1, 674-1, 6743-1, 6745-1, 675-1, 6751-1, 6752-1, 6753-1, 6754-1, 6760-1, 676-1, 6764-1, 6766-1, 6769-1, 677-1, 6771-1, 6776-1, 6777-1, 6779-1, 678-1, 6784-1, 6786-1, 6788-1, 679-1, 6793-1, 680-1, 6804-1, 6807-1, 68-1, 6811-1, 6823-1, 6827-1, 683-1, 6831-1, 6836-1, 6839-1, 6840-1, 684-1, 6845-1, 6847-1, 685-1, 6851-1, 6852-1, 6859-1, 6860-1, 686-1, 6861-1, 6865-1, 6870-1, 687-1, 6872-1, 6875-1, 6880-1, 688-1, 6883-1, 6884-1, 6888-1, 6889-1, 6895-1, 6903-1, 6905-1, 691-1, 6911-1, 6915-1, 6923-1, 6925-2, 693-1, 6931-1, 6938-1, 694-1, 6941-1, 6946-1, 6950-2, 6953-1, 6956-1, 6959-1, 696-1, 6961-1, 6967-1, 6973-1, 6974-1, 6979-1, 6984-1, 6988-1, 6989-1, 6995-1, 6998-1, 700-1, 7004-1, 7007-1, 701-1, 7012-1, 7015-1, 7022-1, 703-1, 7032-1, 7034-1, 7036-1, 704-1, 7046-1, 705-1, 7057-1, 7059-1, 706-1, 7061-1, 7066-1, 7067-1, 7069-1, 7072-1, 7074-1, 7078-1, 708-1, 7081-1, 7089-1, 7094-1, 7098-1, 7100-1, 7103-1, 7108-1, 7114-1, 7117-1, 71-2, 712-1, 7122-1, 7124-1, 7127-1, 713-1, 7133-1, 7135-1, 7138-1, 714-1, 7143-1, 7147-1, 715-1, 7151-1, 7152-1, 7154-1, 7156-1, 7158-1, 7168-1, 717-1, 7174-1, 7178-1, 7181-1, 7182-1, 7185-1, 7188-1, 719-1, 7193-1, 7198-1, 7200-1, 720-1, 7203-1, 7206-1, 7210-1, 7211-1, 7216-1, 722-1, 7221-1, 7223-1, 7227-1, 7228-1, 7234-1, 7238-1, 724-1, 7244-1, 7247-1, 725-1, 7251-1, 7256-1,

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 6 of 6 |
| --- | --- |

**Responsive to these comments:**

7258-1, 726-1, 7263-1, 7264-1, 7268-1, 7269-1, 7270-1, 727-1, 7272-1, 7274-1, 728-1, 7281-1, 7283-1, 7285-1, 7290-1, 7295-1, 7298-1, 7300-1, 7301-1, 7303-1, 73-1, 731-1, 7313-1, 732-1, 733-1, 7334-1, 7335-1, 734-1, 735-1, 7354-1, 7356-1, 736-1, 736-2, 7370-1, 737-2, 7372-1, 738-1, 7383-1, 739-1, 7393-1, 7394-1, 7397-1, 7398-1, 741-1, 7419-1, 74-2, 742-2, 743-1, 744-1, 7456-1, 746-1, 747-3, 7473-1, 748-1, 7483-1, 7484-1, 7486-1, 749-1, 7492-1, 7493-1, 7498-1, 750-1, 7501-1, 752-1, 7530-1, 753-1, 754-1, 7552-1, 7554-1, 756-1, 757-1, 758-1, 759-1, 7599-1, 760-1, 7601-1, 76-1, 761-1, 762-1, 7627-1, 7628-1, 7630-1, 763-1, 7639-1, 764-1, 7648-1, 765-1, 766-1, 7661-1, 7666-1, 7667-1, 767-1, 768-1, 7686-1, 7687-1, 7689-1, 7690-1, 769-1, 770-1, 77-1, 771-1, 772-1, 773-1, 774-1, 7748-1, 7749-1, 775-1, 7758-1, 7760-1, 7761-1, 7762-1, 7764-1, 7766-1, 777-2, 7779-1, 779-1, 7804-1, 7805-1, 7806-1, 7807-1, 7810-1, 781-1, 782-1, 7833-1, 7839-1, 784-1, 7841-1, 7846-1, 785-1, 786-1, 7867-1, 7869-1, 7870-1, 787-1, 788-1, 789-1, 7891-1, 7894-1, 7895-1, 7896-1, 7898-1, 790-1, 7901-1, 791-1, 7917-1, 7920-1, 792-1, 793-1, 794-1, 7943-1, 7945-1, 7948-1, 7950-1, 7957-1, 7960-1, 796-1, 7962-1, 7964-1, 7969-1, 7970-1, 797-1, 7972-1, 7976-1, 7977-1, 798-1, 7983-1, 7986-1, 7991-1, 799-3, 799-4, 7997-1, 7998-1, 8000-1, 800-1, 8001-1, 8003-1, 8009-1, 80-1, 8010-1, 801-2, 801-3, 8015-1, 8020-1, 802-1, 8022-1, 8028-1, 8029-1, 8030-1, 8031-2, 8031-26, 8031-32, 803-2, 8032-241, 8040-1, 804-1, 8043-1, 807-1, 8073-1, 8074-2, 8080-1, 808-1, 8081-1, 8082-1, 8083-1, 8084-1, 8087-1, 809-1, 8092-1, 8093-1, 8094-1, 8097-1, 8101-1, 8105-1, 811-1, 8117-1, 8124-1, 813-1, 8133-1, 8134-1, 81-4, 814-1, 8141-1, 8145-1, 8147-1, 8148-1, 8149-1, 8150-1, 815-1, 8151-1, 8153-1, 8162-1, 8167-1, 8168-1, 8169-1, 817-1, 8174-1, 8180-1, 8181-1, 8184-1, 819-1, 8192-1, 8197-1, 8200-1, 820-1, 821-1, 8212-1, 8215-1, 8218-1, 8224-1, 8225-1, 8226-1, 8227-1, 8232-1, 8235-1, 8239-1, 8241-1, 824-2, 8245-1, 8247-1, 8249-1, 8251-1, 8256-1, 826-2, 8264-1, 8266-1, 827-1, 8272-1, 8273-1, 8279-1, 828-1, 8282-1, 8283-1, 8289-1, 829-1, 8294-1, 8302-1, 8304-1, 8311-1, 8312-1, 8314-1, 832-1, 8321-1, 8323-1, 8326-1, 833-1, 834-1, 835-1, 836-1, 837-2, 838-1, 839-3, 840-1, 84-1, 841-1, 842-1, 842-3, 843-1, 845-1, 847-1, 849-1, 850-1, 851-3, 852-1, 853-1, 854-2, 855-1, 856-1, 857-1, 859-1, 860-1, 864-1, 865-1, 866-2, 868-1, 869-1, 870-1, 87-2, 872-1, 873-1, 874-7, 875-1, 877-1, 878-2, 879-1, 879-3, 879-4, 880-1, 88-1, 882-2, 883-1, 886-3, 887-2, 888-2, 890-3, 891-7, 89-2, 892-2, 893-1, 894-3, 896-1, 900-1, 901-1, 901-2, 90-2, 902-1, 905-1, 907-1, 909-1, 910-1, 911-2, 912-1, 913-2, 914-1, 915-1, 916-1, 919-1, 920-1, 922-1, 923-1, 925-1, 928-1, 930-1, 93-1, 931-1, 932-1, 933-1, 934-1, 935-1, 937-1, 938-1, 939-1, 940-1, 94-1, 941-1, 94-2, 943-1, 944-1, 946-1, 947-1, 947-2, 949-1, 952-1, 954-1, 956-1, 957-1, 958-2, 959-1, 960-1, 96-1, 961-1, 961-2, 962-1, 963-1, 964-1, 968-1, 969-6, 969-7, 970-1, 97-1, 971-2, 972-1, 973-1, 974-1, 976-1, 977-1, 978-1, 979-1, 981-1, 98-3, 987-1, 988-1, 989-1, 990-1, 991-1, 992-1, 993-1, 994-1, 995-1, 996-1, 997-1, 997-2, 999-1, F10-1, F1-2, F1-8, F2-1, F2-4, F2-7, F3-1, F4-3, F4-5, F6-1, F7-4, F8-1, F9-1

Upon careful review, we concluded that this comment is non-substantive for one of the following reasons:

- Contains general comments, opinions, or position statements that express support or opposition to the project;
- Reiterates impacts or actions already described in the DEIS;
- Lacks specific changes or actions for consideration;
- Falls outside the scope or is irrelevant to the proposed action and decision; or
- Lists concerns already decided by law, regulation, or policy.

Appendix R

| Comment response: NS2 | |
|---|---|
| Non-substantive comments related to a specific resource or impact topic | Page 1 of 1 |

**Responsive to these comments:**
4-2, 12-1, 12-3, 1002-2, 104-1, 1041-2, 107-10, 107-3, 1084-6, 1088-1, 1097-3, 1107-3, 1128-8, 1149-1, 1150-3, 1150-6, 1150-9, 1152-1, 1152-3, 1159-2, 1159-4, 1163-1, 1169-2, 1180-3, 1197-3, 1207-4, 1222-2, 1235-3, 1265-1, 1276-4, 1281-2, 1281-3, 1293-2, 1311-16, 1311-2, 1311-21, 1318-3, 1318-4, 132-1, 1322-7, 1328-1, 1329-1, 1338-5, 1338-8, 1359-3, 1379-1, 1388-1, 1453-1, 1454-3, 1455-1, 1455-6, 1468-8, 1473-3, 1504-1, 1517-1, 1531-2, 156-2, 162-2, 1870-1, 1885-1, 1885-2, 1919-2, 1919-3, 19-3, 1933-1, 1933-2, 1941-1, 1957-1, 22-3, 223-2, 235-10, 242-3, 255-5, 259-3, 263-6, 28037-3, 286-6, 286-7, 29505-1, 29753-1, 30074-2, 30078-25, 30079-1, 30144-1 (Emerman3), 311-3, 415-1, 416-1, 43-2, 466-1, 515-4, 55-2, 5550-1, 56-2, 57-2, 572-1, 572-2, 576-2, 585-2, 62-2, 6235-1, 62-4, 64-2, 66-4, 72-1, 778-1, 791-2, 7941-1, 80-2, 8032-173, 8032-209, 8032-27, 8032-303, 8032-44, 8032-45, 809-2, 814-5, 824-1, 86-1, 862-1, 866-13, 866-5, 883-2, 884-1, 884-2, 884-3, 890-1, 894-2, 90-1, 901-3, 90-4, 90-5, 910-4, 91-1, 95-2, 979-2, 99-1

Upon careful review, we concluded that this comment is non-substantive relative to the specific resource or impact topic described for one of the following reasons:

- Contains general comments, opinions, or position statements that express support or opposition to the project;
- Reiterates impacts or actions already described in the DEIS;
- Lacks specific changes or actions for consideration;
- Falls outside the scope or is irrelevant to the proposed action and decision; or
- Lists concerns already decided by law, regulation, or policy.

| Comment response: SO1 | |
|---|---|
| Property values will decline near tailings or nearby facilities from water quality changes, noise, traffic | Page 1 of 1 |

**Responsive to these comments:**
1356-3, 1389-7, 1473-1, 494-1, 60-1, 8032-249, 897-1, 897-2, 897-4, 897-9, 899-1, 899-2, 899-4, 899-9

These comments concern the potential reduction in nearby property values that could be caused by mine-related impacts. Section 3.13 of the DEIS disclosed potential reductions in property value due to the tailings facility (pp. 655–656). As analyzed in the DEIS, the proximity of properties to the tailings facility would be the primary reason for the reduction in property values. We expanded this discussion in section 3.13 of the FEIS to more completely describe the basis for this analysis of the reduction in property values from proximity to tailings.

The DEIS disclosed other potential impacts mentioned in these comments but not explicitly tied back to potential reductions in property value. These include the following: noise (DEIS, pp. 223–241); traffic (DEIS, pp. 258–269); impacts to groundwater quality downstream of tailings storage facilities (DEIS, pp. 381–419); impacts to water supplies from drawdown near the mine site (DEIS, pp. 317–345); and impacts from drawdown near the Desert Wellfield (DEIS, pp. 317–345). We added further discussion to section 3.13 of the FEIS to assess potential reductions in property values due to impacts to private water supplies.

We have not explicitly analyzed reductions in property values resulting from traffic or noise. Noise analysis found that "under most conditions, predicted noise and vibration during construction and operations, for both blasting and non-blasting activities, at sensitive receptors are below thresholds of concern; rural character would not change due to noise" (DEIS, p. ES-22). One exception was along Dripping Springs Road. However, additional mitigation was brought forward between the DEIS and FEIS to address this impact (see FEIS appendix J, mitigation measure RC-NV-01). We added discussion of the effectiveness of this mitigation to section 3.4 of the FEIS. The traffic analysis found that most traffic impacts, as measured by changes in level of service (LOS), remain within acceptable levels and are similar to those caused by natural growth (DEIS, pp. 262–263, 266). Unacceptable LOSs caused by project-related traffic occur at Silver King Mine Road/U.S. 60 (construction and operations), Main Street/U.S. 60 (construction and operations), SR 177/U.S. 60 (construction), and Magma Mine Road/U.S. 60 (operations). Section 3.13 of the FEIS acknowledges that increased traffic and industrial development have an effect on the overall quality of life in an area. However, tying reductions in property value to LOS at specific intersections along a major highway is not feasible or appropriate.

Appendix R

| Comment response: SO2 Economic impacts of water use | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1301-9, 30147-5 (Powers), 8032-291, 8305-1

These comments tie the use of water by the Resolution Copper Mine to economic effects on the State of Arizona and other water users, based on a variety of studies.

The issue of competing water uses, water scarcity, and regional water supplies is one that has been raised in many public comments, and we added necessary additional discussion of this topic to the FEIS in response to comments. See response WT4 for additional discussion.

The use of water by the mine—from whatever source—takes place under a complex regulatory framework for management of limited water resources. This includes the following: the authorities and restrictions put in place by the 1980 Groundwater Management Act, administered by the ADWR, for use of groundwater within Active Management Areas; and the contracting and use of Central Arizona Project (CAP) water, which is administered by the Central Arizona Water Conservation District and Bureau of Reclamation.

Particularly in Arizona, every water source has competing users. Laws and regulations were enacted to codify the value and priorities that the State of Arizona and society in general place on the use of a limited water supply. Any water used by Resolution Copper must adhere to this framework, whether direct use of CAP water, dewatering at the mine site (which lies within the Phoenix Active Management Area), pumping from the Desert Wellfield (also within the Phoenix Active Management Area), or acquisition and use of long-term storage credits.

By definition, the legally permitted use of water by Resolution Copper adheres to the norms and values placed on water by the State of Arizona. Analysis of the economic value of the water used by Resolution Copper, analysis of other beneficial uses for that water, or extrapolation of economic harm to other entities due to the legally permitted use of water by Resolution Copper is outside the scope of analysis of this EIS.

On a local scale, there are potential indirect economic impacts to individual well owners from the Resolution Copper water supply. Section 3.13 of the FEIS analyzes these impacts.

There also are potential risks to regional water supplies in the event of a tailings storage facility failure. We do not anticipate this to occur, based on the demonstration in section 3.10.1 of how Resolution Copper design standards meet or exceed State, Federal, international, and industry-standard guidelines (DEIS, pp. 520–527). The importance of tailings safety resulted in the disclosure of potential impacts to regional water supplies if a failure were to occur (DEIS, pp. 535–554). We expanded this discussion in the FEIS to incorporate additional work conducted on tailings safety between the DEIS and FEIS, specifically the FMEA conducted for the preferred alternative.

| Comment response: SO3 Dripping Spring Wash road mitigations | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
28449-83, 30075-95, 897-7, 899-7

These comments are concerned with the potential impacts to Dripping Springs Road due to its use as access to the Alternative 6 tailings storage facility.

The DEIS proposed a potential reroute of access to the Alternative 6 tailings storage facility in order to resolve noise issues (mitigation measure RC-218, p. 242, and appendix J, p. J-7). This potential mitigation was dropped between the DEIS and FEIS due to the greater impacts that would result from constructing it, compared with the relatively minor noise issues it would mitigate. Instead, different mitigation was proposed along Dripping Springs Road that would reduce the noise impact. We described the effectiveness of this new mitigation in section 3.4 of the FEIS and summarized the details in appendix J of the FEIS (mitigation measure RC-NV-01).

We added details on road maintenance for Dripping Springs Road to section 3.4 of the FEIS.

Appendix R

| Comment response: SO4 Powers report comments | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
30147-1 (Powers), 30147-10 (Powers), 30147-11 (Powers), 30147-2 (Powers), 30147-3 (Powers), 30147-4 (Powers), 30147-7 (Powers), 30147-8 (Powers), 8032-288, 8032-290, 8032-292

These comments provide specific criticisms of the economic analysis conducted for the DEIS and summarized in section 3.13. These comments are based on an economics report conducted by Power Consulting for the San Carlos Apache Tribe (herein called the Power report). These comments address four specific issues:

- Boom-bust analysis in the DEIS
- Quantification of negative economic impacts on nature-based tourism and amenities
- Exaggeration of local positive impacts
- Lack of analysis of societal impacts

Boom-bust analysis

Section 3.13 of the DEIS analyzed and disclosed the vulnerability of the Resolution Copper Mine to the boom/bust cycles that are common in the industry (p. 653). The full boom-bust analysis contained in the project record (BBC Research and Consulting 2018) addressed many of the issues raised in the Power report.

We expanded our discussion in section 3.13 of the FEIS to more clearly describe the methodologies used for this analysis and the uncertainties involved in some of the inputs. More importantly, the Power report raises a number of social concerns that are not specifically economic in nature and that have to do with the workforce and communities that are subject to boom-bust cycles. We added new discussion to section 3.13 of the FEIS to directly address these types of societal impacts.

Quantification of negative economic impacts

Several comments see inconsistencies in the treatment of the economic "benefits" of the proposed mine with the "negative impacts" on recreation and "amenity-supported economic vitality." The Power report argues that the "benefits" and "negative impacts" were not treated equally in the DEIS and primarily focuses on the points that natural amenities and the visitor-based economy are vital to Arizona and to the area near the proposed mine in particular. These points are largely made by citing information provided in the DEIS, and we agree with them, which is why an analysis of these impacts was included in section 3.13 (DEIS, pp. 653–655).

A main concern is that there is more quantification of the potential "benefits" associated with the proposed mine than of the "negative impacts" on the amenity and recreation-based economy. We acknowledge this is the case. However, the Power report does not provide new data or analysis to support further quantification of "negative impacts." Therefore, the narrative or qualitative approach used in the DEIS also was used in the FEIS.

Exaggeration of positive benefits to Town of Superior

These comments indicate that the DEIS exaggerated the "positive impacts" of the project. This assertion is based on the argument that most of the proposed mine's benefits will occur outside the town of Superior. Exploration of where these benefits would occur is a fundamental part of the analysis contained in the project record (BBC Research and Consulting 2018) and is summarized in the DEIS (pp. 650–651). We revised this analysis based, in part, on comments and on direct discussions with the Town of Superior. The revised analysis in section 3.13 of the FEIS accurately depicts where the positive economic benefits of the project would occur.

Societal impacts

These comments indicate that the non-economic societal impacts have not been adequately discussed. We added a new discussion to section 3.13 of the FEIS to address these impacts.

Appendix R

| Comment response: SO5 | |
|---|---|
| Economic losses from livestock changes, including multiplier effect | Page 1 of 1 |

**Responsive to these comments:**
1122-2, 8032-286

We added an analysis of the economic impact from reductions in livestock grazing capacity to section 3.13 of the FEIS.

Comments raised concerns that the pipeline corridor could inhibit movement of cattle and operation of a grazing allotment. Note that the pipelines would be buried in most locations and are not anticipated to restrict access for livestock or personnel.

Comments also raised concerns that water sources used by livestock would be lost. We anticipate that some water sources would be impacted due to dewatering at the mine site. A monitoring and mitigation plan is required that would restore water to any impacted spring or stream. The only lost water sources that would remain unmitigated would be those lost within the subsidence area or within the footprint of a tailings storage facility. Grazing would not take place within these areas.

| Comment response: SO6 | |
|---|---|
| Costs associated with loss of recreation and tourism | Page 1 of 1 |

**Responsive to these comments:**
1003-2, 1097-6, 1235-11, 1360-13, 1454-17, 1468-9, 1523-4, 209-1, 495-2, 548-2, 5925-3, 5990-1, 6559-1, 748-2, 8032-207, 8032-289, 8032-328

Many of these comments focus on the economic costs associated with the loss of recreation opportunities and tourism that would be caused by the loss of areas. These impacts were specifically analyzed for the DEIS (BBC Research and Consulting 2018) and are included in section 3.13 (DEIS, pp. 653–655).

We developed a mitigation package related to recreational opportunities between the DEIS and FEIS. We assessed the effectiveness of this suite of mitigations to replace recreation opportunities in sections 3.9 and 3.13 of the FEIS.

Other comments point to the long-term effects on recreation and property values, even after closure of the facility. We added discussion to section 3.13 of the FEIS to address this issue.

| Comment response: SO7 | |
|---|---|
| Competition for electricity and water | Page 1 of 1 |

**Responsive to these comments:**
1068-2, 1301-3, 1542-1

These comments pertain to the potential economic impacts of the use of power by the mine. Note that many comments are based on an estimation of power use that is not supportable; see response WT24 for more detail.

Since publication of the DEIS, SRP has conducted an independent load study for the project and has concluded the following: "The total maximum combined load proposed by RC is 273 to 315 MW, which represents 3.7 to 4.3 percent of SRP's 2019 peak demand. SRP is well suited to provide the needed power just as it has done with other large power users across the state. SRP does not see any limitations to serving this load to the Project at the aforementioned sites, presuming the recommended system upgrades are implemented. With these system upgrades, there will be no impact on the neighboring customers as the Project site increase loads as per the estimated load levels" (1898 and Company 2020). Also note that information received since January 2021 using a different estimation technique has modified the anticipated power use; this updated disclosure has been incorporated into chapter 2 of the FEIS.

Some comments also note the impacts of competition for water. See response SO2 for more discussion of this topic.

Appendix R

| Comment response: SO8 | |
|---|---|
| Statements of positive economic benefits | Page 1 of 1 |

**Responsive to these comments:**
1111-2, 1197-5, 1281-4, 1396-3, 1396-7

These comments note the positive economic benefits that would occur from the mine. The analysis contained in section 3.13 of the FEIS accurately assessed the positive and negative socioeconomic effects that would occur from the mine, and this analysis remains in the FEIS.

| Comment response: SO9 | |
|---|---|
| Employment effects of specific facilities, such as filter plant being placed in Superior, or tailings storage facility in Gila County | Page 1 of 1 |

**Responsive to these comments:**
1516-3, 317-8, 518-3

These comments express the economic benefits of placement of the tailings storage facility at the Skunk Camp location or express support for the movement of the filter plant to be within the boundaries of the town of Superior.

We added analysis for these changes in alternatives to section 3.13 of the FEIS.

| Comment response: SO10 | |
|---|---|
| Socioeconomic effects on other communities (Kearny, Florence, San Tan Valley, Queen Creek, Apache Junction, and Gold Canyon, Winkelman, Hayden) | Page 1 of 1 |

**Responsive to these comments:**
28449-111, 285-2, 291-1, 314-3

These comments question the economic effects that would be felt by specific individual communities within the analysis area.

Existing analysis encompasses these communities. We added discussion regarding each of these communities to section 3.13 of the FEIS to better clarify the pertinent effects.

| Comment response: SO12 | |
|---|---|
| Gila River impacts from water supply | Page 1 of 1 |

**Responsive to these comments:**
27045-2

This comment states, "Freeport Copper in New Mexico is pushing to dam the Gila River to provide our water to this proposed mine."

This is an incorrect statement. Freeport McMoRan is not associated with the Resolution Copper Project. No water sources proposed for the Resolution Copper Project originate with or are associated with the Gila River.

| Comment response: SO14 | |
|---|---|
| Comments related to Town of Superior impacts analysis | Page 1 of 1 |

**Responsive to these comments:**
1113-2, 1158-50, 1286-2, 1312-3, 1360-12, 1389-1, 1389-35, 250-1, 261-5, 261-7, 283-3, 310-3, 314-2, 322-2, 8032-306, 866-1, 866-15, 866-16, 928-3

These comments indicate that analysis of potential economic impacts to the Town of Superior is flawed, including the calculation of costs to the Town of Superior, tax revenue, impacts to the school system, impacts to emergency services, and housing stock.

We revised the socioeconomic analysis to address many of these issues; changes were based in part on discussions between the Forest Service and the Town of Superior following publication of the DEIS (BBC Research and Consulting 2020). We changed the analysis appropriately in section 3.13 of the FEIS to address these concerns.

Appendix R

| Comment response: SO15 | |
|---|---|
| Emissions will inhibit other development | Page 1 of 1 |

**Responsive to these comments:**
1438-8

This comment indicates that the development of the Resolution Copper Project, by emitting nitrogen oxides, would reduce the amount of this criteria pollutant that could be emitted by other developments or projects, thereby inhibiting growth within the area.

Mine emissions must meet regulations and conform to State plans for implementation of the Clean Air Act. Section 3.6 of the FEIS demonstrates that this is the case.

The emission of criteria pollutants by competing sources takes place under a complex regulatory framework for management of regional air quality. This includes the authorities and restrictions put in place by the Clean Air Act, which ultimately are enacted through permitting administered by PCAQCD or the ADEQ.

Every emission of a criteria pollutant reduces the ability of the airshed to receive other emissions without violating air quality regulations and guidelines. For instance, the air quality analysis conducted for the Resolution Copper Project had to incorporate the existing background air quality, which encompasses all sources that preceded the Resolution Copper Project in the airshed. These laws and regulations were enacted to codify the value and priorities that the State of Arizona and society in general place on the emission of pollutants. Any emission by the Resolution Copper Project must adhere to this framework. By definition, the legally permitted emissions by the Resolution Copper Project adhere to the norms and values placed on air quality by the State of Arizona. The decision whether it is more appropriate for the mine, or for some other development, to use this "capacity" for emitting pollutants is outside the scope of analysis of this EIS.

| Comment response: SO16 | |
|---|---|
| Labor force details | Page 1 of 1 |

**Responsive to these comments:**
104-5, 1097-4, 1389-8, 1464-5, 231-2, 291-3, 392-2

These comments concern the labor force assumptions used in the DEIS. We updated the economic analysis and labor force analysis using the most recent numbers available from Resolution Copper (BBC Research and Consulting 2020). The updated analysis contained in section 3.13 of the FEIS accurately assesses the anticipated labor force and associated impacts using the best sources of information and taking into account uncertainty about future predictions.

| Comment response: SO17 | |
|---|---|
| Offsets for payments in lieu of taxes (PILT) | Page 1 of 1 |

**Responsive to these comments:**
866-11

This comment asks that a comparison be made for the revenues generated by the Resolution Copper Project to the amount currently paid by the Federal Government in lieu of taxes.

The revenues generated by the Resolution Copper Project and to which jurisdiction they would accrue is complex and the focus of the analysis in the project record (BBC Research and Consulting 2018) and in section 3.13 (DEIS, pp. 648–651). We updated this analysis in section 3.13 of the FEIS to incorporate the most recent data and assumptions available.

R-286

Appendix R

| Comment response: SO18<br>Impacts to State Trust land | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1188-4, 562-13, 562-5 | |

These comments concern the potential impact to Arizona State Trust land, specifically the future Superstition Vistas development area in the East Salt River valley.

Many public comments raised the issue of competing water uses, water scarcity, and regional water supplies. We added discussion of this topic to the FEIS. This includes the Superstitions Vistas development. See response WT4 for additional discussion.

The DEIS contains analysis of the impact to adjacent property values caused by proximity to a tailings facility (DEIS, pp. 655–656). Section 3.13 of the FEIS clarifies that these reductions in value would apply to any adjacent lands—whether private land or State Trust land.

| Comment response: SO19<br>Social effects of mine | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1003-1, 1389-3, 1523-9, 8032-293 | |

These comments indicate that non-economic societal impacts were not adequately discussed. We added a new discussion to section 3.13 of the FEIS to address these impacts.

| Comment response: SO21<br>Boom-bust impacts; financial viability | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>106-3, 1097-5, 1360-11, 1389-4, 151-4, 182-2, 890-2 | |

Section 3.13 of the DEIS analyzed and disclosed the vulnerability of the Resolution Copper Mine to the boom-bust cycles that are common in the mining industry (DEIS, p. 653). Many of the issues raised in the Power report are directly addressed in the full boom-bust analysis contained in the project record (BBC Research and Consulting 2018).

We expanded our discussion in section 3.13 of the FEIS to more clearly describe the methodologies used for this analysis and the uncertainties involved in some of the inputs. More importantly, the Power report raises a number of social concerns that are not specifically economic in nature, that have to do with the workforce and communities that are subject to boom-bust cycles. We added new discussion to section 3.13 of the FEIS to directly address these types of societal impacts.

These comments also question the financial viability of the mine. We are not required to assess the financial viability of the mine proposal. Resolution Copper holds mining claims that confer a statutory right to enter upon public lands to prospect, explore, develop, mine, and process mineral resources. Demonstrating the financial ability to do so is not a requirement under Federal mining laws.

We do have a responsibility to ensure that long-term environmental liabilities on NFS lands will not occur, which is accomplished through appropriate bonding and financial assurance as discussed in chapter 1 and elsewhere (DEIS, pp. 15–20, 65, 104, 391–417).

Comments also raise the question of demand for copper and the international copper market. This also is a financial decision the mining company must make as it assesses the financial viability of the project. Assessing financial viability and international copper markets is outside the scope of analysis for this EIS.

The analysis of alternative mining techniques (see response AMT1 for more detail) incorporates economics only on a per-ton basis, with the goal of assessing not profitability but instead whether requiring alternative mining techniques would be reasonable.

Appendix R

| Comment response: SR2 | |
|---|---|
| Comments related to BLM visual management framework | Page 1 of 1 |

**Responsive to these comments:**
1051-1

We added discussion to FEIS section 3.11 that updates the scenery resource impact analysis methodology to describe the rationale for using the BLM Visual Resource Management (VRM) system for analyzing impacts to scenery and how that system relates to and is similar to the Forest Service Visual Management System.

| Comment response: SR4 | |
|---|---|
| Clarification of rationale for analysis distances | Page 1 of 1 |

**Responsive to these comments:**
1051-5

The impact distance zones and project analysis area described in the DEIS section 3.11 are based on landscape topography in the project area, general visibility distances of project features, and location of sensitive viewpoints. Collectively, these represent the geographic scope of expected impacts to scenery from the proposed project.

The 6-mile buffer around the tailings facilities represents the visibility within the landscape from the sensitive viewpoints that were identified through review of the locations where people gather, travel, recreate, or live in the vicinity of the proposed project.

Although the viewshed analyses for the tailings facilities presented in Newell, Grams, et al. (2018) illustrate modeled visibility beyond 6 miles, this model does not incorporate landscape features such as vegetation and structures or a distance factor that shows reduced visibility by distance. At a distance beyond 6 miles, it is not anticipated that the tailings facilities would be visible to the casual observer.

| Comment response: SR5 | |
|---|---|
| Visual impact of fog plume | Page 1 of 1 |

**Responsive to these comments:**
8032-233, 8032-267, 8032-270

We have included additional analysis for fog plume impacts in section 3.11 of the FEIS, and simulations for fog plume effects are included in appendix D of Newell, Grams, et al. (2018).

The DEIS included analysis of impacts to visual resources for the subsidence area and all tailings facility alternatives. In addition, it included analysis of visual impacts to KOPs at Picket Post Mountain and Boyce Thompson Arboretum, and it further included parts of the Superstition Wilderness and White Canyon Wilderness areas in the viewshed analyses in Newell, Grams, et al. (2018).

| Comment response: SR7 | |
|---|---|
| Comment about areas denuded of vegetation | Page 1 of 1 |

**Responsive to these comments:**
8032-269

We have updated section 3.11 of the FEIS to further explain the visual simulation development process and the use of revegetation success at the West Plant Site legacy mining sites as a reference for simulation development.

The FEIS contains an additional simulation package and analysis for the preferred alternative, Skunk Camp (see FEIS section 3.11 and appendix D of Newell, Grams, et al. (2018)), which presents the approximate view of the tailings facility at 15-, 20-, and 30-year intervals. These simulations illustrate the scenery impact over time and account for concurrent reclamation activities beginning at approximately year 10.

R-288

Appendix R

| Comment response: SR8 | |
|---|---|
| Question on visual haze effects | Page 1 of 1 |

**Responsive to these comments:**
227-2

The analysis of visual haze effects includes multiple analysis points and is included in section 3.6 (DEIS, pp. 288–292). The effects from air quality on people nearby (whether local residents or visitors) are also analyzed in section 3.6. See response TS24 for more details about the new analysis included in the FEIS.

| Comment response: SR9 | |
|---|---|
| Subsidence area visual analysis | Page 1 of 1 |

**Responsive to these comments:**
8032-268, 8032-272

Representative KOPs were identified through a selection process with the Forest Service. Based on potential recreation locations, access, and topography, a KOP location was selected to represent potential views of the subsidence area. This KOP is located east of the subsidence area on NFS Road 2466; based on this KOP, it is anticipated that the subsidence area would not be visible due to intervening landforms. We have updated section 3.11 of the FEIS to describe the KOP selection process.

| Comment response: SR10 | |
|---|---|
| Dark sky impacts | Page 1 of 1 |

**Responsive to these comments:**
8032-275

We included additional analysis for impacts to regional dark skies from mining operations in FEIS section 3.11, including anticipated lighting from each of the mine plan locations (West Plant Site, East Plant Site, tailings facility, pump stations, and filter plan and loadout facility) and anticipated impacts to the town of Superior, Oak Flat campground, Boyce Thompson Arboretum, and Queen Valley.

Lighting impacts to wildlife are disclosed in section 3.8 of the DEIS and FEIS.

| Comment response: SR11 | |
|---|---|
| Visual impacts related to pipelines | Page 1 of 1 |

**Responsive to these comments:**
1311-11

We revised the FEIS to remove the Alternative 5 – West pipeline option and the Alternative 6 – South pipeline option. The scenery impact analyses for the remaining Alternative 5 – East pipeline option and Alternative 6 – North pipeline option were updated and are included in section 3.11 of the FEIS.

| Comment response: SR12 | |
|---|---|
| Visual impacts to Arizona National Scenic Trail | Page 1 of 1 |

**Responsive to these comments:**
1311-5

The impact analysis for the Arizona National Scenic Trail is presented in the DEIS throughout section 3.11 and includes much of the analysis presented in the comment (DEIS, pp. 594–618), specifically with regard to the impacts to the Barnett Camp area of the Arizona National Scenic Trail through analysis of KOP 5. A visual simulation for KOP 5 that illustrates the pipeline bridge at Barnett Camp is presented in Newell, Grams, et al. (2018).

A discussion of the impacts of the borrow area on the Arizona National Scenic Trail was added to FEIS section 3.11 for Alternatives 2 and 3.

Appendix R

---

**Comment response: SR13**

Greater impact anticipated for non-motorized users vs. motorized users; impacts from displacement of recreation

Page 1 of 1

**Responsive to these comments:**
1097-7, 1454-6, 1523-3, 28449-22, 28449-86, 319-3, 8032-210, 8032-211, 8032-213, 8032-214, 8032-215

The analysis of a reduction in non-motorized uses under all alternatives is provided in section 3.9 (DEIS, pp. 495–509). Impacts to motorized uses are also provided in section 3.9. The approach for these analyses has not changed between the DEIS and FEIS.

The commenters express many of the direct impacts that this EIS has disclosed, where recreation opportunity would be lost, and noise, air quality, and visual impacts are anticipated to impact non-motorized recreation experiences. However, to assert that this same level of direct impact be universally applied to all surrounding public lands is beyond the scope of this analysis.

We included a discussion of public land recreation displacement in FEIS section 3.9 under "Loss of Federal Land Base." This information discloses the potential impact of shifting recreational use to other public lands in the area and describes the unique recreation setting and opportunity at Oak Flat.

Some of the issues put forth by commenters that are wholly outside the scope of this analysis include the request for the proponent to construct recreation facilities in Superior, Arizona, and to develop extensive, yet-to-be-surveyed motorized trails. However, specific mitigation to offset recreational opportunity impacts was developed after the DEIS; this mitigation was included in appendix J of the FEIS and assessed for effectiveness in section 3.9 (FEIS appendix J, mitigation measure FS-RC-03). This was an evolution of mitigation measure RC-214, included in the DEIS (appendix J, p. J-15).

---

**Comment response: SR13_A**

Greater impact anticipated for non-motorized users vs. motorized users; impacts from displacement of recreation; with addition for specific comments 8032-327, 1523-2, 1454-5

Page 1 of 1

**Responsive to these comments:**
1454-5, 1523-2, 8032-327

See response SR13 for response to comments on motorized users and loss of Federal land base for recreation.

The indirect impacts of mining to surrounding lands (such as Upper and Lower Devil's Canyons, as the commenter suggests) such as dewatering, noise, dust, view degradation, subsidence, and other mine impacts are discussed under the analysis for each resource in the FEIS. The discussion in the FEIS at section 3.9 provides in-depth analysis of the potential shifting/displacement of recreational users to surrounding private and public lands.

---

**Comment response: SR14**

Recreational value of Oak Flat

Page 1 of 1

**Responsive to these comments:**
1523-7

Oak Flat has been used by locals and visitors alike for decades, and its history and importance as a recreation site include traditional recreation like camping, hiking, and nature viewing. It also contains unique recreation settings and opportunities as it relates to rock climbing. It also has a strong link to cultural and heritage resources.

We added information on the historic recreational use of Oak Flat in FEIS section 3.9 under "Loss of Federal Land Base." This information discloses the unique recreation setting of Oak Flat and the loss of recreation opportunity that would occur once Oak Flat is closed to the public.

Appendix R

| Comment response: SR16<br>Definition of recreation opportunity spectrum (ROS) (or equivalent) for BLM lands around Peg Leg;<br>request to conduct inventory | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>28449-67, 28449-74, 28449-75, 28449-76 | |

The BLM's Tucson Field Office Planning Area is guided by the 1989 Phoenix resource management plan, and the recreation management prescriptions therein did not specify ROS acreages. Section 201(a) of FLPMA specifies the Secretary must prepare and maintain on a continuing basis an inventory of all lands (including for recreation purposes). This inventory is conducted by the BLM during the land use planning process. While the BLM does use ROS or ROS-like management frameworks for recreation, in this portion of the Tucson Field Office, there are no lands designated for ROS. Therefore, a quantitative recreation opportunity inventory was not conducted for the DEIS, and it remains inappropriate to do so in the FEIS.

Section 3.9.3.2 was updated in the FEIS to provide a discussion of the differences between the Forest Service's recreation categorization and the BLM's recreation categorization.

| Comment response: SR17<br>Lack of "Recreation Specialist Report" | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>8032-208 | |

While a standalone Recreation Technical Report was not created for this EIS, the analysis and project record are supported by baseline data acquisition, review, verification, and compilation processes, including tiering to applicable NEPA analysis like the Apache Leap EA or Baseline EA, numerous project-specific recreation-related process memoranda, geographic information system (GIS) and spatial data and calculations, administrative draft and DEIS working documents, specialist-to-specialist communication and meetings, subject matter expert/agency specialist input, engagement with local community groups like the Recreation User Group, and forest plan consistency reviews. All the information gathered as part of the baseline data acquisition culminates in the recreation section of the EIS. We note that neither NEPA nor the Forest Service requires Specialist Reports for EISs, and a Recreation Specialist Report was not produced for the FEIS.

We included new analysis on the very real potential for recreation opportunity displacement, in FEIS section 3.9 under "Loss of Federal Land Base."

| Comment response: SR18<br>White Canyon Area of Critical Environmental Concern (ACEC) | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>203-1 | |

Incorrect labels for White Canyon Wilderness were corrected on all figures in the FEIS. The description of the purposes for designation of the wilderness was also included in section 3.9 of the FEIS.

| Comment response: SR19<br>Power line noise | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>8032-280 | |

This comment states that the effect of power line noise on recreation should be assessed.

We added an analysis of anticipated noise impacts on recreationists from power lines to sections 3.4 and 3.9 of the FEIS.

The approximate levels of noise in close proximity to power lines are estimated as 40 to 50 dBA, which is below the most stringent noise thresholds selected in the DEIS.

Appendix R

| Comment response: SR20 Motorized recreation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1276-6, 911-1 | |

Much of the motorized recreation experience within the Near West tailings storage facility footprint includes a loop experience, which is a different opportunity from an out-and-back experience. Additional discussion has been added to section 3.9 of the FEIS to describe the impact to loop-route opportunities more clearly. Additional mitigation for motorized recreation was included in FEIS appendix J, with a focus on recreation experiences like motorized loops (see FEIS appendix J, mitigation measure FS-RC-03).

| Comment response: SR21 Inconceivables mitigation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1343-2 | |

We developed additional details regarding the Inconceivables climbing area mitigation proposal (see FEIS appendix J, mitigation measure RC-RC-05). We determined the route and design features of the mitigation proposal using information from cultural and natural resources surveys and from consistency reviews of existing and pending Forest Service management decisions. We documented our recreation mitigation evaluation findings in a process memorandum (Rausch and Rasmussen 2020) to support the disclosures in FEIS section 3.9 and in appendix J.

| Comment response: SR22 Request for data collection for rock-climbing impacts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1048-4, 6124-1 | |

The FEIS (section 3.9) includes the best available information for climbing resources in the analysis area, and this threshold of reasonableness is consistent with guidance contained in the Forest Service's NEPA requirements. As some public comments correctly contend, comprehensive climbing guides for this area are not easily found. Classic Queen Creek and surrounding area guides, including Karabin Jr. (1996), informed the analysis, and a comprehensive review of climbing resources was included in the DEIS (Oliver 2017).

Additional information on climbing data is not necessary for this analysis; the FEIS identifies this impact as major and long term.

| Comment response: SR23 Adjacent rock-climbing areas | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1454-10, 1454-8, 1523-5, 1523-6, 8032-329, 8032-331 | |

These comments identify the Pond and Atlantis climbing areas as not being analyzed in the DEIS and state that any mitigation proposal related to them is inappropriate.

These are incorrect statements. These two climbing resources were correctly included in the analysis in section 3.9 (DEIS, pp. 493–494). No mitigation related to these two climbing resources was proposed in the DEIS, nor has any been proposed in the FEIS.

There may be other access agreements related to these two climbing areas that have been executed outside the Forest Service NEPA process. Agreements between Resolution Copper and climbing groups as they relate to access to these areas would be similar to any private partnership, which is subject to termination.

Appendix R

| Comment response: SR24<br>Arizona National Scenic Trail analysis; Arizona National Scenic Trail Comprehensive Plan | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1311-3, 1311-8, 1389-28, 1454-9, 1523-8, 28449-70, 28449-84, 8032-330 | |

Reference to the Arizona National Scenic Trail comprehensive plan is included in the FEIS. While not available for public review at the time of this FEIS publication, much of the information that will feed into the comprehensive plan (nature and purpose development documents) is now referenced in this analysis. As the commenter correctly points out, the Forest Service manages the area, allowing motorized and other uses.

The nature and purpose of the Arizona National Scenic Trail was re-reviewed, and additional text was added to the FEIS to better specify potential impacts, particularly for Passage 18.

| Comment response: SR25<br>Birding | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30075-94 | |

Section 3.9 of the FEIS now includes discussion of birding as a recreation opportunity and describes the recreation setting as it relates to prime birding areas (e.g., riparian areas, canyons).

| Comment response: SR26<br>Hunting | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>283-2, 30075-88, 30075-89, 30075-91 | |

Section 3.9 of the DEIS included basic information regarding the hunting opportunities in the analysis area, such as the Game Management Units affected and the common species hunted, and indicated that the analysis area was subject to application of basic hunting regulations (DEIS, p. 489).

The FEIS includes more detailed information about the hunting opportunities (species and hunts) in the analysis area, and missing information regarding lawful discharge of firearms was corrected. The hunting setting of the proposed tailings storage facility is more specifically described as the commenter requested, including the link between dispersed camping opportunities and hunting opportunities.

| Comment response: SR27<br>Impacts to climbing | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>965-1 | |

A comprehensive climbing inventory of the Oak Flat area was provided in section 3.9.3.2 of the DEIS; this is the only inventory in existence for the analysis area, apart from local and national climbing guidebooks and publicly available information on the Internet. Additional climbing areas in the analysis area, both known and unknown, will not be inventoried for the FEIS.

Appendix R

| Comment response: SR30 Comments related to Peg Leg Visual Resource Management (VRM) Class Objectives | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 28449-80, 28449-97 | |

Table 3.11.4-11 in the DEIS identifies acres where the proposed project components intersect Federal lands, not all lands in the analysis area. Section 3.11 of the FEIS was revised to include information regarding meeting Class III objectives for Alternative 5 – Peg Leg. The DEIS analysis states that the Peg Leg tailings storage facility alternative would likely not meet VRM Class III objectives. If the Arizona National Scenic Trail and Gila River pipeline crossing area is designated Interim VRM Class II, the proposed alternative would also not meet these objectives. These data are not available to make this determination. A representative KOP for the West Pipeline crossing of the Arizona National Scenic Trail and Gila River corridors was not identified as part of the analysis to determine degree of contrast, and it is assumed, based on project components and descriptions, that the pipeline crossing would not meet interim VRM Class II objectives without further mitigation measures.

The West Pipeline has been removed from further consideration, thus eliminating any potential visual impacts to the Reymert Townsite.

| Comment response: SR31 Comments related to BLM Visual Resource Management (VRM) framework | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 28449-91 | |

We have added the text provided related to further defining BLM directives to the FEIS.

| Comment response: SR32 Changes to visual analysis driven by comments related to viewshed quantification | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 28449-94 | |

We have included additional analysis in the FEIS for each alternative to quantify the number of acres visible for each tailings storage facility option within the foreground, middle ground, and background distance zone area as defined in the DEIS.

| Comment response: SR33 Changes to visual analysis driven by comments, including additional travel routes | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 28449-48, 28449-92, 28449-93, 28449-95 | |

We have included the additional routes identified by the commenter in the FEIS as part of the effects analysis for Alternative 5, as applicable.

The majority of routes identified below by the commenter are near the West Pipeline Corridor, which is no longer under consideration:

- Box Canyon Road
- North Sandman
- Cottonwood Canyon
- Mineral Mountain
- Reymert Road
- Whitlow Ranch Road

Battle Axe Road, which has been identified by the commenter, intersects the East Pipeline Corridor, and the FEIS has been updated accordingly. Rincon Road was not located, and a specific location was not provided by the commenter.

Appendix R

| Comment response: SR34 | |
|---|---|
| Changes to visual analysis findings driven by comments | Page 1 of 1 |

**Responsive to these comments:**
28449-154, 28449-96

We have updated conclusions associated with the degree of contrast and description of contrast as indicated by the commenter.

Additionally, as part of the analysis, the tailings storage facilities were evaluated as structures, rather than as landform modifications. There would be no change in determination of contrast and/or conformance with VRM objectives as a result of this methodology.

| Comment response: SR35 | |
|---|---|
| Visibility analysis and associated figure information | Page 1 of 1 |

**Responsive to these comments:**
1051-4

Further clarification related to the methodology associated with the development of the viewshed analyses is provided in Newell, Grams, et al. (2018). We have updated section 3.11 of the FEIS to include additional information regarding KOP selection.

| Comment response: SR36 | |
|---|---|
| Changes to visual analysis driven by comments, including a new metric of viewshed quantification and additional travel routes | Page 1 of 1 |

**Responsive to these comments:**
1051-2, 28449-23

Additional information on concurrent reclamation (a design feature that reduces impacts to scenery, also known as progressive reclamation) for the tailings facilities is included in section 3.3 of the FEIS.

Additional information on scale and vegetative pattern is included in table 3.11.4-1 of the FEIS.

An additional simulation package and analysis for the preferred alternative (Alternative 6 – Skunk Camp) is presented in the FEIS and in appendix D of Newell, Grams, et al. (2018) to illustrate the approximate view of the tailings facility at 15-, 20-, and 30-year intervals. This illustrates the scenery impact over time and accounts for concurrent reclamation beginning at approximately year 10.

The FEIS contains additional analysis illustrating the anticipated length of time the tailings facilities would potentially be visible to travelers on the area's scenic byway (U.S. 60) and the Arizona National Scenic Trail.

The Florence-Kelvin highway simulation for KOP 27 in the DEIS illustrates the top of the tailings facility, which is not vegetated at the simulated mine-life year. The top of the facility, which is visible in the simulation, is not "painted to match the sky" as understood by the commenter, but actually shows the water covering.

| Comment response: SR37 | |
|---|---|
| Recreational values of Oak Flat | Page 1 of 1 |

**Responsive to these comments:**
1454-7

We disclosed the impacts to the nature-based tourism economy, including the recreation uses listed in the comment in section 3.13 (DEIS, p. 653). More specific analysis of impacts to recreation resources was included in section 3.9 (DEIS, pp. 495–509).

Appendix R

| Comment response: TR1 | |
|---|---|
| Street wear and maintenance | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1113-1, 1516-2, 310-2, 8032-310 |

These comments indicate that street wear and maintenance should have been analyzed, in addition to traffic and access.

The primary roadways used by the project (U.S. 60, SR 177, SR 79) are designed and maintained by the Arizona Department of Transportation (ADOT) to accommodate typical passenger cars and trucks. Roadways are designed to incorporate growth in background traffic volumes as part of the design life of the pavement structure. Increases in traffic (passenger cars and standard load trucks) are already included in the existing roadway design and do not require separate mitigation.

When necessary, overweight/oversized vehicles will need to obtain permits from ADOT. These permits outline specific criteria for use of such transports to ensure that damage to State highways does not occur.

A different concern for road degradation and maintenance needs would be the use of roads within the town of Superior. ADOT did not design or maintain these roads. The original road use plan analyzed in the DEIS used Magma Avenue. In response to comments on the DEIS and concerns from the Town of Superior, the revised road use plan uses the existing entrance at the intersection of Main Street/North Smeltertown Road during construction and operations. Most vehicles traveling to/from the mine entrance at North Smeltertown Road likely would use the intersection of U.S. 60/Main Street. This is the fastest and most direct route to the West Plant Site. Trips into the town of Superior using Main Street (north of North Smeltertown Road) and/or Magma Avenue are expected to be limited and consist of employees visiting restaurants and other amenities in town.

Vehicle use of a small section of road from U.S. 60 along Main Street to the Lone Tree/Smelter Town Gate would increase. Resolution Copper introduced mitigation to cover increased maintenance costs for road degradation within the town of Superior caused by mine traffic (see FEIS appendix J, mitigation measure RC-SO-06).

We added discussion of the revised Road Use Plan, potential for pavement degradation, and new mitigation measures to section 3.5 of the FEIS.

Other comments are concerned with the double-accounting of costs associated with road maintenance. The socioeconomic analysis was revised after consultation with the Town of Superior and Resolution Copper. The analysis more closely reflects the costs and benefits of the mine for the Town of Superior. Resolution Copper introduced mitigation to reflect these increased costs (see FEIS appendix J, mitigation measure RC-SO-06).

| Comment response: TR3 | |
|---|---|
| Impacts to roads near filter plant/loadout facility | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1538-3, 38-3, 417-2 |

These comments largely are concerned with impacts to local roads near the filter plant/loadout facility, specifically Skyline Drive.

Section 3.5 (DEIS, pp. 249–252) described the access route for the filter plant. The existing condition of these roads also is described (DEIS, p. 249), as are the existing traffic volumes and LOS (DEIS, pp. 255–257). Baseline traffic data were collected for four intersections along this access route.

Filter plant/loadout facility-related traffic is relatively small, compared with the other mine facilities, with peak hour construction trips of 60 employee and 18 material trips, and peak-hour operations trips of 18 employees (DEIS, p. 260). Three of these intersections were analyzed for LOS; two are disclosed in section 3.5 (DEIS, pp. 258–261). Mine-related traffic causes no changes in LOS. We anticipate the Combs Road/Schnepf Road intersection would experience unacceptable LOSs in the future, regardless of the mine-related traffic. Other intersections along Skyline Drive would experience no degradation in LOS due to mine-related traffic.

One comment indicates that Skyline Drive is closed to through traffic at Laine Road. We believe this corresponds to a transition from private to Arizona State Trust land. Access restrictions on this road will adhere to Arizona State Trust land requirements. We added a discussion to section 3.9 of the FEIS regarding the possible impacts of opening access to lands because of mine infrastructure.

Appendix R

| Comment response: TR4 | |
|---|---|
| Back roads | Page 1 of 1 |

**Responsive to these comments:**
1508-2

An inventory of all "back roads" was not conducted for the DEIS, but all NFS roads currently open to public use were listed (see table 3.9.4-2 of the DEIS). An assessment to determine "orphaned roads" is described in section 3.5 and, as they relate to the recreation setting, in section 3.9.

| Comment response: TR5 | |
|---|---|
| Mitigation for unacceptable level of service (LOS) | Page 1 of 1 |

**Responsive to these comments:**
1461-1

These comments note intersections in the analysis that will experience unacceptable LOSs as a result of mine traffic.

These impacts are disclosed in section 3.5 (DEIS, pp. 262–263) and include Silver King Mine Road/U.S. 60 (change in LOS to "E" during construction and "F" during operations), Main Street/U.S. 60 (change in LOS to "F" during construction and operations), SR 177/U.S. 60 (change to LOS "E" during construction), and Magma Mine Road/U.S. 60 (change to LOS "F") during construction.

The original road use plan analyzed in the DEIS used Magma Avenue. In response to comments on the DEIS and concerns from the Town of Superior, the revised road use plan uses the existing entrance at the intersection of Main Street/North Smeltertown Road during construction and operations. We expect that most vehicles traveling to/from the mine entrance at North Smeltertown Road would use the intersection of U.S. 60/Main Street. This is the fastest and most direct route to the West Plant Site. We revised the transportation analysis to incorporate these changes, and we updated the results in section 3.5 of the FEIS to reflect the changes. Note that Smeltertown Road and Lonetree Road refer to the same location.

These changes still result in unacceptable LOSs. SR 177/U.S. 60 was not reanalyzed, and those results have not changed between the DEIS and FEIS. The Silver King Road/U.S. 60 intersection was reanalyzed and improved, though it still has an unacceptable LOS (change to LOS of "E" during operations). Main Street/U.S. 60 was reanalyzed and remains at an unacceptable LOS (change to LOS of "F" during construction and operations).

The Main Street/Smeltertown Road intersection was reanalyzed and maintains adequate LOS. The Main Street/Magma Avenue would no longer be used by mine-related traffic.

No mitigations were developed for traffic impacts in the DEIS, though a number of applicant-committed environmental protection measures were identified. These included (DEIS, p. 258) the following: (1) installation of new stop signs at minor approaches to intersections as needed, subject to ADOT approval; (2) having flaggers or officers to assist with turning movements at major project intersections during peak construction, subject to ADOT approval; and (3) using construction traffic or similar advanced warning signs as needed during peak construction, subject to ADOT approval.

No new applicant-committed environmental protection measures or mitigation measures related to these intersections were brought forward for the FEIS. We are not authorized to require implementation of mitigation measures for traffic impacts at these intersections. However, a handful of mitigation measures were recommended based on the NEPA team's analysis. We describe these in the project record (see mitigation measure PF-TA-02) (Garrett 2025).

| Comment response: TR6 | |
|---|---|
| Oversized loads | Page 1 of 1 |

**Responsive to these comments:**
8032-305

This comment expresses concern that oversized loads are not documented in the EIS.

Specific information on oversized loads is not known at this time. When necessary, overweight/oversized vehicles will obtain permits from ADOT. These permits outline specific criteria for the use of such transports to ensure that damage to State highways does not occur and that traffic impacts are understood and mitigated to the extent possible (typically by timing the loads).

Appendix R

| Comment response: TR7 | |
| --- | --- |
| Analysis of movement of molybdenum and copper concentrates | Page 1 of 1 |

| Responsive to these comments: |
| --- |
| 8032-307 |

This comment states that the DEIS did not analyze the transportation of molybdenum and copper concentrates. This is incorrect.

The DEIS included this analysis. Chapter 2 included molybdenum processing as part of the proposed action (pp. 38, 47). The analysis includes the intent to transport the molybdenum concentrate from the West Plant Site by truck (DEIS, p. 58).

The molybdenum trucks were included in the traffic analysis in section 3.5 (DEIS, p. 258; see also Southwest Traffic Engineering LLC (2017)).

Chapter 2 of the DEIS included the movement of copper concentrate from the filter plant/loadout facility to the railhead (DEIS, pp. 9, 38, 51).

Impacts along the rail to the filter plant/loadout facility are analyzed for noise in section 3.4 (DEIS, pp. 214, 227–230) and for traffic impacts in section 3.5 (DEIS, p. 261).

We added further discussion of rail impacts to section 3.5 of the FEIS to better describe existing and future conditions. All crossings on the MARRCO corridor are signalized and currently operate two trains or fewer per night, based on current Federal Railroad Administration (FRA) information. During peak production years, an average 0.8 train sets per day is expected to enter and exit the facilities, with a typical train set being 100 cars. The typical covered hopper rail car is upward of 65 feet long, with an estimated 75 feet for each engine required for pulling the 11,000-ton load. This places the total train length at approximately 7,000 feet. Assuming an estimated travel speed between 5 and 10 miles per hour (in accordance with FRA documentation from 2011) and that no gate-down time associated with switching will be required, the estimated increase in gate-down time is 8 to 15 minutes each day. According to FRA data, no trains cross these locations between 6 a.m. and 6 p.m.

As noted in chapter 1, the smelter location is unknown at this time (DEIS, pp. 38, 58). Analysis of concentrate movement beyond the railhead is speculative.

| Comment response: TR8 | |
| --- | --- |
| Analysis of impacts to U.S. 60, SR 77, and SR 177 | Page 1 of 1 |

| Responsive to these comments: |
| --- |
| 267-2, 8032-309, 8032-313 |

These comments indicate that additional analysis is needed for U.S. 60, SR 77, and SR 177.

Mine-related traffic impacts to these highways, beyond the intersections analyzed in the DEIS, are well within the design capacity, even when considering population increase. Specific analysis of traffic impacts on these routes is not warranted.

We added discussion to section 3.5 of the FEIS to clarify this point.

Appendix R

| Comment response: TR9 | |
|---|---|
| Traffic accidents and fatalities | Page 1 of 1 |

**Responsive to these comments:**
8032-315, 8032-47

These comments concern the lack of analysis for traffic accidents and fatalities.

Extrapolation of accidents based on traffic volumes is not an appropriate analysis technique. However, examination of crash data is reasonable. We added this analysis to section 3.5 of the FEIS.

Crash data on U.S. 60 at Silver King Mine Road and Main Street were obtained from ADOT's Traffic Records Section and reviewed as a part of this traffic analysis to determine whether there are any observable trends. Records for the most recent 5-year period were reviewed and reported (Southwest Traffic Engineering LLC 2020b).

Available crash data do not reveal any crash patterns or trends at the study intersections that require mitigation by the project. A single left-turn collision was reported in 2015 at the West Main Street/U.S. 60 intersection. Analysis shows there would be an added 611 eastbound left-turn mine trips at this intersection during construction and 133 eastbound left-turn mine trips during normal operations (Southwest Traffic Engineering LLC 2020b). This does not yet warrant mitigation but will require monitoring for potential safety mitigation if turning left becomes a concern.

No new applicant-committed environmental protection measures or mitigation measures related to these intersections were brought forward for the FEIS. We are not authorized to require implementation of mitigation for traffic impacts at these intersections. However, a handful of mitigation measures were recommended based on the NEPA team's analysis and are described in the project record (Garrett 2025). One of these recommendations concerns the use of a temporary traffic signal during construction at Main Street/U.S. 60.

| Comment response: TR11 | |
|---|---|
| Road impacts from pipeline | Page 1 of 1 |

**Responsive to these comments:**
28449-17, 28449-77, 28449-81

The FEIS includes additional details regarding the potential impacts to motorized recreation opportunities that may result from pipeline construction and operation. Specific common route names such as Battle Axe Road and Mineral Mountain Road are now noted in the analysis.

The FEIS is not evaluating the West and South pipeline routes, as they have been dropped from consideration.

| Comment response: TR13 | |
|---|---|
| Rail transportation impacts | Page 1 of 1 |

**Responsive to these comments:**
1158-2, 1158-27, 1311-18, 8032-318, 8032-319, 8032-48

These comments raise a number of concerns with the analysis of impacts related to rail transportation of copper concentrate.

Chapter 2 of the DEIS included the movement of copper concentrate from the filter plant/loadout facility to the railhead (DEIS, pp. 9, 38, 51), including the movement of the filter plant to the West Plant Site (DEIS, pp. 81–84).

Impacts along the rail between the filter plant/loadout facility are analyzed for noise in section 3.4 (DEIS, pp. 214, 227–230) and for traffic impacts in section 3.5 (DEIS, p. 261). See response NO2 for additional discussion of the revised analysis of rail noise in the FEIS. See response TR7 for additional discussion of rail impacts on traffic in the FEIS.

These comments note the potential impact of releasing hazardous materials during rail transport. We added discussion of this possibility to section 3.10.3 of the FEIS.

These comments also note potential impacts to the Arizona National Scenic Trail from the use of the railroad to transport concentrate between the West Plant Site and the railhead in Alternative 4. We acknowledged this in chapter 2:
"The MARRCO corridor track would require upgrades along the entire length, bridge replacement at Queen Creek Bridge, and significant upgrades for crossings at Queen Creek, US 60, SR 79, the Arizona National Scenic Trail, Hewitt Canyon Road, and other NFS roads" (DEIS, p. 84). Such upgrades have not been designed at this time but are considered part of the actions proposed under Alternative 4.

Appendix R

| Comment response: TR14<br>Concerns with traffic analysis | Page 1 of 2 |
| --- | --- |
| **Responsive to these comments:**<br>8032-304 | |

These comments contain a number of specific concerns with the traffic analysis. These include the following:

1) Incorrect methodology was used to generate the traffic impact reports. Two-way, two-lane highway segment methodology was used when the roadway conditions mandate the directional methodology must be used.

2) There is also evidence of incomplete LOS worksheets.

3) No input data are documented; there is incorrect site information, and incorrect lane width and shoulder width used to determine adjusting values.

4) The DEIS incorrectly bases its traffic counts on only two studies on a Friday in 2015 (between 7 am and 10 pm) and presumably also on a Friday during the same hours of the day in November of 2018 (this was supposed to cover winter visitor traffic). No explanation was given as to why the sample is so small or why only those days were used. To begin with summer traffic begins well before 7 am and winter visitors have not all yet arrived in November.

5) Why were these studies done 3-4 years ago? It is unclear if the DEIS's multiplier rate for traffic increase of 2% per year was added to make those old studies more relevant. Also, since the Skunk Camp tailings alternative was not made public until 2017 at the earliest, does the Resolution Copper study claim to have surveyed the intersection of Highway 777 and Dripping Springs Road in 2015?

6) Why does the DEIS assume that construction would begin in 2022 when Resolution Copper publicly maintains that construction would begin much later as would presumably <u>production</u>?

<u>Two-way, two-lane highway segment methodology</u>

We maintain that the intersections are the key analysis points where conflicts occur. We maintained this approach between the DEIS and FEIS. Mine-related traffic impacts on the highway segments between intersections are well within the design capacity, even when considering population increase. Specific analysis of traffic impacts on these routes is not warranted. See also response TR8. We added discussion to section 3.5 of the FEIS to clarify this point.

<u>Incomplete worksheets</u>

This comment refers to worksheets in the original traffic analysis report (Southwest Traffic Engineering LLC 2017). These worksheets were updated for key intersections (Southwest Traffic Engineering LLC 2020b). The worksheets reflect percent heavy vehicles and peak hour factors based on traffic counts.

<u>Lane width and shoulder width</u>

Shoulder widths do not impact the calculations required for intersection analyses. In accordance with ADOT procedures and their typical lane width design/construction, 12-foot lanes are used in capacity calculations unless more narrow lanes are noted during the field review. The field review did not note such lanes. We added discussion to section 3.5 of the FEIS to clarify this point.

Appendix R

| Comment response: TR14<br>Concerns with traffic analysis | Page 2 of 2 |
| --- | --- |

**Responsive to these comments:**
8032-304

Baseline traffic counts

Background (baseline) traffic counts were purposefully taken to capture peak traffic (i.e., peak day of week and season). According to discussions with ADOT (Southwest Traffic Engineering LLC 2020c), traffic counts were taken on Friday (the day of the week with historically highest traffic volumes due to users traveling for the weekend in the region). Also, to ensure that the most conservative case scenario was analyzed, traffic counts were taken seasonally in August 2015 and November 2016, with the most conservative winter (November) counts used for the analysis.

The period from 7 a.m. to 10 p.m. provides a typical daily count that captures most a.m. and p.m. peak hours. Traffic count data shown in the appendix of the original traffic analysis (Southwest Traffic Engineering LLC 2017) indicated that U.S. 60 only encounters one peak (p.m.), with traffic steadily increasing between a.m. and p.m. hours.

Note that the revised analysis (Southwest Traffic Engineering LLC 2020b) analyzes both a.m. and p.m. peak hours, with no change in the conclusions.

Timing of Baseline Studies

Baseline studies were conducted during the NEPA analysis (2015–2016), with modeling conducted shortly thereafter (2017). The data used in the modeling were reasonable, recent, and pertinent to the affected environment captured in the DEIS. Note that publication of the DEIS occurred in August 2019, but most analysis was completed in 2017–2018, with 2019 primarily dedicated to finishing the administrative draft, receiving cooperating agency review of the administrative draft, and producing the revised DEIS for publication.

ADOT's road-aggregated annual growth rates are below the 2 percent annual growth used in the analysis. The analysis used a growth rate of 2 percent as a conservative estimate to account for uncertainty in the development plan (i.e., shifting study years). For example, ADOT data estimated that growth at U.S. 60/SR 79 would be 1.6 percent per year and that growth at U.S. 60/SR 177 would be 1.6 percent per year.

The comments ask, "Why does the Resolution Copper study claim to have surveyed the intersection of Highway 77 and Dripping Springs Road in 2015?" We assume that this refers to the traffic assessment conducted specifically for the tailings storage alternatives (Southwest Traffic Engineering LLC 2018). This document clearly states that the baseline studies at SR 77 and Dripping Springs Road were conducted in March 2018 (Southwest Traffic Engineering LLC 2018:14).

Start of Construction in 2022

The DEIS explained that traffic modeling necessitates picking specific dates (DEIS, pp. 244–246) and notes the steps taken to ensure that conservative traffic values were used. When the FEIS was originally published in January 2021, the assumption that 2022 is an unreasonable time frame for construction was not warranted. At that time, 2022 remained a reasonable start time for construction. Conceivably, it would have allowed time for publication of the FEIS and draft ROD, completion of the pre-decisional objection process, and publication of the final ROD.

With the republication of the FEIS, this is no longer the case, and a start date in 2022 clearly did not occur.

However, in the January 2021 Rescinded FEIS we recognized that process delays could occur. Our analysis of growth rates suggests that, based on the difference between the growth rate used in the analysis and ADOT's estimated growth rate, the published analysis would remain valid until at least 2025. We added further discussion of this issue to section 3.5 of the FEIS. We believe this conclusion remains valid for the republished FEIS, as well.

Appendix R

| Comment response: TR15 Effects on U.S. 60 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1369-1 | |

The potential effects on U.S. 60 were an integral part of the subsidence analysis conducted for the project. The analysis concluded that no impacts are anticipated at U.S. 60 (DEIS, p. 154). In addition, specific monitoring and mitigation is in place to ensure that potential impacts are observed and mitigated if they occur (DEIS, pp. 149–150). See responses GS13 and GS14 for more details.

| Comment response: TR17 Safety of bicyclists | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-314 | |

This comment notes that the safety of bicyclists considering mine truck traffic was not analyzed, noting specifically SR 77 and SR 177.

We analyzed these State routes in section 3.5 in the DEIS. The SR 177 typical section provides a 4-foot shoulder in each direction of travel. However, there are sections of the highway where the shoulder is less than the desired 4 feet or does not exist at all. Current daily truck traffic on SR 177 is approximately 200 trucks per day. The added truck traffic on SR 177 represents a 2 percent increase in total trucks. Given this existing condition, there has been one recorded pedestrian collision on SR 177 (2009–2018). There have been no recorded bicycle collisions on either SR 177 or SR 77 between Winkelman and U.S. 60 (2009–2018). Available crash data do not reveal any crash patterns or trends along the study corridors that require mitigation by the project.

We added analysis of these data to section 3.5 of the FEIS.

| Comment response: TR18 School bus safety | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-323 | |

This comment concerns analysis of school bus safety.

The analysis in the DEIS covers a wide variety of potential impacts to vehicular traffic. School buses represent one type of vehicular traffic. Therefore, impacts are encompassed in the traffic analysis in section 3.5 of the FEIS.

We added further analysis to section 3.5 of the FEIS to analyze available crash data. See response TR9 for more discussion. None of the factors identified as potential safety issues suggest a propensity for school buses to be more at risk than other vehicular traffic.

| Comment response: TR20 Role of ADOT | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-316 | |

This comment states that the role of ADOT was overlooked in the DEIS description of decisions that must be made in the transportation arena.

This is incorrect. ADOT guidance pertinent to the analysis of impacts is stated in section 3.5 (DEIS, p. 246). The need for a Right-of-Way Encroachment Permit is stated in chapter 1 (DEIS, p. 18).

Further, traffic analysis was based on publicly available ADOT data sources and guided by conversations with ADOT staff regarding data collection methodology (Southwest Traffic Engineering LLC 2020b).

Appendix R

| Comment response: TR21 Conflicts with off-highway-vehicle (OHV) users | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-212, 8032-311 | |
| Additional analysis and qualitative discussion about user displacement are included in section 3.9 of the FEIS. Understanding the conflicts that may arise from user displacement, including the potential noise and the impacts it may have to non-motorized recreation settings, the Forest Service has included additional analysis on non-motorized user conflicts with OHV users. | |

| Comment response: TR22 Impacts from traffic | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1477-4 | |
| This comment notes a number of impacts related to traffic, including quality of life, transportation, air quality, road maintenance, and cumulative effects. | |

These aspects were analyzed in the DEIS, with some additional discussion added in the FEIS.

With regard to quality of life, see response EJ6 for more detail.

Transportation and access was analyzed in section 3.5 (DEIS, pp. 244–274) using a variety of methodologies.

Air quality was analyzed in section 3.6 (DEIS, pp. 275–294) using a variety of methodologies; the analysis incorporated emissions from employee and delivery traffic.

With regard to road maintenance, see response TR1 for more detail.

With regard to cumulative effects, see response NEPA54 for more detail.

| Comment response: TS1 | |
|---|---|
| FMEA, breach analysis, seismic analysis, and emergency planning | Page 1 of 2 |

**Responsive to these comments:**
1075-4, 1097-8, 1118-1, 1200-2, 1209-5, 1279-1, 1329-3, 1342-4, 1349-2, 1452-1, 1452-2, 1474-2, 1501-6, 263-2, 295-2, 30066-3, 30141-6, 30145-5 (Emerman4), 30145-6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4), 313-2, 323-1, 524-23, 550-2, 8032-10, 8032-21, 8032-240, 8032-245, 8032-43, 866-9, 897-6, 899-6

These comments concern the potential for a tailings embankment failure and the analysis that was presented in the DEIS.

In response to comment, the Forest Service has included additional analysis of tailings safety issues in the FEIS, particularly with regard to the preferred alternative (Alternative 6) tailings storage facility. This effort was driven by mitigation measures required by the Tonto National Forest and included in the DEIS. These include the following:

- Conducting a refined FMEA before the FEIS (DEIS, p. 557; appendix J, p. J-19, mitigation measure FS-227).
- Development of an emergency action plan for the tailings storage facility, and specifically a refined breach analysis before the FEIS based on the outcome of the FMEA (DEIS, p. 557; appendix J, p. J-20, mitigation measure FS-229).

Additional hydrologic and geotechnical fieldwork and data collection were also conducted for the preferred alternative to support the measure required by the Forest Service. See response ALT22 for a listing of the specific information developed between DEIS and FEIS for the preferred alternative.

A discussion of the FMEA process undertaken is provided in FEIS chapter 3, section 3.10.1.

Some comments request that "3rd party risk analysis be undertaken." This is essentially the purpose and scope of the FMEA (see FEIS chapter 3, section 3.10.1).

Several comments specifically mention seismic hazards associated with the tailings storage facility. These hazards were specifically considered during the FMEA process. In addition, site-specific seismic hazard evaluations have been prepared for the Alternative 6 tailings storage facility location, and specific investigations were undertaken to ascertain whether certain faults that underlie the tailings storage facility are active. The results of these analyses are summarized in FEIS sections 3.2 and 3.10.1.

Many comments also mistakenly identify the 5,000-year earthquake as the design basis for the tailings storage facility. This is an incorrect assumption. The design basis for the tailings storage facility is the Maximum Credible Earthquake (DEIS, p. 529). See response TS2 for more details.

Appendix R

| Comment response: TS1 | |
|---|---|
| FMEA, breach analysis, seismic analysis, and emergency planning | Page 2 of 2 |

**Responsive to these comments:**
1075-4, 1097-8, 1118-1, 1200-2, 1209-5, 1279-1, 1329-3, 1342-4, 1349-2, 1452-1, 1452-2, 1474-2, 1501-6, 263-2, 295-2, 30066-3, 30141-6, 30145-5 (Emerman4), 30145-6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4), 313-2, 323-1, 524-23, 550-2, 8032-10, 8032-21, 8032-240, 8032-245, 8032-43, 866-9, 897-6, 899-6

A breach analysis was conducted in section 3.10.1 of the DEIS (pp. 538–540). This breach analysis represents a scenario in which the tailings are saturated at the time of failure and flow extensively downstream. The analysis was based solely on a statistical assessment of historic tailings failures, with no consideration for site-specific conditions. As required in mitigation measure FS-229 in the DEIS, the Tonto National Forest anticipated that a breach analysis using details of the actual tailings design and location would be one of the outcomes of the FMEA. This breach analysis was conducted and consists of largely non-saturated failure of the embankment and NPAG tailings. This breach analysis, in conjunction with the approach used in the DEIS, forms the bounds of anticipated failures. The anticipated failures form the basis for future emergency planning by Resolution Copper. We have included a description of the refined breach analysis in section 3.10.1 of the FEIS, and it can be found in (KCB Consultants Ltd. 2020h).

Some comments request that the breach analysis be based on "actual design and environmental factors." This is essentially what has been done, informed by the FMEA process.

Many comments indicate that downstream impacts from a potential tailings storage facility failure have not been analyzed. This is incorrect. Section 3.10.1 of the DEIS analyzes the effects from a failure of saturated tailings that travel far downstream. The impacts assessed from this runout include the following:

- Estimated chemistry of released liquids and released solids (DEIS, p. 540)
- Potential risk to life and property (DEIS, p. 544 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 549 [Alt 5], p. 552 [Alt 6])
- Potential exposure to contaminants (DEIS, p. 544 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 549 [Alt 5], p. 552 [Alt 6])
- Potential disruption of water supplies and infrastructure (DEIS, p. 544 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 550 [Alt 5], p. 552 [Alt 6])
- Potential destruction of habitat and vegetation (DEIS, p. 545 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 550 [Alt 5], p. 552 [Alt 6])
- Large-scale societal impacts (DEIS, p. 545 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], pp. 550–551 [Alt 5], p. 553 [Alt 6])

Many comments also cite high-profile catastrophic failures. Indeed, we noted several of these in the DEIS itself (Mt. Polley [pp. 520–521], Fundão [pp. 521–522], and Brumadinho [p. 515]), and the historic tailings upon which the breach analysis was based incorporated the majority of known catastrophic tailings breaches (DEIS, pp. 519–520). This experience has informed the NEPA analysis, including the FMEA for the preferred alternative.

Other comments request the evaluation of the risks associated with different types of tailings embankments and pipelines. These analyses were included in section 3.10.1. Embankment types included modified-centerline embankments (Alternatives 2 and 3), filtered tailings (Alternative 4), centerline embankments (Alternatives 5 and 6), and downstream embankments (PAG cells for Alternatives 5 and 6).

Appendix R

| Comment response: TS1_A FMEA, breach analysis, seismic analysis, and emergency planning; with addition for specific comment 1349-1 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1349-1

See response TS1 to the general topic of tailings failure, the FMEA, seismic analysis, and emergency planning.

This comment asks specifically about the studies conducted for the tailings pipeline. Studies include the following:

- The site-specific seismic hazard analyses for the mine site and Alternative 6 tailings storage facilities (Wong et al. 2020a).
- The pipeline management plan available before the DEIS, which includes specific analysis of potential failure modes, including geohazards and storm events (AMEC Foster Wheeler Americas Limited 2019).
- A pipeline protection and integrity plan prepared in response to comments, which includes specific analysis of potential failure modes, including geohazards such as slope instability, seismic hazards, scour, and geological subsidence (Golder Associates Inc. 2020). This plan includes specific mitigation methods to respond to these geohazards.

| Comment response: TS2 Insufficiency of tailings design; design earthquake; embankment type | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1301-17, 1322-4, 1448-6, 1501-1, 1587-1, 178-2, 230-2, 24-4, 255-6, 259-5, 263-5, 27995-2, 27996-1, 28106-2, 30145-1 (Emerman4), 30145-2 (Emerman4), 30145-3 (Emerman4), 30145-4 (Emerman4), 336-1, 568-3, 67-2, 8032-256, 8032-258, F1-5, F2-6, F4-6, F6-4

These comments variously state that the tailings facility design would be illegal in other countries, with Brazil and Chile noted specifically, or would not meet the standards of either the USACE or the ADEQ.

These are incorrect statements. While many of these comments do not identify specific factors, we believe they likely are based on two fundamental misunderstandings. The first misunderstanding is that the tailings storage facility is designed only to a 5,000-year earthquake event, which is the specific topic of a report submitted with comment letter #8032 by Dr. S. Emerman. This is an incorrect assumption. The design basis for the tailings storage facility is the Maximum Credible Earthquake (DEIS, p. 529). The second misunderstanding is that the tailings storage facility proposed to use an upstream-type embankment, which is rapidly becoming unacceptable for the mining industry. While Resolution Copper's original proposal used an upstream embankment, this was changed during alternatives development to a modified-centerline embankment (DEIS, p. 67). No upstream embankments are proposed for any of the alternatives.

The requirements of these different regulatory programs with respect to tailings facilities is disclosed in section 3.10.1, table 3.10.1-1 (DEIS, pp. 524–525). Table 3.10.1-2 in section 3.10.1 outlined the comparison of the Resolution Copper tailings design parameters specifically with ADEQ and National Dam Safety Program requirements (DEIS, pp. 528–529).

Section 3.10.1 included a comparison of the Resolution Copper Project design with local, national, and international regulations and industry best practices (DEIS, pp. 522–527). The DEIS concludes, "The designs developed by Resolution Copper meet the most stringent of these standards, whether required (National Dam Safety Program or Aquifer Protection Permit program) or solely industry best practice" (DEIS, p. 527).

Appendix R

| Comment response: TS3 Specific questions on tailings storage facility design parameters | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1301-19

This comment asks several specific questions about the tailings storage design parameters:

- Potential for liquefaction, specifically due to monsoon storms
- Handling of water during tropical storms
- Presence of 100-year floodplains

With respect to liquefaction, the presence of water in the facility is not a consideration because the tailings design assumes that liquefaction will occur regardless of conditions. This is described in section 3.10.1 (DEIS, p. 515) and in the design documents. For example, from the design document for the preferred alternative, "For stability analysis, all potentially liquefiable contractive tailings are assumed to liquefy regardless of the triggering mechanism" (Klohn Crippen Berger Ltd. 2018d:22).

The handling of stormwater and stormwater controls is described in section 3.7.2 (DEIS, pp. 379–380), with more details in Newell and Garrett (2018d). Stormwater controls at the tailings storage facility are designed for complete capture and control of stormwater during operations:

> "Generally speaking, during operations any precipitation or runoff that comes into contact with tailings, ore, hazardous material storage areas, or processing areas is considered "contact water." During operations contact water would be captured, contained in basins, pumped out after storm events, and recycled back into the process water stream. This type of containment would be required by both the stormwater and aquifer protection permits that would be issued for the project. Contact water would not be released to the environment at any time during operations. . . . The tailings storage facility generally follows the same strategy during operations. For all alternatives, runoff from upstream of the facility would be diverted around the facility to prevent any contact with tailings. For Alternatives 2, 3, 5, and 6, any precipitation falling within the facility would run into the recycled water pond, and any runoff from the external embankments would be routed to the downstream seepage collection ponds, then pumped back and recycled into the process water stream." (DEIS, p. 379)

The stormwater analysis was revised for the FEIS. See response WT35 for more discussion. As part of this analysis, the design storm events used for the facility are described in detail in the FEIS:

- All dams and diversion channels would be designed to handle the 100-year, 24-hour storm event.
- The tailings storage facility itself is designed for greater than the 72-hour Probable Maximum Flood, including the conservative assumption that diversions fail and stormwater enters the facility as well. The Probable Maximum Flood is defined as the flood that may result from the most severe combination of critical meteorological and hydrologic conditions. This Probable Maximum Flood encompasses precipitation outcomes from all types of precipitation patterns, including monsoon, winter frontal, and tropical storms.
- Downstream of the embankment, the seepage collection pond is sized to hold an operating pond, a week's worth of inflows without outflow (i.e., an upset condition where pumps fail), and the 200-year 24-hour storm volume.

With respect to floodplains, these are disclosed in DEIS section 3.7.3 (pp. 435–444), with further details included in Newell and Garrett (2018d). Some of the tailings storage facilities do partially lie within the 100-year floodplains (Alternatives 5 and 6), whereas other areas have not been fully mapped for floodplains (Alternatives 2 and 3).

Regardless, design specifications exist to specifically address the location of tailings storage facilities within floodplains. For instance, the ADEQ Best Available Demonstrated Control Technology (BADCT) requires that if they are within the 100-year floodplain, drainage structures must be designed to protect them from the 100-year peak stream flows (Klohn Crippen Berger Ltd. 2018d:8).

Appendix R

| Comment response: TS5 | |
|---|---|
| Height of tailings embankment | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 555-8 |

This comment says, "The EIS states that the dam created by facility would be approximately 1,000 feet tall. This is not feasible and needs to be reconsidered in order to maintain structural stability of the facility."

This is an incorrect statement. The tailings storage facility embankment height varies by alternative: 521 feet [Alt 2, DEIS p. 73], 510 feet [Alt 3, DEIS p. 80], 310 feet [Alt 5, DEIS p. 93], and 490 feet [Alt 6, DEIS p. 99].

This comment may mistakenly refer to the height of the filtered tailings facility for Alternative 4, which is 1,040 feet for the NPAG tailings (DEIS, p. 87). This is not a dam or embankment; filtered tailings are freestanding with a structural shell but do not require any sort of embankment or dam.

| Comment response: TS7 | |
|---|---|
| Liner for PAG tailings; seepage controls | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 11-1, 1333-2, 1448-2, 1602-3, 99-3 |

These comments raise questions or concerns regarding the use of liners, particularly for the PAG tailings, and question the impact of seepage.

The concept of a "liner" evolved during alternatives development (see Newell and Garrett (2018d)), and discussion in the DEIS is more expansive than just a geomembrane. The term used in the DEIS is "engineered low-permeability layer," which could consist of one or more of the following: an engineered low-permeability liner, compacted fine tailings, asphalt, slurry bentonite, cemented paste tailings, etc.

Most alternatives incorporate a low-permeability layer. Alternative 2 incorporates it in the PAG cell starter facility (DEIS, pp. 69, 73). Alternative 3 incorporates it in the entire PAG cell (DEIS, pp. 78, 80). Alternative 5 incorporates it in the entire PAG cell and the starter NPAG cell (DEIS, pp. 90, 93). Alternative 6 incorporates it in the entire PAG cell (DEIS, pp. 97, 99). The NEPA team specifically assessed the longevity of liners and seepage through liners (Newell and Garrett 2018d).

In all cases, we assume seepage would occur, regardless of the type of low-permeability layer or liner incorporated. This would be true even for a facility lined with a full geomembrane liner (see Newell and Garrett (2018d)). The water quality analysis contained in section 3.7.2 of the DEIS assumes that this seepage would occur and estimates the potential impacts in groundwater and surface water downstream.

While not relied upon for any aspect of the NEPA analysis, Resolution Copper would also be obtaining an Aquifer Protection Permit for the tailings storage facility (DEIS, pp. 16, 363–364). This permit would have specific requirements for seepage control, water quality monitoring, and water quality standards.

| Comment response: TS10 | |
|---|---|
| Inconsistent references to most resilient alternative | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 524-22 |

This comment noted internal inconsistencies regarding which alternative represents the most resilient facility. We have clarified this language in the Executive Summary and in section 3.10.1 of the FEIS.

Appendix R

| **Comment response:** TS12<br>Varied water-related criticisms | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1151-1 | |

This comment raises four criticisms:

- With respect to the design earthquake, see response TS2 for more detail.
- With respect to the power consumption by the project, see response WT24 for more detail.
- With respect to geothermal water, see response WT6 for more detail.
- With respect to overall water use for the project, see response WT1.

| **Comment response:** TS13<br>Varied tailings-related criticisms | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1381-2 | |

This comment raises four criticisms:

- With respect to the design earthquake, see response TS2 for more detail.
- With respect to seepage from the tailing storage facility, see response TS7 for more detail.
- With respect to emergency planning and warnings to residents downstream of a tailings storage facility, and specifically development of an emergency action plan, this is a requirement of all the national and international regulations and industry best practices reviewed in section 3.10.1 (DEIS, p. 525). It is not a requirement of Arizona regulations under the Aquifer Protection Permit program. We added mitigation measure FS-229 between the DEIS and FEIS to develop the breach analysis based on site-specific designs to inform emergency planning efforts. See response TS1 for more details. In addition, section 3.10.1 of the FEIS now discusses the Global Industry Standard on Tailings Management (standard), launched on August 5, 2020. Both of Resolution Copper's parent companies (Rio Tinto and BHP) are signatory to the International Council on Mining and Metals (ICMM) and through that membership have committed to implementing the new standard. Principal 13 of the standard requires emergency response planning.
- Potential impacts from leakage from slurry pipelines are addressed in section 3.10.1 (DEIS, pp. 540–554).

| **Comment response:** TS14<br>Alternative 4 Silver King stormwater controls | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>51-2 | |

Stormwater controls for Alternative 4 – Silver King are described in detail in Newell and Garrett (2018d) and summarized in section 3.7.2 (DEIS, pp. 379–380).

Appendix R

| Comment response: TS15 | |
|---|---|
| Varied questions on tailings alternatives | Page 1 of 1 |

**Responsive to these comments:**
1279-5

This comment raises several concerns and questions regarding tailings alternatives.

Impacts to scenery and recreation from Alternatives 2, 3, and 4 are disclosed in section 3.9 (DEIS, pp. 502–505) and section 3.11 (DEIS, pp. 603–609). Disclosures include impacts to the Arizona National Scenic Trail users. Impacts to scenery and recreation from Alternative 6 are also disclosed in these same sections (DEIS, pp. 507–509, 615–616).

The NEPA team specifically reviewed placing tailings at previously disturbed sites, including mine pits, during alternatives analysis but found it to be impractical for a variety of reasons (DEIS, appendix F, pp. F-4 through F-6). Ray Mine was specifically analyzed (DEIS, appendix F, p. F-5). Full details of the evaluation are contained in the Alternatives Evaluation Report (SWCA Environmental Consultants 2017a).

The ramifications of a breach at Alternatives 2, 3, 4, and 5 were analyzed in section 3.10.1 (DEIS, pp. 535–554). This included potential impacts to groundwater and water supplies for the San Tan Valley, Queen Creek, and Florence.

| Comment response: TS16 | |
|---|---|
| Concerns with stormwater controls for tailings storage facilities | Page 1 of 1 |

**Responsive to these comments:**
1128-12, 1128-13, 8032-33

The handling of stormwater and stormwater controls was described in section 3.7.2 (DEIS, pp. 379–380), with more detail in Newell and Garrett (2018d). Stormwater controls at the tailings storage facility are designed for complete capture and control of stormwater during operations.

> *"Generally speaking, during operations any precipitation or runoff that comes into contact with tailings, ore, hazardous material storage areas, or processing areas is considered 'contact water.' During operations contact water would be captured, contained in basins, pumped out after storm events, and recycled back into the process water stream. This type of containment would be required by the stormwater and aquifer protection permits issued for the project. Contact water would not be released to the environment at any time during operations. The tailings storage facility generally follows the same strategy during operations. For all alternatives, runoff from upstream of the facility would be diverted around the facility to prevent any contact with tailings. For Alternatives 2, 3, 5, and 6, any precipitation falling within the facility would run into the recycled water pond, and any runoff from the external embankments would be routed to the downstream seepage collection ponds, then pumped back and recycled into the process water stream."* (DEIS, p. 379)

The stormwater analysis was revised in the FEIS; see response WT35 for more discussion. As part of this analysis, the design storm events used for the facility are described in detail in the FEIS:

- All dams and diversion channels would be designed to handle the 100-year, 24-hour storm event.
- The tailings storage facility itself is designed for greater than the 72-hour Probable Maximum Flood, including the conservative assumption that diversions fail and enter the facility as well. The Probable Maximum Flood is defined as the flood that may result from the most severe combination of critical meteorological and hydrologic conditions. This Probable Maximum Flood encompasses precipitation outcomes from all types of precipitation patterns, including monsoon, winter frontal, and tropical storms.
- Downstream from the embankment, the seepage collection pond is sized to hold an operating pond, a week's worth of inflows without outflow (i.e., an upset condition where pumps fail), and the 200-year 24-hour storm volume.

With respect to floodplains, these are disclosed in section 3.7.3 (pp. 435–444), with further detail included in Newell and Garrett (2018d). Some of the tailings storage facilities do partially lie within the 100-year floodplains (Alternatives 5 and 6), whereas other areas have not been fully mapped for floodplains (Alternatives 2 and 3).

Regardless, design specifications exist to specifically address the location of tailings storage facilities within floodplains. For instance, ADEQ BADCT requires that if they are within the 100-year floodplain, drainage structures must be designed to protect them from the 100-year peak stream flows Klohn Crippen Berger Ltd. (2018d:8).

Appendix R

| Comment response: TS17 | |
|---|---|
| Varied criticisms related to tailings storage facilities | Page 1 of 1 |

**Responsive to these comments:**
863-2

This comment raises several concerns and questions regarding tailings storage facilities.

With respect to tailings safety, see responses TS1 and TS2 for more discussion. A comparison of the Resolution Copper Project design with local, national, and international regulations, and industry best practices is included in section 3.10.1 (DEIS, pp. 522–527). The DEIS concludes, "The designs developed by Resolution Copper meet the most stringent of these standards, whether required (National Dam Safety Program or Aquifer Protection Permit program) or solely industry best practice" (DEIS, p. 527).

The potential for acid generation is fundamental to the water quality analysis in section 3.7.2 (DEIS, pp. 370–373). Additional comments were raised regarding operational segregation of PAG and NPAG tailings. We have added further discussion on this topic to section 3.7.2 of the FEIS.

The NEPA team specifically reviewed placement of tailings in previous mine excavations during alternatives analysis but found it to be impractical for a variety of reasons (DEIS, appendix F, pp. F-4 through F-6). Putting tailings back into the Resolution crater is specifically analyzed (DEIS, appendix F, p. F-6). Full details of the evaluation are contained in the Alternatives Evaluation Report (SWCA Environmental Consultants 2017a), as well as in appendix F of the DEIS.

| Comment response: TS19 | |
|---|---|
| Regulation at Skunk Camp | Page 1 of 1 |

**Responsive to these comments:**
8032-42

This comment requests clarification of the framework under which a tailings storage facility at the Skunk Camp location (Alternative 6) would be regulated.

We described this issue in several places within the DEIS. Federal financial assurance mechanisms are not applicable to this location (DEIS, p. 553): "However, Alternative 6 differs from the other alternatives because the tailings facility would not be located on lands managed by the Forest Service (Alternatives 2, 3, and 4) or BLM (Alternative 5). For Alternative 6, the Federal financial assurance mechanisms would not be applicable." Section 3.7.2 of the DEIS specifically discussed this with respect to water quality and potential long-term contamination (p. 417).

Similarly, adherence to National Dam Safety Standards would not apply to this location (DEIS, appendix J, p. J-20): "Alternative 6: As facility would ultimately be located on private land, Forest Service would not have authority to require these specific design standards."

However, note that the specific State and industry guidance discussed in section 3.10.1 remains pertinent to Skunk Camp (DEIS, pp. 523–526), as does the new Global Industry Standard on Tailings Management, launched on August 5, 2020 (standard). Both of Resolution Copper's parent companies (Rio Tinto and BHP) are signatory to the ICMM and through that membership have committed to implementing the new standard. We now discuss this new standard in section 3.10.1.

We added further discussion to chapter 1 of the FEIS to clarify which components of the project would be regulated by various agencies.

| Comment response: TS20 Response times in event of failure | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 124-3, 67-3, 8032-242, 8032-255, 8032-41, 99-2 | |

These comments all reference the potential response times that would be experienced by residents downstream of a tailings storage facility in the event of a failure.

Many of these reference specific time frames it would take for tailings to reach downstream communities. The methods used to develop these estimates are not clearly articulated by the comments. We investigated a number of methods for conducting breach analyses (see Newell and Garrett (2018c)). The chosen method (Rico empirical method) does not estimate travel times. Such travel times were not disclosed in the DEIS, nor are they disclosed in the FEIS.

With respect to emergency planning and warnings for residents downstream from a tailings storage facility, and specifically development of an emergency action plan, this is a requirement of all national and international regulations and industry best practices reviewed in section 3.10.1 (DEIS, p. 525). It is not a requirement of Arizona regulations under the Aquifer Protection Permit program. We required mitigation measure FS-229 between the DEIS and FEIS to develop the breach analysis based on site-specific designs to inform emergency planning efforts. See response TS1 for more details.

Development of a full emergency action plan is premature, given that the tailings storage facility would likely not be constructed for at least a decade and on-the-ground details of downstream infrastructure, communities, and residents likely will change in that time. We believe that the disclosures of a liquefied breach analysis (Rico method), as included in the DEIS; a site-specific unsaturated embankment failure analysis, as included in section 3.10.1 of the FEIS; and the analysis of the downstream consequences of these failures adequately disclose the environmental effects required under NEPA.

Development of emergency plans is required by the Global Industry Standard on Tailings Management, launched on August 5, 2020 (standard). Both of Resolution Copper's parent companies (Rio Tinto and BHP) are signatory to the ICMM and through that membership have committed to implementing the new standard. Principal 13 of the standard requires emergency response planning. Requirement 13.1 requires the preparation and implementation of a site-specific tailings facility emergency preparedness and response plan based on credible flow failure scenarios and the assessment of potential consequences. Requirement 13.2 requires engaging with public-sector agencies, first responders, local authorities, and institutions to assess the capability of emergency response services to address the hazards in the emergency preparedness and response plan. Requirement 13.3 requires all reasonable steps to maintain a shared state of readiness.

| Comment response: TS20_A Response times in event of failure; with addition for specific comment 8032-257 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-257 | |

See response TS20 for discussion of the general topic of response times in the event of a tailings storage facility failure.

This comment also mentions the incorrect assumption that the design earthquake for the tailings storage facility is 5,000 years. See response TS2 for more discussion about this incorrect assumption.

| Comment response: TS21 Specific concerns over long-term liability | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1468-10 | |

This comment raises a number of concerns regarding long-term liability.

Regarding the potential health effects from tailings fugitive dust, see response TS24 for more details.

With respect to bankruptcy, chapters 1 and 2 of the DEIS included a discussion of financial assurances (pp. 15–20, 65, and 104). We updated these discussions in the FEIS. Section 3.7.2 of the DEIS specifically discussed financial assurances with respect to water quality and potential long-term contamination (DEIS, pp. 381–417).

Appendix R

| Comment response: TS22<br>Consultation with irrigation districts | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-259

The analysis of tailings safety in section 3.10.1 of the DEIS considered potential impacts to the San Carlos Irrigation and Drainage District, including potential disruption of infrastructure and contamination of water supplies (pp. 531, 534, and 550). Section 3.10.1 also addressed the "financial and societal hardships" resulting from a catastrophic failure of the tailings storage facility (DEIS, pp. 540–554; see "Large Scale Societal Impact" subsections for each alternative).

In its "Memorandum to Heads of Federal Agencies," dated January 30, 2002, CEQ listed 12 factors for Federal agencies to consider when determining which agencies to invite as "cooperating agencies." Cooperating agencies have a responsibility to participate throughout the NEPA process by providing special expertise and pertinent data, participating in preparation and/or review of analyses and documents, or having pertinent legal jurisdiction for such things as issuing permits. We reviewed agencies and entities for cooperating agency status and extended invitations to those we felt best met the criteria and were capable of carrying out the obligations of a cooperating agency. No irrigation districts were identified as potential cooperating agencies.

However, the San Carlos Irrigation and Drainage District and other irrigation districts have many opportunities to be involved in the NEPA process without cooperating agency status. As a local government entity, these districts can contact us if issues arise regarding this or other projects.

| Comment response: TS23<br>Use of Pinto Valley Mine | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
108-1

This comment states, "They say they will dump these poisons at BHP's nearby Pinto Creek mine."

We believe this refers to the Pinto Valley Mine. During the alternatives development process, the Pinto Valley Mine was considered as a tailings storage location but eventually was dismissed from detailed consideration. The potential for placing tailings at previously disturbed sites, including mine pits, was specifically reviewed by the NEPA team but found to be impractical for a variety of reasons (DEIS, appendix F, pp. F-4 through F-6). The Pinto Valley Mine was specifically analyzed (DEIS, appendix F, p. F-5). The Alternatives Evaluation Report includes full details of this evaluation (SWCA Environmental Consultants 2017a).

Appendix R

| Comment response: TS24 | |
|---|---|
| Analysis of potential health concerns | Page 1 of 5 |

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

These comments contain numerous concerns about health impacts and the analysis of potential health impacts from the mine project. These comments include the following:

- Health impacts from deposition of heavy metals in dust from the tailings storage facility, including ingestion through game, livestock, or plants
- Health impacts like asthma and heart disease caused generally by emissions of particulate matter and ultrafine particles
- Health impacts from valley fever or other fungal diseases spread by dust from the tailings storage facility
- Already vulnerable populations due to existing cancer clusters in the vicinity of the mine site or due to existing elevated levels of contaminants like arsenic
- Potential impacts to mine employees
- Health impacts from water quality degradation
- Health impacts from the excavation and processing of radioactive materials
- Health impacts from the excavation and processing of asbestiform materials
- Concentration of processing chemicals in the tailings storage facility

Potential health impacts from air emissions and dust deposition

The rationale and approach used in the DEIS to assess the potential impact to health from elevated concentrations of contaminants in water is described in SWCA Environmental Consultants (2018b), "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (pp. 6–14). It is summarized as follows:

> *"Federal law has established specific air quality standards that are considered to be protective of human health and the environment. The intent of promulgating these standards is explicitly spelled out in the Clean Air Act. . . . For the purposes of the National Environmental Policy Act (NEPA) analysis, the ability to meet these standards is considered protective of public health; therefore, a separate health-based analysis is not necessary in order to disclose impacts on human health."*

This approach had changed slightly by the time the DEIS was published, and an additional health risk assessment was conducted (DEIS, p. 279):

Appendix R

| Comment response: TS24<br>Analysis of potential health concerns | Page 2 of 5 |
|---|---|

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

> "For the purposes of the NEPA analysis, the ability to meet air quality standards is considered protective of public health; therefore, a separate health-based analysis of individual constituents, particularly those associated with particulate emissions, is not necessary in order to disclose impacts on human health. . . . However, the levels of metals deposition associated with particulate emissions were estimated and compared with Regional Screening Levels for which the EPA has derived carcinogenic and/or non-carcinogenic chronic health effects. Where the cancer risk health quotient is less than 1, excess cancer risk is less than $1 \times 10^{-6}$, and where the non-carcinogenic chronic health effects health quotient is less than 1, the health index for non-carcinogenic chronic health effects is less than 1. For all alternatives, the estimated human health risk associated with the maximum air concentrations of inorganic metals is less than $1 \times 10^{-6}$ cancer risk (representing a risk below 1.0 for cancer) and below 1.0 for non-carcinogenic chronic health effects. Further background about these estimations can be found in Newell et al. (2018)."

We took this same approach in section 3.6 of the FEIS, but analysis was expanded with additional analysis (Randall 2020b). An important aspect of the health risk assessment included in the FEIS is that the risk factors take into account multiple exposure pathways. This analysis included inhalation and ingestion through a variety of methods, including drinking of water, inhalation of emissions, and dermal contact or ingestion of soils.

Potential health impacts from airborne fungal diseases

Comments raised the concern that certain fungal diseases, like coccidioidomycosis (valley fever), could be transmitted due to ground disturbance from the project. Valley fever is a human fungal infection caused by inhaling fungi spores in certain geographic areas in Arizona. This infection is endemic to Arizona and can occur as a result of many activities (e.g., construction activities, gardening, farming, windy weather, dirt biking, driving all-terrain vehicles).

The project will include ground-disturbing activities, like any other form of development. Numerous controls will be used and required to reduce fugitive dust (DEIS, pp. 283–284). Emissions of particulate matter at the facility boundaries do not exceed Federal standards established to prevent adverse health effects. The Resolution Copper Project is no more likely to contribute to the spread of valley fever than any other form of disturbance.

Appendix R

| Comment response: TS24 | |
|---|---|
| Analysis of potential health concerns | Page 3 of 5 |

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

Presence of existing cancer clusters

During scoping meetings and the public comment period for the DEIS, the concern was raised that the existing populations of the town of Superior and nearby communities are at higher risk for health effects, due to existing high rates of cancer.

The NEPA team evaluated this issue after scoping. Results were included in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:30-31). This analysis concluded, "Given the public concern and interest, the documentation described above will be disclosed. However, at this time there does not appear to be any compelling evidence that a cancer cluster exists, and as such it is not expected to be incorporated into any assessment of health effects."

Public comments received on the DEIS do not contain any specific, additional information on this issue. We included an additional discussion about this topic in section 3.6 of the FEIS.

Potential impacts to mine employees

The air quality analysis demonstrates that Federal air quality standards (NAAQS) are met at the facility fence line, thus being protective of the health of the public at large. The potential impact of air emissions to mine employees within the boundaries of the facility was considered to be beyond the scope of the NEPA analysis. The rationale for this was described in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:13):

> "The above analysis components will focus solely on exposure to the general public. While acknowledging that mine workers within the boundaries of the mine facilities have a greater potential for exposure, the Mine Safety and Health Administration (MSHA) enforces specific health and safety standards, as well as monitoring. Resolution Copper will directly address worker health and safety regulations in compliance with MSHA rules. For the purposes of the NEPA analysis this oversight is considered to be protective of mine worker health and safety. Worker health and safety regulations are not evaluated further under NEPA requirements."

Potential health impacts from water contamination

The rationale and approach used in the DEIS to assess the potential impact to health from elevated concentrations of contaminants in water was described in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:14-19). It is summarized as follows:

Appendix R

| Comment response: TS24 Analysis of potential health concerns | Page 4 of 5 |
|---|---|

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

> *"For the purposes of the NEPA analysis, the ability to meet these standards is considered protective of public health; therefore, separate health-based analysis of individual constituents is not necessary in order to disclose impacts on human health.*
>
> *1) Predictions will be made of potential water quality impacts to groundwater from exposure to materials either in situ or at the surface, and from seepage or other discharge of process water. Groundwater quality changes due to the project will be compared to numeric Arizona Aquifer Water Quality Standards. Compliance with narrative Arizona Aquifer Water Quality Standards will be assessed in a qualitative manner.*
>
> *2) Predictions will be made of potential surface water quality changes from stormwater runoff from the project areas and will be compared with numeric Arizona Surface Water Quality Standards. Compliance with narrative Arizona Surface Water Quality Standards will be assessed in a qualitative manner."*

Predictions of groundwater and surface water quality impacts, with a comparison with the appropriate standards, are contained in section 3.7.2 (DEIS, pp. 373–419). The results of the analysis are summarized as follows (DEIS, p. ES-24):

> *"After closure, the reflooded block-cave zone could have poor water quality; however, a lake in the subsidence crater is not anticipated, and no other exposure pathways exist for this water.*
>
> *Stormwater runoff could have poor water quality, but no stormwater contacting tailings or facilities would be released during operations or post-closure until reclamation is successful.*
>
> *All of the tailings facilities would lose seepage with poor water quality to the environment, and all are dependent on a suite of engineered seepage controls to reduce this lost seepage. Modeling indicates that seepage from Alternatives 2 and 4 would result in water quality problems in Queen Creek; Alternative 3 would not, but requires highly efficient seepage control to achieve this (99.5 percent capture). Seepage from Alternatives 5 and 6 does not result in any anticipated water quality problems; these alternatives also have substantial opportunity for additional seepage controls if needed."*

The approach taken in the FEIS is identical to that taken in the DEIS, although some tools used to predict water quality impacts for Alternative 6 were refined. See response WT7 for more discussion.

Appendix R

| Comment response: TS24 | |
|---|---|
| Analysis of potential health concerns | Page 5 of 5 |

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

<u>Potential health impacts from radioactive materials</u>

Section 3.7.2 (DEIS, pp. 418–419) summarized analysis of the presence of radioactive materials in the ore and the potential concentration of those materials during processing (technologically enhanced naturally occurring radioactive materials). The full detailed analysis is contained in Newell and Garrett (2018d). The analysis concluded,

> *"When compared with common background levels, review of existing information at the site does not suggest the strong presence of naturally occurring radioactive materials above typical concentrations, although a small percentage (2 to 6 percent) of samples have exhibited concentrations above thresholds of concern.*
>
> *The processes that historically have been documented with problems would not occur as part of this project. . . . With respect to the processing (flotation) that would be used during the Resolution Copper Project, site-specific locked cycle testing has simulated the effect of processing to potentially concentrate radioactive materials, and no concentrations are above any thresholds of concern for uranium, radium, and gross alpha activity."*

Additional investigation was undertaken after receipt of DEIS comments (Randall 2020b), with similar conclusions. The public comments received on the DEIS contain general discussions of the issue and theoretical sources and exposure mechanisms but do not contain additional information relevant for analysis. This analysis remains unchanged in section 3.7.2 of the FEIS.

<u>Potential health impacts from asbestiform materials</u>

Section 3.7.2 (DEIS, p. 419) summarized analysis of the presence of asbestiform materials in the ore and the potential release of these materials during processing, based on analysis contained in Duke (2019a). The analysis concluded,

> *"Asbestos is present in trace to minor amounts in the Resolution ore and development rock as fibrous forms of the amphibole minerals tremolite and actinolite, primarily tremolite. The general threshold for asbestos-containing material is more than 1 percent asbestos as determined by polarized light microscopy (40 CFR 61.141).*
>
> *These analyses indicate that asbestiform minerals are present in the ore deposit, but on average the percentage is below the threshold for concern. However, the block caving is not conducted on the ore deposit as a whole, but panel by panel. When viewed on a panel-by-panel basis, overall asbestiform minerals are not anticipated to exceed 0.1 percent by weight."*

Additional investigation was undertaken after receipt of DEIS comments (Randall 2020b), with similar conclusions. The public comments received on the DEIS contain general discussions of the issue and theoretical sources and exposure mechanisms but do not contain additional information that informs this analysis. This analysis remains the same in section 3.7.2 of the FEIS.

<u>Concentration of processing chemicals in tailings seepage</u>

Analysis of the potential for processing chemicals used during the flotation process to be concentrated, carried into the tailings storage facility, and released in seepage was analyzed in section 3.7.2 (DEIS, pp. 417–418). The analysis concluded that for six specific reagents analyzed, three have no theoretical pathway to be released, two degrade at rates high enough to be unlikely to persist in tailings seepage, and one (a binder and flocculant) is unlikely to be mobile. This analysis remains the same in section 3.7.2 of the FEIS.

Appendix R

| Comment response: TS24_A<br>Analysis of potential health concerns; with addition for specific comments 8032-149; 899-5 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-149, 899-5

See response TS24 for the general topic of analysis of health impacts.

This comment contains mention of a number of issues: "The dust related to mining activities can contain a variety of toxic materials, and can cause exceedances of health-based air quality standards, as well as provisions that protect Class I airsheds such as the Superstition Wilderness. The Forest Service has underestimated the impacts of the air pollution that would be generated by this mine on the health of both employees and area residents, region-wide visual impact on scenery and view sheds, and the impact on plant and animal life. Consideration of the impacts on recreational values and property values was also not adequately considered."

Section 3.6 (DEIS, pp. 282–288) contained an analysis of health-based air quality standards (NAAQS). The project meets all NAAQS at the facility boundaries.

Section 3.6 (DEIS, pp. 288–292) contained an analysis of impacts to sensitive areas, including five Class I areas and two Class II areas, including the Superstition Wilderness. This analysis includes impacts from criteria pollutants, haze and visibility, and deposition of nitrogen and sulfur.

Section 3.11 (DEIS, pp. 594–618) contained an analysis of impacts to scenery and viewsheds.

The analysis of impacts on plants is contained in section 3.3 (DEIS, pp. 183–205), and the analysis of impacts on wildlife is contained in section 3.8 (DEIS, pp. 457–476). See specifically pp. 161 and 448 of the DEIS for descriptions of how the analysis areas for plants and wildlife incorporate air quality.

Section 3.9 (DEIS, pp. 495–509) contained an analysis of impacts on recreation. Also see section 3.13 (DEIS, p. 653) for air quality impacts related to nature-based tourism.

Section 3.13 (DEIS, pp. 647–656) contained an analysis of impacts on property values.

| Comment response: TS24_B<br>Analysis of potential health concerns; with addition for specific comment 8032-166 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-166

See response TS24 for the general topic of analysis of health impacts.

This comment lists a number of specific contaminants. All of these, with the exception of fluoride (which was not identified in the tailings samples), were included in the health assessment.

| Comment response: TS24_C<br>Analysis of potential health concerns; with addition for specific comment 1309-2 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1309-2

See response TS24 for the general topic of analysis of health impacts.

This comment notes concerns with the use of chemicals for dust control. Treatment with chemicals or polymer dust suppressants is one of the applicant-committed environmental protection measures for controlling dust emissions described in section 3.6 (DEIS, p. 283). These materials would be used in accordance with manufacturer recommendations and all applicable laws and regulations. In general, because of the stormwater controls that prevent any water contacting tailings from being released, exposure pathways even in the event of improper use of these materials at the tailings storage facility are limited.

Appendix R

| Comment response: TS24_D<br>Analysis of potential health concerns; with addition for specific comment 6181-2 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>6181-2 | |

See response TS24 for response to the general topic of analysis of health impacts.

This comment notes several additional concerns. Section 3.10.1 (DEIS, pp. 535–554) contained the analysis of potential tailings storage facility failure. Section 3.10.3 (DEIS, pp. 577–582) contained an analysis of risk associated with hazardous waste transport.

| Comment response: TS26<br>Potential for air blast | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1043-2, 1097-10, 8032-234, 8032-46 | |

These comments concern the potential for an air blast to occur within the block-cave zone during active mining.

We agree that block caving air blasts are a mine operational safety concern. The potential impact of an air blast on mine employees within the boundaries of the facility is beyond the scope of the NEPA analysis. The rationale is similar to that described in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:13) with respect to worker exposure to air contaminants:

> *"The above analysis components will focus solely on exposure to the general public. While acknowledging that mine workers within the boundaries of the mine facilities have a greater potential for exposure, the Mine Safety and Health Administration (MSHA) enforces specific health and safety standards, as well as monitoring. Resolution Copper will directly address worker health and safety regulations in compliance with MSHA rules. For the purposes of the NEPA analysis this oversight is considered to be protective of mine worker health and safety. Worker health and safety regulations are not evaluated further under NEPA requirements."*

| Comment response: TS27<br>Impacts of traffic on medical care | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1504-3 | |

This comment raises concerns with traffic affecting medical transport and care.

Section 3.5 of the DEIS contained an analysis of transportation impacts (pp. 254–269). It focused primarily on intersections, which is where most traffic conflicts occur. We added further analysis to section 3.5 of the FEIS to discuss impacts specific to highway segments, including impacts to Phoenix as noted in the comment. See response TR1 for more discussion.

| Comment response: TS28<br>Impacts to vegetation and habitat | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1464-3, 1469-2 | |

These comments raise concerns with impacts to vegetation and habitat.

The analysis of impacts to vegetation is contained in section 3.3 (DEIS, pp. 183–205), including the types and acreage of vegetation lost to project disturbance. Biodiversity is analyzed in sections 3.3 and 3.8 (DEIS, pp. 197 and 463). The impact of that habitat loss on wildlife species is analyzed in section 3.8 (DEIS, pp. 457–476). Potential impacts on surface waters due to this loss of vegetation and disturbance are also analyzed in section 3.7.3 (DEIS, pp. 427–444). Edge effects, artificial night lighting, noise, vibration, and associated disturbance on species is discussed in section 3.8 (DEIS, pp. 459–462).

We added further details about the analysis regarding edge effects, artificial night lighting, noise, vibration, and the associated disturbance to section 3.8 of the FEIS. We also added further details about biodiversity to section 3.8 of the FEIS.

Appendix R

| Comment response: TS29 Pipeline failure | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1544-13, 45-1, 8032-236, 8032-237

These comments raise concerns over the risk and consequences of pipeline failures.

Section 3.10.1 of the DEIS analyzed the potential for pipeline failures and their consequences (DEIS, pp. 535–554).

We evaluated a pipeline protection and integrity plan in response to comments. The plan incorporates specific analysis of potential failure modes, including geohazards such as slope instability, seismic hazards, scour, and geological subsidence, mechanical failure, corrosion and erosion, operational failures, and human-caused failures (Golder Associates Inc. 2020). It also includes specific mitigation methods to respond to these potential failure modes.

One comment notes that lubricant is used in the slurry pipeline. This is an incorrect statement. The slurry (tailings and water) and concentrate (concentrate and water) pipelines do not need lubricant to facilitate flow in the pipes.

Also see response GS1 for more discussion of seismic risk to pipelines.

| Comment response: TS30 Locations of tailings storage | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1196-2, 1206-3

These comments question where the tailings would be stored.

We analyzed five tailings storage facility alternatives at four separate locations. These are described in detail in chapter 2 (DEIS, pp. 29–100).

| Comment response: TS31 Choice of tailings type for preferred alternative | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1463-2

This comment questions the determination of tailings type for the preferred alternative, though referencing only the Executive Summary.

A variety of tailings types was analyzed in the DEIS, as described in chapter 2 (DEIS, p. 50), each with varying water and solids content. The use of thickened tailings (50–70 percent solids) is considered for three of the alternatives (Alternatives 2, 5, and 6), with ultrathickened tailings considered for one alternative (Alternative 3) and filtered tailings considered for one alternative (Alternative 4).

The analysis of multiple tailings types allows for a comparison of impacts in the NEPA analysis.

As the responsible official, the Forest Supervisor for the Tonto National Forest can modify an alternative in the ROD as long as the modification is "encompassed within the range of alternatives analyzed" in the EIS. Thus, the decision documented in the ROD can pick and choose between actions, activities, and facilities presented in the action alternatives to form a selected action. This could include changing the tailings type, if such a decision is within the scope of the ROD. See response ALT1 for more discussion on this topic.

| Comment response: TS32 Pipeline safety protocols | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-30

Section 3.10.1 of the DEIS discusses pipeline safety. The section includes the potential for failures and spills (DEIS, pp. 535–554) as well as the applicant-committed environmental protection measures, including safety protocols that will be followed (DEIS, pp. 536–538).

Appendix R

| Comment response: WI1 | |
|---|---|
| Specific species, species groups, and available survey data | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1084-4, 1349-6, 8032-185, 8032-192, 8032-195 |

These comments identify specific species or groups of species that are perceived to have been insufficiently analyzed. In some cases this information was already sufficiently analyzed in the DEIS; in other cases, we have expanded the analysis in the FEIS.

We have added more discussion describing potential impacts on species protected under the Migratory Bird Treaty Act to section 3.8 of the FEIS.

We addressed lowland leopard frog in section 3.8 (DEIS, p. 466, table 3.8.4-2) using as a metric the acres of modeled suitable habitat for all alternatives. We also mentioned the species in light of a potential failure of the tailings storage facility (DEIS, p. 532). Minimization measures that would reduce or avoid potential impacts on the species are discussed in section 3.8 (DEIS, p. 458). We added text to section 3.8 of the FEIS to further discuss the potential for the species to occur in the project area.

We addressed potential impacts to fish, reptiles, and amphibians from habitat loss and changes to water quality in section 3.8 (DEIS, pp. 458–461, for general project impacts; DEIS, pp. 461–463, for "Additional Impacts Specific to Wildlife Groups" broken out by mammals, birds, amphibians, reptiles, and invertebrates).

We addressed springs, seeps, and water holes in the affected area in sections 3.7.1 and 3.8 (DEIS, pp. 452 and 460, figure 3.8.3-1 on p. 453, and table 3.7.1-2 on p. 314). We have added further details to section 3.8 regarding potential dewatering of springs and riparian areas.

We analyzed habitat loss, degradation, and fragmentation in section 3.8 (DEIS, pp. 459–461). We analyzed habitat use (selection) and changes to foraging/hunting and breeding behavior and success in section 3.8 (DEIS, pp. 459–462).

We addressed edge effects, artificial night lighting, noise, vibration, and disturbance to species in section 3.8 (DEIS, pp. 459–462). We have added further detail to the analysis regarding edge effects, artificial night lighting, noise, vibration, and associated disturbance to section 3.8 of the FEIS.

Some comments raise concerns that inadequate surveys were conducted. The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring, with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

Potential impacts on the Arizona hedgehog cactus are addressed in the DEIS and also are subject to Section 7 consultation with the FWS. The species is addressed in section 3.3 (DEIS, pp. 178, 179, 195, 197, and 203). The final Biological Opinion issued by the FWS is attached to the FEIS as appendix P.

Since January 2021, the Telegraph Fire burned portions of the project area. We analyzed the potential impacts of the fire on threatened or endangered species and determined that reconsultation on Section 7 was not warranted (Gladding 2025).

| Comment response: WI3 | |
|---|---|
| Impacts from flow reductions | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 30075-44 |

We addressed potential impacts to wildlife from reductions in surface flows in sections 3.7.3 and 3.8 (DEIS, pp. 447, 462, 463, 472, and 473).

We have added further details to the analysis in section 3.8 of the FEIS regarding how changes in surface flow impact wildlife.

Appendix R

| Comment response: WI5 | |
|---|---|
| Concerns over insufficient survey data and analysis of game species | Page 1 of 1 |

**Responsive to these comments:**
1534-2

These comments identify potential shortcomings in survey data and concerns regarding game species and hunting.

With respect to survey data or research, the ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

We addressed potential impacts to hunting in section 3.9 (DEIS, pp. 489, 498–500). Mitigation related to wildlife is given in section 3.8 (DEIS, pp. 479–480). No specific hunting mitigation was proposed or included in the DEIS.

We have added further detail about potential impacts to game species to section 3.8 of the FEIS and impacts to hunting in section 3.9 of the FEIS. Additional mitigation has also been brought forward related to hunting and wildlife species and is included in section 3.8 and appendix J of the FEIS (see mitigation measures FS-TA-01 and FS-WI-01).

| Comment response: WI6 | |
|---|---|
| Sonoran desert tortoise, Gila monster | Page 1 of 1 |

**Responsive to these comments:**
8031-67, 8032-190, 8032-191

These comments raise concerns about the analysis of Sonoran desert tortoise and Gila monster and insufficiency of survey data.

We addressed impacts to vegetation and wildlife in sections 3.3 and 3.8 of the DEIS, respectively, as well as in the "Unavoidable Impacts" sections (3.3.4.8 and 3.8.4.4). Cumulative impacts were also addressed in sections 3.3.4.8 and 3.8.4.4 of the DEIS. We have expanded the cumulative impacts analysis in the FEIS (chapter 4).

In section 3.8, we addressed potential impacts to predator/prey relationships from power lines, including predation on Sonoran desert tortoise by ravens (DEIS, p. 462).

Mitigation for wildlife species, including Sonoran desert tortoise and Gila monster, is given in section 3.8 (DEIS, pp. 457–458). We analyzed the potential impacts on wildlife and special status species using the best available information. Uncertain and unknown information is discussed, as well (DEIS, p. 450). Potential mitigation for Sonoran desert tortoise includes preconstruction surveys, biological monitoring, crew orientation, and creation of tortoise crossings for the pipeline corridors in suitable habitat.

With respect to survey data, the ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information for the Forest Supervisor to make a reasoned choice between alternatives.

We have added further details to section 3.8 of the FEIS regarding edge effects impacting Sonoran desert tortoise habitat use and selection.

| Comment response: WI7 | |
|---|---|
| Analysis of wind erosion and fugitive dust | Page 1 of 1 |

**Responsive to these comments:**
28449-28, 28449-29, 28449-30, 28449-31

These comments are concerned with fugitive dust and wind erosion.

We analyzed fugitive dust as part of the air quality analysis in section 3.6 by assessing criteria pollutants $PM_{10}$ and $PM_{2.5}$ (DEIS, pp. 282–292). Based on our modeling results, these pollutants are estimated to meet applicable air quality standards at the fence line of each facility.

The susceptibility of soils to water and wind erosion is disclosed in section 3.3 (DEIS, pp. 192–193).

Appendix R

| Comment response: WI8 Time frame for regeneration of land | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1356-2

This comment concerns the long time frame for regeneration of disturbed land, as well as the importance of vegetation resources for Tribal members.

The time frame for reestablishing native vegetation and specifically the potential for these lands to meet their future desired condition is disclosed in section 3.3 (DEIS, pp. 197–201). The difficulties are fully disclosed: "Revegetation success in these desert ecosystems is demonstrated. However, impacts to soil health and productivity may last centuries to millennia, and the ecosystem may not meet desired future conditions. The habitat may be suitable for generalist wildlife and plant species, but rare plants and wildlife with specific habitat requirements are unlikely to return" (DEIS, p. ES-22).

For further discussion of the overall importance of the land to Tribal members, see response CR4. For further discussion of the species of Tribal importance, see response CR15.

| Comment response: WI9 Impact of mine processes on soil | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1115-2

This comment raises concerns with long-term effects of potential contamination of soil due to exposure to chemicals or mine tailings.

These effects are analyzed in several places in the DEIS.

We disclosed the potential for release of tailings or concentrate (from a tailings storage facility or pipeline rupture) and the resulting long-term contamination that would result in section 3.10.1 (DEIS, pp. 540–542, 544–546).

We analyzed the interaction of water with tailings material and the subsequent release into the environment through tailings seepage in section 3.7.2 (DEIS, pp. 373–419).

We also discussed the potential for stormwater to interact with tailings material in section 3.7.2 (DEIS, pp. 379–381). See response WT35 for a discussion of how this analysis has been refined for the FEIS.

We analyzed the potential for impacts to human health from air emissions of chemicals or particulate matter in section 3.6 (DEIS, pp. 282–292). This includes a specific impact to human health. See response TS24 for a discussion of how this analysis has been refined for the FEIS, including potential exposure to asbestiform materials, radioactive materials, heavy metals, and processing chemicals.

Appendix R

| Comment response: WI10 Vegetation analysis and Arizona hedgehog cactus | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-197

These comments identify a number of specific issues related to Arizona hedgehog cactus and general vegetation analysis.

The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

An analysis of the potential impacts to Arizona hedgehog cactus was disclosed in the DEIS (pp. 178–179, 195, 197, and 203). Arizona hedgehog cactus are subject to Section 7 consultation with the FWS. We added discussion of the outcome of this process to section 3.3 of the FEIS, and the final Biological Opinion issued by the FWS is attached to the FEIS as appendix P.

Since January 2021, the Telegraph Fire burned portions of the project area. We analyzed the potential impact of the fire on threatened or endangered species, particularly Arizona hedgehog cactus, and determined that re-consultation on Section 7 was not warranted (Gladding 2025).

We addressed potential impacts to vegetation communities from other items mentioned in the comments in sections 3.3, 3.7.1, and 3.8 of the DEIS, including the removal of vegetation by mining activity (DEIS, p. 202), air pollution (DEIS, pp. 161–163, noting the analysis area for vegetation defined to encompass deposition impacts), dewatering (DEIS, pp. 178 and 317–340), invasive species (DEIS, pp. 197–201), and fire (DEIS, pp. 190–201).

| Comment response: WI11 Avian analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-178

These comments concern impacts to avian species and available information to support the avian analysis.

We have added further discussion of species protected under the Migratory Bird Treaty Act in section 3.8 of the FEIS.

The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

Appendix R

| Comment response: WI12 Mammal analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-189

These comments concern impacts to wildlife and mammal species and available information to support the analysis.

We addressed wildlife and mammals in section 3.8 (DEIS, pp. 457–461). Mitigation for these species was also discussed in section 3.8 (DEIS, pp. 479–480).

The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives and therefore a population density analysis would not be required.

We have added further information and analysis regarding the issues raised in this comment to section 3.8 of the FEIS.

| Comment response: WI13 Improvements on bird analysis; Migratory Bird Treaty Act | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-177, 8032-180, 8032-181, 8032-182, 8032-183, 8032-184

We have added text describing potential impacts on species protected under the Migratory Bird Treaty Act in section 3.8 of the FEIS.

| Comment response: WI14 Wildlife camera data | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-205

We have used the wildlife camera data submitted with this comment and included those data in the baseline data for section 3.8.

| Comment response: WI15 Wildlife connectivity | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-61, 30075-62, 8031-68, 8032-201

These comments concern habitat blocks and habitat connectivity across the larger landscape.

Habitat connectivity is addressed in section 3.8 (DEIS, pp. 452–456, 463–465). We have added further information to section 3.8 of the FEIS regarding habitat connectivity, including defining habitat category 1 and 2 blocks, the ability of species to move between habitat blocks, linkages, and potential impacts to individual wildlife and species groups related to potential impacts to springs.

Appendix R

| Comment response: WI16 General wildlife analysis; uncertain information | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-172

This comment raises a number of issues regarding general analysis of wildlife and biological resources, including analysis at alternative locations, cumulative impacts, mitigation, threatened and endangered species, and uncertainties in the analysis.

With respect to the analysis of impacts to wildlife and biological resources, direct and indirect effects are analyzed in section 3.8 (DEIS, pp. 457–476). This analysis includes impacts to special status species, such as threatened and endangered species. Cumulative effects are analyzed as well (DEIS, pp. 476–479); note that we have reworked the cumulative effects analysis for the FEIS (chapter 4), with the intent of using more quantitative metrics than those used in the DEIS. Migratory birds are also addressed as special status wildlife species, but note that we have added further detail to the analysis impacts to species protected by the Migratory Bird Treaty Act in section 3.8 of the FEIS.

Potential impacts on threatened and endangered species are addressed in the DEIS and also are subject to Section 7 consultation with the FWS. These species are addressed in section 3.3 (DEIS, pp. 473–476). The final Biological Opinion issued by the FWS is attached to the FEIS as appendix P.

With respect to alternative locations, impacts to wildlife species are assessed separately for each of the alternatives in section 3.8 (DEIS, pp. 463–472).

Mitigation for wildlife species was also discussed in section 3.8 (DEIS, pp. 479–480) and was summarized in appendix J. Additional mitigation measures related to wildlife have been developed since the DEIS, and we have added these to section 3.8 and appendix J of the FEIS.

A number of these comments indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contribute to the analysis statements contained in the DEIS. There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

The comment states, "The DEIS cites the problem of 'uncertainties and unknown information' and 'assumptions,' including 'limitations in the use of GIS data,' 'lack of current scientific data,' and 'reliance on other resource analyses' that further this problem (Ch. 3, p. 450)."

It is incorrect to characterize these statements as problems. They are disclosures of uncertainties in the analysis, but they do not preclude an adequate assessment of impacts. The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

Appendix R

| Comment response: WI17 | |
|---|---|
| Management indicator species (MIS) | Page 1 of 1 |
| **Responsive to these comments:** 8032-175 | |

This comment indicates that the analysis of management indicator species (MIS) is insufficient, as it is based solely on habitat acreage lost.

We address MIS species in section 3.8 (DEIS, pp. 454–457, 472) and in the background documentation (see Newell (2018j)). Analysis of MIS has a specific purpose that is applicable on a forest-wide basis. MIS are plant and animal species, communities, or special habitats that are selected for emphasis in planning and monitored during forest plan implementation in order to assess the effects of management activities on their populations and the populations of other species with similar habitat needs, which they may represent. In order to determine the level of impact that each of these MIS may incur on a forest-wide level, analysis was completed to determine the percentage of each species' occupied habitat across the Tonto National Forest that may be impacted (lost or altered) by implementation of any of the action alternatives. Calculation of acres of disturbance to MIS habitat is an appropriate technique to meet these purposes.

Note that in December 2023 the Tonto National Forest implemented a revised forest plan, and the MIS concept is no longer used in the forest plan as a management tool. For consistency and completeness, the analysis of MIS remains in the FEIS.

| Comment response: WI18 | |
|---|---|
| Wildlife impacts from tailings failure or seepage | Page 1 of 1 |
| **Responsive to these comments:** 8032-174, 8032-29 | |

These comments indicate that exposure of wildlife to seepage affected by tailings or a tailings release was not included in the DEIS. We addressed wildlife exposure during a major tailings release in section 3.10.1 (DEIS, p. 544). We addressed wildlife exposure to seepage ponds in section 3.8 (DEIS, p. 460). We have added a revised analysis to section 3.7.2 of the FEIS that specifically analyzes water quality from a release of stormwater during operations; we have also added further discussion to section 3.8 to more clearly describe the effects that water in seepage ponds, seepage, or stormwater could have on wildlife.

Appendix R

| Comment response: W119<br>Noise/vibration/light impacts on species | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-281

This comment indicates that the EIS needs to disclose impacts of noise, vibration, and artificial light on plants and animals that normally inhabit the surrounding areas.

Disclosure of these impacts is already incorporated into the DEIS, as described below.

Wildlife impacts focus primarily on two aspects: acreage of habitat that could be affected by the project, and the typical impacts experienced in these areas by various species.

The buffer areas that define the wildlife habitat impacts were based specifically on noise and light impacts. The buffer area selected was 1 mile, and the rationale for this distance to represent noise and light impacts is included in Newell (2018j), as well as the DEIS:

> *"The noise modeling shows that for all action alternatives, noise levels at 1 mile would be at or below the level of normal human conversation; as such, the 1-mile buffer is sufficient to address potential impacts from noise-producing activities. We also expect light associated with project construction and facilities to increase night-sky brightness from 1 to 9 percent (Dark Sky Partners LLC 2018). Light impacts would occur across the landscape but available research suggests any substantial impacts would occur within the 1-mile buffer (Newell 2018j)."* (DEIS, pp. 448–450)

Specific impacts to individuals caused by noise and light are described in Section 3.8, Wildlife and Special Status Wildlife Species. In the DEIS, see specifically pp. 458–459 (general construction noise/vibration impacts: change in use patterns, competition, stress levels, decreased immune response, hearing damage, diminished intraspecific communication, increased predation risk, reduced reproductive success); pp. 460–461 (general operations lighting impacts: changes in foraging, changes in migration/dispersal); p. 461 (mammal-specific impacts); p. 462 (bird-specific impacts); p. 462 (reptile-specific impacts); p. 462 (invertebrate-specific impacts); and p. 463 (amphibian-specific impacts).

| Comment response: W120<br>Species of Economic and Recreational Importance | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-73

We addressed Species of Economic and Recreational Importance (SERI) in section 3.8 (DEIS, pp. 451–452). Additional analysis of species that are game species is included in Section 3.9, Recreation, with respect to hunting (DEIS, pp. 489, 500), and Section 3.13, Socioeconomics (DEIS, pp. 653–655).

We have added further analysis of SERI in sections 3.8 and 3.9 of the FEIS.

Appendix R

| Comment response: WI21 Bat species | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-188

These comments concern analysis of bat species, and bat inventories.

We addressed existing conditions and potential impacts to bats in section 3.8, including from artificial light, impacts to prey species, roost impacts, and habitat impacts (DEIS, pp. 452, 460, and 461). Acres of impacts to habitat for special status bat species are given in table 3.8.4-2 (DEIS, p. 470). Mitigation is described, as well (DEIS, pp. 479–480). We added further details to section 3.8 of the FEIS regarding potential impacts to bat species.

As lesser long-nosed bat is no longer listed as threatened or endangered, Section 7 consultation with the FWS for the species would not occur. We give the acres of modeled habitat for the species that would be potentially impacted under each action alternative in table 3.8.4-2 (DEIS, p. 470).

With respect to survey data or bat inventories, the ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information for the Forest Supervisor to make a reasoned choice between alternatives.

| Comment response: WI22 Missing species | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-66

This comment indicates that additional source data are needed for wildlife species and that some species may be missing, compared with reports generated by Arizona Game and Fish Department.

We have added the source to table 3.8.4-2 and other tables, and we have updated the data for the FEIS. Note that not all species appear in the DEIS; some may be screened out. This additional information is included in the background documentation (see Newell (2018j)).

We addressed SERI in section 3.8 (DEIS, pp. 451–452). Additional analysis of species that are game species is included in Section 3.9, Recreation, with respect to hunting (DEIS, pp. 489, 500), and Section 3.13, Socioeconomics (DEIS, pp. 653–655). We have added further analysis of SERI in sections 3.8 and 3.9 of the FEIS.

We addressed ecologically important areas in "Special Habitat Areas" and "Wildlife Connectivity" in section 3.8 of the DEIS. We added further details and analysis to the FEIS for "Special Habitat Areas" and "Wildlife Connectivity."

| Comment response: WI23 Impacts to Gila chub in Mineral Creek | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-193

We have addressed potential impacts to Gila longfin dace and Gila chub in section 3.8 (DEIS, pp. 462 and 469, for Gila longfin dace; and pp. 469 and 475–476, for Gila chub). Potential impacts on threatened and endangered species are also subject to Section 7 consultation with the FWS. The final Biological Opinion issued by the FWS is attached to the FEIS as appendix P. Note that for the Section 7 consultation, Mineral Creek was assumed to be occupied habitat for Gila chub.

We added further details to section 3.8 of the FEIS regarding the potential impacts to Gila longfin dace and Gila chub.

Appendix R

| Comment response: WI24 | |
|---|---|
| Ocelot | Page 1 of 1 |

**Responsive to these comments:**
8032-187

We addressed the potential for the ocelot to occur in the project area in the wildlife resources process memorandum (Newell 2018j). The species was determined to be unlikely to occur based on guidance from species' experts at FWS and because the project alternatives occur outside the area where the species is known to occur, with only one known record. Also, camera trap data from the project vicinity have not shown any ocelots.

FWS agreed in its Biological Opinion that the species was unlikely to occur in the project and action areas.

| Comment response: WI25 | |
|---|---|
| Impacts to Mineral Creek | Page 1 of 1 |

**Responsive to these comments:**
5760-2, 8032-194

This comment states, "The DEIS then describes potential damage to nearby critical habitat in Mineral Creek above the confluence with Ga'an Canyon, including 'reduction of perennial pools and a conversion of vegetation toward xeroriparian species', but concludes that "groundwater modeling for the action alternatives does not indicate that impacts from groundwater drawdown would significantly impact Mineral Creek in the area of designated critical habitat' (Ch. 3, p. 476)."

To be clear, the statement of potential impacts (DEIS, p. 476) does not tie the impacts to Mineral Creek, and as noted in the comment, the DEIS explicitly states that groundwater drawdown is not anticipated to impact Mineral Creek.

We addressed potential impacts to Mineral Creek and critical habitat from changes in surface and groundwater hydrology. The drawdown analysis is contained in section 3.7.1 (DEIS, p. 320), and the surface hydrology analysis is contained in section 3.7.3 (since no stormwater is lost within the Mineral Creek watershed, it is not analyzed specifically; see the analysis area on p. 423).

We addressed potential impacts from water contamination in section 3.7.2, and water quality would meet all wildlife standards for acute and chronic exposure. We have added further analysis of water quality impacts to wildlife in section 3.8 of the FEIS.

We consulted with FWS regarding the potential impacts on Gila chub and designated critical habitat, and FWS concurred that the project may affect but is not likely to adversely affect the species or designated critical habitat. The final Biological Opinion issued by FWS is attached to the FEIS as appendix P.

These comments also note impacts to Gila longfin dace. We addressed Gila longfin dace in section 3.8 (DEIS, pp. 462, 469). We have added further detail to section 3.8 of the FEIS regarding potential impacts to Gila chub.

Appendix R

| Comment response: WI26<br>Clarifications of aspects of reclamation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
524-16, 8032-239, 8032-32

These comments raise several issues related to reclamation details.

One comment questions how the remaining material in the seepage ponds, where solids have been concentrated through evaporation, would be removed and disposed of. As noted in the DEIS (p. 391), these solids would be handled as solid or hazardous waste. Solids physically would be removed, along with the liner for the seepage pond, and disposed in an appropriate facility off-site. We added more detail this aspect to section 3.7.2 of the FEIS.

Several comments ask for cost details for reclamation. We calculate costs for reclamation activities during the bond approval process. This takes place after the NEPA analysis, after a ROD, and during the approval stage of the operating plan, whether in the form of a special use permit or a GPO. It is not our policy to include bonding financial estimates in the EIS documents.

Another comment notes, "Although options for post-closure seepage management are briefly discussed, substantial additional detail is warranted given the importance of implementing and maintaining seepage management for protecting water quality. . . . Add a detailed discussion of the post-closure tailings seepage management periods and strategies for each alternative, including a discussion of the infrastructure required and potential impacts from constructing and operating post-closure management facilities. For water treatment options, discuss available treatment technologies that could be used, the water quality that could be achieved, as well as likely AZPDES permit requirements and whether they could be met."

We added further discussion of post-closure water quality management to section 3.7.2 of the FEIS.

Appendix R

| Comment response: WT1 | |
|---|---|
| Disclosed water use is incorrect and unrealistic | Page 1 of 1 |

**Responsive to these comments:**
1053-1, 1084-3, 1088-2, 1092-2, 1094-1, 1284-1, 1301-13, 1301-14, 1322-5, 1344-4, 1349-4, 1419-1, 1420-1, 1441-2, 1448-4, 1455-4, 1468-2, 1501-4, 151-2, 154-1, 1602-1, 224-1, 24-2, 255-1, 259-2, 263-3, 27848-3, 27916-2, 27993-1, 27995-3, 28093-5, 28106-3, 286-5, 298-1, 30065-4, 30143-6 (Emerman2), 30143-7 (Emerman2), 52-2, 5760-1, 67-4, 871-2, 910-3, F1-7, F2-5, F4-4, F6-5

The information presented in these comments is not factually accurate. Detailed comments related to this topic were submitted with comment letter #8032 in the form of a report from Dr. S. Emerman titled "Projected Consumption of Electricity and Water by the Proposed Resolution Copper Mine, Arizona." Based on estimates of per-ton water use by mines both globally and in Arizona, Dr. Emerman calculates that "predicted water consumption of the Resolution Copper Mine is 50,000 acre-feet per year."

The water balance of the mine is complex, and the DEIS discloses the water use of the mine in multiple places, including in chapter 2 (see "Water Use," DEIS, pp. 52–54); chapter 3, section 3.7.1 (see "Changes in Desert Wellfield Pumping"); and Appendix H, Further Details of Mine Water Balance and Use (appendix H of the DEIS).

There is no single water balance component that equals "predicted water consumption." We interpret the term "predicted water consumption" in the comment to mean water that is lost from evaporation, seepage, or shipping with concentrate and therefore cannot be captured and recycled. Similarly, "predicted water consumption" also equals the various sources of water supply that continually make up for this lost water, and this can be readily quantified. The "predicted water consumption" of the mine consists of three components:

1) By far the largest of these components is makeup water pumped from the Desert Wellfield in the East Salt River valley (for the preferred alternative, this water use ranges from 5,578 to 17,948 acre-feet per year (af/yr), depending on the project phase, and averages 13,289 acre-feet (af) over the 41-year period of active pumping; see DEIS, appendix H, p. H-8).

2) For consumptive use it would be reasonable to also add the dewatering from the East Plant Site (ranges from 1,298 to 2,118 af/yr, with an average of 1,715 af/yr; see DEIS, appendix H, p. H-2); and

3) The capture of precipitation at the tailings storage facility (for the preferred alternative, ranges from 1,110 to 1,865 af/yr, with an average of 1,678 af/yr; see DEIS, appendix H, p. H-4).

Thus, the "predicted water consumption" of the mine as disclosed in the DEIS averages 16,682 af/yr (13,289 af + 1,715 af + 1,678 af = 16,682 af/yr).

The point made by these public comments is that this disclosed water use (16,682 af/yr) is less than that predicted by Dr. Emerman from literature estimates (50,000 af/yr). The Emerman analysis was thoroughly examined and considered, and the results are included in the project record (see Garrett (2020c)). It should be noted that Emerman did not base his calculations on any of the information described above that is contained in the DEIS, but rather on the GPO (Resolution Copper 2016c).

A review of the same literature sources used by Dr. Emerman confirms the point made: Resolution Copper water use as disclosed is less than would be anticipated, based on other mines. However, Emerman fails to examine why this difference exists, but instead assumes it means the disclosure is flawed. As discussed in the review of the Emerman report (Garrett 2020c), the data sources used by Dr. Emerman fail to account for the type of tailings. Specifically, the Resolution Copper Project is using thickened tailings ranging from 50 to 65 percent solids, compared with 20 to 50 percent solids in a conventional tailings slurry (see DEIS, p. 50). The review of the Emerman report demonstrates that the water difference identified by Dr. Emerman is due to use of this technology (Garrett 2020c).

In other words, the Resolution Copper Project uses less water than other mines because the proponent has incorporated enhanced technology (thickening) in order to reduce water use.

Appendix R

| Comment response: WT1_A | |
|---|---|
| Disclosed water use is incorrect and unrealistic; with addition for specific comment 30143-8 | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30143-8 (Emerman2) |

See response WT1 for response to the estimates of water use contained in the Emerman report. In addition, see response WT24 for the response to the estimates of power use by the project in the Emerman report.

This comment is a summary of the points made by Dr. Emerman and poses a number of questions. The answers to these questions are as follows:

- Does Rio Tinto have a guarantee from SRP that they will supply power to the Resolution Copper Mine? Response: The power requirements estimated by Dr. Emerman are erroneous, as discussed in response WT24. In addition, as discussed in response WT24, SRP has conducted an independent load study for the project and concluded the following: "The total maximum combined load proposed by RC is 273 to 315 MW, which represents 3.7 to 4.3 percent of SRP's 2019 peak demand. SRP is well suited to provide the needed power just as it has done with other large power users across the state. SRP does not see any limitations to serving this load to the Project at the aforementioned sites, presuming the recommended system upgrades are implemented. With these system upgrades, there will be no impact on the neighboring customers as the Project site increase loads as per the estimated load levels" (1898 and Company 2020). Also note that information received since January 2021 using a different estimation technique has modified the anticipated power use, and this updated disclosure has been incorporated into chapter 2 of the FEIS.

- Why does Rio Tinto believe that the water consumption for the Resolution Copper Mine will be 10.2 percent of the average for copper mines in Arizona? Response: As discussed in response WT1, water use calculated for the Resolution Copper Mine is based on a thickened tailings slurry that differs from sources in the literature referenced by Dr. Emerman. Resolution Copper is investing in thickening technology specifically in order to reduce water use.

- Why does Rio Tinto believe that water consumption for the Resolution Copper Mine will be only 15,700 af/yr when the water exported with the tailings alone will be 25,600 af of water per year, according to the GPO? Response: This information is out of date. The disclosure and the analysis in the DEIS are based on updated information developed during the NEPA analysis, not the GPO from 2016. The actual amount of water exported with the tailings differs by alternative. For instance, for Alternative 2 this ranges from 5,820 af/yr to 20,810 af/yr (DEIS, appendix H, p. H-2). Dr. Emerman also disregards the amount of water that is reclaimed back to the process from the tailings storage facility. For instance, for Alternative 2 this ranges from 434 to 2,989 af/yr (DEIS, appendix H, p. H-4).

- What alternatives does Rio Tinto have for water supply if Rio Tinto cannot meet its promise to consume only 15,700 af of water per year? Even if Rio Tinto can fulfill its promise to consume only 15,700 af of water per year, how will Rio Tinto secure the shortfall of 35 percent of necessary water supply, as stated in the GPO? Response: Resolution Copper's water supply from the Desert Wellfield must be permitted through the ADWR; the Desert Wellfield is located within the Phoenix Active Management Area and is therefore subject to the requirement to obtain valid groundwater rights. This is true regardless of the amount of water Resolution Copper pumps from the Desert Wellfield.

Appendix R

| Comment response: WT1_B Disclosed water use is incorrect and unrealistic; with addition for specific comment 8031-50 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-50 | |

See response WT1 for response to the estimates of water use contained in the Emerman report.

This comment also refers back to the water use figures provided in the GPO (Resolution Copper 2016e) and indicates that the DEIS numbers differ. This is correct; the DEIS estimates of water use are based on actual tailings alternatives and do differ in a number of ways from the general estimates in the GPO. The comments also indicates that the DEIS "simply concludes with no analysis or support that for the life of the mine, '87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River Valley.'"

It is incorrect to state that this conclusion is not supported. The quote from the comment is taken solely from the Executive Summary, with no reference to the rest of the analysis in the DEIS itself. The water balance for the mine is complex, and the DEIS, DEIS references, and the project record contain extensive analysis of the mine water balance. For instance, the DEIS discloses the water use of the mine in chapter 2 (see "Water Use," DEIS, pp. 52–54); chapter 3, section 3.7.1 (see "Changes in Desert Wellfield Pumping"); and Appendix H, Further Details of Mine Water Balance and Use (DEIS appendix H). These are based in turn on reference documents such as WestLand Resources Inc. (2018b).

| Comment response: WT2 Questions about total amount of water use | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1166-2, 1196-1, 1301-16, 1333-1, 7687-2, 8032-67 | |

There is no single water balance component that equals "predicted water consumption." We interpret the term "predicted water consumption" used in the comment to mean water that is lost from evaporation, seepage, or shipping with concentrate and that cannot be captured and recycled. Similarly, "predicted water consumption" also equals the various sources of water supply that continually make up for this lost water, and this can be readily quantified. The "predicted water consumption" of the mine consists of three components:

(1) By far the largest of these components is makeup water pumped from the Desert Wellfield in the East Salt River valley (for the preferred alternative, this water use ranges from 5,578 to 17,948 af/yr, depending on the project phase, and averages 13,289 af over the 41-year period of active pumping; see DEIS, appendix H, p. H-8).

(2) For consumptive use it would be reasonable to add the dewatering from the East Plant Site (ranges from 1,298 to 2,118 af/yr, with an average of 1,715 af/yr; see DEIS, appendix H, p. H-2).

(3) The capture of precipitation at the tailings storage facility (for the preferred alternative, ranges from 1,110 to 1,865 af/yr, with an average of 1,678 af/yr; see DEIS, appendix H, p. H-4).

Thus, the "predicted water consumption" of the mine as disclosed in the DEIS averages 16,682 af/yr (13,289 af + 1,715 af + 1,678 af = 16,682 af/yr).

Appendix R

| Comment response: WT3 | |
|---|---|
| Amount of water use shown in Appendix H | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30078-22 |

The comment correctly restates and interprets the data shown in table 2.2-1 of the DEIS but does not correctly interpret the data in appendix H.

The numbers cited in the comment from appendix H, p. H-3, for Alternatives 2 and 6 are specifically for the combined inflow to the West Plant Site, which in turn consists of process makeup water (a combination of groundwater pumped from the Desert Wellfield and return flow from the filter plant) and tailings recycled water.

The numbers shown in table 2.2-1 only reflect the Desert Wellfield pumping. Both the process makeup water and Desert Wellfield pumping values shown in appendix H are consistent with table 2.2-1. For process makeup water, Alternative 2 (peak year = 13,757 af [p. H-2]) uses more than Alternative 6 (peak year = 11,779 af [p. H-3]). For Desert Wellfield pumping, Alternative 2 (peak year = 19,926 af [p. H-7]) uses more than Alternative 6 (peak year = 17,948 af [p. H-8]).

| Comment response: WT4 | |
|---|---|
| Water scarcity and competing water uses | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1054-1, 1068-3, 107-1, 107-2, 1083-4, 1090-2, 1093-2, 1110-2, 1117-1, 1128-11, 1140-2, 1150-8, 1161-2, 1189-1, 1189-2, 122-7, 1235-6, 1301-10, 1301-11, 1301-4, 1301-5, 1301-7, 1310-1, 1318-2, 1321-1, 1321-2, 132-4, 1335-3, 1338-9, 1358-4, 1359-4, 1360-15, 1374-1, 1381-1, 1383-1, 1389-13, 1464-1, 1464-2, 1538-2, 1540-10, 1540-8, 1544-7, 1919-1, 209-3, 233-3, 27978-1, 28449-54, 28561-2, 290-3, 291-2, 30064-2, 30066-2, 30078-15, 30078-16, 30078-17, 30078-18, 30078-36, 30079-3, 30079-4, 30138-1, 30147-6 (Powers), 356-2, 356-3, 392-1, 40-3, 410-1, 417-1, 437-3, 44-2, 452-2, 481-2, 506-1, 529-1, 533-2, 555-16, 555-17, 555-18, 557-1, 5727-2, 59-3, 5942-2, 595-1, 609-2, 612-1, 614-1, 624-1, 633-2, 639-1, 64-4, 669-3, 6950-1, 6984-2, 737-1, 747-1, 777-1, 8031-42, 8031-51, 8031-56, 8031-73, 8032-101, 8032-106, 8032-107, 8032-62, 8074-1, 8144-1, 82-5, 8320-1, 894-1, 897-3, 897-8, 899-3, 899-8, 900-3, 906-1, 943-2, 974-2, 979-3, F10-2 |

Groundwater use by the mine is regulated by the State of Arizona, not the Forest Service. The Arizona legal framework has been promulgated in order to balance competing uses of a finite resource, under a comprehensive framework of water rights and water use permits. The responsibility of the Forest Service under NEPA is to analyze and disclose the water use of the mine and disclose the anticipated effects on the environment caused by extraction and use of that water.

Numerous public comments raise the issue of water shortages due to overallocation, drought, and future meteorological trends. The DEIS addresses these issues in several sections, including the following: "Ongoing Climatic Trends Affecting Water Balance" (DEIS, p. 311); "Cumulative Effects – East Salt River Valley Water Supplies" (DEIS, p. 341); "Cumulative Effects – Recharge and Recovery Credits" (DEIS, p. 341); and "Cumulative Effects – Regional Water Supplies" (DEIS, p. 342). The DEIS concludes, "Cumulatively, the total demand on the groundwater resources in the East Salt River valley is substantial and could be greater than the estimated amount of physically available groundwater" (DEIS, p. 342).

The FEIS reaches similar conclusions; however, the cumulative effects analysis has been expanded in chapter 4 of the FEIS to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

Appendix R

---

| **Comment response: WT4_A**<br>Water scarcity and competing water uses; with addition for specific comment 1068-1; 30078-13 | **Page 1 of 1** |
|---|---|

**Responsive to these comments:**
1068-1, 30078-13

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment also raises the issue of the use of long-term storage credits. With respect to the makeup water supply for the project, the intent of the analysis contained in the DEIS is to consider the maximum physical impacts that could be caused by the pumping. For this reason, the analysis models the physical extraction of all water from the Desert Wellfield, regardless of legal status: "The impacts from the Desert Wellfield that are described in this section are based on the physical removal of water from the aquifer as it exists today and are not a reflection of the legal availability of that groundwater" (DEIS, p. 342). Resolution Copper has obtained long-term storage credits equal to more than one-half of the planned water supply over the life of the mine (DEIS, p. 342). These long-term storage credits represent water that otherwise would have already been pumped from the aquifer; thus, from a regulatory viewpoint, ADWR does not consider pumping that recovers these credits to be "new" groundwater extraction. In the DEIS, the pumping of the full amount of groundwater was modeled without the regulatory context in order to ensure that physical impacts to the aquifer were not underrepresented.

With respect to the FEIS, (1) the pumping analysis continues to assume that all water is removed directly from the Desert Wellfield, without reduction from direct delivery, in order to not underestimate physical impacts to the aquifer; and (2) the cumulative effects analysis in chapter 4 of the FEIS has been expanded to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

Also note that these comments mention recent modeling of projected shortfalls in the Pinal Active Management Area conducted by the ADWR; the area for which this modeling was conducted does not extend as far north as the Desert Wellfield. However, because there is a hydrologic connection between the Pinal and Phoenix Active Management Areas, further analysis has been added to describe this connection and the potential overlap for drawdown predicted in each area.

---

| **Comment response: WT4_B**<br>Water scarcity and competing water uses; with addition for specific comment 1379-3; 83-2; 8201-2;<br>461-2; 366-1 | **Page 1 of 1** |
|---|---|

**Responsive to these comments:**
1379-3, 366-1, 461-2, 8201-2, 83-2

See response WT4 for the response to the general topic of water scarcity and competing water uses.

Several comments claim that the amount of water use was not disclosed or cite incorrect water usage numbers.

With respect to the disclosure of water use, the water balance of the mine is complex, and the DEIS discloses the water use of the mine in multiple places, including in chapter 2 (see "Water Use," DEIS, pp. 52–54); chapter 3, section 3.7.1 (see "Changes in Desert Wellfield Pumping"); and Appendix H, Further Details of Mine Water Balance and Use (DEIS appendix H). There is no single water balance component that equals "predicted water consumption." We interpret the term "predicted water consumption" used in the comment to mean water that is lost from evaporation, seepage, or shipping with concentrate and that cannot be captured and recycled. Similarly, "predicted water consumption" also equals the various sources of water supply that continually make up for this lost water, and this can be readily quantified. The "predicted water consumption" of the mine consists of three components:

(1) By far the largest of these components is makeup water pumped from the Desert Wellfield in the East Salt River valley (for the preferred alternative, this water use ranges from 5,578 to 17,948 af/yr, depending on the project phase, and averages 13,289 af over the 41-year period of active pumping; see DEIS, appendix H, p. H-8).

(2) For consumptive use it would be reasonable to add the dewatering from the East Plant Site (ranges from 1,298 to 2,118 af/yr, with an average of 1,715 af/yr; see DEIS, appendix H, p. H-2), and

(3) The capture of precipitation at the tailings storage facility (for the preferred alternative, ranges from 1,110 to 1,865 af/yr, with an average of 1,678 af/yr; see DEIS, appendix H, p. H-4).

Thus, the "predicted water consumption" of the mine as disclosed in the DEIS averages 16,682 af/yr (13,289 af + 1,715 af + 1,678 af = 16,682 af/yr).

See also response WT1 for more discussion about incorrect estimates for mine water use.

---

Appendix R

| Comment response: WT4_C<br>Water scarcity and competing water uses; with addition for specific comment 1454-12 and 6419-21 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1454-12 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

These comments incorrectly assert that no analysis of the impact on the local area from the pumping was contained in the DEIS. The analysis of groundwater drawdown in the vicinity of the Desert Wellfield is provided in section 3.7.1 of the DEIS (see specifically figure 3.7.1-2, and pp. 335–340 (changes in the Desert Wellfield by alternative)). The analysis of groundwater drawdown in the vicinity of the mine site is also contained in section 3.7.1 of the DEIS (see specifically figure 3.7.1-3 and all of section 3.7.1.4, which looks at impacts to GDEs and water supplies from groundwater drawdown).

| Comment response: WT4_D<br>Water scarcity and competing water uses; with addition for specific comment 1463-1 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1463-1 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

The comment states, "I think it would be valuable to the public if there was more of a discussion on the potential impact there may be at these sites." This appears to refer to riparian areas where mitigation would be applied.

Discussion of the impacts to these areas is found in the DEIS in the following places: table 3.7.1-3 (see specifically the footnote for types of riparian impacts anticipated: "reduction or loss of spring/stream flow, increased mortality or reduction in extent or health of riparian vegetation, and reduction in the quality or quantity of aquatic habitat from loss of flowing water, adjacent vegetation, or standing pools"); p. 329 (anticipated impacts on Devil's Canyon); p. 329 (anticipated impacts on springs); pp. 329–332 (anticipated impacts on Queen Creek); and pp. 333–334 (longer term anticipated impacts on springs, Queen Creek, Devil's Canyon, Telegraph Canyon, and Arnett Creek).

Also see response WT8 for more details about riparian impacts contained in the DEIS.

| Comment response: WT4_E<br>Water scarcity and competing water uses; with addition for specific comment 1468-4 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1468-4 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

The comment asks, "Has the impact of the reduction in the water table on the ability of the surrounding areas to provide adequate water for development been factored into the financial impact of this project?" We have added a discussion of the financial impacts of changes to the water supply to the socioeconomics section of the FEIS (section 3.13).

Appendix R

| Comment response: WT4_F | |
|---|---|
| Water scarcity and competing water uses; with addition for specific comment 8031-55; 8031-57; 8032-108 | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 8031-55, 8031-57, 8032-108 |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

These comments criticize the lack of inclusion of the drought contingency plan in the cumulative effects analysis. This criticism is based on an incorrect assumption.

We evaluated the drought contingency plan as a potential RFFA. Our cumulative effects analysis in the DEIS consisted of three documented steps:

- First, a list of any and all potential RFFAs was compiled from available sources, including public scoping, internal scoping, news media, and the Forest Service Schedule of Proposed Actions. These potential RFFAs were screened for temporal overlap and to ensure that sufficient detail existed to allow for analysis. The results of this screening are detailed in "Process Memorandum to File – Determination of Reasonably Foreseeable Actions Considered in Cumulative Effects Analysis" (Rigg and Morey 2018).
- Second, for those RFFAs that passed the initial screening and for other key RFFAs raised specifically after the initial screening, a more complete resource-by-resource assessment of spatial overlap was conducted. The results of this screening are provided in "Process Memorandum to File – Cumulative Effects Analysis" (SWCA Environmental Consultants 2018a).
- Third, the analysis of cumulative effects for all RFFAs that passed both screenings was provided in chapter 3 of the FEIS, in each of the appropriate resource sections.

The assessment of the drought contingency plan can be found in SWCA Environmental Consultants (2018a). (Note that this process memorandum is a compilation of worksheets and does not have useful page numbering; the drought contingency plan can be found on p. 68 of the PDF file). The drought contingency plan was not analyzed because there is no temporal overlap with the Resolution Copper Project: "Although an important reasonably foreseeable future action, the DCP is statutorily set to expire in December 2026. A new water management plan for the seven Colorado River basin states and Mexico will replace it, but work on this new plan has not yet begun. . . . Overall conclusion: It is unlikely that any of the provisions of the DCP will be in effect when (or if) the Resolution Mine becomes operational, which is not likely to occur before 2026-2027. No information exists as to what any new water management plan that will replace it will entail. This analysis therefore presumes no cumulative effects can be established between the Resolution Mine project and the DCP."

Despite the fact that the drought contingency plan itself could not be analyzed, we expanded the FEIS cumulative effects analysis (chapter 4 of the FEIS) to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

Appendix R

| Comment response: WT4_G | |
|---|---|
| Water scarcity and competing water uses; with addition for specific comment 83-1, 59-4, 562-4 | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 562-4, 59-4, 83-1 |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

These comments specifically mention the planned Superstitions Vistas development area in the East Salt River valley. We evaluated these developments as a potential RFFA. See response WT4_F for more details about the steps of the cumulative effects analysis.

The assessment of Superstition Vistas can be found in (SWCA Environmental Consultants 2018a). (Note that this process memorandum is a compilation of worksheets and does not have useful page numbering; Superstition Vistas can be found on p. 33 of the PDF file.) Superstition Vistas was not analyzed as a standalone RFFA because insufficient detail exists: "Development of any or all of these projects depends on numerous factors, including public demand for new housing and commercial facilities in the area as well as necessary roads, bridges, and water and electrical and other infrastructure and services; favorable market conditions; municipal government approval of planning and individual development designs; and innumerable other factors. It is considered too speculative to estimate if, when, or to what extent development may occur in these areas."

However, we still incorporated the future growth in the Superstition Vistas planning area conceptually. One RFFA carried into the cumulative effects analysis was "Future Assured Water Supplies" (SWCA Environmental Consultants 2018a:76). This RFFA includes more general impacts, as well: "Note that this RFFA is combined with the overall use of water resources and development in the East Salt River valley, which are assessed together for cumulative effects." The resulting analysis is disclosed in section 3.7.1 (DEIS, pp. 341–342).

Note that we expanded the FEIS cumulative effects analysis (chapter 4) to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends. This includes the Superstition Vistas development.

Since January 2021, a portion of the Superstition Vistas development area has been auctioned off, and a specific development is planned. This change is discussed in chapter 4.

| Comment response: WT4_H | |
|---|---|
| Water scarcity and competing water uses; with addition for specific comment 30078-19 | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30078-19 |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment indicates that the level of analysis conducted for cumulative effects is not sufficient under NEPA.

In response to comment, the cumulative effects analysis has been expanded and reformatted in the FEIS. The FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes the cumulative impacts in the East Salt River valley. After consultation with the ADWR, additional modeling has been conducted to quantify the combined impact of future regional water use with the Resolution Copper Project Desert Wellfield pumping, including approved assured water supplies and extraction of all accumulated long-term storage credits. The quantitative results of this model are included in section 3.7.1 and chapter 4 of the FEIS.

Appendix R

| Comment response: WT4_I<br>Water scarcity and competing water uses; with addition for specific comment 8032-100 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>8032-100 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "The DEIS (p. 335) states that 'the amount of groundwater in storage in the East Salt River valley subbasin (above a depth of 1,000 feet) is estimated to be about 8.1 million acre-feet.' The amount of water in storage (meaning in water storage facilities) is NOT the same thing as the amount of water which actually exists in the subbasin."

This is an incorrect reading of the DEIS. The value of 8.1 million af refers to the amount of groundwater physically existing in the basin above a depth of 1,000 feet. It does not refer to the amount of water stored in permitted water storage facilities.

| Comment response: WT4_J<br>Water scarcity and competing water uses; with addition for specific comment 1499-2 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1499-2 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "Resolution Copper essentially gave up on modeling the impacts on groundwater resources from the Desert Wellfield withdrawals claiming it is too difficult to foresee."

The comment is not correct. We evaluated the modeling results from the Desert Wellfield impacts analysis as the basis for our disclosure of impacts in the DEIS. The analysis of groundwater drawdown in the vicinity of the Desert Wellfield is contained in section 3.7.1 of the DEIS (see specifically figure 3.7.1-2 and pp. 335–340 (changes in the Desert Wellfield by alternative)).

| Comment response: WT4_K<br>Water scarcity and competing water uses; with addition for specific comment 6419-2 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>6419-2 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "Dewatering the pit may also have unintended consequences on local groundwater as the analysis conducted by Resolution Copper failed to determine the source of water that would have to be removed and managed."

This is an incorrect statement. The proposed mine is not an open-pit mine.

Assuming the comment may be referring to the underground mine infrastructure in the block-cave zone, this is still an incorrect statement. Analysis of groundwater drawdown in the vicinity of the mine site is also contained in section 3.7.1 of the DEIS (see specifically figure 3.7.1-3 and all of section 3.7.1.4, which looks at impacts to GDEs and water supplies from groundwater drawdown).

| Comment response: WT4_L<br>Water scarcity and competing water uses; with addition for specific comment 52-3 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>52-3 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "The DEIS says that this would cause the ground to collapse as much as 10 feet."

This is an incorrect statement. The DEIS acknowledges the potential for ground subsidence but makes no specific predictions. See response WT10 for more details about subsidence impacts.

Appendix R

| Comment response: WT6 | |
|---|---|
| Ramifications of geothermal water | Page 1 of 1 |

**Responsive to these comments:**
1068-4, 1235-5, 1301-1, 1468-3, 151-3, 28605-1, 290-2, 29444-2, 30142-1 (Emerman1), 30142-2 (Emerman1), 30142-3 (Emerman1), 30142-4 (Emerman1), 30142-5 (Emerman1), 30142-6 (Emerman1), 30142-7 (Emerman1), 30143-1 (Emerman2), 30147-9 (Powers), 356-5, 452-4, 567-2, 5885-2, 6097-1, 669-2, 8000-2, 8032-299, 8032-300, 8032-88, F10-4

These comments suggest that Resolution Copper is underestimating the amount of groundwater required to be removed in order to dewater the mine infrastructure. These same comments also focus on the temperature of the water, suggesting that the cooling requirements have not been properly taken into account by the design. These comments have been made by multiple commenters but are handled in the most detail in two technical reports (attached to comment letter #8032 as B2 and B3) authored by Dr. S. Emerman.

The Forest Service explored the issues raised in these two reports and documented the review (Garrett 2020c). This review found that the information compiled by Dr. Emerman is quoted correctly from sources and is factual as applied to the specific location and experience of constructing Shaft 10.

However, Dr. Emerman has then extrapolated these facts to the project as a whole, based primarily on review of the GPO (Resolution Copper 2016c), rather than on the documents used in the NEPA analysis. When taken in the context of the entire project and all other available information, the conclusions drawn by Dr. Emerman are not valid. Four specific considerations that led to this conclusion are discussed in detail in Garrett (2020c).

The Forest Service also determined that the temperature data were not unexpected or unanticipated and that the high temperatures have been assumed in the support documents and incorporated into both the design and the analysis (Garrett 2020c).

| Comment response: WT6_A | |
|---|---|
| Ramifications of geothermal water; with addition for specific comment 28930-2 | Page 1 of 1 |

**Responsive to these comments:**
28930-2

See response WT6 for the response to the general topic of geothermal water.

The comment states that there has not been a geotechnical study or a cultural resource study conducted for the preferred alternative (Alternative 6 – Skunk Camp).

With respect to cultural resources, this is not factually correct. As noted on p. 635 of the DEIS, almost all the land in this alternative was surveyed before the DEIS was prepared: "Please note that portions of the proposed pipeline corridors for the Skunk Camp alternative have not been completely surveyed. At this time, 16,049 acres (96 percent) of the alternative has been surveyed for Alternative 6 and the north pipeline route option, and 16,559 acres (96 percent) has been surveyed for Alternative 6 and the south pipeline route option." These surveys are now fully complete and have been consulted on with the Arizona SHPO, as required under Section 106 of the NHPA.

With respect to the geotechnical study, the comment is correct that this had not been completed as of the time of publication of the DEIS. The Forest Service obtained the results in late 2019 from Resolution Copper. These results are reflected in the FEIS (see section 3.2 for an overview) and in fact formed a key part of the collaborative review of tailings safety that occurred in February 2020 (the FMEA, described in section 3.10.1 of the FEIS).

Appendix R

| Comment response: WT7 | |
| Refined analysis for water quality for the preferred alternative (Alternative 6 – Skunk Camp) | Page 1 of 1 |

**Responsive to these comments:**
103-2, 1084-5, 1128-9, 1157-1, 1158-32, 1158-33, 1158-41, 1540-11, 28449-52, 30075-41, 30078-34, 30078-35, 524-4, 555-11, 555-13, 555-15, 555-23, 66-3, 7690-2, 8031-64, 8032-251, 8032-252, 8032-84, 8237-1

These comments express concerns for water quality in general. Potential surface water and groundwater quality impacts have been fully analyzed and disclosed in the DEIS. See response WT48 for more details.

Many of these comments are specifically concerned with the preferred alternative (Alternative 6 – Skunk Camp) and the potential downstream water quality impacts to residents along Dripping Spring Wash or water supplies farther downstream, such as Winkelman or Hayden.

The analysis of potential impacts to surface water and groundwater quality associated with the preferred alternative was refined and is presented in section 3.7.2 of the FEIS. The updated analysis is supported by additional baseline hydrologic investigations, aquifer testing, and additional groundwater and surface water quality samples. The results disclosed in the FEIS are similar to those in the DEIS. The concentrations of contaminants due to the seepage from the Alternative 6 tailings storage facility are not anticipated to exceed numeric water quality standards.

| Comment response: WT8 | |
| Riparian analysis and mitigation | Page 1 of 2 |

**Responsive to these comments:**
1219-2, 1322-6, 1501-5, 1544-10, 27681-3, 27755-2, 27955-3, 27995-4, 27996-3, 28093-4, 28093-6, 28106-4, 30075-25, 30075-3, 30075-5, 30075-50, 30075-52, 30075-7, 30075-8, 8031-46, F6-6

These comments generally indicate that riparian habitats have not been adequately analyzed in the DEIS.

We consider the analysis of impacts to riparian habitats to be thorough and complete. A number of these comments indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

The analysis of riparian areas and potential impacts appears in the following places in the DEIS:

- Section 3.3, amount of riparian vegetation and xeric riparian vegetation removed by each alternative (DEIS, pp. 176–178)
- Section 3.3, desired future conditions from the Tonto National Forest for riparian and xeric riparian areas, the potential to meet these conditions after reclamation, and the amount of time needed to meet these conditions (DEIS, pp. 186, 188–190, and 200)
- Section 3.3, anticipated impacts to riparian vegetation extent and health due to water quantity and quality impacts (DEIS, p. 196)
- Section 3.7.1, descriptions of GDEs, including riparian areas (DEIS, pp. 312–317)
- Section 3.7.1, impacts to GDEs, including riparian areas, due to dewatering from the project (DEIS, pp. 317–340)
- Section 3.7.1, cumulative impacts to GDEs, including riparian area (DEIS, pp. 340–342)
- Section 3.7.1, mitigation, mitigation effectiveness, and unavoidable adverse effects on GDEs (DEIS, pp. 342–345)
- Section 3.7.3, amount of wetlands (defined under the National Wetlands Inventory) impacted (DEIS, pp. 435–444)
- Section 3.7.3, amount of jurisdictional wetlands (defined under Section 404 of the CWA) impacted (DEIS, pp. 435–444)
- Section 3.7.3, impact of changes in geomorphology on GDEs, including riparian vegetation (DEIS, pp. 433–434)

Appendix R

| Comment response: WT8 | |
|---|---|
| Riparian analysis and mitigation | Page 2 of 2 |
| **Responsive to these comments:** | |
| 1219-2, 1322-6, 1501-5, 1544-10, 27681-3, 27755-2, 27955-3, 27995-4, 27996-3, 28093-4, 28093-6, 28106-4, 30075-25, 30075-3, 30075-5, 30075-50, 30075-52, 30075-7, 30075-8, 8031-46, F6-6 | |

- Section 3.7.3, impact of reductions in storm flow on surface water systems supporting vegetation (DEIS, pp. 435–444)
- Section 3.8, impact on special habitat areas supporting wildlife, including riparian (DEIS, pp. 452 and 459–461)
- Section 3.8, impact to specific species groups, including impacts of low-elevation riparian loss on MIS (DEIS, pp. 461–463 and 472)
- Section 3.8, impact to threatened and endangered species from riparian zone impacts (DEIS, pp. 473–476)
- Section 3.10.1, potential to impact riparian areas from tailings storage facility or pipeline failures (DEIS, pp. 527–534 and 540–543)

In addition to these, there are a number of reference documents that contain more detail on these riparian areas. Key documents include the following (all of which were available for public review of the website at the time of release of the DEIS):

- DEIS reference "Summary and Analysis of Groundwater-Dependent Ecosystems" (Garrett 2018e)
- DEIS reference "Spring and Seep Catalog Resolution Copper Project Area Upper Queen Creek and Devils Canyon Watersheds, Version 2.0" (WestLand Resources Inc. and Montgomery and Associates Inc. 2018)
- DEIS reference "Surface Water Baseline Addendum: Upper Queen Creek, Devils Canyon, and Mineral Creek Watersheds" (Montgomery and Associates Inc. 2017d)
- DEIS reference "2017 Oak Flat Surface Water Monitoring Program" (Montgomery and Associates Inc. 2017a)

Note: we added further description of riparian impacts to the FEIS, including potential impacts to landowners from drawdown (section 3.13), the results of Section 7 consultation on threatened and endangered species (section 3.8), and further descriptions of the types of riparian impacts that could occur (section 3.7.1).

| Comment response: WT8_A | |
|---|---|
| Riparian analysis and mitigation; with addition for specific comment 1107-5 | Page 1 of 1 |
| **Responsive to these comments:** | |
| 1107-5 | |

See response WT8 for the response to the topic of inadequate riparian analysis in the DEIS.

Potential impacts to water rights are described in section 3.7.1 (DEIS, pp. 332–333). Also see response NEPA14 for more discussion of water rights impacts.

Appendix R

| **Comment response: WT9** | |
|---|---|
| Pumping from MARRCO corridor | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 8031-52, 8032-102 |

This comment indicates that "impacts of activities in the desert wellfield (MARRCO corridor) including water pumping have not been fully considered . . . . Future activity in the MARRCO corridor includes at least the drilling of several dozen wells, construction of major power line infrastructure, new pump stations, grading and sloping, access roads, and an additional 50-foot easement (DEIS, appendix G, p. G-10), all of which are major connected actions as defined in 40 C.F.R. § 1508.25, and which should have been fully analyzed in this DEIS."

All impacts within the MARRCO corridor were included in the DEIS:

- With respect to ground disturbance, the entire footprint of the MARRCO corridor was incorporated into all analysis in the DEIS with an assumption of 100 percent disturbance, as described in chapter 2 (DEIS, p. 38). This ground disturbance incorporates many impacts found in the analysis of soils (section 3.3), vegetation (3.3), and wildlife habitat (section 3.8).
- Noise impacts along the MARRCO corridor are in section 3.4 (DEIS, pp. 227–232).
- Transportation impacts related to activities along the MARRCO corridor are in section 3.5 (DEIS, pp. 254–269).
- Air quality impacts related to activities along the MARRCO corridor are in section 3.6 (DEIS, pp. 284–291). Note also that more detailed impacts are found in the DEIS references for air quality, such as Air Sciences Inc. (2019b).
- Impacts from the pumping of the Desert Wellfield are specifically analyzed in section 3.7.1 (DEIS, pp. 325–340).
- Recreation impacts related to the MARRCO corridor, particularly the crossing of the Arizona National Scenic Trail, are analyzed in section 3.9 (DEIS, pp. 498–509).
- Potential impacts caused by rupture of a concentrate pipeline along the MARRCO corridor are analyzed in section 3.10.1 (DEIS, pp. 538–554).

| **Comment response: WT10** | |
|---|---|
| Subsidence analysis | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1177-2, 30078-50, 30078-51, 46-1, 555-20, 8031-53, 8032-103, 8032-79 |

These comments concern the analysis of potential land subsidence in the East Salt River valley caused by pumping from the Desert Wellfield. The analysis of land subsidence is found in section 3.7.1 (DEIS, p. 334). Note that this short summary is not the sole analysis of land subsidence. Further description can be found in Newell and Garrett (2018d), and further references are provided in the project record.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

Based on comments on the DEIS, we have included additional analysis of land subsidence in section 3.7.1 of the FEIS. We also have included a new discussion of the regional water supply and competing water uses in a new cumulative effects chapter in the FEIS (chapter 4).

Several of these comments note the lack of mitigation proposed for pumping impacts from the Desert Wellfield. This is a correct statement. Mitigation is not a regulatory requirement for pumping impacts properly permitted by the ADWR, nor is it within the jurisdiction of the Forest Service to require it for pumping impacts off of NFS lands. Further, Resolution Copper has not brought forth voluntary mitigation for impacts to nearby well owners or property owners.

A specific comment was made that MODFLOW could be used to quantitatively estimate the contribution of the Desert Wellfield to subsidence. This specific issue was brought forward to the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS) and explored by the NEPA team. We found that the ADWR Salt River valley model, which is based on MODFLOW, is a sufficient tool to estimate the contribution of the Desert Wellfield to subsidence in the East Salt River valley, when considered alongside historic data (Walser 2020b).

Appendix R

| Comment response: WT12 | |
|---|---|
| Analysis of impacts in the San Tan area | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1342-5, 1544-9, 29-6, 42-1 |

These comments indicate that analysis of dewatering impacts—either at the mine site or in the East Salt River valley near the Desert Wellfield—is missing from the DEIS. This is not a correct statement.

The analysis of dewatering impacts from the mine site is found in section 3.7.1, including the analysis of potential impacts on springs and seeps, perennial waters, riparian areas, and water supplies (DEIS, pp. 317–340). This includes the analysis of mitigation meant to offset these impacts (DEIS, pp. 342–344).

The analysis of dewatering impacts in the San Tan area (East Salt River valley) from pumping at the Desert Wellfield is also found in section 3.7.1 (DEIS, pp. 317–340). No mitigation is pertinent to this pumping, but substantial discussion of the cumulative impacts on the regional water supplies in this area is also found in section 3.7.1 (DEIS, pp. 340–342).

Based on comments on the DEIS, we have included a necessary new discussion of the regional water supply and competing water uses in a new cumulative effects chapter in the FEIS (chapter 4).

| Comment response: WT14 | |
|---|---|
| Long-term storage credits | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1540-9, 49-1 |

The use of long-term storage credits by Resolution Copper is discussed in chapter 2 (DEIS, p. 59), in section 3.7.1 as part of "Applicant-Committed Environmental Protection Measures" (DEIS, pp. 327–328), and in section 3.7.1 as part of the cumulative effects analysis (DEIS, pp. 340–342). Based on comments on the DEIS, we have expanded the discussion of the regional water supply and competing water uses in the reformatted cumulative effects chapter in the FEIS (chapter 4). This refined cumulative effects analysis includes the cumulative impact caused by the removal of all currently held long-term storage credits in the East Salt River valley, in addition to the removal of water by Resolution Copper for the mine. See also response WT4_A for more discussion of the analysis of long-term storage credits.

One comment notes the lack of mitigation proposed for pumping impacts from the Desert Wellfield. This is a correct statement. Mitigation is not a regulatory requirement for pumping impacts properly permitted by the ADWR, nor is it within the jurisdiction of the Forest Service to require it for pumping impacts off of NFS lands. Further, Resolution Copper has not brought forth voluntary mitigation for impacts to nearby well owners or property owners.

| Comment response: WT15 | |
|---|---|
| Pumping impacts | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1158-38 |

This comment notes, "The DEIS states, 'Drawdown from 10 to 30 feet is anticipated in wells in the Superior area.' It assumed that this estimate is an addition to the drawdown that has occurred already as a result of dewatering in the #9 and #10 shafts at Oak Flat."

To clarify, the quote from the DEIS that is referenced in the comment represents the impact anticipated from the no action alternative. These anticipated drawdowns are indeed in addition to any drawdown that has occurred in the past due to Resolution Copper dewatering pumping. The amount of drawdown that has already occurred near Superior is also disclosed in section 3.7.1 (DEIS, p. 309; see wells DHRES-03, -04, -05, and -16).

Appendix R

| Comment response: WT16 Long-term trends beyond 200 years | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 1321-4, 30075-2, 8032-90 | |

These comments indicate that the use of the 200-year threshold for assessing impacts is inappropriate. These comments misconstrue the analysis contained in the DEIS.

The choice to restrict the groundwater modeling analysis to 200 years was arrived at after discussions with the Groundwater Modeling Workgroup (DEIS, p. 300). This time frame is applicable only to quantitative impacts. As noted in the DEIS, "Even if quantitative results are unreliable at long time frames, the general trends in modeled groundwater levels can indicate whether the drawdown or impact reported at 200 years represents a maximum impact, or whether conditions might still worsen at that location. These trends are qualitatively explored, regardless of time frame" (DEIS, p. 300).

This qualitative exploration of long-term trends beyond 200 years is also contained in section 3.7.1 (DEIS, p. 325, no action alternative; and pp. 333–334, action alternatives).

Long-term trends were also quantitatively used in the analysis of whether a lake would develop in the subsidence crater (DEIS, pp. 375–379). See response WT36 for details about how the subsidence lake analysis has been modified in response to comments.

| Comment response: WT17 Insufficient analysis of water quantity impacts in Queen Creek | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 30075-29 | |

This comment notes that "full discussion and disclosure of the environmental effects on Queen Creek caused by the Propose Action requires an analysis of all combined stressors (mine dewatering; the block cave zone; loss of runoff in the subsidence area)," along with the effects of future meteorological trends.

All of these impacts have been analyzed in the DEIS for Queen Creek. Mine dewatering and block-cave zone impacts are analyzed in section 3.7.1 (DEIS, pp. 317–340). Loss of runoff to Queen Creek from the subsidence zone is analyzed in section 3.7.3 (DEIS, pp. 427–444).

The comment indicates that any drawdown impacts should be looked at in tandem with impacts to surface runoff. This indeed was done in the DEIS for those GDEs experiencing both impacts. For instance, see analysis of Devil's Canyon in section 3.7.1 (DEIS, p. 329), which concludes, "Percent reductions in average annual flow due to the subsidence area range from 5.6 percent in middle Devil's Canyon to 3.5 percent at the confluence with Mineral Creek; percent reductions during the critical low-flow months of May and June are approximately the same. Combined with loss from spring DC-6.6W due to groundwater drawdown, total estimated flow reductions along the main stem of lower Devil's Canyon caused by the proposed project could range from 5 to 10 percent."

Queen Creek does not experience effects from both drawdown and runoff like Devil's Canyon. As described in the DEIS, only impacts from surface runoff are likely (DEIS, pp. 329–332).

The effects of future meteorological trends have been considered in both the groundwater and surface water analysis, as discussed in the section titled "Ongoing Meteorological Trends Affecting Water Balance" in section 3.7.1 (DEIS, p. 311) and in the section titled "Climate Conditions" in section 3.7.3 (DEIS, pp. 426–427). For groundwater drawdown, effects of future meteorological trends were incorporated into the groundwater modeling itself as one of the sensitivity analyses modifying the amount of recharge to the system (see September 2018 groundwater workgroup notes (Morey 2018e), Action Item 89, and Meza-Cuadra et al. (2018c)).

The impact of future meteorological trends on surface runoff is not readily predicted in ephemeral systems or perennial systems without reliance on snowmelt: "While future projected temperature increases are anticipated to change mean annual precipitation to a small degree, the majority of changes to annual flow in the Lower Colorado River basin are related to changes in runoff timing. Increased temperatures are expected to diminish the accumulation of snow and the availability of snowmelt, with the most substantial decreases in accumulation occurring in lower elevation portions of the basin where cool season temperatures are most sensitive to warming (Dugan 2018)" (DEIS, p. 427).

We have added a comprehensive discussion of future meteorological trends to chapter 4 of the FEIS to incorporate all of the different resources in one location.

Appendix R

| Comment response: WT19 | |
|---|---|
| Water rights | Page 1 of 1 |

**Responsive to these comments:**
1540-5, 30078-26, 30078-47, 30078-48, 555-19

The comments purport that project activities may result in impacts to surface water rights. Comments involving the Winters doctrine and Federal reserved water rights are also discussed in response NEPA14.

Several comments indicate that groundwater pumping by wells in the Desert Wellfield in the Salt River valley has not been considered for surface water impacts under the General Stream Adjudication of the Gila River. As noted in section 3.7.1, drawing firm conclusions about impingement on surface water right holders is problematic: "Goals of the adjudication include clarifying the validity and priority of surface water rights and providing a clear legal framework for when groundwater withdrawals would impinge on surface water rights. The adjudication has been underway for several decades, and while progress has been made, many issues remain unresolved, including any prioritization or validation of water rights in the analysis area" (DEIS, p. 332). The DEIS then concludes that while physical loss to these springs is disclosed, "impact on any surface water rights from a legal or regulatory standpoint cannot yet be determined due to the ongoing adjudication" (DEIS, p. 332).

However, for the case of the Desert Wellfield, these same difficulties are not present. As noted in the DEIS, "Current depths to groundwater in the vicinity of the Desert Wellfield range from 400 to 600 feet below ground surface" (DEIS, p. 310). While it is correct that groundwater pumping can in some cases be legally considered surface water under the General Stream Adjudication, usually these wells are located quite close to surface waters, pull water from the same aquifer as the surface water (usually young alluvium), and have relatively shallow groundwater levels because of this. The Desert Wellfield is located roughly 4 miles from Queen Creek (typically ephemeral at this location), 10 miles from the Gila River (typically ephemeral at this location), and 25 miles from the Salt River, with groundwater levels hundreds of feet below the ground surface. There is no reasonable expectation that any of the groundwater pumping wells would impact surface water rights.

There are also pumping wells associated with the seepage collection ponds at the tailings storage facilities. These are similarly unlikely to impact surface water rights. Even the closest alternative tailings storage facility locations (Alternatives 2 and 3) are located several miles from the nearest flowing surface waters, and these wells are intended to capture and control seepage, which represents water being added to the aquifer. These wells are not intended to substantially dewater the aquifer from its current state.

As noted in section 3.7.3 of the DEIS, surface water flows will also be reduced, due to either the subsidence crater (a permanent reduction) or the tailings storage facility stormwater control (reduction only during operations).

With respect to subsidence crater impacts, through mitigation these flows would be returned to Queen Creek. This new mitigation is described in section 3.7.1 and appendix J (see mitigation measure FS-WR-04) of the FEIS.

With respect to the tailings stormwater controls, typically, sequestration and control of stormwater from development in upland areas are not considered under the General Stream Adjudication, with exceptions for diversions in active channels such as stock tanks. For Alternatives 5 and 6, there would be temporary, operational, reductions in stormwater delivered to the Gila River (DEIS, pp. 437–444). As with impacts to springs, while physical reduction to surface flow can be disclosed, impacts to any surface water rights from a legal or regulatory standpoint cannot be determined unless stormwater controls are considered to be appropriate for consideration under the General Stream Adjudication or other water rights proceedings. This includes any impacts to downstream water rights holders on the Gila River, including the San Carlos Irrigation and Drainage District, which lies beyond the groundwater and surface water analysis area but diverts surface water from the Gila River near Florence.

Additional discussion was added to section 3.7.3 of the FEIS on surface water rights.

One comment also discusses the inconsistency of spring loss from the project with Forest Service groundwater policy. The Forest Service has multiple mandates expressed by Congress through a number of laws. The appropriate execution of these mandates is further detailed in regulation and in policy documents (like Forest Service Handbook issuances). Where conflicts occur, the Forest Service must balance these mandates when arriving at a decision.

Appendix R

| Comment response: WT20<br>Potential inconsistency | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1158-34

This comment identifies a potential inconsistency in reported drops in water levels near Superior.

The first mention of a drop of "50 feet since 2009" is found on p. 306 of the DEIS, as noted in the comment. This reference is specific to the values shown in table 3.7.1-1, which looks at four specific wells that are representative of water levels in the deep groundwater system outside the Resolution Graben.

The second mention of a drop of "20 to 90 feet since 2009" is found on p. 312 of the DEIS, as noted in the comment. This reference is meant to be a more encompassing statement—not specific to the four specific wells in table 3.7.1-1, but representative of all water levels monitored around Superior.

| Comment response: WT21<br>Water sources analyzed; inadequate analysis of water drawdown impacts | Page 1 of 2 |
| --- | --- |

**Responsive to these comments:**
1158-52, 1301-15, 8032-297, 8032-97, 8032-98

This comment notes perceived inadequacies in the analysis of water sources and impacts.

The first comment is regarding water sources for the mine. There is some potential for renewable water sources to be brought to bear, to reduce groundwater pumping, as described in chapter 2. "Resolution Copper proposes to use water either directly from the CAP canal or through wells along the MARRCO corridor in the East Salt River Valley" (DEIS, p. 59). This also includes credits for water already recharged to the aquifer: "Currently, Resolution Copper has acquired approximately 313,000 acre-feet of renewable long-term storage credits within the Phoenix and Pinal Active Management Areas (AMAs)" (DEIS, p. 59).

However, the DEIS acknowledges that the renewable supplies from the CAP may or may not be available: "Resolution Copper has also applied for an additional 2,238 acre-feet per year allocation of CAP Non-Indian Agricultural water from the U.S. Department of the Interior Bureau of Reclamation; this application is not yet approved" (DEIS, p. 59).

The Central Arizona Project Non-Indian Agricultural (CAP-NIA) reallocation has been appropriately analyzed under NEPA by the Bureau of Reclamation, a process that began with scoping in November 2015 and that concluded with a signed FONSI on November 8, 2019. As of the publication of the January 2021 FEIS, the reallocation had not yet taken place; however, on September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for an annual allocation of 2,238 af of CAP-NIA water. In 2022, this allocation was delivered to New Magma Irrigation and Drainage District. Future use of the Resolution Copper CAP allotment remains as disclosed in the DEIS and FEIS: potentially used directly, or recovery of long-term storage credits by pumping from the Desert Wellfield.

Our consistent goal with the EIS analysis has been to avoid underestimating impacts. With respect to uncertainty about water sources, we undertook a conservative approach to ensure that impacts caused by the mine water supply were not underestimated. That approach was to model the physical removal of necessary makeup water from the Desert Wellfield in the East Salt River valley with no offsets from either CAP water or long-term storage credits. The pumping impacts shown in the DEIS from pumping at the Desert Wellfield are found in section 3.7.1 (DEIS, pp. 317–340).

We added more discussion to chapter 2 of the FEIS to clarify the sources of water assessed.

Similarly, some comments note that permitting by the ADWR is not completed yet. This is correct. However, all groundwater that is anticipated to be physically removed from the aquifer, regardless of how ADWR chooses to permit it, has been modeled, and the impacts are disclosed in the DEIS.

Appendix R

| Comment response: WT21 | |
|---|---|
| Water sources analyzed; inadequate analysis of water drawdown impacts | Page 2 of 2 |

**Responsive to these comments:**
I158-52, I301-15, 8032-297, 8032-97, 8032-98

These comments point to insufficiency in the cumulative effects analysis for water resources, including the issue of water shortages due to overallocation, drought, and future meteorological trends. The DEIS addresses these issues in several sections, including "Ongoing Climatic Trends Affecting Water Balance" (DEIS, p. 311); "Cumulative Effects – East Salt River Valley Water Supplies" (DEIS, p. 341); "Cumulative Effects – Recharge and Recovery Credits" (DEIS, p. 341); and "Cumulative Effects – Regional Water Supplies" (DEIS, p. 342). We concluded, "Cumulatively, the total demand on the groundwater resources in the East Salt River valley is substantial and could be greater than the estimated amount of physically available groundwater" (DEIS, p. 342). We reached similar conclusions in the FEIS; however, the cumulative effects analysis (chapter 4 of the FEIS) was expanded to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

One comment notes that impacts to GDEs were not analyzed for the Desert Wellfield. This is a correct statement. As noted in the DEIS, "Current depths to groundwater in the vicinity of the Desert Wellfield range from 400 to 600 feet below ground surface" (DEIS, p. 310). Unlike for the mine site, there are no GDEs that access water this deep.

| Comment response: WT21_A | |
|---|---|
| Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 8032-99 | Page 1 of 1 |

**Responsive to these comments:**
8032-99

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment specifically notes the Phoenix Active Management Area goals. Discussion of these goals was added to the FEIS in the expanded cumulative effects analysis to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

| Comment response: WT21_B | |
|---|---|
| Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 8032-298 | Page 1 of 1 |

**Responsive to these comments:**
8032-298

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment specifically requests that the CAP-NIA water reallocation for Resolution Copper be included as a connected action in the EIS.

The CAP-NIA reallocation has been appropriately analyzed under NEPA by the Bureau of Reclamation, a process that began with scoping in November 2015 and that concluded with a signed FONSI on November 8, 2019. As of the publication of the January 2021 rescinded FEIS, the reallocation had not yet taken place; however, on September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for an annual allocation of 2,238 af of CAP-NIA water. In 2022, this allocation was delivered to New Magma Irrigation and Drainage District. Future use of the Resolution Copper CAP allotment remains as disclosed in the DEIS and FEIS: potentially used directly, or recovery of long-term storage credits by pumping from the Desert Wellfield.

In the DEIS, we acknowledged that CAP water may be a future water source but did not assume it would be available and did not incorporate it into the impacts analysis. All necessary makeup water is assumed to be physically removed from the East Salt River valley aquifer in order to avoid underestimating impacts.

We updated this discussion in the FEIS to reflect the advancement of the Bureau of Reclamation process. However, the approach remains the same. Because there are clear concerns over the physical availability of CAP water, regardless of the legal availability to Resolution Copper, we did not assume that this source was physically available. As with the DEIS, all necessary makeup water is assumed to be physically removed from the East Salt River valley aquifer in order to avoid underestimating impacts.

Appendix R

| Comment response: WT21_C Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 30078-46 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30078-46 | |

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment indicates that "the right to use groundwater on other than the land overlying the well is dependent upon the issuance of a permit to transfer water from wells located miles away from the point of production and is inconsistent with the general law of the State of Arizona." This is an incorrect statement.

The Desert Wellfield is located within the Phoenix Active Management Area. As such, the water supply must be appropriately permitted by the ADWR prior to pumping (DEIS, p. 18), and ultimately some form of groundwater right must be obtained before pumping.

The ultimate type of groundwater right includes several options for which use away from the point of extraction is allowable, including Type 2 Non-Irrigation Grandfathered Rights or Type 2 Mineral Extraction Rights.

| Comment response: WT21_D Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 8032-105 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-105 | |

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment indicates that "Resolution Copper's water recharge and storage credits, which are 'not required under Arizona water law' and a 'voluntary measure' (DEIS p. 341) are not a requirement by definition and should not be relied upon at all in any part of the DEIS."

This is indeed the approach we disclosed in the DEIS and continue to use in the FEIS. All necessary makeup water for the mine is assumed to be physically removed from the East Salt River valley aquifer in order to avoid underestimating impacts, with no offsets for any storage or recharge credits. By acquiring these credits, Resolution Copper has theoretically already offset some impacts in the aquifer either by directly recharging water or by preventing groundwater pumping that otherwise would have occurred. Regardless, none of these potential offsets were considered in the DEIS to reduce impacts.

| Comment response: WT23 Reduction of water content in tailings | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 562-8 | |

See response ALT1 for more discussion of the application of filtered tailings to alternatives other than Alternative 4 – Silver King.

One of the key differences between alternatives in the DEIS is the application of different amounts of water removal from the tailings slurry (DEIS, p. 50). All action alternatives use as a basis "thickened tailings" (50 to 70 percent solids), which contain less water than conventional slurry tailings (20 to 50 percent solids). Alternatives 3 and 4 use techniques that reduce water content even further. Alternative 4 uses filtered tailings, which generally represent the least water content possible with the tailings material (85 percent solids).

Appendix R

| Comment response: WT24 | |
|---|---|
| Power use by project | Page 1 of 1 |

**Responsive to these comments:**
122-4, 1235-12, 1301-12, 1301-2, 1454-18, 1544-14, 30143-2 (Emerman2), 30143-3 (Emerman2), 30143-4 (Emerman2), 30143-5 (Emerman2), 8032-295, 8032-296, 8032-301, 910-2

These comments question the power use estimates for the mine. This concern is handled in the most detail in two technical reports (attached to comment letter #8032 as B2 and B3), authored by Dr. S. Emerman.

In general, the comments suggest that the amount and temperature of geothermal water that would be encountered during mining is underestimated or undisclosed by Resolution Copper and therefore that the power requirements to pump the water and cool the mine have been underestimated. See response WT6 for discussion of the geothermal water amount and temperature. As noted there, when taken in the context of the entire project and all available information, the conclusions drawn by Emerman are not valid; neither the groundwater amounts nor the temperatures were unexpected or unanticipated in the design and analysis. The extrapolations of power use based on these erroneous estimates are equally invalid (Garrett 2020c).

Partially in response to these comments, SRP conducted an independent load study for the project and concluded the following: "The total maximum combined load proposed by RC is 273 to 315 MW, which represents 3.7 to 4.3 percent of SRP's 2019 peak demand. SRP is well suited to provide the needed power just as it has done with other large power users across the state. SRP does not see any limitations to serving this load to the Project at the aforementioned sites, presuming the recommended system upgrades are implemented. With these system upgrades, there will be no impact on the neighboring customers as the Project site increases loads as per the estimated load levels" (1898 and Company 2020). Also note that information received since January 2021 using a different estimation technique has modified the anticipated power use, and this updated disclosure has been incorporated into chapter 2 of the FEIS.

| Comment response: WT24_A | |
|---|---|
| Power use by project; with addition for specific comment 1565-3 | Page 1 of 1 |

**Responsive to these comments:**
1565-3

See response WT24 for the response to the topic of power use for the project.

This comment further asserts that the project "uses a tailings plan illegal in many other countries." This appears to be based on an erroneous assumption; see response TS2 for more discussion.

Appendix R

| Comment response: WT25<br>Independent hydrology study | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1074-1, 1185-1, 1206-2, 1210-2, 1301-8, 1406-1, 1407-1, 1539-3, 183-1, 27996-2, 28014-1, 28497-1, 28802-2, 29157-1, 376-2

These comments generally indicate that an independent hydrologic study needs to be conducted in order to analyze impacts from the project.

The professional conclusions and analysis contained in the DEIS and FEIS have been conducted by the independent third-party contractor working for the Forest Service. Conflict-of-interest management is a requirement of the third-party contract, and these issues have been actively managed by the third-party NEPA contractor since the awarding of the contract in 2015. A consolidated description of contracting and conflict-of-interest management activities is contained in the project record (Garrett 2019g).

See also response NEPA29 for specific conflict-of-interest allegations and investigation results.

With respect to hydrologic analysis, in order to inform the analysis being conducted by the independent third-party professionals, the Tonto National Forest also convened a Groundwater Modeling Workgroup (meeting roughly between September 2017 and November 2018) to assess and discuss the mine-site groundwater model prior to the DEIS. Then, the Tonto National Forest convened an expanded Water Resources Workgroup (meeting roughly between January 2020 and July 2020) to discuss comments received on the DEIS and additional analysis for the FEIS. These workgroups are described in detail in several memoranda in the project record (BGC Engineering USA Inc. 2020b; Garrett 2020j).

These workgroups were designed to include many professional viewpoints, including Forest Service specialists, the third-party NEPA specialists, agency specialists (including representatives from the EPA, ADEQ, ADWR, Arizona Game and Fish Department, USACE, and ASLD), Resolution Copper and its contractors, and the San Carlos Apache Tribe. Several meetings included participants from the USGS; see response NEPA48 for more discussion about this relationship.

In all cases, the goal of the workgroup was to review the analysis being conducted and have open discussion about technical methodologies, results, and documentation; raise concerns and questions; request clarifications or additional data; and discuss the use and portrayal of analyses in the EIS documents. The group was not intended to reach consensus on all issues. Where professional disagreements remained, the Tonto National Forest committed to documenting these and explaining the agency's decision (BGC Engineering USA Inc. 2020b).

| Comment response: WT25_A<br>Independent hydrologic study; with addition for specific comment 1454-11 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1454-11

See response WT25 for response to the topic of independent hydrologic studies.

This comment states, "No conclusive hydrological study has been conducted for the Oak Flat/Superior, AZ area." This comment is not correct. The analysis disclosed in the DEIS is based on a groundwater model specific to the mine-site area, which in turn is based on extensive geological investigations (see BGC Engineering USA Inc. (2018a) and extensive hydrologic investigations and monitoring (in some cases since 2002). See Newell and Garrett (2018d) for lists of key background documents.

This comment also states that "no geotechnical and hydrological study was done on the Skunk Camp site prior to publication of the DEIS." This comment is not correct. The specific investigations available for the DEIS are discussed in section 3.7.2 (DEIS, pp. 356–357), as are the ramifications of any uncertain or unknown information (DEIS, pp. 350–363). Additional investigations were conducted for the FEIS that are responsive to this comment; see responses WT7 and ALT22 for more details.

Appendix R

| Comment response: WT26 Notification of residents in East Salt River valley; incorrect statements about subsidence | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1544-5, 30065-3, 910-5 | |

These comments ask whether water users in the East Salt River valley have been notified of the water use by the mine. See responses NEPA27 and NEPA30 for more detail on the specific outreach used for the East Salt River valley.

These comments also contain incorrect statements regarding the amount of subsidence. The DEIS acknowledges the potential for ground subsidence but makes no specific predictions. See response WT10 for more details about the subsidence impacts.

| Comment response: WT27 Well identity | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1158-37 | |

This comment states, "The DEIS reports that 'Well DHRES-16 743 is used as a proxy for potential impacts on water supplies and individual wells in the area.' In a search of the ADWR well registry, this well number is not valid."

The name "DHRES-16 743" is a project-specific name assigned by Resolution Copper, not an ADWR well registry identification. The ADWR well registry number for this well is 55-917232 (see Shelley et al. (2016)).

Appendix R

| Comment response: WT28 | |
|---|---|
| NPAG/PAG subaqueous deposition | Page 1 of 1 |

**Responsive to these comments:**
1448-3, 30140-1 (Maest), 30140-10 (Maest), 30140-2 (Maest), 30140-3 (Maest), 30140-4 (Maest), 8032-114, 8032-115, 8032-116

These comments concern the effectiveness of subaqueous deposition, particularly of the PAG tailings, to control acid generation.

The comments indicate that subaqueous deposition is the "lone proposed mitigation measure for PAG tailings." This is incorrect. THE DEIS notes numerous control measures for PAG tailings, which vary by alternative. These include full lining of the PAG cells (Alternatives 2, 3, 5, and 6), full downstream embankments for the PAG cells (Alternatives 5 and 6), and extensive seepage collection systems (all alternatives) (DEIS, pp. 381–417).

The comments state that no testing was conducted on the efficacy of submerging PAG tailings to prevent acid generation. This is incorrect. Column tests were conducted by Resolution Copper that measured the rate of oxygen consumption by tailings. Tests were run with variable percentages of the pyritic tailings submerged in water, up to full saturation, and the results clearly demonstrate the expected: as greater amounts of pyritic tailings are submerged, the rate of oxygen consumption—and therefore sulfide mineral oxidation—decreases (Duke HydroChem LLC 2016).

The question of the efficacy of using subaqueous deposition to control the acid generation of PAG tailings was brought forward to the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Upon our request, additional information was submitted by Resolution Copper for consideration. The analyses from the NEPA project team on the efficacy of the PAG subaqueous deposition in an arid environment, based in part on this additional information, are found in the project record (Enos 2020; Williamson 2020), and discussion of this issue has been expanded in section 3.7.2 of the FEIS.

The comments also indicate concern that NPAG tailings, which despite predictions may have the potential for acid generation, would not be handled in a similar manner to prevent acid generation. We explored this issue through the Water Resources Workgroup and requested more information from Resolution Copper. The first part of the investigation clarified that while the design of the tailings storage facility is governed by the anticipated split between NPAG and PAG tailings, during operations, geochemical testing would also take place that would verify the actual acid generation potential of the different tailings streams. This includes routine sampling (likely no less than monthly) for whole NPAG tailings, NPAG cyclone overflow and underflow, and PAG tailings. Sampling of the NPAG underflow cells occurs specifically to confirm that they are geochemically suitable for the outermost surface layer of tailings on the embankment slope. If they are not, amendments may be needed (i.e., limestone) prior to concurrent reclamation (Wickham 2020).

The second part of the investigation clarified that the tailings storage facility design incorporated sufficient flexibility to accommodate future changes in the percentage of NPAG/PAG if the reality—as verified through operational sampling—varies from the predictions (KCB Consultants Ltd. 2020a). We added further discussion of this issue to section 3.7.2 of the FEIS.

Appendix R

| Comment response: WT30 | |
|---|---|
| Hydrologic connection to San Carlos Apache Reservation | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 235-18, 30078-40, 30078-41, 58-1, 77-2 |

These comments contain incorrect statements or assumptions regarding the hydrology of the project area.

Comments identify the Salt and Black Rivers and their watersheds as not being analyzed. None of the project surface water or groundwater impacts extend into any of these drainages.

We disclosed that all potential surface water impacts associated with the East Plant Site, West Plant Site, tailings storage facility for Alternatives 2, 3, and 4, and subsidence area are to stormflows in Queen Creek, which ultimately joins the Gila River downstream. Similarly, all potential surface water impacts associated with the tailings storage facility for Alternatives 5 and 6 are to stormflows to the Gila River, well downstream of the San Carlos Apache Tribal boundary. We provided a figure showing the surface water quantity analysis area and potentially impacted surface watersheds in section 3.7.3 (DEIS, p. 423).

Groundwater drawdown from the mine similarly does not impact tributaries to the Salt River, such as Pinto Creek. The groundwater quantity analysis area is shown in section 3.7.1 (DEIS, p. 297) and does not extend across the groundwater basin boundary to Pinto Creek; the anticipated drawdown similarly is shown in section 3.7.1 (DEIS, p. 302) and does not reach to Pinto Creek.

Groundwater impacts would not be anticipated to extend to the San Carlos Apache Tribal lands or to the town of Miami, as indicated in comments. Aside from the distance from any anticipated drawdown impacts (DEIS, p. 302), there are substantial hydrologic barriers separating project components from these areas, including the Pinal Mountains and Mescal Mountains.

After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts. We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands. An analysis of this potential has now been added to section 3.7.1 of the FEIS.

Appendix R

| Comment response: WT31 | |
|---|---|
| Baseline trends | Page 1 of 1 |

**Responsive to these comments:**
290-1

This comment identifies changes in hydrologic conditions for GDEs that are not adequately captured in the affected environment description in the DEIS, specifically, the reported reductions in flow and drying of water sources.

These potential effects were specifically analyzed for the DEIS. The ongoing pumping operations by Resolution Copper to dewater mine infrastructure began in 2009 (DEIS, p. 312). The concern that this pumping might already be affecting water sources, and thus changing the baseline conditions, was brought forward during scoping and analyzed in section 3.7.1. The analysis in section 3.7.1 concludes, "Most hydrologic indicators show no significant change over time in Devil's Canyon (Garrett 2019f). A number of other water sources have been monitored on Oak Flat and show seasonal drying, but these locations have been demonstrated to be disconnected from the Apache Leap Tuff aquifer, relying instead on localized precipitation (Garrett 2018e; Montgomery and Associates Inc. 2017a)" (DEIS, p. 312).

We statistically analyzed any available hydrologic time series data to identify downward trends (see Garrett (2019f)). This included baseflow calculations at four locations in Devil's Canyon (time period from roughly 2003 to 2015); manual flow measurements collected at four springs in Devil's Canyon (time period from roughly 2003 to 2017); and saturated length measurements collected in Devil's Canyon (time period from 2002 to 2013). The memo concludes (using a $P$ value of 0.05 for statistical significance), "Of the thirteen data sets analyzed, none show a statistically significant trend either upward or downward. The saturated length of Devil's Canyon would be significant if the threshold were adjusted slightly higher (p-value of 0.10), in which case it shows an upward trend, not a downward trend. Overall, none of the direct field measurements taken between roughly 2003 and 2017 of hydrologic parameters along Devil's Canyon suggest that dewatering pumping is having a negative effect on natural stream or spring flow" (Garrett 2019f:5).

In the same process memorandum (Garrett 2019f), we reviewed monitoring of 14 sites on Oak Flat, observed over three seasons between March and September 2017. From these data we concluded, "While the results were useful for determining the hydrology and seasonal dynamics of these sites, the period of monitoring is insufficient to detect any long-term trends that may be associated with ongoing pumping. The most that can be said is that pumping (which restarted in 2009) has not resulted in complete drying of the 14 locations monitored, and that the reliance on storage of precipitation in near surface alluvial veneers suggests that pumping would not affect these locations" (Garrett 2019f:5).

| Comment response: WT32 | |
|---|---|
| Mounding below tailings storage facility and exposure at surface | Page 1 of 1 |

**Responsive to these comments:**
28449-49, 524-11

Several comments raised the possibility of seepage from the tailings storage facility causing a rise in groundwater levels that would potentially create a new surface water exposure where only ephemeral channels exist now, in Queen Creek (Alternatives 2, 3, and 4), Donnelly Wash (Alternative 5), or Dripping Spring Wash (Alternative 6).

This possibility was explored during the April 2020 meeting of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). The same question had been raised by a cooperating agency prior to the release of the DEIS, and a white paper documenting the estimates of anticipated mounding was provided to the workgroup for consideration (Morey 2020c). This analysis indicates that the groundwater levels are not anticipated to rise to the point of creating new surface exposure of tailings seepage.

With respect to the preferred alternative, the suggestion was made in the Water Resources Workgroup to confirm this analysis using the refined groundwater flow model being conducted for the preferred alternative (see also response WT7 for more details on the refined Skunk Camp water quality analysis). The results of the refined water quality analysis were submitted in July 2020 and confirm that groundwater levels are not anticipated to approach ground surface downstream of the preferred alternative tailings storage facility (Montgomery and Associates Inc. 2020c).

We added further discussion of this issue to section 3.7.2 of the FEIS.

Appendix R

| Comment response: WT33 | |
|---|---|
| Specific suggested technique for estimating changes in geomorphology | Page 1 of 1 |

**Responsive to these comments:**
28449-55

DEIS section 3.7.3 contains an analysis of the potential changes in storm flows caused by the project isolating portions of the watershed, as well as the potential changes in stream geomorphology or sediment movement caused by these changes in storm flows (DEIS, pp. 433–434). This comment suggests employing an alternative or supporting technique that could be used to bolster the analysis of geomorphology.

The possibility of using this technique was explored during the April 2020 meeting of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). After discussion with the workgroup, we further explored the issue (Garrett 2020a), including review of a new analysis conducted by Resolution Copper using the proposed technique, specifically for the preferred alternative (JE Fuller 2020). This new analysis concluded that the reduction in mean annual discharge caused by the proposed tailings storage facility would not adversely impact the overall channel pattern downstream of the facility. We agreed with this conclusion. We added further discussion of this issue to section 3.7.3 of the FEIS.

| Comment response: WT35 | |
|---|---|
| Revised stormwater quality analysis | Page 1 of 1 |

**Responsive to these comments:**
1335-1, 1448-5, 30140-13 (Maest), 30140-14 (Maest), 30140-7 (Maest), 8032-113, 8032-119

We included analysis of surface water quality impacts in DEIS section 3.7.2, which can be caused by runoff contacting facilities, including tailings, or by seepage from the tailings storage facility entering downstream surface waters. The DEIS primarily focused on water quality impacts caused by seepage from the tailings storage facility. With respect to water quality of stormwater runoff, we analyzed the stormwater controls during construction, operations, and closure (DEIS, pp. 379–380); estimated the potential stormwater quality (DEIS, p. 381); and assessed the potential for discharge of stormwater (DEIS, pp. 379–380). We concluded, "At no point during construction, operation, closure, or post-closure would stormwater coming into contact with tailings, ore, or processing areas be allowed to discharge downstream. After closure, precipitation falling on the tailings facilities would interact with the soil cover, not tailings" (DEIS, p. 380).

These comments express concern that the assumption that stormwater would never be released is not realistic and that stormwater in contact with tailings could be anticipated to be released under some extreme conditions or failure of controls. We explored this question with the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). An initial discussion of the workgroup in February 2020 determined that indeed there are scenarios during operations under which the tailings storage facility would allow discharge of stormwater that had contacted tailings (Johnson 2020). We requested that Resolution Copper conduct an analysis of the conditions under which this would occur and the potential quality of that released stormwater. The analysis was conducted and further discussed with the workgroup in June 2020 (Morey 2020e) and subsequently submitted to and reviewed by the NEPA project team (Resolution Copper 2020f).

We modified section 3.7.2 of the FEIS to include analysis of the conditions under which stormwater would be released during operations, the estimated quality of that stormwater, and the potential impacts resulting from the stormwater release.

Appendix R

| Comment response: WT36 Subsidence lake analysis | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1321-3, 1342-2, 1448-8, 30140-6 (Maest), 8032-112, 8032-117, 8032-176, 8032-92, 8032-93

We analyzed the potential for a lake to develop in the subsidence crater, after closure of the mine (DEIS, pp. 375–379). We acknowledged in the DEIS that several conditions exist that suggest a lake could form, including the presence of a subsidence crater estimated to be 800 to 1,100 feet deep, recovering groundwater levels in the deep groundwater system after dewatering ends, and a block-cave zone that would hydraulically connect the deep groundwater system to the surface. In the DEIS we compared the elevations of the subsidence crater with the modeled elevations of groundwater during recovery and found that even after a period of 1,000 years they did not intersect. The DEIS concludes, "Ultimately the Forest Service determined that the presence of a subsidence lake was speculative and not reasonably foreseeable, and as such it would therefore be inappropriate to analyze in the EIS" (DEIS, p. 376).

These comments disagree with this conclusion, indicating that creation of the subsidence lake is inevitable.

This issue was discussed with the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). The discussion took place during the January 2020 meeting (Morey 2020a), and the general conclusions reached during that meeting were recapped for the Workgroup in February 2020 as follows: "We need to modify the language we use to describe the potential for a crater lake ('remote and speculative'); however, the analysis of the impacts of a subsidence lake >1000 years in the future remains inappropriate" (Johnson 2020).

The suggested change in language was based on an acknowledgment that there are trends present that if they persisted over a long period of time (greater than 1,000 years), they could indeed form a subsidence lake. In this sense, such a lake could be considered "reasonably foreseeable." The terms "remote and speculative" were determined to be more descriptive of the situation, which would take place at a point so far in the future that it prevents a viable analysis. We modified the discussion in section 3.7.2 to reflect this language.

One comment raised the argument that the groundwater levels were likely to return to pre-mining levels, and this would create a subsidence lake. The workgroup explored this issue, along with many other groundwater modeling issues, in June and July 2020 (Morey 2020d, 2020e). We concluded that this assumption is fundamentally incorrect. The changes wrought to the aquifer by the block caving fundamentally change the hydrologic and geological framework of the system. A return to pre-mining hydrologic conditions is not anticipated, and a return to pre-mining groundwater levels is not inevitable.

Similar comments also raised the issue of groundwater modeling uncertainty, noting that while a range of values was given for the ultimate depth of the subsidence crater, a similar range of values was not given for the ultimate modeled groundwater levels, and noting that doing so would better reflect the uncertainty inherent in the modeling analysis. We requested this output from Resolution Copper and incorporated it into the analysis.

We revised the subsidence lake analysis in section 3.7.2 of the FEIS to incorporate the uncertainty inherent in the groundwater model. The conclusions remain similar to those stated in the DEIS.

Appendix R

| Comment response: WT37 | |
|---|---|
| Comments concerning water quality predictions for the block-cave zone | Page 1 of 2 |

| Responsive to these comments: |
|---|
| 30140-11 (Maest), 30140-12 (Maest), 30140-15 (Maest), 30140-5 (Maest), 30140-8 (Maest), 524-8, 8032-111, 8032-118 |

These comments raise concerns over the predictions in the DEIS for potentially poor water quality in the block-cave zone after closure.

We presented two different modeling approaches for estimating potential water quality in the block-cave zone (DEIS, pp. 349–352). The comments received on these modeling approaches were brought forward to the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Discussion in March 2020 (Loomis 2020) clarified the use of these two models and whether they are appropriate for estimating post-closure water quality in the block-cave zone. It became clear that the two models shown in the DEIS (table 3.7.2-1, p. 349) were misconstrued by the NEPA team. These two models were both created for a specific purpose: to estimate the load of pollutants entering the West Plant Site from the East Plant Site. These models largely calculate the same chemical load, but differ in how that load is delivered to the West Plant Site. The earlier "Eary" model assumed that all oxidation products associated with the fractured ore were rinsed into the sump water. The later "Hatch" model assumed that all oxidation products associated with the fractured ore remain with the ore and do not report to the sump, but are instead retained in ore moisture. In both cases, the mass of oxidation products is consistent and enters the West Plant Site, ultimately becoming one source contributing to elevated metals in the tailings seepage.

Neither of these models is a proper analog for the physical and chemical actions that take place when the block-cave zone is reflooded after closure. Discussion of these models was removed from section 3.7.2 of the FEIS.

We replaced these inappropriate estimates with different and more appropriate methods of estimating post-closure block-cave water quality impacts in the FEIS (Williamson 2020). Physically, oxygen is anticipated to be present in the unsaturated block-cave zone, but in limited quantities. Some oxygen arrives in groundwater that must travel through overlying caved ore, either from the surrounding aquifer or percolating from the subsidence crater at the surface. At the end of mining, oxygen would also be present within the fractured mineralized ore around the draw points, where ventilation actively replenishes oxygen to the extent air flow can reach into the fractured ore body (estimated to be from tens to hundreds of feet, but overall not known with any certainty).

Conceptually, what happens to water quality upon closure is described succinctly in Borden (2014) (also appendix R of the GPO): "The first flush of water which accumulates in the underground workings will release any residual sulfide oxidation products into solution. The first water which accumulates at the production level is thus likely to have the poorest quality within the caved zone. Subsequent reflood waters which accumulate above this in the mineralized rock zone will have progressively better water quality as saturation progresses upward."

Appendix R

| Comment response: WT37<br>Comments concerning water quality predictions for the block-cave zone | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
30140-11 (Maest), 30140-12 (Maest), 30140-15 (Maest), 30140-5 (Maest), 30140-8 (Maest), 524-8, 8032-111, 8032-118

At closure, both ventilation and pumping systems are turned off. As the groundwater level recovers and rises, it submerges ore and effectively halts oxidation. This is the same process by which acid generation will be controlled in the PAG tailings cell, by maintaining saturation and a water cap (see response WT28).

The above description, based on the anticipated physical and chemical effects, indicates that oxidation would not persist in the block-cave zone after reflooding, but does not provide any reliable estimate of post-closure water quality. To that end, Resolution Copper also conducted a number of geochemical tests intended to specifically address the potential flooding of the block-cave zone.

Resolution Copper conducted a number of humidity cell tests to characterize the geochemistry and acid generation potential of mined rock. These are known as "kinetic" tests, as they track the changes over time in the quality of water in contact with ore or rock samples. Humidity cell tests are typically run for at least 20 weeks, and many are run longer.

Resolution Copper converted 14 of the humidity cell tests into saturated column tests upon completion, in order to analyze how reflooding might affect water quality. The saturated column tests were run for 12 weeks (MWH Americas Inc. 2013). The results for all 14 saturated column tests support the conceptual description that the initial reflooding removes most of the oxidation products from oxygenated fractured ore (primarily around the draw points), and then gradually water quality improves. The concentrations from the first week of the saturated column test (initial reflooding) are substantially greater than the last week of the humidity cell test, and then concentrations substantially decline by the final week of the saturated column test. Using sulfate as an example, the median sulfate concentration at the end of the humidity cell tests is 360 mg/L. Immediately after reflooding, the median sulfate concentration increases to 1,024 mg/L. By completion of the saturated column test after 12 weeks, the median sulfate concentration has fallen to 42 mg/L. Concentrations of all of the constituents of concern followed a similar pattern. Furthermore, the final concentrations from the saturated column tests are less than Arizona numeric aquifer water quality standards, suggesting that long-term water quality in the block-cave zone after closure may not represent an environmental concern, though uncertainty still exists. A discussion of the anticipated physical and chemical effects of reflooding of the block-cave zone after closure, along with the results of the saturated column tests, was added to section 3.7.2 of the FEIS.

The comments also focus on the uncertainty of these estimates. The primary uncertainty lies with the amount of oxygen that can infiltrate the block-cave zone, both during active ventilation and afterward. Regardless of the uncertainty, we also explored whether there are any foreseeable points at which this potentially poor-quality water would be exposed to the environment (DEIS, pp. 375–379). Neither development of a subsidence crater nor exposure through other pathways is anticipated.

In March 2020, the Water Resources Workgroup also further explored the potential for exposure of poor-quality water within the block cave. We requested additional information from Resolution Copper (Meza-Cuadra and Pantano 2020), which confirmed that hydraulic gradients will persist for centuries that prevent movement of any potentially poor-quality water—which may not exist based on the saturated column tests—out of the block-cave zone. Further effort was also put into assessing the potential for subsidence lake development (see response WT36). The discussion of potential exposure pathways, including subsidence lake development, mine workings or natural caves, and lateral movement of groundwater, was updated in section 3.7.2 of the FEIS.

Appendix R

| **Comment response: WT39** | |
| Request for revised DEIS, based on geochemistry analysis concerns | Page 1 of 1 |

| **Responsive to these comments:** |
| 8032-120 |

This comment points to perceived uncertainty with respect to many of the geochemical analyses, including the efficacy of managing PAG tailings using subaqueous deposition, the quality of water in the block-cave zone, the formation of a subsidence lake, and water use, and requests that a revised DEIS be completed.

Other detailed comments were received concerning all of the items listed above. In each case, we undertook additional investigation and analysis in order to consider the comment, much of it under the auspices of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS): for efficacy of PAG tailings management, see response WT28; for block-cave water quality, see response WT37; for formation of the subsidence lake, see response WT36; for water use, see response WT1.

For many of these points, the additional analysis conducted has led to refined presentations and discussions in the FEIS. However, none of the items mentioned have led us to fundamentally change our conclusions contained in the DEIS and FEIS.

The comment is not correct that refined analysis in response to comments should result in a revised DEIS rather than an FEIS. This contradicts the NEPA process; modifications are anticipated to be made between the DEIS and FEIS in response to public comments.

| **Comment response: WT41** | |
| Criticism of analysis method | Page 1 of 1 |

| **Responsive to these comments:** |
| 30140-9 (Maest), 8032-110 |

This comment raises concerns about the specific tests used to estimate stormwater quality disclosed in the DEIS.

One specific concern is the use of an older version of the Sobek method. We investigated this concern and determined that "the use of the original or modified Sobek method does not functionally affect the outcome of characterization to any meaningful extent" (Williamson 2020:2).

Another concern raised was about the use of the synthetic precipitation leaching procedure tests to estimate stormwater quality. Synthetic precipitation leaching procedure results are shown as one of three methods for estimating potential stormwater quality (DEIS, pp. 381–383). However, as described in the text, we assumed that no stormwater was anticipated to be released and that none of these tests were pertinent to the DEIS analysis. We revised our approach to disclosing potential stormwater releases in section 3.7.2 of the FEIS; see response WT35 for more details.

Appendix R

| Comment response: WT42 Draining of Apache Leap Tuff | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30078-14, 8032-266

These comments suggest that as a result of the block cave, "all groundwater in the [Apache Leap Tuff], and underlying geologic structure affected by block cave mine subsidence and fracturing will permanently drain to the mine."

The general concept and mechanisms in the comments are correct, as described in section 3.7.1:

> "The block-caving conducted to remove the ore body would unavoidably result in fracturing and subsidence of overlying rocks. These effects would propagate upward until reaching the ground surface approximately 6 years after block-caving begins (Garza-Cruz and Pierce 2017). It is estimated that the subsidence area that would develop at the surface would be approximately 800 to 1,100 feet deep (see Section 3.2, Geology, Minerals, and Subsidence). Fracturing and subsidence of rock units would extend from the ore body to the surface. This includes fracturing of the Whitetail Conglomerate that forms a barrier between the deep groundwater system and the Apache Leap Tuff aquifer. When the Whitetail Conglomerate fractures and subsides, a hydraulic connection is created between all aquifers. Effects of dewatering from the deep groundwater system would extend to the Apache Leap Tuff aquifer at this time." (DEIS, p. 328)

While the mechanism as stated in the comments is generally correct, it does not mean that "all" groundwater in the Apache Leap Tuff aquifer drains into the mine. The statement in the comments is an overly simplistic representation of a complex system. Identifying how much groundwater would drain from the Apache Leap Tuff, how fast it would drain, and how long it would take to recover after cessation of pumping requires sophisticated tools to model the complex hydrologic properties of the groundwater system. A specific example of such complexity is the effect of the faults that bound the Resolution Graben; these faults have demonstrably prevented propagation of dewatering impacts of the deep groundwater system (DEIS, pp. 304–309). We determined that the numeric groundwater model was the appropriate tool with which to assess this system based on several specific factors listed in section 3.7.1 (DEIS, p. 295). The results of the groundwater model show that the Apache Leap Tuff aquifer does not completely drain, that drawdown varies over time and space (see DEIS, pp. 317–334 and appendix H), and that recovery eventually also happens (DEIS, pp. 333, 375–378).

Appendix R

| Comment response: WT43 Generic concerns about water quality | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1043-1, 1180-4, 1237-3, 1276-3, 1368-1, 27436-1, 286-1, 555-1, 555-10, 555-28, 555-4, 56-1, 63-1, 82-2, 837-1, 839-2, 844-1

These comments express concerns about potential changes to water quality as a result of the mine.

In the DEIS, we disclosed whether there would be potential impacts to water quality in three areas: (1) oxidation and subsequent acid drainage of mineralized ore in the block-cave zone after closure; (2) seepage from the tailings storage facility that enters groundwater and eventually perennial surface water; and (3) the potential for stormwater runoff to contact tailings or processing facilities.

The analysis of block-cave water quality, including potential exposure routes, can be found in section 3.7.2 (DEIS, pp. 375–379). See also response WT37 regarding changes to this analysis in the FEIS in response to public comments.

The analysis of stormwater quality can be found in section 3.7.2 (DEIS, pp. 379–381). See also response WT35 regarding changes to this analysis in the FEIS in response to public comments.

The analysis of the potential for seepage from the tailings storage facility to enter groundwater and surface water can be found in section 3.7.2 (DEIS, pp. 381–419). This section includes analysis of the potential water quality of seepage, the design and efficacy of seepage controls, predictions of changes in groundwater quality resulting from seepage, and predictions of changes in surface water quality in downstream perennial waters resulting from seepage.

Comments also are concerned with the potential impacts of water quality on wildlife species. This analysis can be found in section 3.8 (DEIS, pp. 460–463).

Specific comments were made on the potential to impact community water supplies, including Queen Valley, and Arizona Water Company wells serving Apache Junction, Superior, Winkelman, and Pinal Valley.

The issue of the hydrologic connection of Queen Valley with Queen Creek and the potential for impacts from tailings seepage associated with Alternatives 2, 3, and 4 was discussed as part of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Analysis was added to section 3.7.2 of the FEIS to further evaluate potential impacts on water resources in Queen Valley. See response WT59 for more detailed discussion of this issue.

Analysis was also added to section 3.7.2 of the FEIS to further discuss the potential impacts to community water systems, including the water systems of Apache Junction, Superior, Winkelman, and Pinal Valley. The Arizona Water Company supply wells for Superior, Pinal Valley, and Apache Junction are located in the East Salt River valley. No water quality changes are anticipated to result from the mine in these areas.

The DEIS disclosed the effects of a potential tailings facility failure in section 3.10.1. This included potential impacts to public water supplies, which vary by alternative but do include these service areas (DEIS, pp. 531, 544, 547, 548, 550, 552). While these impacts were disclosed in the DEIS and have high consequences, the probability of their occurring is low and minimized by required adherence to Federal and Arizona design standards and by applicant-committed environmental protection measures. See response TS1 for more details on the process undertaken to minimize risks in the tailings facility design.

The Arizona Water Company Winkelman system is located on the Gila River downstream from Alternative 6 – Skunk Camp. Seepage from the tailings storage facility is anticipated to enter the aquifer along Dripping Spring Wash and eventually to enter the Gila River. The analysis of impacts to water quality in the Gila River is found in section 3.7.2 (DEIS, pp. 411–417). This analysis was refined in the FEIS. For both the DEIS and FEIS, we disclose that no numeric surface water quality standards would be exceeded in the Gila River, and increases of constituents without numeric standards (total dissolved solids, sulfate) would be negligible.

Appendix R

| Comment response: WT44 Impaired waters analysis, including Arizona Pollutant Discharge Elimination System (AZPDES) discharge permit | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-32, 30075-35, 30075-38, 30075-42, 30075-43, 8031-60, 8031-61

These comments contain criticisms of perceived errors in the analysis of where discharges from the project may impact waters listed as impaired by the State of Arizona. Many of these comments are based on an incorrect assessment of where discharges would occur from the project.

Discharges associated with the project as analyzed in the DEIS were restricted to seepage from the tailings storage facility entering groundwater and then entering surface water some distance downstream. The impaired waters selected and described in section 3.7.2 (DEIS, pp. 369–370) were appropriately chosen as those waters downstream of the various tailings storage facility alternative locations: Queen Creek from the Superior Wastewater Treatment Plant to Whitlow Ranch Dam, impaired for copper, which would be potentially impacted by Alternative 2 (DEIS, p. 392), Alternative 3 (DEIS, p. 398), and Alternative 4 (DEIS, pp. 404–405); and the Gila River from the San Pedro River to Mineral Creek, impaired for suspended sediment, which would be potentially impacted by Alternative 6 (DEIS, p. 417). Comments identified upper Queen Creek and Arnett Creek as appropriate for analysis; however, these do not have the potential to receive potential discharge from tailings storage facilities.

Comments also identify an existing Arizona Pollutant Discharge Elimination System (AZPDES) discharge permit that Resolution Copper holds for the West Plant Site, which involves two outfalls that could indeed affect the upper Queen Creek reach. These are permitted for stormwater discharges over the 100-year, 24-hour storm and for discharge of treated effluent from the water treatment plant. These discharges do not occur regularly. They have not occurred at the site since Resolution Copper began operating at the West Plant Site in 2004, nor are these discharges proposed as part of the project. Rather, all treated water is anticipated to be required for use in processing. Further discussion of the status and use of the AZPDES permits has been added to section 3.7.2; however, the analysis of discharges under these permits and their impact on impaired waters remains inappropriate and was not included in the FEIS.

Note that since the January 2021 Rescinded FEIS was published, Resolution Copper sought and received renewal of that AZPDES permit. However, in November 2022, a decision was issued in an ongoing appeal, and the court found that the ADEQ could not renew the permit because Resolution Copper's dewatering discharge from Shaft 10 represented a new source. Further, the court noted that ADEQ would need to finalize standards on Queen Creek before a similar AZPDES permit could be issued. Permitting of any current or future discharges at these locations under the AZPDES program remains unresolved at this time. As noted above, however, these discharges are not anticipated as part of the proposed project, as all water is anticipated to be required for use in processing.

Discharge of stormwater was not anticipated or analyzed in the DEIS, as described in section 3.7.2 (DEIS, pp. 379–381). This analysis was revised in section 3.7.2 of the FEIS, including the potential impacts on impaired waters; see response WT35 for more details.

Appendix R

| Comment response: WT45 | |
|---|---|
| Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 1 of 7 |
| **Responsive to these comments:** 8031-59 | |

These comments are specific to the groundwater model completed for the mine site. Detailed comments related to this topic were submitted with comment letter #8032 in the form of a report from Dr. B. Prucha titled "Review of Hydrologic Impacts In the Draft Environmental Impact Statement Resolution Copper Project and Land Exchange August 2019."

With respect to the hydrologic analysis and the groundwater model, in order to inform the analysis being conducted by the independent third-party professionals, we convened a Groundwater Modeling Workgroup (meeting roughly between September 2017 and November 2018) to assess and discuss the mine-site groundwater model prior to the DEIS. This was followed by an expanded Water Resources Workgroup (meeting roughly between January 2020 and July 2020) to discuss comments received on the DEIS and additional analysis for the FEIS. These workgroups are described in detail in several memoranda in the project record (BGC Engineering USA Inc. 2020b; Garrett 2020j).

These workgroups were designed to include many professional viewpoints, including Forest Service specialists, the third-party NEPA specialists, cooperating agency specialists (including representatives from the EPA, ADEQ, ADWR, Arizona Game and Fish Department, USACE, and ASLD), Resolution Copper and its contractors, and specialists representing other stakeholders such as the San Carlos Apache Tribe.

The general goal of the workgroup was to review the modeling analysis being conducted and have open discussion about technical methodologies, results, and documentation; raise concerns and questions; request clarifications or additional data from the modeling contractors; and discuss the use and portrayal of the model in the EIS documents. The group was not convened for the purpose of reaching consensus on all topics considered. We did commit to documenting any professional disagreement and the Forest Service course of action, along with a clear rationale for why a different course was taken (BGC Engineering USA Inc. 2020b).

The detailed modeling comments by Dr. Prucha were brought forward and reviewed by the Water Resources Workgroup between January 2020 and July 2020. Specific input in response to these comments was obtained from the NEPA third-party groundwater modelers and Resolution Copper's modeling contractors. This included requests for additional output and analyses (see Garrett (2020j)). The full details of the discussion and conclusions specific to the groundwater modeling comments are contained in the project record (Garrett 2020e).

Appendix R

| Comment response: WT45 | |
|---|---|
| Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 2 of 7 |

**Responsive to these comments:**
8031-59

Ultimately, Dr. Prucha's report was considered as 15 separate issues:

1. Modeling process, characterization, conceptualization
2. Model code selection
3. Groundwater-dependent ecosystems (GDEs)
4. Baseline conditions
5. Decisions about use of model output (200 years, 10 feet)
6. Skunk Camp modeling
7. Surface water/groundwater
8. Choice of calibration wells and targets
9. Calibration
10. Uncertainty analysis
11. Geothermal effects
12. Subsidence crater lake analysis
13. Subsidence effects in the model
14. Desert Wellfield model
15. Inappropriate modeling choices for faults, recharge, evapotranspiration (ET), and boundary conditions

A summary of the comments and discretionary actions that we made is provided below; see Garrett (2020e) for more details.

1. Modeling process, characterization, conceptualization

These comments raised concerns that the overall modeling process did not follow industry standards, including in the characterization and conceptualization of the groundwater system. The NEPA team determined the following: (1) industry-standard processes were followed and are clearly documented in the project record (BGC Engineering USA Inc. 2018d:appendix A); (2) specific questions/issues were appropriately considered and documented prior to modeling; (3) the conceptualization of the groundwater system incorporated substantial data collection, the field efforts included feedback loops to identify and fill data gaps, and, ultimately, these efforts resulted in an adequate basis for modeling; (4) alternative conceptual models had been appropriately considered and incorporated into the modeling analysis; and (5) the aquifer test data set was substantial and adequate for supporting the model characterization. The NEPA team identified some project record material that required updating, but no changes to the modeling approach or FEIS text were warranted based on these comments.

Appendix R

| Comment response: WT45 | |
|---|---|
| Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 3 of 7 |
| **Responsive to these comments:**<br>8031-59 | |

### 2. Model code selection

These comments raised concerns that the model code selection was not fully vetted or that the wrong model code was used. The NEPA team determined the following: (1) the code was selected for specific reasons; (2) the model code selection was appropriate (MODFLOW-SURFACT), and the appropriateness was a specific topic of discussion in the Groundwater Modeling Workgroup; (3) the rationale for selection was appropriately documented; and (4) the specific alternative model codes identified in the comments do not override the specific reasons why MODFLOW-SURFACT was selected and approved in the first place. The NEPA team recognized that additional text was needed to augment the description of the model code selection and criteria; this text was added to section 3.7.1 of the FEIS.

### 3. Groundwater-dependent ecosystems

As part of the Groundwater Modeling Workgroup, any springs, streams, or other potential GDEs were evaluated for the most likely source of water; the intent of this evaluation was to identify those GDEs connected to the regional aquifers that would be impacted by mine-related drawdown. These comments express disagreement with the conclusions reached, characterizing several of the GDE determinations used in the DEIS as "unconvincing." The NEPA team determined that these comments contain errors and contain little specificity for why the GDE determinations were said to be lacking in light of the substantial lines of evidence brought forward by the NEPA team to evaluate the GDEs. The GDE evaluations used for the DEIS (Garrett 2018e) were based on multiple lines of evidence, with a clear methodology and framework identified for how each line of evidence would be evaluated. Given the lack of specificity in these comments, the NEPA team did not identify any changes that were necessary to the approach, the project record, or the FEIS.

### 4. Baseline conditions

These comments criticize the choice of baseline conditions used for the model and NEPA analysis, particularly in light of the mine pumping that is currently ongoing. The decision regarding which baseline conditions were appropriate for both the groundwater model and the NEPA analysis was the subject of specific and lengthy discussions prior to the preparation of the DEIS, including Groundwater Modeling Workgroup discussions. Full consensus was not reached. The rationale for our ultimate decision on the appropriate baseline conditions has been clearly articulated in the EIS (DEIS, pp. 299–300) and in the project record (see Garrett (2018d)); dissenting opinions have been fully articulated and considered, as well (see BGC Engineering USA Inc. (2018d:section 5.1)). From these comments, we recognized that additional information was needed in the EIS and project record to fully describe the baseline information incorporated into the model; this text was added to section 3.7.1 of the FEIS.

Appendix R

| Comment response: WT45 | |
|---|---|
| Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 4 of 7 |

**Responsive to these comments:**
8031-59

**5. Decisions on the use of model output, including limiting quantification to 200 years and 10 feet**

Two key decisions that resulted from discussions in the Groundwater Modeling Workgroup were to limit quantification of modeled drawdown to 200 years and 10 feet. These comments describe these decisions as arbitrary and uninformed. As with baseline conditions, the consideration of the limitations of quantified model output and the decision to limit quantification of drawdown to 200 years and 10 feet were the subject of specific and lengthy discussions in the Groundwater Modeling Workgroup prior to the preparation of the DEIS. Full consensus was not reached. The rationale for choosing the model limitations for our analysis approach was clearly articulated in the EIS (DEIS, pp. 300–301). A dissenting opinion from a workgroup member was fully articulated and considered, as well (see BGC Engineering USA Inc. (2018d:section 5.1)). Additionally, the comments incorrectly characterize the analysis contained in the DEIS in three ways. First, the characterization that GDEs were excluded from monitoring because of the 10-foot drawdown threshold is incorrect. As a specific remedy to the uncertainties inherent in modeling, the proposed mitigation and monitoring program includes all GDEs identified with a connection to the regional aquifers, regardless of their anticipated impacts as predicted by the groundwater modeling (DEIS, pp. 301–303, 343–344). Second, impacts beyond 200 years were not ignored. The EIS does include qualitative descriptions of long-term trends beyond 200 years (DEIS, pp. 333–334). Third, impacts less than 10 feet were also not ignored. The EIS graphically shows impacts less than 10 feet (DEIS, appendix L). We determined from these comments that some clarification in the text was required to better explain that these analyses exist; such clarification was added to section 3.7.1 of the FEIS.

**6. Skunk Camp modeling**

These comments state that a conceptual model was not provided for the Alternative 6 water analysis and that the hydrogeologic characterization associated with Alternative 6 is missing. Neither of these assertions is correct: the conceptual model of Alternative 6 was clearly documented in the project record, and the level of hydrogeologic characterization and the effect it has on modeling uncertainty and comparison between alternatives were specifically described in section 3.7.2 (DEIS, pp. 357–361). Between the DEIS and FEIS, we reviewed further field investigations for Alternative 6 that are responsive to these comments. See responses ALT22 and WT7 for further discussion. Text was added to section 3.7.2 to reflect the new information collected.

Appendix R

| Comment response: WT45 | |
|---|---|
| Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 5 of 7 |

| Responsive to these comments: |
|---|
| 8031-59 |

#### 7. Modeling of surface water/groundwater interaction

These comments state that the model code selection was inappropriate and that a fully coupled surface water/groundwater model would have been more appropriate; alternatively, they state that the wrong techniques or packages within the existing model were used to model surface water/groundwater interaction. We determined that the choice of modeling techniques to simulate the physical processes of recharge or discharge in stream channels is fundamentally a professional choice, not an error. As with baseline conditions and use of model output, consideration of the appropriate methods with which to model surface water and groundwater interaction was the subject of specific and lengthy discussions in the Groundwater Modeling Workgroup prior to the preparation of the DEIS. Full consensus was not reached. The rationale and dissenting opinions have been documented in the project record (see BGC Engineering USA Inc. (2018d:section 5.1)). Further, the combined impacts of surface water changes and groundwater drawdown were indeed analyzed together in the DEIS, as requested in the comment, for the one location where both types of impacts occur—Devil's Canyon (DEIS, p. 329). No impacts were ignored as a result of the techniques chosen, even if there were other methods available that could have been used to analyze them. Given the lack of specificity in these comments, the NEPA team did not identify any changes that were necessary to the approach, the project record, or the FEIS.

#### 8. Choice of calibration wells and targets

These comments criticize the choice not to analyze impacts at individual wells but instead to rely on representative wells for key locations where private wells provide water supplies (Top-of-the-World, Superior, Boyce Thompson Arboretum). The rationale for the choice not to analyze individual wells was clearly articulated, with several specific reasons noted (Newell and Garrett 2018d). The alternative choice expressed in these comments would in no way overcome the obstacles that drove the choice made by the NEPA team. Further, the fundamental type of analysis desired in the comment—the ability to analyze the potential impacts at any point in the aquifer—already exists in the DEIS analysis through the drawdown figures (DEIS, pp. 298, 302, 323). Based on these comments, the NEPA team determined that some clarification was necessary to explain how impacts can be assessed using the existing analysis; this clarification was added to section 3.7.1 of the FEIS.

Appendix R

| Comment response: WT45<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 6 of 7 |
|---|---|

**Responsive to these comments:**
8031-59

### 9. Calibration

These comments indicate that the groundwater model calibration process was flawed and inappropriate. We determined the following: (1) the calibration data set covered an appropriate area; (2) the calibrated hydraulic conductivity matches the substantial real-world data collected in the field; (3) the claim made in the comments that water levels represented the sole calibration target was incorrect; (4) the concentration of head targets near the mine site is acknowledged and unavoidable but also is not inappropriate, as this represents the area that would experience the greatest stresses and that has highly sensitive GDEs (Devil's Canyon); and (5) generic references to other data sets are inappropriate, as no other specific data set exists that would have improved upon those used. In this case, we did identify additional model output that was needed in response to these comments; this output was requested, received, and incorporated into the FEIS analysis (Garrett 2020j).

### 10. Uncertainty Analysis

These comments criticize the approach taken to assess uncertainty in the modeling and suggest that such an approach contradicts industry standards. In fact, we concluded that this is a difference of professional opinion that actually is explicitly discussed in modeling guidance, with the approach identified in the comments being suggested in some guidance but expressly disagreed with in other guidance. The comments also criticize the disclosure of the uncertainty analysis that was conducted. We assert that the full suite of model runs (87 in all) was properly disclosed. As a more general concern, the comments suggest that risk and uncertainty were not adequately assessed in the decision-making process or analysis. We found this also to be unsupported, as the uncertainty of the model is explicitly addressed in numerous places in the documentation and clearly was a fundamental part of our Forest Service decision making (see, for instance, "Key Decision on Use of Model Results – Strategies to Address Uncertainty" (DEIS, p. 301)). In response to these comments, we did not identify any changes to he made to our analysis approach or to text in the EIS, but we did identify some additional discussion needed in project record material.

### 11. Geothermal Effects

These comments indicate that geothermal effects were not included in the model, as would be appropriate. In this case, we found that the comments had merit. There is a reasonable rationale for not including geothermal effects, but none of the DEIS or Groundwater Modeling Workgroup documentation captured this rationale. We determined that additional documentation was necessary in response to this comment, though the overall modeling approach remains appropriate and has not been changed.

Appendix R

| Comment response: WT45 Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 7 of 7 |
|---|---|

**Responsive to these comments:**
8031-59

**12. Subsidence crater lake analysis**

One fundamental outcome of our DEIS analysis is that a subsidence crater lake is not likely to develop and therefore would be inappropriate to attempt to analyze. These comments criticize that decision, indicating that development of a subsidence crater lake is reasonably foreseeable and that the methodology we used to determine otherwise was flawed. This topic is discussed in greater detail in response WT36. In response to these comments, we revised the methodology approach used in the DEIS and requested additional model output data in order to execute that revised approach (Garrett 2020j). However, our conclusions in the FEIS based on the revised approach remain the same: the creation of a lake in the subsidence crater is remote and speculative and would be inappropriate to analyze.

**13. Subsidence effects in the model**

These comments indicate that subsidence effects were not explicitly incorporated into the groundwater flow model and that the model was inappropriate for subsidence effects. We found that this to be a correct interpretation; however, the modeling of a change in elevation of land surface above the regional aquifer has no bearing on the outcome of the groundwater model. We also found that the approaches used to assign hydraulic conductivity in the block-cave zone were appropriate and would not lead to any substantial change in model outcomes. Based on these comments, we determined that additional explanation in the project record was necessary to capture how the block-cave zone is modeled.

**14. Desert Wellfield model**

These comments indicate that the separate groundwater model used to predict impacts from the Desert Wellfield was not scrutinized or vetted by the NEPA team, unlike the mine-site groundwater model, which was scrutinized. This is a correct statement. Because the model used for the Desert Wellfield is a standard regulatory model prepared and used by the ADWR, the same level of evaluation was not deemed necessary. These comments were discussed with the Water Resources Workgroup, and ultimately there was consensus that the comments were valid and that some level of vetting of the Desert Wellfield model would be appropriate. This analysis was completed (Walser 2020a), included in the project record, and disclosed in section 3.7.1 of the FEIS.

**15. Inappropriate modeling choices for faults, recharge, evapotranspiration, and boundary conditions**

These comments are extensive and detailed, but in general they criticize various modeling choices made with respect to modeling faults, recharge, evapotranspiration, and setting boundary conditions. We noted that there are many modeling tools and techniques available, and modelers have to make choices about which tools and techniques to use. There are always other tools that could have been used—that the comments raise other possible approaches is a moot point. The appropriate threshold for concern is whether the comments make a valid argument that the existing method is actually in error or that the rationale for using the existing method is incorrect.

The NEPA team reviewed each individual criticism and determined in all cases that adequate information and rationale exist to justify the choices made and that in many cases alternative methods were in fact investigated to determine the potential effect on the model (such as changing fault properties, changing recharge, or changing boundary conditions). In every case, the existing approaches not only are valid options, they have been demonstrated in various ways to accurately predict real-world conditions. Where uncertainty exists, it was determined that the uncertainty had been properly incorporated into the uncertainty analysis and disclosed in the DEIS. We identified some additional output data needed on one topic (springs) and recognized that some additional explanation in the FEIS was needed, but no overall change in modeling approach is warranted.

| Comment response: WT45_A Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30145-1; 8032-70; 8032-68 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30146-1 (Prucha), 8032-68, 8032-70

For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #3 in WT45.

Appendix R

| Comment response: WT45_B<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-2 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-2 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #12 in WT45. | |

| Comment response: WT45_C<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-3; 8032-75 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-3 (Prucha), 8032-75 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #7 and #9 in WT45. | |

| Comment response: WT45_D<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-4 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-4 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #3, #4, #5, and #7 in WT45. | |

| Comment response: WT45_E<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-5 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-5 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #7, and #10 in WT45. | |

| Comment response: WT45_F<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-6 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-6 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #6, #11, and #15 in WT45. | |

| Comment response: WT45_G<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-7 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-7 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #2, #11, and #15 in WT45. | |

Appendix R

| Comment response: WT45_H<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-8; 8032-73 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-8 (Prucha), 8032-73 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #6 in WT45. | |

| Comment response: WT45_I<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-9; 8032-74 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-9 (Prucha), 8032-74 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #5, #7, #8, #12, and #15 in WT45. | |

| Comment response: WT45_J<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-10 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-10 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #4, #7, and #9 in WT45. | |

| Comment response: WT45_K<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-11; 8032-81; 8032-82; 8032-83; 8032-85 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-11 (Prucha), 8032-81, 8032-82, 8032-83, 8032-85 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #9 in WT45. | |

| Comment response: WT45_L<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-12 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-12 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #4, #6, and #9 in WT45. | |

Appendix R

| Comment response: WT45_M<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-13 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-13 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #5, #11, and #13 in WT45. | |

| Comment response: WT45_N<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-14; 8032-91 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-14 (Prucha), 8032-91 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #5, #10, #12, and #13 in WT45. | |

| Comment response: WT45_O<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-15; 8032-95 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-15 (Prucha), 8032-95 | |
| For full response, see response WT45. This concerns raised in this comment are addressed specifically by issues #5, #9, #10, and #14 in WT45. | |

| Comment response: WT45_P<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-72 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-72 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #2, #7, #11, and #15 in WT45. | |

| Comment response: WT45_Q<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-78 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-78 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #10 in WT45. | |

Appendix R

| | |
|---|---|
| **Comment response:** WT45_R<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-71 | Page 1 of 1 |
| **Responsive to these comments:**<br>8032-71 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #2, #7, and #10 in WT45. | |

| | |
|---|---|
| **Comment response:** WT45_S<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-87 | Page 1 of 1 |
| **Responsive to these comments:**<br>8032-87 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #13 in WT45. | |

| | |
|---|---|
| **Comment response:** WT45_T<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-76; 8032-77 | Page 1 of 1 |
| **Responsive to these comments:**<br>8032-76, 8032-77 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #9 and #15 in WT45. | |

| | |
|---|---|
| **Comment response:** WT46<br>Nitrogen analysis | Page 1 of 1 |
| **Responsive to these comments:**<br>524-14 | |
| We added further discussion of the assumptions and calculations used for nitrogen loading in the block-cave zone due to blasting in section 3.7.2 of the FEIS. | |

| | |
|---|---|
| **Comment response:** WT47<br>Chromium analysis | Page 1 of 1 |
| **Responsive to these comments:**<br>524-13 | |
| This comment concerns the appropriate speciation of chromium to include in the water quality analysis. Based on this comment, we modified the approach used in section 3.7.2 of the FEIS to incorporate standards for chromium III and VI where appropriate. | |

Appendix R

| Comment response: WT48 Need for water quality analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1329-4, 30075-33

Potential impacts on surface water and groundwater, as requested in the comment, are disclosed in section 3.7.2, as follows:

- potential stormwater quality (DEIS, pp. 379–383),
- potential impacts of tailings seepage to surface water and groundwater quality (DEIS, pp. 387–390 [Alt 2], pp. 395–397 [Alt 3], pp. 401–404 [Alt 4], pp. 408–410 [Alt 5], pp. 414–416 [Alt 6])
- post-closure ramifications on water quality (DEIS, p. 391 [Alt 2], p. 398 [Alt 3], p. 404 [Alt 4], p. 411 [Alt 5], p. 417 [Alt 6])
- potential impacts on impaired waters (DEIS, p. 392 [Alt 2], p. 398 [Alt 3], pp. 404–405 [Alt 4], p. 411 [Alt 5], p. 417 [Alt 6])
- potential impacts on assimilative capacity (DEIS, p. 392 [Alt 2], p. 398 [Alt 3], p. 405 [Alt 4], p. 411 [Alt 5], p. 417 [Alt 6])
- potential for processing chemicals to persist in tailings seepage (DEIS, pp. 417–418)
- potential for technologically enhanced naturally occurring radioactive materials (DEIS, pp. 418–419)
- potential for asbestiform materials (DEIS, pp. 419–420)
- cumulative impacts (DEIS, pp. 419–420)

In addition to the impacts disclosed in section 3.7.2, the potential impacts to water quality from a catastrophic failure of the tailings storage facility or the failure of a slurry or concentrate pipeline are analyzed in section 3.10.1 (DEIS, pp. 535–558).

| Comment response: WT49 Issue of oxygenation from stormwater infiltrating the subsidence crater | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-31, 30075-36, 30078-33

The analysis of potential block-cave water quality was revised in the FEIS; see response WT37 for more details.

These comments raise the question of oxygenation within the block-cave zone and the impact this would have on water quality. Oxygenation has been incorporated into the operational analysis of water quality, and the oxygenation products associated with mineralized rock are appropriately carried through into the processing plant and ultimately the tailings seepage, as further described in section 3.7.2.

During closure, we determined that the models used in the DEIS were inappropriate (see response WT37). A more appropriate approach was used in section 3.7.2 in the FEIS, based on saturated column testing conducted by Resolution Copper, specifically intended to estimate the water quality associated with submerged mineralized rock. While oxygenated precipitation would enter the subsidence crater and likely would indeed infiltrate and contribute to aquifer recharge, the remnants of the mineralized ore body are located thousands of feet below ground and would be the first material submerged upon closure once dewatering has ceased. Some level of dissolved oxygen is associated with any source of groundwater submerging the mineralized ore, whether recharged precipitation or groundwater flowing into the block-cave zone from the surrounding aquifer. The potential for any oxidation of mineralized rock due to the presence of any dissolved oxygen available within the submerged block-cave zone is replicated by the saturated column tests we use in the FEIS to assess post-closure block-cave water quality.

Appendix R

| Comment response: WT50 | |
|---|---|
| Community water supplies | Page 1 of 1 |

**Responsive to these comments:**
235-23

This comment indicates that the "DEIS fails to address the loss and contamination of water in communities surrounding the proposed project area including Globe, Superior, Miami, San Carlos, Kearny, Florence, Queen Valley and other surrounding areas." This is an incorrect statement.

The potential for groundwater drawdown to impact water supplies is addressed in section 3.7.1, specifically for water supplies around the mine site (DEIS, p. 333) and around the Desert Wellfield (DEIS, pp. 335–340; varies by alternative).

At the mine site, the analysis of water loss includes potential impacts to wells that are representative of impacted community water supplies corresponding to Superior, Top-of-the-World, and Boyce Thompson Arboretum (DEIS, p. 326). As shown in figure 3.7.1-3 (DEIS, p. 302), Globe, Miami, San Carlos, Kearny, Florence, and Queen Valley are beyond the limits of anticipated impact caused by drawdown at the mine site.

Similarly, as shown in figure 3.7.1-2 (DEIS, p. 298), Globe, Miami, San Carlos, Kearny, and Queen Valley are beyond the limits of anticipated impact caused by drawdown from the Desert Wellfield. Florence is located just outside the analysis area shown in figure 3.7.1-2, and some drawdown might indeed reach the town of Florence and other communities in the East Salt River valley not mentioned specifically in the comment. See response WT4 for more discussion of how regional water supplies and competing water uses have been analyzed, with additional discussion in the FEIS.

Potential water contamination from seepage entering downstream surface waters is described in section 3.7.2. As shown in figure 3.7.2-1 (DEIS, p. 347), Globe, Miami, San Carlos, and Florence are outside the area of analysis in which water impacts would occur.

Kearny is located along the Gila River, downstream of where seepage from the tailings storage facility at the Skunk Camp location (Alternative 6) could affect the Gila River. As described in section 3.7.2, all numeric surface water quality standards are anticipated to be met in the Gila River; thus, impacts to water supplies are unlikely downstream at Kearny. Additional analysis was added to the FEIS with respect to seepage impacts from Alternative 6; see response WT7 for more details.

Queen Valley is located downstream of Whitlow Ranch Dam, where seepage from the tailings storage facilities for Alternatives 2, 3, and 4 would enter surface water. The hydrologic connection between Queen Valley and Queen Creek and the potential for impact from tailings seepage associated with Alternatives 2, 3, and 4 were discussed as part of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Analysis was added to section 3.7.2 of the FEIS to further evaluate potential impacts on water resources in Queen Valley. See response WT59 for more detailed discussion of this issue.

| Comment response: WT51 | |
|---|---|
| Sodium selenite | Page 1 of 1 |

**Responsive to these comments:**
1231-1, 281-1

This comment refers to sodium selenite specifically and water quality impacts in general. Sodium selenite is one of many compounds that can contribute to dissolved selenium concentrations in water. The analysis and disclosure in the EIS are applicable to any impacts specific to sodium selenite.

Selenium is a specific constituent of concern identified for the water quality analysis (DEIS, p. 365). Predicted concentrations of selenium in groundwater and surface water as a result of tailings seepage are compared with Arizona numeric water quality standards as a threshold of concern (DEIS, pp. 387–390 [Alt 2], pp. 395–397 [Alt 3], pp. 401–404 [Alt 4], pp. 408–410 [Alt 5], pp. 414–416 [Alt 6]). Predicted concentrations of selenium in stormwater are similarly compared with Arizona numeric water quality standards (DEIS, pp. 379–383). Arizona numeric water quality standards compared for selenium include for aquifers, body contact, agricultural use, and chronic wildlife exposure (DEIS, appendix N, table N-5).

Appendix R

| Comment response: WT52<br>Water quality related comments by Dr. Maest | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>8032-109 | |

This comment references a number of specific water quality comments that were submitted in a report titled "Review of Geochemical Issues of Resolution Copper's Draft Environmental Impact Statement, August 2019," authored by Dr. A. Maest. The following responses are applicable to this report:

- Response WT28, regarding concerns with subaqueous deposition of potentially acid generating tailings
- Response WT35, regarding analysis of stormwater quality
- Response WT36, regarding the potential for the development of a lake in the subsidence crater
- Response WT37, regarding anticipated water quality within the block-cave zone
- Response WT41, regarding the use of specific analytical techniques

| Comment response: WT54<br>Contribution to regional water quality from impacted springs | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30078-45 | |

The springs and perennial streams potentially impacted by dewatering represent discharge points from the regional aquifers, either the deeper groundwater system or the Apache Leap Tuff aquifer. These springs and streams do not represent recharge points for these aquifers but discharge points.

Once exposed at the surface, in some cases these high-quality waters contribute to stream runoff and ultimately may form a small component of recharge to the larger region. An example is spring DC-6.6W, which is anticipated to be impacted by drawdown and forms 0 to 5 percent of flow in Devil's Canyon (DEIS, p. 329). In most cases, however, the springs in question do not flow far enough to contribute to surface runoff and are likely to be consumed locally through evaporation or transpiration by riparian plants.

The baseflow of perennial streams in the area (Devil's Canyon and Mineral Creek) is not anticipated to be impacted by drawdown; contribution to regional recharge from these sources would remain unchanged.

| Comment response: WT55<br>Impacts to water quality from copper | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>555-5 | |

The comment correctly states that concentrations of copper in stormwater—at least for stormwater contacting the filtered tailings on Alternative 4—are predicted to be 3,294 milligrams per liter (mg/L) (DEIS, p. 382). The comment compares this with the maximum contaminant level for copper, which is 1.3 mg/L. This number is correct, but maximum contaminant levels are regulations specific to drinking water. The EIS disclosure uses different thresholds for analysis.

Copper is a specific constituent of concern identified for the water quality analysis (DEIS, p. 365). Predicted concentrations of copper in groundwater and surface water as a result of tailings seepage are compared with Arizona numeric water quality standards as a threshold of concern (DEIS, pp. 387–390 [Alt 2], pp. 395–397 [Alt 3], pp. 401–404 [Alt 4], pp. 408–410 [Alt 5], pp. 414–416 [Alt 6]). Predicted concentrations of copper in stormwater are similarly compared with Arizona numeric water quality standards (DEIS, pp. 379–383). Arizona numeric water quality standards compared for copper include those for aquifers, body contact, agricultural use, and wildlife exposure (DEIS, appendix N, table N-5).

The maximum contaminant level of 1.3 mg/L referenced in the comment is the least restrictive of the standards used as impact thresholds in the EIS. The most restrictive is 0.0191 mg/L (DEIS, appendix N, table N-5).

The potential concentrations in stormwater identified by the comment (DEIS, p. 365) would not be released to the environment, as discussed in section 3.7.2 (DEIS, pp. 379–381). However, we revised the stormwater analysis in section 3.7.2 of the FEIS to reflect possible release scenarios; see response WT35 for more details.

Appendix R

| Comment response: WT56 Additional spring sources not analyzed | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-200, 8032-202

These comments raise the issue of potential springs either on Oak Flat or within the footprints of the tailings storage facilities that were not analyzed in the DEIS. Four appendices to comment letter #8032 provide specific information.

Appendix M-1 provides a map of purported spring locations. A similar exercise was conducted by the NEPA team early in the analysis process, compiling potential spring locations from all available sources (Rietz 2017). The vast majority of the springs identified in Appendix M-1 do not exist in perennial form on the landscape. They may be artifacts of historic water conditions, they may be mismapped, or they may be seasonal or ephemeral seeps or springs. The types of water sources that stand to be impacted by mine drawdown are those that have persistent water on the landscape and are connected to the regional aquifer. The term we used in the NEPA analysis is "groundwater-dependent ecosystems" (GDEs). Spring inventories based on historic maps and available databases are not sufficient to define springs in this way.

However, field surveys are sufficient to define those springs likely to be impacted by mine drawdown, and these surveys were conducted over the entire mine footprint, including the Federal parcel (Oak Flat) and each of the tailings storage facility locations. Perennial springs have been identified and monitored, in some cases extending back to 2002 (Montgomery and Associates Inc. and WestLand Resources Inc. 2017; WestLand Resources Inc. and Montgomery and Associates Inc. 2018, 2020). The map provided with the comment (appendix M-1) is not sufficient to determine true GDEs.

The springs identified and monitored in these surveys were then assessed against multiple lines of evidence to determine the likely source of water (local sources or regional sources that could be impacted by mine drawdown) (DEIS, pp. 312–317) (Garrett 2018e). The springs fed by regional sources are those that the NEPA team analyzed for potential impacts, using the predictions of the groundwater model or the disturbance footprint of the project (DEIS, pp. 317–340; see especially p. 324). These are the same springs for which monitoring would be undertaken during operations and mitigation applied to any water reductions, regardless of anticipated impacts disclosed in the DEIS (DEIS, pp. 342–344).

Appendix M-2 to comment letter #8032 contains images and details of "an unnamed cave seep." Based on the coordinates provided, this is actually the GDE analyzed in the DEIS as "The Grotto" (WestLand Resources Inc. and Montgomery and Associates Inc. 2020). This water feature is anticipated to be lost to the subsidence crater (DEIS, p. 324).

Appendix M-3 to comment letter #8032 contains images and details of "an unnamed Cienega." Based on the coordinates provided, this is actually the feature identified and monitored as "Anxiety Fault Pond" (Montgomery and Associates Inc. 2017a). The project record documentation describes this feature as follows: "Anxiety Fault Pond is an anthropogenic, earthen pond off of Magma Mine Road, approximately 1.5 miles from the Highway 60 turnoff (Figure 1). The pond is in a naturally flat lying area, south of the Number 9 wash drainage (Photo 11). The source of water in the pond is runoff from rain events and seepage from the jointed and fractured Tal topography above the pond." This pond is one of four persistent surface water features identified on Oak Flat that likely derive water from local sources and therefore would not be impacted by groundwater drawdown resulting from mine dewatering. However, these features still would be lost, as they lie within the footprint of the projected subsidence crater. These features were not included in the DEIS in section 3.7.1 but were added to section 3.7.1 of the FEIS as impacted features.

Appendix M-4 to comment letter #8032 contains images and details of a "Swimming Hole Spring unnamed unmapped." Based on the coordinates provided and comparison of the photographs provided, this is actually the GDE analyzed in the DEIS as "Rancho Rio Spring" (WestLand Resources Inc. and Montgomery and Associates Inc. 2020). This water feature is anticipated to be lost to the subsidence crater (DEIS, p. 324).

Appendix R

| Comment response: WT57 Adverse impact of assimilative capacity change | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30075-45 | |
| We revised the "Unavoidable Adverse Effects" section of the water quality analysis (added to section 3.7.2) in the FEIS to reflect that a reduction in assimilative capacity is an adverse effect. | |

| Comment response: WT58 Impacts to individual wells | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 38-2, 8032-80 | |

Note that this topic is also covered in response WT45. The concerns raised in these comments are addressed specifically in issue #8 in response WT45.

These comments raise the concern that "the evaluation of future drawdown at the surrounding wells was not conducted." This is an incorrect statement. The analysis of impacts on surrounding water supply wells from drawdown was analyzed in the DEIS.

Our approach in the DEIS was to use three proxy locations for representative water supplies that could be impacted by drawdown resulting from mine dewatering. The specific reasons for which proxies were used instead of individual wells is articulated in the project record (Newell and Garrett (2018d).

The larger question is whether the DEIS lacks disclosure of important drawdown impacts that are not shown by the proxies. In fact, the DEIS contains the information necessary for anybody to understand the drawdown at their individual well. If the proxy wells (one for Superior, one for Top-of-the-World, one for Boyce Thompson) are deemed insufficient for this purpose, perhaps because a reader owns a well farther afield, the full spatial distribution across the landscape is still shown in the DEIS: figure 3.7.1-2 for drawdown near the Desert Wellfield (DEIS, p. 298), figure 3.7.1-3 for drawdown at the mine site under the proposed action (DEIS, p. 302), and figure 3.7.1-8 for drawdown at the mine site under the no action alternative (DEIS, p. 323). Also note that figure 3.7.1-3 does show the full range of drawdown from all the uncertainty analysis as well, not just the single best-calibrated run. Other specific representations of drawdown are shown in DEIS appendix L, with the specific location shown in figure 3.7.1-7 (DEIS, p. 315). Any of these locations are indicative of drawdown in the regional aquifer, which could impact individual wells.

We added further discussion to section 3.7.1 of the FEIS to further describe where results specific to individual well owners can be found. We have also included the overall number of individual wells anticipated to be impacted to disclose a sense of the magnitude of the issue.

| Comment response: WT59 Queen Valley water rights | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 268-2, 8032-96 | |

These comments state that the DEIS "does not recognize or discuss the existing ground and surface water rights granted and purchased by the Queen Valley Golf Course and the Queen Valley Community."

See response WT19 for a full discussion of water rights issues.

As with other surface water rights, the Queen Valley water rights are similar to other potential water rights discussed in the DEIS, such as springs. In the DEIS we conclude that while physical loss to these sources can be disclosed, "impact on any surface water rights from a legal or regulatory standpoint cannot yet be determined due to the ongoing adjudication" (DEIS, p. 332).

The physical connection between Queen Valley and the Queen Creek system (and therefore the potential for impact from project activities) was not explicitly assessed in the DEIS. This description has been added to section 3.7.2 of the FEIS. Further discussion of the potential to impact water rights in Queen Valley has been added to section 3.7.3, and further discussion of the potential for contamination to impact Queen Valley has been added to section 3.7.2.

Appendix R

| Comment response: WT60 | |
|---|---|
| Destruction of trees/Winters doctrine | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1469-1 |

See response NEPA14 for discussion of the Winters doctrine with respect to federally reserved water rights.

Response NEPA14 is primarily about potential loss of springs and the Federal water rights associated with those springs. This comment expands the issue more generally to include water potentially needed to sustain vegetation. Analysis of vegetation that may lose water due to the mine is focused on water sources and associated vegetation that have a connection to the regional aquifer (GDEs). This is the primary focus of section 3.7.1 of the DEIS (pp. 317–344). Potential Federal water rights associated with these areas are disclosed, as well (DEIS, pp. 332–333).

A separate question raised by this comment is the "number of trees that will be destroyed by the mining operation." From context, it would appear that this is specifically referring to the loss of water as described above, not the physical destruction of trees. While a specific number of trees is not enumerated in the DEIS, the physical destruction of vegetation and habitat is described in several places in the DEIS, including the following:

- Section 3.3 for the amount of vegetation removed by each alternative (DEIS, pp. 176–178);
- Section 3.3, desired future vegetation conditions from the Tonto National Forest for riparian and xeric riparian areas, the potential to meet these conditions after reclamation, and the amount of time needed to meet these conditions (DEIS, pp. 186, 188–190, 200);
- Section 3.3, anticipated impacts to riparian vegetation extent of health due to water quantity and quality impacts (DEIS, p. 196);
- Section 3.7.1, descriptions of GDEs, including riparian areas (DEIS, pp. 312–317);
- Section 3.7.1, impacts to GDEs, including riparian areas, due to dewatering from the project (DEIS, pp. 317–340);
- Section 3.7.1, cumulative impacts to GDEs, including riparian areas (DEIS, pp. 340–342);
- Section 3.7.1, mitigation, mitigation effectiveness, and unavoidable adverse effects on GDEs (DEIS, pp. 342–345);
- Section 3.7.3, impacts of changes in geomorphology on GDEs, including riparian vegetation (DEIS, pp. 433–434); and
- Section 3.7.3, impacts of reductions in storm flow to surface water systems that support vegetation (DEIS, pp. 435–444).
- Section 3.8, impacts to special habitat areas supporting wildlife, including riparian (DEIS, pp. 452, 459–461)
- Section 3.8, impacts to specific species groups (DEIS, pp. 461–463, 472)
- Section 3.10.1, potential to impact riparian areas from tailings storage facility or pipeline failures (DEIS, pp. 527–534, 540–543)

Appendix R

| Comment response: WT61 Prediction of streamflow impact | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-26, 30078-27

This comment questions the ability of the groundwater model to predict impacts to streamflow in Devil's Canyon specifically and questions the basis for the conclusions regarding impacts in the DEIS.

The limitations of the groundwater model with respect to predicting impacts were the subject of extensive discussions in the Groundwater Modeling Workgroup and are described in the DEIS (pp. 299–301).

Informed by these discussions, we made a reasoned decision regarding the quantitative use of the model output: "Based on combined professional judgment, the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict" (DEIS, p. 301).

The DEIS also clearly notes that impacts less than 10 feet are not negligible: "The Groundwater Modeling Workgroup recognized that while the model may not be reliable for results less than 10 feet in magnitude, changes in aquifer water level much less than 10 feet still could have meaningful effects on GDEs, even leading to complete drying" (DEIS, p. 301). Although we understand that these types of impacts could occur, that does not mean that the tools available can reasonably predict them. The decision regarding how to use model output was not based on the fact that such impacts would be negligible but on the fact that the best available tools were insufficient to predict those impacts.

We clearly recognized the ramifications of not having the tools to accurately predict impacts at fractions of a foot, hundreds of years in the future, despite applying the best available science in the form of the groundwater model, and took steps to respond to this uncertainty:

> *"The Groundwater Modeling Workgroup explored a number of other modeling techniques, including explicitly modeling the interaction between groundwater and surface water to predict small changes in streamflow, but found that these techniques had similar limitations. To address this problem, monitoring of GDEs would be implemented during mine operations, closure, and potentially beyond. . . . If monitoring identifies real-world impacts that were not predicted by the modeling, mitigation would be implemented. Mitigation is not restricted to unanticipated impacts; mitigation may also be undertaken for those GDEs where impacts are expected to occur."* (DEIS, pp. 301–303)

The comment notes specifically that "the conclusions in Table 3.7.1-3 that drawdown of the wetted stream reaches in Devil's Canyon are 'unlikely' and 'not anticipated' do not appear to be supported by data or analysis." These statements are fully supported by the groundwater modeling analysis, which includes the limitations of that modeling. Specifically, the results in table 3.7.1-3 are based on 87 separate modeling runs, examining a variety of scenarios. The main stream segments of middle Devil's Canyon (DC-8.8C, DC-8.1C) show anticipated drawdown (above the 10-foot threshold) in only 1 of 87 model runs. Spring DC-6.1E shows anticipated drawdown in 0 of 87 model runs. Spring DC-6.6W shows anticipated drawdown in 76 of 87 model runs; the ramifications of spring DC-6.6W's losing flow due to drawdown are described, combined with the anticipated stormwater reductions resulting from the subsidence crater (DEIS, p. 329). These specific model runs are the data and analysis that support the conclusions in table 3.7.1-3.

The wetted stream reaches in Devil's Canyon are not anticipated to be impacted based on our analysis. However, these areas will be monitored, and if flow reductions are observed resulting from the mine—even if unanticipated now— mitigation would be applied to replace flows (DEIS, pp. 342–344).

Appendix R

| Comment response: WT62 Potential error in reported results | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-24

This comment references a table circulated at a Groundwater Modeling Workgroup meeting on September 12, 2018, and notes: "SWCA presented to the Groundwater Modeling Workgroup a Table containing a summary of Potential Impacts to Groundwater-Dependent Ecosystems. This Table concludes that seven locations, including springs, in Devil's Canyon will experience greater than 10 feet of groundwater drawdown caused by Resolution Mine block-caving. In addition to Spring DC-6.6W, they are: DC8.8C; DC8.2W, DC8.1C; DC7.1C, DC6.14C; DC6. 1E."

The notes from the September 12, 2018, Groundwater Modeling Workgroup meeting do include a table titled "Table X. Summary of Potential Impacts to Groundwater-Dependent Ecosystems." All of the specific locations noted in the comment are on this table. However, for each, the prediction is "<10," not greater than 10 feet. The basis for this comment appears to he a misreading of that table. Additionally, this table has been superseded by tahles in the DEIS; the table that appears in the DEIS (table 3.7.1-3, pp. 318–322) is not the same. When preparing the DEIS in 2019, after the conclusion of the Groundwater Modeling Workgroup's efforts, the NEPA team decided to simplify the reporting of model results. The impacts from the proposed action in the table from September 2018 are based on the concept of an impact calculation, rather than raw drawdown as output from the model. In the September 2018 table, the impact is defined as the drawdown under the no action alternative (raw output from the model) subtracted from the drawdown under the proposed action (raw output from the model).

This approach—while justifiable—led to numerous points of confusion, which were pointed out by cooperating agencies when reviewing the administrative draft of the DEIS. In response, a simpler approach was taken to report the raw output from the model for both the no action and proposed action alternatives, with no other calculations. This was felt to be more understandable and more importantly would not lead to any "masking" of potential impacts. This was particularly evident for spring DC-6.6W. Under the old approach (shown on the September 2018 table), this spring would not be anticipated to be impacted. Under the revised approach that appears in the DEIS, spring DC-6.6W is anticipated to be impacted by drawdown in the range of 10 to 30 feet (DEIS, pp. 319 and 329).

This change of approach, the rationale for the change, and a quantification of the ramifications of the change for every GDE is described in Newell and Garrett (2018d). Importantly, we think this revised approach avoided underestimating impacts to GDEs in our analysis.

Appendix R

| Comment response: WT63 | |
|---|---|
| East Salt River valley model sufficiency | Page 1 of 1 |

**Responsive to these comments:**
8031-54, 8032-104

These comments question the use of the groundwater modeling for the East Salt River valley and state that "the DEIS makes no attempt whatsoever to model or estimate groundwater resources and thus, makes no attempt to study the cumulative impacts."

This is an incorrect statement. The analysis of potential impacts from pumping in the East Salt River valley at the Desert Wellfield is based on modeling and is discussed in section 3.7.1. Disclosure of impacts includes quantifications of drawdown and water use that varies by alternative (DEIS, pp. 317–344). Cumulative impacts to water resources are analyzed in section 3.7.1, as well (DEIS, pp. 340–342), including in specific sections titled "East Salt River Valley Water Supplies" and "Regional Water Supplies."

Additional information was added to the FEIS related to these topics. While the cumulative effects analysis was thorough and documented, we acknowledge that certain aspects of the impacts analysis could have been better quantified. The FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes the cumulative impacts in the East Salt River valley. After consultation with the ADWR, additional modeling was conducted to quantify the combined impact of future regional water use with the Resolution Copper project Desert Wellfield pumping, including approved assured water supplies and extraction of all accumulated long-term storage credits. The quantitative results of this model are included in chapter 4 and have been added to section 3.7.1 of the FEIS.

In addition, further work has been conducted regarding vetting of the regulatory model used to predict impacts for the Desert Wellfield; this discussion has been included in the project record (Walser 2020a) and in section 3.7.1 of the FEIS. See also response WT45, issue #14.

We consider the analysis of drawdown impacts to be thorough and complete. Some of these comments ignore or indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

| Comment response: WT68 | |
|---|---|
| Request for inclusion of surface water losses in groundwater depletion | Page 1 of 1 |

**Responsive to these comments:**
1358-7

This comment focuses on the long-term impact to the Phoenix area water supply, including reductions in surface flow.

Cumulative impacts to water resources are analyzed in section 3.7.1 (DEIS, pp. 340–342), including specific sections on "East Salt River Valley Water Supplies" and "Regional Water Supplies."

While the cumulative effects analysis was thorough and documented, we acknowledge that certain aspects of the impacts analysis could have been better quantified. The FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes the cumulative impacts in the East Salt River valley. After consultation with the ADWR, additional modeling was conducted to quantify the combined impact of future regional water use and the Resolution Copper Project Desert Wellfield pumping, including approved assured water supplies and extraction of all accumulated long-term storage credits. The quantitative results of this model are included in chapter 4 and have been added to section 3.7.1 of the FEIS.

Appendix R

| **Comment response: WT69** Combination of modeling effects | Page 1 of 1 |
|---|---|

| **Responsive to these comments:** 30078-24 |
|---|

This comment suggests that it was inappropriate to consider modeling impacts using separate models, pointing specifically to the mine site model and the Desert Wellfield model.

This comment was raised for discussion in the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS) (Morey 2020a). The two separate models are justifiable because there is no reasonable hydrologic connection between the two domains (Queen Creek flows for approximately 4 miles through rock-dominated areas between the Superior basin and the East Salt River valley basin), nor do drawdown impacts from either model extend far enough to act in combination (DEIS, p. 298 for Desert Wellfield drawdown impacts, p. 302 for mine site drawdown impacts). The edge of the East Salt River valley model domain is shown in figure 3.7.1-2 (DEIS, p. 298).

| **Comment response: WT71** Concerns with the use of the 200-year time frame | Page 1 of 1 |
|---|---|

| **Responsive to these comments:** 30078-23 |
|---|

This comment raises three issues: concerns with the use of the 200-year time frame, concerns with model domains, and statements regarding past Resolution Copper efforts.

With respect to the 200-year time frame, the comment misinterprets the use of this time frame in the DEIS. Results beyond 200 years were discussed in the DEIS, just not quantitatively. See response WT16 for more discussion, as well as response WT45, issue #5.

With respect to model domains, see response WT69.

With respect to past Resolution Copper statements or efforts, these are immaterial to the analysis at hand. See response WT25 for more discussion about the independent hydrologic analysis.

| **Comment response: WT72** Subsidence in modeling | Page 1 of 1 |
|---|---|

| **Responsive to these comments:** 8032-89, 8032-94 |
|---|

These comments are primarily addressed by response WT45, issue #13. However, several auxiliary issues are also raised.

These comments indicate that Magma Mine workings were not presented or reviewed. This is an incorrect statement. The Magma Mine workings were explicitly incorporated into the groundwater model for the mine site. This information is provided in (WSP USA 2019).

These comments also indicate that "the DEIS should have also assessed impacts within the following watersheds: North of Queen Creek, including Haunted Canyon, Upper Pinto Creek, and West Fork watersheds.; Walnut Canyon to the south, which drains into the Gila River via Donnelly Wash."

This conclusion is drawn by arbitrarily expanding the impact contours shown in the groundwater modeling results. As shown in figure 3.7.1-3 (DEIS, p. 302), the drawdown from the mine dewatering does not reach far enough to cross the groundwater basin boundary where it would affect Haunted Canyon, Upper Pinto Creek, and West Fork, nor would any surface water impacts due to reductions in stormwater occur in these areas (DEIS, p. 423).

Similarly, Walnut Canyon, which drains into the Gila River, is not located within any areas of groundwater drawdown from the mine dewatering (DEIS, p. 302), nor would any surface water impacts due to reductions in stormwater occur in these areas (DEIS, p. 423). Note that the comment is incorrect that Walnut Canyon drains into the Gila River via Donnelly Wash; rather, Walnut Canyon is within the Donnelly Wash subwatershed but does not actually flow into Donnelly Wash.

Neither of these areas would be reasonable to include in the analysis for groundwater or for surface water impacts,

Appendix R

| Comment response: WT76 | |
| --- | --- |
| Use of median flow volumes | Page 1 of 1 |

| Responsive to these comments: |
| --- |
| 524-9 |

This comment indicates that when predicting potential impacts to surface water due to tailings seepage, the appropriate flow values are low-flow conditions instead of median flow conditions.

The use of median flow values was intentional in the DEIS, as it is a common method for assessing baseflow conditions instead of conditions dominated by storm runoff. Using base flow is a conservative approach in that it prevents the dilution of seepage by large storm events, which would lead to lower predicted concentrations in surface water and potentially underestimate impacts (see footnote 46, DEIS, p. 365).

Use of low-flow values is an even more conservative approach. We added further disclosure to section 3.7.2 of the FEIS to evaluate the potential impacts if low-flow values are used in lieu of baseflow conditions (see "Further Assessment with Low-Flow Conditions" under each alternative in section 3.7.2 of the FEIS).

| Comment response: WT77 | |
| --- | --- |
| Incorrect statements about watershed areas | Page 1 of 1 |

| Responsive to these comments: |
| --- |
| 1158-43 |

This comment points to various watershed areas noted in the DEIS and states that they are inconsistent.

The first mention of an area in the comment is the total watershed area of Queen Creek, identified as 143 square miles (DEIS, p. 425). This number is correct and specifically refers to the contributing watershed for Queen Creek, as measured at Whitlow Ranch Dam.

The second mention of an area in the comment is that 1.76 square miles of the watershed would be lost to subsidence (DEIS, p. 429). This number is correct.

The third mention of an area in the comment is a quote from section 3.7.1: "Runoff from over 20 percent of the Queen Creek watershed above Magma Avenue Bridge would be lost to the subsidence area" (DEIS, p. 316). This sentence is indeed incorrect. It should read that 20 percent of the average flow is lost from the watershed above Magma Avenue Bridge, not that the lost area represents 20 percent of the Queen Creek watershed. We corrected this in the FEIS.

| Comment response: WT78 | |
| --- | --- |
| Scope of analysis for water quality curtailed at nearest perennial water | Page 1 of 1 |

| Responsive to these comments: |
| --- |
| 524-12 |

This comment concerns the analysis of water quality only at the nearest downstream perennial water. The rationale for this choice is described in the "Analysis Area" discussion of section 3.7.2 (DEIS, p. 346).

The issue of the hydrologic connection between Queen Valley and Queen Creek and the potential for impacts from tailings seepage associated with Alternatives 2, 3, and 4 below Whitlow Ranch Dam was discussed as part of the Water Resources Workgroup (reconvened in January 2020 to assist the Tonto National Forest in reviewing and addressing comments on the DEIS). We added analysis to section 3.7.2 of the FEIS to further evaluate potential impacts on water resources in Queen Valley. See response WT59 for more detailed discussion of this issue.

Appendix R

| Comment response: WT79 | |
|---|---|
| Questions about inconsistencies regarding impacts to groundwater-dependent ecosystems (GDEs) | Page 1 of 1 |

**Responsive to these comments:**
30075-18, 30075-20, 30075-22, 30075-23

These comments identify perceived inconsistencies in the DEIS disclosure of model impacts, compared with results previously reviewed by the Groundwater Modeling Workgroup.

It is important to note that the results reviewed at various points during the Groundwater Modeling Workgroup are not identical to the results displayed in the DEIS.

When preparing the DEIS in 2019, after the conclusion of the Groundwater Modeling Workgroup's efforts we deemed it necessary and prudent to simplify the reporting of model results. The impacts from the proposed action reviewed by the Groundwater Modeling Workgroup (see the September 2018 meeting notes in particular (Morey 2018e)) were based on the concept of an impact calculation, rather than raw drawdown as output from the model. With this approach, impact is defined as the drawdown under the no action alternative (raw output from the model) subtracted from the drawdown under the proposed action (raw output from the model).

This approach—while justifiable—led to numerous points of confusion, which were pointed out by cooperating agencies when reviewing the administrative draft of the DEIS. In response, a simpler approach was taken to report the raw output from the model for both the no action and proposed action alternatives, with no other calculations. We felt this would be more understandable and more importantly would not lead to any "masking" of potential impacts. This was particularly evident for spring DC-6.6W, as a key example. Under the old approach (shown on the September 2018 table), this spring would not be anticipated to be impacted. Under the revised approach that appeared in the DEIS, spring DC-6.6W is anticipated to be impacted by drawdown in the range of 10 to 30 feet (DEIS, pp. 319, 329).

Our change in approach, the rationale for the change, and a quantification of the ramifications of the change for every GDE are described in Newell and Garrett (2018d). Importantly, we assert that this revised approach avoided underestimating impacts to GDEs in the NEPA analysis.

| Comment response: WT80 | |
|---|---|
| Request for water quality analysis document | Page 1 of 1 |

**Responsive to these comments:**
555-7

The requested document is the DEIS reference identified as Gregory and Bayley (2018b) and has been available on the project website since publication of the DEIS.

Appendix R

| Comment response: WT81<br>Specific questions about the Alternative 5 – Peg Leg water quality analysis | Page 1 of 3 |
|---|---|
| **Responsive to these comments:**<br>28449-155 | |

This comment includes a number of questions about the Alternative 5 – Peg Leg water quality modeling report (Gregory and Bayley 2018c).

The first question concerns the calculation of the hydraulic conductivity value (K) for the site. As noted in the report, "Hydraulic conductivity is estimated to be 2.11 feet/day (ft/d) based on total basin size, estimated recharge, and hydraulic gradient" (Gregory and Bayley 2018c). Hydraulic conductivity is a parameter that is difficult to observe in the field, except through some manner of pumping test. By contrast, the hydraulic gradient can be observed directly from measured water levels, and recharge in the arid Southwest can be estimated based on elevation and basin size from previous literature studies. With these parameters, the K value can be back-calculated.

The comment notes that a K value of 2.11 feet/day falls outside the normal range for alluvium. The full reference for Anderson et al. (1992) is not provided, but we believe this represents USGS Professional Paper 1406-B, "Geohydrology and Water Resources of Alluvial Basins in South-Central Arizona and Parts of Adjacent State." This is correct, but the K value of 2.11 feet/day falls well within the range for upper and lower basin fill (Anderson et al. 1992:B16), which forms part of the basin. The use of the term "alluvium" in Gregory and Bayley (2018c) should not be construed to exclude basin-fill materials. Regardless of literature values, as noted in the comment, we have aquifer test data, as well, that can inform the K value. At the time of the DEIS, the Near West field study included some aquifer test data, and at this time we also have the Skunk Camp field study on Dripping Spring Wash. We believe Dripping Spring Wash is likely a better analog for Donnelly Wash (Peg Leg location). Seven constant-rate pumping tests, two injection tests, and 11 slug tests were conducted in 2019 (Montgomery and Associates Inc. 2019a). An additional five constant-rate pumping tests and six injection tests were conducted in 2020 (Montgomery and Associates Inc. 2020g). Hydraulic conductivity values from this data set of 28 field tests range from 0.002 foot/day to 24 feet/day, with a median of 3.4 feet/day, a mean of 5.4 feet day, and a geometric mean of 2.2 feet/day. The value used for the Alternative 5 – Peg Leg water quality modeling is near the middle of this range.

The second question concerns the choice of recharge parameters, particularly the split of 75 percent "focused" recharge and 25 percent "diffuse" recharge, and the lack of consistency with values published for the nearby San Pedro Basin in (Meixner et al. 2016). The terms "diffuse" and "focused" recharge are defined in Meixner et al. (2016:126): "In this analysis, diffuse recharge is operationally defined as being sourced from precipitation and occurs as direct infiltration of precipitation followed by percolation to the water table. Focused recharge from ephemeral or perennial surface-water expressions occurs via concentration of precipitation and shallow interflow at the Earth's surface through runoff processes and subsequent infiltration, percolation, and recharge of runoff at specific locations on the landscape (e.g., ephemeral streams and playas)." This publication provides estimates for the division of diffuse, focused, mountain system, and irrigation recharge in 11 basins throughout the western United States.

Appendix R

| Comment response: WT81 | |
|---|---|
| Specific questions about the Alternative 5 – Peg Leg water quality analysis | Page 2 of 3 |
| **Responsive to these comments:**<br>28449-155 | |

As noted in the comment, the San Pedro Basin is one of these, and an estimate of 0 percent diffuse recharge is given. The range of diffuse recharge across the western United States varies from 0 to 98 percent.

In this case, there is a difference in terms between Meixner et al. (2016) and Gregory and Bayley (2018c). Gregory and Bayley (2018c:6) note, "Diffuse recharge [is] classified as groundwater underflow in the model." Meixner et al. (2016:126), by contrast, define diffuse recharge only as "direct infiltration of precipitation followed by percolation to the water table" and include a separate term, "mountain system recharge" (abbreviated MSR in the following quote), to incorporate other aspects of recharge flowing into the basin in the subsurface: "MSR includes recharge from stream loss at mountain fronts (MFR) (also a form a focused recharge, but herein grouped with MSR), along with subsurface transfer of groundwater from the mountain block to the adjacent alluvial aquifer (mountain-block recharge, or MBR)." In other words, the "diffuse" recharge of Gregory and Bayley does not strictly match the usage by Meixner et al. and is a term that incorporates any recharge mechanisms other than focused recharge.

The comment notes that siting the tailings storage facility near the margins of the alluvium may reduce total system recharge. This capture of precipitation, preventing it from reaching ephemeral channels where focused recharge can occur, is correct, at least during operations when stormwater is not allowed to be released. The reduction in this flow has been disclosed in section 3.7.3 (DEIS, pp. 437–441). Roughly 21 percent of storm flow and potential recharge would be sequestered by the tailings storage facility. The inability for this water to recharge the aquifer was added to section 3.7.3 in the FEIS.

The comment notes that the Gregory and Bayley model report mentions two samples in the Donnelly Wash subbasin, while the DEIS only lists one (DEIS, pp. 408–409). This is a misunderstanding about what the actual modeling results use for baseline water quality. The report indeed notes that only two groundwater quality samples exist (Gregory and Bayley 2018c:9). However, only the Tea Cup Well sample was used to define baseline water quality, as it is located immediately below the tailings storage facility footprint. This is not clear from the Gregory and Bayley report itself but is clear from the backup spreadsheets provided to the Forest Service. These files are described in Garrett (2019d).

Appendix R

| Comment response: WT81 | |
|---|---|
| Specific questions about the Alternative 5 – Peg Leg water quality analysis | Page 3 of 3 |

| Responsive to these comments: |
|---|
| 28449-155 |

The comment notes that exploration wells should be used to confirm the depth of the geophysical surveys. The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. In this case, while detailed geotechnical information is indeed critical to the eventual building of a tailings storage facility, it is not a key factor in making a reasoned choice between alternatives. In each case, sufficient geotechnical information was available to provide an initial design for the tailings storage facility (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d). The information in hand and disclosed in the DEIS was sufficient to understand the distinctions between the facilities. The effect of this potential uncertainty on decision making is directly discussed for one of the analyses most crucial for differentiating between alternatives, the seepage modeling (DEIS, pp. 354–357).

The comment notes that the mixing cells used for the water quality model expand into the Gila Conglomerate instead of being confined to the alluvium. This choice was made in order to ensure that all of the embankment—and more importantly the seepage measures below the embankment-like finger drains—are incorporated into the model.
The comment also notes that the mixing cells do not match the Donnelly Wash alluvium. This mismatch is only evident when comparing the surface expression of the alluvium; the mixing cells are intended to represent an idealized flow through the aquifer, with a representative thickness of alluvium. The modeling approach (a simple mixing model) does not allow for matching the complex real-world geometries of the aquifer, nor is this matching necessary to obtain a reasonable estimate of water quality.

The comment also notes that the model is deterministic (giving one outcome) and not probabilistic (giving multiple outcomes). This fundamental choice of modeling was discussed in the Groundwater Modeling Workgroup in 2017. Overall, the choice was made by the Tonto National Forest to use deterministic modeling but to also incorporate discussion of uncertainties and sensitivities where appropriate. The various uncertainties for the Alternative 5 – Peg Leg water quality model are discussed specifically in section 3.7.2 (DEIS, pp. 353–363, with a summary shown graphically on p. 362). Importantly, this discussion concludes with a rationale for why the models are considered reasonable in light of these uncertainties (DEIS, p. 363).

Appendix R

| Comment response: WT82 | |
|---|---|
| Inconsistencies in Devil's Canyon | Page 1 of 1 |
| **Responsive to these comments:** | |
| 30075-1 | |

This comment states, "Spring DC-6.6W, a spring located on the wall of Middle Devil's Canyon, is predicted to experience drawdown of 10-30 feet and dry up 200 years after the start of the mine as a result of Resolution Mine's dewatering and block-cave mining. Action: The modeled prediction of the mine-related loss of this spring must be reconciled with any predictive statement that the Middle Devil's Canyon baseflow is not expected to experience drawdown."

There is no inconsistency in the results. The base flow in Middle Devil's Canyon is represented by monitoring points DC-8.8 and DC8.1 (see Newell and Garrett (2018d) for a full compilation of groundwater modeling results, which are summarized in the DEIS, table 3.7.1-3, p. 319). Simply put, the drawdown contours predicted by the groundwater model reach spring DC-6.6W on the west side of the canyon (11 feet of drawdown) but do not reach the main stem of the canyon at the thresholds the model is capable of predicting (<10 feet).

Discharge from spring DC-6.6W flows into Devil's Canyon, however, and contributes to base flow in that way. Analysis of this impact is contained in section 3.7.1 (DEIS, p. 329), in combination with the anticipated stormflow reductions in Devil's Canyon.

| Comment response: WT83 | |
|---|---|
| Various criticisms of the water resource analysis | Page 1 of 1 |
| **Responsive to these comments:** | |
| 8031-24, 8031-63 | |

This comment expresses concerns that information was not available in the DEIS or in supporting documents.

We consider the analysis of impacts to water resources to be thorough and complete. Some of these comments indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

One specific criticism is the inability to find reference Newell and Garrett (2018d). This reference is correctly cited throughout the DEIS and correctly included in the Literature Cited section (DEIS, p. 753). It was available on the project website when the DEIS was released in August 2019. However, it does appear that the citation on the website was labeled 2018c, though the title was correctly stated. This was remedied when brought to our attention.

With respect to other information, not all details of a complex project can or should be included in the DEIS itself. The substantial volume of baseline data reports, analysis reports, and modeling reports cited in the DEIS contain much of the details requested and were available for review of the website when the DEIS was released in August 2019.

| Comment response: WT84 | |
|---|---|
| Specific questions about the Alternative 6 – Skunk Camp water quality modeling | Page 1 of 1 |
| **Responsive to these comments:** | |
| 524-10 | |

See response WT32 for more detail on how the possibility of exposure of seepage in surface water was investigated, both on Dripping Spring Wash and Queen Creek.

In addition, subsequent field investigations have verified the statement in the DEIS that Dripping Spring Wash is ephemeral, with groundwater levels deep enough to prevent surface water exposure (KCB Consultants Ltd. 2019; Montgomery and Associates Inc. 2020a; WestLand Resources Inc. and Montgomery and Associates Inc. 2020).

Appendix R

| Comment response: WT89 | |
|---|---|
| Reduction in precipitation from subsidence | Page 1 of 1 |

**Responsive to these comments:**
30078-39, 30078-49

This comment states that "the draft fails to consider wind rose patterns which will be affected by the vertical collapse of the mountain unit, and the resulting alteration of the related precipitation."

We do not anticipate that the subsidence crater would have any noticeable effect on weather patterns or climate, except at a localized scale immediately around the subsidence crater.

Geography and elevation indeed have an influence on precipitation. Orographic precipitation is rain, snow, or other precipitation produced when moist air is lifted as it moves over a mountain range. Similarly, changes in elevation are associated with changes in air pressure and temperature.

However, while the fundamental mechanisms are valid, it is not reasonable to expect that these effects would occur at the same scale as the subsidence crater. These effects occur on the scale of large swaths of the landscape. For instance, summer precipitation in Arizona largely differs between the lower desert areas (approximately 1,000 feet in elevation) and the high mountain areas (approximately 5,000–7,000 feet in elevation).

Numerous analogous situations exist in Arizona. The Ray mine is located nearby and is well over 1,000 feet deep. The Lavender pit in Bisbee is 900 feet deep. We have not discovered any reports that either pit has affected local weather patterns. In Phoenix, South Mountain park and Piestewa Peak both feature elevation changes of over 1,000 feet, across miles of landscape, yet these features do not fundamentally alter the desert climate of Phoenix in the way that traveling up 1,000 feet in elevation toward the mountains might. As an example, Black Canyon City (2,000 feet above mean sea level) has an annual precipitation of 14 inches, compared with Phoenix (1,080 feet above mean sea level), which has an annual precipitation of 9 inches.

| Comment response: WT90 | |
|---|---|
| Section 404 regulatory changes | Page 1 of 1 |

**Responsive to these comments:**
8031-22

This comment indicates that the USACE "should have conducted a full analysis of the potential impacts of Arizona's proposed assumption of the CWA 404 Permit Program and potential changes to the WOTUS Rule."

Regulation of waters of the U.S. under the CWA is subject to specific laws and regulations. At times, these regulations are revised or the interpretation of existing regulations must change due to court decisions. The permit issued by the USACE must comply with these regulations. Predicting future changes in regulations is speculative and not required under NEPA or CWA permitting.

As a concrete example, the State of Arizona was considering assumption of the 404 permit program but since the publication of the DEIS has decided to discontinue this pursuit. Such decisions are not predictable.

Regarding changes in jurisdiction, Resolution Copper received an Approved Jurisdictional Determination (AJD) for aquatic features in the Queen Creek watershed (U.S. Army Corps of Engineers 2020a) and a Preliminary Jurisdictional Determination (PJD) for potential waters of the U.S. in the Dripping Spring Wash watershed (U.S. Army Corps of Engineers 2020b). Permit processing is underway, based on these jurisdictional determinations, which were performed consistent with Rapanos guidance that was in effect at the time at which the determinations were made. It would be speculative to consider future changes in jurisdiction, and this is not required under NEPA or CWA permitting.

Appendix R

| Comment response: WT91 | |
|---|---|
| Control of seepage | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 8032-31 |

This comment notes that using the wrong materials to prevent seepage would have adverse consequences.

This was considered in the DEIS. Scoping comments and initial alternatives development focused on the concept of a "liner," envisioning an artificial geomembrane as a primary means of seepage control. This vision evolved to encompass a number of materials, depending on which would be the most effective at a specific location ("Evolution of the Fully Lined Alternative" (Newell and Garrett 2018d)).

As noted in section 3.7.2, "The foundation would be treated during construction to reduce seepage and encourage flow into the drain system. Foundation treatment can include a variety of techniques such as dental concrete, cut-offs, grouting, or engineered low-permeability layers such as compacted fine tailings, engineered low permeability liners, asphalt, slurry bentonite, and/or cemented paste tailings. Specific treatments would be designed based on real-world conditions encountered during site preparation" (DEIS, p. 384).

| Comment response: WT92 | |
|---|---|
| Closure plans for Alternative 6 – Skunk Camp | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 524-18 |

This comment raises two general concerns with the closure plans for Alternative 6 – Skunk Camp. First, the comment expresses concerns about the plan to allow post-closure drainage to cross the watershed divide and discharge to Mineral Creek. This aspect of the closure plan was dropped and is no longer being contemplated.

Second, the comment requests disclosure of Skunk Camp closure plans in detail. The following plans were received and contain more details about likely reclamation activities (KCB Consultants Ltd. 2020c; Tetra Tech Inc. 2020). We added a discussion of the specific reclamation and closure plans from these documents in section 3.3 of the FEIS. Note that since the January 2021 publication of the Rescinded FEIS, several additional reclamation plans have been received and are cited in and incorporated into the FEIS.

# Appendix S. Consultation History

# Introduction

As noted in chapter 5, the Forest Supervisor, Tonto National Forest, has been conducting Tribal consultation related to various Resolution Copper projects, the land exchange, and management of the Apache Leap Special Management Area (SMA). These consultation activities have been guided by the laws, regulations, and executive orders identified below.

**Advisory Council on Historic Preservation (ACHP) regulations for the Protection of Historic Properties (36 Code of Federal Regulations 800):** These regulations outline when Federal agencies must consult with Tribes regarding a Federal undertaking, and the issues and other factors this consultation must address to be compliant with Section 106 of the National Historic Preservation Act.

**Executive Order 13175:** This executive order directs executive departments and agencies to establish regular and meaningful consultation and collaboration with Tribal officials in the development of Federal policies that have Tribal implications. It calls attention to the importance of strengthening the government-to-government relationship between the United States and Indian Tribes based on three fundamental principles:

- The Federal Government has enacted numerous statutes and promulgated numerous regulations that establish and define a trust relationship with Indian Tribes.

- The United States continues to work with Indian Tribes on a government-to-government basis to address issues concerning Indian Tribal self-government, Tribal trust resources, and Indian Tribal treaty and other rights.

- The United States recognizes the right of Indian Tribes to self-government and supports Tribal sovereignty and self-determination.

**Section 3003 of Public Law (PL) 113-291:** Section 3003(c)(3) of this law directs the Secretary of Agriculture to consult with affected Indian Tribes concerning issues of concern related to the Southeast Arizona Land Exchange and any adverse effects resulting from mining and related activities on those lands.

Consultation for the Resolution Copper Project and Land Exchange has included formal and informal meetings, correspondence, sharing information, site visits, and documentation of Tribal comments and concerns by the U.S. Forest Service (Forest Service). Consultation is ongoing and will continue for the life of the project. As sovereign nations, federally recognized Tribes determine their own standards for formal and informal consultation. The Forest Service (2016b:chapter 10, subsection 11.3) directs the Forest Service through "Principals of mutual concurrence" to reach agreement on when and how formal consultation is occurring.

Table S-1, contained in this appendix, lists the consultation records between the Tonto National Forest and the Tribes, including formal and informal communications. Table S-2 continues the list of consultation records from the time of reinitiation of consultation.

Appendix S

Table S-1. Tonto National Forest Tribal consultation and communication record for the Resolution Copper Project (2003–Present)

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 11/09/03 | Discussion at Western Apache Coalition | Apache | San Carlo Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | TNF staff discussed proposed land exchange and requested Apache assistance in reviewing a CR survey (cited in 7/16/09 memo) |
| 1/27/04 | Official Letter from TNF Supervisor to Tribal Chairs | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | N/A | TNF met 11/10/03 with Resolution Copper Mining LLC (Resolution Copper) regarding proposed land exchange and archaeological survey of area; Apache sites recorded; will send report once received; requested assistance in ethnohistoric research of area |
| 11/10/05 | Official form letter from TNF Supervisor to Tribal Mailing List | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided copy of archaeological survey of proposed land exchange area; discussed RCM plan to conduct ethnohistorical archival research; and TNF invited Tribes to conduct interview-based study |
| 1/23/06 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Request 2 CR reports on Land Exchange Area and site visit as part of consultation |
| 2/23/06 | Official Letter from Hopi CPO to Desert Archaeology | Puebloan | Hopi Triba | N/A | Comments on Desert's research design for Oak Flat (cited in PR 571) |
| 5/15/06 | Informal meeting with cultural staff | Yavapai | Yavapai Prescott Indian Tribe | Prescott, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |
| 5/22/06 | Informal meeting with cultural staff | Yavapai | Fort McDowell Yavapai Nation | Fountain Hills, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |
| 6/19/06 | Informal meeting with cultural staff | Puebloan | Hopi Tribe CPO | Kykotsmovi, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |
| 6/21/06 | Informal meeting with cultural staff | O'odham | Four Southern Tribes meeting | Sells, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-2

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/20/07 | Official Letter from San Carlos Chair to President Bush on behalf of Tribal Coalition | Apache Hopi Hualapai | Camp Verde Yavapai Apache Hopi Tribe Hualapai Tribe San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | n/a | Tribal Coalition opposition to RCM mine |
| 1/25/08 | Formal meeting TNF Cultural Staff with Four Southern Tribes | O'odham | Ak-Chin Indian Community Gila River Indian Community Salt River Pima-Maricopa Indian Community Tohono O'odham Nation | Maricopa AZ | Recorded in 7/16/09 internal summary of tribal consultation re RCM |
| 2/27/08 | Formal meeting TNF Cultural Staff with San Carlos cultural staff | Apache | San Carlos Apache Tribe | Peridot, AZ | Recorded in 7/16/09 internal summary of tribal consultation re RCM |
| 5/16/08 | Official Letter from Congressman Grijalva to U.S. Department of the Interior (USDOI) and U.S. Department of Agriculture (USDA) | n/a | n/a | n/a | Complaint on lack of G2G consultation by agencies at highest levels with Tribes regarding mining projects |
| 5/19/08 | Emails between TNF Archaeologist and YAN Archaeologist | Yavapai Apache | Yavapai Apache Nation | N/A | Emails regarding meeting to discuss Resolution Copper Project proposed exploratory drilling |
| 6/06/08 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Conveyed Plan of Operations for Resolution Copper Project Pre-feasibility Mining Studies; requested tribal input on sensitive areas |
| 6/23/08 | Informal Meeting with Western Apache Coalition cultural staff | Apache | San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Payson, AZ | Resolution Copper Project Pre-feasibility Studies NEPA Consultation Recorded in 7/16/09 internal summary of tribal consultation re RCM |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-3

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/27/08 | Official Letter from TNF Mesa Ranger District | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Requesting input on proposed Resolution Copper Project water pipeline |
| 7/07/08 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response to TNF 6/06/08 letter; request 2 CR reports and information about water pipeline |
| 7/07/08 | Official Letter from Hopi CPO to TNF Mesa Ranger District | Puebloan | Hopi Tribe | N/A | Request information on any cultural resources and how this relates to Resolution Copper Project |
| 9/11/08 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed CR report for pre-feasibility study and requested information on sensitive areas |
| 9/29/08 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Request for site visit and for an ethnographic study of the project area |
| 11/03/08 | Official Letter from Hopi CPO to TNF Supervisor | Pueblo | Hopi Tribe | n/a | Intend to invite TNF to meet to discuss RCM pre-feasibility studies, water line, and concerns regarding proposed land exchange |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-4

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/01/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Resolution Copper Project Pre-feasibility Plan of Operations EA and requested comments |
| 4/13/09 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Comments on Pre-feasibility Study |
| 4/29/09 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on Pre-feasibility Study |
| 4/30/09 | Letter from Sparks Law Firm on behalf of San Carlos and Tonto Apache | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe | N/A | Requesting 180-day extension of comment period on Pre-feasibility Study |
| 5/05/09 | Letter (partial) from TNF to Sparks Law Firm | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe | N/A | Denying requested 180-day comment extension and requesting proof of representation for San Carlos and Tonto Apache tribes |
| 5/11/09 | Official Letter from TNF Supervisor to Leaders | All Tribes (10) | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to attend information sharing meeting |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-5

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/15/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed final version of Pre-feasibility CR Inventory Report |
| 5/29/09 | Formal Meeting* with tribal cultural staff | Apache Puebloan | Hopi Tribe<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | TNF S.O<br>Phoenix, AZ | Prefeasibility study, CR Inventory, status of Land Exchange, tribal concerns |
| 6/10/09 | Official Letter from TNF Supervisor to Chairman | Apache | White Mountain Apache Tribe | N/A | Thanking for attending 5/29 meeting |
| 6/11/09 | Official Letter from TNF Supervisor to Chairman | Yavapai | Fort McDowell Yavapai Nation | N/A | Thanking for attending 5/29 meeting |
| 6/15/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | Apache Puebloan | Hopi Tribe<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | N/A | Thanking for attending on 5/29 meeting |
| 6/16/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | Apache O'odham Yavapai | Gila River Indian Community<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai Prescott Indian Tribe | N/A | Reporting on 5/29/09 meeting |
| 6/30/09 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Oppose the finding of No Adverse Effect for Pre-feasibility Study |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-6

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 6/30/09 | TNF Consultation Tracker | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Documents Consultation on Resolution, 1/27/04 –6/30/09 |
| 7/06/09 | Official Letter from San Carlos Chairman to Secretary Dept of Agriculture | Apache | San Carlos Apache Tribe | N/A | San Carlos has not been consulted on the Land Exchange |
| 7/13/09 | Official Letter from Yavapai Prescott to TNF Supervisor | Yavapai | Yavapai Prescott Indien Tribe | N/A | Defer to Fort McDowell, but wish to be kept informed on project |
| 7/16/09 | Internal U.S. Forest Service (USFS) email | | | n/a | Provides chronology of TNF tribal consultation regarding RCM between 1/27/04 and 7/16/09 |
| 3/16/10 | Official Letter from TNF Supervisor to Tribal leaders and staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requested comment on Pre-Feasibility report for connected state and private lands |
| 3/29/10 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Comments on Prefeasibility Study EA |
| 10/20/10 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Tribe | N/A | Requested meeting to discuss upcoming forest projects and best way to consult |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-7

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 2/08/11 | Official Letter from San Carlos Chairman to Secretary, USDA | | | n/a | Referred to in 6/27/11 letter from Secretary of Agriculture |
| 6/27/11 | Official Letter from Secretary of Agriculture to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Discusses proposed land exchange; requirements for FS consultation |
| 7/26/11 | Copy of Official Letter from Hopi to U.S. Congressmen | Puebloan | Hopi Tribe Chairman | N/A | Opposition to Land Exchange |
| 9/06/11 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request meeting on all projects impacting Oak Flat region |
| 10/17/11 | Official Letter from TNF Globe District Ranger to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Resolution Copper Project Plan of Operations for a Magnetotelluric Geophysical (mT) Survey, and Cultural Resources Monitoring Plan |
| 10/24/11 | Official Letter from Hopi CPO Response to Globe District Ranger | Puebloan | Hopi Tribe CPO | N/A | Response to 10/17/11 letter; Consultation request and request for monitoring report – Resolution Copper mT Survey |
| 10/25/11 | Official Letter from Gila River THPO to TNF Supervisor | O'odham | Gila River Indian Community | N/A | Opposes mining; requested monitors during geophysical testing |
| 12/16/11 | Formal Meeting* with Tribal Leaders | Apache | San Carlos Apache Tribal Council | San Carlos, AZ | Resolution Copper Pre-feasibility Plan of Operations for mT Survey |
| 12/19/11 | Official Letter from TNF Supervisor to Chairman, A.G., cultural staff | Apache | San Carlos Apache Tribe | N/A | Thanks for meeting on 12/16/11 |
| 12/28/11 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Thanks for meeting and re-emphasized TNF's trust responsibilities to tribes |
| 1/09/12 | Internal memo from TNF Archaeologist to TNF Supervisor | n/a | | n/a | RCM Pre-feasibility tribal consultation timeline |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-8

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/17/12 | Email from TNF Archaeologist to San Carlos THPO | Apache | San Carlos Apache Tribe | n/a | Items to discuss regarding documentation and evaluation of traditional cultural places (TCPs) for Oak Flat |
| 2/06/12 | Email from TNF Archaeologist to Hopi CPO | Pueblo | Hopi Tribe | n/a | Inviting Hopi to participate in the development of the TCP Nomination |
| 2/06/12 | Email from TNF Archaeologist to Yavapai-Prescott Archaeologist | Yavapai | Yavapai-Prescott Indian Tribe | n/a | Follow up of earlier discussion regarding TCP nomination and evidence of Yavapai in TNF archaeological record |
| 2/07/12 | Official Letter from Hopi CPO to U.S. Senate Energy and Natural Resources Committee | Puebloan | Hopi Tribe | N/A | Opposing proposed Land Exchange |
| 4/26/12 | Email from TNF Archaeologist to San Carlos THPO | Apache | San Carlos Apache Tribe | n/a | Asked if map is ready for inclusion in TCP Nomination or should they meet to discuss further |
| 5/11/12 | Exchange of letters between TNF and San Carlos | Apache | San Carlos Apache Tribe | Oak Flat, AZ | Re: San Carlos obtaining a non-commercial use permit for ceremony at Oak Flat |
| 9/25/12 | Email from TNF Tribal Relations Program Manager to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Conveyed draft list of culturally sensitive plants requested by San Carlos Council; asked for comment |
| 9/21/12 | Official Letter from TNF Globe District Ranger to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation  Gila River Indian Community  Hopi Tribe  Pueblo of Zuni  Salt River Pima-Maricopa Indian Community  San Carlos Apache Tribe  Tonto Apache Tribe  White Mountain Apache Tribe  Yavapai-Apache Nation (representatives of both)  Yavapai-Prescott Indian Tribe | N/A | Plan of Operations for Resolution Copper's mT Survey  (mT = Magnetotellurics is an electromagnetic geophysical method for inferring the earth's subsurface electrical conductivity from measurements of natural geomagnetic and geoelectric field variation at the Earth's surface.) |
| 9/25/12 | Official Letter from White Mountain Apache Tribe THPO to TNF District Ranger | Apache | White Mountain Apache Tribe | N/A | White Mountain Apache Tribe recommends an ethnohistoric study to inform the mT Survey |
| 10/02/12 | Official Letter from Hopi Tribe CPO to TNF District Ranger | Puebloan | Hopi Tribe | N/A | Reply to TNF 9/21/12 letter; want to consult and request copy of monitoring report, Resolution Copper mT Survey |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-9

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 10/08/12 | Official Letter from Gila River Indian Community to TNF District Ranger | O'odham | Gila River Indian Community | N/A | Reply to TNF 9/21/12 letter; request copies of mT survey area archaeological reports for review (provided) |
| 10/26/12 | Official Letter from San Carlos Apache Tribe Chairman to TNF District Ranger | Apache | San Carlos Apache Tribe | N/A | mT Survey Decision Memo: environmental assessment insufficient; project merits EIS |
| 11/23/12 | Official Letter from San Carlos Apache Tribe A.G. to District Ranger | Apache | San Carlos Apache Tribe | N/A | Objection to Categorical Exclusion: cumulative impacts merit EIS |
| 3/13/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Comments in 10/26/12 letter referred to EIS; 9/21/12 letter asked for comments on mT proposal, copy enclosed; Apache plant list provided again; still seek comment; contact if want to meet |
| 3/27/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Invitation to participate in Superior Area Ethnographic Study |
| 4/08/13 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Accept Invitation to Participate in Ethnographic Study |
| 4/17/13 | Copy of San Carlos Apache Tribe Executive Memo | Apache | San Carlos Apache Tribe | N/A | Designate San Carlos Apache Tribe staff to work on the Superior Area Ethnographic Study |
| 4/17/13 | Letter from San Carlos THPO to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Invitation to attend sunrise ceremony in Oak Flat to educate Forest staff on a place that is sacred |
| 4/18/13 | Formal Meeting* with Tribal Staff | Pueblo | Hopi Tribe CPO | Kykotsmovi, AZ | Superior Area Ethnographic Study |
| 4/26/13 | Official Letter from San Carlos Chairman to Secretary of Agriculture and TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request to consult on land exchange and to receive associated documents |
| 6/06/13 | Memorandum of Understanding (MOU) | Apache | Tonto Apache Tribe | n/a | [5/1/15 letter mentions MOU sections that require TNF to "incorporate TEK into land and resource management decisions to promote sustainable ecosystems and protect traditional cultural properties and resources"] |
| 6/26/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Designating project leads for Superior Area Ethnographic Study and provide copy of Oak Flat archaeological report |
| 7/31/13 | Official Letter from TNF Supervisor to Gila River THPO | O'odham | Gila River Indian Community | N/A | Comments received; archaeological monitor will be present during mT survey |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-10

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 7/31/13 | Official Letter from TNF Supervisor to Hopi CPO | Puebloan | Hopi Tribe | N/A | Comments received; archaeological monitor will be present during mT survey |
| 7/31/13 | Official Letter from TNF Supervisor to WMAT THPO | Apache | White Mountain Apache Tribe | N/A | Comments received; archaeological monitor will be present during mT survey |
| 6/20/13 (final signature 8/16/13) | Executed MOU between TNF and San Carlos | Apache | San Carlos Apache Tribe | N/A | Protocols for San Carlos participation in Ethnohistoric/Ethnographic Study |
| 11/15/13 | GPO submitted to TNF by Resolution Copper | N/A | N/A | N/A | Resolution Copper submits GPO for Resolution Copper Mine |
| 11/15/13 | FOIA request by San Carlos | Apache | San Carlos Apache Tribe | N/A | [Letter not located, but is mentioned in TNF 12/06/13 letter and 1/29/14 FOIA response] |
| 11/15/13 | FOIA request by San Carlos | Apache | San Carlos Apache Tribe | n/a | FOIA request (see 12/9/13) |
| 11/15/13 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Requested copy of Resolution Copper Project Mining Plan of Operations and TNF's analyses [Response 1/29/14 suggests the 11/15/13 letter was a FOIA request, but this letter makes no mention of FOIA] |
| 12/6/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache | N/A | Acknowledged receipt of FOIA request in 11/15/13 letter [letter not located]; stated Forest Service/TNF cannot consult on Congressional action (SE AZ Land Exchange) but is available to consult on Resolution Copper Project proposed mine plan |
| 1/29/14 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache | N/A | Cover letter with response to 11/15/13 FOIA request with enclosed CD |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-11

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 5/13/14 | Official Letter from TNF Supervisor | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Request meeting to consult on Resolution Copper's Baseline Hydrologic and Geotechnical Data Gathering Activities Project, and Superior Area Ethnographic Study |
| 5/27/14 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response to 5/14/14 TNF letter; support EIS for the proposed data gathering and request consultation meeting |
| 5/28/14 | Official Letter from TNF Supervisor to Chairman | Yavapai | Ft. McDowell Yavapai Nation | N/A | Request meeting to confer on TNF NEPA Proposed Activities, including Resolution Copper Project Baseline request |
| 5/28/14 | Official Letter from TNF Supervisor to Chairman | Yavapai | Yavapai-Prescott Indian Tribe | N/A | Request meeting to confer on TNF NEPA Proposed Activities, including Resolution Copper Project Baseline request |
| 5/30/14 | Official Letter from GRIC THPO to TNF Supervisor | O'odham | Gila River Indian Community | N/A | Reviewed mT archaeological report and considers adequate; remain opposed to project |
| 6/16/14 | Official Letter from YPIT Cultural Research Director to TNF Supervisor | Yavapai | Yavapai-Prescott Indian Tribe | N/A | Response to TNF 5/13/14 letter re: Baseline testing CR report; support avoidance of historic properties |
| 6/20/14 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request extension of deadline for comments on Baseline testing report |
| 6/23/14 | Official Letter from Fort McDowell President to TNF Supervisor | Yavapai | Fort Mc Dowell Yavapai Nation | N/A | Regarding Baseline Hydrological and Geotechnical Data Gathering and clarifying proper consultation procedure for Fort McDowell |
| 6/23/14 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on Resolution Copper Project Baseline study |
| 7/01/14 | Email from TNF Tribal Relations Program Manager to Fort McDowell Director of Governmental Relations | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to 6/23/14 letter forthcoming; attempting to set up meeting |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-12

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/23/14 | Formal Meeting* of TNF Leaders and CPO Staff | Puebloan | Hopi Tribe CPO | N/A | Comments on Resolution Copper Project Baseline study and Land Exchange |
| 8/04/14 | Emails between Fort McDowell Director of Government Relations and TNF Tribal Relations Program Manager | Yavapai | Fort McDowell Yavapai Nation | N/A | Communication protocol and attempt to set meeting |
| 8/21/14 | Official Letter from TNF Supervisor to Fort McDowell President | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to Fort McDowell 6/23/14 letter with comments on Baseline |
| 8/21/14 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Receipt of 6/20 and 6/23 letters re: Baseline Plan; some comments pertain to General Plan; response to Baseline comments |
| 8/21/14 | Official Letter from TNF Supervisor to Hopi CPO | Puebloan | Hopi Tribe | N/A | Conveyed draft MOU for government-to-government consultation [missing attachment] |
| 10/31/14 | TNF Internal Brief, Oak Flat National Register of Historic Places (NRHP) Nomination | Apache | | n/a | Reviews steps and timeline for nominating Oak Flat as a TCP |
| 2014-2015 | Ethnographic/ Ethnohistoric Study fieldwork and report | All Tribes (10) invited | Gila River Indian Community | Superior, AZ | Cultural Landscapes and Traditional Cultural Places within the Resolution Copper project area |
| | | | Hopi Tribe | | |
| | | | Pueblo of Zuni | | |
| | | | Salt River Pima-Maricopa Indian Community | | |
| | | | San Carlos Apache Tribe | | |
| | | | Tonto Apache Tribe | | |
| | | | White Mountain Apache Tribe | | |
| | | | Yavapai-Apache Nation (representatives of both) | | |
| | | | Yavapai-Prescott Indian Tribe | | |
| 2/17/15 | AZ Mining Reform to Forest Service | Apache | San Carlos Apache Tribe | N/A | Provided copy of letter and statement from San Carlos and AZ Mining Reform re: Oak Flat |
| 2/18/15 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache | N/A | Request TNF obtain return of TCP form released by SHPO to Resolution Copper |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-13

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/12/15 | Official Letter from TNF Supervisor to Tribal leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requested comments on Baseline EA |
| 3/30/15 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Comments on Resolution Baseline EA |
| 3/31/15 | Official Letter from TNF Supervisor to Apache Stronghold | Apache | San Carlos Apache Tribal Council | N/A | Thanking for 2/17/15 Joint Statement and TNF will not remove crosses |
| 3/31/15 | Official Letter from Yavapai-Apache Nation Chairman and cultural staff to TNF Supervisor | Yavapai | Yavapai-Apache Nation | N/A | Comments on Resolution Baseline Plan EA |
| 4/13/15 | Official Letter from Fort McDowell Yavapai Nation Governmental Relations Director to TNF Supervisor | Yavapai | Fort McDowell Yavapai Nation | N/A | Comments on Resolution Baseline Plan EA |
| 4/13/15 | Official Letter from San Carlos Apache Tribe A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Response to TNF 3/12/15 letter requesting comments on Resolution Baseline EA; requests TNF send letters to Chair and provide POCs for consultation |
| 4/22/15 | Formal Meeting* of TNF and Tribal Staffs | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe | TNF S.O., Phoenix, AZ | Forest projects update, including Resolution |
| 4/23/15 | Official Email from Region 3 Tribal Relations to TNF and San Carlos | Apache | San Carlos Apache Tribe | N/A | Correspondence re: MOU process |
| 4/27/15 | Formal Meeting* with Tribal Leaders | Apache | San Carlos Apache Tribe | San Carlos, AZ | Deputy Undersecretary Blazer and Bosworth met with San Carlos Apache Tribe Vice Chair and A.G. re: Land Exchange |
| 4/30/15 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Invited to meet re: Baseline EA; Second invitation issued 06/29/15 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-14

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/01/15 | Official Letter from Tonto Apache Tribe Vice Chairman to TNF Supervisor | Apache | Tonto Apache Tribe | N/A | Comments on Baseline Plan – there are TCPs in the project area |
| 6/09/15 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Special Use Permit for Oak Flat continued encampment |
| 6/11/15 | Official Letter from TNF Supervisor to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Response to 4/2/15 FOIA request |
| 6/19/15 | Official Letter from San Carlos Chairman to U.S. Secretary of Agriculture | Apache | San Carlos Apache Tribe | N/A | Request for government-to-government consultation on NDAA |
| 6/19/15 | TNF Tribal Liaison | Apache | San Carlos Apache Tribe | N/A | Telephone log documenting attempts to set meeting with San Carlos (see also 8/24/15) |
| 6/24/15 | Official Letter from Gila River THPO to TNF Supervisor | O'odham | Gila River Indian Community | N/A | Comments on Baseline EA |
| 6/29/15 | Telephone log documenting TNF staff attempts to set meeting with San Carlos | Apache | San Carlos Apache Tribe | n/a | Multiple attempts to call Attorney General, Chairman, and acting Chairman to set up G2G meeting (see also 6/24/15) |
| 7/09/15 | Official Letter from TNF Supervisor to Tonto Chairman | Apache | Tonto Apache Tribe | N/A | Response to Tonto 6/01/15 comments on Baseline Plan |
| 7/15/15 | Official Letter from TNF Supervisor to GRIC Governor | O'odham | Gila River Indian Community | N/A | Invitation to Gila River Indian Community Governor to consult on the TCP nomination |
| 7/30/15 | Official Letter from National Park Service | N/A | N/A | N/A | Notified TNF of technical errors in TCP nomination |
| 7/31/15 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Invitation to consult about the TCP nomination and Oak Flat |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-15

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 8/04/15 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to consult about the NDAA Land Exchange |
| 8/14/15 | Formal Meeting* with Tribal staffs | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Notes: Land Exchange, Resolution Copper's Baseline Plan |
| 8/17/15 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response to invitation to consult re: SE AZ Land Exchange |
| 8/24/15 | Phone Log and Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Attempting to set up meeting |
| 8/24/15 | Email from TNF Archaeologist to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Written follow up on voicemail left on Attorney General's phone inquiring if Chairman wants to meet with TNF regarding RCM Baseline |
| 9/14/15 | Report (Ethnographic and Ethnohistoric Study of the Superior Area, Arizona) undertaken for RCM project, submitted to TNF for distribution to Tribes | All Tribes (10) | Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | Superior, Arizona area | Identifies sites of importance to Tribes representing Western Apache, Yavapai, O'odham, and Hopi/Zuni Pueblo cultural groups; copies provided to Tribes for review<br>CONFIDENTIAL |
| 9/18/15 | Official Letter from TNF Supervisor to Fort McDowell Government Relations | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to 4/13/15 comments from Fort McDowell Government Relations |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-16

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 9/18/15 | Official Letter from TNF Supervisor to YAN Chairman and cultural staff | Apache Yavapai | Yavapai-Apache Nation | N/A | Response to YAN's 3/31/15 comments on Baseline Plan |
| 9/22/15 | Formal Meeting* with Hopi CPO staff | Puebloan | Hopi Tribe | Kykotsmovi, AZ | Update on Forest projects, including Resolution |
| 9/24/15 | Formal Meeting* with Tribal staffs | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tonto Apache Triba<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Apache representative) | Payson, AZ | Resolution Copper Baseline Plan, TCP Mitigation Plan, Avoidance of Springs |
| 9/28/15 | TNF Tribal Liaison attempts to contact THPO | Apache | San Carlos Apache Tribe | N/A | – |
| 9/30/15 | Official Email from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Provided Superior Area Ethnographic Study and thanked for their participation |
| 10/02/15 | Formal Meeting* with Zuni Leaders | Pueblo | Pueblo of Zuni | Zuni, NM | Update on Forest projects, including Resolution Copper EIS and Land Exchange |
| 10/15/15 | Formal Meeting* with Tribal staffs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | TNF S.O., Phoenix, AZ | Notes: Land Exchange, Baseline Plan of Operations, Oak Flat Traditional Cultural Places |
| 10/21/15 | Formal Meeting* with Tribal staffs | Apache | Mescalero Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Notes: Baseline Plan, Traditional Cultural Places Mitigation Plan, Avoidance of Springs |
| 10/21/15 | TCP Mitigation Plan for Baseline Hydrological and Geotechnical Data Gathering Activities Plan of Operations | | | n/a | Specifics of springs avoidance plan with map showing buffers, and stipulating archaeological monitoring during project<br>CONFIDENTIAL (Site Locations) |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-17

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/22/15 | Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Provided redacted copy of Ethnography as example of FOIA response, and unredacted copy |
| 10/22/15 | TNF Tribal Liaison to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Telephone log of attempts to set meeting |
| 10/27/15 | Official Letter from San Carlos A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Decline consulting on Resolution Copper Mine as unaware that TNF has been delegated the responsibility |
| 11/02/15 | Email from TNF Tribal Liaison to GRIC THPO | O'odham | Gila River Indian Community | N/A | Provided information prior to 11/6/15 meeting |
| 11/04/15 | Official Letter from USDA Secretary to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to 6/19/15 San Carlos letter re: consultation about Land Exchange |
| 11/06/15 | Formal Meeting* with Tribal staff | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | TNF S.O., Phoenix, AZ | Baseline Plan and proposed mitigations for TCPs |
| 11/16/15 | Formal Meeting* with Tribal staff | Yavapai | Fort McDowell Yavapai Nation | Fountain Hills, AZ | Land Exchange, Baseline EA |
| 11/30/15 | Formal Meeting* with Tribal staffs | Yavapai | Fort McDowell Yavapai Nation<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | Prescott, AZ | Resolution Copper Baseline Plan, Land Exchange, Apache Leap SMA |
| 12/18/15 | Formal Meeting* with Tribal staffs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | Sacaton, AZ | Notes: Land Exchange, Superior Area Ethnographic Study, Resolution Copper's Baseline Plan -- Traditional Cultural Places Mitigations, Oak Flat Traditional Cultural Place |
| 1/13/16 | Formal Meeting* with Tribal staffs | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Notes: Baseline EA draft decision notice |
| 1/15/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | Apache Pueblo Yavapai | Hopi Tribe<br>San Carlos Apache Tribe<br>White Mountain Apache Yavapai-Prescott Indian Tribe | N/A | Regarding EA on Hydro/geo baseline study |
| 2/29/16 | Official Letter from San Carlos Chairman to Regional Forester | Apache | San Carlos Apache Tribe | N/A | Objections to Baseline Hydrological and Geotechnical Data Gathering FONSI |
| 3/01/16 | TNF Tribal Liaison and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Telephone log re: attempts to set meeting to discuss objections to Baseline EA |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-18

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/04/16 | NRHP Listing | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Superior area | Oak Flat Traditional Cultural Place, Superior Area Ethnographic Study |
| 3/07/16 | Internal TNF Table summarizing consultation to date regarding RCM Baseline | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | RCM Baseline |
| 3/08/16 | Official Letter from Region 3 Forester to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Acknowledge receipt of objections to Baseline EA |
| 3/16/16 | Email from Ft McDowell Governmental Relations to TNF Supervisor | Yavapai | Fort McDowell Yavapai Nation | N/A | Five questions regarding TCP, ALSMA mgmt. plan, mtg notes, timelines, next mtg |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-19

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/16/16 | Official email from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Official start of environmental review for Resolution Copper Project and land exchange |
| 3/17/16 | Email from TNF Tribal Liaison to Salt River Chairman | O'odham | Salt River Pima-Maricopa Indian Community | N/A | Resent 3/16/16 email that bounced |
| 3/18/16 | Email from San Carlos Attorney General to TNF Archaeologist | Apache | San Carlos Apache Tribe | n/a | Confirms G2G meeting for 4/06–4/07/16 on RCM Baseline and MOU with USDA regarding Land Exchange; MOU will be transmitted to Vilsack and Bosworth on 3/21/16 |
| 3/21/16 | Official Letter from San Carlos Chairmen to USDA Secretary and TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Conveyed draft proposed Land Exchange Memorandum of Understanding (MOU) |
| 4/01/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requesting comment on scope of EIS |
| 4/01/16 | Email from TNF Deputy Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Regarding the MOU |
| 4/01/16 | Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Draft MOU revisions |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-20

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/04/16 | Email from TNF Archaeologist to San Carlos Chairman and Attorney General | Apache | San Carlos Apache Tribe | n/a | Provided draft agenda for 4/06/16 meeting and digital copy of scoping letter (PR 2957) |
| 4/06/16 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response on scope of the EIS |
| 4/06/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Resolution Copper's Baseline Finding of No Significant Impact |
| 4/06/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Initiate government-to-government consultation and MOU |
| 4/06/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request for extension to scoping period |
| 4/06/16 | Formal Meeting* with Tribal Leaders | Apache | San Carlos Apache Tribe | TNF S.O., Phoenix, AZ | Update on Forest projects, including Resolution Copper EIS, Baseline Study, and Land Exchange |
| 4/12/16 | Formal Meeting* with Tribal Leaders | Puebloan | Pueblo of Zuni | Zuni, NM | Discussed Resolution Copper Project, requested video of elders visiting project area |
| 4/19/16 | Email from San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Additional requests for information |
| 4/22/16 | Official Letter from TNF Supervisor to Hopi CPO | Puebloan | Hopi Tribe | N/A | Responding to 4/6/16 Hopi letter re: the EIS process |
| 4/26/16 | Presentation by TNF Staff | O'odham | Ak-Chin Indian Community Gila River Indian Community Salt River Pima-Maricopa Indian Community | Scottsdale, AZ | Update on Forest projects including Resolution Copper Project EIS and Land Exchange, for Four Southern Tribes Cultural Group |
| 4/26/16 | Official Letter from Acting Regional Administrative Review Coordinator to San Carlos Chairman | | San Carlos Apache Tribe | N/A | [mentioned in 4/29/16 San Carlos letter] |
| 4/29/16 | Official Letter from San Carlos Chairman to Acting Regional Administrative Review Coordinator | Apache | San Carlos Apache Tribe | N/A | Oppose Baseline activities plan |
| 5/04/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Comments received on Baseline Plan |
| 5/04/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Extension of Scoping period; other issues to be discussed at 5/16/16 meeting in San Carlos |
| 5/04/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Confirmed action items from 4/06/16 meeting regarding the NDAA MOU and the meeting set for 5/18/16 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-21

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 5/06/16 | Email from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Provided alternate times/dates for telephona conference with Regional Forester regarding objections to Baseline FONSI |
| 5/13/16 | Official Letter from San Carlos Chairman to Regional Forester | Apache | San Carlos Apache Tribe | N/A | San Carlos objections to Baseline Plan Finding of No Significant Impact |
| 5/16/16 | Official Letter from Regional Forester to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Analysis of San Carlos objections; approval of Baseline Plan |
| 5/17/16 | Emails between San Carlos and TNF | Apache | San Carlos Apacha Triba | N/A | Cancelled 5/18/16 meeting |
| 6/17/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided TNF Points of Contact for Land Exchange MOU and invitation to tour |
| 6/21/16 | Email from TNF Tribal Liaison to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided TNF Points of Contact for Land Exchange MOU |
| 6/30/16 | Email from TNF Tribal Liaison to San Carlos Chairman and Attorney General | Apacha | San Carlos Apache Tribe | n/a | Follow up to 6/17/16 invitation to tour and discuss groundwater issues on 7/12–13; Attorney General responded that Dr. Wells will attend on behalf of Attorney General |
| 7/14/16 | Official Letter from White Mountain Apache THPO to TNF Mine Specialist | Apache | White Mountain Apache Tribe | N/A | White Mountain Apache Tribe provided comments on Resolution public scoping |
| 7/18/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apacha Triba | N/A | San Carlos Apache Tribe provided comments on Resolution public scoping |
| 8/25/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Decision Notice: Finding of No Significant Impact for Baseline Plan of Operations |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-22

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/29/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Requesting consultation re: Apache Leap SMA Management Plan |
| 10/31/16 | Email from San Carlos A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Conveyed draft MOU |
| 11/02/16 | Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Acknowledge receipt of draft MOU |
| 11/03/16 | Formal Meeting* USDA and San Carlos Chairman | Apache | San Carlos Apache Tribe | Washington, DC | Notes from San Carlos/USDA Meeting (author unknown) |
| 11/07/16 | Emails San Carlos Attorney General and TNF Tribal Liaison | Apache | San Carlos Apache Tribe | n/a | Attempts to set meeting to discuss MOU |
| 11/16/16 | TNF leaders and staff met with Fort McDowell representative | Yavapai | Fort McDowell Yavapai Nation | Unknown | TNF Tribal consultation form documented RCM Baseline Plan discussion |
| 11/23/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Will meet 12/14/16 to discuss MOU and other Land Exchange issues |
| 11/29/16 | Formal Meeting* with Tribal cultural staff | Yavapai | Fort McDowell Yavapai Nation Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | TNF S.O., Phoenix, AZ | Land Exchange, Resolution Copper Project (EIS), Apache Leap SMA |
| 12/01/16 | Email from TNF Tribal Liaison to San Carlos Chairman and A.G. | Apache | San Carlos Apache Tribe | N/A | Provided agenda for Apache Cultural meeting 12/09/16 |
| 12/08/16 | Email from San Carlos Attorney General to TNF Tribal Liaison | Apache | San Carlos Apache Tribe | n/a | Questions about topics for meeting |
| 12/09/16 | Formal Meeting* with Tribal cultural staff | Apache | Mescalero Apache Tribe San Carlos Apache Tribe Tonto Apache Tribe | Payson, AZ | Land Exchange, EIS, Apache Leap SMA |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-23

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/12/16 | Email from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Conveyed Land Exchange MOU with proposed edits |
| 12/13/16 | Formal Meeting* with Tribal Leaders | Pueblo | Pueblo of Zuni | Zuni, NM | Land Exchange, EIS, Apache Leap SMA |
| 12/14/16 | Formal Meeting* with Tribal Leader and staff | Apache | San Carlos Apache Tribe | TNF S.O., Phoenix, AZ | Land Exchange, EIS, Apache Leap SMA, MOU re: government-to-government consultation |
| 12/20/16 | Formal Meeting* with Tribal cultural staff | Yavapai | Fort McDowell Yavapai Nation | TNF S.O., Phoenix, AZ | Land Exchange, EIS, Apache Leap SMA |
| 12/30/16 | Formal Meeting* with Tribal cultural staff | O'odham | Salt River Pima-Maricopa Indian Community<br>Gila River Indian Community | TNF S.O., Phoenix, AZ | Land Exchange, EIS, Apache Leap SMA |
| 1/10/17 | Field Trip | O'odham | Salt River Pima-Maricopa Indian Community<br><br>Gila River Indian Community | Superior, AZ | Land Exchange and Proposed Tailings Location |
| 1/11/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | MOU re: government-to-government consultation |
| 2/16/17 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | MOU re: government-to-government consultation |
| 2/16/17 | Informal Meeting TNF Tribal Relations Program Manager and Tribal staff | Apache | Yavapai-Apache Nation<br>(Apache Cultural representatives) | Camp Verde, AZ | Apache Leap SMA and Resolution EIS |
| 3/07/17 | Formal Meeting* with Tribal leaders and staff | Apache | Mescalero Apache Tribe | Mescalero, NM | Update on Forest projects, including Apache Leap SMA and Resolution EIS |
| 3/20/17 | Email from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Invitation to meetings on 4/27 and 4/28 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-24

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/20/17 | Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation | N/A | Invitation to meetings and tour, 4/27 and 4/28 |
| | | | Gila River Indian Community | | |
| | | | Hopi Tribe | | |
| | | | Mescalero Apache Tribe | | |
| | | | Pueblo of Zuni | | |
| | | | Salt River Pima-Maricopa Indian Community | | |
| | | | San Carlos Apache Tribe | | |
| | | | Tonto Apache Tribe | | |
| | | | White Mountain Apache Tribe | | |
| | | | Yavapai-Apache Nation (representatives of both) | | |
| | | | Yavapai-Prescott Indian Tribe | | |
| 3/29/17 | Formal Meeting* with Hopi CPO | Puebloan | Hopi Tribe | Kykotsmovi, AZ | Land Exchange, EIS, Apache Leap SMA |
| 4/07/17 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Apache Leap SMA brochure and draft agenda for April 27 meeting and field visits |
| 4/27/17 | Formal Meeting* and field tour with Tribal Leaders and cultural staff | All Tribes (11) invited | Ak-Chin Indian Community | Superior, AZ | Meeting: EIS and addressing adverse effects Tour: JI Ranch as possible mitigation |
| | | | Gila River Indian Community | | |
| | | | Mescalero Apache Tribe | | |
| | | | Salt River Pima-Maricopa Indian Community | | |
| | | | San Carlos Apache Tribe | | |
| | | | Tonto Apache Triba | | |
| | | | White Mountain Apache Tribe | | |
| | | | Yavapai-Apache Nation (Apache and Yavapai representatives) | | |
| 4/27/17 | Comment Form | Apache | San Carlos Apache Tribe | Superior, AZ | Chairman Rambler provided written comments at All Tribes meeting |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-25

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/28/17 | Field Trip | All Tribes (11) invited | Ak-Chin Indian Community<br>Gila River Indian Community<br>Mescalero Apache Tribe<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Yavapai representatives) | Superior area | Tour of Mine and Proposed Facilities areas |
| 5/01/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on Apache Leap SMA plan and EA |
| 5/15/17 and 5/16/17 | Field Trips | All Tribes invited (11) | Ak-Chin Indian Community Mescalero Apache Tribe | Superior, AZ | Hike to top of Apache Leap and tour of Resolution Mine shaft |
| 5/18/17 | Official Email from TNF Supervisor to Leaders and staff | All Tribes (11) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed minutes from 4/27 and 4/28 all tribes mtg, provided link to Apache Leap draft management plan, asked for comments by June 16 |
| 6/30/17 | Official Letter from TNF ALSMA Project Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Requested comments on ALSMA management plan |
| 7/05/17 | Formal Meeting* with Tribal Leader and Staff | Apache | Yavapai Apache Nation (Apache cultural representatives) | Camp Verde, AZ | Tailings Alternatives |
| 7/07/17 | Email from TNF Deputy Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Re: Apache Leap Special Management Area Management Plan |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-26

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|--------------------|----------|--------------------|
| 7/10/17 | Email from TNF Tribal Relations Program Manager to YAN Chairman and staff | Apache Yavapai | Yavapai-Apache Nation | N/A | Provided items requested in 7/05/17 meeting |
| 7/13/17 | Formal Meeting* of TNF and SHPO | | Arizona State Historic Preservation Officer | TNF S.O., Phoenix, AZ | Section 106 process, PA, tribal consultation |
| 7/20/17 | Official Letter from TNF Supervisor to Tribal Leaders and cultural staff | All Tribes invited | Ak-Chin Indian Community  Fort McDowell Yavapai Nation  Gila River Indian Community  Hopi Tribe  Mescalero Apache Tribe  Pueblo of Zuni  Salt River Pima-Maricopa Indian Community  San Carlos Apache Tribe  Tonto Apache Tribe  White Mountain Apache Tribe  Yavapai-Apache Nation (representatives of both)  Yavapai-Prescott Indian Tribe | TBD | Invitation to All Tribes meeting October 5, 2017 |
| 7/26/17 | Email from TNF Tribal Relations Program Manager to Ak-Chin Cultural Staff | O'odham | Ak-Chin Indian Community | n/a | Invitation to All Tribes meeting 10/05/17 |
| 7/31/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on modified Apache Leap SMA Management Plan |
| 8/02/17 | Official Letter from TNF Supervisor to San Carlos Apache Tribal Council | Apache | San Carlos Apache Tribe | N/A | Request to engage in formal government-to-government meeting with tribal council re: Apache Leap SMA |
| 8/09/17 | Email from TNF RCM Project Lead to San Carlos Water Consultant | Apache | San Carlos Apache Tribe | n/a | Invitation to join groundwater modeling analysis group meeting on 9/17/17 |
| 8/16/17 | Email from TNF Tribal Relations Program Manager to Zuni THPO | Pueblo | Pueblo of Zuni | n/a | Requested Zuni review of ALSMA Management Plan, setting up elders visit to ALSMA and fall Council meeting |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-27

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|-----------------------|----------|----------------------|
| 9/07/17 | Official Letter from TNF Supervisor to Tribal Leader and Cultural Staff | All Tribes (12) invited | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | n/a | Invitation to second All Tribes meeting on 10/05/17 |
| 10/05/17 | Formal Meeting* with Tribal Leaders and Staffs | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Payson, AZ | Apache Leap SMA, EIS, Tailings Alternatives, SHPO Consultation |
| 10/06/17 | Field Trip | All Tribes (11) invited | Mescalero Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Yavapai)<br>Yavapai Prescott Indian Tribe<br>Pueblo of Zuni | Superior area | Field Trip to Peg Leg Tailings Alternative |
| 10/10/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Letter to Regional Forester Objecting to Final Apache Leap EA |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal Issues.

S-28

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 10/23/17 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes Invited | Ak-Chin Indian Community<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requesting Tribal Input on Tailings Alternatives |
| 10/25/17 | Email from SWCA to White Mountain elder | Apache | White Mountain Apache Tribe | n/a | Provided information on water associated with Apache Leap/Oak Flat as requested at All Tribes meeting |
| 11/01/17 | Email from TNF RCM Project Lead to San Carlos Attorney General | Apache | San Carlos Apache | n/a | Provided links to requested information |
| 11/02/17 | Email from TNF Tribal Relations Program Manager to Tribes | All Tribes (11) | Ak-Chin Indian Community<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided link to Tailings Alternatives report |
| 11/29/17 and 11/30/17 | Field Trips | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Apache representatives) | Superior area | Field Trip to Peg Leg Tailings Alternative and Mine Tour |
| 12/06/17 | Official Letter from White Mountain THPO to TNF Supervisor | Apache | White Mountain Apache Tribe | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |
| 12/06/17 | Official Letter from Tonto Apache Chairwoman and cultural staff to TNF Supervisor | Apache | Tonto Apache Tribe | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-29

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/06/17 | Official Letter from Yavapai-Apache Nation Chairwoman and cultural staff to TNF Supervisor | Apache | Yavapai-Apache Nation (Apache representatives) | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |
| 12/08/17 | Official Letter from Mescalero Apache Present and THPO to TNF Supervisor | Apache | Mescalero Apache Tribe | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |
| 1/08/18 | Official Letter from Hopi CPO | Puebloan | Hopi Tribe | N/A | Note: Letter written but never mailed by Hopi (confirmed by Hopi CPO) |
| 1/09/18 | Formal Meeting* of TNF Supervisor with San Carlos Chairman and Staff | Apache | San Carlos Apache Tribe | San Carlos, AZ | Tailings Alternatives/Mining Technique |
| 1/23/18 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Support for Peg Leg and request for additional data |
| 1/25/18–2/02/18 | Tribal Monitor Training | All Tribes invited | Ak-Chin Indian Community Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Salt River Pima-Maricopa Indian Community White Mountain Apache Tribe Yavapai-Apache Nation | Chandler and Globe, AZ | First training of Tribal Monitors |
| 2/09/18 | Email from TNF Supervisor to San Carlos Chairman (and email from Lyndon w/corrected attachment) | Apache | San Carlos Apache Tribe | N/A | Asked if TNF had any outstanding items from mtg, sent mtg notes, and asked for San Carlos' promised mine deposit characterization |
| 2/12/18 | Email from SWCA to San Carlos Chairman with link to requested data | Apache | San Carlos Apache Tribe | N/A | Provided additional data requested at Jan 10, 2018, meeting |
| 3/13/18 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided digital copy of mailed invitation to May 2 meeting |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-30

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/14/18 | Official Letter from TNF Supervisor to Tribal Leaders and Staff | All Tribes (11) invited | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to 3rd All Tribes meeting on Resolution Copper Mine, May 2 |
| 3/14/18 | Emails TNF Tribal Relations Program Manager and San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Regarding 5/03/18 Apache meeting |
| 3/21/18 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache | N/A | Will attend 5/02/18 All Tribes; requested agenda materials 2 weeks prior to meeting; thanked for materials sent by SWCA |
| 4/09/18 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and cultural staff | All Tribes (11) and TNF leaders | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Sent draft agenda for 5/02/18 All Tribes meeting and invitation to participate in development of PA (version 3); attachments included Section 106 Status Report; Resurvey/TCP of Oak Flat outline; and Oak Flat HPTP outline; and SharePoint link to file containing inventory reports |
| 4/27/18 | Formal Meeting* with Tribal Staffs | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | TNF S.O., Phoenix, AZ | Update on Forest projects and Resolution EIS; provided PA outline |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-31

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/01/18 | Formal Meeting* with Tribal Staffs | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>Yavapai-Apache Nation (Apache representatives)<br>White Mountain Apache Tribe | Flagstaff, AZ | Update on Forest projects and Resolution EIS; provided PA outline |
| 5/02/18 | Formal Meeting* with Tribal Leaders and Staffs | All Tribes invited | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Flagstaff, AZ | Update on Resolution Copper Project; discuss Oak Flat treatment; provided PA outline |
| 5/03/18 | Formal Meeting* with Tribal Staffs | Puebloan | Hopi Tribe Pueblo of Zuni | Flagstaff, AZ | Update on Forest projects and Resolution EIS |
| 5/04/18 | Email from TNF RCM Project Manager to San Carlos Attorney General Office | | San Carlos Apache Tribe | n/a | Provided maps of alternative tailings locations, requested at 5/2/18 All Tribes meeting |
| 5/10/18 | SWCA provided maps requested by THPOs at All Tribes meeting | Apache | Mescalero Apache San Carlos Apache | N/A | Large format map of Oak Flat archaeology sites sent to both tribes; pdf of Alternatives map, Springs map, and Alt 6 map to San Carlos |
| 5/23/18 | Formal Meeting of Agencies, | N/A | TNF BLM SHPO | TNF S.O., Phoenix, AZ | TNF's April 2018 Section 106 report; PA |
| 5/24/18 | Internal TNF Project Summary | | | | Tribal consultation regarding RCM tailings alternatives |

\* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 5/29/18 and 5/30/18 | Field Tour and Discussions with Elders | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | Peg Leg Tailings Alternative | Tour and Discussion of TCPs recorded by Tribal Monitors |
| 6/05/18 | Email from TNF Tribal Relations Program Manager to Tribal cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Announced second Tribal Monitor Training and requested nominations |
| 6/07/18 | Formal Meeting* with Tribal Staffs | Yavapai | Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | TNF S.O., Phoenix, AZ | Update on Forest projects and Resolution EIS |
| 6/13/18 | Programmatic Agreement (PA) Public Workshop | All Tribes | Tohono O'odham Nation | Tucson, AZ | PA Contents |
| 6/14/18 | Formal Meeting* with Tribal Council Executive Committee and Staff | Apache | Mescalero Apache Tribe | Mescalero, NM | Discussion on Resolution Copper Mine |
| 9/04/18 | Formal Meeting* with Tribal Council | Puebloan | Pueblo of Zuni | Zuni, NM | Discussion on Resolution Copper Mine |
| 9/16/18 | Emory Oak meeting | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Tribe | Camp Verde, AZ | Kickoff meeting to set objectives and identify potential groves for restoration |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-33

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/28/18 | Official Letter from TNF Supervisor to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Request for comment on draft HPTP and PA version 3 (provided on share drive 4/9/18); due Nov 9 |
| 10/1/18–10/10/18 | Tribal Monitor Training | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | San Carlos, AZ | Second Tribal Monitor Training |
| 10/15/18 | Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Request for comment on Peg Leg Tailings Alternative Tribal Perspectives Report, due Nov. 9, 2018<br><br>CONFIDENTIAL [report not included in PR] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-34

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 10/25/18 | Emails between Zuni Governor and TNF Tribal Relations Program Manager | Puebloan | Pueblo of Zuni | N/A | Requested extension of deadline for identifying NDAA mitigation measures |
| 11/13/18 | Official Letter from Hopi CPO | Puebloan | Hopi Tribe | N/A | Comment on Peg Leg Tailings TM Report |
| 11/7/18 | Email from TNF Tribal Relations Program Manager to BLM Cultural Resources Specialist | Cooperating Agency | | | Conveyed Hopi comment on Peg Leg TM report |
| 11/14/18 and 11/15/18 | Field Tours and Discussions with Elders | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni | Near West and Silver King areas | Tour and Discussion of TCPs recorded by Tribal Monitors |
| 11/19/18 | Email from TNF Tribal Relations Program Manager | All Tribes (11) invited | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to attend 11/26/18 meeting to discuss draft PA |
| 11/26/18 | Formal Meeting* with Cooperating Agencies and Consulting Tribes | All Tribes (11) invited | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community<br>ACHP, BLM, AZ SHPO, ASLD | TNF S.O., Phoenix, AZ | Discussion of proposed changes to draft PA version 3 |
| 11/28/18 | Emory Oak Field Trip | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation (Apache representatives) | Camp Verde area | Examined potential groves |
| 12/03/18 | Official Letter Signed by TNF and BLM | Apache O'odham Yoeme | Ak-Chin Indian Community<br>Fort Sill Apache Tribe<br>Pascua Yaqui Tribe<br>Tohono O'odham Nation | N/A | Invitation to 4 additional tribes BLM consults, to consult regarding the Peg Leg Alternative area |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-35

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 2/05/19 | Emory Oak Field Trip | Apache | Tonto Apache Tribe | Payson, AZ | Examined potential groves |
| 2/13/19 | Official Email from TNF Tribal Relations Program Manager | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed PA version 4, asking for comments by March 15, 2019, and informing of meeting to discuss on March 27 or 28, 2019 |
| 2/21/19 | Email from Gila River Native American Graves Protection and Repatriation Act (NAGPRA) Staff to TNF Tribal Relations Program Manager | O'odham | Gila River Indian Community | n/a | Provided comments on draft Oak Flat Burial Plan and referred TNF to Gila River CR Management Program Director for cost of treatment of human remains |
| 2/28/19 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to Discuss Draft PA on 3/28 and to Attend All Tribes Consultation Meeting on 3/29; conveyed PA version 4 |
| 3/08/19 | Email from Hopi Tribe to TNF Tribal Relations Program Manager | Puebloan | Hopi Cultural Preservation Office Program Manager | N/A | Comments on PA version 4 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-36

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|--------------------|----------|---------------------|
| 3/11/19 | Formal Meeting* of TNF Supervisor with Mescalero Leaders, staff, and elders | Apache | Mescalero Apache Tribe | Superior, AZ | Annual consultation meeting: and update on Resolution Copper Project EIS; PA version 4 with comments due 3/28/19; viewed Oak Flat from Mine East Plant |
| 3/15/19 | Official Letter from San Carlos | Apache | San Carlos Apache Tribe | N/A | Comments on PA draft version 4 and request for informal staff meeting and formal presentation to Council |
| 3/25/19 | Email from San Carlos THPO to TNF | Apache | San Carlos Apache Tribe | N/A | Requested large format maps on paper [provided by SWCA via mail] |
| 3/25/19 | Emory Oak - Red Rock IDT Meeting | Apache | Tonto Apache Tribe Yavapai-Apache Nation (Apache representatives) | Red Rock Ranger Station | Discussed objectives, potential treatments, and NEPA status of groves examined in Red Rock District of Coconino NF |
| 3/28/19 | Formal Meeting* with Cooperating Agencies and Consulting Tribes | All Tribes (11) invited | Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | Phoenix, AZ | Discussion of PA Version 4 |
| 3/28/19 | Tour of Huhugam Curation Facility | All Tribes (11) invited | Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | Wild Horse Pass | Tour of proposed curation facility for project archaeological collections |
| 3/29/19 | Formal Meeting* with All Tribes | All Tribes (11) invited | Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | Phoenix, AZ | Update on status of Resolution Copper EIS, PA, HPTPs, and discussion |
| 3/29/19 | Email from SWCA to Hopi Archaeologist | Pueblo | Hopi Tribe | n/a | Provided requested copy of PowerPoint from 3/29/19 meeting |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/02/19 | Email from TNF Tribal Relations Program Manager to All Tribes | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Thanked for attending All Tribes mtg and advised of Skunk Camp Elders Tour May 6 and 7 and TM Training Aug/Sep |
| 4/03/19 | Official Email from TNF Tribal Relations Program Manager | Puebloan | Hopi Tribe CPO | N/A | Response to Hopi comments on draft PA |
| 4/04/19 | Formal Meeting* with Tribal Staffs | O'odham | Gila River Indian Community<br>Salt River Indian Community | TNF S.O., Phoenix, AZ | Annual consultation; focus on Resolution Copper Mine |
| 4/10/19 | Emory Oak – FS planning meeting | N/A | None | Tele meeting | Forest staff planning for NEPA and NHPA requirements for groves identified on Coconino National Forest |
| 4/12/19 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to Chair and Staff to attend Elders Tour of Skunk Camp Tailings Alternative |
| 4/12/19 | Email from TNF Tribal Relations Program Leader to San Carlos Chair, A.G., and cultural staff | Apache | San Carlos Apache Tribe | N/A | Provided digital copy of TNF Supervisor's 4/12/19 invitation to tour Skunk Camp |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-38

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 4/15/19 | Formal Meeting* with Tribal Leaders and Staff | Apache Yavapai | Yavapai-Apache Nation | Camp Verde, AZ | Annual consultation and discussion of mitigation for Resolution Copper Project |
| 4/18/19 | Emory Oak Field Trip | Apache | Yavapai-Apache Nation | Fossil Creek, AZ | Examined potential groves identified by YAN-Apache elders near Fossil Creek |
| 4/24/19 | Formal Meeting* with Tribal Leaders and Staff | Puebloan | Pueblo of Zuni | Zuni | Annual consultation and discussion of mitigation for Resolution Copper Project |
| 4/25/19 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to SC letter of 3/15/19 re: PA |
| 4/25/19 and 5/02/19 | Emails between TNF Tribal Relations Program Manager and San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Response to request for TM assistance in San Carlos archaeology training; thank you from San Carlos THPO for TM good job speaking with trainees |
| 4/30/19 | Email from TNF Tribal Relations Program Manager to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided agenda for May 6 and 7 tour of Skunk Camp |
| 5/02/19 | Email from TNF Tribal Relations Program Manager to Zuni Governor | Puebloan | Pueblo of Zuni | N/A | Conveyed 4/24/19 meeting notes |
| 5/08/19 and 5/07/19 | Field Trip with Tribal Leaders, Staff, and Elders | All Tribes (11) invited | Gila River Indian Community<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache<br>Yavapai-Apache Nation (Apache) | Skunk Camp area | Tour and discussion of Skunk Camp Tailings Alternative led by Tribal Monitors |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-39

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 5/14/19 | Formal Meeting* with Tribal Leader and Staff | Apache | San Carlos Apache Tribe | San Carlos, AZ | Discussion of PA, mining technique, and water analyses |
| 5/16/19 | Email from TNF Tribal Relations Program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | N/A | Provided status of TM plant guide |
| 5/17/19 | Email from San Carlos A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Requested information regarding EIS analyses |
| 5/30/19 | Formal Meeting* with Tribal Staff | Puebloan | Hopi Tribe | Flagstaff, AZ | Annual consultation update and PA version 4.9 |
| 6/05/19 | Emory Oak Elders Advisory Meeting and Field Trip | Apache | San Carlos Apache Tribe White Mountain Apache Tribe | Globe Ranger District | Discussed project approaches, examined potential groves in Globe Ranger District, and discussed potential groves on WMAT and SCAT |
| 6/11/19 | Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Provided PA version 5 (no appendices) as attachment; hardcopies to follow; requested comments by 6/21/19; notified of PA signatories teleconference on 6/25/19; tribes contact Tribal Relations Program Manager if want to attend |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/12/19 (letter dated 5/20/19, not mailed until 6/12 due to closure of TNF S.O. Bldg) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Provided flash drive with: PA version 5 and appendices (requested comments by June 19, 2019), Oak Flat HPTP with Burial Plan of Action (requested comments by June 28, 2019) |
| 6/14/19– 6/15/19 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Regarding information requested by San Carlos and providing PA version 5 Appendices requested in 6/14/19 email from A.G. |
| 6/17/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Provided items 1 and 3 requested 5/17/19 after 5/14/19 meeting between TNF and San Carlos; items 2 and 4 anticipated in July |
| 6/18/19 | Emory Oak – Red Rock District IOT Meeting | Apache | Yavapai-Apache Nation | Red Rock Ranger District | Discussed NEPA status of identified groves |
| 6/25/19 | Teleconference regarding PA | All Tribes (11) invited | No tribe attended; only PA signatories | N/A | Discussed PA version 5 |
| 7/08/19– 7/09/19 | Emory Oak Elders Advisory Council Meeting and Field Trip | Apache | San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Payson/ Young | Discussed project objectives and approaches; examined potential groves |
| 7/10/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on PA version 5 |
| 7/25/19 | Email from TNF Tribal Relations Program Manager to Apache cultural staff | Apache | San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | N/A | Coordinating August 2 tour of newly discovered Apache Rockshelter at Oak Flat |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-41

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/26/19 | Emails between TNF Tribal Relations Program Manager and Zuni THPO | Puebloan | Pueblo of Zuni | N/A | Provided PA version 5 for review; discussed project history via telephone |
| 7/26/19 | Copy of letter from San Carlos Chairman to AZ Tribes, NCAI, and PA Signatories | All SW Tribes | Ak-Chin Indian Community<br>Cocopah Indian Tribe<br>Colorado River Indian Tribe<br>Fort McDowell Yavapai Nation<br>Fort Mojave Indian Tribe<br>Fort Sill Apache Tribe<br>Fort Yuma Quechan Tribe<br>Gila River Indian Community<br>Havasupai Tribe<br>Hopi Tribe Hualapai Tribe<br>Kaibab Paiute Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Juan Paiute Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Criticized TNF PA Consultation |
| 8/02/19 | Field visit by Apache Tribes to Oak Flat | Apache | San Carlos Apache | Oak Flat, AZ | All Apache tribes cultural staff were invited; only San Carlos THPO staff and their family members attended |
| 8/05/19 and 8/06/19 | Email from TNF Tribal Relations Program Manager to Zuni THPO | Puebloan | Pueblo of Zuni | N/A | Discussed project background on phone 8/05/19 and sent requested Superior Area Ethnography in 8/06/19 email |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-42

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/09/19 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Announcing publication of DEIS, invitation to public meetings, and to consult |
| 8/12/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Conveyed items 2 and 4 of 5/17/19 request; release of DEIS and comment period; and imminent release of PA version 6 |
| 8/16/19 | Official Email from TNF Tribal Relations Program Manager to Tribes cultural staff | All Tribes (11) (except San Carlos) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed PA version 6 and requested comments by 9/13/19 |
| 8/16/19 | Email from TNF Tribal Relations Program Manager to San Carlos leaders and staff | Apache | San Carlos Apache | N/A | Conveyed PA version 6 and clarified comments due 9/13/19 |
| 8/16/19 | San Carlos THPO to TNF Tribal Relations Program Manager | Apache | San Carlos Apache | N/A | Provided Tribal Consultation Response form re: DEIS comments; deferred to San Carlos A.G. |
| 8/16/19 | Email from TNF Heritage Program Manager to PA Signatories | N/A | N/A | N/A | Conveyed PA version 6, appendices, and comments crosswalk |

* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-43

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 8/19/19 | Email from TNF Tribal Relations Program Manager to White Mountain Chair | Apache | White Mountain Apache Tribe | N/A | Seeking protocol for obtaining approval for EOCTRI program on WMAT reservation |
| 8/20/19 | Email from San Carlos THPO Office to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | San Carlos consultation form requesting face-to-face mtg re: DEIS |
| 8/20/19 | Email reply from TNF Tribal Relations Program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | N/A | Offer to work with San Carlos THPO to set up meeting |
| 8/23/19 | Emory Oak Meeting and Field Trip | Apache | White Mountain Apache Tribe | Cibecue, AZ | Examined groves and discussed steps to restore on tribal land |
| 8/26/19 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager and response | Apache | San Carlos Apache Tribe | N/A | Questions about EOCTRI program answered by TNF |
| 8/29/19 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to 7/26/19 San Carlos letter about PA process |
| 8/29/19 | Email from TNF Tribal Relations Program Manager to Chairman | Apache | San Carlos Apache Tribe | N/A | Conveyed Bosworth 6/12/19 letter with PA version 6 |
| 8/29/19 | Email from TNF Tribal Relations Program Manager to Chairman | Apache | San Carlos Apache Tribe | N/A | Sent attachment missing from earlier 8/29/19 email |
| 8/29/19 | Formal Meeting TNF/SHPO | N/A | N/A | SHPO, Phoenix, AZ | Discussed consultation and PA |
| 9/04/19 | Official Letter from Chairman to TNF Supervisor | Yoeme | Pascua Yaqui Tribe | N/A | Comments on consultation process, tribal monitor program, and PA in present form |
| 9/09/19–9/16/19 | Tribal Monitor Training | All Tribes | Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni White Mountain Apache Tribe Yevapai-Apache Nation (representatives of both) | | Third Tribal Monitor Training |
| 9/17/19 | Email from TNF Tribal Relations Program Manager | PA Signatories | N/A | N/A | Provided TNF's 8/29/19 response to San Carlos' 7/10/19 letter |
| 9/17/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Requested meeting with Tribal Council |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-44

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/17/19 | Phone call from TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | N/A | Requested meeting with Tribal Council |
| 9/17/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Requested extension of comment period on DEIS; SO mtg re: Tribal Monitor Program; and field visit to Skunk Camp |
| 9/18/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | N/A | N/A | N/A | Provided copy of 6/12/19 Bosworth Letter conveying PA version 6 to tribes |
| 9/18/19 | Email from TNF Tribal Relations Program Manager to Tohono O'odham THPO | O'odham | Tohono O'odham Nation | N/A | Follow-up on telephone call to inquire if TO want to consult on Resolution Copper Mine |
| 9/23/19 | Email from TNF Tribal Relations Program Manager to All Tribes chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Save the date for next All Tribes meeting October 28, 2019 |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-45

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 9/25/19 | Official Letter from TNF Supervisor to All Tribes chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed flash drive with GPO SIR Vol I; Summary of Findings and Vol II: Site Descriptions and reports dated 2003–2017 |
| 9/27/19 | Email from TNF Heritage Program Manager to ACHP | N/A | N/A | N/A | Provided copy of 9/25/19 TNF Official Letter to tribes |
| 9/30/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on PA Ver 6; cc: to SHPO, USACE, ACHP, BLM and all Arizona tribes |
| 10/01/19 | Email from San Carlos A.G. Office to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Conveyed copy of Rambler's 9/30/19 letter |
| 10/01/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. Office | Apache | San Carlos Apache Tribe | N/A | Requested meeting for Bosworth with Chairman and invited to October 28–29 meetings |
| 10/02/19 | Email from TNF Tribal Relations Program Manager to WMAT Tribal Council Administration | Apache | White Mountain Apache Tribe | N/A | Requested time to present information about TM Program to Tribal Council |
| 10/02/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Reply to 9/17/19 request for extension on DEIS comments, public mtg at SC, TM Program discussion, CR data, Skunk Camp tour |
| 10/02/19 | Email from San Carlos A.G. to TNF Supervisor and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Inquired whether TNF would provide formal response on SC's 9/30/19 PA comments |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-46

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/02/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Bosworth travelling this week; will respond to SC 9/30/19 letter upon return |
| 10/03/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman's Office and A.G. | Apache | San Carlos Apache Tribe | N/A | Conveyed cultural documents sent to USACE |
| 10/04/19 | Email from TNF Tribal Relations Program Manager to All Tribes chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community | N/A | Sent draft agenda and RSVP form for 10/28 All Tribes and 10/29 PA meetings |
| | | | Fort McDowell Yavapai Nation | | |
| | | | Fort Sill Apache Tribe | | |
| | | | Gila River Indian Community | | |
| | | | Hopi Tribe | | |
| | | | Mescalero Apache Tribe | | |
| | | | Pascua Yaqui Tribe | | |
| | | | Pueblo of Zuni | | |
| | | | Salt River Pima-Maricopa Indian Community | | |
| | | | San Carlos Apache Tribe | | |
| | | | Tohono O'odham Nation | | |
| | | | Tonto Apache Tribe | | |
| | | | White Mountain Apache Tribe | | |
| | | | Yavapai-Apache Nation (representatives of both) | | |
| | | | Yavapai-Prescott Indian Tribe | | |
| 10/04/19 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Could not open attachment in 10/03/19 Tribal Relations Program Manager email replying to San Carlos' 9/17/19 letter |
| 10/07/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Sent zipped version of 2018 Section 106 report that was provided to USACE (and attached to 10/04/19 Tribal Relations Program Manager email) |
| 10/07/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Thanked TNF for DEIS comments extension and invited to Council meeting 10/21/19 |
| 10/07/19 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe Cultural Preservation Office | N/A | NDAA mitigation request |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-47

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/09/19 (letter dated 10/8/19) | Official Letter from TNF Supervisor to chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to All Tribes and PA meetings, 10/28/19 and 10/29/19<br><br>(GRIC letter returned – incorrect PO Box; resent) |
| 10/10/19 | Email from TNF Tribal Relations Program Manager | Apache | Mescalero Apache Tribe | N/A | Asking new President if November 5 meeting is still on [no response] |
| 10/15/19 | Official Letter from TNF Supervisor to Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos letter dated 9/17/19; DEIS comment extension, public meeting in San Carlos, meet in Phoenix to discuss TM Program, info shared with USACE, visits to Dripping Springs |
| 10/15/19 | Email from TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Conveyed electronic version of TNF Supervisor 10/15/19 letter and available dates to meet |
| 10/22/19 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache | n/a | Discussing dates for special Council meeting suggested by San Carlos |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-48

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 10/23/19 | Official Email from TNF Tribal Relations Program Manager to tribal cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Extension of DEIS comment deadline to 12/22/19 for all tribes |
| 10/24/19 | Email from TNF Tribal Relations Program Manager to BLM Cultural Resources Specialist | N/A | Kim Ryan | N/A | Provided electronic copy of Revised Peg Leg TM Report |
| 10/25/19 | Official Letter from ACHP to TNF Supervisor | N/A | N/A | N/A | Commented on PA, Tribal consultation, and resolution of adverse effects |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-49

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/27/19 | Official Email from TNF Tribal Relations Program Manager | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed electronic version of Tribal Consultation Summary and Plan (PR 3479) |
| 10/28 and 10/29/19 | Formal Meeting* | All Tribes (15) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Phoenix, AZ | Discussed consultation plan, status of historic properties inventories and Oak Flat HPTPs, Tribal Monitor Program and Signatories Listening Session Morning of Day 2 |
| 10/29/19 | Formal Meeting* of PA Signatories (tribes invited to attend) | All Tribes (15) invited | Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | Phoenix, AZ | Discussed PA version 6 |
| 11/06/19 | Emory Oak Elders Advisory Council Meeting | Apache | White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Update on grove status; TM cultural surveys |
| 11/06/19 | Official Letter from White Mtn Apache Vice Chair | Apache | White Mountain Apache Tribe | N/A | Will continue to consult on Resolution Copper Mine |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-50

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 11/07/19 | Email from TNF Tribal Relations Program Manager to THPO | O'odham | Salt River Pima-Maricopa Indian Community | N/A | Follow-up regarding tribal resolution mentioned by Angela Garcia-Lewis at 10/28/19 meeting |
| 11/07/19 | Copy of Official Letter from San Carlos Chairman to USACE | Apache | San Carlos Apache Tribe | N/A | Requests USACE lead PA for Skunk Camp and not issue 404 Permit |
| 11/07/19 | Official Letter from YAN Chairman to TNF Tribal Relations Program Manager | Apache Yavapai | Yavapai-Apache Nation | N/A | Thanked TNF for consulting; wants to continue consulting on failings |
| 11/08/19 | Official Email from White Mountain Apache Vice Chairman to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | NDAA Mitigation requests for SE AZ Land Exchange CONFIDENTIAL |
| 11/12/19 | Email from TNF Tribal Relations Program Manager to WMAT Legislative Advisor | Apache | White Mountain Apache Tribe | N/A | Asked for POC for mitigation discussions |
| 11/12/19 | Email from TNF Tribal Relations Program Manager to WMAT Legislative Advisor | Apache | White Mountain Apache Tribe | N/A | Thanked for comments on consultation |
| 11/13/19 | Email from BLM Cultural Resources Specialist to TNF Tribal Relations Program Manager | | | N/A | Provided comments on draft Consultation Summery and Plan |
| 11/15/19 | Formal Meeting*, TNF and YAN Tribal Council | Apache Yavapai | Yavapai-Apache Nation | Camp Verde, AZ | Discussion of Resolution Copper Project and mitigations |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-51

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|-------------------|---------------------|----------|---------------------|
| 11/19/19 | Email from TNF Tribal Relations Program Manager to PA Signatories and Tribes | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Reminder to provide comments on attached Consultation Plan by Nov 29, 2019 |
| 11/22/19 | Formal Meeting* TNF and San Carlos Tribal Council | Apache | San Carlos Apache Tribal Council | San Carlos, AZ | Updated status of EIS process, answered questions; presentation by San Carlos water consultant |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|-----------------|--------------------|----------|---------------------|
| 12/03/19 | Email from TNF Tribal Relations Program Manager | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Forwarded invitation to PA workshop and provided PA version 7 |
| 12/03/19 | Emails between Zuni THPO and TNF Tribal Relations Program Manager | Puebloan | Pueblo of Zuni | N/A | Tribal Relations Program Manager response to 3 questions from Dongoske re: TM Program; treatments for sites NRHP eligible under Criteria A,B,C; and need to address tribal spiritual impacts; provided TM protocols |
| 12/03/19 and 12/04/19 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager and reply | Apache | San Carlos Apache Tribe | N/A | A.G. provided list of items requested by San Carlos; Tribal Relations Program Manager responded that TNF will provide them shortly |
| 12/03/19 and 12/04/19 | Email from San Carlos A.G. to Buckles, WestLand Resources | Apache | San Carlos Apache Tribe | N/A | Requested copies of WRI 10/28/19 meeting power point presentations; WRI provided by email 12/4/19 |
| 12/04/19 | Presentation to White Mountain Tribal Council | Apache | White Mountain Apache Tribe | Whiteriver, AZ | TNF's Tribal Relations Program Manager and WMAT's THPO Altaha presented on Tribal Monitor Program and EOCTRI project proposed for Cibecue |
| 12/05/19 | Official letter from Hopi THPO to TNF Supervisor | Pueblo | Hopi Tribe | n/a | Comments on the draft Tribal Consultation Plan |
| 12/05/19 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 9/30/19 letter re: PA version 6; also provided Oak Flat HPTP Addendum |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-53

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/05/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Provided digital version of TNF 12/5/19 letter and attachments |
| 12/05/19 | Email from TNF Tribal Relations Program Manager to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Provided GPS locations of 5 SIs visited in May 2019 Tribal Monitors' Tour of Skunk Camp |
| 12/07/19 | Email from WMAT THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided comments on PA version 7 |
| 12/09/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | | ACHP<br>ASLD<br>BLM<br>Resolution Copper<br>SHPO<br>USACE<br>USFS Region 3 | N/A | Provided copy of TNF 12/05/19 response to San Carlos 9/30/19 letter |
| 12/09/19 | Email from TNF Tribal Relations Program Manager to WMAT Vice Chairman | Apache | White Mountain Apache Tribe | N/A | Invitation to PA Workshops; provided PA version 7 |
| 12/09/19 | Email from TNF Tribal Relations Program Manager to WMAT Legis. Advisor | Apache | White Mountain Apache Tribe | N/A | Invitation to PA Workshops; provided PA version 7 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-54

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 12/10/19 | Official Email from TNF Tribal Relations Program Manager to Signatories and Tribes | All Tribes (15) and Signatories (ACHP, ASLD, BLM, Resolution Copper, SHPO, USACE, Forest Service Reg 3) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided revised Consultation Plan |
| 12/10/19 | Official Letter from TNF Supervisor to PYT Chair | Yoeme | Pascua Yaqui Tribe | N/A | Response to PYT comments on PA version 6 |
| 12/10/19 | Email from TNF Tribal Relations Program Manager to PYT Chairman | Yoeme | Pascua Yaqui Tribe | N/A | Provided digital copy of 12/10/19 Letter from Bosworth with response to PA Comments |
| 12/10/19 | Official Letter from TNF Supervisor to Zuni Governor | Puebloan | Pueblo of Zuni | N/A | Response to Zuni Comments on PA version 6 |
| 12/10/19 | Email from TNF Tribal Relations Program Manager to Zuni THPO | Puebloan | Pueblo of Zuni | N/A | Conveyed digital copy of TNF Supervisor 12/10/19 letter to Zuni |
| 12/10/19 | Official Letter from TNF Supervisor to WMAT Vice Chairman | Apache | White Mountain Apache Tribe | N/A | Thanked for 11/6/19 commitment to consult, 11/8/19 mitigation request, and hosting TNF staff 12/4/19 presentation to Council |
| 12/10/19 | Email from TNF Tribal Relations Program Manager to WMAT Legislative Advisor | Apache | White Mountain Apache Tribe | N/A | Conveyed digital copy of 12/10/19 letter from TNF Supervisor to Vice Chairman |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-55

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/10/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | | ACHP<br>Arizona State Land Department BLM<br>Resolution Copper SHPO<br>USACE<br>Forest Service Region 3 | N/A | Provided email copy of 12/10/19 response letter to Zuni |
| 12/11/19 | TNF Public Meeting | All Tribes (15) invited | San Carlos Apache Tribe<br>White Mountain Apache Tribe | Phoenix Airport Hotel | Public discussion on PA version 7; Staff from 2 tribes attended |
| 12/12/19 | Formal Meeting* of TNF and PA Signatories (tribes invited) | All Tribes (15) invited | San Carlos Apache Tribe<br>White Mountain Apache Tribe | SWCA Office, Phoenix, AZ | PA version 7 |
| 12/13/19 | Official Letter from Chairman to TNF Supervisor | Apache Yavapai | Yavapai-Apache Nation | N/A | Comments on Resolution Copper Project EIS, TM program, and process |
| 12/15/19 and 12/16/19 | Emails between San Carlos A.G. and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Clarifying due date and format for DEIS commants; TNF responded: Dec 23 and flash drive are acceptable; S.O. staffing hours on Dec 23 |
| 12/16/19 | Official Letter from TNF Supervisor to YAN Chairman | Apache Yavapai | Yavapai-Apache Nation | N/A | Thanking for mitigation requests and continuing government-to-government consultation on Resolution Copper Project |
| 12/16/19 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Re: items outstanding from 12/3/19 request |
| 12/16/19 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Re: items outstanding from 5/17/19 request |
| 12/16/19 | Email from TNF Resolution Copper Project Lead to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Clarifying 12/23/19 due date for DEIS comments and S.O. hours of operation |
| 12/16/19 | Email from San Carlos Asst. A.G. to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Requested copies of sign-in sheets and notes for 12/11/19 and 12/12/19 PA meetings (see 1/23/20) |
| 12/19/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | | N/A | N/A | Provided YAN 's 12/13/19 comments on Resolution Copper Project consultation process |
| 12/23/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Conveyed comments on DEIS (letter via webform; comments via flash drive delivered to TNF SO) |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-56

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|---------------------|
| 12/30/19 | Annual Report | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | N/A | Provided copy of EOCTRI 2019 Annual Report |
| 1/07/20 | Formal Meeting TNF and Pascua Yaqui Council | Yoeme | Pascua Yaqui Tribe | Tucson, AZ | TNF and BLM met with Tribal Council to discuss consultation going forward |
| 1/09/20 | Official Letter from TNF Supervisor to leaders and cultural staff | All Tribes (15) | Ak Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed hard copy of Peg Leg TM Report and Review Form<br>CONFIDENTIAL |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-57

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/10/20 | Email from TNF Tribal Relations Program Manager to tribal cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided pdf of Peg Leg TM Report Final Draft and Review Form<br><br>CONFIDENTIAL |
| 1/13/20<br>(letter dated 1/07/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed GPO Research Design on flash drive |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-58

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 1/13/20 | Email from Hopi CPO to TNF, tribal leaders, and cultural staff | Puebloan | Hopi Tribe | N/A | Kudos on TM Program |
| 1/14/20 | Email from YAN Archaeologist to TNF, tribal leaders, and cultural staff | Apache Yavapai | Yavapai-Apache Nation | N/A | Kudos on TM Program |
| 1/14/20 | Email from Zuni Cultural Resources Advisory Team to TNF, tribal Leaders, and cultural staff | Puebloan | Pueblo of Zuni | N/A | Kudos on TM Program |
| 1/14/20 | Official Letter from TNF Supervisor to BLM | | BLM state and field office staff * | N/A | Conveyed Peg Leg TM Report and copies of letters to tribes CONFIDENTIAL |
| 1/15/20 | Email TNF Tribal Relations Program Manager to SRPMIC cultural representatives | O'odham | Salt River Pima-Maricopa Indian Community | N/A | Conveyed requested PDF of PA version 7 and comment matrix |
| 1/16/20 | Emory Oak Elders Advisory Council Meeting | Apache | White Mountain Apache Yavapai-Apache Nation | Payson Ranger District | Discussed findings of CR/TM surveys of Payson groves, and steps to treat groves on WMAT |
| 1/21/20 | Tribal Consultation Response Form from San Carlos | Apache | San Carlos Apache Tribe | N/A | Defer to A.G. for comments on GPO Research Design |
| 1/22/20 | Email from White Mountain Apache THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided comments on Tribal Evaluation Form for Peg Leg Tribal Monitor Report CONFIDENTIAL |
| 1/23/20 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided materials requested after meeting with Tribal Council and itemized in Ritchie 12/3/19 email; questions answered in letter and additional materials provided on flash drive |
| 1/23/20 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of 1/23/20 letter and notice of hard copy in mail |
| 1/23/20 | Email from TNF Tribal Relations Program Manager to BLM and TNF Heritage Resources Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided WMAT comments on Peg Leg TM Report confirming TCPs CONFIDENTIAL |
| 1/27/20 | Copy of Official Letter from San Carlos to USACE (sent via email from Chairman's office) | Apache | San Carlos Apache Tribe | N/A | Requested consultation re: Skunk Camp and groundwater modeling |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-59

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/29/20 | Copy of Official Letter from San Carlos to BLM (sent via email from Chairman's office) | Apache | San Carlos Apache Tribe | N/A | Requested clarification of BLM's responsibilities and commencement of consultation |
| 1/29/20 | Correspondence Form from San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Thanked for response to A.G.'s questions from 11/22/19 and 12/3/19 meetings |
| 1/31/20 | Emails (2) from Morey, SWCA to attendees of PA meetings | Apache O'odham | Signatories<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | N/A | Provided copies of 12/11/19 meeting notes; and 12/12/19 meeting notes |
| 2/04/20 | Email from Grisel, SWCA to cultural reps on behalf of TNF ID Team Leader | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Reminder to submit comments on GPO Research Design and Peg Leg TM Report by 2/14/20 |

\* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-60

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 2/04/20 | Official Email from TNF Tribal Relations Program Manager to tribal cultural staff | All Tribes (11) | Fort McDowall Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided list of potential natural resources in Oak Flat and Request Form; requested response by 3/6/20 |
| 2/05/20 | Email from YAN Archaeologist to TNF Tribal Relations Program Manager | Apache Yavapai | Yavapai Apache Nation | N/A | Comments on Peg Leg TM Report and Resolution Copper Project GPO Research Design<br>CONFIDENTIAL (TM Report) |
| 2/05/20 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Rumored cutting of Oak Trees in Oak Flat |
| 2/06/20 | Comment Form from San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Acknowledged receipt of info requested at 11/22/19 meeting |
| 2/11/20– 2/13/20 | Emory Oak project interviews for video | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Camp Verde, Payson, and Cibecue | Interviewed elders, tribal council members, Forest staff participating in project |
| 2/18/20 | Official Letter from TNF Supervisor to Pascua Yaqui Chairman | Yoeme | Pascua Yaqui Tribe | N/A | Thanked for meeting and provided requested data |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-61

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|-------------------|---------------------|----------|---------------------|
| 2/20/20 | Official Email from TNF Tribal Relations Program Manager to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided memo on HHRO survey at Oak Flat |
| 2/20/20 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache | N/A | Responded to San Carlos 2/5/20 letter regarding trees in Oak Flat |
| 2/21/20 | Email from TNF Project Lead to San Carlos | Apache | San Carlos Apache | N/A | Conveyed electronic copy of Bosworth's 2/20/20 letter |
| 2/25/20 | Official Emails from White Mountain THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Concerns about HPTP and Research Design |
| 3/03/20 | Email from Tribal Relations Program Manager to Hopi CPO | Puebloan | Hopi Tribe | N/A | Set next meeting date to consult re: Resolution Copper Mine |
| 3/04/20 | Formal Meeting* with Zuni cultural staff | Puebloan | Pueblo of Zuni | N/A | NDAA Mitigations |
| 3/04/20 and 3/18/20 | Emails between WMAT THPO and TNF Tribal Relations Program Manager | Apache | White Mountain Apache | N/A | PA provision for Tribal Intellectual Property Rights |
| 3/05/20 | Formal Meeting* with Leaders | Apache Yavapai | Yavapai-Apache Nation | Camp Verde, AZ | Opportunity to gather natural resources from Oak Flat area |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-62

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/20/20 | Official Email from TNF Tribal Relations Program Manager | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Provided upcoming schedule of Tribal Monitor projects, and reminder to request O.F. natural resources |
| 3/30/20 | Official Email from TNF Tribal Relations Program Manager to tribes to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Oak Flat HPTP Addendum and asked for input on consultation |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-63

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 3/31/20 | Official Email from TNF Tribal Relations Program Manager to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Near West Tribal Monitor survey report and requested TCP identification (mailed hard copies to GRIC and YAN)<br>CONFIDENTIAL |
| 4/08/20 | Official Email from TNF Tribal Relations Program Manager to tribes | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed link to Silver King TM Report and eligibility form<br>CONFIDENTIAL |
| 4/16/20 | Official Letter from USACE Colonel to San Carlos chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 11/07/19 letter requesting to consult; documents attempts to meet; requests to teleconference |
| 5/01/20 | Email from TNF Resolution Copper Project Archaeologist summarizing 4/31/20 telephone conversation with WMAT THPO | Apache | White Mountain Apache Tribe | N/A | Concerned about sensitive ethnographic information in Research Design; agreed to inclusion of cautionary statement |
| 5/07/20 | Emory Oak Elders Advisory Council meeting | Apache | White Mountain Apache Tribe<br>Yavapai-Apache Nation | Tele-meeting | Discussed status of CR surveys and NEPA for Payson and Coconino groves, EO video, and youth activity changes due to COVID-19 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-64

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/21/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Save the Date for 6/9/20 meeting to discuss NDAA mitigations |
| 6/01/20–6/05/20 | Tribal Monitor Refresher Training | All Tribes (11) invited | Monitors from:<br>Ak-Chin Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Yavapai-Apache Nation | Tele-meeting | Additional skills and techniques for current TMs |
| 6/02/20 | Email from TNF Tribal Relations Program Manager to Chair and Vice Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Invitation to attend June 9 meeting on mitigations |
| 6/02/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided agenda for June 9 online meeting on mitigations |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-65

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/09/20 | Formal Meeting* with Tribes, Resolution Copper, NFF | All Tribes (11) invited | Gila River Indian Community<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Tele-meeting | Discussed potential mitigations for the NDAA and requested input |
| 6/10/20 | Email from TNF Tribal Relations Program Manager to 6/9/20 meeting attendees | All Tribes (11) TNF Staff<br>Resolution Copper<br>NFF | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Provided two PowerPoint presentations from 6/9/20 All Tribes meeting |
| 6/11/20 | Email from YPIT CR Dept Director to TNF Tribal Relations Program Manager | Yavapai | Yavapai-Prescott Indian Tribe | N/A | Submitted TCP form for Perlite Spring in Near West Tailings Alternative<br>CONFIDENTIAL |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-66

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|--------------------|----------|----------------------|
| 6/16/20 | Official Email from TNF Tribal Relations Program Manager | All Tribes (11) TNF Staff Resolution Copper NFF | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided notes from 6/9/20 meeting and request for Advisory Board volunteers |
| 6/16/20 | Official Letter from San Carlos Chair to TNF Supervisor and Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Requested digital copy of 6/9/20 teleconference, a government-to-government meeting, and ceasing work on DEIS |
| 6/18/20 | Email from TNF Tribal Relations Program Manager to San Carlos leaders | Apache | San Carlos Apache Tribe | N/A | Provided video of 6/9/20 teleconference |
| 6/26/20 | Official Email from TNF Tribal Relations Program Manager to YAN Archaeologist | Apache | Yavapai-Apache Nation | N/A | Responded to YAN comments on Peg Leg TM report and Research Design |
| 6/29/20 | Email from TNF Tribal Relations Program Manager to WMAT Tribal Administrator | Apache | White Mountain Apache Tribe | N/A | Request to meet with Tribal Council |
| 6/29/20 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Request to meet with Tribal Council |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-67

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 7/02/20 (letter mailed 7/06/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed flash drive with SIR Vol III: Tailings Alternatives and Oak Flat, and additional smaller reports; requested comments by 9/7/20<br><br>[GRIC letter to Chair refused for missing postage; THPO letter shredded in post office due to flash drive; resent to both 8/10/20 along with the 7/27/20 letter and PA version 8] |
| 7/09/20 | Official Letter from San Carlos Chairman to ACHP President | Apache | San Carlos Apache Tribe | N/A | Request for final PA and for review of Section 106 compliance by Forest Service |
| 7/16/20 | Email from TNF Tribal Relations Program Manager to Cultural Staff | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community<br>Tohono O'odham Nation | N/A | Informed that would be presenting on Resolution Copper Project at next day's 4 Southern Tribes meeting and provided TNF Schedule of Proposed Activities (SOPA) |
| 7/17/20 | Presentation to Four Southern Tribes by TNF Tribal Relations Program Manager | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community<br>Tohono O'odham Nation | N/A | PowerPoint presentation on Resolution Copper Project status, and SOPA |
| 7/21/20 | Official Letter from ACHP to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 7/9/20 letter: PA is imminent; will request that OFAP review TNF Section 106 process |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-68

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/24/20 | Official Letter from TNF Supervisor (signed by Torres) to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 6/16/20 letter; lists items sent already; mentions Resolution Copper Project mitigations; offers to meet virtually; cannot cease work on DEIS; will be sending PA and Oak Flat NAGPRA POA next week |
| 7/24/20 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman, A.G., and cultural staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of 7/24/20 letter from Bosworth |
| 7/27/20 (mailed 7/29/20) | Official Letter from TNF Supervisor to Tribal Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed PA version 8 draft final and appendices, on flash drive with a blank comment form; requested comments by September 4, 2020<br><br>[Also mailed to non-tribal consulting parties and emailed by M. Hangan to Resolution Copper, BLM, SHPO, ITCA, Region 3, Doug Stephens WO, and WRI]<br><br>[GRIC Chair and THPO received another copy to replace the first that was lost in mail; added to the replacement 7/2/20 flash drive that was mailed 8/10/20] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-69

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/28/20 | Official Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copy of Oak Flat TM Report CONFIDENTIAL |
| 7/29/20 | Email from TNF Tribal Relations Program Manager to Chair and Vice Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Conveyed digital copy of Oak Flat TM Report CONFIDENTIAL |
| 7/29/20 | Official Email from TNF Tribal Relations Program Manager to cultural staff and all San Carlos POCs | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Oak Flat POA (dated 7/27/20) and notice that Oak Flat data recovery set to start week of October 12; invited to visit before, during or after field work; suggested field tours later in October or November |
| 7/29/20 | Email from SWCA Donna Morey to WMAT PA meeting attendees | WMAT ITCA | Brannen Parrish Shan Lewis Marla Dedgar | N/A | Conveyed PA draft version 8 |
| 8/12/20 | Emory Oak Elders Advisors Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation | Tele-meeting | Update on status of identified groves; discussion of EO blueprint for continuing program as part of Resolution Copper Mine mitigation |
| 8/19/20 | Emory Oak – Cibecue planning meeting | Apache | White Mountain Apache Tribe | Tele-meeting | Planning meeting for cultural resource surveys of three groves in Cibecue District of WMAT |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-70

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 8/21/20 | Email from TNF Tribal Relations Program Manager to San Carlos | Apache | San Carlos Apache Tribe | N/A | Follow up to 7/24/20 letter from Bosworth requesting consultation on the Resolution Copper Project |
| 8/25/20 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request clarification on NDAA mitigation process and NAGPRA Plan of Action |
| 8/28/20 (mailed 8/31/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Introducing ACF who will craft blueprint for Education and Cultural Preservation Funds. [Tonto certified letter rejected by PO; digital copy provided 8/31/20; mailed hard copy w/o certified, 9/2/20] |
| 8/31/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copy of 8/28/20 letters from Bosworth |
| 8/31/20 | Emails between San Carlos A.G. and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Invited TNF to safe-distanced meeting at Apache Gold on 9/9/20; also stated their comments on PA version 8 will be submitted by September 4 |
| 8/31/20 | Email from WMAT THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache | N/A | Questions regarding Oak Flat HPTP and tribal site visits |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-71

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 9/02/20 | Email from TNF Tribal Relations Program Manager to Hopi THPO | Puebloan | Hopi Tribe CPO | N/A | Apologized for incorrect address, sent revised 8/28/20 letter regarding ACF role in planning mitigation funding and asked for Chair email |
| 9/02/20 | Email from TNF Tribal Relations Program Manager to Hopi Chairman | Puebloan | Hopi Tribe | N/A | Provided digital copy of revised 8/28/20 letter with apology for erroneous last name used in letter mailed 8/31/20 |
| 9/03/20 | Official Letter from San Carlos Chair to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Objections to proposed mitigations; need for Supplemental EIS; notice that PA version 8 comments coming separately |
| 9/03/20 [received by TNF 9/30/20 via ACHP] | Official Letter from San Carlos Chair to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Provided comments on PA version 8. [attached to 9/08/20 letter to ACHP conveying 9/03/20 letter to Bosworth and the PA comments] |
| 9/04/20 | Official Email from WMAT THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided comments on PA version 8 |
| 9/08/20 | Official Letter from San Carlos Chair to ACHP Executive Director | Apache | San Carlos Apache Tribe | N/A | Provided copy of 9/03/20 letter to TNF with comments on PA version 8 |
| 9/08/20 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager and TNF staff | Apache | San Carlos Apache Tribe | N/A | Canceled meeting scheduled for 9/9/20 |
| 9/08/20 (mailed 9/10/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Provided blueprints for Tribal Monitor, Emory Oak, and Youth mitigation programs; requested comment by October 9, 2020 |
| 9/08/20 | Official Letter from Fort McDowell President to TNF Supervisor | Yavapai | Fort McDowell Yavapai Nation | N/A | Echoes San Carlos request to defer FEIS |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-72

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|-----------------------|----------|----------------------|
| 9/09/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided digital copy of 9/8/20 letter |
| 9/11/20 | Letter from WMAT Cultural Resource Director to AZ Tribal Leaders | All Arizona Tribes (22) | | N/A | Urged all tribes to oppose Resolution Copper Project and not work with TNF |
| 9/15/20 | Official Letter from ACHP to TNF re: Sec 106 | All Tribes (15)<br>FS Region 3<br>Other Interested Parties | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided comments on PA version 8; requested updates on consultation process |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-73

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 9/15/20 [received 9/30/20 by TNF from ACHP] | Email from San Carlos A.G. Secretary to ACHP Executive Director | Apache | San Carlos Apache Tribe | N/A | Provided to ACHP a copy of San Carlos' 9/03/20 latter to TNF Supervisor with comments on PA version 8 [it was missing from their 9/09/20 letter to ACHP] |
| 9/17/20 | Official Letter from YAN to TNF Tribal Relations Program Director | Apache Yavapai | Yavapai-Apache Nation | N/A | Urged TNF not to delay process due to request from single tribe |
| 9/24/20 | Official Letter from TNF Supervisor to Fort McDowell President | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to 9/09/20 letter comments on PA and Tribal Monitor program |
| 9/24/20 | Email from TNF Tribal Relations Program Manager to Fort McDowell President | Yavapai | Fort McDowell Yavapai Nation | N/A | Conveyed digital copy of TNF 9/24/20 Letter from TNF Supervisor |
| 9/24/20 | Emails between San Carlos A.G. and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Informed TNF that Chairman Rambler available to meet on 10/08/20; Lyndon replied that new tribal program manager would be in touch to make COVID-safe arrangements |
| 9/25/20 (mailed 9/28/20) | Official Letter from TNF Supervisor to Tribal Leaders and Staff | All Tribes (15) | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Triba White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Provided flash drive with revised GPO Research Design and comments matrix for January 2020 version; 9 survey reports, and technical memo on built environment; requested comments by 10/23/20 |
| 9/28/20 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Accepted proposed meeting date/time and asked if teleconferencing would be provided |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-74

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/30/20 [received via email from ACHP] | Official Letter dated 9/08/30 from San Carlos to ACHP | Apache | San Carlos Apache Tribe | N/A | Included copy of San Carlos 9/3/20 letter to TNF Supervisor and comments on PA version 8 (which were not received directly by TNF) |
| 9/28/20–10/5/20 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Discussions regarding arrangements for 10/08/20 meeting and requesting agenda from tribe |
| 9/30/20 | Official Letter from TNF Acting Supervisor to YAN Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Thanked for 9/17/20 letter and informed of Tribal Relations staffing change |
| 10/01/20 | Email from TNF Tribal Relations Program Manager to YAN Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Conveyed digital copy of 9/30/20 letter from TNF Acting Supervisor responding to YAN 9/17/20 letter |
| 10/01/20–10/05/20 | Email from TNF Tribal Relations Program Manager to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Regarding proposed sunrise ceremony at Oak Flat |
| 10/05/20 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Regarding topics for 10/08/20 meeting; request for Adkins' vitae; requested that A.G. be cc'd on any correspondence to San Carlos Chair and THPO |
| 10/07/20 | Official Letter from TNF Supervisor to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Response to 8/25/20 letter regarding NDAA mitigations and process |
| 10/07/20 | Email from TNF Tribal Relations Program Manager to Chairman and Staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of response to 8/26/20 letter re: NDAA |
| 10/07/20 | Official Letter from TNF Supervisor to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Response to 9/0320 letter requesting a Supplemental EIS |
| 10/07/20 | Email from TNF Tribal Relations Program Manager to Chairman and Staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of response to 9/03/20 letter #1 re: Supplemental EIS |
| 10/07/20 | Official Letter from TNF Supervisor to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Response to 9/03/20 letter (received 9/30/20) with comments on PA version 8 |
| 10/07/20 | Email from TNF Tribal Relations Program Manager to Chairman and Staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of response to 9/03/20 letter re: PA 8 |
| 10/08/20 | Formal Meeting of TNF Acting Supervisor and staff with San Carlos Vice Chairman and staff | Apache | San Carlos Apache Tribe | San Carlos, AZ | Meeting requested initially by TNF 7/24/20, (canceled twice because of COVID-19); discussed PA |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-75

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 10/13/20 | Email from TNF Tribal Relations Program Manager to Chair and Staff | Apache | San Carlos Apache Tribe | N/A | Thanked for hosting government-to-government consultation meeting |
| 10/13/20 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman and Staff | Apache | San Carlos Apache Tribe | n/a | Thanked for hosting government-to-government consultation meeting |
| 10/21/20 | Official Program Manager to Tribal cultural staff and all San Carlos contacts | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Asked tribes to request Oak Flat site visits and to conduct blessing before data recovery begins November 30, 2020 |
| 10/22/20 | Official Letter from AZ SHPO to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Reply to San Carlos 9/14/20 letter to SHPO re: TNF PA version 8 comments |
| 10/29/20 (mailed 11/3/20) | Official Letter from TNF Supervisor to San Carlos Chairman and other staff | Apache | San Carlos Apache Tribe | N/A | Reply to San Carlos's 9/03/20 comments on PA version 8 [cc: to SHPO and ACHP] |
| 11/02/20 | Email from Tribal Relations Program Manager to San Carlos contacts | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of 10/29/20 letter to Chairman Rambler, A.G. acknowledged receipt [cc: to SHPO and ACHP] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-76

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 11/03/20 | Official Email from Tribal Relations Program Manager to Tribal cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copy of Preliminary Report of Oak Flat Natural Resources Survey and reiterated invitation to collect resources |
| 11/05/20 | Emails from Tribal Relations Program Manager to Cultural staff | O'odham Pueblo | Gila River Indian Community<br>Pueblo of Zuni | N/A | Inquiring whether they wish to do a blessing at Oak Flat |
| 11/06/20 | Email from WRIT to TNF Tribal Relations Program Manager | O'odham | Gila River Indian Community | N/A | GRIC THPO office will conduct a blessing of Oak Flat prior to 11/30/20 |
| 11/09/20 | Statement from White Mountain Apache Tribe Cultural Resource Director | Apache | White Mountain Apache Tribe | N/A | Statement opposing Resolution Copper Mine; sent to U.S. Federal Government Trustees and Tribal leaders [list not provided] |
| 11/12/20 | Emory Oak Advisory Council Quarterly Meeting | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Update on groves; contract signed for mastication of Crackerjack grove; discussed Advisory Board description |
| 11/13/20 | Letter from Apache Stronghold to ACHP | N/A | Interested party | N/A | Comments on Forest Service consultation; attached 9/11/20 and 11/9/20 letters from Ramon Riley, WMAT Culture Resource Director |
| 11/18/20 | Official Letter from TNF Acting Supervisor to Archaeology Southwest | N/A | Interested party | N/A | Response to comments on PA version 8 regarding SRP, Tribal Consultation, and Public Involvement |
| 11/25/30 and 11/30/20 | Emails between TNF Tribal Relations and White Mountain Cultural Resources Director | Apache | White Mountain Apache Tribe | N/A | Questions regarding the EOCTRI program |
| 12/09/20 | Email from TNF Tribal Relations Program Manager to Hopi THPO | Pueblo | Hopi Tribe | n/a | Question about identification and determination of rock art feature (no response as of July 2021) |

\* = Forest Service line officer present
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-77

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/14/20 | Email from TNF Mitigation Tribal Liaison to WMAT Repatriation Specialist | Apache | White Mountain Apache Tribe | N/A | Response to Ramon Riley's questions about the EOCTRI program and proposed mitigation fund; cc: to THPO and Cibecue |
| 12/15/20 | Official Letter from ACHP to TNF | N/A | Programmatic Agreement Signatory | N/A | Results of 36 CFR 800.9(a) compliance review |
| 12/21/20 | Official Letter from TNF Acting Supervisor to Tribal leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copies of Skunk Camp and Peg Leg Corridors cultural resource survey reports |
| 12/22/20 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Notice of additional information on water resources analysis and request for SEIS; information to follow in mail |
| 12/23/20 | Email from TNF Acting Supervisor to San Carlos Chair | Apache | San Carlos Apache Tribe | n/a | Thanked for 12/22/20 letter sent via email; TNF will respond once information is received |
| 12/23/20 | Official Letter from San Carlos THPO to TNF Acting Supervisor | Apache O'odham Yavapai | Fort McDowell Yavapai Apache<br>Gila River Indian Community<br>Salt River Indian Community<br>San Carlos Apache<br>Tohono O'odham Nation | n/a | Advised TNF that members of Apache Stronghold and listed tribes will tour Skunk Camp 12/31/20 to offer prayers |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-78

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 12/23/20 (mailed and emailed notice 12/24/20) | Official Letter from Acting TNF Supervisor to Tribal leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed digital copies of Skunk Camp and Peg Leg Corridors cultural resource survey reports; requested comment by February 24, 2021 |
| 12/23/20 (mailed 12/28/20) | Official Letter from Acting TNF Supervisor to Tribal leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed Final PA, comment matrix, and concurring party signatory page; offer to meet |
| 12/24/20 | Email from Pascua Yaqui President to SWCA | Yoeme | Pascua Yaqui Tribe | n/a | Acknowledged receipt of Peg Leg and Skunk Camp cultural reports and intent to review |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-79

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 12/30/20 | Email from Gila River Indian Community THPO to SWCA | O'odham | Gila River Indian Community | n/a | Acknowledged receipt of Peg Leg and Skunk Camp cultural reports |
| 1/05/21 (mailed 1/06/21; emailed digital version by SWCA 1/07/21) | Official Letter from TNF Acting Forest Supervisor to Tribal Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided copy of Oak Flat Campground Management Plan and requested comments by 2/05/21 |
| 1/05/21 | Email from San Carlos Chairman to TNF Acting Forest Supervisor (copy to USACE) | Apache | San Carlos Apache Tribe | n/a | Asks why TNF has not responded to his 12/22/20 demand for a SEIS based on water studies conducted by San Carlos, and why no courtesy call regarding the planned 1/15/21 publication of the FEIS |
| 1/07/21 | Official Letter from San Carlos Chairman to ACHP Director | Apache | San Carlos Apache Tribe | n/a | Requests continued ACHP review of 5 themes identified in letter regarding Section 106 process; requests ACHP not sign the PA at this time |
| 1/08/21 | Official Letter from ACHP Director to USFS Region 3 Acting Regional Forester and TNF Acting Forest Supervisor | | | n/a | Provides recommendations for completing NHPA and NEPA compliance, and publication of FEIS |
| 1/08/21 | Email from Office of Federal Agency Programs to TNF Supervisor (copies to Tribal cultural staff, TNF staff, agencies, and interested public) | | | n/a | Provided copy of ACHP's 1/08/21 letter to USFS Region 3 and TNF, and copy of 1/07/21 San Carlos letter to ACHP |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|---------------------|----------|----------------------|
| 1/08/21 | ACHP Statement | | | n/a | Published statement on NDAA and request for clarification from TNF on the PA |
| 1/08/21 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Request for G2G consultation meeting on PA, comment matrix |
| 1/08/21 | Email from Pascua Yaqui THPO to TNF Tribal Relations Program Manager | Yoeme | Pascua Yaqui Tribe | n/a | Expressed concerns about timing of announced FEIS publication date and date for comments on the Skunk Camp CR report |
| 1/10/21 (by email; mailed 1/11/21) | Official Letter from TNF Acting Forest Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Response to San Carlos 12/22/20 letter regarding water analyses |
| 1/11/21 | Official Letter from TNF Acting Forest Supervisor to Tribal Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Announced publication of FEIS will be 1/15/21 |
| 1/12/21 | Official Letter from San Carlos Chairman to TNF Acting Forest Supervisor | Apache | San Carlos Apache Tribe | n/a | Criticized water modeling and reiterated need for SEIS |
| 1/13/21 | Email from TNF Tribal Relations Program Manager to Tohono O'odham THPO | O'odham | Tohono O'odham Nation | n/a | Response to phone message on Adkins' voicemail; copy of PA will be mailed to THPO; request to set up phone discussion about PA signatory status [PA mailed 1/13/21] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-81

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/13/21 | Telephone Log, TNF Tribal Relations with Tohono O'odham THPO | O'odham | Tohono O'odham Nation | n/a | THPO called to acknowledge receipt of PA; their attorneys will review, and he will be in touch with TNF |
| 1/13/21 | Email from Pascua Yaqui THPO to TNF Acting Forest Supervisor | Yoeme | Pascua Yaqui Tribe | n/a | Requests deferral of FEIS until all environmental and cultural studies are completed |
| 1/13/21 | Email TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Provided response to THPO's 1/08/21 and 1/13/21 emails regarding comments on Skunk Camp and publication of FEIS |
| 1/14/21 | Telephone Log of call from San Carlos Chairman and Staff to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | San Carlos notified it has filed a lawsuit and a request for injunction against TNF Land Exchange; Adkins discussed with TNF Acting Forest Supervisor |
| 1/15/21 | Emails with copy of 1/11/21 Letter from TNF Supervisor to Tribal Leaders and staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | SWCA sent email to each Tribe with copies of 1/11/21 letters to Tribal leader and staff, announcing publication of FEIS |
| 1/26/21 | Telephone Log of call from Tohono O'odham THPO to TNF Tribal Relations | O'odham | Tohono O'odham Nation | n/a | Inquired about signatory status for Tohono O'odham and status of Land Exchange |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-82

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|-----------------|--------------------|----------|--------------------|
| 1/28/21 | Email from TNF RCM Project Heritage Resources Lead to Tribes and Interested Parties | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided response to ACHP 1/8/21 letter (enclosed: TNF 12/22/20 letter to USFS Region 3; and USFS Region 3's 1/14/21 response to TNF)<br><br>[also sent to PA signatories, USFS Region 3, and interested parties] |
| 2/25/21 | Emory Oak Advisory Council Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Update on groves and research; and discussed Advisory Board description |
| 2/16/21 | Telephone Log of call from San Carlos THPO to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe/Apache Stronghold | n/a | THPO called to request closure of Oak Flat campground for Sunrise Ceremony, same weekend as Mrs. Wilson's request for 3/08/21–3/15/21 closure |
| 2/17/21 | Telephone Log of call from TNF Tribal Relations Program Manager to San Carlos member Mrs. Wilson | Apache | San Carlos Apache Tribe | n/a | Discussed the double booking of Oak Flat for sunrise ceremonies; referred her to San Carlos THPO to discuss arrangements and asked her to inform TNF of the outcome |
| 2/18/21 | Telephone Log of call between TNF Tribal Relations Program Manager and San Carlos THPO Office | Apache | San Carlos Apache Tribe | n/a | Continued discussion of Oak Flat closure for sunrise ceremony(ies) |
| 2/18/21 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Delegation of authority to THPO for San Carlos sunrise ceremonies |
| 2/24/21 | Telephone Log of call between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/e | Discussed status of Oak Flat and pending lawsuits |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-83

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 2/25/21 | Emory Oak Advisory Council Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Update on groves and research; and discussed Advisory Board description |
| 3/01/21 | Memo from USDA to USFS to rescind FEIS | | | n/a | Instructed to re-initiate consultation and keep USDA informed of progress |
| 3/01/21 | Email from TNF Acting Forest Supervisor to all Tribes | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed USDA decision to rescind FEIS; invited questions to be addressed to Torres or Adkins |
| 3/11/21 | Official Letter from U.S. Environmental Protection Agency regarding water findings | Apache<br>O'odham | Gila River Indian Community<br>San Carlos Apache Tribe | n/a | Advises Tribes of finding of potential effects from water discharge from Skunk Camp tailings, in contradiction of USACE findings |
| 3/18/21 | Arizona Republic 3/07/21 article sent from Hopi Tribe to TNF Supervisor | Pueblo | Hopi Tribe | n/a | Article dated 3/03/21 by E.J. Montini cut from newspaper and sent to S.O. in tribal envelope without comment |
| 3/18/21 (emailed 3/18/21) | San Carlos Tribal Consultation Response Form | Apache | San Carlos Apache Tribe | n/a | Response on TNF proposed Access and Management Plan Oak Flat Campground; cited adverse effects and directed consultation via Attorney General's Office |
| 3/23/21 | Email from TNF Tribal Relations program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | n/a | Thanked for consultation response form (PR 4988) and will reach out to THPO to discuss cited adverse effects of management plan; conveyed copy of email to San Carlos Attorney General |
| 5/06/21 and 5/07/21 | Zuni Field Trip to Oak Flat to Collect Natural Resources | Pueblo | Pueblo of Zuni | Superior/Oak Flat, Arizona | Members of Zuni CR Advisory Team collected plants and minerals |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-84

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/7/2021 | Emory Oak Advisory Council Quarterly Meeting | Apache | Yavapai-Apache Nation | telemeeting | Update on groves; potential field trip to examine canker affecting EO in southern Arizona; upcoming harvest trips; finalized roles of Advisory Board; EOCTRI video |
| 8/12 and 8/13/21 | Emory Oak Advisory Council Quarterly Meeting & Field Trip | Apache | White Mountain Apache Tribe Yavapai-Apache Nation | Camp Verde | Field trip examined Needle Rock grove post FS backfire, then Dry Creek and Long Canyon groves to discuss treatment strategy with elders. Meeting next day continued discussions |

**Table S-2. Reinitiation of Tribal consultation by USDA**

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/03/21 | Decision Memo from Deputy Under Secretary, USDA | | | | Designating NFS Associate Deputy Chief Barnie Gyant to re-initiate tribal consultation |
| 9/08/21 | Email from TNF Tribal Relations Program Manager on behalf of TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Invited Tribe to listening session on 10/19/21; time to be determined once date is selected |
| 9/10/21– 9/30/21 | Emails between USDA Office of the Secretary (OSEC) and USDOI | | | | Series of emails to identify independent mining expert to review mining technique proposed by RCM |
| 9/10/21 | Email from TNF Acting Supervisor to Arizona SHPO | | | n/a | Advised SHPO that TNF is reinitiating tribal consultation |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/10/21 | Email from TNF Tribal Relations Program Manager with letter from NFS Associate Deputy Chief to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Invitation to attend USFS tribal listening session 10/19/21, 10:00 a.m. Arizona time |
| 9/28/21 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided draft agenda for 10/19/21 with a late morning end early afternoon session, asked for list of non-tribal entities that Tribes want invited to listen, informed that transcript will be available |
| 9/28/21 (see also 10/19/21) | Email from Mapetsi Policy Group on behalf of San Carlos Apache Tribe to OSEC | Apache | San Carlos Apache Tribe | n/a | Provided copy of San Carlos's contracted water resources analysis by James Wells |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-86

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/14/21 | Email from San Carlos Chairman's office to USDA, USFS, TNF | Apache | San Carlos Apache Tribe | n/a | Conveyed copy of 10/14/21 letter sent by San Carlos to President Biden and Secretary of Agriculture Vilsack regarding consultation process |
| 10/14/21 | Email from San Carlos Chairman's Office to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Conveyed copy of 10/14/21 letter sent by San Carlos to NFS Associate Deputy Chief Bernie Gyant regarding consultation process and request to reschedule 10/19/21 listening session |
| 10/14/21 | Official Letter from White Mountain Chairwoman to NFS Associate Deputy Chief | Apache | White Mountain Apache Tribe | n/a | Posed 8 questions about the withdrawal of the FEIS and continuing consultations |
| 10/15/21 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community | n/a | Provided meeting connection information and agenda |
| | | | Fort McDowell Yavapai Nation | | |
| | | | Fort Sill Apache Tribe | | |
| | | | Gila River Indian Community | | |
| | | | Hopi Tribe | | |
| | | | Mescalero Apache Tribe | | |
| | | | Pascua Yaqui Tribe | | |
| | | | Pueblo of Zuni | | |
| | | | Salt River Pima-Maricopa Indian Community | | |
| | | | San Carlos Apache Tribe | | |
| | | | Tohono O'odham Nation | | |
| | | | Tonto Apache Tribe | | |
| | | | White Mountain Apache Tribe | | |
| | | | Yavapai-Apache Nation | | |
| | | | Yavapai-Prescott Indian Tribe | | |
| 10/15/21 | Email from Hopi THPO to TNF Tribal Relations Program Manager | Pueblo | Hopi Tribe | n/a | Acknowledged telephone discussion and conveyed written statement to be read into 10/19/21 listening session meeting record. |
| 10/18/21 | Telephone Log of call between TNF Tribal Relations Program Manager and White Mountain NAGPRA Representative | Apache | White Mountain Apache Tribe | n/a | Adkins spoke to Ramon Riley per the Chairwoman's request, and answered the 8 questions posed in White Mountain 10/14/21 letter |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-87

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 10/19/21 | Tribal listening session | All Tribes (15) | Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Triba<br>Pascua Yaqui Tribe<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>White Mountain Apache Tribe | Telemeeting | Tribal listening session to re-initiate consultation on RCM |
| 10/20/21–10/27/21 | Emails between TNF Tribal Relations Program Manager and USDA OTR Program Analyst | | | n/a | Discussion of Salt River request for independent review of EIS water quality and mining methods analyses |
| 10/21/21 | Email from Salt River THPO to TNF Tribal Relations Program Manager | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Requested water quality study |
| 10/27/21 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Acknowledged receipt of request for water quality study and will respond esap |
| 11/04/21–11/05/21 | Official Letter dated 11/04/21 from TNF Supervisor to Tribal Leaders and Cultural Staff, conveyed in 11/05/21 email from Tribal Relations Program Manager | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided copy of Bosworth 11/04/21 letter with audio file and transcript of 10/19/21 meeting, and Powerpoint from meeting, and encouraged Tribes to fill out doodle poll regarding next meeting(s) |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-88

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 11/11/21 | Official Letter from NFS Associate Deputy Chief to White Mountain Chairwoman | Apache | White Mountain Apache Tribe | n/e | Provided responses to 8 questions in White Mountain Apache Tribe 10/14/21 letter |
| 11/17/21–12/08/21 | Emails between Mapetsi Policy Group, TNF, OSEC, and OTR requesting virtual meeting | Apache | San Carlos Apache Tribe | n/a | Request from Mapetsi Policy Group on behalf of San Carlos to TNF for virtual meeting to discuss fulfilling the Joint Secretarial Order regarding co-management; OSEC and OTR also part of the discussion |
| 11/19/21 | Emory Oak Advisory Council Quarterly Meeting | Apache | White Mountain Apache Tribe / Yavapai-Apache Nation | telemeeting | Update on groves and research. |
| 11/22/21 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Requested that their staff set up a meeting to discuss San Carlos concerns |
| 11/30/21 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Staff | All Tribes (15) | Ak-Chin Indian Community / Fort McDowell Yavapai Nation / Fort Sill Apache Tribe / Gila River Indian Community / Hopi Tribe / Mescalero Apache Tribe / Pascua Yaqui Tribe / Pueblo of Zuni / Salt River Pima-Maricopa Indian Community / San Carlos Apache Tribe / Tohono O'odham Nation / Tonto Apache Tribe / White Mountain Apache Tribe / Yavapai-Apache Nation / Yavapai-Prescott Indian Tribe | n/e | Request for Tribes to complete doodle poll regarding re-initiation of consultation |
| 11/30/21 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Requesting call from Rambler to discuss RCM |
| 11/30/21 | Email from San Carlos Chairman to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Chairman Rambler authorized his admin to set a telephone meeting with Gyant |
| 11/30/21 | Email from NFS Associate Deputy Chief to White Mountain Chairwoman | Apache | White Mountain Apache Tribe | n/a | Requesting call from Chairwoman Lee-Gatewood to discuss RCM |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-89

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/07/21 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Provided 11/05/21 Water Quality Information Roadmap |
| 12/07/21 | Email from Salt River THPO to TNF Tribal Relations Program Manager | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Thanked for water quality information and will get back with dates for meeting |
| 12/07/21 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Asked if Salt River THPO is the designated consultation staff, asked for agenda items and to pick date/time for next meeting |
| 12/08/21 | Emails between TNF Tribal Relations Program Manager and Gila River Indian Community Cultural Staff | O'odham | Gila River Indian Community | n/a | Asked Gila River Indian Community to select date and time for meeting and provide topics they would like to discuss; subsequent emails set time |
| 12/08/21 | Email from TNF Tribal Relations Program Manager to San Carlos Deputy Attorney General | Apache | San Carlos Apache Tribe | n/a | Asked San Carlos Tribe to select date and time for meeting and provide topics they would like to discuss |
| 12/08/21 | Email from TNF Tribal Relations Program Manager to White Mountain THPO | Pueblo | White Mountain Apache Tribe | n/a | Asked White Mountain Tribe to select date and time for meeting, and provide topics they would like to discuss |
| 12/09/21 | Email from TNF Tribal Relations Program Manager to Hopi Tribe THPO | Pueblo | Hopi Tribe | n/a | Asked Hopi Tribe to select date and time for meeting and provide topics they would like to discuss |
| 12/09/21 | Emails between TNF Tribal Relations Program Manager and Gila River Indian Community THPO | O'odham | Gila River Indian Community | n/a | Selected date and time for meeting and will set up an agenda of topics to discuss |
| 12/09/21 | Email from TNF Tribal Relations Program Manager to Mescalero Apache Tribe THPO | Apache | Mescalero Apache Tribe | n/a | Asked Mescalero Apache Tribe to select date and time for meeting and provide topics they would like to discuss |
| 12/17/21 | Official meeting of NFS Associate Deputy Chief and San Carlos Leaders and Council | Apache | San Carlos Apache Tribe | telemeeting | Adkins' email summary dated 1/6/22; it was decided that the NFS Associate Deputy Chief will meet in person with Chairman and Council at Oak Flat on 1/18/22 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-90

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/03/22 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mascalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed 4 water quality documents |
| 1/05/22 & 1/07/22 | Emails between TNF Tribal Relations Program Manager to White Mountain THPO | Apache | White Mountain Apache Tribe | n/a | Various emails attempting to set meeting between TNF and White Mountain Apache Tribe |
| 1/10/22 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Asked Salt River THPO to select date and time for meeting and provide topics they would like to discuss; set meeting for 1/19/22 |
| 1/18/22 | Official meeting of NFS Associate Deputy Chief with Hopi CPO staff | Pueblo | Hopi Tribe | Telemeeting | Consultation meeting |
| 1/19/22 | Official meeting of NFS Associate Deputy Chief with O'odham THPOs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | Telemeeting | Consultation meeting |
| 1/20/22 | Email from TNF Tribal Relations Program Manager to O'odham THPOs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | n/a | Provided information on leaching method, requested in 1/19/22 meeting |
| 1/24/22 | Email from SWCA to Hopi Tribe consultation meeting attendees | Pueblo | Hopi Tribe | n/a | Provided 1/16/22 meeting notes and transcript |
| 1/25/22 | *Chi' chil Advisory Board Quarterly Meeting* | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Revised Emory Oak partnership statement; changed name to Chi 'chil Advisory Board |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-91

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/26/22 | Email from SWCA to O'odham consultation meeting attendees | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | n/a | Provided 1/19/22 meeting notes SG and transcript |
| 2/03/22 | Emails from TNF Tribal Relations Program Manager to Tribal leaders and Cultural Staff | Apache<br>Yoeme | Fort Sill Apache Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe | n/a | Inquired if Tribe wishes to engage in G2G consultation about RCM with NFS Associate Deputy Chief Gyant |
| 2/08/22 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Response to 2/8/22 email concerning 3 incidents at Oak Flat (refers also to telephone conversation earlier in day on same subject) CONFIDENTIAL |
| 2/10/22 | Official public meeting of NFS Deputy Chief, TNF Leaders, and San Carlos at Oak Flat | Apache | San Carlos Apache Tribe | Oak Flat, Arizona | Summary notes of meeting highpoints CONFIDENTIAL |
| 2/11/22 | Official meeting NFS Associate Deputy Chief, TNF, and San Carlos Chairman and Attorney General | Apache | San Carlos Apache Tribe | Peridot, Arizona | Meeting between NFS (Gyant), TNF (Bosworth, Torres, Robertson, and Adkins), and San Carlos (Rambler, Ritchie, Jimmie); discussed San Carlos' concerns about the project and the FEIS CONFIDENTIAL |
| 2/18/22 | Email from TNF Tribal Relations Program Manager to Tribal leaders and Cultural Staff | Apache<br>O'odham<br>Pueblo<br>Yavapai<br>Yoeme<br>(11 Tribes) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Invitation on behalf of NFS Associate Deputy Chief to engage in G2G consultation regarding RCM |
| 2/22/22 | Emails between TNF Tribal Relations Program Manager and Hopi THPO | Pueblo | Hopi Tribe | n/a | Addressed questions raised by Hopi Tribe concerning consultation about the RCM project; will arrange a meeting between NFS Associate Deputy Chief Gyant and Hopi Tribe |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-92

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|---------------------|
| 3/02/22 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | Apache O'odham Pueblo Yavapai Yoeme | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Follow up to 2/18/22 email inviting G2G consultation |
| 3/02/22 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Follow up on Water Quality study issues |
| 3/02/22 | Emails between TNF Tribal Relations Program Manager and Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Pascua Yaqui Tribe request to consult and TNF follow up inquiring what meeting format is requested |
| 3/02/22 | Emails between TNF Tribal Relations Program Manager and Mescalero THPO | Apache | Mescalero Apache Tribe | n/a | Mescalero Apache Tribe requested in-person meeting and site visit. |
| 3/03/22 | Emails between TNF Tribal Relations Program Manager and White Mountain THPO | Apache | White Mountain Apache Tribe | n/a | White Mountain THPO suggested TNF contact White Mountain Tribe Legal Department prior to arranging meeting with Tribal Council |
| 3/07/22 | Emails between TNF Tribal Relations Program Manager and Tribal Leaders | Apache Yoeme | Mescalero Apache Tribe Pascua Yaqui Tribe | n/a | Requested dates for meeting with NFS Associate Deputy Chief Gyant during week of 3/21/22 |
| 3/07/22– 3/10/22 | Emails between TNF Tribal Relations Program Manager and Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Pascua Yaqui suggested 2 dates for NFS Associate Deputy Chief to meet with the Tribal Council |
| 3/11/22 | Email confirming telephone conversation between TNF Tribal Relations Program Manager and Mescalero Apache Tribe THPO | Apache | Mescalero Apache Tribe | n/a | Email confirming telephone request to meet with NFS Associate Deputy Chief Gyant on 4/07 or 4/08 at Oak Flat; TNF will check with the NFS Associate Deputy Chief |
| 3/11/22 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief's Office | Apache | Mescalero Apache Tribe | n/a | Asked if Gyant can attend either date proposed by Mescalero for tour of Oak Flat |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-93

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/16/22 | Emails between White Mountain THPO and TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | n/a | Altaha asked if TNF is involved in the renewal of RCM's Arizona Department of Environmental Quality water permit; Adkins clarified that the permit was analyzed in FEIS, but TNF is not the deciding agency for the permit |
| 3/17/22 | Email from TNF Tribal Relations Program Manager to Mescalero THPO | Apache | Mescalero Apache Tribe | n/a | Regarding arrangements for 4/07/22 meeting at Oak Flat with NFS Associate Deputy Chief Gyant |
| 3/19/22 | Email from TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | NFS Associate Deputy Chief Gyant will attend 3/30/22 Pascua Yaqui Tribal Council meeting virtually |
| 3/29/22 | Official letter from NFS Deputy Gyant to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Response to 10/14/21 letter; comments heard during 10/19/21 listening session; legal issues; Oak Flat field visit; direct contact information |
| 3/29/22 | Email from TNF Tribal Relations Program Manager to SRP-MIC | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Inquiring about Tribe's review of Water Quality Information provided on 1/06/21 |
| 3/30/22 | Official meeting of NFS Associate Deputy Chief, TNF, and Pascua Yaqui Tribal Council | Yoeme | Pascua Yaqui Tribe | Telemeeting | Discussed Pascua Yaqui's opposition to the mine and the destruction of cultural sites, plants, animals, and water resources |
| 4/06/22 | Emails between Salt River THPO and TNF Tribal Relations Program Manager | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Salt River listed parameters for requested additional water analyses |
| 4/07/22 | Meeting of NFS Associate Deputy Chief, TNF Leaders, and Mescalero Council Members and Cultural Staff | Apache | Mescalero Apache Tribe | Superior and Dripping Springs, Arizona | Meeting and field trip to view Oak Flat mining area and Skunk Camp proposed tailings' location |
| 4/12/22 | Email from TNF Tribal Relations Program Manager to White Mountain Chairwoman and Cultural Staff | Apache | White Mountain Apache Tribe | n/a | Requested meeting of NFS Associate Deputy Chief Barnie Gyant and White Mountain Tribal Council |
| 4/12/22 & 4/13/22 | Emails between White Mountain THPO and TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | n/a | Advised that new administration will take office 5/06/22 and will want to re-engage on RCM consultation |
| 4/13/22 | Emails between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Setting up meeting to discuss water issues raised by Salt River |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-94

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/15/22 & 4/19/22 | Emails between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Relayed NFS Associate Deputy Chief Gyant's question whether Salt River would accept BLM Hydrologist as third-party reviewer of water data; Anton replied that request is for new third-party study, not a review of the existing; stressed that he can consult with Mr. Gyant about the topics, but Salt River is not the only Tribe that made the request |
| 4/22/22–4/25/22 | Emails between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Discussed meeting topics and asked Anton if Chris Garrett, SWCA hydrologist, should attend 4/26 meeting to discuss water issues; replied in affirmative |
| 4/26/22 | Meeting of NFS Associate Deputy Chief, TNF Leaders, and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | Telemeeting | Anton provided input on tribal concerns about EIS water analysis deficiencies |
| 4/22/22 to 4/27/22 | Emails between BLM hydrologist and NFS Associate Deputy Chief | n/a | n/a | n/a | BLM review of RCM EIS water analyses will be provided by 5/24/22 |
| 5/02/22 | Emails between Mescalero Councilman Brusuelas and TNF Tribal Relations Program Manager | Apache | Mescalero Apache Tribe | n/a | Requested materials as follow-up to field tour; USFS provided 4/07/22 meeting notes; and summary of 5 mitigation funds discussed in October 2020 |
| 5/04/22 | Chi' chil Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe; White Mountain Apache Tribe; Yavapai-Apache Nation | Camp Verde | Update on groves and research; 2 groves added; distributed revised partnership statement |
| 5/27/22 | Chi' chil Advisory Board Quarterly Meeting | Apache | White Mountain Apache Tribe; Yavapai-Apache Nation | Hondah | Provided project background for WMAT Tribal leaders; updates on groves and research |
| 6/17/22 | Emory Oak Field Trip | Apache | White Mountain Apache Tribe; Yavapai-Apache Nation | Cibecue | Examined grove and discussed preparation of a cost proposal to treat 3 groves at Cibecue |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-95

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/30/22 | Official letter from NFS Associate Deputy Chief to Tribal Leaders and Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Gyant informed Tribes of his retirement and provided name of contact pending new designee |
| 8/12/22 | Emory Oak Field Trip | Apache | Yavapai-Apache Nation | Payson | Scouted Cherry Creek grove near Camp Verde |
| 8/15/22 | Official letter from San Carlos Chairman to USDA Secretary, USDOI Secretary, Domestic Policy Council Director | Apache | San Carlos Apache Tribe | n/a | Describes impacts of proposed mine and EIS failures (did not include Indigenous Traditional Ecological Knowledge in analyses, devaluation of impacts to Oak Flat, water analyses and impacts, valuation of exchange lands); seeks to include USDOI in consultations on RCM |
| 8/24/22 | Emory Oak picking trip | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Scouted for acorns in first grove treated by EOCTRI |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-96

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/26/22 | Official letter from TNF Supervisor to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed BLM's 6/13/22 review of hydrology aspects of the RCM EIS; TNF will pursue identified topics; and invited Tribes to pursue further with TNF |
| 8/29/22 | Email from TNF Tribal Relations Program Manager conveying 8/26/22 Official Letter from TNF Supervisor to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | See 8/26/22 letter |
| 8/30/22 | Email from Pascua Yaqui THPO to TNF Tribal Relations Program Manager | Yoeme | Pascua Yaqui Tribe | n/a | Encourages TNF to re-evaluate water and tailings analyses |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-97

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|-----------------------|----------|----------------------|
| 8/30/22 | Email from TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Thanked for comments, and will share with leadership; asked if Pascua Yaqui Tribe wants to meet to discuss further |
| 9/06/22 | Telephone Log of conversation between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Salt River THPO requested copies of the data provided to BLM and any additional water analyses; Richard will direct SWCA to provide to Salt River THPO |
| 9/06/22 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Provided link to FEIS and supporting documents and suggested Shane reach out to SWCA for any additional supporting documents on water analyses |
| 9/09/22 | Official letter from San Carlos Chairman to USDA Secretary, USDOI Secretary, and Domestic Policy Council Director | Apache | San Carlos Apache Tribe | n/a | Second request to meet to discuss the BLM Analysis of Water Data in the FEIS and additional issues San Carlos feels were inadequately addressed |
| 9/12 and 9/13/22 | Chi' chil Advisory Board Quarterly Meeting | Apache | Tonto Apache Tribe | Flagstaff | Apache Countermap presentation; updates on groves and biological/cultural surveys. |
|  |  |  | White Mountain Apache Tribe |  | EOCTRI panel at Biennial Conference on 9/13/22 |
|  |  |  | Yavapai-Apache Nation |  |  |
| 9/13/22 | Official letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Requests new EIS by new consultant to address points raised in BLM review of hydrology analyses, as well as other issues such as Skunk Camp tailings alternative |
| 9/13/22 | Email from San Carlos Chairman's Office to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Conveyed digital copy of 9/13/22 letter; hard copy in mail |

\* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-98

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 10/21/22 | Official Decision Memorandum from USDA Under Secretary for Natural Resources and Environment | All Tribes | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Tribe Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Delegating NFS Associate Deputy Chief Troy Heithecker as the USDA Consulting Official for G2G consultation with Tribal Nations regarding RCM |
| 11/28/22 | Official Meeting NFS Associate Deputy Chief, OTR, San Carlos Chairman and Attorney General, and Mapetsi Policy Group | Apache | San Carlos Apache Tribe | Washington, DC | Meeting to discuss San Carlos opposition to Resolution Copper Mine |
| 12/11/22 | Emails between USFS OTR and Mapetsi Policy Group | Apache | San Carlos Apache Tribe | n/a | Mapetsi Policy Group provided transcript of NFS Associate Deputy Chief Gyant's 2/11/22 meeting with San Carlos, as part of follow up from 11/28/22 meeting |
| 12/15/22 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | Yavapai-Apache Nation | telemeeting | Updates on groves and potential groves; presentation on Kaibeb NF pinyon jay project that may intersect |
| 1/18/23 | Official letter from Ak-Chin Indian Community Chairman to NFS Associate Deputy Chief | O'odham | Ak-Chin Indian Community | n/a | Support the Apache Nation closest to the project in their venture to address their use of Oak Flat sacred site |
| 2/28/23–3/16/23 | Emails between Mapetsi Policy Group and NFS regarding arrangements for visit to San Carlos | Apache | San Carlos Apache Tribe | n/a | Coordinated trip schedule and provided draft agendas for 3/28/23 meeting with Tribal Council and 3/29/29 Oak Flat tour |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-99

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|--------------------|----------|--------------------|
| 3/22/23 | Email from TNF Tribal Relations Program Manager conveying 3/22/23 Official letter from NFS Associate Deputy Chief to Tribal Leaders and Cultural Staff (letter also mailed) | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Heithecker summarized issues raised by Tribes since re-initiation of consultation in September 2021; extended invitation to listening session on 4/25/23 |
| 3/28/23 | Official meeting USDA Under Secretary Wilkes, NFS, and TNF with San Carlos Apache Tribal Council | Apache | San Carlos Apache Tribe | San Carlos, Arizona | Meeting to discuss status of consultation and the revision of the EIS; followed by tour of projects for which the Tribe is seeking federal funding |
| 3/29/23 | Presentations and tour of Oak Flat for USDA Under Secretary Wilkes and NFS staff | Apache | San Carlos Apache Tribe | Oak Flat, Arizona | Presentations by proponents for saving Oak Flat and tour to familiarize Washington staff with the area |
| 3/29/23<br>3/30/23<br>4/01/23<br>4/18/23 | Emails NFS Associate Deputy Chief and San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Heithecker thank you for meeting 3/28/23 and tour 3/29/23, and request to continue formal G2G consultation; 3/30 Rambler will reply after discusses with team; 4/1 Heithecker requested meeting transcript and list of San Carlos issues; 4/18 Heithecker follow up to set G2G meeting |
| 4/04/23 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Requested copy of sign-in sheet for Oak Flat Tour on 3/29/23 |
| 4/06/23 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Adkins response to Ritchie's protest about SWCA involvement in Tribal listening session slated for 4/25/23 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-100

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/06/23 | *Chi' chil Advisory Board Quarterly Meeting* | Apache | White Mountain Apache Tribe / Yavapai-Apache Nation | telemeeting | Updates on groves, initial analysis of Crackerjack post treatment; prepping for Red Rock groves treatments |
| 4/07/23 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | Regarding San Carlos Apache Tribe | n/a | Suggested Heithecker reach out to Rambler to confirm listening session will occur on 4/25/23 |
| 4/25/23 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Asked if anyone from San Carlos would be attending the tribal listening session on 4/25/23 |
| 4/25/23 | USFS Tribal Listening Session | All Tribes (15) invited | Gila River Indian Community / Hopi Tribe / Mescalero Apache Tribe / Pascua Yaqui Tribe / Salt River Pima-Maricopa Indian Community / San Carlos Apache Tribe / Tohono O'odham Nation / White Mountain Apache Tribe | Telemeeting | Discussed issues identified by Tribes and the status of the EIS |
| 5/10/23 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community / Fort McDowell Yavapai Nation / Fort Sill Apache Tribe / Gila River Indian Community / Hopi Tribe / Mescalero Apache Tribe / Pascua Yaqui Tribe / Pueblo of Zuni / Salt River Pima-Maricopa Indian Community / San Carlos Apache Tribe / Tohono O'odham Nation / Tonto Apache Tribe / White Mountain Apache Tribe / Yavapai-Apache Nation / Yavapai-Prescott Indian Tribe | n/a | Provided transcript and notes for 4/25/23 listening session |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-101

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|---------------------|
| 6/27/23 | Emory Oak Field Trip | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Camp Verde | Examined Hartwell grove treated with hand-lopping |
| 7/28/23 | Emory Oak scouting trip | Apache | Tonto Apache Tribe<br>Yavapai-Apache Nation | Payson | Searched for acorn at Payson Ranger District, Dude Fire scar, and Crackerjack |
| 8/10/23 | Emory Oak picking trip | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Picked acorns at Ranger Station and Rumsey Park in Payson |
| 8/18/23 | Official Letter from San Carlos Apache Chairman to USFS Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Proposes a MOU, a working group, and 6 topics to be discussed by the working group for RCM tribal consultation |
| 8/22/23 | Email from San Carlos Legal Secretary to TNF Supervisor and Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Conveyed copy of 8/18/23 letter from Rambler to Heithecker |
| 8/22/23 | Email from TNF Tribal Relations Program Manager to San Carlos Legal Secretary | Apache | San Carlos Apache Tribe | n/a | Informed San Carlos that 8/18 and 8/22/23 emails had incorrect email address for Heithecker; Adkins forwarded latter via correct email |
| 9/01/23 | Official Letter from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Replied to 8/18/23 letter saying USFS would like to delay September meeting so it can draft MOU for discussion |
| 9/01/23 | Email from San Carlos Chairman to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Agreed to delay meeting with USFS to discuss draft MOU |
| 9/06/23 | Emails from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Confirmed that water data had been provided to SWCA ethnographer and provided link to the online FEIS update |
| 11/06/23 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Informed Rambler that MOU is nearly ready to share and hopes some dates can be offered to reschedule consultation later in November or December |
| 12/07/23 | Email NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Provided for discussion with San Carlos, the USFS Draft MOU for G2G consultation on RCM, incorporating issues identified by Tribe |
| 1/16/24 | Email NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Following up to set meeting date to discuss the draft MOU |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-102

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 1/29/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Triba<br>White mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Marked Vincent Randall's passing and Chi' Chil Advisory Board support for continuing project; updates on groves; field and research objectives for 2024 |
| 2/05/24 | Email from San Carlos Attorney General to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Responding to 1/16/24 email and noting that San Carlos review of draft MOU will be complete mid-February |
| 2/05/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Informing Mr. Ritchie that Heilhecker is not available in March, but would be available in April and seeking to set a meeting date |
| 2/12/24 | Email from San Carlos Attorney General to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Suggesting second or third week of April for meeting; revised draft should be sent to Heilhecker by next week or following week |
| 2/13/24 | Email reply from NFS Associate Deputy to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Heilhecker available third or fourth week of April |
| 3/04/24 | Emory Oak Field Trip | Apache | Yavapai-Apache Nation | Fossil Creek<br>Needle Rock | Assessed potential post-fire treatments to discuss with *Chi' Chil* Advisory Board |
| 3/14/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Follow-up to 2/13/24 email from Heilhecker to Rambler seeking to set meeting date |
| 3/15/24 | Emails between San Carlos Chairman and TNF Tribal Relations Program Manager | Apache | San Carlos Apacha Tribe | n/a | Set 5/15/24 mtg in San Carlos Council chambers |
| 3/19/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Requested San Carlos comments on draft MOU sent 12/7/23 by TNF, prior to meeting |
| 3/19/24 | Telephone Log of conversation between San Carlos Attorney General and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Ritchie spoke with Adkins about the status of the draft MOU |
| 3/27/24 | Telephone Log of conversation between San Carlos Attorney General and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Ritchie concerned he could not provide MOU revisions before April meeting due to lawsuits requiring his attention; Adkins confirmed San Carlos chairman moved meeting to 5/15/24. Ritchie will try to provide MOU comments by 4/02/24 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-103

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/27/24 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | | n/a | Adkins forwarded his telephone log (originally misdated) to Heilhecker and also requested discussion of next steps with 14 other consulting Tribes [misstated date of San Carlos meeting as 4/15/24] |
| 4/15/24 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | | n/a | Adkins relayed telephone conversation with San Carlos Attorney General re: MOU comments coming on 4/17/24 |
| 4/19/24 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Regarding telephone conversation between Richard Adkins, TNF, and Alex Ritchie, San Carlos, re: delivery of comments on MOU today and inquiring about the people being copied on conversations |
| 4/19/24 | Official letter from San Carlos Chairman to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/e | Letter conveying San Carlos proposed changes to draft MOU; emailed copy with hard copy via US mail |
| 4/22/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman's Office | Apache | San Carlos Apache Tribe | n/a | Email acknowledging receipt of emailed 4/19/24 letter and draft MOU from San Carlos Chairman's office |
| 4/25/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Hon Dah | Memorialized Vincent Randall's passing; updates on groves, research, potential youth activities, and elders guidance on these |
| 5/10/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman's Office | Apache | San Carlos Apache Tribe | n/a | Sent final proposed agenda for 5/15/24 meeting |
| 5/15/24 | Official meeting of NFS Associate Deputy Chief and TNF Leaders with San Carlos Tribal Council | Apache | San Carlos Apache Triba | San Carlos, Arizona | Discussed EIS and proposed consultation MOU |
| 5/17/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Thank you for the meeting and follow up on creating working groups to address, ACHP response letter and consultation MOU |
| 5/17/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Requested copy of court reporter's transcript of 5/15/24 meeting at San Carlos |
| 5/20/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | San Carlos will send transcript upon receipt from court reporter |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-104

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|--------------------|----------|---------------------|
| 5/20/24 | Email from San Carlos Attorney General to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Suggested Fridays for meetings to finalize MOU between USFS and San Carlos |
| 5/20/24 | Email from NFS Associate Deputy Chief to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Is available any of the next 3 Friday mornings |
| 5/23/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Suggested three dates in June for meeting |
| 5/28/24 | Official letter from NFS Associate Deputy Chief to Tribal Leaders | All Tribes (15) Apache O'odham Pueblo Yavapai Yoeme | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Tribe Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Provided review of consultation activities since withdrawal of FEIS and invitation to discuss further, and enclosed his 3/23/23 offer to consult (PR 6026-6042) |
| 5/29/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | 6/07/24 and Microsoft Teams format is good for the meeting; requested USFS marked-up version of MOU prior to meeting |
| 5/30/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Adkins will send Teams invitation and anticipates marked-up version of MOU will be available early next week |
| 6/04/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Conveyed USFS's marked up Draft MOU |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-105

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/04/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Asked for V. Grant and V. Nosie to be added to email chain; advised he will not be available for 6/08/24 meeting, but San Carlos Attorney General office attorneys will attend |
| 6/05/24 | Email TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Acknowledged Ritchie meeting conflict and will add Grant and Nosie to email |
| 6/05/24 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General office | Apache | San Carlos Apache Tribe | n/a | Velasquez will attend 6/07/24 MOU discussion for San Carlos Attorney General office |
| 6/05/24 | Email from TNF Tribal Relations Program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | n/a | Provided marked up MOU and will send invite to 6/07/24 meeting |
| 6/08/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman and staff | Apache | San Carlos Apache Tribe | n/a | Provided draft agenda for meeting on 6/07/24 |
| 6/07/24 | Official meeting of NFS Associate Deputy Chief and TNF Leaders with San Carlos Tribal Council | Apache | San Carlos Apache Tribe | n/a | Discussed draft MOU for consultation on the RCM EIS |
| 6/07/24 | Emails between TNF Tribal Relations and San Carlos Attorney General office | Apache | San Carlos Apache Tribe | n/a | Provided transcript, attendance file, and agenda from meeting |
| 7/22/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Provided USFS Draft MOU for review by San Carlos and requested meeting date to discuss |
| 7/25/24 | *Chi' chil Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe  Tonto Apache Tribe  White Mountain Apache Tribe  Yavapai-Apache Nation | Payson | Updates on groves and research; need for Cibecue prescriptions; discussion of problems picking in public places; need to involve youth |
| 7/31/24 | Emory Oak picking trip | Apache | San Carlos Apache Tribe  Tonto Apache Tribe  White Mountain Apache Tribe  Yavapai-Apache Nation | Payson | Collected fallen acorns in Payson Ranger District parking lot; Payson Roundup reporter interviewed elders about importance of acorn; moved to City Park to continue collecting. |
| 8/05/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Follow up regarding meeting date to discuss draft MOU sent on 7/22/24 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-106

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/05/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | MOU received, will review and reply |
| 8/09/24 | *Chi'chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Elders discussion of proposed treatments for Needle Rock and Fossil Creek groves |
| 10/23 – 10/24/24 | *Chi'chil* Advisory Board Quarterly Meeting | Apache | White Mountin Apache Tribe<br>Yavapai-Apache Nation | Camp Verde | Tour of results of Dry creek hand lopping; Meeting discussed youth director position, additional groves, forest and research updates, recruitment of members |
| 2/18/25 | *Chi'chil* Advisory Board Quarterly Meeting | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Discussed positive reaction to newspaper article on Apache acorn picking; updates on groves and research; RCM video request; and Youth Director tasks |
| 4/22/25 | Copy of letter dated 04/18/25 from USDA Secretary to ACHP Executive Director | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed USDA decision to publish the FEIS and draft Record of Decision, and conclude NHPA Section 106 process as of 4/17/25 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

*This page intentionally left blank.*

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-108

Appendix S

| Consulting Tribes | Official Name |
|---|---|
| Ak-Chin | Ak-Chin Indian Community |
| Fort McDowell | Fort McDowell Yavapai Nation |
| Fort Sill | Fort Sill Apache Tribe |
| Gila River | Gila River Indian Community |
| Hopi | Hopi Tribe |
| Mescalero | Mescalero Apache Tribe |
| Pascua Yaqui | Pascua Yaqui Tribe |
| Salt River | Salt River Pima-Maricopa Indian Community |
| San Carlos | San Carlos Apache Tribe |
| Tohono O'odham | Tohono O'odham Nation |
| Tonto | Tonto Apache Tribe |
| White Mountain | White Mountain Apache Tribe |
| Yavapai-Apache | Yavapai-Apache Nation |
| Yavapai-Prescott | Yavapai-Prescott Indian Tribe |
| Zuni | Pueblo of Zuni |

# Acronyms

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| ALSMA | Apache Leap Special Management Area |
| ASLD | Arizona State Land Department |
| ASM | Arizona State Museum |
| BLM | Bureau of Land Management (a branch of the USDOI) |
| CPO | Cultural Preservation Office |
| CR | cultural resources |
| DEIS | draft environmental impact statement |
| EA | environmental assessment |
| EIS | environmental impact statement |
| EOCTRI | Emory Oak Collaborative Tribal Restoration Initiative |
| FEIS | final environmental impact statement |
| FOIA | Freedom of Information Act |
| FONSI | finding of no significant impact |
| G2G | Government-to-Government |
| GPO | General Plan of Operations |
| HPTP | Historic Properties Treatment Plan |

Appendix S

| | |
|---|---|
| HR | House of Representatives |
| IDT | Inter Disciplinary Team |
| MOU | memorandum of understanding |
| mT | magnetotelluric geophysical |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NDAA | National Defense Authorization Act of 2015 |
| NEPA | National Environmental Policy Act |
| NFF | National Forest Foundation |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NRHP | National Register of Historic Places |
| OSEC | USDA Office of the Secretary |
| OTR | USDA Office of Tribal Relations |
| PA | Programmatic Agreement |
| POC | point-of-contact |
| RC | Resolution Copper Mining LLC |
| RCM | Resolution Copper Mine |
| S.O. | Forest Supervisor's Office |
| SEIS | supplemental environmental impact statement |
| SHPO | Arizona State Historic Preservation Office |
| SRP | Salt River Project |
| SWCA | SWCA Environmental Consultants |
| TCP | traditional cultural place |
| THPO | Tribal Historic Preservation Office |
| TM | Tribal Monitor |
| TNF | Tonto National Forest |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USDOI | U.S. Department of the Interior |
| USFS | U.S. Forest Service (a branch of the USDA) |
| WRI | WestLand Engineering and Environmental Services (formerly WestLand Resources Inc.) |