No. 25-5189

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SAN CARLOS APACHE TRIBE,
Plaintiff-Appellant,

v.

UNITED STATES FOREST SERVICE, ET AL.,
Defendants-Appellees,

and

RESOLUTION COPPER MINING, LLC,
Intervenor-Appellee

Appeal from the United States District Court for the District of Arizona
Honorable Dominic W. Lanza (No. 2:21-cv-00068-DWL)

**OPENING BRIEF OF APPELLANT SAN CARLOS APACHE TRIBE**

**SAN CARLOS APACHE TRIBE DEPARTMENT OF JUSTICE**
Alexander B. Ritchie, AZ Bar No. 019579
Justine Jimmie, AZ Bar No. 019148
Laurel Herrmann, AZ Bar No. 025623
Jana Sutton, AZ Bar No. 032040
Bernardo M. Velasco, AZ Bar No. 033746
P.O. Box 40
San Carlos, Arizona 85550
Tel. (928) 475-3344
alex.ritchie@scat-nsn.gov
justine.jimmie@scat-nsn.gov
laurel.herrmann@scat-nsn.gov
jana.sutton@scat-nsn.gov
bern.velasco@scat-nsn.gov
*Attorneys for the San Carlos Apache Tribe*

**THE SPARKS LAW FIRM, P.C.**
Joe P. Sparks, AZ Bar No. 002383
7503 First Street
Scottsdale, Arizona 85251
Tel. (480) 949-1339
joesparks@sparkslawaz.com
*Attorney for the San Carlos Apache Tribe*

**TITLA & PARSI, PLLC**
Steve Titla, AZ Bar No. 009325
245 S. Hill Street
P.O. Box 1143
Globe, Arizona 85502
Tel. (928) 812-7714
steve@titlaparsi.com
*Attorney for the San Carlos Apache Tribe (of counsel)*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................... iii

LIST OF ACRONYMS........................................................................ viii

I.      INTRODUCTION ........................................................................1

II.     JURISDICTIONAL STATEMENT ..................................................5

III.    ISSUES PRESENTED FOR REVIEW ............................................5

        A.      Is the EIS a final agency action under SALECA and the APA?.............6

        B-1.    Is Ninth Circuit precedent establishing a plaintiff may prove an action is arbitrary and capricious with extra-record evidence still controlling? ...................................................................................6

        B-2.    Did the Tribe's evidence of factors that the EIS did not consider demonstrate the EIS is arbitrary and capricious?...................................6

        C.      Did the district court err by crediting Federal Defendants with consultation efforts that they acknowledged were inadequate and did not cure? ........................................................................6

        D-1.    Did the district court err when it balanced the hardships by considering generalized policy questions rather than weighing concrete harms between the Tribe and government? ...........................7

        D-2.    Did the district court err by failing to consider harm to the public interest that would result if Federal Defendants transferred Oak Flat before satisfying SALECA's EIS and consultation requirements?.......7

IV.     STATEMENT OF THE CASE ........................................................7

V.      SUMMARY OF THE ARGUMENT............................................14

VI.     ARGUMENT..............................................................................25

        A.      Standard of Review ...........................................................25

B.    The Tribe Has Standing Under the Administrative Procedures Act ...25

C.    The Balance of Factors Compels that a Preliminary Injunction is Necessary During the Pendency of the Action....................................32

1.    The Tribe's Expert Scientific Evidence Is Admissible Under Ninth Circuit Precedent, Is Consistent with *Seven County*, and Establishes Likelihood of Success on the Merits .....................32

2.    Federal Defendants Failed to Satisfy SALECA's Consultation Requirements ............................................................................49

3.    The District Court Applied an Incorrect Standard for Balancing the Hardships to the Government and the Public Interest ........52

VII.   CONCLUSION.................................................................................58

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..............7, 32, 53

*Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) .....................26

*Assurance Wireless U.S.A., LP v. Reynolds*, 100 F.4th 1024 (9th Cir. 2024) ..........54

*Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87 (1983) .....................................37

*Bennett v. Spear*, 520 U.S. 154 (1997).................................... 4, 6, 14, 25, 27, 29, 31

*Burlington Truck Lines v. U.S.*, 371 U.S. 156 (1962) ...............................................35

*Ctr. for Food Safety v. Regan*, 56 F.4th 648 (9th Cir. 2022) ........................34, 41, 47

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) .................33

*Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*,
    297 F. Supp. 3d 898 (D. Ariz. 2017).........................................................22, 52

*Envtl. Defense Ctr. v. Bur. of Ocean En. Mgmt.*, 36 F.4th 850 (9th Cir. 2022)........30

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*,
    98 F.4th 1180 (9th Cir. 2024).........................................................................32

*Hubbard v. City of San Diego*, 139 F.4th 843 (9th Cir. 2025) .................................25

*Island Indus. Inc. v. Sigma Corp.*, 142 F.4th 1153 (9th Cir. 2025) .........................25

*Jimenez v. Quarterman*, 555 U.S. 113 (2009).........................................................26

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)........................................25

*King v. Burwell*, 576 U.S. 473 (2015).....................................................................26

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004).....................................................................47, 48

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ..........................................................47

iv

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983).........................................................2, 35, 38, 39

*Nken v. Holder*, 556 U.S. 418 (2009)...........................................7, 22, 23, 54, 59

*Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185
    (9th Cir. 2019)..................................... 2, 4, 6, 15, 34, 35, 37, 48, 49

*Pac. Coast Fed'n of Fishermans Ass'ns v. Blank*, 693 F.3d 1084
    (9th Cir. 2012)....................................................34, 35, 37

*Pitcairn v. Philip Hiss Co.*, 113 F. 492 (3d Cir. 1902)...........................................51

*Rep. of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988)..........................49

*San Luis & Delta-Mendota Water Authority v. Locke*,
    776 F.3d 971 (9th Cir. 2014)............................... 2, 4, 6, 15, 18, 33, 35, 36, 37

*Seven County Infrastructure Coal. v. Eagle County*,
    145 S. Ct. 1497 (2025)................................... 1, 2, 18, 35, 39, 40, 50

*Shoshone-Bannock Tribes of the Fort Hall Reservation v.*
    *U.S. Dep't of Interior*, 2025 WL 2424422 (9th Cir. 2025) .................3, 10, 56

*Shell Offshore Inc. v. Greenpeace, Inc.*, 709 F.3d 1281 (9th Cir. 2013)............53, 58

*Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995)......................................17

*Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*,
    496 F. Appx. 712 (9th Cir. 2012) ....................................................52

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010)....................................................52

*Tohono O'odham Nation v. Dept. of the Interior*, 138 F.4th 1189
    (9th Cir. 2025)....................................................29, 30

*United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941)...................................56

*W. Watersheds Project v. Grimm*, 921 F.3d 1141 (9th Cir. 2019) ....................55, 56

*Wash. State Farm Bur. v. Marshall*, 625 F.2d 296 (9th Cir. 1980)....................33, 34

**Statutes**

4 Stat. 729......................................................................................56

5 U.S.C. § 702..............................................................................17, 25

16 U.S.C. § 539p.......................................................................*passim*

28 U.S.C. § 1292...............................................................................5

28 U.S.C. § 1331...............................................................................5

28 U.S.C. § 1362...............................................................................5

42 U.S.C. § 4332.............................................................................47

48 Stat. 944 ..........................................................................1, 16, 21

54 U.S.C. § 306101 *et seq.*...............................................................3

**Regulations**

36 C.F.R. § 800.6...........................................................................51

40 C.F.R. § 1501.6.........................................................................27

**Rules**

Fed. R. App. P. 4..............................................................................5

Fed. R. Evid. 701-03....................................................................34, 36

**Federal Register**

20 Fed. Reg. 7336-37........................................................................8

36 Fed. Reg. 19029 ..................................................................8

**Amended Constitution and Bylaws of the San Carlos Apache Tribe**

Art. V, § 1.....................................................................1, 21

**Other Authorities**

Black's Law Dictionary .........................................................34

San Carlos Apache Tribe Water Rights Settlement Agreement (Mar. 30, 1999) ......3

*United States v. Gila Valley Irr. Dist.*, Globe Equity Decree No. 59
      (D. Ariz. June 29, 1935), art. V, VI(2) .................................3, 56, 57

## <u>LIST OF ACRONYMS</u>

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| ER | Excerpt of Record |
| FONSI | Finding of No Significant Impact |
| MOU | Memorandum of Understanding |
| NDAA | National Defense Authorization Act |
| NEPA | National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* |
| NHPA | National Historic Preservation Act of 1966, 54 U.S.C. § 300101 *et seq.* |
| NPAG | Non-potentially acid generating |
| PAG | Potentially acid generating |
| ROD | Record of Decision |
| SALECA | Southeastern Arizona Land Exchange and Conservation Act, 16 U.S.C. § 539p |

## I.    INTRODUCTION

Since time immemorial, Apaches have practiced their traditional religion, culture, and customs at *Chí'chil Biłdagoteel*, a sacred place known as "Oak Flat." Nevertheless, the Southeastern Land Exchange and Conservation Act of 2015 ("SALECA") directs the Secretary of Agriculture ("Secretary") to transfer Oak Flat to Resolution Copper Mining, LLC ("Resolution") so it can mine Oak Flat into oblivion.  16 U.S.C. § 539p.

Before the Secretary transfers Oak Flat, SALECA imposes certain conditions precedent.  The Secretary must publish an environmental impact statement ("EIS") that evaluates the environmental and cultural consequences of the Resolution project, and that EIS must be the product of government-to-government consultation with the San Carlos Apache Tribe ("Tribe"), through the San Carlos Council, the Tribe's governing body.  16 U.S.C. 539p(c)(3), (9); Indian Reorganization Act of 1934, 48 Stat. 944 § 16(e); Amd. Const. and Bylaws of the San Carlos Apache Tribe, art. V, § 1(a). On June 20, 2025, the United States Forest Service ("Forest Service") published an EIS that fails to meet these requirements. *See* 16 U.S.C. § 539p(c)(3), (9).

Because this challenge concerns the adequacy of an EIS, *inter alia*, the key question is whether its analysis of the *direct* environmental and cultural consequences of Resolution's mine is arbitrary and capricious.  *Seven County*

*Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1511 (2025); 16 U.S.C. § 539p(c)(3), (9). Below, the district court misinterpreted this recent Supreme Court decision to provide agencies with unfettered discretion over both direct and indirect effects. Read on its own terms, however, *Seven County* does not rewrite judicial review for *direct* effects. 145 S. Ct. at 1511-15. Instead, *Seven County* only provides wide discretion to an agency's analysis of *indirect* effects. *Id.* As such, existing Supreme Court and Ninth Circuit precedent regarding *direct* effects remains controlling. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Or. Natural Desert Ass'n v. Rose* ("*ONDA*"), 921 F.3d 1185, 1190–92 (9th Cir. 2019); *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014).

Here, the EIS is arbitrary and capricious because its analysis of the direct effects that SALECA requires it to address (1) fails to consider numerous relevant factors, (2) is internally contradictory, and (3) does not employ the best available science.[1] Consequently, the EIS cannot support federal decisions related to tailing storage facilities and pipelines and fails to address certain environmental catastrophe. Nevertheless, Federal Defendants[2] stand ready to transfer Oak Flat to Resolution.

---

[1]*See Locke,* 776 F.3d at 995.
[2]"Federal Defendants" refers to all federal defendants named in this action; where applicable, individual defendants are named.

Additionally, this case involves Indian title of use and occupancy, constitutional and treaty rights, and the Tribe's decreed water rights held in trust by the United States for the Tribe, and therefore the Court should apply Indian canons of construction in its evaluation of this matter. *See Shoshone-Bannock Tribes of the Fort Hall Reservation v. U.S. Dep't of Interior et al.*, 2025 WL 2424422, *12 (9th Cir. 2025).

Once Oak Flat becomes Resolution's private property, the Tribe will suffer irreparable harm. Notwithstanding the Tribe's superior Indian title of continued use and occupancy, Resolution intends to exclude the public (and members of the Tribe) from all but 50 of Oak Flat's 2,422 acres, in a manner that would impair the practice of traditional Apache religion, culture, and essential customs. Oak Flat will lose federal protections related to historic preservation. *See* 54 U.S.C. § 306101 *et seq.* Resolution's mine will also violate decreed water rights held in trust by the United States for the Tribe. *See United States v. Gila Valley Irr. Dist.*, Globe Equity Decree No. 59 (D. Ariz. June 29, 1935), art. V, VI(2); San Carlos Apache Tribe Water Rights Settlement Agreement (Mar. 30, 1999) at ¶ 4.0. (7-ER-1368-69, 1397-99; 8-ER-1761-62).

To prevent Oak Flat's transfer until Federal Defendants rectify these deficiencies, the Tribe moved for a preliminary injunction below. The district court denied the motion and committed four legal errors. Specifically, the court

(1) failed to determine as a matter of law that the EIS is a final agency action under SALECA and the Administrative Procedures Act ("APA"); (2) determined the Tribe was not likely to succeed on the merits even though it produced admissible scientific evidence demonstrating that the EIS's analysis of several material issues was arbitrary and capricious; (3) determined that Federal Defendants had discharged their consultation obligations despite admitting on the record in 2021 that they had not done so and did not subsequently cure that failure; and (4) failed to balance the hardships between the Tribe and Federal Defendants, but instead adopted Congress' supposed policy motivations behind Oak Flat's transfer.

This Court should reverse the district court and direct that court to enjoin Oak Flat's transfer for four reasons. First, the EIS is a final agency action under SALECA and the APA because it represents the culmination of the Secretary's environmental and cultural decision-making processes, and legal consequences flow from its publication. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

Second, the opinions of Dr. Emerman and Dr. Wells that the Tribe presented in its motion for preliminary injunction are admissible under Ninth Circuit precedent and demonstrate that the EIS is arbitrary and capricious. *See Locke*, 776 F.3d at 992; *ONDA*, 921 F.3d at 1190–92.

Third, there is no basis to determine that the Secretary discharged her consultation obligations because Federal Defendants admitted on the record that pre-

2021 consultation efforts had been inadequate as a matter of law.  Further, that the Forest Service was still negotiating a memorandum of understanding ("MOU") with the Tribe to guide a future consultation in May 2024 establishes that Federal Defendants never cured that failure.

Fourth, when the harms the Tribe will suffer if the injunction is denied are weighed against the any hardship to the government, the balance tips sharply in favor of the Tribe.  Further, the public has an interest in Federal Defendants satisfying SALECA's conditions precedent of preparing a comprehensive EIS and government-to-government consultation with the Tribe before transferring Oak Flat.

## II.    JURISDICTIONAL STATEMENT

Federal Courts have subject matter jurisdiction because a federally recognized Indian tribe brings this action, and the controversy arises under the Constitution, laws, and treaties of the United States.  *See* 28 U.S.C. §§ 1331, 1362.  Further, this Court has jurisdiction to review interlocutory orders refusing an injunction from the United States District Court for the District of Arizona.  28 U.S.C. § 1292(a)(1).

On August 15, 2025, the district court entered an order refusing the requested injunction to enjoin Federal Defendants from transferring Oak Flat to Resolution. (1-ER-94).  Immediately after, the Tribe timely filed a notice of appeal.  (2-ER-98-103); Fed. R. App. P. 4(a)(1)(a).  This Court has jurisdiction to review that order.

## III.    ISSUES PRESENTED FOR REVIEW

A. The Administrative Procedures Act permits review of "final agency actions." *Bennett* holds that an action is a "final agency action" when (1) the agency reaches the "consummation" of its decision-making process and (2) "legal consequences" flow from it. 520 U.S. at 177–78. SALECA requires the Secretary to thoroughly investigate the environmental and cultural consequences of Resolution's mine, and then, publish a comprehensive EIS as the final act before the Secretary transfers Oak Flat.

**Issue A: Is the EIS a final agency action under SALECA and the APA?**

B. Ninth Circuit precedent allows plaintiffs to prove an agency action is arbitrary and capricious with extra-record evidence of factors the agency did not consider. *See Locke*, 776 F.3d at 992; *ONDA*, 921 F.3d at 1190–92. In *Seven County*, the Supreme Court reaffirmed that federal agencies must fully address *direct* effects under an arbitrary and capricious standard and held that vacating an EIS requires proof that an agency decision could change. Below, the Tribe presented evidence that the EIS fails to consider numerous critical factors that SALECA required the Secretary to analyze, and that had the EIS considered them, its conclusions might change.

**Issue B-1: Is Ninth Circuit precedent establishing a plaintiff may prove an action is arbitrary and capricious with extra-record evidence still controlling?**

**Issue B-2: Did the Tribe's evidence of factors that the EIS did not consider demonstrate the EIS is arbitrary and capricious?**

C. In March 2021, Federal Defendants withdrew a previous EIS and stated on the record that they needed to conduct additional consultation with the Tribe. As of June 2024, the Tribe and Federal Defendants were negotiating a MOU to govern future consultation that did not occur.

**Issue C: Did the district court err by crediting Federal Defendants with consultation efforts that they acknowledged were inadequate and did not cure?**

D. When a plaintiff shows serious questions on the merits, an injunction is warranted if the balance of hardships between plaintiff and defendant tip sharply in the plaintiff's favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). Further, when a party seeks a preliminary injunction against the government, courts merge the factors that consider hardship to the government and the public interest because the public's interest, generally, is for the government to enforce the law. *Nken v. Holder*, 556 U.S. 418, 436 (2009). SALECA directs the Secretary to prepare an EIS and to consult with Indian tribes before transferring Oak Flat. The district court did not consider whether any hardships would result from delaying Oak Flat's transfer but determined that Congress had balanced the relevant policy concerns in favor of transferring Oak Flat.

**Issue D-1: Did the district court err when it balanced the hardships by considering generalized policy questions rather than weighing concrete harms between the Tribe and government?**

**Issue D-2: Did the district court err by failing to consider harm to the public interest that would result if Federal Defendants transferred Oak Flat before satisfying SALECA's EIS and consultation requirements?**

## IV.    STATEMENT OF THE CASE

From time immemorial, Oak Flat has been home to Apache deities, traditional Apache religious ceremonies, and countless culturally significant Apache properties, including human remains and artifacts. (7-ER-1343-44, 1364-65). Oak Flat, which lies within Tonto National Forest, has been sacred to members of the Tribe and their ancestors as an indispensable place to worship, pray, and gather religiously important foods and medicines. (*Id.*).

In 1955, President Eisenhower withdrew Oak Flat and the surrounding area from "all forms of appropriation under the public-land laws," including mining activity. Public Land Order 1229, 20 Fed. Reg. 7336-37 (Oct. 1, 1955). In 1971, President Nixon modified that order to open protected lands to some forms of appropriation but continued to protect Oak Flat from mining activity specifically. Public Land Order 5132, 36 Fed. Reg. 19029 (Sept. 25, 1971). In violation of these orders, Resolution's predecessors unlawfully explored beneath Oak Flat in the mid-1990s; Resolution asserts that its predecessor discovered one of the largest copper deposits in the world.

Now, Resolution intends to mine copper beneath Oak Flat using a method that will cause a subsidence crater to form underneath Oak Flat and destroy this sacred place. (7-ER-1344-45). Accordingly, between 2004 and 2013, Resolution lobbied members of Congress to exchange Oak Flat for other lands. (7-ER-1344). For ten years, the Tribe successfully opposed Resolution's lobbying efforts with its members testifying before Congress about the importance of Oak Flat in traditional Apache religion, culture, and essential customs. (*Id.*).

Nevertheless, in 2015, Senator Jeff Flake (a former Rio Tinto lobbyist) and the late Senator John McCain attached SALECA as a non-germane rider outside of regular procedure to the Carl Levin and Howard P. Buck McKeon National Defense Authorization Act of 2015 ("NDAA"). (7-ER-1344-45). Although

SALECA directs the Secretary to transfer Oak Flat to Resolution so it may construct a gargantuan mine, SALECA requires several conditions precedent. 16 U.S.C. § 539p(c)(3), (9)-(10).

"Prior to conveying [Oak Flat]," SALECA requires the Secretary to "prepare a single environmental impact statement . . . which shall be used as the basis for all decisions under Federal law related to the proposed mine." 16 U.S.C. § 539p(c)(9)(B). This expressly includes "permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.* Further, the EIS shall "assess the effects of the mining and related activities . . . on the cultural and archaeological resources that may be located" within Oak Flat and "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any." 16 U.S.C. § 539p(c)(9)(C). Regarding the subject matter of the required EIS, SALECA imposes *and heightens* NEPA's requirements by requiring a comprehensive EIS (rather than individual NEPA processes) that extends well beyond the comparatively few decisions that federal agencies may make to address impacts from every aspect of Resolution's mine. *See* 16 U.S.C. § 539p(c)(9)(A), (B).

Second, the EIS must be informed by "government-to-government consultation with affected Indian tribes concerning issues of concern . . . related to

9

the land exchange." 16 U.S.C. § 539p(c)(3)(A). After this consultation, the Secretary is also required to "consult with Resolution Copper to seek to find mutually acceptable measures to (i) address the concerns of affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities." 16 U.S.C. § 539p(c)(3)(B).

Related, SALECA requires the Secretary to inventory cultural properties and consider how to mitigate adverse impacts. 16 U.S.C. § 539p(c)(9)(D). The Tribe and Federal Defendants have consistently interpreted this to incorporate the requirements of § 106 of the National Historic Preservation Act ("NHPA"). Until the Secretary completes this process, she lacks the obligation—and the authority— to transfer Oak Flat to Resolution. SALECA did not expressly extinguish the Tribe's Indian title of use and occupancy to Oak Flat. *See Shoshone-Bannock Tribes*, 2025 WL 2424422, at *12.

In January 2021, the Forest Service, acting on behalf of the Secretary, gave notice that it would publish an EIS, and the Tribe filed the underlying action. (7-ER-1374). In February 2021, the Tribe filed a motion for preliminary injunction, asserting numerous failures in the 2021 EIS and government-to-government consultation. (8-ER-1833). Federal Defendants withdrew the 2021 EIS, stating that "additional time [wa]s necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensure

10

the agency's compliance with federal law." (8-ER-1840). Using the language of SALECA, Federal Defendants recognized that "government-to-government consultation" with the Tribe had been inadequate and that "addressing areas of concern" could yield "mutually acceptable measures" to address those concerns and "minimize adverse effects." *See* 16 U.S.C. § 539p(c)(3).

Accordingly, the Parties agreed by joint motion to withdraw the Tribe's motion and stay the action while they undertook consultation efforts. (8-ER-1834). That joint motion reiterated Federal Defendants' position that "addition time is needed to reinitiate consultation with Tribes and ensure impacts have been fully analyzed." (8-ER-1833).

Between 2021 and 2024, representatives from the Tribe and Forest Service exchanged correspondence and held informal meetings. (5-ER-0982-1005). Neither party considered these exchanges to constitute the government-to-government consultation required by SALECA or contemplated in the Joint Motion. Even a May 14, 2024 "consultation" between the Tribe and Forest Service focused primarily on drafting a MOU to guide substantive consultation. (3-ER-0473-77). At that meeting, the Tribe also requested written responses to concerns it raised about the tailings storage facility, groundwater pumping, and to comments prepared by the Bureau of Land Management and Advisory Council on Historic

11

Preservation ("ACHP"). (*Id.*). The Parties never executed the MOU and the Forest Service never engaged the Tribe in substantive consultation. (3-ER-0477).

Instead, on April 17, 2025, Federal Defendants gave notice that they intended to publish the instant EIS and immediately transfer Oak Flat to Resolution. (8-ER-1837-47). On May 14, the Tribe filed a Motion for Preliminary Injunction to Enjoin Publication of the EIS and the Land Exchange.[3] (8-ER-1808-27). On June 9, the district court denied the Tribe's motion for preliminary injunction, but nevertheless enjoined Oak Flat's transfer for 60 days to give effect to the Parties' agreement in the Joint Motion. (8-ER-1806). On June 20, the Forest Service published the EIS that is the subject of this appeal. (7-ER-1354).

On July 14, 2025, the Tribe filed a second amended complaint[4] and a motion for preliminary injunction in which it established standing under the APA and asked the Court to enjoin Oak Flat's transfer because the EIS failed to satisfy the requirements of SALECA, NEPA, and NHPA. (6-ER-1311-38; 7-ER-1340-1401). The Tribe's motion was supported by the declarations and memoranda of Dr.

---

[3]The May 14 motion predates the motion for preliminary injunction that is the subject of this appeal, which was filed on July 14, 2025.

[4]The Tribe also alleged claims grounded in the Free Exercise Clause of the First Amendment to the United States Constitution, the Apache Treaty of 1852, Religious Freedom Restoration Act, the Indian Title doctrine, and the Tribe's decreed water rights, each of which would be affected by Oak Flat's transfer and the Resolution mine plan of operations.

Steven Emerman and Dr. James Wells, both of whom had commented during or participated in the EIS process.  (5-ER-1009-81; 6-ER-1083-1112).

Those opinions identified numerous factors that Federal Defendants did not consider and demonstrated that the EIS was arbitrary and capricious.  These factors include:  (1) an industry standard dam breach analysis evaluating the integrity and suitability of the proposed tailings storage facility;  (2) the impact on acid formation and risks caused by the presence of acid-generating tailings and potentially acid-generating tailings in the so-called "non-potentially acid-generating tailings"; (3) the most common causes of pipeline failure and the consequences thereof; and (4) the failure to consider that oxygen will be present in the collapse zone, increasing the risk of acid drainage in the water pumped from the underground mine and used in ore processing and tailings transport and storage.  (5-ER-1009-81; 6-ER-1083-1112).  Both Dr. Emerman and Dr. Wells opine that, had a reasonable agency in Federal Defendants' position considered these factors, they would likely prefer different project alternatives.  (5-ER-1014; 6-ER-1088).

On July 28, 2025, Federal Defendants and Resolution opposed the motion.[5]  (6-ER-1177-1302).  On August 4, the Tribe filed a consolidated reply in support of

---

[5]Federal Defendants also filed a Motion to Strike the declarations and memoranda of Dr. Emerman and Dr. Wells, which the Tribe opposed.  (6-ER-1303-10).

13

the motion.  (2-ER-305-327).  On August 6, the district court held oral argument.

At argument, the Tribe orally moved, in the alternative, for an injunction pending

appeal if the court denied a preliminary injunction.  (2-ER-0292-93).

On August 15, 2025, the district court denied the Tribe's motions for

preliminary injunction and for an injunction pending appeal.  (1-ER-91).  Among

many determinations, the court erroneously determined (1) the Tribe merely raised

serious questions about whether the EIS is a final agency action; (2) the Tribe did

not demonstrate likelihood of success or serious questions on the merits for claims

based on SALECA, NEPA, and NHPA; (3) that the balance of hardships and public

interest needed to "tip sharply" in the Tribe's favor; and (4) that Congress resolved

the balance of hardships and public interest by passing SALECA.  (1-ER-35-37,

92-93).  The same day, the Tribe filed its notice of appeal.  (2-ER-103).

## V.    SUMMARY OF THE ARGUMENT

This Court should reverse the district court to correct four errors and remand

with instructions to enter a preliminary injunction preventing the transfer of Oak

Flat during the pendency of this action.  First, the EIS is a final agency action

under SALECA and the APA because it consummates the Secretary's

environmental and cultural investigatory and decision-making processes.  *Bennett*,

520 U.S. at 177–78.  Further, legal consequences flow from its publication because

it triggers Oak Flat's transfer.  *See id*.

14

Second, the opinions of Dr. Emerman and Dr. Wells, admissible under Ninth Circuit precedent, demonstrate that the EIS is arbitrary and capricious. *See Locke*, 776 F.3d at 992; *ONDA*, 921 F.3d at 1190–92. Specifically, the EIS fails to consider numerous material factors, is internally inconsistent, and predicts outcomes the analysis cannot support.

Third, Federal Defendants have not discharged their consultation obligations. Indeed, their 2021 admission that consultation had been inadequate renders their pre-2021 efforts inadequate as a matter of law. Moreover, because the Forest Service never cured that failure through further substantive consultation, but instead led the Tribe to believe consultation was forthcoming by negotiating a MOU to govern that consultation, there is no basis to support the district court's determination to the contrary.

Fourth, the district court improperly merged the balance-of-hardships and public-interest factors by resolving them on Congress's supposed policy motivations behind SALECA. Instead, the Court should have balanced the hardships to the Tribe if the injunction is denied against the hardship to the government if granted. Further, the court should have recognized the public's interest in SALECA's conditions precedent favors the Tribe—including a valid EIS and consulting with the Tribe. Consequently, the court should have determined that the balance tips sharply in the Tribe's favor.

15

## A. Publishing the EIS is a "Final Agency Action" Under SALECA and the APA.

SALECA is a unique statute that imposes familiar obligations from NEPA and NHPA but heightens them due to the extraordinary environmental and cultural harms that Resolution's mine will cause. Although Federal Defendants and our courts are familiar with NEPA and NHPA in the ordinary course, SALECA imposes unique requirements and a unique process that differs from ordinary NEPA and NHPA challenges.

In particular, SALECA requires a single comprehensive EIS that assesses the wide impacts of Resolution's mine, including all ancillary facilities, such as tailings storage facilities and pipelines, regardless of whether any agency will decide anything related to these components. *See* 16 U.S.C. § 539p(c)(9). Further, SALECA requires the Secretary to engage in "government-to-government consultation" with affected Indian tribes to understand their concerns and then, consistent with the federal government's trust obligation, to consult with Resolution to "seek to find mutually acceptable measures" to address these concerns and to "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities." 16 U.S.C. § 539p(c)(3), (9); 48 Stat. 944 § 16(e). Defendants made no substantial effort to comply with these requirements.

16

Unlike ordinary NEPA and NHPA processes, these EIS and consultation obligations under SALECA are not limited to those aspects of Resolution's mine over which a federal agency will take a discretionary action. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995). As such, publishing the EIS consummates Federal Defendants' obligations under SALECA. Further, because SALECA ties Oak Flat's transfer to publishing the EIS, legal consequences flow from its publication. *See* 16 U.S.C. § 539p(c)(10). Accordingly, publishing the EIS is a final agency action under SALECA and the APA.

Below, the district court determined that the Tribe had only established serious questions about whether publishing the EIS was a final agency action. This error stems from analyzing the final-agency-action question using NEPA as the "relevant statute" rather than SALECA. *See* 5 U.S.C. § 702. That is, the court did not fully resolve this question in the Tribe's favor because certain cases interpreting final agency actions under NEPA couple an EIS with a final record of decision ("ROD"), which has not been issued here. SALECA, however, does not require or even speak of a ROD. Further, SALECA requires an EIS that is far broader in scope than merely addressing the limited issues to be decided in any ROD related to the Resolution mine.

Because the text and structure of SALECA demonstrate that publishing the EIS is a final agency action, this Court should reverse the district court and

17

determine as a matter of law that the Tribe is likely to succeed on the merits of this question.

### B. The Tribe's Expert Scientific Evidence Is Admissible Under Ninth Circuit Precedent, Is Consistent with *Seven County*, and Establishes Likelihood of Success on the Merits.

Ninth Circuit precedent allows plaintiffs to prove an EIS is arbitrary and capricious with extra-record evidence of factors that an agency did not consider. *See Locke*, 776 F.3d at 992.   In *Seven County*, the Supreme Court announced a "course correction of sorts . . . to bring judicial review under NEPA back in line with the statutory text and common sense."  145 S. Ct. at 1514.  *Seven County* does so by restoring deference to agencies regarding whether and how to consider *indirect* effects of a project, but leaves in place law requiring full analysis of *direct* effects, which cannot be arbitrary and capricious.  *Id.* at 1511-15.

In practical terms, *Seven County* promotes judicial deference to the scope of an agency's environmental analysis to the extent the agency has discretion to set those parameters.  *Id.* at 1512-13.  Although *Seven County* recognizes agencies are entitled to great deference in limiting their investigation beyond direct effects, that deference is in the context of *indirect* effects of the action at issue; *direct* effects must be fully analyzed.  *Id*.  Further, *Seven County* expressly states that a court may vacate an EIS when a plaintiff demonstrates that an agency's decision could change.  *Id*. at 1514.

18

This distinction between direct and indirect effects is further illustrated by the facts of *Seven County*, which pertain to a new railroad line in Utah over which the Surface Transportation Board ("Board") had authority to regulate. *Id.* at 1507. Nevertheless, the D.C. Circuit determined that the Board should have considered *indirect* impacts that may result from third parties as far away as Texas and Louisiana. *Id.* The Supreme Court disagreed, holding that a plaintiff could not challenge the Board's failure to include analyses that were not within its jurisdiction. *Id.* at 1512-13.

Here, of course, SALECA establishes the very subjects that the EIS must analyze, and the Forest Service does not have discretion to ignore those subjects or fail to analyze critical factors related to them. Reading Ninth Circuit precedent and *Seven County* together establishes that the Tribe can challenge the EIS with evidence of material factors that an agency did not consider that, if considered, could lead to a change in an agency's decision(s).

Below, the Tribe's experts opined that the EIS fails to consider numerous critical factors related to the tailings storage facilities, pipelines, and acid-mine drainage. Although the district court considered some of Dr. Emerman's and Dr. Wells' opinions, it disregarded them as "one engineer disagree[ing] with other engineers." (1-ER-54). The court, however, could not summarily dismiss these opinions as merely second-guessing the Forest Service's judgments and

19

conclusions.  Instead, the court should have determined whether the identified factors were addressed in the EIS and, if not, whether those omissions render the EIS arbitrary and capricious.

In failing to conduct this analysis, the district court applied the incorrect law and erred.  Because the EIS does not consider several material factors and, as Dr. Emerman and Dr. Wells opine, because analysis of those factors would have led a reasonable agency in the Forest Service's position to prefer different alternatives, the district court erred when it did not determine that the Tribe has a substantial likelihood of success on the merits.

### C. Federal Defendants Failed to Satisfy SALECA's Consultation Requirements.

SALECA requires the Secretary to engage in broad "government-to-government consultation" with affected Indian tribes to understand and address their concerns related to Oak Flat's transfer and the mining to follow.  16 U.S.C. § 539p(c)(3).  SALECA further requires the Secretary to then consult with Resolution regarding these concerns and "seek to find mutually acceptable measures" to "address the concerns" and "minimize adverse effects" on such tribes.  16 U.S.C. § 539p(c)(3)(B).  Likewise, the resulting EIS must assess and identify mitigation measures related to impacts on "cultural and archeological resources" of "mining and related activities on the Federal land conveyed to Resolution Copper."  16 U.S.C. § 539p(c)(9)(C).

20

In March 2021, when Federal Defendants withdrew the 2021 EIS, they stated in writing on the record that they needed to resume consultation with Indian tribes to better understand and address their concerns. (8-ER-1840-41). This is an admission that, through March 2021, Federal Defendants had not satisfied their consultation obligations. *See* 16 U.S.C. § 539p(c)(3).

The district court disregarded this admission and, instead, credited Federal Defendants for those same efforts. (1-ER-73-74). Further, Federal Defendants failed to substantively consult with the Tribe in the intervening four years. Indeed, the "consultation" that did occur on May 14, 2024, included a discussion over a draft MOU that would guide a future consultation. (3-ER-0473-77). The Parties never executed the MOU, the Forest Service did not schedule another meeting with the San Carlos Council,[6] and no consultation occurred thereafter. (3-ER-0477).

The district court erred when it credited the Forest Service with previous consultation efforts that Federal Defendants recognized were inadequate and compounded that error when it determined, without evidentiary support, that the

---

[6]The EIS frequently misstates that the Forest Service met with the San Carlos Council when it did not; for example, the meeting on June 7, 2024 involved legal counsel for the Tribe, but no members of the San Carlos Council, which alone is authorized to represent the Tribe in government-to-government consultation. 48 Stat. 944 § 16(e); Amd. Const. and Bylaws of the San Carlos Apache Tribe, art. V, § 1(a); (3-ER-473; *compare* 5-ER-1004, *with* 6-ER-1118 ("This is not consultation. This meeting is confined to the MOU and hopefully negotiating mutually acceptable terms.").

21

Tribe "refused to engage in good faith" during consultations *prior to 2016*. (1-ER-72); *see Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 941-42 (D. Ariz. 2017). To the extent pre-2016 efforts are relevant (they are not), the court in *Concerned Citizens* did not find that the Tribe "refused to engage in good faith," but only that it had received "an opportunity" to consult on aspects of the project then at issue and did not take advantage of them at that time. 279 F. Supp. 3d at 939, 942. This has no bearing on post-2021 consultation.

The district court further erred when it credited letters and emails from the Forest Service as sufficient consultation, even though the Forest Service, at the very same time, was negotiating a MOU to govern a future consultation. (1-ER-74-75). The Forest Service's conduct induced the Tribe to believe that a future consultation was forthcoming, and the Tribe reasonably awaited that opportunity. This Court should reverse the district court's determination that the Tribe is unlikely to succeed on the merits of its consultation claims.

### D. The District Court Applied an Incorrect Standard for Balancing the Hardships to the Government and the Public Interest.

When a plaintiff seeks a preliminary injunction against the government, courts merge the factors that consider hardship to the defendant and the public interest. Doctrinally, these factors merge because the public's interest, generally, is for the government to enforce the law. *Nken*, 556 U.S. at 436. In merging the factors, the question does not concern the policy issues that may have motivated

22

Congress to pass certain legislation. If this were so, these factors would always weigh in government's favor.

Instead, courts must consider how detrimental it would be to enjoin the government from taking the challenged action during the pendency of the case. In *Nken*, the Supreme Court directed lower courts to consider any hardship that may arise from not deporting the petitioner-alien during the pendency of his case, not the policies that motivated Congress to enact a statutory deportation scheme.

Here, the district court erred in three respects. First, the court recited as a matter of law that the Tribe needed the hardship and public-interest factors to each tip sharply in its favor. (1-ER-92). To obtain an injunction on the serious questions standard, the Tribe's task is not to prove that two scales tip sharply in its favor (one for the balance of hardships and another for the public interest), but for one scale balancing hardships between the Tribe and the government to tip sharply in its favor.

Second, in analyzing the public interest, the court deferred entirely to what it assumed were Congress' generalized policy considerations supposedly motivating it to enact SALECA without a basis to do so. (1-ER-90-93). In doing so, the court failed to compare concrete hardships. Third, by focusing exclusively on Oak Flat's transfer and ignoring SALECA's conditions precedent, the court failed to weigh the

23

harms to the public interest that will result if Federal Defendants transfer Oak Flat before preparing the EIS SALECA requires.

Had the district court properly weighed the factors, it would have concluded that the Tribe will suffer extraordinary irreparable harm once Oak Flat is transferred, while enjoining the land exchange would only constitute a minor hardship, if any, on the government and public. Among many considerations, the court would have concluded that (1) Resolution's mine will not produce copper for many years; (2) the United States has an ample, stable, and diverse supply of copper;[7] and (3) once Resolution's mine finally does produce copper, the copper will go to the world market and the profits to Australia and the United Kingdom.[8] (2-ER-0235; 6-ER-1336-37; 8-ER-1854-55).

Moreover, because the EIS does not adequately address the environmental and cultural consequences of Resolution's mine, enjoining the government will serve the public interest and cause the balance to tip further in the Tribe's favor.

---

[7] *See Mineral Commodity Summaries*, U.S. Geological Survey (January 2025), available at: https://pubs.usgs.gov/periodicals/mcs2025/mcs2025-copper.pdf.

[8] Resolution is owned by Rio Tinto (55%), a British-Australian corporation whose largest shareholder is the state-owned Chinese corporation Chinalco, and BHP PLC (45%), an Australian corporation.

24

## VI.    ARGUMENT

### A.    Standard of Review

This Court "review[s] the denial of a preliminary injunction for abuse of discretion," but "review[s] *de novo* the underlying issues of law." *Hubbard v. City of San Diego*, 139 F.4th 843, 849 (9th Cir. 2025) (cleaned up). "[A] district court abuses its discretion when it makes an error of law." *Island Indus. Inc. v. Sigma Corp.*, 142 F.4th 1153, 1162 (9th Cir. 2025).

### B.    The Tribe Has Standing Under the Administrative Procedures Act

The APA provides a right of action to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under the APA, a plaintiff must identify an "'agency action' that affects him" and that action must be a "final agency action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). An action is "final when "(1) the agency reaches the 'consummation' of its decision[-]making process and (2) the action determines the 'rights and obligations' of the parties or is one from which 'legal consequence will flow.'" *Bennett*, 520 U.S. at 177–78.

Here the "relevant statute" is SALECA, a unique act that, although the subject of at least four separate actions in the District of Arizona, has not been

interpreted by reviewing courts.[9]  Nevertheless, because SALECA references

NEPA and imposes obligations consistent with NHPA, cases interpreting those

statutes are instructive.  Where the text and structure of SALECA depart from

NEPA and NHPA or indicate a different result, courts must give effect to that text

and structure.  *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any

question of statutory interpretation, our analysis begins with the plain language of

the statute."); *see also King v. Burwell*, 576 U.S. 473, 486 (2015) ("[W]hen

deciding whether the language is plain, the Court must read the words 'in their

context and with a view to their place in the overall statutory scheme.'").

SALECA requires several actions before authorizing the Secretary to

transfer Oak Flat.  These include publication of a single, comprehensive EIS that

considers every aspect of the land exchange, mine plan of operations, and all

components of the mine project and that has been informed by government-to-

government consultation with affected Indian tribes.  *See* 16 U.S.C. § 539p(c)(3),

(9).  In addition to consultation, SALECA requires the Secretary to "assess the

effects of the mining and related activities on [Oak Flat's] cultural and

archeological resources" and to "identify measures . . . to the extent practicable, to

minimize potential adverse impacts on those resources, if any."  16 U.S.C.

---

[9]This Court's opinion in *Apache Stronghold v. United States* does not
interpret SALECA but turns on the Free Exercise Clause, Apache Treaty of 1852,
and the Religious Freedom Restoration Act.  *See* 101 F.4th 1036 (9th Cir. 2024).

§ 539p(c)(9)(D).

Once the Secretary completes this thorough investigation, informed by government-to-government consultation, and publishes and EIS, it must transfer Oak Flat within sixty days of publishing the EIS.  16 U.S.C. § 539p(c)(10).  Thus, legal consequences flow from the decision to publish.

Read as a whole, *the* final action to be taken under SALECA is to publish the EIS.  Indeed, doing so consummates the Secretary's obligations under SALECA and publication alone triggers or otherwise requires the transfer, completing the object of the statute.  *See* 16 U.S.C. § 539p(c)(10); s*ee Bennett*, 520 U.S. at 177–78.

Below, the district court erred when it disregarded the text and structure of SALECA by assessing whether the Tribe's NEPA-oriented claims were final agency actions within the meaning of NEPA rather than under SALECA itself.[10] (1-ER-35-37); *see* 16 U.S.C. § 539p(c)(9)(B).

Consequently, the district court erroneously imposed a ceiling on its analysis of the Tribe's claims by determining that it raised no more than serious questions on the merits.  As the Tribe argued below, it challenges decisions made under SALECA itself, which is the primary frame of reference, and not to future

---

[10]The district court correctly determined that the EIS was a final agency action for the Tribe's NHPA-oriented consultation claims.  (1-ER-64).

decisions that SALECA may contemplate.  (2-ER-0111-17; 6-ER-1322-26).

This critical distinction is demonstrated by SALECA's requirement of an EIS that considers subjects beyond those committed to agency discretion, including the land exchange, the mine plan of operations, and regional impacts.  16 U.S.C. § 539p(c)(9)(A)-(B).  Although Federal Defendants may not have discretion in whether to transfer Oak Flat once a legally complaint EIS is published, SALECA nevertheless requires an EIS that evaluates each of these impacts.  *See id.*  SALECA also requires the EIS to include an analysis of the cultural and archaeological impacts and to identify potential measures to minimize adverse impacts.  *See* 16 U.S.C. § 539p(c)(9)(C).  These concerns are beyond the scope of NEPA, encompass analysis under NHPA, and need not be included as part of any ROD that may later issue.

The tailings and concentrate pipelines are instructive on the distinction between APA review under SALECA as opposed to NEPA.  For a claim brought solely under NEPA, the underlying decision would concern special use permits to locate pipelines across federal land and would be memorialized in a ROD.  Further, a pure NEPA process may not require an EIS at all if the agency determined that locating such pipelines would result in a finding of no significant impact ("FONSI").  *See* 40 C.F.R. § 1501.6.

SALECA forecloses this outcome.  Instead, SALECA incorporates the

28

requirements of NEPA, but heightens them. SALECA compels an EIS—not a NEPA process—and it requires that the EIS consider every aspect of Resolution's planned mine, regardless of whether any aspect of it will later become the subject of an agency decision. *See* 16 U.S.C. § 539p(c)(9). Concerning any future decision an agency might make, SALECA requires that the EIS support such decision, but it does not direct any decisions. In short, SALECA requires a comprehensive EIS, and the Tribe challenges whether the EIS that Federal Defendants published meets SALECA's express requirements.

This Court's decision in *Tohono O'odham Nation v. Department of the Interior* illustrates how courts should conduct textual and context-driven interpretations of whether an action constitutes a final agency action. 138 F.4th 1189 (9th Cir. 2025). In *Tohono O'odham Nation*, the Bureau of Land Management ("BLM") issued two limited notices to proceed that authorized construction of transmission towers in the San Pedro Valley. *Id.* at 1198–1200. The United States moved to dismiss, urging that notices to proceed, categorically, are never final agency actions and that the only agency action had been an ROD that was published beyond the six-year statute of limitations. *See id*.

In determining that the limited notices were final agency actions, this Court applied *Bennett*'s two-factor test using a pragmatic approach. *Id.* at 1200 –02. Specifically, this Court determined that the notices consummated BLM's

29

investigation into historic properties because issuing them meant that no further investigation or consultation would follow. *Id.* This Court also recognized that legal consequences flowed from the notices because they authorized the proponent to begin erecting towers. *Id.*; *see Envtl. Defense Ctr. v. Bureau of Ocean En. Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022) ("it is 'the effect of the action and not its label that must be considered'").

Regarding that ROD, which set the towers' route through the San Pedro Valley, this Court rejected the United States' argument that the ROD was the final agency action for plaintiffs' NHPA claims because at the time BLM issued the ROD, it had deferred its NHPA obligations to a later time. *Tohono O'odham Nation*, 138 F.4th at 1195. This commonsense approach recognizes that an ROD is not necessary or sufficient to establish that an agency has taken a final action. Instead, courts must analyze the claims, relevant statutes, and facts of the case to determine whether the *Bennet* factors are satisfied.

Here, the 2025 EIS is a final agency action because its publication (1) consummated SALECA's obligation on the Secretary to conduct a wide investigation into the environmental and cultural impacts of Resolution's proposed mine; and (2) directly triggered legal consequences by mandating the transfer of Oak Flat. Thus, the district court erred when it determined that the Tribe merely raised "serious questions" about whether the EIS is a final agency action. Because

30

SALECA requires no further decision than to publish the EIS before Oak Flat is transferred, the EIS necessarily consummates Federal Defendants' investigatory and decision-making processes. *See Bennett*, 520 U.S. at 177–78.

Rather than adopt this straightforward analysis, the district court became mired in questions of whether the EIS constitutes a final agency action under NEPA.[11]  (1-ER-33-37).  Such analysis is unnecessary.  This challenge is brought directly under SALECA itself, contesting whether the Secretary has satisfied the statutory conditions precedent before she is authorized to transfer Oak Flat. Although SALECA imposes most of NEPA's obligations on the EIS, and therefore NEPA is relevant to the Tribe's challenges, this challenge is not purely (or primarily) brought under NEPA to contest decisions based on the EIS.  While NEPA informs the Secretary's obligations, NEPA and the lack of an ROD do not shield her actions taken under SALECA from review.

Because the Tribe brings this challenge under SALECA, the question is not whether publication of the EIS constitutes a "final agency action" under NEPA, but whether it does so under SALECA.  The text and structure of SALECA demonstrate that the EIS is a "final agency action" for purposes of the APA.  This is no mere

---

[11]This is not to say that an aggrieved person could not challenge discrete decisions made in a forthcoming ROD or argue that the EIS does not explain such decisions.  Such challenges, if brought under NEPA, would be analyzed as such and would be distinct from the claim the Tribe brings under SALECA.

"serious question," but a point of law that the Tribe has established. Accordingly, the Tribe has standing to obtain preliminary relief that maintains the *status quo* without being artificially limited to the serious-questions standard.

### C.   The Balance of Factors Compels that a Preliminary Injunction is Necessary During the Pendency of the Action.

The Tribe is entitled to a preliminary injunction enjoining Oak Flat's transfer during the pendency of this action to prevent irreparable harms that the Tribe and its members will suffer. The district court erred when it determined that the Tribe neither established a likelihood of success nor serious questions on the merits.

To obtain an injunction, a party must show the balance of four factors warrants relief. *All. for the Wild Rockies*, 632 F.3d at 1131–35. These include: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities; and (4) an injunction is in the public interest. *Id.* So long as irreparable harm is likely, a party need not carry all four factors, because courts analyze them on a sliding scale. *Id.* As such, the Tribe only needs to show "serious questions" exist on the merits and that the balance of hardships tips in its favor. *Id.* The serious-questions standard only requires a "fair chance of success." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024).

The district court erred in applying these factors below on three points of law. First, the court failed to consider the opinions of Dr. Emerman and Dr. Wells as admissible evidence of material factors that the EIS failed to consider. Second,

the court erroneously determined that Federal Defendants discharged their consultation obligations, overlooking that in 2021 they acknowledged that those efforts had been inadequate and yet did not cure them. Third, the court applied the wrong legal test when merging hardship to the government and the public interest by deferring to what it assumed were Congress' generalized policy rationales in passing SALECA rather than considering whether the public would suffer any concrete harms from delaying Oak Flat's transfer.

### 1. The Tribe's Expert Evidence Is Admissible Under Ninth Circuit Precedent, Is Consistent with Seven County, and Establishes Likelihood of Success on the Merits.

In a challenge brought under the APA, courts conduct a "plenary review" of the record to determine whether an agency's decision was arbitrary and capricious. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). Several issues intertwine when courts evaluate whether an agency acted arbitrarily or capriciously. These include which standards and types of evidence establish that an action is arbitrary or capricious. Further, because even a plenary review of the technical scientific issues involved in APA cases often lies beyond an ordinary layperson's knowledge, it is common for a plaintiff to supplement the administrative record with expert evidence. *See Locke*, 776 F.3d at 992;[12] *Wash.*

---

[12] *Locke* also permits evidence showing that the agency relied on documents not in the record or bad faith by the agency.

*State Farm Bur. v. Marshall*, 625 F.2d 296, 305 (9th Cir. 1980); *also* Fed. R. Evid. 701–03.

Regarding applicable standards, a decision is arbitrary or capricious when it is based on personal whim and contrary to evidence rather than reason. *See arbitrary*, Black's Law Dictionary (12th ed. 2024) ("of, relating to, or involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures"); *capricious*, Black's Law Dictionary ("contrary to the evidence").

While an agency maintains some discretion to establish the scope of its investigation, it cannot omit critical factors and rely on materially incomplete or unsupported analysis because the resulting decision would be arbitrary. *See ONDA*, 921 F.3d at 1190–92 (failure to establish baseline condition made analysis of effects impossible); *also Ctr. for Food Safety v. Regan*, 56 F.4th 648, 654 (9th Cir. 2022) (agency action vacated when based on insufficient data).

Likewise, while an agency may resolve conflicts in its analysis or the underlying facts, its decisions cannot contradict the analysis and facts because the resulting decision would be capricious. *See ONDA*, 921 F.3d at 1190–91 (NEPA requires agencies to "'articulate[ ] a rational connection between the facts found and the choice made,' instead of relying on an *ipse dixit* assessment of

34

environmental impacts over a contrary expert opinion and data") (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012)).

Further, while an agency may be able to accept risks that a court would deem unacceptable in a *de novo* review, the agency is not privileged to rely on arbitrary and capricious analyses and conclusions. As the Supreme Court explains, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

This framework is consistent with NEPA's requirement that an agency investigate and face the environmental consequences of its actions without compelling a particular result. *See Seven County*, 145 S. Ct. at 1514. In other words, although NEPA does not require agencies to make environmentally responsible decisions, it does require responsible analyses of the consequences of proposed actions. *See Locke*, 776 F.3d at 995–96 (agency "relied on the factors the Congress intended it to consider, considered all important aspects of the problem, and offered explanations for its decisions that are in line with the evidence") and ("used the best scientific data available, even if that science was not always perfect"). Indeed, an agency must not "disregard available scientific evidence that is in some way better than the evidence it relies on." *Id.*

35

As is apparent from the decisions resolving NEPA cases, the scientific issues underlying an agency's analysis are often complex and technical. Accordingly, courts permit plaintiffs to supplement the administrative record with expert evidence (1) showing that the agency has not considered all relevant factors; (2) explaining technical terms or complex subject matter; and (3) providing background information. *See Locke*, 776 F.3d at 992; *Marshall*, 625 F.2d at 305; *see also* Fed. R. Evid. 701–03. Fundamentally, the question is not whether the expert opinion evidence is admissible, but the purposes for which it is admissible and how courts must evaluate the evidence to properly resolve a claim that an agency action is arbitrary and capricious.

The "relevant factors" exception[13] "permits a district court to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis." *Locke*, 776 F.3d at 993. This Court clarified the "fine, but important" distinction that a district court may admit evidence "to help [it] understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious," but "may not look to this evidence as a basis for questioning the agency's scientific analyses or

---

[13]Although the primary thrust of Dr. Emerman's and Dr. Wells's opinions is to demonstrate that the EIS does not consider relevant factors, portions of their opinions explain complex technical terms and background information explaining those opinions.

36

conclusions." *Id.*; *see also Pac. Coast Fishermans' Ass'ns*, 693 F.3d at 1091 (courts must determine whether agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made") (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983)).

In *Locke*, state water districts challenged a biological opinion ("BiOp") prepared by the National Marine Fisheries Service under the Endangered Species Act related to certain river and canal systems between California's Central Valley and the Bay Area Delta. 776 F.3d at 982–88. There, the district court erred by conducting a *de novo* review that ultimately invalidated the BiOp. *Id.* at 992–93. This Court resolved those issues, not by categorically dismissing the extra-record evidence, but by parsing the record to determine whether the plaintiff's and district court's characterizations of the record were accurate. *Id.*

In *ONDA*, this Court determined that the Interior Board of Land Appeals ("Board") acted arbitrarily and capriciously in two respects. First, the Board changed its position on whether motor vehicle traffic would be allowed on certain routes that were "difficult or impossible" to identify without providing an explanation for the change and, further, by doing so in substantial reliance on representations about the locations of such routes by interested parties. *ONDA*, 921 F.3d at 1189–90. Second, the Board purported to assess the environmental

37

impacts of increased travel without establishing the baseline conditions. *Id.* at 1190–92.

These cases demonstrate that courts must not reduce plaintiffs' claims to disagreements among experts without wrestling the issues to the ground. Indeed, the fundamental task for courts remains to consider evidence questioning whether an agency considered all relevant factors, contradicts its own analysis, or fails to use the best available evidence, and then the court must determine whether, in light of that evidence, the agency's analysis was arbitrary and capricious.

Below, the district court failed to consider whether the EIS evaluated the factors that Dr. Emerman identified in his declaration and memorandum and, instead, reduced his opinions to disagreements between engineers over the conclusions. (1-ER-53-55). In doing so, the Court adopted Resolution's over-extension of *Seven County*. (1-ER-54). Quoting Resolution, the court reasoned that "[b]oth *Seven County* and long-time NEPA precedents unambiguously teach that this Court should decline to interject itself into disputes about technical details . . . and should instead defer to the agency's well-reasoned analysis." This misstates the Supreme Court and Ninth Circuit precedent recited above, as well as *Seven County*.

According to *Seven County*, the question under NEPA remains "whether the agency action was reasonable and reasonably explained"; *i.e.*, whether it is

38

arbitrary and capricious.  145 S. Ct. at 1511 (citing *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43).  This requires analysis of direct environmental consequences and feasible alternatives.  *Id.* at 1511.  While an agency is entitled to the greatest deference in deciding which *action alternatives* to consider and which *indirect* effects it may consider, nothing in *Seven County* indicates that deference concerning "significant effects from the project at issue," particularly those within the immediate area of the project, differs from the arbitrary and capricious standard established above.  *Id.* at 1512.  To be sure, the EIS must "address environmental effects from the project at issue" and the substantial deference that *Seven County* restores is for "indirect effects" and "other projects separate in time or place from the project at hand."  *Id.* at 1513.

The facts of *Seven County* bear out that Ninth Circuit precedent remains good law.  In *Seven County*, a coalition of counties applied to the United States Surface Transportation Board ("Board") for approval of an 88-mile railroad line in northeastern Utah that would transport oil from the region.  *Id.* at 1508.  The Board produced an EIS considering numerous significant and adverse impacts including disruptions to local wetlands, land use, and recreation as well as minor impacts such as air pollution and big-game movement.  *Id.*  The EIS noted, but did not fully analyze, potential effects of increased oil drilling in the region that is "separate from the railroad line itself" or downstream refining of the oil carried by the

39

railroad to Louisiana and Texas.  *Id.* at 1508–09.  Based on these incomplete analyses, the D.C. Circuit Court of Appeals found the EIS deficient and vacated it.

In reversing the Court of Appeals, however, the Supreme Court did not alter the scope of NEPA review required for the *direct* impacts of agency action. Further, *Seven County* does not alter the meaning of arbitrary and capricious, and it does not indicate that agencies may refuse to consider critical evidence, ignore superior analyses, or contradict their own facts and analysis.

Instead, *Seven County* primarily seeks to correct NEPA jurisprudence that "has led to more agency analysis of separate projects, more consideration of attenuated effects, more exploration of alternatives to proposed agency action, more speculation and consultation and estimation and litigation."  *Id.* at 1513. Accordingly, the Supreme Court announced a "course correction of sorts . . . to bring judicial review under NEPA back in line with the statutory text and common sense."  145 S. Ct. at 1514.  Importantly, in doing this, *Seven County* leaves untouched that agencies must analyze direct effects using the best available evidence and analysis.

Using the language of *Seven County*, the solution is not to chop down the "judicial oak" of NEPA review by eliminating all scrutiny, as the district court did. *Id.* at 1514.  Rather, *Seven County* prunes the oak by directing courts to focus on direct effects of projects at issue under the existing arbitrary and capricious

40

standard, and extending greater deference to independent effects. In practical terms, *Seven County* promotes judicial deference to the scope of an agency's environmental analysis to the extent it has discretion to set those parameters. *Id.* Although certain language in *Seven County* suggests that plaintiffs cannot rely on NEPA to second guess an agency's judgments, the case expressly states that a court may vacate an EIS when a plaintiff demonstrates that an agency's decision could change. *Id.*

Read together, *Seven County* and Ninth Circuit precedent require that the district court's task is to determine whether the agency analyzed direct effects and whether the agency might act differently with information that it should have considered, but did not, and whether its analyses are arbitrary and capricious. The Tribe and its expert evidence prove just this—that the EIS is arbitrary and capricious because it failed to consider critical factors that could have a material impact on the analysis and ensuing recommendations.

Here, SALECA establishes the very subjects that the EIS must analyze, and the Forest Service does not have discretion to ignore those subjects or fail to analyze critical factors related to them. 16 U.S.C. § 539p(c)(9)(B); *see Ctr. for Food Safety*, 56 F.4th at 652 (agency cannot "flout the will of Congress" by failing to conduct required investigations). Indeed, SALECA directs the Secretary to consider the direct impacts of the "land exchange," "the proposed mine and

41

Resolution mine plan of operations," and "any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities"—this includes the pipelines and tailings storage facility. 16 U.S.C. § 539p(c)(9). To be clear, the EIS must address the direct effects of each of these subjects.

On these points, the declarations of Dr. Emerman and Dr. Wells show the depth and breadth of Federal Defendants' failures. The district court, however, disregarded these opinions as "one engineer disagree[ing] with other engineers." (1-ER-54). Instead, the court should have determined whether the identified factors were addressed in the EIS *at all* and, if not, whether omitted factors were material.

Pipeline failure is a ready example of material factors not considered. Dr. Emerman explains that the EIS fails to consider nine of ten possible causes and ignores corrosion, the most common cause. (5-ER-1016-20). Consequently, Dr. Emerman opines that the EIS understates the risks of pipeline failure by a factor of 20-to-1. (*Id.*). Further, Dr. Emerman demonstrates the EIS does not consider critical factors relevant to failure including the volume of tailings, Resolution's inability to rapidly halt production in the event of a failure, and high-risk features like canyon crossings. (5-ER-1020-23). Incredibly, the EIS fails to consider the probability, toxicity, and harms of a concentrate pipeline failure. (5-ER-1023-26).

42

Regarding a dam breach analysis and the risks of situating a 1.37 billion ton tailings storage facility within mere miles of the communities of Dripping Springs, Winkleman, Hayden, and Kearney, Dr. Emerman explained critical background information demonstrating the differences between the preliminary analysis that was conducted for the EIS and the industry standard analysis that should have been completed. (5-ER-1026-31). Specifically, Dr. Emerman explains that the analysis conducted "would be acceptable only when a project is in the 'scoping' or 'conceptual design' phase," and the industry standard analysis for a project at this stage requires a comprehensive analysis of the landscape's geophysical characteristics, as well as an evaluation of the how the volume of tailings would disperse in the case of a failure. (*Id.*).

Dr. Emerman also identified the lack of an emergency response and preparedness plan, which should have been conducted to determine whether the preferred site is permissible under international and industry standards. (*Id.* at 5-ER-1026-31, 1038-40). Rather than conduct these analyses, the EIS acknowledges that these will need to be completed, but has deferred their completion on the theory that the mine will not be operational for several years. (*Id.* at 1028-30). This delay is impermissible because SALECA requires the Secretary to prepare an EIS that will address all future decisions *before* she is authorized to transfer Oak Flat to Resolution. *See* 16 U.S.C. § 539p(c)(9)(A).

43

Further, Dr. Emerman also explains how the EIS relies on an inadequate "empirical" model to evaluate the runout distance of a tailings dam failure—and then fails use the output of its own model. To be clear, Dr. Emerman explains how an empirical model must extrapolate from tailing storage facilities that are an order of magnitude smaller than Resolution's, resulting in unreliable predictions, especially as compared to the industry standard dam breach analysis. (5-ER-1030-33). Further, although the EIS's empirical model calculates that in the event of a dam failure, tailings would runout 268 miles, the EIS, without justification, only considers effects within 50 miles. (*Id.*). The decision to disregard its own analysis and artificially limit consideration of direct impacts from a dam breach is definitionally arbitrary and capricious.

Moreover, Dr. Emerman explains how the EIS fails to consider numerous "credible failure modes" due to an error in how it defines the term. Whereas the industry standard analysis defines a credible failure mode as any mode physically possible, regardless of probability, the EIS failed to consider 23 of 39 credible failure modes because it considered them "non-plausible." (Emerman p.19-20). The EIS, however, does not define "non-plausible" or explain how it arrived at the conclusion that it need not consider possible failure modes, it simply declared them unlikely. (*Id.*). Indeed, the EIS failed to consider material factors bearing on

44

whether the tailings dam will fail including foundation characterization, a stability analysis, and errors in outer embankment design. (5-ER-1034-43).

Dr. Emerman also explains how the EIS acknowledges that so-called "non-potentially acid-generating" ("NPAG") tailings will be comprised of 15% acid-generating material and 44% potentially acid generating material ("PAG"). (5-ER-1043-44). Dr. Emerman further explains that the mining industry does not categorize tailings as "non-potentially acid-generating"; instead, tailings are either non-acid generating, potentially acid-generating, or acid generating. (*Id.*). Dr. Emerman explains that not only does the EIS use confusing terminology, but the Forest Service was aware of the public's confusion, continued using the term, and apparently confused itself by disregarding that the so-called NPAG tailings are 59% acid-generating and potentially acid-generating material, and yet treats them as non-acid generating. (*Id.*).

The EIS erroneously treats NPAG tailings as non-acid generating material in three critical ways. First, while PAG tailings would be stored underwater to prevent acid formation, the EIS accepts the risk of depositing NPAG tailings above water where they are continually exposed to oxygen and form acid drainage. (5-ER1044). Second, the "NPAG" tailings would cover PAG tailings, ensuring further acid formation. (*Id.*). Third, "NPAG" tailings would be used to construct the outer embankment of the tailings dam, increasing the risk of uncontrolled acid-

mine drainage into the underlying aquifer and downstream waterways and, critically, undermining the dam's stability.  (5-ER-1044-45).

This is yet another critical, analytical decision in the EIS that contradicts the underlying facts and data.  Indeed, by acknowledging that 59% of so-called "NPAG" tailings are comprised of acid-generating and potentially acid-generating material, and then treating them as non-acid generating tailings, the EIS is internally inconsistent, and the analysis must be arbitrary and capricious.

To be sure, these failures are material and could result in changes to the Forest Service's analyses, recommendations, and future actions based on the EIS. As for the tailings storage facility, its three-mile long, nearly 500-foot-high dam constructed with mine tailings would impound more than *1.37 billion tons* of wet mining waste, and Dr. Emerman concludes that the eventual breach of its dam will create an enormous environmental catastrophe.  (5-ER-1034).

Without properly conducting these analyses, the Forest Service cannot assess whether the risks presented by its preferred tailings storage facility alternative are acceptable and, further, whether to approve pipelines across federal land to convey tailings to this site.  As such, these failures not only render these analyses arbitrary and capricious, but they will render any future decision based on the EIS arbitrary and capricious.

SALECA requires the Secretary to analyze and address these direct effects, and the EIS simply fails to analyze them. *See* 16 U.S.C. § 539p(c)(9)(B); *Ctr. for Food Safety*, 56 F.4th at 652 (agency cannot "flout the will of Congress" by failing to conduct required investigations). Nevertheless, the district court did not assess whether Dr. Emerman's opinions identified critical failures in the EIS; instead, it accepted Resolution's generalized assertions that the EIS conducted a so-called "comprehensive breach (*i.e.*, total failure) analysis for each of the Project alternatives" and accepted Resolution's characterization of Dr. Emerman's opinions as "simpl[e] instances of one engineer disagreeing with others." (1-ER-54).

Indeed, the district court did not address the majority of Dr. Emerman's opinions summarized above. In doing so, the court erred by failing to evaluate whether the EIS fails to conduct materially necessary analyses that are integral to the subjects that SALECA requires the EIS to address. *See* 16 U.S.C. § 539p(c)(9)(B). Further, the court did not assess whether the EIS will support all future decisions under federal law. *See id.* Moreover, by omitting this analysis, Federal Defendants did not prepare a comprehensive EIS that evaluates cumulative and synergistic environmental impacts. *See* 42 U.S.C. § 4332(C); *Kleppe v. Sierra Club*, 427 U.S. 390, 409-410 (1976); *Klamath-Siskiyou Wildlands Center v. BLM*,

47

387 F. 3d 989, 997 (9th Cir. 2004) (tiering NEPA documents does not cure deficiencies in cumulative impact analyses).

Similarly, Dr. Wells explains why the presence of oxygen in the collapse zone is critical to evaluating acid concentrations in water pumped from the mine that Resolution will use to process ore and to transport and store tailings. (6-ER-1087-88, 1099-1100). Dr. Wells further explains how the EIS arbitrarily assumed that oxygen would not be present in this zone and the impact that decision would have on the entire acid-drainage analyses. (*Id.*). Indeed, elsewhere in the EIS, the Forest Service acknowledges "geochemical changes of the groundwater within the underground block-cave zone caused by interaction of exposed rock surfaces to water *and oxygen*." (*Id.*). Thus, the Forest Service's decision to zero out oxygen in the collapse zone is capricious because it flatly contradicts basic facts acknowledged elsewhere in the EIS. *See ONDA*, 921 F.3d at 1190-92.

Similarly, the EIS purports to analyze impacts on groundwater dependent ecosystems, but selects a model that lacks the granularity to identify them. (6-ER-1087, 1096-1099). In short, groundwater dependent ecosystems, like seeps, springs, and creeks that, in addition to being sacred to many tribal members, are areas where groundwater comes to or near the surface. (*Id.*). These natural hydrogeologic systems could dry out from less than a 10-foot decline in the water table, and yet the EIS employs a model with a 200-foot margin of error. (*Id.*). This

48

means the model could fail to register even a 190-foot drop in the water table, far greater than the drop Dr. Wells opined could wipe out seeps, springs, and creeks.

This failure is the corollary to the failure in *ONDA*, where the agency did not establish the baseline condition, and therefore, could not measure impacts. *See ONDA*, 921 F.3d at 1190-92. Here, the EIS employs a method that cannot measure impacts to a relevant degree but still relies upon it anyway to assess impacts on these fragile ecosystems. Because the model is incapable of making predictions on the scale required, such analysis and reliance are arbitrary and capricious. *See id.*

Like with Dr. Emerman's opinions, the district court adopted Federal Defendants' characterizations of these defects as "scientific and technical analysis to which [it] must defer." (1-ER-58). Indeed, the court merely determined that the EIS addressed the subjects in some fashion and did not attempt to resolve whether the EIS was internally consistent and capable of reaching the conclusions it offers. NEPA review requires more. Instead, the court was required to determine not whether the EIS addresses a subject in some form, but whether the analysis was arbitrary and capricious.[14]

---

[14]Alternatively, to the extent these questions required further analysis of the district court, than it could reasonably conduct within the 60-day timeframe provided by SALECA, it should have determined that the Tribe presented serious questions on the merits and granted a preliminary injunction. *See Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

To illustrate that Dr. Emerman's and Dr. Wells's opinions do not concern indirect effects of the sort in *Seven County*, they do not opine that the EIS fails to consider indirect effects such as increased arsenic and lead emissions from copper smelters, whether in the United States or East Asia, carbon emissions from ocean-going vessels carrying copper concentrate to China, or the possibility that such ships may spill copper into the ocean. *See* 145 S. Ct. at 1507. To be sure, the EIS could have considered these indirect effects, but failing to do so was not arbitrary and capricious. *See id.* at 1512.

Instead, by failing to adequately analyze direct effects of subjects mandated by SALECA, the district court applied the incorrect law. Because the EIS does not consider several material factors and because analysis of those factors would have led a reasonable agency in the Forest Service's position to prefer different alternatives for the tailings storage facility and pipelines, the district court erred when it did not determine that the Tribe has a substantial likelihood of success on the merits. *See Seven County*, 145 S. Ct. at 1514.

### 2. *Federal Defendants Failed to Satisfy SALECA's Consultation Requirements.*

Independent of the EIS's arbitrary and capricious analysis of numerous issues, Federal Defendants also failed to satisfy their government-to-government consultation obligations.

SALECA requires the Secretary to engage in broad "government-to-

50

government consultation" to understand and address tribes' concerns related to Oak Flat's transfer and the mining to follow.  16 U.S.C. § 539p(c)(3).  Following consultation, the Secretary must then consult with Resolution regarding these concerns and "seek to find mutually acceptable measures" to "address the concerns" and "minimize adverse effects."  16 U.S.C. § 539p(c)(3)(B).  Likewise, the resulting EIS must assess and identify mitigation measures related to impacts on "cultural and archeological resources" of "mining and related activities on the Federal land conveyed to Resolution Copper."  16 U.S.C. § 539p(c)(9)(C).

Further, the government-to-government consultation SALECA requires is intended to establish how the Federal Defendants will avoid, minimize, and mitigate adverse effects to the Tribe's cultural and religious resources.  *See id*; 36 C.F.R. § 800.6(b)(1)(i)–(iv).

In March 2021, when Federal Defendants withdrew the 2021 EIS, they stated in writing, on the record that they needed to resume consultation with Indian tribes to better understand and address their concerns.  (8-ER-1840).  This is an admission that, through March 2021, Federal Defendants had not satisfied these obligations.  *See* 16 U.S.C. § 539p(c)(3); *Pitcairn v. Philip Hiss Co.*, 113 F. 492, 495 (3d Cir. 1902) ("A binding admission may be made by parties, not only on the record, but by their statements to the court.").

In the intervening four years, Federal Defendants failed to substantively

consult with the Tribe as SALECA requires.  Instead, the "consultation" on May 14, 2024, consisted of the Tribe requesting—once again—that the Forest Service provide written responses to certain documents and a discussion over a draft MOU that the Forest Service and Tribe intended to guide a future, substantive consultation.  (3-ER-473-77).   The Parties never executed the MOU and no consultation followed.  (*Id.*).

The district court erred when it credited Federal Defendants with pre-2021 consultation efforts they recognized were inadequate.  (1-ER-72-74).  Neither of the cases the court relies on to do so involve an admission by the agency that previous efforts were inadequate.  *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 607–10 (9th Cir. 2010); *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. Appx. 712, 714–15 (9th Cir. 2012).

The court compounded that error by determining that it could not "ignore[]" that the Tribe "refused to engage in good faith" *before 2016*.  (1-ER-72); *see Concerned Citizens*, 279 F. Supp. 3d at 941–42.  The court in *Concerned Citizens*, however,  only determined that the Tribe  did not make a "meaningful effort" to consult despite receiving "an opportunity" to do so *before 2016*.  *Id*.

The district court further erred when it credited letters and emails as sufficient consultation, even though the Forest Service, at the very same time, was

52

negotiating a MOU to govern a future consultation. (1-ER-74-75). The Forest Service induced the Tribe to believe a future consultation was forthcoming. The Tribe was justified in believing that the Forest Service would still consult, and Federal Defendants do not rebut this, did not indicate the Tribe had been dilatory, or that they would forfeit consultation. Instead, the Tribe reasonably awaited a substantive consultation that the Forest Service promised but never delivered.

This Court should reverse the district court's determination that the Tribe is unlikely to succeed on the merits of its consultation claims.

### 3. The District Court Applied an Incorrect Standard for Balancing the Hardships to the Government and the Public Interest.[15]

Courts apply the preliminary injunction factors on a sliding scale. *See All. for the Wild Rockies*, 632 F.3d at 1131–35. When a plaintiff shows likelihood of success on the merits and irreparable harm, an injunction is warranted. When there are only serious questions on the merits, a plaintiff must show that the balance of hardships tip sharply in its favor. *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). The balance of hardships compares the harms that would result as between plaintiff and defendant if an injunction is refused or granted. *See Shell Offshore*, 709 F.3d at 1291.

---

[15]The Court only needs to resolve this issue if the Tribe has only raised serious questions on the merits. If the Court determines the Tribe is likely to succeed on the merits and will suffer irreparable harm, it can reverse and direct an injunction for the Tribe. *See All. for the Wild Rockies*, 632 F.3d at 1131–35.

When a plaintiff seeks a preliminary injunction against the government, courts merge the factors that consider hardship to the defendant with the public interest. *See Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). These factors merge because the public's interest is for the government to enforce the law. *See Nken*, 556 U.S. at 435–36. In merging the factors, courts do not consider policy issues that may have motivated Congress to pass legislation. If this were so, these factors would always favor the government because Congress would have resolved them by enacting the law.

Instead, courts must consider any detriments from enjoining the government during the pendency of the case. *See id.* In *Nken*, the Supreme Court corrected the habit of courts to regard any hardship to the government as categorically negligible. *Id.* Instead, the Court directed courts to consider hardship to the public that may arise if the government cannot follow a duly enacted law. *Id.*

In *Nken*, the question was whether the public would suffer harm if the government did not deport the petitioner-alien, not the policies motivating a statutory deportation scheme. *See id.* The Court reasoned, the public interest "may be heightened by the circumstances" such as a particularly dangerous alien, or one who has substantially prolonged his stay by abusing process. *Id.* at 436. The Court in *Nken* also recognized that "there is a public interest in preventing aliens from being wrongfully removed." *Id.* at 436.

54

Importantly, merging the factors does not override the required balancing of harms between plaintiff and government. To be sure, a plaintiff's harm may be irreparable but lack gravity. Here, however, the Tribe's harm is irreparable and exceedingly grave. *See* (dec. of Rose Belvado, ¶ 20) ("If Oak Flat is destroyed, it would kill not just my spirituality, but it will kill our Ga'an [Apache deities] and ruin our Apache religion."); (dec. of Carol Sneezy, ¶ 21) ("The destruction of Oak Flat will ruin our Apache religion and my connection to the Creator God and the Ga'an.") (dec. of Chairman Rambler, ¶ 19) ("the Mine will destroy the Apaches' connection to [Oak Flat], and permanently destroy Apache traditional religion by permanently preventing prayers and spiritual ceremonies and by foreclosing access to our Ga'an (Holy Beings) who inhabit the area").[16]

Here, the balance tips sharply in the Tribe's favor. If Oak Flat's transfer is not enjoined, Resolution will press forward, creating grave and irreparable hardship for the Tribe and its members. Resolution shows no intention of honoring the Tribe's Indian title of use and occupancy, and its mine will destroy the homes of Ga'an, drain aquafers that feed sacred streams, seeps, and springs, and impair

---

[16]The district court properly determined that the Tribe and its members will suffer irreparable harm once Oak Flat is transferred to Resolution, and that keeping that harm at bay to allow continued religious activities and cultural uses of Oak Flat until Federal Defendants satisfy SALECA's conditions precedent warrants relief. (1-ER-88-90). *See W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1147–48 (9th Cir. 2019).

55

the Gila River and the Tribe's decreed rights to its waters held in trust by the

United States. The Tribe's Indian title of use and occupancy predates the United

States by over 1,000 years and has not been extinguished. (7-ET-1395-97). *See*

*United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 346-47, n.4 (1941). As this

Court recently reaffirmed:

> There must be clear evidence that Congress actually
> considered the conflict between its intended action on the
> one hand and Indian treaty rights on the other, and chose
> to resolve that conflict by abrogating the treaty. Although
> Congress certainly has the power to modify Tribes' rights,
> the United States' trust responsibility to Tribes requires the
> preservation of Tribal rights unless Congress's contrary
> intent is clear and unambiguous.

*Shoshone-Bannock*, 2025 WL 2424422, at *12 (cleaned up).[17] The transfer will

seal Oak Flat's fate and start the irreversible countdown to its destruction and the

end of traditional Apache religious and cultural practices. *See W. Watersheds*

*Project v. Grimm*, 921 F.3d 1141, 1147-48 (9th Cir. 2019) (temporary relief meets

redressability requirement). Additionally, Resolution's mine will violate water

rights in the region, including the Tribe's decreed water rights held in trust by the

---

[17]*See also* Trade and Intercourse Act of 1834, ch. 161, 4 Stat. 729 § 12 ("no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the constitution").

United States under the Globe Equity Decree. (7-ER1397-99). These hardships are grave and irreparable.

Likewise, the harm to the government and public interest are negligible. Here, the harm is negligible because (1) Resolution's mine will not produce any copper for many years; (2) the United States has an ample, stable, and diverse supply of copper;[18] and (3) once Resolution's mine finally does produce copper, it will go to the world market and the profits to Australia and the United Kingdom. (2-ER-0235; 6-ER-1336-37; 8-ER-1854-55).

Moreover, the public interest would be served by an injunction because the directives in SALECA do not begin and end with the transfer of Oak Flat. Rather, before authorizing the transfer, SALECA requires a comprehensive EIS that meets the minimum requirements of NEPA and that is informed by government-to-government consultation with affected Indian tribes. *See* 16 U.S.C. § 539p(c)(3), (9). The public interest is not simply that Resolution may eventually deliver copper concentrate to the global market, but first that the Secretary thoroughly, fairly, and honestly analyze the environmental and cultural impacts that every aspect of the proposed mine will have. *Id.*

---

[18] *See Mineral Commodity Summaries*, U.S. Geological Survey (January 2025), available at: https://pubs.usgs.gov/periodicals/mcs2025/mcs2025-copper.pdf.

Below, the district court erred in three respects.  First, the court recited that the balance of hardships *and the public interest* each must tip sharply in the Tribe's favor.  (1-ER-92).  Instead, the hardships as between the Tribe and the government must tip sharply in the Tribe's favor; public interest need not tip sharply for the Tribe.  *See Shell Offshore*, 709 F.3d at 1291.

Second, the district court erred by deferring entirely to what it assumed were Congress' motivations when it passed SALECA.  (1-ER-90-92).  Doing so, the court misinterpreted the public-interest factors as generalized policy questions rather than concrete harms.  Following the court's approach, no act of Congress would ever be enjoined because no plaintiff could ever negate that legislation enacted by Congress serves the public interest.

Even assuming that the generalized policies supposedly motivating SALECA are relevant, the district court erred by weighing the policies motivating Oak Flat's *transfer* and did not consider the policies behind its EIS and consultation obligations.  Further, these merit even less weight because SALECA did not progress through Congress's ordinary deliberative procedure:  it did not advance through committee, there were no markups, and it never went to the floor. After ten years of bipartisan opposition, Senators Flake and McCain attached SALECA in the last minutes of a waning lame-duck session as a non-germane rider to the NDAA, a must-pass bill.  (*Id.*). While this legislative history does not negate

58

public interest, it indicates it deserves little weight and that a delay during the pendency of the action is no great imposition.

Third, even assuming the district court could analyze generalized policy questions, it erred by focusing exclusively on Oak Flat's transfer and ignoring SALECA's conditions precedent. The court failed to weigh the public harms that will result if Federal Defendants transfer Oak Flat before preparing a legally adequate EIS that is informed by consultation with the Tribe. *See Nken*, 556 U.S. at 436. Had the court considered these conditions precedent, it would have concluded that Oak Flat's transfer cannot proceed until the Secretary satisfies them. The balance of hardships and public interest tip sharply in the Tribe's favor.

## VII. CONCLUSION

This Court should reverse the order of the district court and enter an injunction prohibiting Federal Defendants from transferring Oak Flat to Resolution during the pendency of the underlying action.

///

///

///

///

///

///

59

Respectfully submitted this 8th day of September, 2025.

San Carlos Apache Tribe
Department of Justice

By: */s/ Alexander B. Ritchie (with
permission)*
Alexander B. Ritchie
Justine Jimmie
Laurel Herrmann
Jana Sutton
Bernardo M. Velasco
*Attorneys for Appellant San
Carlos Apache Tribe*


The Sparks Law Firm, P.C.

By: */s/ Joe P. Sparks*
Joe P. Sparks
*Attorney for Appellant San Carlos
Apache Tribe*


Titla & Parsi, PLLC

Steve Titla
*Attorney for Appellant San Carlos
Apache Tribe (of Counsel)*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the type-volume limit of Local Rule of Appellate Procedure 32-1 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,956 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman.

The Sparks Law Firm, P.C.

By: /s/ Joe P. Sparks

 Joe P. Sparks
*Attorney for Appellant San Carlos Apache Tribe*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 8, 2025, I filed the foregoing document electronically through the CM/ECF system, which caused all parties through counsel of record to be served by electronic means, as reflected on the Notice of Electronic Filing.

The Sparks Law Firm, P.C.

By: /s/ Joe P. Sparks

 Joe P. Sparks
*Attorney for Appellant San Carlos Apache Tribe*