**No. 25-5185**
**No. 25-5189**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

San Carlos Apache Tribe,

*Plaintiff-Appellant*,

v.

United States Forest Service, et al.,

Defendants-Appellees,

and

Resolution Copper Mining LLC,

Intervenor-*Appellee*.

_____

Appeal from the United States District Court for the District of Arizona,
Case No. 2:25-cv-00068-PHX-DWL, Honorable Dominic Lanza, District Judge
Consolidated with *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.*

_____

**BRIEF OF AMICUS CURIAE SACRED GROUND LEGAL SERVICES**
**IN SUPPORT OF APPELLANT SEEKING INJUNCTIVE RELIEF AND REVERSAL**
_____

Jack Warren Fiander, WSBA No. 13116
Sacred Ground Legal Services
5808A Summitview Avenue #93
Yakima, WA 98908
(509) 969-4436
towtnuklaw@msn.com
*Counsel for Amicus Curiae*
Sacred Ground Legal Services

## QUESTION PRESENTED

Whether the Treaty of Guadalupe Hidalgo, the Treaty with the Western Apache, or the Gadsden Treaty clarifying the Treaty of Guadalupe Hidalgo imposed a religious servitude in favor of the Apache upon Oak Flat which has not been abrogated by clear, express, unequivocal action of Congress.

Treaty rights are an issue that has been previously raised in this litigation and has not been waived. Prior litigation has focused upon competing construction of the Religious Freedom Restoration Act.[1] Article VI, Clause 2, of the United States Constitution provides that treaties are the supreme law of the nation. Issues going to *constitutional* issues such as treaties can be raised on appeal. The Court of Appeals in its discretion may consider the effect of such treaties *sua sponte*.

Whether the above referenced treaties impressed the realty involved with a religious servitude in favor of the Apache is a matter of national importance for people of all faiths to which the answer should be yes.

i

---

[1] 42 U.S.C. § 2000bb.

## TABLE OF CONTENTS

Question Presented…………………………………………………... i

Table of Authorities…………………………………………………..ii

Interest of Amicus…………………………………………………… 1

Argument…………………………………………………………….. 2

       Treaties impose a religious servitude upon Oak Flat
       securing free exercise of Apache Religion at Oak Flat………… 2

       Congress has not abrogated the treaty-reserved religious
       rights of the Apache at Oak Flat nor did the Defense
       Authorization Act of 2015……………………………………… 11

Conclusion……………………………………………….......... 15

Certificate of Service……………………………………….......... 17

Certification of Word Count…………………………………………… 18

TABLE OF AUTHORITIES

Cases:                                                                    Page:

*Apache Stronghold v. United States of America*,……………13, 13n, 15
101 F.4th 1036 (9th Cir. 2024)
Ninth Circuit No. 21-15295 (March 1, 2024)

*Cherokee Nation v. Georgia*,……………………………………. 12
30 U.S. 1 (1831)

*Elk v. Wilkins*,…………………………………………………… 12
112 U.S. 94 (1884)

*Employment Division v. Smith*,…............................................. 14
494 U.S. 872, 877 (1990))

*Jones v. Meehan*,…………………………………………………… 8n
175 U.S. 1 (1899)

*Kennedy v. Bremerton School District*,…………………………13, 14
Supreme Court No. 21-418 (June 27, 2022)

*Menominee Tribe v. United States*,……………………………… 13
391 U.S. 404 (1968)

*Nance v. Environmental Protection Agency*,…………………… 12n
645 F. 2d 701 (9th Cir. 1981)

*United States v. Abeyta*,…………………………………………4n, 7
632 F. Supp. 1301 (9th Cir. 1986)

*United States v. Dion*,……………………………………………6n, 12
476 U.S. 734 (1986)

*United States v. Washington*,……………………………………. 8
384 F. Supp. 312, 331-332 (W.D. Wash. 1974),
*affirmed* 520 F.2d 676 (9th Cir. 1975),
*cert. denied*, 423 U.S. 1086 (1976)

iii

*United States v. Winans*,………………………………………8n, 9
198 U.S. 371 (1905).

Other Authority:

U.S. Const. Art. VI, cl. 2………………………………………7n, 9, 9n

U.S. Const. Art. I…………………………………………… 15

Treaty of Guadalupe Hidalgo,……………2, 2n, 3, 4, 5, 6, 7n, 9, 10n, 16n
9 Stat. 922 (Feb. 2, 1848)

Treaty with the Western Apache,…………………………4, 4n, 5, 7, 9
Act of July 1, 1852, 10 Stat. 979

Gadsden Treaty,…………………………………………...…….i, 5, 6
Act of June 30, 1854

Arizona Territorial Act,………………………………………..  2, 2n
12 Stat. 664 (1863)

Arizona Enabling Act,………………………………………  2, 2n
Act of June 20, 1910, 36 Stat. 557

42 U.S.C. § 1996…………………………………………….  12

42 U.S.C. § 2000bb………………………………………………in, 15

Act of June 20, 1910, 36 Stat. 557, 568-579………………………  2

National Defense Authorization Act of 2015……………………11, 13

Felix S. Cohen, *The Spanish Origin of Indian Rights*……………….3, 7n
*in the Law of the United States*,
31 Georgetown L. J. 1 (1942)

18 *Congressional Globe* 429,………………………………..  3
March 9, 1848

iv

## INTEREST OF AMICUS CURIAE

*Amicus curiae* provides legal advice and representation to tribes and tribal members in Washington State and the Pacific Northwest on a pro bono basis. Because there are 29 federally recognized tribal nations in the Pacific Northwest, issues involving the protection of sites of cultural and religious significance arise on a regular basis in connection with large scale industrial and residential development accompanying population development and the increasing scarcity of available land resources. As such, amicus is familiar with the issues raised in this appeal.

Counsel for *amicus curiae* Sacred Ground Legal Services has been a member of the bar of this Circuit since 1984, regularly appears therein, and is familiar with the Ninth Circuit Rules of Appellate Procedure and the unique obligations that *amici curiae* are subject to.

The brief of *amicus curiae* will be short in length and not duplicative of the briefs of the principal parties. Counsel for appellant and appellees have been notified of movant's intent to submit a brief. Appellee Resolution Copper has consented to the submission of such brief.[2]

---

[2] Appellee Resolution Copper consented to the filing of this brief. Counsel for Appellee U.S. Forest Service was informed of movant's intent to submit a brief as amicus curiae and did not respond. No counsel for any party authored this brief in whole or in part and no person or entity other than amicus or its counsel made a monetary contribution for the preparation or submission of this brief.

**ARGUMENT**

**TREATIES IMPOSE A RELIGIOUS SERVITUDE UPON OAK FLAT SECURING FREE EXERCISE OF APACHE RELIGION AT OAK FLAT.**

The Treaty of Guadalupe Hidalgo, 9 Stat. 922 (Feb. 2, 1848), brought an official end to the Mexican-American War. By its terms, Mexico ceded 55 percent of its territory, including the present-day states California, Nevada, Utah, New Mexico, most of Arizona and Colorado, and parts of Oklahoma, Kansas, and Wyoming.[3] Since Time Immemorial, the Western Apache and other Apache tribes exercised their religion at Oak Flat, which is within the area ceded by Mexico to the United States and would become the Territory of Arizona in 1863[4] and the State of Arizona in 1912.[5]

---

[3] National Archives, *The Treaty of Guadalupe Hidalgo*, https://www.archives.gov/education/lessons/guadalupe-hidalgo

[4] 12 Stat. 664.

[5] Act of June 20, 1910, 36 Stat. 557, 568-579.

2

When Mexico ceded its claim to the area in the Treaty of Guadalupe Hidalgo, the United States government pledged to the Mexican government that its "nationals" then residing in the territory ceded by Mexico would be secured in the free exercise of their religion without restriction. Id., Art. IX. *See generally*, Felix S. Cohen, *The Spanish Origin of Indian Rights in the Law of the United States*, 31 Georgetown L. J. 1 (1942). Although, at the time, various Apache bands, were at war with Mexican military, Mexico considered the Apache to be their "nationals" subject to Mexico's sovereignty, in the sense that they were residents of territory claimed by Mexico. This appears to have been the understanding of the United States, as borne out by the discussions in Congress preceding ratification of the Treaty:

> If we annex the land, we must take the population along with it. And shall we, (he said,) by an act of Congress, convert the black, white, red, mongrel, miserable *population* of Mexico—the Mexicans, Indians, Mulattoes, Mestizas, Chinos, Zambos Quinteros—into free and enlightened American citizens, entitled to all the privileges which we enjoy?

18 *Congressional Globe* 429, March 9, 1848 (Statement of Mr. Cabell) (emphasis in original). Apparently, "Indians" such as the Apache were,

3

in Cabell's view, among the population of Mexico and therefore beneficiaries of the Treaty of Guadalupe Hidalgo.[6] The Senate reluctantly ratified the treaty by a vote of 34 to 14) on March 10, 1848, deleting only Article X.[7]

In 1852 the United States entered a treaty with the Western Apache that continued to occupy much of the area relinquished by Mexico to the United States.[8] Article 2 of which provided that perpetual peace and amity would exist with the Apache and Article 9 stated that, "relying upon the justice and liberality" of the United States, the government was "anxious to remove every possible cause that might disturb their peace and quiet" and that the United States would:

> [P]ass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians.

---

[6] That Indians who resided in the former territory of Mexico are beneficiaries of the Treaty of Guadalupe Hidalgo is evident from the opinion in *United States v. Abeyta*, 632 F. Supp. 1301 (9th Cir. 1986), applying the Treaty to taking of an eagle by an Isleta Pueblo.

[7] National Archives, *supra* n. 1 above.

[8] Treaty with the Apache, Act of July 1, 1852, 10 Stat. 979.

4

The 1852 Treaty with the Apache was to be "binding on the contracting parties"[9] and concluded by announcing that:

> [T]he government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians.[10]

In 1853, Congress determined that there was a need to clarify certain articles of the Treaty of Guadalupe Hidalgo in order to assure completion of a railroad through the territory ceded by Mexico. Consequently, a treaty known as the "Gadsden Purchase" or Treaty was entered between the United States and Mexico. Certain articles of the Treaty of Guadalupe Hidalgo were modified or clarified, while others were confirmed as remaining unchanged. Specifically, Article 5 of the Gadsden Treaty stated that:

> All the provisions of the eighth and ninth, sixteenth and seventeenth articles of the treaty of Guadalupe Hidalgo, shall apply to the territory ceded by the Mexican Republic in the first article of the present treaty, and to all the rights of persons and property, both civil and ecclesiastical, within the same, as fully and effectually as if the said articles were herein again recited and set forth.[11]

_____

[9] Article 11.

[10] Id. Presumably, one's ability to exercise their religion furthers one's happiness.
[11] Act of June 30, 1854.

5

It is noteworthy that it is the *ninth* article of the Treaty of Guadalupe Hidalgo in which the United States promised that those in what would become the former territory of Mexico would be protected in the free exercise of their religion without restriction.  As stated in the Gadsden Treaty the ninth article of the treaty of Guadalupe Hidalgo "shall apply to the territory ceded by the Mexican Republic[.]" Given the "liberal" construction to be given to the Treaty with the Apache according to Article 11, it is reasonable to conclude that the free exercise of religion promised in the Treaty of Guadalupe Hidalgo, as clarified by Article 5 of the Gadsden Treaty, applied within "all territory" ceded by Mexico in 1848.

The Tenth Circuit addressed the Treaty of Guadalupe Hidalgo in 1986 and confirmed its continued viability,[12] noting that:

> The Treaty of Guadalupe Hidalgo, like any other treaty to which the United States is a party, may be repudiated, abrogated, or modified as the Congress shall deem suitable. It is of no legal significance that the treaty is with a still-existing, foreign, extraterritorial sovereign. As with treaties with Indian civilizations now within the nation's borders, the treaty has the force of law because it is an act of Congress and, as such, may be altered or repealed as Congress, acting within its constitutional powers, may decide. In our jurisprudence, it is

---

[12] Treaties are not abrogated absent an express statement in an act of Congress demonstrating clear and unambiguous evidence of Congressional intent to do so. *United States v. Dion*, 476 U.S. 734 (1986).

well settled that the provisions of an act of Congress, passed in the exercise of its constitutional authority, on this, as on any other subject, if clear and explicit, must be upheld by the courts, even in contravention of express stipulations in an earlier treaty.

*United States v. Abeyta*, 632 F. Supp. 1301, 1305 (9th Cir. 1986).

In 1852, the United States signed the Treaty of Santa Fe with six Apache chiefs. In it, the United States promised to settle the Apaches' territorial boundaries which included Oak Flat, and to "pass and execute" laws "conducive to the[ir] prosperity and happiness."[13]  In the Treaty, the United States, "anxious to remove every possible cause that might disturb their peace and quiet," agreed to adjust the Apaches' territorial boundaries [Article 9], that the government of the United States would "adopt such other liberal and humane measures" [Article 10], and that the government of the United States "shall so legislate and act as to secure the permanent prosperity and happiness of said Indians" [Article 11].[14]  Few things are

---

[13] Treaties, including those with tribal nations, are the Supreme Law of the nation. U.S. Const. Art. VI, cl. 2.

[14] The United States' interest in Oak Flat derives from the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (Feb. 2, 1848), in which the Government pledged to the Mexican government that its "nationals" then residing in the territory ceded by Mexico would be *secured in the free exercise of their religion without restriction. Id., Art. IX.  See generally,* Felix S. Cohen*, The Spanish Origin of Indian Rights in the Law of the United States*, 31 Georgetown L. J. 1 (1942).

more essential to one's prosperity and happiness than the ability to practice one's religion. *See Apache Stronghold v. United States*, Supreme Court Docket No. 24-291 ("it is undisputed that the government's plan will permanently destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise at Oak Flat") (Gorsuch, J., dissenting).

Although treaty negotiations are with *tribes*, they reserved rights to every *individual* Indian "as though named therein". *United States v. Washington*, 384 F. Supp. 312, 331-332 (W.D. Wash. 1974), *affirmed* 520 F.2d 676 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086 (1976). And such treaties are to be construed as the tribal signatories would have understood the terms and, in case of ambiguity, are to be liberally construed in their favor. Applying the longstanding "Canons of Construction" for Indian treaties that treaties are a *grant* from tribes such that matters not relinquished in such a treaty is *reserved*,[15] it would never have been understood that the Apache, having exercised their freedom of religion at Oak Flat since Time Immemorial, were relinquishing those practices in

_____

[15] *Jones v. Meehan*, 175 U.S. 1 (1899); *United States v. Winans*, 198 U.S. 371 (1905).

8

any of the treaties mentioned *post* nor that the United States would abandon its promise not to legislate to their detriment. As stated in Article VI of the United States Constitution, treaties, including those with tribal nations, are the "Supreme Law" of the nation.[16]

It is not unreasonable to conclude that the San Carlos Apache, like the Isleta Pueblo, are beneficiaries of both the Treaty of Guadalupe Hidalgo and the Treaty of Santa Fe. Rights reserved in treaties with tribal nations are "continuing against the United States and its grantees as well as against the State and its grantees". *United States v. Winans*, 198 U.S. 371 (1905). That those rights are also reserved to the descendants of treaty Indians, without limitation in time, excepting as Congress may determine, has been recognized and applied by the United States Supreme Court from the first to the latest decision of that court. As such, the Apache whose ancestry traces back to the area ceded in the Treaty of Guadalupe Hidalgo would seem to be beneficiaries, both of that Treaty and the later 1852 treaty, both of whose express terms would appear to protect the exercise of Apache religion at Oak Flat. As was stated a century ago in *United States v. Winans*, 198 U.S. 371 (1905):

---

[16] U.S. Const., Art. VI, Cl. 2.

9

> [T]he treaty was not a grant of rights to the Indians, but a grant of right from them -- a reservation of those not granted. And the form of the instrument and its language was adapted to that purpose. Reservations were not of particular parcels of land, and could not be expressed in deeds, as dealings between private individuals. The reservations were in large areas of territory, and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. They imposed a servitude upon every piece of land as though described therein.

198 U.S. at 381. Unlike restrictive covenants, which can only be enforced by money damages, equitable servitudes may be enforced by injunction.[17]

Treaty rights are an issue that has been raised in this litigation. *See*, the Complaint in 2:21-cv-00068-FWL, dkt entry 1, pp. 6-7 (January 14, 2021) (the Forest Service's actions are "violations of certain of the tribe's treaty rights"). The land at Oak Flat seems impressed with an easement or servitude enabling the Apache access to it for the purpose of exercising their religious traditions "without limitation in time"[18] in furtherance of their prosperity and happiness.

## CONGRESS HAS NOT ABROGATED THE TREATY-RESERVED RELIGIOUS RIGHTS OF THE APACHE AT OAK FLAT NOR

---

[17] Unlike "covenants that run with the land," *equitable servitudes* do not require horizontal or vertical privity in order to run with the land.

[18] Or, as stated in Article nine of the Treaty of Guadalupe Hidalgo, "secured in the free exercise of their religion without; restriction."

10

**DID ENACTMENT OF THE DEFENSE AUTHORIZATION ACT OF 2015.**

In 1995, a large copper deposit was discovered beneath Oak Flat. In 2014, Senator John McCain attached a land-transfer bill as a "rider" to the National Defense Authorization Act of 2015, authorizing transfer of a 2,422-acre parcel including Oak Flat to an international mining corporation, Resolution Copper.

In a move that can only charitably described as morbid, Congress, in one section of the Act (§ 3003) *destroying* religious tradition of the Apache at Oak Flat by devoting it to mining purposes, *preserved* public ownership in another subsection of a nearby area called Apache Leap, so named in commemoration of a site where hundreds of Apache leaped to their death to avoid capture by U.S. troops. Apparently, Congress deemed it consistent with the First Amendment and its Article I authority to deem the presence of a tribal religious site such as Oak Flat which predated the United States Constitution so *insignificant* as to merit its obliteration and erasure while *commemorating* a site of Indian genocide as having historical *significance*.

It is indisputable that avowed policies of the United States as to how

11

it acts in relationship to Indians should provide a backdrop to be taken into account in the consideration of this case. *See, e.g.,* 42 U.S.C. § 1996.[19] As should also be taken into account the avowed policy of the United States that the government owes a fiduciary duty toward tribal nations (*Cherokee Nation v. Georgia*, 30 U.S. 1 [1831]), which is distinct from its duties toward other citizens of the United States. *Elk v. Wilkins*, 112 U.S. 94 (1884).[20] As set forth *post*, there are serious questions going to the merits as to whether the aforementioned treaties of which the San Carlos Apache is a beneficiary reserved the tribe's right to practice their religion in the territory ceded by those treaties. There is a strict test for abrogation of rights reserved by treaties. *United States v. Dion*, 476 U.S. 734, 739 (1986) ("the intention to abrogate or modify a treaty is not to be lightly

---

[19] Public Law 95-341, § 1, Act of August 11, 1978, 92 Stat. 469. "On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."

[20] *See also*, *Nance v. Environmental Protection Agency*, 645 F. 2d 701 (9th Cir. 1981) (Supreme Court decisions require the trust obligation owed by the United States to the Indians be exercised according to the strictest fiduciary standards").

imputed to the Congress"). It does not appear that the 2015 Defense Appropriations Authorization Act of 2015 meets that test. Congress must make an unambiguous statement to repeal a treaty or its provisions will remain in effect. *Menominee Tribe v. United States*, 391 U.S. 404 (1968).

In *Apache Stronghold*,[21] however, a divided majority of this Circuit did not even extend nearly the same free exercise of religion protection as the United States Supreme Court has extended to nontribal citizens.

For example, in *Kennedy v. Bremerton School District*, Supreme Court No. 21-418 (June 27, 2022), the Court held that the Free Exercise Clause and Free Speech Clauses of the First Amendment protected high school football coach Kennedy's use of public property to quietly exercise and express his personal religion—a practice that was a "longstanding tradition" predating his employment:

> The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts.

---

[21] *Apache Stronghold v. United States of America*, Ninth Circuit No. 21-15295 (March 1, 2024).

13

Id. (citing *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)). As stated in *Kennedy*, "this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings" (Slip Opinion at 23) (emphasis added). According to the opinion in *Kennedy*, the Free Exercise Clause is to be interpreted by reference to longstanding traditions as well:

> [I]t is true that this Court and others often refer to the Establishment Clause, the Free Exercise Clause, and the Free Speech Clause as separate units. But the three clauses appear in the same sentence of the same Amendment….a natural reading of that sentence would seem to suggest the Clauses have complimentary purposes, not warring ones[.]

Id., p. 21. Consistent with the spirit of these Clauses, the Ninth Circuit should have found that the Apache have, since Time Immemorial, exercised their "longstanding" religious traditions at this area in Arizona called Oak Flat. Nevertheless, because copper was discovered beneath Oak Flat, the Government transferred ownership to Resolution Copper for a mine that will end the Apache's ability to conduct religious rituals there for all time and, unlike the Supreme Court's approval of a football coach's use of public property to exercise his religion, the Ninth Circuit deemed

14

that no such Constitutional servitude applied to public domain land of the United States. *Apache Stronghold v. United States*, No. 21-15295 (March 1, 2024).

This is not a case wherein those of a religious faith seek to obstruct a federal land management decision by asserting newly recognized exercise of religious practices on land *already* in federal ownership. The right to freely exercise Apache religious traditions at what is now known as Oak Flat predates government ownership of such site, and according to the Founders, that right is *unalienable*.

Lawmaking is exclusively delegated to Congress. U.S. Const. Art. I. Congress, in enacting 42 U.S.C. § 2000bb, enunciated that:

> The framers of the Constitution, recognizing free exercise of religion as an *unalienable* right, secured its protection in the First Amendment to the Constitution[.]

42 U.S.C. § 2000bb (a) (1) (emphasis added).

## CONCLUSION

Courts do not question the sincerity of one's religious beliefs. It is unquestionable that the Apache have utilized Oak Flat as a sacred alter since Time Immemorial and not less than three treaties of the United States secure the free exercise of religion within landed ceded by Mexico

15

have not been abrogated by an unequivocal act of Congress.[22]

Such lands are impressed by treaty with a religious servitude binding upon the United States and its grantees which runs with the land.

*Respectfully submitted*,

SACRED GROUND LEGAL SERVICES

S/Jack Warren Fiander

Counsel for *Amicus Curiae*

---

[22] Justices Gorsuch and Thomas note that the territory within which Oak Flat lies came to federal ownership by virtue of the Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Feb. 2, 1848, 9 Stat. 922 (Treaty of Guadalupe Hidalgo). Supreme Court Slip Opinion, 24-291, at 5 (Gorsuch dissenting).  A key provision of which was preservation of religion.

16

Certificate of Service

The foregoing was filed with the Clerk of Court using the Court's electronic filing system, with notice provided to all parties.

S/Jack W. Fiander

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-5189

I am the attorney or self-represented party.

**This brief contains** 3,373 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
 ☐ it is a joint brief submitted by separately represented parties.
 ☐ a party or parties are filing a single brief in response to multiple briefs.
 ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** S/Jack Warren Fiander **Date** 09/08/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

18