**FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

MAR 13 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; EARTHWORKS; CENTER FOR BIOLOGICAL DIVERSITY; ACCESS FUND; GRAND CANYON CHAPTER OF THE SIERRA CLUB, | No. 25-5185 <br><br> D.C. No. 2:21-cv-00122-DWL |
| Plaintiffs - Appellants, | |
| v. | OPINION |
| UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; NEIL BOSWORTH, Supervisor of the Tonto National Forest; BROOKE ROLLINS, US Secretary of Agriculture, | |
| Defendants - Appellees, | |
| RESOLUTION COPPER MINING, LLC, | |
| Intervenor-Defendant - Appellee. | |

| | |
|---|---|
| SAN CARLOS APACHE TRIBE, a federally recognized Tribe, | No. 25-5189 <br> D.C. No. 2:21-cv-00068-DWL |
| Plaintiff - Appellant, | |
| v. | |

UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; NEIL BOSWORTH, Supervisor of the Tonto National Forest; BROOKE ROLLINS,

        Defendants - Appellees,

RESOLUTION COPPER MINING, LLC,

        Intervenor-Defendant - Appellee.

---

GOUYEN BROWN LOPEZ; SINETTA LOPEZ, on behalf of herself and her minor child L.B.; NOMIE BROWN; ANGELA KINSEY, on behalf of herself and her minor children V.K. and M.K.,

        Plaintiffs - Appellants,

  v.

UNITED STATES OF AMERICA; UNITED STATES FOREST SERVICE; BROOKE ROLLINS; UNITED STATES DEPARTMENT OF AGRICULTURE; TOM SCHULTZ,

        Defendants - Appellees,

RESOLUTION COPPER MINING, LLC,

        Intervenor-Defendant - Appellee.

No. 25-5197

D.C. No. 2:25-cv-02758-DWL

Appeal from the United States District Court
for the District of Arizona
Dominic Lanza, District Judge, Presiding

2

25-5185

Submitted January 7, 2026
Phoenix, Arizona

Before: JOHNNIE B. RAWLINSON, MILAN D. SMITH, JR., AND DANIEL A. BRESS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.
Partial Dissent by Judge Rawlinson[1]

M. SMITH, Circuit Judge:

These consolidated cases concern a land exchange, mandated by the Southeast Arizona Land Exchange and Conservation Act (the Land Exchange Act), 16 U.S.C. § 539p, that targets a large copper deposit in Southeast Arizona located in the Tonto National Forest. Plaintiffs bring a variety of claims under the Land Exchange Act, the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), the Religious Freedom Restoration Act (RFRA), and the Free Exercise Clause of the United States Constitution. Because Plaintiffs' claims are unlikely to succeed on the merits, we affirm the district court's denial of Plaintiffs' request for a preliminary injunction against the land exchange.

## FACTUAL BACKGROUND

### I. Statutory History

---

[1] Judge Rawlinson will dissent on the appraisal issue. Judge Rawlinson's partial dissent is forthcoming and will be filed with an amended opinion. The panel is issuing its decision at this time in order to explain its reasoning in resolving the pending motions addressed in the Conclusion and footnote 5.

In 2014, Congress passed the Land Exchange Act as part of the National Defense Authorization Act for Fiscal Year 2015.  Pub. L. No. 113-291, § 3003, 128 Stat. 3292, 3732–41 (2014) (codified at 16 U.S.C. § 539p).  The land exchange had, for many years, been hotly contested in Congress and in public debate.  The Land Exchange Act directs the United States Forest Service to transfer nearly 2,500 acres of National Forest land, including Oak Flat—an Apache ceremonial religious ground—and a deposit containing almost two billion metric tons of copper, in addition to other minerals, to a private mining company, Resolution Copper Mining LLC (Resolution Copper).  In exchange, Resolution Copper must provide over 5,000 acres of equally appraised land to the federal government.  16 U.S.C. §§ 539p(b)(2), (4); (d)(1).

The Land Exchange Act includes a variety of procedural requirements.  For instance, the Secretary of Agriculture must consult with Native American tribes regarding their concerns related to the land exchange, *id.* § 539p(c)(3)(A), and then "seek to find mutually acceptable measures" to address those concerns and "minimize the adverse effects on the affected" tribes.  *Id.* § 539p(c)(3)(B).  The Land Exchange Act also mandates appraisals of the land to ensure an exchange of equal value, "conducted in accordance with nationally recognized appraisal standards."  *Id.* §§ 539p(c)(4), (5).  Furthermore, the Land Exchange Act requires the Government to "prepare a single environmental impact statement [(EIS)] under the

4

National Environmental Policy Act of 1969" prior to conveying the land. *Id.* § 539p(c)(9)(B). That EIS, per the Land Exchange Act, "shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.* Conveyance of the land must occur within 60 days of EIS publication. *See id.* § 539p(c)(10).

## II. Procedural History

### a. Original Litigation

Following issuance of the original EIS on January 15, 2021, three plaintiff groups filed suit seeking to enjoin the conveyance. Two of the groups, also Plaintiffs here—the Arizona Mining Reform Coalition (AMRC)[2] and the San Carlos Apache Tribe (the Tribe)—challenged the EIS's sufficiency and raised similar claims as Plaintiffs in this litigation. The third plaintiff group, Apache Stronghold (not involved in the instant litigation) raised religious freedom claims under the Free Exercise Clause and the Religious Freedom Restoration Act (RFRA) in a separate case. *See Apache Stronghold v. United States*, No. 21-CV-00050 (D. Ariz.).

---

[2] AMRC refers to Plaintiffs-Appellants Arizona Mining Reform Coalition, Inter Tribal Association of Arizona, Inc., Center for Biological Diversity, Earthworks, the Access Fund, and the Sierra Club.

While the *Apache Stronghold* litigation was pending, the Forest Service withdrew the EIS in March 2021 to engage in further consultation with tribal groups. However, the *Apache Stronghold* case proceeded as to the plaintiffs' RFRA and Free Exercise claims. The district court in that case eventually denied the request for a preliminary injunction, and a panel of this court affirmed; the full court then granted en banc rehearing. *See Apache Stronghold v. United States*, 519 F. Supp. 3d 591 (D. Ariz. 2021), *aff'd*, 38 F.4th 742 (9th Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 636 (9th Cir. 2022). The en banc panel reached the same result as the merits panel, ruling that the land exchange did not burden the plaintiffs' religious exercise. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1044, 1051–53, 1063 (9th Cir. 2024). The Supreme Court denied review over a dissent from Justice Gorsuch, joined by Justice Thomas. *See Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480–89 (2025) (Gorsuch, J., dissenting from the denial of certiorari). Apache Stronghold filed a petition for rehearing in light of the Court's subsequent decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), which the Court denied. *Apache Stronghold v. United States*, 146 S. Ct. 285 (2025) (mem.). Justice Gorsuch again noted he would have granted the petition. *See id.*

### b. Current Litigation

25-5185

The Forest Service issued the revised Final EIS (FEIS) on June 20, 2025, restarting the Land Exchange Act's 60-day clock for conveyance of the land. The Forest Service also conducted the required appraisal process pursuant to the Land Exchange Act. This included one appraisal report detailing the area of federal land over which Resolution Copper holds unpatented mining claims, known as the "Mining Claim Zone," and another regarding the "Mineral Withdrawal Area," the federal land over which Resolution Copper holds no mining claims.

AMRC and the Tribe filed motions for a preliminary injunction in early 2025 in anticipation of the Forest Service's filing of the revised Final EIS, which the district court denied on June 6, 2025. However, with the Government's consent, the court entered a temporary stay until August 19, 2025, to allow for a second round of preliminary injunction briefing; the court denied that injunction request on August 15, 2025. The district court found that the plaintiffs had not "established a likelihood of success or even serious questions going to the merits of any of their" appraisal, NEPA, consultation, or National Forest Management Act (NFMA) claims.

Simultaneously, a separate set of Apache plaintiffs (the Lopez Plaintiffs) filed their own suit in the District Court for the District of Columbia on July 24, 2025, which was transferred to the District of Arizona upon the Government's motion. *See Lopez v. United States*, 2025 WL 2193001 (D.D.C. Aug. 1, 2025). The Lopez Plaintiffs raised RFRA, Free Exercise, NHPA, and NEPA claims, which the district

25-5185

court rejected on August 17, 2025, when denying their motion for a preliminary injunction. Under *Apache Stronghold*, the district court ruled, the Lopez Plaintiffs' religious liberty claims were foreclosed, and nothing in *Mahmoud* changed that.

All three Plaintiff groups appealed to this court and simultaneously filed for injunctions pending appeal, seeking to block the land transfer. A motions panel of this court entered an administrative stay on August 18, 2025, referring the motions for injunction pending appeal to the merits panel.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We have "adopted a sliding-scale approach to the *Winter* factors," where "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024) (cleaned up).

We review a district court's decision to deny a motion for a preliminary injunction for abuse of discretion. *See Betschart v. Oregon*, 103 F.4th 607, 616 (9th Cir. 2024). The district court abuses its discretion "when it fails to identify 'the

25-5185

correct legal rule to apply to the relief requested' or applies the correct rule in a way that is illogical, implausible, or unsupported by the facts." *Shayler v. 1310 PCH, LLC*, 51 F.4th 1015, 1020 (9th Cir. 2022) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). In evaluating agency action, the court must determine if the agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "deferential standard simply ensures that the agency has acted within a zone of reasonableness." *League of California Cities v. FCC*, 118 F.4th 995, 1014 (9th Cir. 2024) (internal quotation marks omitted).

## ANALYSIS

### I.     Threshold Justiciability Issues

Plaintiffs must establish Article III standing as to each of their claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). To establish standing, Plaintiffs must show: (1) they have suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury they show is traceable to the challenged

action; and (3) that it is likely that a favorable decision would redress their injury. *Lujan*, 504 U.S. at 560–61.

Absent a specific private right of action, plaintiffs must assert their administrative claims via the Administrative Procedure Act's (APA) judicial review provisions. *See* 5 U.S.C. §§ 701–706. "[A] person suing under the APA must satisfy not only Article III's standing requirements," but also, "[t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153 (1970)). "[I]n the APA context . . . the test is not especially demanding," and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up).

Finally, under the APA, only "final agency action" is reviewable. 5 U.S.C. § 704. Agency action is "final" if it "both (1) 'mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Ctr. for Biological*

25-5185

*Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). This inquiry is meant to consider the "practical and legal effects of the agency action" and should be "pragmatic and flexible." *Id.* (citing *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)).

Plaintiffs have established that all of their claims are reviewable.

### a. Article III Standing

Defendants challenge Plaintiffs' Article III standing on two grounds: first, that they have not demonstrated actual or imminent injury flowing from the land exchange, and second, that their injuries would not be redressed by a favorable judicial decision. We disagree on both counts.

As for actual or imminent injury, under this court's precedents, "plaintiffs may satisfy standing by showing that they face a future injury that is 'imminent,' or 'certainly impending.'" *Int'l Partners for Ethical Care Inc v. Ferguson*, 146 F.4th 841, 851 (9th Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 564 n.2 (1992)) (emphasis omitted). Here, the FEIS points out that "[p]hysical and visual impacts on [traditional cultural places], special interest areas, and plant and mineral resources caused by construction of the mine would be *immediate*, *permanent*, and *large in scale*." That is enough to show imminent injury.

To demonstrate redressability, "a federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will

11                                                                          25-5185

inevitably redress his injury." *Desert Citizens*, 231 F.3d at 1178 (quoting *Beno v. Shalala,* 30 F.3d 1057, 1065 (9th Cir. 1994)). "Plaintiffs have standing if 'there is some possibility that the requested relief will prompt the injury-causing party to reconsider' its actions." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). As for Plaintiffs' appraisal claims, we have held before that injuries flowing from a flawed land exchange appraisal are redressable. *See Desert Citizens*, 231 F.3d at 1178. As we noted, if an agency is required to redo a flawed appraisal, "the particular exchange would not go through" and plaintiffs can continue to use the public land. *Id.* That is the case here.

Plaintiffs' appraisal, consultation, and NEPA claims are also redressable by favorable judicial action, as we have held that even a temporary cessation of agency action can redress connected injuries. *See W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019). As the district court correctly noted, "every day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place."

Therefore, Plaintiffs have demonstrated that they have Article III standing.[3]

---

[3] Though the parties do not contest Plaintiffs' standing for their religious liberty claims, we must nonetheless ensure Plaintiffs have standing for those claims. *See United States v. Hays*, 515 U.S. 737, 742 (1995). Here, the Lopez Plaintiffs face an imminent inability to practice their religion at Oak Flat, an injury traceable to the

### b. Prudential Standing

The Government and Resolution Copper next argue that AMRC has no prudential standing to bring its appraisal claim under the APA. In their view, there is no injury to AMRC from an incorrect appraisal (to the degree the appraisal was incorrect). The district court rejected those arguments below, holding that this court's decision in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000), permits standing for appraisal claims in land exchange cases like this one. The Defendants attempt to distinguish *Desert Citizens* on the grounds that it involved a discretionary land exchange under the Federal Land Policy and Management Act (FLPMA). In their view, AMRC's appraisal claims do not fall within the zone of interests of the Land Exchange Act's appraisal provisions, and *Desert Citizens* is inapposite because the Land Exchange Act, unlike the FLPMA, does not contain a judicial review provision.

Though the FLPMA and Land Exchange Act are different in some respects, the flexible zone-of-interests test supports prudential standing here. We have held that we "may look beyond the section sued under to the statute or act as a whole 'to understand Congress' overall purposes.'" *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 852 (9th Cir. 1989) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401

---

Government's decision to transfer the land to Resolution and redressable by a decision barring that transfer. That suffices to establish standing.

(1987)), and here, the Land Exchange Act contains statutory provisions that seek to protect the public and Native groups' interests in the land. *See* 16 U.S.C. §§ 539p(c)(3), (9); (d)(2); (g); (i)(3). There is also a "public review" sub-provision in the Land Exchange Act's appraisal section. *See id.* § 539p(c)(4)(B)(iv). Taking these provisions together, and given the "lenient approach" to the zone-of-interests test in the APA context, *Lexmark*, 572 U.S. at 130, AMRC has established standing for its appraisal claim.

### c. Final Agency Action

Finally, the FEIS is reviewable as "final agency action" because publication triggers the 60-day time limit for the land exchange, and no further agency action or decision-making process is needed for that deadline to run. *See Ctr. for Biological Diversity*, 58 F.4th at 417 ("An agency action is 'final' only if it both (1) 'mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'" (quoting *Bennett*, 520 U.S. at 177–78)); *Oregon Nat. Desert Ass'n*, 465 F.3d at 982 ("In determining whether an agency's action is final, we look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance with the terms is expected." (cleaned up)); *id.* at 984 ("[W]e look to see

14                                                                                    25-5185

whether the agency has rendered its last word on the matter to determine whether an action is final and is ripe for judicial review." (internal quotation marks omitted)). Accordingly, Plaintiffs have established that their NEPA claims are justiciable.

**II. Plaintiffs have not established a likelihood of succeeding on the merits, nor raised serious questions regarding, any of their claims.**

**a. AMRC is not likely to succeed on, nor has it raised serious questions regarding, its appraisal claims.**

The Land Exchange Act sets out a set of appraisal requirements governing the land at issue. *See* 16 U.S.C. §§ 539p(c)(4), (5). These include the requirements that the appraisals be prepared "in accordance with nationally recognized appraisal standards" and that the land then be exchanged for non-Federal land of equal value. *Id.* § 539p(c)(4)(b)(i). Among other things, national appraisal standards require the value of the appraised land to reflect "the highest and best use of the property" "as if in private ownership and available for sale in the open market," 36 C.F.R. § 254.9(b)(1)(i), meaning "the most probable and legal use of [the] property." *Id.* § 254.2.

These appraisals also reflect the general mining laws, pursuant to which "'[d]iscovery' of a mineral deposit, followed by the minimal procedures required to formally 'locate' the deposit, gives an individual the right of exclusive possession of the land for mining purposes." *United States v. Locke*, 471 U.S. 84, 86 (1985) (quoting 30 U.S.C. § 26); *see also United States v. Shumway*, 199 F.3d 1093, 1098–

25-5185

99 (9th Cir. 1999) ("[T]he finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts."). "[A]n unpatented mining claim remains a fully recognized possessory interest." *Locke*, 471 U.S. at 86.

The Forest Service prepared one appraisal report detailing the area of federal land over which Resolution Copper holds unpatented mining claims, known as the "Mining Claim Zone" (MCZ), and another regarding the "Mineral Withdrawal Area" (MWA), the federal land over which Resolution Copper holds no mining claims. There are two main differences between these two parcels. First, the MCZ contains approximately 35 billion pounds of copper ore, while the MWA contains approximately 5 billion. Second, the MCZ is "encumbered by 148 unpatented mining claims that give Resolution . . . the exclusive right to extract the minerals beneath the MCZ," while Resolution has no such claims against the MWA.

In its appraisal for the MWA, the Forest Service concluded that the parcel was worth $22 million after factoring in the value of the underlying copper ore (valued at approximately $17.5 million). It determined that the highest and best use of the land was "exploration and development of a mineral resource," as no party had mining claims to the underlying minerals. However, for the MCZ, the agency noted that because Resolution had unpatented mining claims to the minerals, the mineral rights were "not part of the estate owned by the United States." Therefore, the

25-5185

highest and best use was "surface land use in support of a mining operation," and the land was only worth about $2 million.

There was no error in this appraisal. As the district court correctly explained, "AMRC's criticisms all flow from a misunderstanding of how unpatented mining claims work." The United States has a "finders keepers" regime for mining claims. In other words, whoever finds minerals on federal land gains an exclusive possessory interest in the land "for purposes of mining and to all the minerals he extracts" from that land. *Shumway*, 199 F.3d at 1098–99. Here, Resolution Copper owns the right to mine the minerals in the MCZ and the minerals themselves, once mined. As the district court determined, if the appraisal had included the value of the MCZ minerals in what the federal government owned, that "would force Resolution Copper, as part of the land exchange, to pay the federal government for the copper it effectively already owns the exclusive right to mine." Indeed, the Land Exchange Act itself indicates that Congress did not contemplate that the appraisal would include the value of the minerals in the MCZ. The statute emphasizes that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." 16 U.S.C. § 539p(i)(1)(C). Effectively wiping out the value of Resolution Copper's mining claims and forcing it to pay twice for its existing rights would undeniably "interfere with" and "impair" those claims. *Id.*

17

AMRC's arguments to the contrary are unavailing. AMRC first argues that the appraisal improperly "based its 'highest and best use' valuation on the current status of the federal lands, instead of its value on the future open market after the lands are private." To reach this conclusion, AMRC seems to assume that "as if in private ownership" means as if owned by Resolution or some other private party in fee simple after the land exchange has concluded. But this is an erroneous reading of the regulations. The better interpretation of the term "as if in private ownership" is that the appraiser needs to determine the present value of the federal lands as if they are exploited for profit by a hypothetical private party. AMRC has failed to highlight any authority suggesting that Congress's decision to transfer this land to Resolution somehow defeats Resolution's already-existing mining claim over that land.

AMRC's remaining arguments fare no better. For instance, AMRC points to regulations that require appraisers to "consider the contributory value of any interest in land such as water rights, minerals, or timber, to the extent they are consistent with the highest and best use of the property." 36 C.F.R. §254.9(b)(1)(iv). That is what the appraiser did here. While it is true that the Government owns the underlying mineral estate, that interest has no practical value because the Government does not own the right to mine those minerals. AMRC ignores language in the regulations that requires appraisers to account for "all encumbrances" on the

property. *Id.* § 254.9(c)(4). Indeed, § 4.6.5.2 of the Uniform Appraisal Standards for Federal Land Acquisitions (which apply "to the extent appropriate" under § 254.9) emphasizes that it is "improper to disregard preexisting encumbrances and their impact on the property," and when encumbered property is totally acquired, "the measure of compensation is the market value of the property as encumbered."

Finally, AMRC also points to various statements in the legislative history suggesting that the appraisals must include a valuation of relevant mineral rights. But as the district court aptly explained, those references most naturally apply to the Mineral Withdrawal Area, over which Resolution Copper holds no mining rights.

AMRC's appraisal arguments are really a challenge to the general mining laws. But "[d]espite much contemporary hostility to the Mining Law of 1872 and high level political pressure by influential individuals and organizations for its repeal, all repeal efforts have failed, and it remains the law." *Shumway*, 199 F.3d at 1098. Accordingly, we reject AMRC's appraisal claims.

### b. Plaintiffs are not likely to succeed on, nor have they raised serious questions regarding, their NEPA claims.

"NEPA imposes no substantive environmental obligations," but instead "is a purely procedural statute that . . . simply requires an agency to prepare an EIS." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). "Importantly, NEPA does not require the agency to weigh environmental consequences in any particular way. Rather, an agency may weigh environmental

19                                                                                    25-5185

consequences as the agency reasonably sees fit under its governing statute." *Id.* Arbitrary and capricious review of NEPA compliance involves only "confirm[ing] that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* at 180. This review "should afford substantial deference to the agency" and "should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 180, 183.

Plaintiffs argue that the FEIS here fails to comply with NEPA in six ways: (1) it fails to properly analyze the land exchange's impacts on water; (2) it fails to consider comments from other agencies; (3) it fails to consider sufficient mitigation measures; (4) it fails to consider certain expert evidence; (5) it fails to consider reasonable alternatives; and (6) it violates NEPA's length requirement. Under the deferential review the Supreme Court mandated in *Seven County*, these arguments are unlikely to succeed.

### i. Cumulative Water Impacts

AMRC first argues that the Government failed to consider "the Mine's cumulative pumping impacts on the aquifer or existing wells alongside the groundwater impacts of the 275-square mile 'Superstition Vistas' mega development." AMRC asserts that the Government only analyzed a portion of the impact and dismissed the rest as "speculative." In AMRC's view, this "conceptual" discussion of the development's water demands is insufficient to comply with NEPA.

Where there are "plain facts before" an agency, AMRC suggests, it cannot choose "to ignore [that] existing and readily available technical information."

Under the circumscribed NEPA review standard the Supreme Court set out in *Seven County*, however, the Government's water analysis as to the Superstition Vistas development suffices. First, the Court in *Seven County* expressly denied that the Government has an obligation under NEPA to consider the impact of "a housing development that might someday be built" near the operative project, even if the "effects from [that] separate project may be factually foreseeable." 605 U.S. at 187; *see also id.* at 190 (distinguishing separate, future projects from ones "interrelated and close in time and place to the project at hand," such as a "residential development next door to and built at the same time as a ski resort"). This is especially true because AMRC has made no argument nor provided any evidence suggesting that the Forest Service has regulatory authority over the Superstition Vistas development. *See id.* at 188 (discussing limited agency obligation to consider "separate projects" over which it "possesses no regulatory authority").

Second, the Government's decision to draw a line between modeling and analyzing the cumulative water impact from "the portion of Superstition Vistas that has a demonstrated source of water," and not "[o]ther portions of Superstition Vistas without demonstrated water supplies," is the type of discretionary decision about "how far to go in considering indirect environmental effects" that we must defer to

21

pursuant to *Seven County*. *Id.* at 182. This is particularly true given the agency *did* analyze the impact of the Superstition Vistas development on water supplies. While it did so qualitatively, rather than quantitatively, as Plaintiffs would prefer, the government's chosen method of analysis is entitled to substantial deference. AMRC's cumulative water NEPA claim is therefore unlikely to succeed on the merits.

### ii.  Other Agencies' Comments

In determining whether the Government has complied with NEPA, the court must generally defer to "the agency regarding what level of detail is required." *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025). "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* (quoting *Seven Cnty.*, 605 U.S. at 183). Under this deferential standard of review, AMRC's arguments regarding comments from other agencies are unlikely to succeed.

AMRC argues that the "the Forest Service failed to consider the full scope of criticisms raised by the Bureau of Land Management ('BLM') and the Arizona State Land Department ('ASLD') about the FEIS." It contends that the FEIS does not acknowledge the BLM Report at all, ignoring that agency's water-related concerns. AMRC also asserts that the FEIS fails to sufficiently address the ASLD's "actual and

specific concerns related to the Mine's direct, indirect, and cumulative socioeconomic impacts on" Arizona's State Land Trust.

As the district court explained, "it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS." But the Supreme Court has made clear that "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Seven Cnty.*, 605 U.S. at 181. Here, Chapter 4 of the FEIS contains an analysis of regional groundwater, including qualitative and quantitative analyses of water sufficiency. The Government therefore did not ignore the agencies' comments, and arguments about the relative detail it afforded particular comments must fail. AMRC's claims regarding the FEIS's treatment of the BLM and ASLD's comments are unlikely to succeed.

### iii. Mitigation Measures

AMRC's final argument fares no better. AMRC contends that the FEIS "failed to fully analyze potential mitigation measures, especially regarding the groundwater pumping and transport of water via the proposed pipelines." But as the district court correctly concluded, the Forest Service considered mitigation measures across "hundreds of pages" in the FEIS. The FEIS explicitly discusses various commenters' concerns about groundwater impacts and notes the limits of the Forest Service's

25-5185

regulatory authority.  AMRC's argument is just another example of it taking issue

with the depth of treatment the Forest Service afforded certain issues in the FEIS.

But as with AMRC's other arguments, the Supreme Court has made clear that it is

largely within the agency's discretion to determine the detail afforded to particular

issues in an EIS, especially those issues over which it lacks regulatory authority.  *See*

*Seven Cnty.*, 605 U.S. at 181, 188.  AMRC's claim regarding the FEIS's treatment

of possible mitigation measures is therefore also unlikely to succeed on the merits.

### iv.  Extra-Record Evidence

The Tribe's NEPA claim centers around two extra-record declarations

submitted in the district court.  The Tribe argues that we should consider those

declarations even though they were not part of the administrative record, and that on

the merits, the FEIS fails to address concerns raised by the declarations regarding

tailings storage and transport, acid rock damage, and hydrological concerns.

Judicial review of agency decision-making should be focused on the

administrative record.  *See Ctr. for Biological Diversity v. United States Fish &*

*Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006).  However, there are

> four exceptions to this rule, allowing extra-record materials (1) if
> necessary to determine whether the agency has considered all relevant
> factors and has explained its decision, (2) when the agency has relied
> on documents not in the record, (3) when supplementing the record is
> necessary to explain technical terms or complex subject matter, or (4)
> when plaintiffs make a showing of agency bad faith.

24

*Id.* (cleaned up). These exceptions are "narrowly construed," and the party invoking them has a "heavy burden to show that the additional materials sought are necessary to adequately review" the agency decision. *Fence Creek Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

Even assuming, without holding, that an exception applies here, the Tribe's arguments fail on the merits. The FEIS addressed each of the topics the Tribe highlights from the declarations, including tailings and pipeline safety, acid rock drainage, and hydrological concerns. Indeed, the Forest Service directly responded to comments by Plaintiffs' experts regarding the same concerns. The Tribe's arguments amount to a disagreement with the FEIS's scientific conclusions as to each of these topics. Judicial review, however, must be at its most deferential "when an agency makes . . . predictive or scientific judgments." *Seven Cnty.*, 605 U.S. at 182; *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) ("[A]n agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints."). Accordingly, the Tribe's NEPA claim is unlikely to succeed.

### v. Alternative Mining Techniques

The Lopez Plaintiffs argue that the FEIS is "deficient" because it does not analyze alternative mining methods that might preserve Oak Flat. They draw on case law explaining that the "heart" of an EIS is its effort to "study, develop, and

25-5185

describe appropriate alternatives to the proposed agency action, thus informing policymakers and the public of options that would avoid or minimize adverse effects on the environment." *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 990 (9th Cir. 2025) (cleaned up).

In determining whether an EIS has appropriately considered alternatives, we have set out a two-step process. First, we must determine "whether or not the EIS's Purpose and Need Statement was reasonable." *Id.* at 995 (cleaned up). Second, we "employ a rule of reason analysis to determine whether the agency considered an adequate range of alternatives to the proposed action." *Id.* (internal quotation marks omitted). However, "an agency need not consider an infinite range of alternatives, only reasonable or feasible ones. Nor does NEPA require a discussion of alternatives that are unlikely to be implemented or that are inconsistent with the agency's basic policy objectives." *Id.* (cleaned up). If an alternative is eliminated from detailed consideration, all the agency is required to do is to "briefly discuss the reasons for [its] elimination." 40 C.F.R. § 1502.14(a).

The Lopez Plaintiffs challenge only the adequacy of the range of alternatives the FEIS considered. They argue that the Government should have analyzed "techniques like cut-and-fill or sublevel stoping." Ultimately, as with the Tribe's NEPA claim, the heart of this claim is a disagreement with the Government's scientific conclusions as to the feasibility and appropriateness of potential alternative

25-5185

mining approaches. Even if the Forest Service's lack of regulatory authority over the eventual mine was not itself a bar to the Lopez Plaintiffs' argument, *see Seven Cnty.*, 605 U.S. at 188, the agency's approach to analyzing the alternatives is entitled to substantial deference. *See id.* at 181–82 ("[A] reviewing court must be at its most deferential" when considering an agency's "predictive and scientific judgments in assessing . . . alternatives." (internal quotation marks omitted)). The record shows that the agency adequately considered possible alternatives and reasonably rejected them due to technical and economic infeasibility. As the agency noted, if alternative techniques were used on the Oak Flat deposit, an estimated 80 percent of the copper tonnage would have to be abandoned, as it would be uneconomical to mine. This explanation is sufficient under NEPA, and under the highly deferential scheme the Supreme Court set out in *Seven County*, we must afford the agency's reasonableness determinations significant deference. Therefore, the Lopez Plaintiffs' NEPA claim based on potential mining technique alternatives is unlikely to succeed.

### vi. Page Limits

Finally, the Lopez Plaintiffs argue that the FEIS exceeds the page limit requirements established by recent amendments to NEPA under the BUILDER Act. 42 U.S.C. § 4336a(e)(1). In their view, this impeded NEPA's goals by "forcing them to digest thousands of pages of material and litigate their claims in a matter of days, without an easily comprehensible administrative record."

25-5185

We assume, without holding, that these page limits—enacted seven years after the FEIS process began—apply here.  Regardless, the Lopez Plaintiffs' claims are unlikely to succeed.  Even if the Government violated the new page limit requirement, that violation did not "materially impede[] NEPA's goals" and was therefore harmless error.  *Friends of the Inyo v. United States Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024) (internal quotation marks omitted).  Though the FEIS's length may have made it more difficult for affected parties and the public at large to digest, it was the result of a decades-long process involving countless stakeholders, comments, and analyses.  As evidenced by the various other NEPA claims Plaintiffs collectively raise in the instant case, not even at its current length does the FEIS satisfy all those parties.  Where NEPA's goal is ultimately "to inform agency decisionmaking," *Seven Cnty.*, 605 U.S. at 173, a too-thorough analysis of a highly controversial, complicated project can hardly be said to conflict with that goal.  The agency here made a reasonable judgment about the level of detail to include, balancing the need to manage the FEIS's length with the need to adequately address the various issues.  That decision is afforded "substantial deference," and courts "should not micromanage those agency choices."  *Id.* at 183.  The Lopez Plaintiffs' page limit requirement argument is therefore unlikely to succeed on the merits.

**c. The Tribe and Lopez Plaintiffs are not likely to succeed on, nor have they raised serious questions regarding, their consultation claims.**

The Tribe and Lopez Plaintiffs argue that the Government has failed to satisfy its consultation obligations under the Land Exchange Act and the NHPA. They are not likely to succeed on either point.

The Land Exchange Act sets out general requirements for the Government's consultation with impacted Native groups. Specifically, the Government must "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). Then the Government must "consult with Resolution Copper and seek to find mutually acceptable measures to" both "address the concerns of the affected Indian tribes" and "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper." *Id.* § 539p(C)(3)(B).

Section 106 of the NHPA, a more general consultation statute, similarly requires the federal government to "take into account the effect of" any government "undertaking on any historic property" and "afford the [Advisory Council on Historic Preservation (ACHP)] a reasonable opportunity to comment." 54 U.S.C. § 306108. Pursuant to the Section 106 process, the federal government "must make *a reasonable and good faith effort* to identify historic properties . . . assess the effects

29

25-5185

of the undertaking on any eligible historic properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effects." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (emphasis added) (citations omitted); *see id.* (describing Section 106 as a "stop, look, and listen" provision).

The Tribe argues that when the Government withdrew the original 2021 EIS to undertake further consultation with impacted Native groups, that was "an admission that, through March 2021, Federal Defendants had not satisfied" their consultation obligations under the Land Exchange Act. And in their view, the Government has done nothing to remedy that failure in the interim; the Tribe requested, but has not received, written responses to various documents and a draft memorandum of understanding (MOU) was never finalized. To the Tribe, any pre-2021 consultation efforts by the parties are not relevant in determining whether the Government has today satisfied its consultation obligations. Nor, the Tribe argues, do letters and emails sent while "the Forest Service, at the very same time, was negotiating a MOU to govern a future consultation" satisfy the Government's consultation obligations.

The Lopez Plaintiffs similarly argue that the Government failed to satisfy its Section 106 obligations by failing to negotiate a "programmatic agreement" with the ACHP to mitigate adverse impacts on the historic properties at issue here. When the

30                                                                                  25-5185

ACHP instead terminated the consultation process, they assert, the Government was required to respond in writing to the ACHP's final recommendations. The Government's written response, in the Lopez Plaintiffs' view, was inadequate under Section 106 because it failed to give "genuine attention" to those recommendations. *See Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999.

We find neither argument compelling. At bottom, both the Land Exchange Act's consultation provisions and Section 106 are procedural statutes like NEPA—in other words, they do not mandate any particular substantive outcome from the consultation process. *See Muckleshoot*, 177 F.3d at 805. Therefore, the Tribe and Lopez Plaintiffs cannot use these provisions to attack the ultimate outcome of the consultation process here.

What remains, then, is whether the Government's actions were "arbitrary and capricious" under the Land Exchange Act and Section 106. As the district court correctly explained, they were not. Over the course of two decades, the Government engaged in thorough consultation with the Tribe, both electronically and in person. The Tribe's attempt to discount the pre-2021 consultation efforts fails because it fails to explain how that earlier portion of the consultation process was at all deficient or irrelevant. This includes failing to cite any case law standing for the idea that re-opening a consultation process negates all pre-reopening consultation efforts. The Tribe's arguments amount to a disagreement with how the Government engaged in

31                                                                25-5185

consultation, including a belief that the consultation was not sufficiently substantive. But the record evinces a thorough consultation process that ultimately resulted in a conclusion contrary to the Tribe's hopes. That is not enough to render the consultation process "arbitrary and capricious."

The same holds true for the Section 106 consultation requirements. The Lopez Plaintiffs argue that the Government ignored the ACHP's recommendation "to assess alternative mining techniques" or "incentivize the consideration of those alternatives." But the Government's response letter explained that "[the Land Exchange Act] limits the authority the USDA will have over most elements of the proposed Resolution Copper Mine (RCM) because once the land is exchanged, the project will be almost entirely on private land." And it further elaborated in the FEIS that "[m]ining operations within the area conveyed by the Forest Service in the exchange are not subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on NFS land under the jurisdiction of the Secretary of Agriculture." The FEIS also analyzed the these proposed alternative mining techniques and dismissed them as "not appropriate for a deposit like the Resolution Copper deposit." These written materials, taken together, evince the agency's good faith effort to address possible mitigation and "demonstrate that it has read and considered" the ACHP's

32                                                              25-5185

recommendations. *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999).

Because the Government adequately fulfilled its consultation obligations under the Land Exchange Act, Plaintiffs have failed to demonstrate a likelihood of success on the merits for their consultation claims.

> **d. The Lopez Plaintiffs are not likely to succeed on, nor have they raised serious questions regarding, their religious liberty claims because they are foreclosed by precedent.**

The Lopez Plaintiffs argue that the land exchange here would violate their religious liberty, as protected by RFRA and the Free Exercise Clause. RFRA bars the federal government from "substantially burden[ing] a person's exercise of religion" unless that burden satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)–(b). And the Free Exercise Clause protects parental rights surrounding their children's religious upbringing, and more generally requires "any government action that burdens religion" to "survive strict scrutiny unless it qualifies as a 'neutral law of general applicability.'" *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990).

But this court foreclosed these arguments in *Apache Stronghold v. United States*. *See* 101 F.4th at 1044, 1051–52, 1063. The en banc court explained that pursuant to the Supreme Court's decision in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988):

> [A] disposition of government real property is not subject to strict scrutiny when it has "no tendency to coerce individuals into acting

33                                                                      25-5185

> contrary to their religious beliefs," does not "discriminate" against religious adherents, does not "penalize" them, and does not deny them "an equal share of the rights, benefits, and privileges enjoyed by other citizens."

*Apache Stronghold*, 101 F.4th at 1055 (quoting *Lyng*, 485 U.S. at 449–50, 453). The *Apache Stronghold* court held that the land transfer under the Land Exchange Act here was "indistinguishable from that in *Lyng*," and therefore was not subject to strict scrutiny under either the Free Exercise Clause or RFRA. *Id.* at 1051–52, 1056. Though the Lopez Plaintiffs detail their disagreement with the en banc court, we remain bound by the en banc court's decision. *See McBurnie v. RAC Acceptance E., LLC*, 95 F.4th 1188, 1193 (9th Cir. 2024).

Recognizing this, the Lopez Plaintiffs seek refuge in the limited exception to that rule, where en banc review is not required if "intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority." *Id.* (internal quotation marks omitted). They argue that the Supreme Court's decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), abrogated *Apache Stronghold* by clarifying the meaning of a "religious burden." In their view, *Mahmoud* stands for the proposition that the court must determine if "looking to 'the specific religious beliefs and practices asserted,' the challenged government actions pose an 'objective danger,' or 'very real threat' to the claimant's religious exercise, thus 'substantially interfer[ing]' with it." *See Mahmoud*, 606 U.S. at 549–50, 553 (internal quotation marks omitted). By contrast, the Lopez Plaintiffs argue, the *Apache Stronghold*

34

majority rejected an inquiry into the relative objective or subjective nature of an asserted interference with religious practice in favor of an inquiry focused on coercion.

But this view of *Mahmoud* does not survive scrutiny. As an initial matter, the Supreme Court itself declined to rehear its denial of certiorari in *Apache Stronghold* in light of *Mahmoud*. *See Apache Stronghold v. United States*, 2025 WL 2824572 (U.S. Oct. 6, 2025). Regardless, the Lopez Plaintiffs misrepresent the thrust of *Mahmoud* by selectively quoting from it. Their focus on the "objective danger" language ignores that *Mahmoud* centers on (1) the education context and (2) policies that directly coerce or indirectly compel behavior at odds with individual religious beliefs or practices, not involving the disposition of government property. *Mahmoud*, 606 U.S. at 546–50.

*Mahmoud* highlights the risk of "impos[ing] upon children a set of values and beliefs that are 'hostile' to their parents' religious beliefs." *Id.* at 553–54 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972)). But risks of these kinds, the Court explained, are different in nature for Free Exercise purposes than those in *Lyng*, which involved "incidental interference with an individual's spiritual activities," as opposed to coercion. *Id.* at 557 (quoting *Lyng*, 485 U.S. at 450). Because *Apache Stronghold* involved neither education nor an attempt by the government to affirmatively coerce or indirectly compel behavior at odds with the plaintiffs'

35                                                                                              25-5185

religious beliefs, it is not "clearly irreconcilable" with *Mahmoud*. *Apache Stronghold* therefore bars the Lopez Plaintiffs' identical claims here.[4]

## III.   Other Injunction Factors

Because Plaintiffs have failed to show a likelihood of success on, or even serious questions regarding, any of their claims, we need not reach the other injunction factors.   We nonetheless recognize that this land transfer will fundamentally alter the nature of the land, including destruction of those sites sacred to the Tribe, the Lopez Plaintiffs, and similarly situated Native individuals.   Despite those grave harms to Native religious practice, Congress has chosen to transfer this land, and Plaintiffs have not raised any viable challenges to that decision.

## CONCLUSION

Because Plaintiffs' claims are unlikely to succeed on the merits, we **AFFIRM** the district court's denial of Plaintiffs' request for a preliminary injunction against the land exchange and **DENY AS MOOT** their request for an injunction pending appeal, Dkt. 12.   The administrative stay currently in effect, Dkt. 19, is **DISSOLVED**.[5]

---

[4] Perhaps understanding this, the Lopez Plaintiffs also offer a version of their religious liberty arguments cast in parental-rights language.   But there is no "coercive interaction[]" here "between the State and its young residents." *Mahmoud*, 606 U.S. at 557.

[5] The motion for leave to file an amicus brief, Dkt. 44, is **GRANTED**.  The motions to file oversized briefs, Dkts. 6, 9, 17, 136, & 139, are **GRANTED**.  The motions to

---

dissolve the administrative stay, Dkts. 83 & 84; motions for an extension of time, Dkts. 90 & 91; and motions to expedite, Dkts. 164 & 166, are **DENIED AS MOOT.**